1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  JANE DOE, et al.,

4                  Plaintiffs,

5           v.                         18 Civ. 9936 (LGS)

6  THE TRUMP CORPORATION, et al.,

7                  Defendants.
                                       Conference
8  ------------------------------x
                                       New York, N.Y.
9                                      December 20, 2018
                                       11:40 a.m.
10
   Before:
11
                        HON. LORNA G. SCHOFIELD,
12
                                       District Judge
13

14                          APPEARANCES

15 KAPLAN HECKER & FINK LLP
        Attorneys for Plaintiffs
16 BY:  ROBERTA ANN KAPLAN
        JOHN C. QUINN
17      -and-
   EMERY CELLI BRINCKERHOFF & ABADY LLP
18 BY:  ANDREW G. CELLI, JR.
        MATTHEW D. BRINCKERHOFF
19
   SPEARS & IMES LLP
20      Attorneys for Defendants
   BY:  DAVID SPEARS
21      BRADLEY POLLINA
        CYNTHIA CHEN
22

23

24

25

 1            (Case called)

 2            MS. KAPLAN:  Good morning, your Honor, for the

 3   plaintiffs, Roberta Kaplan from the Kaplan Hecker firm, and I'm

 4   here with my colleague, John Quinn.

 5            MR. QUINN:  Good morning.

 6            THE COURT:  Good morning.

 7            MR. CELLI:  Good morning, your Honor.  I am Andrew

 8   Celli from Emery Celli Brinckerhoff & Abady.  I'm here with my

 9   partner, Matthew Brinckerhoff.

10            THE COURT:  Good morning.  You may be seated.

11            MR. SPEARS:  Good morning, your Honor, David Spears

12   from the law firm of Spears & Imes.  I'm here with my

13   colleagues, Brad Pollina and Cynthia Chin.

14            THE COURT:  Good morning.  You may be seated.

15            We are here for an initial conference in this case.

16   There are various things that I want to discuss.

17            First of all, thank you for your joint letter which

18   lays out the issues, I thought, well.  I would like to talk

19   about the motion to dismiss.  I know that I only have the

20   letter from the defendants.  I don't have the letter from the

21   plaintiffs.  Since it was due tomorrow, I assume you know what

22   you're putting in the letter.  I would like to hear about that.

23            And then I would like to talk about the plaintiffs'

24   motion for leave to proceed under a pseudonym.

25            Finally, I would like to talk about the motion to stay

1   discovery.

2        Why don't we just begin with a little background.  I

3   have not read the complaint.  I have read your joint letter.  I

4   have a sense of what the case is about.  But I would love to

5   hear a little bit about it and where you expect it to go.

6        MS. KAPLAN:  Your Honor, if I may, I am going to have

7   my partner, Mr. Quinn, address that.

8        MR. QUINN:  Your Honor, would you like me to take the

9   podium?

10       THE COURT:  Wherever you are more comfortable, as long

11  as you speak into a mic because the acoustics are not good.

12       MR. QUINN:  Very well, your Honor.  Thank you.

13       Briefly put, your Honor, the complaint brings a

14  putative class action on behalf of a large class.  There are

15  four representative plaintiffs who have sought the Court's

16  permission to proceed under pseudonym.

17       The allegations of the complaint, the first count of

18  the complaint or the first claim asserted is a RICO claim.

19  There are two distinct RICO theories.  One is an association in

20  fact theory involving an association comprised of the

21  defendants, as well as a number of other entities within the

22  umbrella of companies that do business under the name the Trump

23  Organization.  There is also a distinct legal enterprise theory

24  that the Trump Corporation itself operates as a RICO enterprise

25  controlled by the defendants.

1          The theory of the case fundamentally, your Honor, is

2     that the defendants, acting through this enterprise,

3     perpetrated a pattern of racketeering activity which involved

4     essentially defrauding consumers through fraudulent

5     endorsements and promotions of a series of consumer-facing

6     so-called business opportunities or training programs.

7          Effectively --

8          THE COURT:  If I can interrupt for just one minute.

9     The predicate acts are, I assume, mail fraud and wire fraud?

10         MR. QUINN:  Among other things, your Honor, that's

11    correct.

12         THE COURT:  And the others?

13         MR. QUINN:  The complaint also alleges certain

14    violations of state consumer protection and fraud loss.

15         THE COURT:  In terms of predicate acts and finding

16    underlying criminal violations.

17         MR. QUINN:  Correct.  Under the federal RICO standard,

18    the predicate acts are mail and wire fraud, your Honor.  That's

19    correct.

20         Essentially, the theory of the case is that defendants

21    were paid in secret by a series of third-party companies to

22    offer their endorsements without disclosing the payments and to

23    then make a series of false or misleading statements about the

24    nature of these businesses, the nature of the business

25    opportunities or training programs that they were offering to

1    consumers, as well as the nature of the defendants', plural,

2    own relationship with those third-party entities and the extent

3    of the defendants' own diligence and the basis for the

4    statements that they were making.

5            The common theme among all of the plaintiffs, and we

6    expect ultimately among all members of the class, was that they

7    understood from repeated and consistent messages that were

8    delivered by the defendants, acting through the enterprise and

9    through a series of mediums, they understood the defendants

10   were making a genuine endorsement.  They did not understand

11   that defendants were being paid to make that endorsement.  They

12   believed that the defendants had done extensive diligence

13   and/or had access to inside information or had a relationship

14   with these third-party businesses.

15           THE COURT:  Who actually made the endorsements or

16   false statements?

17           MR. QUINN:  The vast majority of them, your Honor,

18   were made by defendant Donald J. Trump himself, President

19   Trump, who appeared on stage at events promoting these

20   businesses, filmed promotional videos that were widely used to

21   recruit consumers.

22           THE COURT:  What did the other defendants do?

23           MR. QUINN:  The other individual defendants, your

24   Honor, were involved in two principal ways.

25           One, they also lent their own implicit endorsements

 1    appearing on television alongside the founders of some of these

 2    businesses and otherwise appearing in promotional and other

 3    materials.

 4            The second way was that they were actively involved in

 5    the operation of the enterprise.  They helped direct where

 6    funds went, negotiate contracts, secure the payments, and then

 7    maintain --

 8            THE COURT:  How do you know that?  I presume you know

 9    what your clients know, but they don't know the inner workings,

10    I presume, of the business relationship.  How do you know that?

11            MR. QUINN:  That's absolutely right, your Honor.  A

12    large portion of the complaint is based on news sources which

13    have documented some of this.  We have also been able to get

14    access to and copies of promotional materials and other

15    materials, including videos of episodes of the Celebrity

16    Apprentice, where these businesses paid to be featured, for

17    example.

18            THE COURT:  I noticed from the defendants' letter that

19    they point out that your clients all basically entered into a

20    contractual relationship with a company called ACN based on

21    these allegedly false statements and endorsements.  Is there

22    any separate action against ACN?

23            MR. QUINN:  There is no action pending, your Honor,

24    nor have we brought one.

25            The theory of this case is that the cause of the

1    plaintiffs' investments and ultimately the cause of their loss

2    was the false and misleading statements made by the defendants.

3         Each of the four plaintiffs says, and this is alleged

4    in the complaint, that they would not have made these

5    investments if not for what they believed to be a genuine

6    endorsement by the defendants acting through the enterprise,

7    and that that was the principal reason that they bought in and

8    that ultimately, as they realized the truth behind the false

9    and misleading statements that had been made, that was the

10    reason they decided to cut their losses and get out.

11         THE COURT:  What was the truth?

12         MR. QUINN:  The truth, your Honor, as far as we know,

13    that the defendants had done essentially no diligence and that

14    their statements that these things had been vetted by the

15    defendants were untrue, that the defendants did not have --

16    that the nature of their relationship with these companies was

17    not as disclosed, that the defendants had been paid handsomely,

18    sometimes to the tune of millions of dollars, for each of these

19    appearances or statements, which wasn't disclosed, and, at its

20    core, that the business opportunities and training programs did

21    not offer to these consumers the value that the defendants

22    claimed that they did.

23         THE COURT:  Are there other cases where essentially

24    someone says, this is a good idea, you should do it, and then a

25    cause of action arises as to that person?

1        MR. QUINN:  We believe there are, your Honor.  We

2   will, of course, go into this in more detail both in our

3   premotion response letter as well as in briefing.

4        One analogy, your Honor, would be some of the WorldCom

5   cases or penny stock cases where you don't necessarily go after

6   the now-bankrupt company that you were misled into investing.

7   You go after the promoter who was being secretly paid to tell

8   you that it was a good investment, despite knowing the opposite

9   to be true.  I think that's one example, your Honor, of that

10  same theory being used in a different context.

11       THE COURT:  I gather what you presume will happen or

12  hope will happen is that the motion to dismiss will be denied,

13  that discovery will proceed either before or after the decision

14  on the motion, that you will complete discovery, and then move

15  for class certification.

16       I saw in your letter that you also have the intention,

17  regardless of what happens with class certification, to

18  continue to represent your individual clients.  Is all of that

19  more or less right?

20       MR. QUINN:  Reserving all rights, your Honor, that is

21  absolutely right at present as to our expectations and

22  intentions, particularly on that last point.  We intend to

23  proceed whether or not a class is certified.

24       THE COURT:  I'll hear from the defendants.

25       MR. SPEARS:  Thank you, your Honor.

1          Your Honor, I think we have a very strong motion to

2     dismiss as to the two federal causes of action, federal

3     question causes of action, Counts One and Two, RICO, 1962(c)

4     and RICO conspiracy, 1962(D).  We just don't think the case is

5     sustainable because as to all of the claims they allege fraud

6     and so 9(b) applies to all of them.  So the requirements of

7     *Iqbal* and other similar cases, related cases about pleading for

8     particularity, apply, and they cannot meet that standard.

9          THE COURT:  And Rule 9.

10         MR. SPEARS:  And Rule 9.

11         They cannot meet that standard.  They allege that

12    without any specificity as to when or where they heard

13    Mr. Trump only.  They don't allege that any other defendant

14    ever made any statement.  They allege that Mr. Trump said he

15    loved the company, that it was a great opportunity, that it's a

16    chance to be an entrepreneur without having to put up with what

17    entrepreneurs typically have to put up with, opinion

18    statements, some puffery.  These aren't actionable statements,

19    and they have not even pleaded when the statements were made or

20    where.

21         Plaintiff Doe, Jane Doe, doesn't know when she

22    invested.  It could have been mid 2014, it could have been late

23    2014.  We just don't think there is any actionable statement --

24         THE COURT:  Let me interrupt there for just a moment.

25    In terms of false statements, I presume that that's something

1    that the plaintiffs could cure one way or another.  Are there

2    deficiencies in the complaint that are essentially uncurable as

3    a matter of law?

4         MR. SPEARS:  I think that the failure to plead loss

5    causation is uncurable as a matter of law.  They say Mr. Trump

6    said this is a great opportunity and they relied on that.  They

7    may not have said that they relied on it, but that that was

8    important to them.

9         Their failure to be successful at what they undertook

10   with ACN, there may have been a multitude of causes for that.

11   The fact that they would prove it wasn't a great opportunity

12   and that that was the reason for their loss, we don't think

13   loss causation can be cured.

14        THE COURT:  What about the statement or assertion I

15   just heard, which is that each of the plaintiffs will say I

16   would never have invested, I would not have gone near this

17   thing if I had not heard endorsements?

18        MR. SPEARS:  His endorsement still needs to be an

19   actionable misstatement or an actionable omission.  They are

20   incredibly vague about what they remember him saying to them.

21   I hear your Honor about, they can presumably cure that, but I'm

22   not just cynical enough to believe that they will be dismissed

23   on Rule 9(b) grounds and then come back and, all of a sudden,

24   remember very specifically something he said that was an

25   actionable misstatement or omission.

1    They were exposed to a variety of materials, a variety

2    of representations about ACN by all sorts of people.  Ms. Doe

3    says that Mr. Loe got her involved and was enthusiastic about

4    it.  In the absence of any statement --

5    THE COURT:  Just a factual question then.  Are you

6    saying that there were endorsements by all sorts of people, not

7    just the Trumps?

8    MR. SPEARS:  I don't know about endorsements, but

9    there were statements made to them in ACN promotional materials

10   by the people who actually recruited them, the ACN IBOs, they

11   were called, who actually recruited them.

12   THE COURT:  What does that stand for?

13   MR. SPEARS:  I beg your pardon?

14   THE COURT:  IBO, what does that stand for?

15   MR. SPEARS:  Independent business owner.

16   THE COURT:  These are basically the plaintiffs.

17   MR. SPEARS:  I beg your pardon?

18   THE COURT:  The plaintiffs were all IBOs?

19   MR. SPEARS:  Yes.

20   Before they became involved, they were exposed to all

21   sorts of representations about the business, what it involved.

22   Mr. Trump's statements were typically -- at a handful of ACN

23   events he said on stage he was interviewed by somebody, and he

24   talked about his business and his failures and his own

25   bankruptcy and how much he learned from failure and how

1   everyone can learn from failure.  He told anecdotes about his

2   life in business, and, coincidently, he said he loved the

3   founders of ACN.  They were great guys.  They built a great

4   company.  He loved their technology.

5           THE COURT:  If I could interrupt again one second.  I

6   noticed in your letter you said that it was not concealed that

7   the defendants were paid for their endorsements.

8           MR. SPEARS:  Correct.

9           THE COURT:  What are the facts around that?

10          MR. SPEARS:  There are multiple facts, your Honor.

11  Mr. Trump, in one of his interviews that was published in a

12  magazine, he said that he had just entered into a new contract

13  with ACN relating to his endorsements for the company.

14  Plaintiffs say in their complaint, actually allege that when he

15  endorsed the company, they assumed any serious businessman

16  would do due diligence on a company before it endorsed it.

17          Any reasonable plaintiff would assume that when

18  Mr. Trump is talking about renegotiating his contract with ACN,

19  he is talking about being paid money.

20          And there were other instances where he made similar

21  statements or ACN made statements that clearly implied that he

22  was being paid money pursuant to a contractual relationship

23  with them.  To the extent that he didn't come out and say --

24          THE COURT:  I'm being paid for this statement.  To the

25  extent he did not say that, right?

1          MR. SPEARS:  To the extent he did not come out and

2     say, I am not being paid for the statement.  He did not have a

3     fiduciary relationship with these plaintiffs, and he had no

4     obligation to tell people something like he had a fiduciary

5     relationship.  The question is whether he made a half truth, he

6     made an omission that was a half truth.

7          As I said, your Honor, the complaint does not allege a

8     single allegation that any other defendant ever said anything

9     that was heard by any plaintiff.  They never made any

10    representation about ACN that could have been actionable that

11    could be false.  There is just nothing.

12         THE COURT:  I'll just stop you there, if that's all

13    right.

14         I will look forward to reading more in your briefs.

15    But your letter was very interesting and that there is a

16    serious motion to dismiss here.

17         Of course, I have not heard from the plaintiffs.  They

18    have not submitted their letter.  If you would like to say

19    something in response, I'm happy to hear it.

20         MR. SPEARS:  Your Honor, not to fight the Court, I

21    just want to say one sentence.

22         THE COURT:  That's fine.

23         MR. SPEARS:  On the state law claims there is no

24    diversity because they don't meet the jurisdictional amount,

25    and we think the same is true for the CAFA claim.  Thank you.

 1              THE COURT:  I saw that in your letter.  Thank you.

 2              MR. QUINN:  Just to make a couple of brief points,

 3     your Honor.

 4              First, on that last point, and again we will set this

 5     out more thoroughly in our letter, but our view is that the

 6     defendants' argument with respect to the diversity and CAFA

 7     issues is unduly narrow and unduly limited to economic damages,

 8     where there are bases to include other forms of damages in that

 9     evaluation.

10              THE COURT:  What are the other kinds of damages?

11              MR. QUINN:  Your Honor, punitive damages, for example,

12     can count towards the threshold.  On CAFA we think there is a

13     strong basis here to believe that many thousands of people

14     suffered the kind of damages that the plaintiffs alleged in the

15     complaint.

16              THE COURT:  What are ballpark damages for a single

17     plaintiff here?

18              MR. QUINN:  At least $500, which was the cost to buy

19     in to the ACN business opportunity, and some of the plaintiffs

20     here, and we expect many of the class members, also suffered

21     thousands of dollars in losses as they pursued the investment

22     on this false hope, and none of that was ultimately recouped.

23     At least 500 into the thousands per class member.

24              THE COURT:  What about the individual plaintiffs.

25     About what was the quantum of their damages?

1        MR. QUINN:  There is a range.  Each of them has at

2   least $500 in damages.

3        Jane Doe, for example, bought in with the $500,

4   followed up again the next year with another $100 investment

5   and took multiple trips to multiple conventions, each time

6   being told that there was a good chance Mr. Trump would be

7   there.  She might have an opportunity to hear from him

8   directly.  She might have an opportunity to get the benefit of

9   his supposed business acumen.  And all of that didn't pan out.

10  She will testify that she was sharing a hotel room with four

11  other women and one of them was sleeping on a balcony.  They

12  were pouring every penny that they had into this on the word of

13  the defendants, and they lost all of it.

14       If I can make a couple of points about the legal

15  argument.  As to the specificity of the pleadings,

16  respectfully, the complaint is replete with detailed specifics,

17  events, dates, specific videos, Celebrity Apprentice episodes.

18  There is great specificity and a tremendous number of

19  quotations.  A substantial portion of the complaint is --

20       THE COURT:  What about specificity as to the other two

21  defendants?

22       MR. QUINN:  There, your Honor, again, the primary way

23  in which the other individual defendants were involved was in

24  the operation of the enterprise itself, and there is

25  specificity there as to their positions at various entities

1    within it as well as testimony from a former chief financial

2    officer of the Trump Organization who explains that these

3    individual defendants were among a very small group of people

4    who had the authority to sign checks over various constituent

5    entities within the enterprise.  And there are other facts that

6    we continue to try to develop, your Honor, on this.

7            As to the plaintiffs themselves, also each plaintiff,

8    we do allege where they heard the Trump endorsement, what they

9    understood the message to be.  Now, it is the case that in not

10   each of those instances are we able to quote precisely what

11   they heard.  We expect discovery will give us those specifics.

12   But we have alleged all the specifics we can, and in many

13   instances that includes describing what hotel they were sitting

14   at in what month of what year when they saw which video and

15   what they understood defendant President Trump to be saying.

16           On that point, your Honor, I would refer the Court,

17   respectfully, to the Second Circuit's decision in *United States*

18   *v. Autuori*, which is 212 F.3d 105.  This is a Second Circuit

19   decision from 2000, a criminal case, where the Court held there

20   was sufficient evidence to convict an accountant for mail and

21   wire fraud based on statements that financial forecasts were,

22   quote, good and, quote, credible, that the project was, quote,

23   safe, that he, quote, stood behind the numbers.

24           Defendants are purporting to make a puffery argument

25   that these statements are more sufficient in the context of a

criminal case, and of course we are here in a civil case.

       Briefly, your Honor, on loss causation, again, there
are express allegations in the complaint, and I would refer the
Court to paragraph 19, where we explain that each of these
plaintiffs would not have bought in but for the defendants'
statement and that it was precisely the untruth in the
defendants' statement that got them in and.  Once they learned
the truth, that was when they were able to cut their losses and
get out.  We respectfully argue that that satisfies both but
for --

       THE COURT:  How did they learn the truth?

       MR. QUINN:  Their own experience, primarily, really
from suffering this for two or more years and realizing that
they simply couldn't make money and they couldn't in good
conscience try to recruit others into this scheme.

       Very briefly, as to whether a reasonable consumer
would assume that Mr. Trump was being paid, first of all, it's
obviously a question of fact, in our view, your Honor.

       Moreover, and again this is alleged in detail in the
complaint, the defendant said over and over again that his
endorsement was not for any money.  In one of the interviews
that Mr. Spears referred to, he was asked:  What makes you keep
coming back to support this company?  Surely it's not the
money.  He said:  No.  What a great company this is.  I believe
in this company.

1          Those kind of statements, your Honor, are so

2    profoundly misleading to someone, particularly someone

3    economically vulnerable, sitting on their couch, watching a

4    YouTube video, trying to think, how can I get ahead?  How can I

5    start a business?  They looked up to the president, not the

6    then president, but they looked up to Mr. Trump.

7          Those kinds of statements that he wasn't there for any

8    money were tremendously misleading, and they create a duty

9    under Second Circuit law to make the disclosure and to make

10   clear what's really going on, and that wasn't done here, as I

11   think defendants have practically conceded.

12         I would also add that the FTC itself has over and over

13   explained that the effect that celebrity endorsements can have

14   and has required really clear disclosure, and that disclosure

15   was totally lacking here.

16         With that, your Honor, unless the Court has any

17   further questions, we look forward to putting in our letter

18   tomorrow.

19         THE COURT:  I look forward to your letter as well as

20   your brief.  I don't think we need to have another -- that's

21   fine.

22         You don't need to respond because we don't even have a

23   response to the premotion letter.  We don't have a motion.  I

24   just wanted to hear more about it from both sides.

25         The schedule that's been proposed, is that a joint

1   proposal?

2          MR. SPEARS:  Yes, your Honor.

3          THE COURT:  I'm going to trim it just a little bit for

4   two reasons:  One is, I like to get papers filed within 60

5   days; and the other is, I think that it would be better for all

6   concerned if your papers were due on a Friday instead of a

7   Monday.  It means you will not spend the weekend in the office

8   doing it.  The other side may want to peruse it over the

9   weekend.

10         The filing date of January 14 is fine.  Why don't we

11  make the response date February 22.

12         Let's say March 8 for a reply.

13         I'll do a scheduling order so there is no question on

14  what the dates are.  With regard to that, as well as anything

15  else, if I say something and I issue an order and they are

16  inconsistent, please follow the written order.

17         That, I think, is enough said about the motion to

18  dismiss.

19         What I'd like to talk about next is the motion for

20  leave to proceed under pseudonyms.  That is a motion that is

21  fully briefed.  It was filed at the same time as the complaint.

22  I have reviewed your papers.

23         I have just one question.  I know the plaintiffs have

24  tried to talk to the defendants about this, have offered to

25  proceed on a lawyers'-eyes-only basis.  There essentially have

1    been no discussions.

2          Mr. Spears, you want to tell me about that.

3          MR. SPEARS:  Sure.  We discussed this in a telephone

4    call in December.  I believe we put that in the joint

5    submission that was made.  Plaintiffs raised it.  We told them

6    we weren't interested in it.  We told them why.

7          There has only been one proposal made and that is

8    counsel's eyes only.  The individual defendants can't see it

9    and presumably no one else can see it.  That doesn't work for

10   us because we can't take effective discovery without being able

11   to share the information with our clients.

12         THE COURT:  Why is that?  The three individual

13   defendants, what do they need to know in order to take

14   discovery?

15         MR. SPEARS:  Because one important thing we would do,

16   your Honor, as a first step in investigating is try to

17   determine if there have been any interactions with any of those

18   individuals in the past, whether there have been any electronic

19   communications with those individuals, whether there have

20   been --

21         THE COURT:  I don't think there is any allegation that

22   there has been any direct contact, at least that the defendants

23   would be aware of.

24         MR. SPEARS:  Your Honor, there could have been

25   interactions at a Trump enterprise, job applications.

1          THE COURT:  Just to be clear, we are talking about, as

2     I understand it, a mother of three who works in a large retail

3     store, a hospice worker, a delivery food driver, I forget who

4     the fourth one is.  These are, I presume, not people who the

5     Trumps are going to know and remember.

6          MR. SPEARS:  They may not know and remember them, but

7     there may have been a record created somewhere of bias on their

8     parts.

9          THE COURT:  Give me another reason.  Is there another

10    reason?

11         MR. SPEARS:  Yes.  We would exhaustively check social

12    media to see if there is any indication of bias on the part of

13    these people.

14         THE COURT:  You can still do that without telling your

15    clients what the names are.

16         MR. SPEARS:  Your Honor, we represent individuals.

17    It's important to discuss what you find to get feedback, to get

18    ideas about places to look, things to do.  We don't presume to

19    do things on behalf of our clients without getting

20    authorization and getting feedback and working jointly.

21         Another thing we would want to do that's critically

22    important is reach out to ACN and say, here are four names.

23    Please give us everything you have with regard to your

24    interactions with these people.

25         THE COURT:  You can still do that without your clients

1    knowing the people's names.

2          MR. SPEARS:  That's not clear to me.  Once we start

3    getting into third parties, I guess you'd have a protective

4    order or confidentiality agreement with them.

5          But we would also want to take discovery potentially

6    from family members and from friends.  The plaintiffs may have

7    said things to other people around him about why they were

8    making a decision like this.  It may be very important.

9          THE COURT:  Let me reframe the question.  Is there any

10   reason why you would be prejudiced if I granted the motion at

11   least until my decision on the motion to dismiss?  Presumably,

12   this case has a long life.

13         MR. SPEARS:  And discovery was going on?

14         THE COURT:  There are two alternatives.  In one

15   scenario, yes; in one scenario, no.

16         MR. SPEARS:  Your Honor, if you did not order

17   plaintiffs to refile with their own names in it and discovery

18   was stayed, I'd have to think about it as any potential

19   prejudice to defendants would be drastically reduced.  If we

20   are in discovery, they say they want a six-month discovery

21   period, we would need the names immediately.  We have work to

22   do.  All of that would take time.  ACN is not is going to be

23   able to come up with this stuff overnight.  If there were a

24   continuation of the present status while discovery is going on,

25   we would suffer prejudice every day.

1          That's our position, your Honor.

2          THE COURT:  If discovery were going on.  I understand

3    that.

4          I'll hear from the plaintiffs.

5          MS. KAPLAN:  Your Honor, I think I can be brief, given

6    the issues that you raised.

7          With respect to the offer to meet and confer on this,

8    as your Honor obviously knows, negotiation is a two-way street.

9    We would have been happy to talk about other alternatives, but

10   Mr. Spears made it very clear that he wasn't willing to talk to

11   us about it.

12         As we made very clear in our papers, the main concern

13   that our clients have is that their names not be publicized in

14   a way that these very marginalized, quite poor people face

15   threats, face doxing, face things that unfortunately today

16   happen.

17         Your Honor, I spent last night and this morning

18   reading every case in this area.  To be honest with you, there

19   isn't a case directly on point because we have never been in

20   this situation before in which plaintiffs face this risk and

21   they can't even deny that.

22         One, we would certainly be willing to give it to

23   plaintiffs' counsel on an attorneys'-eyes-only basis.  We are

24   willing to talk about other things.  It's the public nature of

25   it that we are concerned about.  Yeah.  I'm here.

1          THE COURT:  What if there were an agreement that it

2     were attorneys' eyes only and they could share it with their

3     clients, but a protective order so that the clients couldn't

4     disclose it?

5          MS. KAPLAN:  I think we would be amenable to doing

6     something like that, your Honor.  In fact, the one question

7     Mr. Spears asked me is:  Well, it's going to be a mess with

8     filings.  How are we going to deal with filings?  I said:  For

9     now we just use the pseudonyms for filings.  You will know

10    which pseudonym translates to which person, so there shouldn't

11    be any kind of undue burden in the clerk's office, but we would

12    certainly be amenable to something like that.  That really is

13    our concern here, is protecting these people.

14          Two, as your Honor pointed out, these are not

15    situations like in other cases and some of the other

16    pseudonymous cases where the plaintiffs are alleging they had

17    any direct interaction with Mr. Trump.  And you yourself

18    pointed it out, they are either watching a video or they are

19    sitting at almost a religious-style convention and hearing him

20    speak.  None of them alleged they had any one-on-one

21    conversations with him.

22          With respect to the subpoenas, because we very much

23    want to get discovery ongoing, as your Honor appreciates, there

24    are ways to deal with that with confidentiality orders and

25    protective orders.  We very much want discovery to happen, but

1    even if your Honor decides it should wait, we really want to

2    make sure ACN is preserving its documents immediately, and so

3    something needs to happen either by way of subpoena or at least

4    a document-preservation subpoena with respect to ACN, because

5    right now they are under no duty to preserve.

6            THE COURT:  They are under a duty to preserve, but

7    perhaps don't have as clear a notice as they could have.

8            MS. KAPLAN:  Exactly, your Honor.  Thank you.

9            THE COURT:  I am prepared to rule on the motion.

10           Plaintiffs have filed a motion for leave to proceed

11   under pseudonyms.  The complaint is filed under pseudonyms.

12           Federal Rule of Civil Procedure 10(a) provides that

13   "the title of the complaint must name all the parties."

14   However, it is also clear that there are exceptions, although

15   the bar is fairly high.  The case I'm referring to is *Sealed*

16   *Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188-89 (2d Cir.

17   2008).  I find that plaintiffs have met their burden of showing

18   that they should be permitted to proceed under pseudonyms at

19   least until the motion to dismiss is decided, and we will talk

20   about discovery in a minute.

21           There are several factors that the case I referenced

22   identified as relevant to the inquiry, and I will discuss the

23   factors that I think tip the balance in favor of allowing

24   plaintiffs to proceed anonymously, at least for a relatively

25   brief period.

1       The two factors that weigh most heavily in favor of

2   plaintiffs are whether identification poses a risk of

3   retaliatory, physical, or mental harm and whether

4   identification presents other harms.

5       Plaintiffs fear that divulging their entities will put

6   them at a substantial risk of harm.  At this early stage in the

7   litigation I cannot conclude that those fears are unfounded

8   and, put differently, I find that the plaintiffs have met their

9   burden of showing that they face at least risks of harm.

10      Plaintiff cited consistent pattern of past conduct

11  that gives rise to a reasonable inference that they may suffer

12  harm as a result of being identified in this action.

13      Defendants argue that any fear of retaliation is

14  speculative and know that this case has not yet drawn any

15  comments from the defendants.

16      But these arguments, I'm afraid, miss the point.  What

17  plaintiffs fear is some future conduct of the defendants and

18  their supporters.  Past conduct can give rise to some

19  reasonable inference of future retaliation, but also the fact

20  that a particular defendant has not yet commented publicly

21  doesn't mean that that won't happen in the future.

22      Defendants also argue that plaintiffs' concerns must

23  be particularized.  Whether or not this is a correct statement

24  of the law, plaintiffs here have offered particularized reasons

25  in their briefing papers why revealing their identities would

1   put them at risk.  The case has garnered considerable media

2   attention and involves criticisms of defendants and their

3   honesty and integrity.  Plaintiffs have cited ample evidence of

4   retaliation and other harms in other cases in similar

5   circumstances, which is sufficient to meet their burden.

6          Finally, the manner in which the president has used

7   his position and platform to affect the course of pending court

8   cases, as Ms. Kaplan said, is really without precedent.

9   Whether instigated by him or by his supporters, the harms at

10  issue here are not hypothetical.  They are real, significant,

11  and present an unwarranted obstacle to those who would seek to

12  vindicate their rights in federal court.

13         I understand that there is a right and a need, if we

14  are going to conduct discovery, for there to be some

15  information available to the defendants, but I believe that in

16  light of all of these considerations, the second factor weighs

17  strongly in favor of granting the motion.

18         Let me discuss briefly the other factors.  One factor

19  is possible prejudice to the defendants.  I find that that

20  weighs in favor of granting the motion.

21         The next step, as we have been talking about, is a

22  motion to dismiss, and I don't believe it's necessary to know

23  the identities of the plaintiffs for you to put forward the

24  arguments that defendants have proposed.

25         Another factor is whether the plaintiffs' identities

1    have been kept confidential.  That weighs in favor of granting

2    the motion, and I would just say that the issue here is really,

3    have their identities been kept secret.  The answer is yes.

4    But once that information is out of the bag, so to speak, there

5    is no way to remedy it.  There is no way to undo it.  Given

6    that factor, I think, also, at least briefly allowing the case

7    to proceed anonymously is warranted.

8         The factor of any public interest in the disclosure

9    also weighs in favor of granting the motion.  Although there

10   are important public aspects to this case, the public interest

11   in knowing the specific identity of the named plaintiffs or the

12   class members they would represent is minimal.

13        Defendants argue that if plaintiffs are allowed to

14   proceed under pseudonyms "they would be able to indulge their

15   worst instincts in the way they litigate this case."

16        This is wholly speculative.  There is nothing that I

17   have seen, at least in the papers so far and the parties'

18   conduct to date, that would support that, and I frankly don't

19   accept that knowing the name of the hospice worker, the food

20   delivery driver, or the other named plaintiffs will affect the

21   course of this litigation.

22        The final factor that weighs in favor of plaintiffs is

23   that there is no alternative mechanism for protecting their

24   confidentiality.

25        Frankly, Mr. Spears, I understand why you would not

1    want to proceed on a lawyers'-eyes-only basis, effectively

2    being forced to keep secrets from your own clients, and

3    particularly in this setting, and there are not any other good

4    means to protect the plaintiffs' identities which are at issue

5    here.

6          For those reasons, plaintiffs' motion for leave to

7    proceed under pseudonyms is temporarily granted under

8    adjudication of the motion to dismiss.

9          If the case survives, plaintiffs may renew the motion

10   at that time.

11         MS. KAPLAN:  Thank you, your Honor.

12         THE COURT:  That brings us to the issue of discovery.

13   What I heard Mr. Spears saying is that he believes that he

14   would be dramatically prejudiced if discovery were to go

15   forward.

16         Frankly, as I was thinking about this, and I'll hear

17   from you again, Ms. Kaplan, on this, the reason I want to hear

18   from Ms. Kaplan is I am inclined to stay discovery.  And the

19   reason is that if discovery were to go forward, I would have

20   two concerns.  One is that it would be largely unilateral

21   discovery, meaning plaintiffs will be getting everything from

22   the defendants, but not much information going the other way.

23   And I'm also frankly concerned that once we start disclosing

24   people's names that the cat does get out of the bag, so to

25   speak, and then we are in a situation that I think the

1    plaintiffs did not want and events could get ahead of us.

2    Ms. Kaplan, do you want to be heard on that?

3    MS. KAPLAN:  Yes, your Honor.  I get to be a plaintiff

4    in this case.  I am not used to in my career being a plaintiff

5    and plaintiffs, as your Honor knows, always want discovery.

6    We understand the concerns that your Honor raised, and

7    I think our main concern, particularly the interplay between

8    the pseudonymous issue and discovery, I was actually concerned

9    about that this morning as I was thinking about this.

10    I think the main issue from our perspective,

11    particularly with the tightened schedule on the motion to

12    dismiss, I think our main concern is third parties.

13    In the *Emoluments* case in Maryland -- we can get you

14    the order -- the Court there stayed discovery but allowed

15    document preservation subpoenas to be served on third parties.

16    I think if your Honor will permit that, that's our main concern

17    at this point.  We know that the parties aren't going to

18    spoliate any documents, but we are concerned about ACN and the

19    principals.

20    If your Honor would permit that, I think that would be

21    a good compromise.

22    THE COURT:  I will permit that.  What I'd like you to

23    do is confer with defendants, see if you can agree on a

24    proposed form of order, and then send it to me.  Probably the

25    sooner the better.  If you could send me a proposed form of

1  order by the close of business tomorrow, I will try to get it

2  out quickly.

3           MS. KAPLAN:  Absolutely, your Honor.

4           THE COURT:  Is there anything else we need to discuss

5  today?

6           One thing I will say.  I have individual rules.  They

7  talk about filing motions.  They have page limits.  I talk

8  about courtesy copies, all those sorts of things that will be

9  useful for you to know.  So please take a look at my individual

10  rules.

11          Anything else?

12          MR. SPEARS:  Your Honor, you just reminded me of one

13  additional thing.

14          We would like to have up to 35 pages on our motion to

15  dismiss.  The complaint is 160 pages long, has 450 allegations.

16          THE COURT:  But you want to say that it doesn't say

17  anything, so how much would it take to do that?

18          MR. SPEARS:  I want to say that none of the dozens of

19  factual statements they attribute to Mr. Trump in there amount

20  to an actionable statement in a fraud case.

21          THE COURT:  Let's do this:  30, 30, and 12.

22          MR. SPEARS:  Thank you, your Honor.

23          MS. KAPLAN:  Deal, your Honor.

24          THE COURT:  We are adjourned.

25          (Adjourned)