**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

JANE DOE, LUKE LOE, RICHARD ROE, and MARY     :
MOE, individually and on behalf of all others similarly     :
situated,     :
    :
            *Plaintiffs,*     :
    :    No. 1:18-cv-09936 (LGS)
       v.     :
    :
THE TRUMP CORPORATION, DONALD J. TRUMP, in   :
his personal capacity, DONALD TRUMP, JR., ERIC     :
TRUMP, and IVANKA TRUMP,     :
    :
            *Defendants.*     :
    :
------------------------------------------------------------------------X

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Joanna C. Hendon
Cynthia Chen
Bradley Pollina
SPEARS & IMES LLP
51 Madison Avenue
New York, New York  10010
Tel:  (212) 213-6996

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................. 1

RELEVANT FACTS ........................................................................ 4

    A.    The ACN Business Opportunity .................................................. 4

    B.    Mr. Trump's Relationship With ACN ............................................ 7

        1.    Mr. Trump's Video Endorsement of ACN ..................................... 7

        2.    Mr. Trump's Personal Appearances ............................................ 8

        3.    *The Celebrity Apprentice* ....................................................... 11

    C.    Plaintiffs Fail to Recoup Their Investments .................................. 12

ARGUMENT ............................................................................... 12

    I.    PLAINTIFFS FAIL TO STATE A RICO CLAIM BECAUSE
        THEY FAIL TO ALLEGE MAIL OR WIRE FRAUD ........................... 12

        A.    Plaintiffs Fail to Particularize Any Allegedly Fraudulent
            Statement by Any Defendant ............................................. 13

            1.    The Applicable Legal Standard ....................................... 13

                a.    Opinion Statements Generally are not
                    Actionable ........................................................... 14

                b.    "Puffery" is Immaterial as a Matter of Law ........... 15

            2.    Discussion .................................................................. 16

                a.    Plaintiffs Fail to Particularize a Fraudulent
                    Statement by Any Defendant ................................. 16

                  b.    Plaintiffs Fail to Particularize Misconduct of
                    Any Kind by The Trump Corporation or
                    Mr. Trump's Children ........................................... 20

        c.      Plaintiffs Fail to Allege Fraud by Omission ..........21

        d.      Plaintiffs Fail to Allege Fraud by "Half Truths" ...21

    B.    Plaintiffs Fail to Plead Loss Causation ..........................................22

    C.    Plaintiffs Fail to Allege a Scheme That Contemplated Economic Harm or That Defendants Willfully Intended to Inflict Such Harm......................................................................24

II.     PLAINTIFFS FAIL TO PLEAD AN "ASSOCIATION IN FACT" RICO ENTERPRISE ..................................................................26

III.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS UNDER 28 U.S.C. §§ 1332 (A) OR (D) ................................................................27

CONCLUSION......................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005) ................................................................................. 14 n. 4

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ................................................................................. 22, 23 n. 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 26, 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 23

*Blockbuster, Inc. v. Galeno*,
    472 F.3d 53 (2d Cir. 2006) ................................................................................. 28

*Bortz v. Noon*,
    556 Pa. 489 (1999) ................................................................................. 19 n. 6

*Boyle v. United States*,
    556 U.S. 938 (2009) ................................................................................. 26

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
    547 F.3d 115 (2d Cir. 2008) ................................................................................. 14

*Chan v. Big Geyser, Inc.*,
    2018 WL 4168967 (S.D.N.Y. Aug. 30, 2018) ................................................................................. 20

*Chiarella v. United States*,
    445 U.S. 222 (1980) ................................................................................. 21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ................................................................................. 15

*Colgan v. Leatherman Tool Grp., Inc.*,
    135 Cal. App. 4th 663 (2006) ................................................................................. 19 n. 6

*Cruz v. FXDirectDealer, LLC*,
    720 F.3d 115 (2d Cir. 2013) ................................................................................. 26

*D. Penguin Bros. Ltd. v. City Nat. Bank*,
    587 F. App'x 663 (2d Cir. 2014) ................................................................................. 26

*DiFolco v. MSNBC Cable L.L.C.*,
　　622 F.3d 104 (2d Cir. 2010).............................................................. 6 n. 2, 8 n. 3

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
　　822 F.2d 1242 (2d Cir. 1987)........................................................................... 20

*ECA & Local 34 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
　　553 F.3d 187 (2d Cir. 2009)............................................................................ 15

*Empire Merchants, LLC v. Reliable Churchill LLP*,
　　902 F.3d 132 (2d Cir. 2018)............................................................ 22, 23 n. 9

*Fait v. Regions Fin. Corp.*,
　　655 F.3d 105 (2d Cir. 2011)............................................................................ 14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
　　783 F.3d 395 (2d Cir. 2015)................................................................... 14 n. 4

*Gilman v. BHC Sec., Inc.*,
　　104 F.3d 1418 (2d Cir. 1997)......................................................................... 27

*Hirsch v. Arthur Andersen & Co.*,
　　72 F.3d 1085 (2d Cir. 1995)................................................................... 17 n. 5

*I. Meyer Pincus & Assocs v. Oppenheimer & Co.*,
　　936 F.2d 759 (2d Cir. 1991)........................................................................... 21

*In re Aetna, Inc. v. Sec. Litig.*,
　　617 F.3d 272 (3d Cir. 2010)........................................................................... 16

*In re Donald J. Trump Sec. Litig.-Taj Mahal Litig.*,
　　7 F.3d 357 (3d Cir. 1993).......................................................................... 21, 22

*In re Gen. Motors LLC Ignition Switch Litig.*,
　　257 F. Supp 3d 372 (S.D.N.Y. 2017).................................................... 14 n. 4

*In re Salomon Analyst AT&T Litig.*,
　　350 F. Supp 2d 455 (S.D.N.Y. 2004)........................................ 14, 17, 24, 25

*Kearns v. Ford Motor Co.*,
　　567 F.3d 1120 (9th Cir. 2009) ............................................................... 14 n. 4

*Kramer v. Unitas*,
　　831 F.2d 994 (11th Cir. 1987) ...................................................................... 19

*Laro, Inc. v. Chase Manhattan Bank*,
    866 F. Supp. 132 (S.D.N.Y. 1994) ................................................................................. 25

*Lasker v. New York State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) .................................................................................... 16, 17

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) .......................................................................................... 14

*Lloyd v. Gen. Motors Corp.*,
    397 Md. 108 (2007) ............................................................................................. 19 n. 6

*Lo v. AT&T Servs., Inc.*,
    2018 WL 587322 (D. Conn. Jan. 29, 2018) .................................................................. 29

*Lynn v. McCormick*,
    2017 WL 6507112 (S.D.N.Y. Dec. 18, 2017) ............................................................... 26

*Mallgren v. Microsoft Corp.*,
    975 F. Supp. 2d 451 (S.D.N.Y. 2013) .......................................................................... 28

*Martens Chevrolet, Inc. v. Seney*,
    292 Md. 328 (1982) ............................................................................................. 19 n. 6

*McBrearty v. Vanguard Grp, Inc.*,
    2009 WL 875220 (S.D.N.Y. Apr. 2, 2009) .............................................................. 23 n. 9

*McKell v. Washington Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) ........................................................................... 19 n. 6

*Moore v. Paine Webber*,
    189 F.3d 165 (2d Cir. 1999) .......................................................................................... 22

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ............................................................................... 6 n. 2

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018) .......................................................................... 16

*Porreco v. Porreco*,
    571 Pa. 61 (2002) ............................................................................................... 19 n. 6

*Radcliffe v. Wright*,
    2018 WL 3187338 (S.D.N.Y. June 28, 2018) ............................................................... 27

*Robinson Helicopter Co. v. Dana Corp.*,
    34 Cal. 4th 979 (2004) ................................................................. 19 n. 6

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................... 21

*Sanchez v. ASA Coll., Inc.*,
    2015 WL 3540836 (S.D.N.Y. June 5, 2015) ................................... 16

*Segal v. Bitar*,
    2012 WL 273609 (S.D.N.Y. Jan. 30, 2012) ............................. 23 n. 9

*Shamsian v. Atl. Richfield Co.*,
    107 Cal. App. 4th 967 (2003) ................................................. 19 n. 6

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir.1994).......................................................... 25

*Snyder v. Harris*,
    394 U.S. 332 (1969)..................................................................... 27

*Spaulding v. Wells Fargo Bank, N.A.*,
    714 F.3d 769 (4th Cir. 2013) .................................................. 14 n. 4

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008).......................................................... 14

*Stuto v. Fleishman*,
    164 F.3d 820 (2d Cir. 1999)...................................................... 8 n. 3

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)..................................................................... 15

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000)............................................... 18, 19, 21

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015).......................................................... 13

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013).......................................................... 15

*United States v. Carlo*,
    507 F.3d 799 (2d Cir. 2007).......................................................... 23

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)...........................................................................24

*United States ex rel O'Donnell v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016)...........................................................................15

*United States v. Gabriel*,
    125 F.3d 89 (2d Cir. 1997)........................................................................23, 25

*United States v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016)...........................................................................13

*United States v. Litvak*,
    889 F.3d 56 (2d Cir. 2018).............................................................................15

*United States v. Males*,
    459 F.3d 154 (2d Cir. 2006)...........................................................................24

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994)...........................................................................24

*United States v. Rybicki*,
    354 F.3d 124 (2d Cir. 2003)...........................................................................15

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987)........................................................................24, 25

*United States v. Szur*,
    289 F.3d 200 (2d Cir. 2002)...........................................................................21

*Valente v. Garrison from Harrison LLC*,
    2016 WL 126375 (E.D.N.Y. Jan. 11, 2016) ...................................................28

*Virginia Bankshares, Inc. v. Sandberg*,
    503 U.S. 1083 (1991)....................................................................................21

*Weir v. Cenlar FSB*,
    2018 WL 3443173 (S.D.N.Y. July 17, 2018) .................................................29

*Weisman v. Connors*,
    312 Md., 428 (1988) ...............................................................................19 n. 6

*Williams v. Affinion Grp., LLC*,
    889 F.3d 116 (2d Cir. 2018)................................................................13, 14, 17

*Wood v. Maguire Automotive, LLC*,
  508 F. App'x 65 (2d Cir. 2013) ...................................................................... 28

*Yocca v. Pittsburgh Steelers Sports, Inc.*,
  578 Pa. 479 (2004) ........................................................................... 19 n. 6

## **Statutes**

18 U.S.C. § 1962 ........................................................................................ 13

28 U.S.C. § 1332 ................................................................................... 27, 28

## **Other Authorities**

Class Action Complaint of Lead Plaintiff, *In re Worldcom Inc. Sec. Litig.*,
  ECF No. 56, 2002 WL 32152258 (S.D.N.Y Oct. 11, 2002) ............................... 18

Defendants The Trump Corporation, Donald J. Trump, Donald Trump, Jr., Eric Trump, and Ivanka Trump respectfully move to dismiss the Complaint filed in this action on October 29, 2018, because it fails to state a claim upon which relief may be granted and, with respect to Plaintiffs' state court claims, federal jurisdiction is lacking.

## PRELIMINARY STATEMENT

Plaintiffs have sued the President in his personal capacity, his three oldest children, and The Trump Corporation, alleging a substantive RICO violation, conspiracy to violate RICO, violations of the consumer fraud statutes of three states, and common law fraud and negligent misrepresentation. While the Complaint purports to allege malfeasance by various Trump entities, it seeks relief for a single class of putative victims – those who paid money to a business Mr. Trump does not own, has never owned, and over whose operations he has never exercised control: American Communications Network ("ACN"), a multi-level marketing company.

Between 2006 and 2015, Mr. Trump provided celebrity endorsement services to ACN, by appearing in promotional videos and magazine articles and at events for which he was paid. In video clips used by ACN to recruit subscribers, Mr. Trump made generic positive statements about the company (*e.g.*, "ACN has a reputation for success, success synonymous with the Trump name," "Believe me, it's ultimately a dream come true," "I see incredible potential in the things they're doing now, and they're planning in the future"). No Plaintiff is alleged to have paid or lost money to the Defendants or to any Trump business, and no Defendant is alleged to have solicited any Plaintiff for anything. It is undisputed that ACN – and ACN alone – through a network of ACN representatives, solicited and collected fees from Plaintiffs, for the benefit of ACN.

Plaintiffs are four men and women who paid ACN $499 for the right to market ACN products and services and, after months of effort, allegedly failed to recoup those fees.  Before enrolling in ACN, each signed a contract acknowledging that "as an IBO I am not guaranteed any income nor am I assured any profits or success," and that "no claims of guaranteed profits or representations of expected earnings . . . have been made by ACN or my sponsor."  Recruited by friends and family who touted ACN as a money-making opportunity, Plaintiffs nonetheless contend Mr. Trump's endorsement is the reason they enrolled in ACN and the reason they failed to recoup their investment.

Plaintiffs' lawsuit is funded by the Tesseract Research Center, whose president describes herself as "[a] long-time progressive strategist" and who also runs the Tesseract Group, "a boutique consulting firm" specialized in "developing, promoting and implementing progressive public policy."[1]  Plaintiffs' counsel includes the author of *To End a Presidency – The Power of Impeachment* (Perseus Books 2018), who also publishes a website that broadcasts *Versus Trump*, a weekly program "about how the Trump administration is breaking the law and what people are doing about it."

ACN has been in business for more than 20 years.  During that time, it has withstood its share of public scrutiny as a member of the "direct selling" industry.  For nine years, Mr. Trump served as a paid spokesperson and motivational speaker for ACN, appearing publicly at events across the United States.  Yet until the filing of this lawsuit (one week before the midterm elections) no one sought to sue Mr. Trump for losses she sustained with ACN.

---

[1] *See, e.g.*, The New York Times, *Trump Persuaded Struggling People to Invest in Scams, Lawsuit Says*, Oct. 29, 2018 ("The [Plaintiffs'] lawyers said . . . the Tesseract Research Center [is] funding the lawsuit."); *Tesseract Group*, http://tesseractllc.com/index1.html (last visited Jan. 8, 2019).
.

And for good reason.  The Complaint is fatally flawed in virtually every respect.  *First*, Plaintiffs' claims, which all sound in fraud, require particularized evidence of a materially false or misleading statement by each Defendant, or an agreement to make such statements, which the Complaint does not contain.  Indeed, the Complaint is devoid of any allegation that any Defendant other than Mr. Trump made statements of *any* kind to *anyone*, and on that basis, alone, it should be dismissed against The Trump Corporation, Ms. Trump, and the President's sons.

*Second*, Mr. Trump's promotional statements about ACN are opinion statements, inactionable as a matter of law, absent particularized proof, not proffered here, that the opinions were not genuinely held when stated.

*Third*, the statements upon which Plaintiffs purport to have relied are "puffery" that courts in this circuit routinely reject at the pleading stage because no "reasonable investor" would have relied upon them.

*Fourth*, to survive a motion to dismiss the RICO claims, Plaintiffs must plead not only "but for" causation – that they signed up for ACN because of something Mr. Trump said – but, also, loss causation – that his statements are the reason Plaintiffs failed to recoup their investments, which Plaintiffs fail to do, recounting, instead, numerous other factors that could have caused their losses.

*Fifth*, to plead RICO predicate acts of mail or wire fraud, Plaintiff must allege "specific facts" giving rise to a "strong inference" that Defendants acted with the specific intent to harm Plaintiffs, which the Complaint fails to do, averring only that Mr. Trump endorsed ACN because it was in his economic interest to do so.

*Sixth*, the "association-in-fact" enterprise alleged by Plaintiffs – which purports to include the Trump family and numerous Trump entities (but not ACN) – is defective as a matter of law, because the Complaint fails to allege specific facts tending to prove the purported "associates" joined together to engage in *any* conduct with respect to ACN or Plaintiffs, let alone racketeering activity.

Finally, if the Court determines the RICO claims should be dismissed, federal jurisdiction over Plaintiffs' state claims will be lacking, because no Plaintiff satisfies the $75,000 amount in controversy requirement for diversity jurisdiction, and because Plaintiffs cannot demonstrate class-wide damages of $5,000,000 or more, as required under the Class Action Fairness Act.

For these reasons the Complaint should be dismissed.

## RELEVANT FACTS

### A.     The ACN Business Opportunity

ACN is a multi-level marketing company that operates from its headquarters in Concord, North Carolina through a network of thousands of representatives who pay ACN for the right to market ACN products and services directly to customers and who recruit others to do the same. (Compl. ¶¶ 69-70; Chen Aff., Exh. 12 at 1.)  Founded in 1993, ACN describes itself as the world's largest "direct seller" of telecommunications and essential services for home and business.  (Chen Aff., Exh. 12 at 1-2.)  ACN encourages individuals to become "Independent Business Owners" ("IBOs").  (Compl. ¶ 69.)  Plaintiffs became IBOs in 2013 (Mary Moe), in 2014 (Luke Loe and Jane Doe), and in 2016 (Richard Roe), which entitled them to market ACN products and services directly to their own customers and to recruit others to do the same.  (*Id.* ¶¶ 153, 166 (Doe); *id.* ¶ 192 (Loe); *id.* ¶ 212 (Roe); *id.* ¶ 222, 228 (Moe).)  IBOs pay an initial sign-up fee and an annual renewal fee in order to be able to sell ACN's products and services.  (*Id.* ¶ 69.)  Between 2013 and 2016, the sign-up fee was $499 and the renewal fee was $149.  (*Id.*)

According to the ACN compensation plan, an IBO could earn small commissions on sales and billings to customers who purchase ACN products and services through the IBO, with additional bonuses for meeting sales targets.  (*Id.* ¶ 70.)  IBOs could also earn money by recruiting others to sign up as IBOs.  (*Id.*)

The "lifeblood" of ACN's recruiting operation is small group events hosted by IBOs in their own homes or at local hotels and event spaces. (*Id.* ¶ 71.)  IBOs are encouraged to identify "warm" leads among friends, family and other contacts and to invite them to small group meetings at their homes.  (*Id.*)  To help them in their sales and recruitment efforts, ACN sells IBOs a series of  "Business Tools," including DVDs (branded "Opportunity Discs") and magazines as well as "Your Business Assistant," a web application IBOs may use to manage their "downlines" (new IBOs whom they recruit to ACN) and customers (persons to whom they have sold ACN products or services).  (*Id.* ¶ 71.)  At these small-group recruiting events, hosts will typically play the DVDs and distribute the materials they have bought from ACN.  (*Id.* ¶ 72.)  The aim is both to sell ACN's products and services and to "share the opportunity" with friends and family to become an IBO.  (*Id.*)  These small meetings are the primary mechanism through which consumers are persuaded to make the initial investment to become an IBO.  (*Id.*)

All four Plaintiffs began their association with ACN in precisely this fashion.  A friend or family member already enrolled as an IBO spoke favorably to each Plaintiff about the business opportunity and encouraged him or her to attend such a meeting, with the friend or family member acting as a sponsor – which they all did.  (*Id.* ¶¶ 154-64 (Doe); *id.* ¶¶ 187-92 (Loe); *id.* ¶¶ 202-15 (Roe); *id.* ¶¶ 223-27 (Moe).)  At those meetings, three of the Plaintiffs were shown an ACN Opportunity Disc containing clips of Mr. Trump endorsing the company.  (*Id.* ¶¶ 160-65 (Doe); *id.* ¶¶ 188-90 (Loe); *id.* ¶¶ 225-27 (Moe).)  Roe was not shown the ACN Opportunity

Disc, but before signing up, he "decided to look ACN up on YouTube," where he found an episode of *The Celebrity Apprentice* on which Mr. Trump appeared with two of the company's founders and stated that he knew ACN well.  (*Id.* ¶¶ 207-08.)

Before enrolling, IBOs must enter into an ACN Independent Business Owner Agreement in which they acknowledge, in writing, that "as an IBO, I am not guaranteed any income, nor am I assured any profits or success, and I certify that no claims of guaranteed profits or representations of expected earnings that might result from my efforts as an IBO have been made by ACN or my sponsor."  IBOs must further acknowledge that they "shall not represent directly or indirectly that any [other] person may, can, or will earn any stated amount or that any IBOs are guaranteed success."  IBOs also agreed that any dispute between them and ACN would be exclusively resolved through binding arbitration.  (Chen Aff., Exh. 18 at ¶¶ 5, 16 (2013); *id.*, Exh. 19 at ¶¶ 5, 16 (2014); *id.*, Exh. 20 at ¶¶ 5, 17 (2016).)[2]

In order to keep IBOs motivated, ACN stages multi-day events, large "Training Events" or "International Conventions," including both large rallies held in auditoriums, with guest speakers who encourage IBOs to make continued investments in ACN, as well as smaller seminar-style break-out sessions.  (*Id.* ¶ 73.)  These conventions are not merely business conferences at which participants meet to network and hear from industry experts:  they are

---

[2] "Chen Aff." Refers to the Affirmation of Cynthia Chen in Support of Defendants' Motion to Dismiss, dated January 14, 2019.  Although not referenced in the Complaint, Plaintiffs "rel[y] heavily upon [the] terms and effect of" the IBO contracts they entered into with ACN, "thereby rendering [those documents] integral to the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) ("A necessary prerequisite for taking into account materials extraneous to the complaint is that the plaintiff rely on the terms and effect of the document in drafting the complaint . . . . This generally occurs when the material considered is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason – usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim – was not attached to the complaint." (internal quotation marks and citations omitted and emphasis removed)).

motivation rallies, designed to stoke enthusiasm and convince IBOs that they can make a profit if they just keep investing and trying to build their downline (that is, recruit, motivate and encourage their own IBOs).  (*Id.*)  These events themselves are a source of revenue for ACN. (*Id.*)

### B.    Mr. Trump's Relationship With ACN

Between 2006 and 2015, Mr. Trump provided celebrity endorsement services to ACN, by appearing in promotional videos and magazine articles and at events for which he was paid. (Compl. ¶¶ 77-80.)  Although ACN updated and reissued these tools frequently, it reused the footage of Mr. Trump, making only minor edits over time.  (*Id.* ¶ 78.)  As a result, Mr. Trump's endorsement appears "in substantially the same form" on every ACN Opportunity Disc.  (*Id.*) Mr. Trump also appeared as a featured speaker at motivational events sponsored by ACN, and, in 2009 and 2011, *The Celebrity Apprentice* featured the company and its founders on two episodes.  (*Id.* ¶¶ 81, 84.)  The Complaint avers no facts suggesting that ACN paid Mr. Trump anything but a flat fee for his services, for example, that his compensation depended upon the number of IBOs enrolled by ACN in a given year.  ACN used its relationship with Mr. Trump, generally, and its television appearances, in particular, to recruit new IBOs and motivate existing ones.  (*See, e.g.*, *id.* ¶¶ 86-87, 146-149.)

#### 1.    Mr. Trump's Video Endorsement of ACN

The Opportunity Discs viewed by Plaintiffs Loe, Doe, and Moe contained the following statements by Mr. Trump, or ones "substantially the same" as these (Compl. ¶ 78):

a.   "ACN has a reputation for success.  Success that's really synonymous with the Trump name and other successful names.  And you can be part of it."

b.   "The beauty of ACN is that you're in business for yourself but not by yourself.  You have a great partner by your side with you every step of the way."

c. "You have a great opportunity before you at ACN without any of the risks most entrepreneurs have you take.  You have the ability to market breakthrough technology before it hits the critical mass.  I've experienced the opportunity that exists when you're able to jump ahead of the curve, and ACN gives you that opportunity.  Believe me, it's ultimately a dream come true."

d. "I've found there are two types of people.  Those who take action and those who let opportunity pass them by.  Which one are you?"

e. "When evaluating a business opportunity, people need to look for strong reasons, a solid practice, success stories, a strong product people really need and want, and a clear plan for the future.  ACN has all of these things."

f. "I've been working with ACN for a few years now.  Since that time, I've developed a great relationship with ACN, and the more I learn about them, the more I like and respect them.  I see incredible potential in the things they're doing now, and they're planning in the future."

(*Id.* ¶ 78.)[3]

### 2. Mr. Trump's Personal Appearances

On at least 14 occasions (Compl. ¶ 81), Mr. Trump appeared at "motivation rallies" intended by ACN "to stoke enthusiasm" among the IBO network (*id*. ¶ 73).  At these events, Mr. Trump typically greeted and signed autographs for groups of IBO "stars," before sitting for an interview for the broader audience with an ACN host.  (*See, e.g., id*. n. 42 at 10:15; Chen Aff., Exh. 15 at 76.)  At these events, Mr. Trump imparted generic advice (*see, e.g.*, Compl. n. 40 at 06:19 ("never ever quit, never ever give up"); *id.* n. 42 at 12:33, 25:20 ("you've got to love what you do, you've got to never give up, never quit," "work hard, never quit, never give up"); *id.* n. 49 at 05:36, 07:28 ("you have to go out there and win," "pick the right business")) and shared

---

[3] *See* Chen Aff., Exhs. 1A & 1B; *id.*, Exh. 1-T (containing statements (c) and (d)); *id.*, Exhs. 2A & 2B; *id.*, Exh. 2-T (containing statements (a), (c), (d), (e), and (f)); *id.* Exh. 3A; *id.* Exh. 3-T (containing statements (a), (b), (c), (d), (e), and (f)).  Because the Complaint relies upon the ACN Opportunity Discs and quotes liberally from ACN print materials and YouTube recordings of live appearances by Mr. Trump at ACN events, the Court may consider them when weighing the adequacy of the Complaint on Defendants' motion to dismiss.  *DiFolco*, 622 F.3d at 111 (2d Cir. 2010); *Stuto v. Fleishman*, 164 F.3d 820, 826 n. 1 (2d Cir. 1999).

with the audience lessons drawn from his own experience, including the financial problems he overcame in the early 1990s (*see, e.g.*, *id.* n. 42 at 17:50).

Mr. Trump also spoke about the ACN business opportunity. (*See, e.g.*, Compl. n. 38 at 00:59 ("It's about confidence when you're working with ACN. It's about confidence when you're selling the videophone . . . Life is about confidence."); *id.* n. 38 at 01:47 ("[T]he enthusiasm here is great . . . You have to know the product. You have to understand the product."); *id.* n. 38 at 02:33, 02:54 (ACN is the "leader in the field" and "you are in the right business"); *id.* n. 45 at 03:28 ("you have . . . an amazing concept whose time has really, really come"); *id.* n. 40 at 01:23 ("I've developed a real liking" for the founders); *id.* n. 42 at 03:02 (the founders have "really become friends of mine").)

While praising the company, Mr. Trump cautioned audience members that not everyone will succeed in business for herself. In Mr. Trump's opinion, the ACN business opportunity afforded participants the opportunity to test their aptitude for direct selling before, or without, giving up their full-time employment. To the extent an IBO found success with ACN, she might choose to leave her job and become an entrepreneur, full-time, but if she did not, she would have risked and lost relatively little by trying. (*See id.* n. 42 at 10:40 ("[L]ook, not everything is going to work out. I mean, I like to phrase it – they talk about the power of positive thinking. I also talk about the power of negative thinking, guard against the downside. If things didn't work out, you're still at your job. And it's one of the things I love about what they're doing here; they're not telling people, buy this . . . do this, do that, leave your job, quit, become rich and then all of sudden people have a problem. You keep your job, and a lot of the people that I met had their job for two or three years and all of a sudden they start[] weeding out of their job and going full-

time into ACN because they're making more money with ACN.  So I like it because it really

takes the risk out.  It takes a lot of the risk out of the decision.  I think it's great.").)

When asked why, after so many years, Mr. Trump continued to work with ACN, he

typically praised the founders (*see, e.g.*, Compl. n. 42 at 02:56 ("I really like the guys")), often

referencing a game of golf, early in the parties' relationship where, to Mr. Trump's surprise, two

of the founders did not want to beat each other, (*see, e.g.*, *id*. n. 42 at 04:38; *id.* n. 40 at 01:30; *id.*

n. 45 at 03:02).

During one such appearance, in Charlotte, North Carolina in early 2013, the following

exchange occurred between the ACN host and Mr. Trump:

| | |
|---|---|
| Host: | So I'm curious about this, you know, uh, why do you keep coming back?  What is it about ACN?  I– certainly not for any money, it's – |
| Mr. Trump: | No. |
| Host: | – for the love of the organization.  Tell us why you love ACN. |
| Mr. Trump: | I left Palm Beach this morning and I said why am I doing it?  And the reason I'm doing it is I really have a, just a special relationship with your founders.  They're good people.  They're hard workers.  They love what they're doing.  They love the people in the room. |

(Compl. n. 45 at 01:31; *see also id*. ¶ 123.)  During the same appearance, however, the ACN host

repeatedly referenced the transactional aspect of the parties' relationship.  (*See id*. n. 45 at 07:17

("So let's talk about the extended relationship that you have with ACN"); *id*. n. 49 at 01:15,

01:24 ("You . . . have lots of choices, the opportunity to be involved with lots of companies, to

endorse and have a relationship with endless opportunities," and "with all these choices, you've

decided that you will now choose to be exclusive with ACN")).  (*See also id*. n. 36 at 02:29

(2009 Charlotte) ("ACN and everyone involved has really enjoyed their partnership with you,

have you enjoyed the partnership with them?  I have and we've just extended it so I'm very

happy about that"); *id.* n. 65 at 01:31 (2006 Interview) ("I am asked to do this, what you're doing

with me, many, many times, and I turn down many, many different proposals"); *id.* n. 40 at

02:08 (2010 Charlotte) ("[Y]ou obviously "speak for a lot of companies, you see a lot of

organizations")).

The print materials upon which Plaintiffs purport to rely were even more blunt about the

fact that ACN was paying Mr. Trump for his services, but emphasized that his decision to

endorse the company was based on more than that.  (*See* Chen Aff., Exh. 16 at 24 ("[Mr. Trump]

may tease about having to give up a golf game for the [ACN] event and get in his private jet to

be there . . . and it's not about the money.  It is about something else entirely.  Light?  Love?

Yes, indeed, and perhaps we are now learning more about the real Donald J. Trump, and the real

ACN."); *id.* at 23 ("When Donald Trump was negotiating with ACN to personally endorse the

company and speak at their events, he made it clear that he would not be doing it 'for the

money.'  He has plenty of money, so something else had to be the deciding factor.  For him, it

came down to the four ACN co-founders."); *id.*, Exh. 11 at 20 (same).)

While quotations from Mr. Trump's live appearances and excerpts from ACN magazine

articles consume many pages of the Complaint, no Plaintiff is alleged to have attended such an

event, or to have viewed footage of them on YouTube, and no Plaintiff is alleged to have read

about Mr. Trump in an ACN magazine.

### 3. *The Celebrity Apprentice*

In 2009 and 2011 – years before any Plaintiff enrolled in ACN – the company's founders

appeared on *The Celebrity Apprentice*.  (Compl. ¶¶ 84-85.)  During the 2011 episode, which

Richard Roe viewed on YouTube (*id.* ¶¶ 207-08), Mr. Trump stated, "[O]n my right are two

friends of mine, Greg Provenzano and Mike Cupisz.  They run a company called ACN, which I

know very well.  It's a home-based marketing company for individuals and it's in over twenty countries. Greg, tell us about your company."  (Chen Aff., Exh. 21-T at 1.)

      **C.**      **<u>Plaintiffs Fail to Recoup Their Investments</u>**

      Once enrolled, Plaintiffs found only limited success as IBOs.  Jane Doe and Luke Loe traveled to Palm Springs, Cleveland and Detroit to attend multi-day ACN rallies.  They also attended bi-weekly recruitment meetings closer to home, some of which Doe hosted.  (Compl. ¶¶ 166-80 (Doe); *id.* ¶¶ 193-99 (Loe).)  Doe renewed her ACN subscription for a second year and persuaded four members of her family to enroll before concluding that the ACN business opportunity was no longer a worthwhile investment.  (*Id.* ¶¶ 172, 181; *see also id.* ¶ 186 ("Despite her strenuous efforts [Doe] simply was not making money.").)  Loe recruited his friend Doe, but never received any income from ACN and "came to realize that ACN was not a good money making opportunity and decided not to renew his membership."  (*Id.* ¶¶ 21, 193-94.) Mary Moe "immersed herself in information about [ACN]."  (*Id.* ¶ 229).  She explored the company's website, watched videos, read pamphlets, and attended "dozens of meetings" hosted by more senior IBOs.  (*Id.* ¶¶ 229-34.)  Moe enrolled her son in ACN and renewed her subscription for a second year before concluding ACN was no longer a worthwhile investment. (*Id.* ¶ 236; *see also id.* ¶ 235 ("She believed she could become the next [star IBO] if she tried hard enough," but she was "unable to find success.").)  Richard Roe worked with an IBO "mentor" who taught him to use the ACN business tools, but Roe found it difficult to recruit new IBOs or to sell ACN products or services.  Once his "mentor stopped reaching out to him . . . [Roe] really had no reason or motivation to continue."  (*Id.* ¶¶ 213-16, 219.)

## ARGUMENT

I.   **PLAINTIFFS FAIL TO STATE A RICO CLAIM BECAUSE THEY FAIL TO ALLEGE MAIL OR WIRE FRAUD**

Plaintiffs fail to state a substantive RICO claim or conspiracy to violate the RICO statute, because they fail to plead the existence of "racketeering activity."  *See generally Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018) (summarizing elements of 18 U.S.C. § 1962(c) and (d)).  Plaintiffs invoke the federal mail and wire fraud statutes, alleging that Mr. Trump's endorsement of ACN on national network television and on the ACN marketing videos operated as a criminal scheme to defraud them of money or property.  That assertion, far-fetched on its face, is legally untenable.  Plaintiffs fail to particularize a single actionable statement or omission by any Defendant reasonably capable of influencing their decision to become IBOs; fail to plead any fact tending to show such statements or omissions proximately caused their losses; and fail to allege even generally that Mr. Trump, knowing the law proscribed his doing so, gave ACN his endorsement for the specific purpose of harming Plaintiffs he did not know, never spoke to, and from whom he stood to receive nothing.

A.   **Plaintiffs Fail to Particularize Any Allegedly Fraudulent Statement by Any Defendant**

1.   The Applicable Legal Standard

Where a plaintiff relies upon predicate acts of mail fraud and wire fraud to state a RICO claim, "[t]he elements of mail and wire fraud must be pled with particularity."  *Williams*, 889 F.3d at 124.  "The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme."  *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015).  "Because the mail fraud and the wire fraud statutes use the same relevant language [courts] analyze them the same way."  *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (internal citation and quotation

marks omitted).  The complaint must "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Williams*, 889 F.3d at 124; *accord Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008). [4]

### a.     Opinion Statements Generally are not Actionable

Statements of opinion "generally cannot constitute fraud," but for "the narrow exception to that rule: namely, that opinions *may* constitute actionable fraud where a present intent to deceive exists," *i.e.* where a defendant makes an "assurance . . . knowing full well that its assurance was false."  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 134-35 (2d Cir. 2008) (emphasis in original) (internal citations and quotation marks omitted).  Thus, in order to state a claim for fraud based on a statement of opinion, Plaintiffs "must allege that defendant's opinions were both false and not honestly believed when they were made."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011).  "[T]o survive a motion to dismiss on a false statement of opinion claim, a plaintiff must allege with particularity provable facts to demonstrate that the statement of opinion is both objectively and subjectively false.  It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the

---

[4] Plaintiffs' state law claims sound in fraud and are all subject to the heightened pleading standards of Rule 9(b) as well.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402-03 (2d Cir. 2015) (common law fraud); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 583 (2d Cir. 2005) (negligent misrepresentation); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (claim under California Business and Professions Code); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 440 (S.D.N.Y. 2017) (claim under Pennsylvania Trade Practices Act); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (claim under Maryland Consumer Protection Act).

opinion truly held." *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 465-66 (S.D.N.Y. 2004) (internal citations and quotation marks omitted).

**b.** **"Puffery" is Immaterial as a Matter of Law**

In order to establish a scheme to defraud, a plaintiff must also allege that the misstatements were material. *U.S. ex rel O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016). A statement or omission is material if the alleged "misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *United States v. Rybicki,* 354 F.3d 124, 145 (2d Cir. 2003) (en banc). In other words, a "lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal." *United States v. Corsey,* 723 F.3d 366, 373 (2d Cir. 2013). Materiality is assessed "under all the circumstances," *TSC Industries, Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976), and "the standard of a 'reasonable investor,' like the negligence standard of a 'reasonable man,' is an objective one." *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (internal citation omitted).

While materiality is a mixed question of law and fact, dismissal at the pleading stage is required if the alleged statements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 34 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal citation and quotation marks omitted). "It is well-established that general statements about reputation, integrity and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). Statements of subjective analysis or opinion, of motives, intentions, or of general statements of optimism or enthusiasm are likewise too broad, general, and nebulous to be material, as a matter

15

of law.  *See, e.g.*, *id.* at 186 (affirming dismissal of complaint predicated on statements by management that UBS prioritized "adequate diversification of risk," and "avoidance of undue concentrations"); *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996) (same, where management represented that it "would not compromise its financial integrity" and that "business strategies will lead to continued prosperity"); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 276, 284 (3d Cir. 2010) (same, where management discussed "our dedication to disciplined pricing," "my personal commitment to continue to maintain discipline and rigor in everything we do," and how "we will always take profitability over growth"); *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-71 (S.D.N.Y. 2018), *appeal docketed*, 18-1165 (2d Cir. Apr. 20, 2018) (dismissing complaint predicated on statements that defendant's software platform would "help[] differentiate ourselves from our competitors around the world," that "we win contracts because we have great technology," and that experts respond to the software platform and say "[w]ow, it has functionality and features that are unique"); *Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006 (JMF), 2015 WL 3540836, at *9 (S.D.N.Y. June 5, 2015) (dismissing civil RICO complaint premised on mail fraud and wire fraud in case complaining of predatory practices by a for-profit college because "under the federal mail and wire fraud statutes, opinions and puffery or ultimately unfulfilled promises are not actionable as fraud" and certain statements in the college's marketing materials about "outstanding job placement assistance" or how students can "immediately embark on meaningful career [sic]" were "expressions of corporate optimism" that "do not give rise to a fraud claim" (internal quotation marks and citations omitted)).

2.      Discussion

    **a.      Plaintiffs Fail to Particularize a Fraudulent Statement by Any Defendant**

Across 160 pages of invective directed at Defendants, personally, Plaintiffs fail to detail a single statement made to them by any Defendant; when or where such statement was made; and how such statement was fraudulent, as they must to avoid dismissal.  *See, e.g., Williams*, 889 F.3d at 124.  Jane Doe avers only that in "mid-to late 2014," at "a hotel" in Los Angeles, she saw a video in which Mr. Trump opined that participants could make a lot of money with ACN and that the company was "one of the best businesses," that she was shown clips of Mr. Trump praising ACN on *The Celebrity Apprentice*, and that there was no disclosure that he was paid for his endorsement.  (Compl. ¶¶ 155-56, 160-63; *see also id.* ¶¶ 187-91 (Loe); *id.* ¶¶ 203-09 (Roe); *id.* ¶¶ 222-26 (Moe).)

But such statements – even in their most particularized form, *see* Chen Aff., Exhs. 1-3 and discussion, *supra*, at 7-8 – consist of "excessively optimistic" opinions "not borne out by subsequent events", *Salomon Analyst*, 350 F. Supp. 2d at 466, and, as such, are inactionable as fraud, and they are all "puffery" of the type this circuit "has consistently held . . . could not have misled a reasonable investor," *Lasker*, 85 F.3d at 59.[5]

*In re Worldcom, Inc. Sec. Litig.,* No. 02-CV-3288 (DLC) (S.D.N.Y.), to which Plaintiffs cite the Court, is unavailing.  *See* Transcript of Conference at 8:4-9, *Jane Doe, et al. v. The Trump Corp., et al.*, No. 18-CV-9936 (LGS) (S.D.N.Y. Dec. 20, 2018) ("One analogy . . . would

---

[5] Introductory paragraphs of the Complaint aver that Mr. Trump misled Plaintiffs by claiming to have performed "extensive due diligence" and to possess "inside information" concerning ACN (*see, e.g*., Compl. ¶ 8), but "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint," *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  No Plaintiff alleges he or she heard Mr. Trump reference due diligence or inside information, and the Opportunity Disks containing the video endorsement upon which Plaintiffs purportedly relied contain no such statements, *see supra*, at 7-8.

be some of the WorldCom cases.").  Following the company's spectacular collapse and
bankruptcy, the indictment of its senior-most executives and one of the largest corporate scandals
of its time, purchasers of WorldCom securities sued, among others, the underwriters of offerings
in which they purchased securities, together with a research analyst (Jack Grubman) employed
by one of the underwriter defendants for fraud, arguing, *inter alia*, that the underwriters failed
reasonably to investigate the truthfulness of statements contained in the SEC Forms 10-Q and
10-K issued by WorldCom and incorporated into registration statements by which the
underwriters offered securities for sale to the public, as required by Section 11 of the Securities
Act of 1933, and that the analyst, in order to curry favor with WorldCom, published favorable,
ostensibly "independent" research designed to cause investors to buy or hold WorldCom
securities, without disclosing the extent to which, among other things, his compensation
depended upon investment banking business garnered from WorldCom, in violation of Section
10(b) of the Securities and Exchange Act of 1934.  *See* Class Action Complaint of Lead Plaintiff,
*In re Worldcom,* No. 02-CV-3288 (DLC) (S.D.N.Y. Oct. 11, 2002), ECF No. 56, 2002 WL
32152258.  In support, plaintiffs alleged specific, factual misstatements concerning the financial
condition of WorldCom and the independence of Mr. Grubman's research, *id*. ¶¶ 111-220, 258-
71, subjects that virtually define the heartland of what is considered material to a "reasonable
investor."

The Second Circuit decision in *United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000), is
also unavailing.  *See* Plaintiffs' Response to Pre-Motion Letter Regarding Motion to Dismiss at
1-2, *Doe v. The Trump Corp.*, No. 18-CV-9936 (LGS) (S.D.N.Y. Dec. 21, 2018), ECF No. 57.
There, the indictment particularized negative facts known by Autuori (an accountant) about his
client, a large real estate company, at the time Autuori was marketing shares in the company to

potential investors, including that the company's financial condition was not as represented and that the company was paying bribes to a union in exchange for its members' purchase of shares. *Autuori*, 212 F.3d at 109-14.  The Complaint in this case, as discussed, fails to allege either the existence of specific facts known to Mr. Trump that could have rendered his opinion statements misleading when spoken, or any statement by Mr. Trump that could have misled a reasonable investor.

Indeed, our research discloses no case, in any circuit, in which a court has sustained mail fraud, wire fraud or RICO claims on the basis of a celebrity endorsement.  *See Kramer v. Unitas*, 831 F.2d 994, 994-95, 998-99 (11th Cir. 1987) (affirming summary judgment award to defendant former professional football player paid to endorse First Fidelity in radio advertisements, where the defendant introduced the audience members to his "friends at First Fidelity," before bank employees stated, "you can earn up to 18.33% annual yield," that the investment purchase "may be insured," and the defendant concluded by inviting the audience to call First Fidelity for more information, because the advertisements contained no false statement by defendant relating to existing or pre-existing fact and instead his statements "constituted sales talk, or puffing"). [6]

---

[6] The defects described in Section I(A) require dismissal of Plaintiffs' state law claims as well, since each requires particularized proof of a false or misleading statement upon which a reasonable investor could rely.  *See Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004) (California common law fraud); *Shamsian v. Atl. Richfield Co.*, 107 Cal. App. 4th 967, 983 (2003) (California common law negligent misrepresentation); *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006) (Cal. Bus. & Prof. Code § 17200); *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680 (2006), *as modified on denial of reh'g* (Jan. 31, 2006) (Cal. Bus. & Prof. Code § 17500); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 333 (1982) (Maryland common law fraud); *Weisman v. Connors*, 312 Md. 428, 444 (1988) (Maryland common law negligent misrepresentation); *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 141-42 (2007) (Maryland Consumer Protection Act); *Porreco v. Porreco*, 571 Pa. 61, 69 (2002) (Pennsylvania common law fraud); *Bortz v. Noon*, 556 Pa. 489, 500-01 (1999) (Pennsylvania common law negligent misrepresentation); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 501 (2004) (Pennsylvania Unfair Trade Practices and Consumer Protection Law).

### b. Plaintiffs Fail to Particularize Misconduct of Any Kind by The Trump Corporation or Mr. Trump's Children

Plaintiffs fail to allege any statement (of any kind) made to them by The Trump Corporation, Donald Trump, Jr., Eric Trump, or Ivanka Trump, or to plead with particularity facts establishing their knowledge of, or any agreement with respect to, any fraudulent statement allegedly made by Mr. Trump.  Indeed, the only allegations concerning The Trump Corporation is that it was "the principal operating company for the collection of companies known as The Trump Organization," (Compl. ¶ 34; *see also id.* ¶¶ 5, 45), and with respect to the Trump children, that each held a senior position within, or otherwise exercised some control over, Trump entities, and that Ivanka Trump and Donald Trump, Jr. appeared alongside their father and the ACN founders on *The Celebrity Apprentice* (where Ms. Trump and her brother are alleged to have said nothing).  (*Id.* ¶¶ 36-38, 46, 47, 85.)[7]

The law is clear that "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also Chan v. Big Geyser, Inc.*, No. 17-cv-6473 (ALC), 2018 WL 4168967, at *13 (S.D.N.Y. Aug. 30, 2018) (dismissing fraud claims where Plaintiffs "only plead generally that 'Defendants' took advantage of them").  Plaintiffs' failure to allege a single statement of any kind, to anyone, by the Trump Corporation or by Mr. Trump's children requires dismissal of all claims against these Defendants on that basis alone.

---

[7] Plaintiffs' RICO allegations as to the "Trump Association-in-Fact" fail for the reasons set forth in Section I, *supra,* as well.

####          c.          Plaintiffs Fail to Allege Fraud by Omission

Plaintiffs suggest they were defrauded by Defendants' failure to disclose that Mr. Trump was being paid by ACN.  (*See, e.g.*, Compl. ¶ 163.)  But the law is clear that, absent a fiduciary or similar legal duty between the parties – which Plaintiffs do not and cannot plead here – omissions are not actionable as mail or wire fraud, *see United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)), and Plaintiffs do not allege the question of Mr. Trump's compensation was material to them, contending, instead, that they relied upon the truthfulness of his endorsement (the "Message") in deciding to enroll as IBOs.  (Compl. ¶¶ 160-66 (Doe); *id.* ¶¶ 188-90 (Loe); *id.* ¶¶ 207-09 (Roe); *id.* ¶¶ 225-27 (Moe).)

####          d.          Plaintiffs Fail to Allege Fraud by "Half Truths"

Nor is the live exchange between Mr. Trump and an ACN host in Charlotte, North Carolina, in early 2013, *supra* at 10, actionable as a half-truth, *Autuori*, 212 F.3d at 119, because no Plaintiff is alleged to have heard it and, in any event, it could not have misled a "reasonable investor" given the mix of information available to IBOs at the time.

To determine whether a "reasonable investor" would have been misled, the Court must "analyze[] the allegedly fraudulent materials in their entirety."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted).  "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor."  *Id.*; *see also In re Donald J. Trump Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369 (3d Cir. 1993) (citing *I. Meyer Pincus & Assocs v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir. 1991) ("Materiality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it.")).  "While a misleading statement will not always lose its deceptive edge simply by joinder with others that

are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil." *Taj Mahal Litig.*, 7 F.3d at 372 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 503 U.S. 1083, 1097 (1991)).  The context here – a lavish corporate event featuring a celebrity renowned for promoting his eponymous brand – where Mr. Trump and ACN each referenced his "extended relationship" with ACN, and that he had "endless opportunities" to "endorse and have a relationship" with "lots of companies" – forecloses any claim that a "reasonable investor" would have understood Mr. Trump's split-second utterance ("No") to be a disclaimer of all financial ties between him and ACN.[8]

### B.      Plaintiffs Fail to Plead Loss Causation

To sue under RICO, a plaintiff must establish not only "but for" causation, but also "that the underlying § 1962 RICO violation was the proximate cause of his injury," *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 140 (2d Cir. 2018) (citation and quotation marks omitted) – that is, that the alleged misstatements "were the reason the transactions turned out to be losing ones," *Moore v. Paine Webber*, 189 F.3d 165, 172 (2d Cir. 1999) (citation, brackets, and quotation marks omitted).  Proximate cause is not shown where the asserted loss "could have resulted from factors other than [the defendants'] alleged acts of fraud." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006).

While the Complaint alleges Plaintiffs would not have enrolled in ACN had Mr. Trump not endorsed it, or "but for" causation, (Compl. ¶ 20 (Doe); *id.* ¶ 21 (Loe); *id.* ¶ 22 (Roe); *id.* ¶ 23 (Moe)), it fails to allege how, or even that, Mr. Trump's endorsement caused their failure to succeed as IBOs and recoup their enrollment fees.  Meanwhile, and in great detail, the Complaint

---

[8] *See also* Chen Aff., Exh. 16 at 23-24; *id.*, Exh. 11 at 20 (ACN articles referencing money paid by ACN to Mr. Trump, discussed *supra* at 11); Compl. n. 36 at 02:29; *id.* n. 65 at 01:31; *id.* n. 40 at 02:08 (references by ACN at other events to the transactional nature of the parties' relationship, discussed *supra* at 10-11).

expressly pleads "factors other than" Mr. Trump that "could have" caused their losses, namely, the difficulties all four Plaintiffs faced trying to sell ACN videophones and cellular telephone service to friends, family and strangers or to recruit others to do so.  For all the ACN success stories, motivational events, and marketing tools, direct selling is a difficult way to earn a living and one for which not all are suited.  (*See* Compl. n. 42 at 10:40 (Mr. Trump cautioning IBOs to consider the "downside" risk of direct selling); Chen Aff., Exh. 18-20 ¶ 5 ("I acknowledge that as an IBO, I am not guaranteed any income nor am I assured any profits or success.").)

That Plaintiffs do not even try to connect any alleged statement by Defendants to their failure to recoup fees they paid ACN renders this the type of lawsuit that federal courts reject as so implausible they must be dismissed on the pleadings – "lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks and citation omitted); *see also id.* (where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the [C]ourt" (quotation marks and citations omitted)).[9]

---

[9] *See also Anza*, 547 U.S. at 459 (reversing Second Circuit's denial of motion to dismiss for failure to plead loss causation in RICO claim brought by store owners alleging store operators engaged in a fraudulent scheme to avoid collecting and reporting sales tax, because "businesses lose and gain customers for many reasons" and plaintiffs losses "could have resulted from factors other than [defendant's] alleged acts of fraud"); *Empire*, 902 F.3d at 142-43 (failure to plead loss causation where customers' "decisions to purchase less" of the plaintiff's products did not "necessarily follow" from the alleged racketeering); *Segal v. Bitar*, 11-CV-4521 (LBS), 2012 WL 273609, at *11 (S.D.N.Y. Jan. 30, 2012) (online poker players who lost access to funds deposited with defendants' gaming website did not adequately plead loss causation because the government's seizure of online gambling website's assets precluded a "sufficiently direct causal link between the racketeering offenses and Plaintiffs' injuries"); *McBrearty v. Vanguard Grp, Inc.*, 08-CV-7650 (DLC), 2009 WL 875220, at *3 (S.D.N.Y. Apr. 2, 2009) (shareholders in investment funds that invested in illegal gambling businesses did not adequately allege loss causation, because "the shareholders were injured not by the ownership of or investment in the illegal gambling operations, but by the reaction of the stock price to the publicity following the government's investigation of those operations").

### C.  **Plaintiffs Fail to Allege a Scheme That Contemplated Economic Harm or That Defendants Willfully Intended to Inflict Such Harm**

To establish mail fraud or wire fraud, Plaintiffs must prove that the defendant acted "willfully," that is, with the intent to do something the law forbids, and with the "intent to defraud." *United States v. Gabriel*, 125 F.3d 89, 96 (2d Cir. 1997).  To show the required "intent to defraud, the government must prove that defendants contemplated some actual harm or injury to their victims" and to their victims' property interests. *Id.* (internal quotation marks omitted). Allegations that the defendants "garnered some benefit from their scheme" are not enough. *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987).  Plaintiffs "must prove that the defendant acted *with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim*." *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) (emphasis added and citation omitted); *see also United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006) (to prove a "scheme or artifice for obtaining money or property in the context of the mail fraud statute" the defendants' scheme must have been "intended to deprive another of property rights" (internal quotation marks omitted)).  "Because the defendant must intend to harm the fraud's victims, misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the victim." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (internal citations and quotation marks omitted); *see also United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) ("To convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature or that the village could have negotiated a better deal for itself if it had not been deceived.").

In order to allege an intent to defraud, Plaintiffs must "point[] to specific facts that give rise to a strong inference of fraudulent intent.  The strong inference may be supported either by

(a) facts to show that defendants had both motive and opportunity to commit fraud, or (b) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Salomon Analyst*, 350 F. Supp. 2d at 466 (internal citations and quotation marks omitted).  In assessing a defendant's fraudulent intent, moreover, a court must assume that "the defendant is acting in his or her informed economic self-interest."  *Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 138 (S.D.N.Y.1994) (Parker, J.), *aff'd,* 60 F.3d 810 (2d Cir.1995) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994)).

The Complaint does not plead the requisite intent to harm with particularity.  While introductory paragraphs of the Complaint aver that Defendants targeted investors "because they were not experienced in financial and commercial matters" (Compl. ¶13 (emphasis removed)), sought "to ensnare vulnerable consumers" (*id*. ¶ 4) and to "profit from customers' unrecouped investments" (*id*. ¶ 9), those allegations are devoid of any factual support, much less "specific facts" giving rise to a "strong inference" of fraudulent intent, *Salomon Analyst*, 350 F. Supp. 2d at 466, and Mr. Trump's opinion, puffery and motivational statements – including his suggestion that investors take steps to protect themselves against the "downside" risk of direct selling – bear no indicia of an intent to harm.[10]  (Compl. n. 42 at 10:40.)  Nor does the conclusory allegation that Mr. Trump was "aware that the vast majority of consumers would lose whatever money they invested" in ACN (*id.* ¶ 9) suffice, because allegations that a defendant "had 'some realization' that a fraud was being perpetrated and may have 'recognized' the fraud's capacity to cause harm" are insufficient as a matter of law, *Gabriel*, 125 F.3d at 97.  The Complaint at most alleges that Defendants acted "with the common purpose of earning revenue" from ACN in order to

---

[10] While some ACN participants may be "among the most economically marginalized and vulnerable Americans" (Compl. ¶ 13), photographs of the ACN rallies at which Mr. Trump spoke, reproduced in the Complaint and in print materials to which Plaintiffs cite tend to belie that the Defendants targeted such individuals.  (*id.* ¶¶ 73, 86; Chen. Aff., Exh. 15 at 76; *id.*, Exh. 6 at 10-12.)

enrich Mr. Trump (Compl. ¶¶ 41, 381), by making endorsements for which Mr. Trump would be

paid regardless of whether any participant signed up for or paid fees to ACN – allegations that

are plainly inadequate as a matter of law, *see Starr*, 816 F.2d at 101.

## II.   PLAINTIFFS FAIL TO PLEAD AN "ASSOCIATION IN FACT" RICO ENTERPRISE

Plaintiffs purport to allege an "association-in-fact" RICO enterprise consisting of Mr.

Trump and The Trump Corporation (but not ACN), together with Donald Trump, Jr., Eric

Trump, and Ivanka Trump, and a cast of companies not alleged to have made any statement or

omission concerning Mr. Trump's relationship with ACN.  (Compl. ¶¶ 42, 379.)  An association-

in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by

evidence that the various associates function as a continuing unit."  *Boyle v. United States*, 556

U.S. 938, 945 (2009) (internal quotation marks and citation omitted).  The alleged associates

"must share a common purpose to engage in a particular fraudulent course of conduct and work

together to achieve such purposes."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir.

2013) (citation and internal quotation marks omitted).  To plead the required "common purpose

to engage in a particular fraudulent course of conduct," a complaint must make "specific factual

allegation[s] about the intent" of the alleged enterprise members.  *Id.* at 120-21; *see also D.*

*Penguin Bros. Ltd. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (same).

The sole allegation in the Complaint concerning the intent of the alleged "associates-in-

fact" is that they "shared a common purpose of earning revenue from the Endorsed Entities in

exchange for conveying the false and misleading Message," (Compl. ¶ 41), but that "naked

assertion devoid of further factual enhancement" is plainly inadequate, *D. Penguin Bros.*, 587 F.

App'x at 668 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Lynn v.*

*McCormick*, No. 17-CV-1183 (CS), 2017 WL 6507112, at *6 (S.D.N.Y. Dec. 18, 2017)

("[T]here is no allegation that the officer alleged to have been part of the enterprise . . . committed, or had anything to do with, any of the allegedly fraudulent acts, so the claim against him is not plausible." (citation omitted)); *see also* discussion, *supra*, at Section I(A)(2)(b).

**III.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS UNDER 28 U.S.C. §§ 1332 (A) OR (D)**

Federal subject matter jurisdiction exists "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs" and where the parties meet certain diversity of citizenship requirements.  28 U.S.C. §1332(a).  There is no diversity jurisdiction over Plaintiffs' state law claims because Plaintiffs fail to satisfy the amount-in-controversy requirement under the diversity statute.  *See Gilman v. BHC Sec., Inc.*, 104 F.3d 1418, 1422 (2d Cir. 1997) (it is "well-established" that "each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional amount requirement" of $75,000) (citation and quotation marks omitted); *see also Radcliffe v. Wright*, No. 16-CV-9511 (GHW), 2018 WL 3187338, at *3 (S.D.N.Y. June 28, 2018) ("The Supreme Court has long recognized that the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement.") (quoting *Snyder v. Harris*, 394 U.S. 332, 335 (1969) (quotation marks omitted)).  Because Plaintiffs allege damages of only a fraction of the $75,000 required for the Court to exercise diversity jurisdiction, (*see, e.g.*, Compl. ¶¶ 166, 168, 169, 179, 181 (Doe: $499 registration fee, $3,500 in convention-related fees, several meeting fees of $20 each, $150 renewal fee); *id.* ¶¶ 192, 195 (Loe: $499 registration fee, fees of $10 to $20 for each of "25 to 30 meetings"); *id.* ¶ 220 (Roe: $499 registration fee, $10 for a seminar, "expenses" for travel to events); *id.* ¶¶ 228, 230, 231 (Moe: $499 registration fee, fees of $5 to $10 for each of "about 25 meetings," fees of $49 to $69 for each of unspecified number of seminars)), diversity jurisdiction does not exist.

The Court also lacks subject matter jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).  That statute provides for federal subject matter jurisdiction over certain multistate class actions where, among other things, the aggregate "matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  *Id.*  The proposed class does not meet the amount-in-controversy requirement CAFA.  "Under CAFA . . . the party asserting subject matter jurisdiction has the burden of proving it."  *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 59 (2d Cir. 2006).  "To satisfy its burden, [that party] must prove to a reasonable probability that there is the necessary minimal diversity and that the amount in controversy exceeds $5 million."  *Id.*  In particular, an allegation as to an amount-in-controversy under a statute governing subject matter jurisdiction must meet the "plausibility" standard applicable to Rule 8.  *See, e.g.*, *Wood v. Maguire Automotive, LLC*, 508 F. App'x 65, 65 (2d Cir. 2013) ("Wood's allegation in her complaint of [the amount-in-controversy] is conclusory and not entitled to a presumption of truth.") (citing *Iqbal*, 556 U.S. at 681); *see also, e.g.*, *Weir v. Cenlar FSB*, No. 16-CV-8650 (CS), 2018 WL 3443173, at *12 (S.D.N.Y. July 17, 2018) (reasoning that the "jurisdictional amount, like any other factual allegation" must be "supported by facts rendering it plausible" and concluding that plaintiffs had not "plausibly alleged" the required amount in controversy under CAFA (citations omitted)).

The lone assertion that "there are likely thousands of putative Class Members; the aggregate amount in controversy exceeds the jurisdictional amount or [sic] $5,000,000" (Compl. ¶ 39), is plainly inadequate – and implausible given the quantum of damages alleged for each Plaintiff.  *See*, *e.g.*, *Mallgren v. Microsoft Corp.*, 975 F. Supp. 2d 451, 456 (S.D.N.Y. 2013) (dismissing because amount-in-controversy allegations did not meet the plausibility standard articulated in *Iqbal* where plaintiff conclusorily alleged that "there were several events" that

"qualifie[d] this as a case" meeting the required jurisdictional amount); *Lo v. AT&T Servs., Inc.*, 17-CV-401 (JCH), 2018 WL 587322, at *4 (D. Conn. Jan. 29, 2018) (same where plaintiff alleged a "boilerplate statement that the amount in controversy" exceeded the required jurisdictional amount); *Valente v. Garrison from Harrison LLC*, 15-CV-6522 (DLI)(MDG), 2016 WL 126375, at *2 (E.D.N.Y. Jan. 11, 2016) (same where complaint contained only "boilerplate allegations" that plaintiff "sustained severe personal injuries, was rendered sick, sore lame and disabled, required medical attention, suffered pain, will continue to suffer and will require medical attention in the future" to establish amount-in-controversy).

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint should be granted.

Respectfully submitted,

/s/ Joanna C. Hendon

Joanna C. Hendon
Cynthia Chen
Bradley Pollina

SPEARS & IMES LLP
51 Madison Avenue
New York, New York 10010
Tel:  (212) 213-6996
Fax:  (212) 213-0849

jhendon@spearsimes.com
cchen@spearsimes.com
bpollina@spearsimes.com

*Attorneys for Defendants*