**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

JANE DOE, LUKE LOE, RICHARD ROE, and MARY  :
MOE, individually and on behalf of all others similarly  :
situated,  :
   :
          *Plaintiffs,*  :
   :   No. 1:18-cv-09936 (LGS)
      v.  :
   :
THE TRUMP CORPORATION, DONALD J. TRUMP, in  :
his personal capacity, DONALD TRUMP, JR., ERIC  :
TRUMP, and IVANKA TRUMP,  :
   :
          *Defendants.*  :
   :
-----------------------------------------------------------------------X


# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT


Joanna C. Hendon
Cynthia Chen
Bradley Pollina
SPEARS & IMES LLP
51 Madison Avenue
New York, New York  10010
Tel:  (212) 213-6996

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................... 1

RELEVANT FACTS .......................................................................................................... 4

    A.    The ACN Business Opportunity ........................................................ 4

    B.    Mr. Trump's Relationship With ACN .............................................. 7

        1.    Mr. Trump's Video Endorsement of ACN ............................ 7

        2.    Mr. Trump's Personal Appearances ..................................... 9

        3.    The Celebrity Apprentice ...................................................... 11

    C.    Plaintiffs Fail to Recoup Their Investments .................................. 12

ARGUMENT ..................................................................................................................... 13

I.    PLAINTIFFS FAIL TO STATE A RICO CLAIM BECAUSE
THEY FAIL TO ALLEGE MAIL OR WIRE FRAUD ............................................. 13

    A.    Plaintiffs Fail to Particularize Any Allegedly
Fraudulent Statement by Any Defendant ........................................... 13

        1.    Opinion Statements Generally Are Not Actionable ............ 14

        2.    "Puffery" is Immaterial as a Matter of Law ..................... 15

        3.    Plaintiffs Fail to Particularize a Fraudulent Statement
by Any Defendant ................................................................. 16

        4.    Plaintiffs Fail to Particularize Misconduct of Any Kind
by The Trump Corporation or Mr. Trump's Children ......... 20

        5.    Plaintiffs Fail to Allege Fraud by Omission or Half Truths ......... 21

    B.    Plaintiffs Fail to Plead Loss Causation ........................................... 23

    C.    Plaintiffs Fail to Allege a Scheme That Contemplated Economic
Harm or That Defendants Willfully Intended to Inflict Such Harm ......... 25

II.    PLAINTIFFS FAIL TO PLEAD AN "ASSOCIATION IN FACT"
RICO ENTERPRISE ......................................................................................... 27

III.    THE COURT LACKS SUBJECT MATTER JURISDICTION
OVER PLAINTIFFS' STATE LAW CLAIMS UNDER
28 U.S.C. §§ 1332 (A) OR (D) .................................................................28

CONCLUSION...................................................................................................30

## **TABLE OF AUTHORITIES**

### **Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
  404 F.3d 566 (2d Cir. 2005)...................................................................... 14 n.5

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)........................................................................... 23, 25 n.9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................... 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................... 24, 25

*Blockbuster, Inc. v. Galeno*,
  472 F.3d 53 (2d Cir. 2006)......................................................................... 29

*Bortz v. Noon*,
  556 Pa. 489 (1999) ............................................................................... 20 n.7

*Boyle v. United States*,
  556 U.S. 938 (2009)................................................................................... 28

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
  547 F.3d 115 (2d Cir. 2008)........................................................................ 14

*Chiarella v. United States*,
  445 U.S. 222 (1980)................................................................................... 21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)................................................................... 15, 16

*Colgan v. Leatherman Tool Grp., Inc.*,
  135 Cal. App. 4th 663 (2006) ................................................................ 20 n.7

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013)........................................................................ 28

*D. Penguin Bros. Ltd. v. City Nat. Bank*
  587 F. App'x 663 (2d Cir. 2014) ................................................................ 28

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)..................................................................... 6 n.2

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................................. 15

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d Cir. 2018) .................................................................. 23, 25 n.9

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) ................................................................................. 14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   783 F.3d 395 (2d Cir. 2015) ........................................................................... 14 n.5

*Gilman v. BHC Sec., Inc.*,
   104 F.3d 1418 (2d Cir. 1997) ............................................................................... 29

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995) ........................................................................... 11 n.4

*I. Meyer Pincus & Assocs v. Oppenheimer & Co.*,
   936 F.2d 759 (2d Cir. 1991) ........................................................................... 21, 22

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010) ................................................................................. 16

*In re Donald J. Trump Sec. Litig.-Taj Mahal Litig.*,
   7 F.3d 357 (3d Cir. 1993) .............................................................................. 21, 22

*In re Gen. Motors LLC Ignition Switch Litig.*,
   257 F. Supp 3d 372 (S.D.N.Y. 2017) ............................................................ 14 n.5

*In re Salomon Analyst AT&T Litig.*,
   350 F. Supp 2d 455 (S.D.N.Y. 2004) .................................................. 15, 16, 26, 27

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ...................................................................... 14 n.5

*Kramer v. Unitas*,
   831 F.2d 994 (11th Cir. 1987) ............................................................................. 19

*Laro, Inc. v. Chase Manhattan Bank*,
   866 F. Supp. 132 (S.D.N.Y. 1994) ...................................................................... 26

*Lasker v. New York State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ..................................................................................... 16

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006).............................................................. 14

*Lloyd v. Gen. Motors Corp.*,
    397 Md. 108 (2007) .................................................................... 20 n.7

*Lynn v. McCormick*,
    2017 WL 6507112 (S.D.N.Y. Dec. 18, 2017) ................................... 28

*Mallgren v. Microsoft Corp.*,
    975 F. Supp. 2d 451 (S.D.N.Y. 2013)................................................ 30

*Martens Chevrolet, Inc. v. Seney*,
    292 Md. 328 (1982) ..................................................................... 20 n.7

*McBrearty v. Vanguard Grp, Inc.*,
    2009 WL 875220 (S.D.N.Y. Apr. 2, 2009)................................... 25 n.9

*McKell v. Washington Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) ................................................... 20 n.7

*Moore v. Paine Webber*,
    189 F.3d 165 (2d Cir. 1999)........................................................... 23

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)......................................................... 6 n.2

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018)........................................ 16, 17

*Porreco v. Porreco*,
    571 Pa. 61 (2002) ...................................................................... 20 n.7

*Radcliffe v. Wright*,
    2018 WL 3187338 (S.D.N.Y. June 28, 2018) ................................... 29

*Robinson Helicopter Co. v. Dana Corp.*,
    34 Cal. 4th 979 (2004) ............................................................... 20 n.7

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................... 21

*Sanchez v. ASA Coll., Inc.*,
    2015 WL 3540836 (S.D.N.Y. June 5, 2015) ..................................... 17

*Segal v. Bitar*,
    2012 WL 273609 (S.D.N.Y. Jan. 30, 2012) ............................................................ 25 n.9

*Shamsian v. Atl. Richfield Co.*,
    107 Cal. App. 4th 967 (2003) ....................................................................... 20 n.7

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir.1994) .......................................................................... 26

*Snyder v. Harris*,
    394 U.S. 332 (1969) ..................................................................................... 29

*Spaulding v. Wells Fargo Bank, N.A.*,
    714 F.3d 769 (4th Cir. 2013) ...................................................................... 14 n.5

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008) ........................................................................ 14

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ..................................................................................... 15

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) .............................................................. 18, 19, 21

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ........................................................................ 13

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) ........................................................................ 15

*United States v. Carlo*,
    507 F.3d 799 (2d Cir. 2007) ........................................................................ 25

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) ........................................................................ 26

*United States ex rel O'Donnell v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016) ........................................................................ 15

*United States v. Gabriel*,
    125 F.3d 89 (2d Cir. 1997) .................................................................... 25, 27

*United States v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016) .................................................................. 13, 14

*United States v. Litvak*,
   889 F.3d 56 (2d Cir. 2018) ............................................................. 15

*United States v. Males*,
   459 F.3d 154 (2d Cir. 2006) ...................................................... 25, 26

*United States v. Mittelstaedt*,
   31 F.3d 1208 (2d Cir. 1994) ........................................................... 26

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) ........................................................... 15

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ....................................................... 25, 27

*United States v. Szur*,
   289 F.3d 200 (2d Cir. 2002) ........................................................... 21

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ...................................................................... 22

*Weir v. Cenlar FSB*,
   2018 WL 3443173 (S.D.N.Y. July 17, 2018) ................................ 30

*Weisman v. Connors*,
   312 Md. 428 (1988) .................................................................. 20 n.7

*Williams v. Affinion Grp., LLC*,
   889 F.3d 116 (2d Cir. 2018) ............................................... 13, 14, 16

*Wood v. Maguire Automotive, LLC*,
   508 F. App'x 65 (2d Cir. 2013) ................................................ 29, 30

*Yocca v. Pittsburgh Steelers Sports, Inc.*,
   578 Pa. 479 (2004) ................................................................... 20 n.7

## Statutes

18 U.S.C. § 1962 ................................................................................... 13

28 U.S.C. § 1332 ............................................................................. 28, 29

Defendants The Trump Corporation, Donald J. Trump, Donald Trump, Jr., Eric Trump, and Ivanka Trump respectfully move to dismiss the Amended Complaint filed in this action on January 31, 2019, because it fails to state a claim upon which relief may be granted and, with respect to Plaintiffs' state court claims, federal jurisdiction is lacking.

Plaintiffs filed this lawsuit on October 29, 2018, one week before the midterm elections. It is funded by the Tesseract Research Center, whose president describes herself as "[a] long-time progressive strategist" who also runs the Tesseract Group, "a boutique consulting firm" specializing in "developing, promoting and implementing progressive public policy."[1]  On January 14, 2019, Defendants moved to dismiss the complaint as against all Defendants on numerous grounds.  On January 31, 2019, Plaintiffs filed an Amended Complaint that cures none of the original defects, and in fact only highlights the implausibility, of a lawsuit that seeks to convert a celebrity endorsement by Mr. Trump and the licensing business of the Trump family, *in toto*, into a RICO violation by which Plaintiffs – who paid no money to any Trump business, ever – lost $499 each.

## PRELIMINARY STATEMENT

Plaintiffs have sued the President in his personal capacity, his three oldest children, and The Trump Corporation, alleging a substantive RICO violation, conspiracy to violate RICO, violations of the consumer fraud statutes of three states, and common law fraud and negligent misrepresentation.  While the Amended Complaint purports to allege malfeasance by various Trump entities, it seeks relief for a single class of putative victims – those who paid money to a business Mr. Trump does not own, has never owned, and over whose operations he has never

---

[1] *See, e.g.*, The New York Times, *Trump Persuaded Struggling People to Invest in Scams, Lawsuit Says*, Oct. 29, 2018 ("The [Plaintiffs'] lawyers said . . . the Tesseract Research Center [is] funding the lawsuit."); Tesseract Group, http://tesseractllc.com/index1.html (last visited Feb. 14, 2019).

exercised control:  American Communications Network ("ACN"), a multi-level marketing company.

Between 2006 and 2015, Mr. Trump provided celebrity endorsement services to ACN by appearing in promotional videos and magazine articles and at events for which he was paid.  In video clips used by ACN to recruit subscribers, Mr. Trump made generic positive statements about the company (*e.g.*, "ACN has a reputation for success, success that's really synonymous with the Trump name," "I see incredible potential in the things they're doing now, and are planning in the future").  No Plaintiff is alleged to have paid or lost money to the Defendants or to any Trump business, and no Defendant is alleged to have solicited any Plaintiff for anything.  It is undisputed that ACN, and ACN alone, solicited and collected fees from Plaintiffs, for the benefit of ACN.

Plaintiffs are four men and women who paid ACN $499 for the right to market ACN products and services and, after months of effort, allegedly failed to recoup those fees.  Before enrolling in ACN, each signed a contract acknowledging that "as an IBO, I am not guaranteed any income nor am I assured any profits or success," and that "no claims of guaranteed profits or representations of expected earnings . . . have been made by ACN or my sponsor."  Recruited by friends and family who touted ACN as a money-making opportunity, Plaintiffs nonetheless contend Mr. Trump's endorsement is the reason they enrolled in ACN and the reason they failed to recoup their investment.

ACN has been in business for more than 20 years.  During that time, it has withstood its share of public scrutiny as a member of the multi-level marketing industry.  For nine years, Mr. Trump served as a paid spokesperson and motivational speaker for ACN, appearing publicly at

events across the United States.  Yet until the filing of this lawsuit (one week before the midterm

elections), no one sought to sue Mr. Trump for losses she sustained with ACN.

And for good reason.  The Amended Complaint is fatally flawed in virtually every

respect.  *First*, Plaintiffs' claims, which all sound in fraud, require particularized evidence of a

materially false or misleading statement by each Defendant, or an agreement to make such

statements, which the Amended Complaint does not contain.  Indeed, the Amended Complaint is

devoid of any allegation that any Defendant other than Mr. Trump made a statement heard by

Plaintiffs, and on that basis alone, it should be dismissed against The Trump Corporation, Ms.

Trump, Donald Trump, Jr., and Eric Trump.

*Second*, Mr. Trump's promotional statements about ACN are opinion statements,

inactionable as a matter of law, absent particularized proof, not proffered here, that the opinions

were not genuinely held when stated.

*Third*, the statements upon which Plaintiffs purport to have relied are "puffery" that

courts in this circuit routinely reject at the pleading stage because no "reasonable investor"

would have relied upon them.

*Fourth*, to survive a motion to dismiss the RICO claims, Plaintiffs must plead not only

"but for" causation – that they signed up for ACN because of something Mr. Trump said – but,

also, loss causation – that his statements are the reason Plaintiffs failed to recoup their

investments – which Plaintiffs fail to do, recounting, instead, numerous other factors that could

have caused their losses.

*Fifth*, to plead RICO predicate acts of mail or wire fraud, Plaintiffs must allege "specific

facts" giving rise to a "strong inference" that Defendants acted with the specific intent to harm

Plaintiffs, which the Amended Complaint fails to do, averring only that Mr. Trump endorsed ACN because it was in his economic interest to do so.

*Sixth*, the "association-in-fact" enterprise alleged by Plaintiffs – which purports to include the Trump family and numerous Trump entities (but not ACN) – is defective as a matter of law, because the Amended Complaint fails to allege specific facts tending to prove the purported "associates" joined together to engage in *any* unlawful conduct with respect to ACN or Plaintiffs, let alone racketeering activity.

Finally, if the Court determines the RICO claims should be dismissed, federal jurisdiction over Plaintiffs' state claims will be lacking, because no Plaintiff satisfies the $75,000 amount in controversy requirement for diversity jurisdiction, and because Plaintiffs cannot demonstrate class-wide damages of $5,000,000 or more, as required under the Class Action Fairness Act.

For these reasons the Complaint should be dismissed.

## RELEVANT FACTS

### A.     The ACN Business Opportunity

ACN is a multi-level marketing company that operates from its headquarters in Concord, North Carolina through a network of thousands of representatives who pay ACN for the right to market ACN products and services directly to customers and who recruit others to do the same. (Compl. ¶¶ 80-81; Chen Aff., Exh. 1 at 1.)  Founded in 1993, ACN describes itself as the world's largest "direct seller" of telecommunications and essential services for home and business. (Chen Aff., Exh. 1 at 1-2.)  "Direct selling" or "network marketing" is a retail channel used by companies such as Amway, Avon Products, and Mary Kay Inc.  In materials Plaintiffs cite, Warren Buffett is reported to have described one of his network marketing companies as "the best investment I ever made."  (Compl. n. 139.)

4

ACN encourages individuals to become "Independent Business Owners" ("IBOs"). (Compl. ¶ 80.)  Plaintiffs became IBOs in 2013 (Mary Moe), in 2014 (Luke Loe and Jane Doe), and in 2016 (Richard Roe), which entitled them to market ACN products and services directly to their own customers and to recruit others to do the same.  (*Id.* ¶ 181 (Doe); *id.* ¶¶ 220, 225 (Loe); *id.* ¶ 235 (Roe); *id.* ¶ 259 (Moe).)  IBOs pay an initial sign-up fee and an annual renewal fee in order to be able to sell ACN's products and services.  (*Id.* ¶ 80.)  Between 2013 and 2016, the sign-up fee was $499 and the renewal fee was $149.  (*Id.*)  According to the ACN compensation plan, an IBO could earn small commissions on sales and billings to customers who purchase ACN products and services through the IBO, with additional bonuses for meeting sales targets. (*Id.* ¶ 81.)  IBOs could also earn money by recruiting others to sign up as IBOs.  (*Id.*)

The "lifeblood" of ACN's recruiting operation is small group events hosted by IBOs in their homes or at local hotels and event spaces.  (*Id.* ¶ 82.)  IBOs are encouraged to identify "warm" leads among friends, family, and other contacts and to invite them to meetings at their homes.  (*Id.*)  To help IBOs in their sales and recruitment efforts, ACN sells a series of "Business Tools," including DVDs (branded "Opportunity Discs") and magazines as well as "Your Business Assistant," a web application IBOs may use to manage  their "downlines" (new IBOs whom they recruit to ACN) and customers (persons to whom they have sold ACN products or services).  (*Id.*)  At these small-group recruiting events, hosts typically play the DVDs and distribute the materials they have bought from ACN.  (*Id.* ¶ 83.)  The aim is both to sell ACN's products and services and to "share the opportunity" with friends and family to become an IBO. (*Id.*)  These small meetings are the primary mechanism through which consumers are persuaded to make the initial investment to become an IBO.  (*Id.*)

5

All four Plaintiffs began their association with ACN in precisely this fashion.  A friend or family member already enrolled as an IBO spoke favorably to each Plaintiff about the business opportunity and encouraged him or her to attend such a meeting, with the friend or family member acting as a sponsor – which they all did.  (*Id.* ¶¶ 183-96 (Doe); *id.* ¶¶ 220, 222-25 (Loe); *id.* ¶¶ 238-41, 244-46 (Roe); *id.* ¶¶ 260-69 (Moe).)  At those meetings, three of the Plaintiffs were shown an ACN Opportunity Disc containing clips of Mr. Trump endorsing the company. (*Id.* ¶¶ 189-95 (Doe); *id.* ¶¶ 222-24 (Loe); *id.* ¶¶ 262-68 (Moe).)  Roe was not shown the ACN Opportunity Disc, but before signing up, he "decided to look ACN up on YouTube," where he found an episode of *The Celebrity Apprentice* on which Mr. Trump appeared with two of the company's founders and stated that he knew ACN well.  (*Id.* ¶¶ 240-44.)

Before enrolling, IBOs must enter into an ACN Independent Business Owner Agreement in which they acknowledge, in writing, that "as an IBO, I am not guaranteed any income, nor am I assured any profits or success, and I certify that no claims of guaranteed profits or representations of expected earnings that might result from my efforts as an IBO have been made by ACN or my sponsor."  IBOs must further acknowledge that they "shall not represent directly or indirectly that any [other] person may, can, or will earn any stated amount or that any IBOs are guaranteed success."  IBOs also agreed that any dispute between them and ACN would be exclusively resolved through binding arbitration.  (Chen Aff., Exh. 7 at ¶¶ 5, 16 (2013); *id.*, Exh. 8 at ¶¶ 5, 16 (2014); *id.*, Exh. 9 at ¶¶ 5, 17 (2016).)[2]

---

[2] "Chen Aff." Refers to the Affirmation of Cynthia Chen in Support of Defendants' Motion to Dismiss the Amended Complaint, dated February 21, 2019.  Although not referenced in the Amended Complaint, Plaintiffs "rel[y] heavily upon [the] terms and effect of" the IBO contracts they entered into with ACN, "thereby rendering [those documents] integral to the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) ("A necessary prerequisite for taking into account materials extraneous to the complaint is that the plaintiff rely on the terms and effect of the document in drafting the complaint . . . . This generally occurs when the material considered is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason – usually because the document, read in its entirety, would undermine the legitimacy of the

In order to keep IBOs motivated, ACN also stages multi-day events, large "Training Events" or "International Conventions," including both large rallies held in auditoriums, with guest speakers who encourage IBOs to make continued investments in ACN, as well as smaller seminar-style break-out sessions.  (*Id.* ¶ 84.)  These conventions are not merely business conferences at which participants meet to network and hear from industry experts.  (*Id.*)  They are motivational rallies, designed to stoke enthusiasm and convince IBOs that they can make a profit if they just keep investing and trying to build their downline (that is, recruit, motivate, and encourage their own IBOs).  (*Id.*)  These events themselves are a source of revenue for ACN. (*Id.*)

### B.     Mr. Trump's Relationship With ACN

Between 2006 and 2015, Mr. Trump provided celebrity endorsement services to ACN, by appearing in promotional videos and magazine articles and at events for which he was paid. (Compl. ¶¶ 88-95.)  Mr. Trump also appeared as a featured speaker at motivational events sponsored by ACN, and, in 2009 and 2011, *The Celebrity Apprentice* featured the company and its founders on two episodes.  (*Id.* ¶ 99.)  The Amended Complaint avers no facts suggesting that ACN paid Mr. Trump anything but a flat fee for his services, for example, that his compensation depended upon the number of IBOs enrolled by ACN in a given year.

### 1.     Mr. Trump's Video Endorsement of ACN

The Opportunity Discs viewed by Plaintiffs contained the following statements by Mr. Trump:

a.  "ACN has a reputation for success.  Success that's really synonymous with the Trump name and other successful names, and you can be a part of it."  (Compl. ¶¶ 116, 212 (Doe), 226 (Loe), 254 (Roe), 264 (Moe).)

---

plaintiff's claim – was not attached to the complaint." (internal quotation marks and citations omitted and emphasis removed)).

b. "You have a great opportunity before you at ACN without any of the risks most entrepreneurs have to take.  You have the ability to market breakthrough technology before it hits the critical mass.  I've experienced the opportunity that exists when you're able to jump ahead of the curve, and ACN gives you that opportunity."  (*Id.* ¶¶ 107, 212 (Doe), 226 (Loe), 254 (Roe), 265 (Moe).)

c. "I've found there are two types of people:  Those who take action and those who let opportunity pass them by.  Which one are you?"  (*Id.* ¶¶ 119, 192 (Doe), 212 (Doe), 226 (Loe), 254 (Roe), 265 (Moe).)

d. "When evaluating a business opportunity, people need to look for strong reasons, a solid practice, success stories, a strong product people really need and want, and a clear plan for the future.  ACN has all of these things."  (*Id.* ¶¶ 117, 254 (Roe), 264 (Moe).)

e. "I've been working with ACN for a few years now.  Since that time, I've developed a great relationship with ACN, and the more I learn about them, the more I like and respect them.  I see incredible potential in the things they're doing now, and are planning in the future."  (*Id.* ¶¶ 144, 212 (Doe), 226 (Loe), 254 (Roe).)

f. "It's my absolute pleasure to speak to you on behalf of ACN.  I work with a lot of companies and I can say with 100% confidence that you've made the right decision choosing ACN."  (*Id.* ¶¶ 119, 212 (Doe), 226 (Loe), 254 (Roe).)

g. "I've experienced the opportunity that exists when you're able to jump ahead of the curve and ACN gives you that opportunity."  (*Id.* ¶¶ 107, 165, 212 (Doe), 226 (Loe), 254 (Roe), 265 (Moe).)

h. "Direct selling is actually one of the oldest, most respected business models in the world.  And has stood the test of time most importantly.  ACN approaches it with a fresh perspective that you won't find anywhere else.  I know what it takes to be a success and ACN has a winning business model, and I mean winning."  (*Id.* ¶¶ 114, 226 (Loe), 254 (Roe)).

i. "ACN provides you with everything you need to be successful.  All the training, support and tools, combine that hard work and commitment and you'll be well on your way to living the lifestyle that you deserve." (*Id.* ¶¶ 119, 254 (Roe).)

j. "ACN is leading the way in a new technology that will literally revolutionize the way we communicate with the ACN video phone.  And trust me it's changing everything.  The absolute truth is that this technology will be present in every home within the next several years."  (*Id.* ¶¶ 123, 226 (Loe))

k. "No matter who you are, no matter what you do, everyone can find value in this technology.  With my busy schedule, the ACN video phone keeps me personally connected to my contacts around the world, without ever leaving my office."  (*Id.* ¶¶ 123, 133, 226 (Loe).)

2.      Mr. Trump's Personal Appearances

On at least 14 occasions (Compl. ¶ 96), Mr. Trump appeared at "motivational rallies"

intended by ACN "to stoke enthusiasm" among the IBO network (*id*. ¶ 84).[3]  At ACN rallies,

Mr. Trump typically greeted and signed autographs for groups of IBO "stars," before sitting for

an interview for the broader audience with an ACN host.  (*See, e.g., id*. n. 72 at 10:15; Chen Aff.,

Exh. 2 at 76.)  At these events, Mr. Trump imparted generic advice (*see, e.g.*, Compl. n. 70 at

06:19 ("never ever quit, never ever give up"); *id.* n. 79 at 05:36, 07:28 ("you have to go out there

and win," "pick the right business")) and shared with the audience lessons drawn from his own

experience (*see, e.g.*, *id*. n. 72 at 17:50).  Mr. Trump also spoke about the ACN business

opportunity.  (*See, e.g.*., *id.* n. 68 at 02:33, 02:54 (ACN is the "leader in the field" and "you are in

the right business"); *id.* n. 75 at 03:28 ("you have . . . an amazing concept whose time has really,

really come").)

Mr. Trump cautioned that not everyone will succeed in business for herself.  In his

opinion, the ACN business opportunity afforded participants a chance to test their aptitude for

direct selling before, or without, giving up their full-time employment.  To the extent an IBO

found success with ACN, she might choose to leave her job and become an entrepreneur, full-

time, but if she did not, she would have risked and lost relatively little by trying.  (*See id*. n. 72 at

10:40 ("[L]ook, not everything is going to work out.  I mean, I like to phrase it – they talk about

the power of positive thinking.  I also talk about the power of negative thinking, guard against

the downside.  If things didn't work out, you're still at your job.  And it's one of the things I love

about what they're doing here; they're not telling people, buy this . . . do this, do that, leave your

---

[3] While Mr. Trump's live appearances consume many pages of the Amended Complaint, no Plaintiff is alleged to
have attended such an event, or to have viewed footage of them on YouTube.  Likewise, Plaintiffs Doe and Moe
state they viewed ACN magazines, but neither contends she did so before enrolling in ACN.  (Compl. ¶¶ 213-14
(Doe); *id.* ¶ 271 (Moe).)

job, quit, become rich and then all of sudden people have a problem.  You keep your job, and a
lot of the people that I met had their job for two or three years and all of a sudden they start[]
weeding out of their job and going full-time into ACN because they're making more money with
ACN.  So I like it because it really takes the risk out.  It takes a lot of the risk out of the decision.
I think it's great.").)

When asked why, after so many years, Mr. Trump continued to work with ACN, he
typically praised the founders (*see, e.g.*, Compl. n. 72 at 02:56 ("I really like the guys")), often
referencing a game of golf early in the parties' relationship where, to Mr. Trump's surprise, two
of the founders did not want to beat each other, (*see, e.g.*, *id.* n. 72 at 04:38; *id.* n. 70 at 01:30; *id.*
n. 75 at 03:02).

During one such appearance, in Charlotte, North Carolina in early 2013, the following
exchange occurred between the ACN host and Mr. Trump:

| | |
|---|---|
| Host: | So I'm curious about this, you know, uh, why do you keep coming back?  What is it about ACN?  I– certainly not for any money, it's – |
| Mr. Trump: | No. |
| Host: | – for the love of the organization.  Tell us why you love ACN. |
| Mr. Trump: | I left Palm Beach this morning and I said why am I doing it?  And the reason I'm doing it is I really have a, just a special relationship with your founders.  They're good people.  They're hard workers.  They love what they're doing.  They love the people in the room. |

(Compl. n. 75 at 01:31; *see also id.* ¶ 145.)  During the same appearance, however, the ACN host
repeatedly referenced the transactional aspect of the parties' relationship.  (*See id.* n. 75 at 07:17
("So let's talk about the extended relationship that you have with ACN"); *id.* n. 79 at 01:15,
01:24 ("You . . . have lots of choices, the opportunity to be involved with lots of companies, to
endorse and have a relationship with endless opportunities," and "with all these choices, you've

decided that you will now choose to be exclusive with ACN")).  (*See also id*. n. 66 at 02:29

(2009 Charlotte) ("ACN and everyone involved has really enjoyed their partnership with you,

have you enjoyed the partnership with them?  I have and we've just extended it so I'm very

happy about that"); *id.* n. 99 at 01:31 (2006 Interview) ("I am asked to do this, what you're doing

with me, many, many times, and I turn down many, many different proposals"); *id.* n. 70 at

02:08 (2010 Charlotte) ("[Y]ou obviously speak for a lot of companies, you see a lot of

organizations")).

The print materials upon which Plaintiffs purport to rely are even more blunt about the

fact that ACN was paying Mr. Trump for his services, but emphasized that his decision to

endorse the company was based on more than that.  (*See* Chen Aff., Exh. 3 at 23 ("When Donald

Trump was negotiating with ACN to personally endorse the company and speak at their events,

he made it clear that he would not be doing it 'for the money.'  He has plenty of money, so

something else had to be the deciding factor.  For him, it came down to the four ACN co-

founders."); *id.*, Exh. 4 at 20 (same); *id.*, Exh. 5 at 68 (Mr. Trump's endorsement is "not just a

business deal between ACN and Donald Trump.").)[4]

3.     The Celebrity Apprentice

In 2009 and 2011 – years before any Plaintiff enrolled in ACN – the company's founders

appeared on *The Celebrity Apprentice*, a television program that aired for eight years in prime

time on the NBC network.  (Compl. ¶¶ 99-103.)  During the 2011 episode, Mr. Trump stated,

"[O]n my right are two friends of mine, Greg Provenzano and Mike Cupisz.  They run a

---

[4] Introductory paragraphs of the Amended Complaint aver that Mr. Trump misled Plaintiffs by claiming to have performed "extensive due diligence" and to possess "inside information" concerning ACN (*see, e.g.*, Compl. ¶ 8), but "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint," *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  No Plaintiff alleges he or she heard Mr. Trump reference due diligence or inside information, and the Opportunity Discs containing the video endorsement upon which Plaintiffs purportedly relied contain no such statements, *see supra* at 7-8.

company called ACN, which I know very well.  It's a home-based marketing company for individuals and it's in over twenty countries. Greg, tell us about your company."  (Chen Aff., Exh. 10-T at 1.)  No Plaintiff saw this *The Celebrity Apprentice* episode featuring ACN when it aired.  Richard Roe found the 2011 episode years later on YouTube.  (Compl. ¶¶ 242-43).

C.    **Plaintiffs Fail to Recoup Their Investments**

Once enrolled, Plaintiffs found only limited success as IBOs.  Jane Doe and Luke Loe traveled to Palm Springs, Cleveland, and Detroit to attend multi-day ACN rallies.  They also attended bi-weekly recruitment meetings closer to home, some of which Doe hosted.  (Compl. ¶¶ 196-202, 207-10, 215-17 (Doe); *id*. ¶¶ 229-33 (Loe).)  Doe renewed her ACN subscription for a second year and persuaded four members of her family to enroll, one as an IBO and three as customers, before concluding that the ACN business opportunity was no longer a worthwhile investment.  (*Id.* ¶¶ 202-03, 211; *see also id*. ¶ 216 ("Despite her strenuous efforts [Doe] simply was not making money.").)  Loe recruited his friend Doe, but never received any income from ACN and "came to realize that . . . ACN was not a good money making opportunity and decided not to renew his membership."  (*Id.* ¶¶ 22, 227-28.)  Mary Moe "immersed herself in information about [ACN]."  (*Id*. ¶ 270).  She explored the company's website, watched videos, read pamphlets, and attended "dozens of meetings" hosted by more senior IBOs.  (*Id.* ¶¶ 270-75.)  Moe enrolled her son in ACN and renewed her subscription for a second year before concluding ACN was no longer a worthwhile investment.  (*Id.* ¶ 278; *see also id*. ¶ 277 ("She believed she could become the next [star IBO] if she tried hard enough," but she was "unable to find success.").)  Richard Roe worked with an IBO "mentor" who taught him to use the ACN business tools, but Roe found it difficult to recruit new IBOs or to sell ACN products or services.

Once his "mentor stopped reaching out to him . . . [Roe] really had no reason or motivation to continue." (*Id.* ¶¶ 248-53, 256.)

## ARGUMENT

### I.   PLAINTIFFS FAIL TO STATE A RICO CLAIM BECAUSE THEY FAIL TO ALLEGE MAIL OR WIRE FRAUD

Plaintiffs fail to state a substantive RICO claim or conspiracy to violate the RICO statute, because they fail to plead the existence of "racketeering activity." *See generally Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018) (summarizing elements of 18 U.S.C. § 1962(c) and (d)).  Plaintiffs invoke the federal mail and wire fraud statutes, alleging that Mr. Trump's endorsement of ACN on national network television, in ACN marketing videos, and in ACN magazines operated as a criminal scheme to defraud.  That assertion, far-fetched on its face, is legally untenable.  Plaintiffs fail to particularize a single actionable statement or omission by any Defendant reasonably capable of influencing their decision to become IBOs; fail to plead any fact tending to show such statements or omissions proximately caused their losses; and fail to allege even generally that Mr. Trump, knowing the law proscribed his doing so, gave ACN his endorsement for the specific purpose of harming Plaintiffs he did not know, never spoke to, and from whom he stood to receive nothing.

#### A.   Plaintiffs Fail to Particularize Any Allegedly Fraudulent Statement by Any Defendant

Where a plaintiff relies upon predicate acts of mail fraud and wire fraud to state a RICO claim, "[t]he elements of mail and wire fraud must be pled with particularity." *Williams*, 889 F.3d at 124.  "The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015).  "Because the mail

13

fraud and the wire fraud statutes use the same relevant language [courts] analyze them the same way." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (internal citation and quotation marks omitted).  The complaint must "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams*, 889 F.3d at 124; *accord Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008). [5]

1.  Opinion Statements Generally Are Not Actionable

Statements of opinion "generally cannot constitute fraud," but for "the narrow exception to that rule: namely, that opinions *may* constitute actionable fraud where a present intent to deceive exists," *i.e.* where a defendant makes an "assurance . . . knowing full well that its assurance was false." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 134-35 (2d Cir. 2008) (emphasis in original) (internal citations and quotation marks omitted).  Thus, in order to state a claim for fraud based on a statement of opinion, Plaintiffs "must allege that defendant's opinions were both false and not honestly believed when they were made." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011).  "[T]o survive a motion to dismiss on a false statement of opinion claim, a plaintiff must allege with particularity provable facts to demonstrate that the statement of opinion is both objectively and subjectively false.  It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on

---

[5] Plaintiffs' state law claims sound in fraud and are all subject to the heightened pleading standards of Rule 9(b) as well.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402-03 (2d Cir. 2015) (common law fraud); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 583 (2d Cir. 2005) (common law negligent misrepresentation); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (claim under California Business and Professions Code); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 440 (S.D.N.Y. 2017) (claim under Pennsylvania Trade Practices Act); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (claim under Maryland Consumer Protection Act).

14

hindsight or falls short of an identifiable gap between the opinion publicly expressed and the

opinion truly held." *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 465-66 (S.D.N.Y.

2004) (internal citations and quotation marks omitted).

### 2.   "Puffery" is Immaterial as a Matter of Law

In order to establish a scheme to defraud, a plaintiff must also allege that the

misstatements were material.  *U.S. ex rel O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d

650, 657 (2d Cir. 2016).  A statement or omission is material if the alleged "misinformation or

omission would naturally tend to lead or is capable of leading a reasonable [person] to change

[his] conduct." *United States v. Rybicki,* 354 F.3d 124, 145 (2d Cir. 2003) (en banc).  In other

words, a "lie can support a fraud conviction only if it is material, that is, if it would affect a

reasonable person's evaluation of a proposal." *United States v. Corsey,* 723 F.3d 366, 373 (2d

Cir. 2013).  Materiality is assessed "under all the circumstances," *TSC Indus., Inc. v. Northway,*

*Inc.*, 426 U.S. 438, 449 (1976), and "the standard of a 'reasonable investor,' like the negligence

standard of a 'reasonable man,' is an objective one," *United States v. Litvak*, 889 F.3d 56, 64 (2d

Cir. 2018) (internal citation omitted).

While materiality is a mixed question of law and fact, dismissal at the pleading stage is

required if the alleged statements or omissions are "so obviously unimportant to a reasonable

investor that reasonable minds could not differ on the question of their importance." *ECA &*

*Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d

Cir. 2009) (internal citation and quotation marks omitted); *see also* cases cited *infra* at 16-17.

"[G]eneral statements about reputation, integrity and compliance with ethical norms are

inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely

upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183

15

(2d Cir. 2014).  Statements of subjective analysis or opinion, of motives, intentions, or of

optimism or enthusiasm are likewise too broad, general, and nebulous to be material, as a matter

of law.  *See, e.g.*, *id.* at 186 (affirming dismissal of complaint predicated on statements by

management that UBS prioritized "adequate diversification of risk," and "avoidance of undue

concentrations"); cases cited *infra* at 16-17.

> 3.     Plaintiffs Fail to Particularize a Fraudulent Statement by Any Defendant

Across 190 pages of invective directed at Defendants, personally, at the ACN business

model, broadly, and at the decision of a mass media company, NBC Universal, to broadcast

entertainment without disclosing to Plaintiffs payments made by the corporate sponsors of that

entertainment (Compl. ¶¶ 16-17, 74-75), Plaintiffs nonetheless fail to allege a single actionable

statement made to them by any Defendant, as they must to avoid dismissal.  *See, e.g., Williams*,

889 F.3d at 124.  The statements upon which they purport to rely, *see supra* at 7-8, at most

consist of "excessively optimistic" opinions of Mr. Trump, *Salomon Analyst*, 350 F. Supp. 2d at

466, and, as such, are inactionable as fraud.  They are also classic "puffery" of the type this

circuit "has consistently held . . . could not have misled a reasonable investor."  *Lasker v. New

York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996); *see, e.g.*, *id.* at 57-58 (affirming

dismissal of complaint where management represented that it "would not compromise its

financial integrity" and that "business strategies will lead to continued prosperity"); *In re Aetna,

Inc. Sec. Litig.*, 617 F.3d 272, 276, 284 (3d Cir. 2010) (same, where management discussed "our

dedication to disciplined pricing," "my personal commitment to continue to maintain discipline

and rigor in everything we do," and how "we will always take profitability over growth");

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-71

(S.D.N.Y. 2018), *appeal docketed*, 18-1165 (2d Cir. Apr. 20, 2018) (dismissing complaint based

on statements that defendant's software platform would "help[] differentiate ourselves from our competitors around the world," that "we win contracts because we have great technology," and that experts respond to the software platform and say "[w]ow, it has functionality and features that are unique"); *Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006 (JMF), 2015 WL 3540836, at *9 (S.D.N.Y. June 5, 2015) (dismissing civil RICO complaint alleging acts of mail and wire fraud, because "under the federal mail and wire fraud statutes, opinions and puffery or ultimately unfulfilled promises are not actionable as fraud" and statements concerning "outstanding job placement assistance" or how students can "immediately embark on meaningful career [sic]" were "expressions of corporate optimism" that "do not give rise to a fraud claim" (internal quotation marks and citations omitted)).

Only those statements (a) suggesting that Mr. Trump used the ACN videophone himself (Compl. ¶¶ 226, 267) and (b) touting the durability of the "direct selling" business model (*id.* ¶¶ 114-15, 226, 254), upon which Plaintiffs rely, come close to a statement of fact, rather than of opinion or puffing, and the Amended Complaint fails to allege either falsity or materiality as to any of these statements.[6]

*In re Worldcom, Inc. Sec. Litig.,* No. 02-CV-3288 (DLC) (S.D.N.Y.), to which Plaintiffs have cited the Court, is unavailing. *See* Transcript of Conference at 8:4-9, *Jane Doe, et al. v. The Trump Corp., et al.*, No. 18-CV-9936 (LGS) (S.D.N.Y. Dec. 20, 2018) ("One analogy . . . would be some of the WorldCom cases."). Following the company's spectacular collapse and bankruptcy, the indictment of its senior-most executives and one of the largest corporate scandals of its time, purchasers of WorldCom securities sued, among others, the underwriters of offerings

---

[6] Plaintiffs allege that they "relied" upon such statements (Compl. ¶¶ 113, 226), but the significance of the statement to a "reasonable investor" is the touchstone for materiality under the mail and wire fraud statutes. Subjective or actual reliance is an element of neither mail nor wire fraud. *See* discussion *supra* at 15-16.

in which they purchased securities, together with a research analyst (Jack Grubman) employed

by one of the underwriter defendants for fraud, arguing, *inter alia*, that the underwriters failed

reasonably to investigate the truthfulness of statements contained in the SEC Forms 10-Q and

10-K issued by WorldCom and incorporated into registration statements by which the

underwriters offered securities for sale to the public, as required by Section 11 of the Securities

Act of 1933, and that the analyst, in order to curry favor with WorldCom, published favorable,

ostensibly "independent" research designed to cause investors to buy or hold WorldCom

securities, without disclosing the extent to which, among other things, his compensation

depended upon investment banking business garnered from WorldCom, in violation of Section

10(b) of the Securities and Exchange Act of 1934.  *See* Class Action Complaint of Lead Plaintiff,

*In re Worldcom,* No. 02-CV-3288 (DLC) (S.D.N.Y. Oct. 11, 2002), ECF No. 56, 2002 WL

32152258.  In support, plaintiffs alleged specific, factual misstatements concerning the financial

condition of WorldCom and the independence of Mr. Grubman's research, *id*. ¶¶ 111-220, 258-

71, subjects that virtually define the heartland of what is considered material to a "reasonable

investor."  Here, by contrast, Plaintiffs seek to predicate RICO claims on a celebrity

endorsement, which was, on its face, carefully scripted to consist entirely of puffing and

forward-looking and opinion statements, together with truthful statements of fact.

The Second Circuit decision in *United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000), is

also unavailing.  *See* Plaintiffs' Response to Pre-Motion Letter Regarding Motion to Dismiss at

1-2, *Doe v. The Trump Corp.*, No. 18-CV-9936 (LGS) (S.D.N.Y. Dec. 21, 2018), ECF No. 57.

There, the indictment particularized negative facts known by Autuori (an accountant) about his

client, a large real estate company, at the time Autuori was marketing shares in the company to

potential investors, including that the company's financial condition was not as represented and

that the company was paying bribes to a union in exchange for its members' purchase of shares. *Autuori*, 212 F.3d at 109-14.  The Amended Complaint in this case, as discussed, fails to allege the existence of specific facts known to Mr. Trump that could render his opinion statements misleading when spoken, or any statement by Mr. Trump that could have misled a reasonable investor.  The Amended Complaint alleges only that various SEC Form 10-K filings, by an obscure company connected to ACN but unrelated to any Trump business, contained information which – had Mr. Trump reviewed it – would or should have called into question the reasonableness of claims made by him concerning the prospects of the ACN video phone. (Compl. ¶¶ 124-26.)  But the Amended Complaint is devoid of any facts tending to show that Mr. Trump reviewed these materials, knew they existed, or that he, at any time, possessed information that, if true, would have rendered his statements about ACN false when made, as the Grand Jury alleged was the case in *Autuori*.

Indeed, our research discloses no case, in any circuit, in which a court has sustained mail fraud, wire fraud, or RICO claims on the basis of a celebrity endorsement.  *See Kramer v. Unitas*, 831 F.2d 994, 994-95, 998-99 (11th Cir. 1987) (affirming summary judgment award to defendant former professional football player paid to endorse First Fidelity in radio advertisements, where the defendant introduced the audience members to his "friends at First Fidelity," before bank employees stated, "you can earn up to 18.33% annual yield," that the investment purchase "may be insured," and the defendant concluded by inviting the audience to call First Fidelity for more information, because the advertisements contained no false statement by defendant relating to existing or pre-existing fact and instead his statements "constituted sales talk, or puffing").[7]

---

[7] The defects described in Section I(A) require dismissal of Plaintiffs' state law claims as well, since each requires particularized proof of a false or misleading statement upon which a reasonable investor could rely.  *See Robinson*

4.     <u>Plaintiffs Fail to Particularize Misconduct of Any Kind by The Trump Corporation or Mr. Trump's Children</u>

Plaintiffs fail to allege any statement (of any kind) made to them by The Trump Corporation, Donald Trump, Jr., Eric Trump, or Ivanka Trump, or to plead with particularity facts establishing their knowledge of, or any agreement with respect to, any fraudulent statement allegedly made by Mr. Trump.  Plaintiffs allege that Eric Trump described ACN as "an incredible company," and its founders as "incredible people" (Compl. ¶ 117), but no Plaintiff is alleged to have seen those statements, and both are pure opinion and puffery.  The Complaint alleges no fraudulent statement of any kind by Donald Trump, Jr. or Ms. Trump.  The Amended Complaint likewise falls short concerning The Trump Corporation, alleging only that it was "the principal operating company for the collection of companies known as The Trump Organization," and that it "exercised substantial control" over various Trump entities, to none of which do Plaintiffs attribute any fraudulent act or omission concerning ACN.  (Compl. ¶¶ 36, 430; *see also id.* ¶¶ 5, 47.)

The Amended Complaint adds new allegations concerning Ms. Trump, but rather than cure the defects of the original Complaint, this material only highlights them:  In 2009, Ms. Trump published a memoir in which she described in candid detail the commercial relationships at the heart of *The Celebrity Apprentice*, and how that television program enhanced the fame and

---

*Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004) (California common law fraud); *Shamsian v. Atl. Richfield Co.*, 107 Cal. App. 4th 967, 983 (2003) (California common law negligent misrepresentation); *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006) (Cal. Bus. & Prof. Code § 17200); *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680 (2006), *as modified on denial of reh'g* (Jan. 31, 2006) (Cal. Bus. & Prof. Code § 17500); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 333 (1982) (Maryland common law fraud); *Weisman v. Connors*, 312 Md. 428, 444 (1988) (Maryland common law negligent misrepresentation); *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 141-42 (2007) (Maryland Consumer Protection Act); *Porreco v. Porreco*, 571 Pa. 61, 69 (2002) (Pennsylvania common law fraud); *Bortz v. Noon*, 556 Pa. 489, 500-01 (1999) (Pennsylvania common law negligent misrepresentation); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 501 (2004) (Pennsylvania Unfair Trade Practices and Consumer Protection Law).

wealth of her family.  (Compl. ¶¶ 72-75).  Thus, Plaintiffs' own pleading makes clear that, years before any of them enrolled in ACN, Ms. Trump was perfectly comfortable disclosing publicly the extent to which *The Celebrity Apprentice* was a vehicle for "transparent . . . product placement" and the Trump brand a vehicle for lucrative licensing and endorsement deals – facts Plaintiffs would persuade a trier of fact were criminally concealed from them.

5.      Plaintiffs Fail to Allege Fraud by Omission or Half Truths

Plaintiffs suggest they were defrauded by Defendants' failure to disclose that Mr. Trump was being paid by ACN.  (*See, e.g.*, Compl. ¶¶ 138, 193.)  But the law is clear that, absent a fiduciary or similar legal duty between the parties – which Plaintiffs do not and cannot plead here – omissions are not actionable as mail or wire fraud.  *See United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  Nor is the live exchange between Mr. Trump and an ACN host in Charlotte, North Carolina, in early 2013, *supra* at 10, actionable as a half-truth, *Autuori*, 212 F.3d at 119, because no Plaintiff is alleged to have heard it and, in any event, it could not have misled a "reasonable investor" given the mix of information available to IBOs at the time.  To determine whether a "reasonable investor" would have been misled, the Court must "analyze[] the allegedly fraudulent materials in their entirety."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted).  "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor."  *Id*.; *see also In re Donald J. Trump Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369 (3d Cir. 1993) ("[M]ateriality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it.") (citing *I. Meyer Pincus & Assocs v. Oppenheimer &*

21

*Co.*, 936 F.2d 759, 763 (2d Cir. 1991)).  "While a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil." *Taj Mahal Litig.*, 7 F.3d at 372 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).  The context here – a lavish corporate event featuring a celebrity renowned for promoting his eponymous brand, where Mr. Trump and ACN each referenced his "extended relationship" with ACN and that he had "endless opportunities" to "endorse and have a relationship" with "lots of companies" – forecloses any claim that a "reasonable investor" would have understood Mr. Trump's split-second utterance ("No") to be a disclaimer of all financial ties between him and ACN.[8]

Statements by Mr. Trump that he works with ACN because he likes, understands, and respects the founders of the company, and that he attends ACN live events because he enjoys making speeches for big crowds, are not actionable as fraud either.  As an initial matter, these statements appeared in ACN magazines viewed by no Plaintiff prior to enrollment (Compl. ¶ 149) or occurred at live events for which Plaintiffs were not present (*id.* ¶¶ 140-44, 146-48). Further, Plaintiffs nowhere allege, nor plead particular facts tending to show, any of these statements was untrue, or, with respect to Mr. Trump's opinions, not genuinely held when stated. (*Id.* ¶ 149.)  The Court should also find Mr. Trump's failure to reference his fee arrangement in Opportunity Discs or print materials produced and published by ACN (and not by Mr. Trump or any Trump business) or during live appearances for ACN immaterial as a matter of law – that is, the Court should find any such omission one that no "reasonable investor" would consider important.  That the business of the Trump family is to promote their name for money has been

---

[8] *See also* Chen Aff., Exh. 3 at 23; *id.*, Exh. 4 at 20; *id.* Exh. 5 at 68 (ACN articles referencing money paid by ACN to Mr. Trump, discussed *supra* at 11); Compl. n. 66 at 02:29; *id.* n. 99 at 01:31; *id.* n. 70 at 02:08 (references by ACN at other events to the transactional nature of the parties' relationship, discussed *supra* at 10-11).

the subject of public discussion for decades; it is a fact with which our popular culture is virtually saturated. Plaintiffs' own source materials leave no doubt on this score. (*See, e.g.*, Compl. n. 4 at 8 (reviewing "decades" of press scrutiny of Mr. Trump); *id.* n. 9 (same).)

### B.  Plaintiffs Fail to Plead Loss Causation

To sue under RICO, a plaintiff must establish not only "but for" causation – that is, that the alleged RICO acts caused plaintiff to enter into the transaction at issue, but also "that the underlying § 1962 RICO violation was the proximate cause of his injury," *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 140 (2d Cir. 2018) (citation and quotation marks omitted) – in other words, that the alleged misstatements "were the reason the transactions turned out to be losing ones," *Moore v. Paine Webber*, 189 F.3d 165, 172 (2d Cir. 1999) (citation, brackets, and quotation marks omitted). Proximate cause is not shown where the asserted loss "could have resulted from factors other than [the defendants'] alleged acts of fraud." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006).

While the Amended Complaint alleges Plaintiffs would not have enrolled in ACN had Mr. Trump not endorsed it, or "but for" causation, (Compl. ¶ 21 (Doe); *id.* ¶ 22 (Loe); *id.* ¶ 23 (Roe); *id.* ¶ 25 (Moe)), it fails to plead particular, plausible facts tending to prove Mr. Trump's endorsement caused their failure to succeed as IBOs and recoup their enrollment fees. Meanwhile, in detail and with total plausibility, the Amended Complaint expressly pleads "factors other than" Mr. Trump that "could have" caused their losses, namely, the difficulties all four Plaintiffs faced trying to sell ACN services to friends, family and strangers or to recruit others to do so. For all the ACN success stories, motivational events, and marketing tools ACN makes available to its IBOs, direct selling is a difficult way to earn a living and one for which not all are suited. (*See* Compl. n. 72 at 10:40 (Mr. Trump cautioning IBOs to consider the

"downside" risk of direct selling); Chen Aff., Exh. 7-9 ¶ 5 ("I acknowledge that as an IBO, I am not guaranteed any income nor am I assured any profits or success.").)

Plaintiffs seek to plug this hole with allegations that, once signed up as IBOs, they continued reading and seeing statements packaged by ACN that contained Mr. Trump's endorsement, and that, as a result of ACN's repeated publication of Mr. Trump's endorsement, Plaintiffs paid additional funds to ACN, for example, to purchase copies of ACN publications and to attend ACN meetings for which a fee was charged by the host.  (*See, e.g.*, Compl. ¶¶ 197, 206-08, 212-14, 226, 233-34, 254-55).  But these allegations at most plead "but for" causation associated with additional outlays of money by Plaintiffs to ACN.  They do not – and cannot – plausibly connect the impact of Mr. Trump's endorsement to any individual Plaintiff's failure to recoup her initial (or any subsequent) investment by selling ACN products and services or by recruiting others to do so.

This is among the most glaring of the flaws in this lawsuit.  No amount of time-consuming discovery and fact development will change the fact that, if permitted to proceed under their chosen legal theory, Plaintiffs will be unable to establish more than that, no matter how seasoned and sophisticated the ACN marketing tools, the inherent challenges of cold-calling customers, even with the assistance of social media, are what caused Plaintiffs to fail as IBOs and not recoup their expenses, and not the celebrity endorsement they say inspired them to enroll in the first place.  That Plaintiffs fail plausibly to connect any alleged statement by any Defendant to their failure to recoup fees they paid ACN renders this the type of lawsuit that federal courts reject as so implausible they must be dismissed on the pleadings – "lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value."  *Bell Atl. Corp.*

24

*v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks and citation omitted); *see also id.* (where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the [C]ourt" (quotation marks and citations omitted)).[9]

### C.   Plaintiffs Fail to Allege a Scheme That Contemplated Economic Harm or That Defendants Willfully Intended to Inflict Such Harm

To establish mail fraud or wire fraud, Plaintiffs must prove that the defendant acted "willfully," that is, with the intent to do something the law forbids, and with the "intent to defraud." *United States v. Gabriel*, 125 F.3d 89, 96 (2d Cir. 1997). To show the required "intent to defraud, the government must prove that defendants contemplated some actual harm or injury to their victims" and to their victims' property interests. *Id.* (internal quotation marks omitted). Allegations that the defendants "garnered some benefit from their scheme" are not enough. *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987). Plaintiffs "must prove that the defendant acted with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim." *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) (internal citation omitted); *see also United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006) (to prove a "scheme or artifice for obtaining money or property in the context of

---

[9] *See also Anza*, 547 U.S. at 459 (reversing Second Circuit's denial of motion to dismiss for failure to plead loss causation in RICO claim brought by store owners alleging store operators engaged in a fraudulent scheme to avoid collecting and reporting sales tax, because "businesses lose and gain customers for many reasons" and plaintiffs' losses "could have resulted from factors other than [defendant's] alleged acts of fraud"); *Empire*, 902 F.3d at 142-43 (failure to plead loss causation where customers' "decisions to purchase less" of the plaintiffs' products did not "necessarily follow" from the alleged racketeering); *Segal v. Bitar*, No. 11-CV-4521 (LBS), 2012 WL 273609, at *11 (S.D.N.Y. Jan. 30, 2012) (online poker players who lost access to funds deposited with defendants' gaming website did not adequately plead loss causation because the government's seizure of online gambling website's assets precluded a "sufficiently direct causal link between the racketeering offenses and Plaintiffs' injuries"); *McBrearty v. Vanguard Grp, Inc.*, No. 08-CV-7650 (DLC), 2009 WL 875220, at *3 (S.D.N.Y. Apr. 2, 2009) (shareholders in investment funds that invested in illegal gambling businesses did not adequately allege loss causation, because "the shareholders were injured not by the ownership of or investment in the illegal gambling operations, but by the reaction of the stock price to the publicity following the government's investigation of those operations").

the mail fraud statute" the defendants' scheme must have been "intended to deprive another of property rights" (internal quotation marks omitted)).  "Because the defendant must intend to harm the fraud's victims, misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the victim."  *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (internal citations and quotation marks omitted); *see also United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) ("To convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature or that the village could have negotiated a better deal for itself if it had not been deceived.").

In order to allege an intent to defraud, Plaintiffs must "point[] to specific facts that give rise to a strong inference of fraudulent intent.  The strong inference may be supported either by (a) facts to show that defendants had both motive and opportunity to commit fraud, or (b) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Salomon Analyst*, 350 F. Supp. 2d at 466 (internal citations and quotation marks omitted).  In assessing a defendant's fraudulent intent, moreover, a court must assume that "the defendant is acting in his or her informed economic self-interest."  *Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 138 (S.D.N.Y.1994) (Parker, J.), *aff'd*, 60 F.3d 810 (2d Cir.1995) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994)).

The Amended Complaint does not plead the requisite intent to harm with particularity. While introductory paragraphs of the Amended Complaint aver that Defendants targeted investors "because they were not experienced in financial and commercial matters" (Compl. ¶ 14 (emphasis removed)), sought "to ensnare vulnerable consumers" (*id*. ¶ 4) and to "profit from customers' unrecouped investments" (*id*. ¶ 9), those allegations are devoid of any factual

support, much less "specific facts" giving rise to a "strong inference" of fraudulent intent, *Salomon Analyst*, 350 F. Supp. 2d at 466, and Mr. Trump's opinion, puffery and motivational statements – including his suggestion that investors take steps to protect themselves against the "downside" risk of multi-level marketing – bear no indicia of an intent to harm.[10]  (Compl. n. 72 at 10:40.)  Ms. Trump's clear-eyed disclosures concerning *The Celebrity Apprentice* and the ways in which her family monetizes its brand are likewise wholly inconsistent with any desire to deceive.  (Compl. ¶¶ 72-75.)  Nor does the conclusory allegation that Mr. Trump was "aware that the vast majority of consumers would lose whatever money they invested" in ACN (*id.* ¶ 9) suffice, because allegations that a defendant "had 'some realization' that a fraud was being perpetrated and may have 'recognized' the fraud's capacity to cause harm" are insufficient as a matter of law, *Gabriel*, 125 F.3d at 97.  The Amended Complaint at most alleges that Defendants acted "with the common purpose of earning revenue" and conspired "to defraud consumers and enrich themselves" from ACN in order to enrich Mr. Trump (Compl. ¶¶ 43, 78, 428), by making endorsements for which Mr. Trump would be paid regardless of whether any participant signed up for or paid fees to ACN – allegations that are plainly inadequate as a matter of law, *see Starr*, 816 F.2d at 101.

## II.   PLAINTIFFS FAIL TO PLEAD AN "ASSOCIATION IN FACT" RICO ENTERPRISE

Plaintiffs purport to allege an "association-in-fact" RICO enterprise consisting of Mr. Trump and The Trump Corporation (but not ACN), together with Donald Trump, Jr., Eric Trump, and Ms. Trump, and a cast of companies not alleged to have made any statement or omission concerning Mr. Trump's relationship with ACN.  (Compl. ¶¶ 44, 426.)  An association-

---

[10] While some ACN participants may be "among the most economically marginalized and vulnerable Americans" (Compl. ¶ 14), photographs of the ACN rallies at which Mr. Trump spoke tend to belie that the Defendants targeted such individuals.  (*Id.* ¶¶ 84, 101; Chen. Aff., Exh. 2 at 76; *id.*, Exh. 6 at 10-12.)

in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 945 (2009) (internal quotation marks and citation omitted).  The alleged associates "must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citation and internal quotation marks omitted).  To plead the required "common purpose to engage in a particular fraudulent course of conduct," a complaint must make "specific factual allegation[s] about the intent" of the alleged enterprise members.  *Id.* at 120-21; *see also D. Penguin Bros. Ltd. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (same).

The sole allegation in the Amended Complaint concerning the intent of the alleged "associates-in-fact" is that they "shared a common purpose of earning revenue from the Endorsed Entities in exchange for conveying the false and misleading Message," (Compl. ¶¶ 43, 52; *accord id.* ¶¶ 2, 4, 77-78), but that "naked assertion devoid of further factual enhancement" is plainly inadequate, *D. Penguin Bros.*, 587 F. App'x at 668 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Lynn v. McCormick*, No. 17-CV-1183 (CS), 2017 WL 6507112, at *6 (S.D.N.Y. Dec. 18, 2017) ("[T]here is no allegation that the officer alleged to have been part of the enterprise . . . committed, or had anything to do with, any of the allegedly fraudulent acts, so the claim against him is not plausible." (citation omitted)); *see also* discussion *supra* Section I(A)(4).

## III.  THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS UNDER 28 U.S.C. §§ 1332 (A) OR (D)

Federal subject matter jurisdiction exists "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs" and where the parties meet certain diversity of citizenship requirements.  28 U.S.C. §1332(a).  There is no diversity jurisdiction

over Plaintiffs' state law claims because Plaintiffs fail to satisfy the amount-in-controversy requirement under the diversity statute. *See Gilman v. BHC Sec., Inc.*, 104 F.3d 1418, 1422 (2d Cir. 1997) (it is "well-established" that "each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional amount requirement" of $75,000) (citation and quotation marks omitted); *see also Radcliffe v. Wright*, No. 16-CV-9511 (GHW), 2018 WL 3187338, at *3 (S.D.N.Y. June 28, 2018) ("The Supreme Court has long recognized that the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement.") (quoting *Snyder v. Harris*, 394 U.S. 332, 335 (1969) (quotation marks omitted)). Because Plaintiffs each allege damages of only a fraction of the $75,000 required for the Court to exercise diversity jurisdiction, (*see, e.g.*, (Doe) Compl. ¶¶ 196, 198, 199, 209, 211; (Loe) *id.* ¶¶ 225, 229; (Roe) *id.* ¶¶ 248, 252, 257; (Moe) *id.* ¶¶ 269, 272-73), diversity jurisdiction does not exist.

The Court also lacks subject matter jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). That statute provides for federal subject matter jurisdiction over certain multistate class actions where, among other things, the aggregate "matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." *Id.* The proposed class does not meet the CAFA amount-in-controversy requirement. "Under CAFA . . . the party asserting subject matter jurisdiction has the burden of proving it." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 59 (2d Cir. 2006). "To satisfy its burden, [that party] must prove to a reasonable probability that there is the necessary minimal diversity and that the amount in controversy exceeds $5 million." *Id.* In particular, an allegation as to an amount-in-controversy under a statute governing subject matter jurisdiction must meet the "plausibility" standard applicable to Rule 8. *See, e.g.*, *Wood v. Maguire Automotive, LLC*, 508 F.

App'x 65, 65 (2d Cir. 2013); *see also, e.g.*, *Weir v. Cenlar FSB*, No. 16-CV-8650 (CS), 2018 WL 3443173, at *12 (S.D.N.Y. July 17, 2018).

Plaintiffs' allegations that, between 2011 and 2016, ACN had 200,000 IBOs, each of whom, implicitly, paid at least $499 in their initial registration fees, (Compl. ¶¶ 404, 410) are inadequate.  This is not a securities class action, in which the Defendants issued false or misleading Form 10-Ks, such that the Court may plausibly consider all stockholders to be members of a class of putative victims.  The Amended Complaint supplies no basis for the Court's finding plausible that at least 10,000 IBOs (a) enrolled in ACN within the four-year statute of limitations applicable to RICO; (b) failed to recoup their enrollment fees; and (c) would contend that Mr. Trump was both the but-for reason they enrolled in ACN and the proximate cause of their failure to recoup their enrollment fees.  *See*, *e.g.*, *Mallgren v. Microsoft Corp.*, 975 F. Supp. 2d 451, 456 (S.D.N.Y. 2013) (dismissing because amount-in-controversy allegations did not meet plausibility standard where plaintiff conclusorily alleged that "there were several events" that "qualifie[d] this as a case" meeting the required jurisdictional amount).

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Complaint should be granted.

Respectfully submitted,

/s/ Joanna C. Hendon

Joanna C. Hendon
Cynthia Chen
Bradley Pollina

SPEARS & IMES LLP
51 Madison Avenue
New York, New York 10010
Tel:  (212) 213-6996
Fax:  (212) 213-0849

jhendon@spearsimes.com
cchen@spearsimes.com
bpollina@spearsimes.com

*Attorneys for Defendants*

31