# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE, LUKE LOE, RICHARD ROE, and
MARY MOE, individually and on behalf of all
others similarly situated,

*Plaintiffs*,

*v.*

THE TRUMP CORPORATION, DONALD J.
TRUMP, in his personal capacity,
DONALD TRUMP JR., ERIC TRUMP, and
IVANKA TRUMP,

*Defendants*.

No. 18 Civ. 9936

---

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Roberta A. Kaplan, Esq.
John C. Quinn, Esq.
Joshua Matz, Esq.
Alexander J. Rodney, Esq.
Matthew J. Craig, Esq.
Emily C. Cole, Esq.

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Telephone: (212) 763-0883

Andrew G. Celli, Jr., Esq.
Matthew D. Brinckerhoff, Esq.
O. Andrew F. Wilson, Esq.
Katherine Rosenfeld, Esq.
David Berman, Esq.

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center
New York, NY 10020
Telephone: (212) 763-5000

*Attorneys for Plaintiffs*

March 7, 2019

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 2

STANDARD OF REVIEW .......................................................................................................... 8

ARGUMENT ............................................................................................................................... 9

I.      DEFENDANTS ENGAGED IN RACKETEERING ACTIVITY .................................. 10

    A.      The Amended Complaint Sufficiently Alleges a Scheme to Defraud ................. 11

        1.      Materiality ................................................................................................ 11

            a.      Defendants' Material Misrepresentations ..................................... 12

            b.      Defendants' Statements Were Not Mere Puffery ......................... 16

            c.      Defendants' Statements Were Not Mere Opinion ........................ 20

        2.      Reliance ..................................................................................................... 21

        3.      Participation by Certain Defendants ......................................................... 22

    B.      The Amended Complaint Sufficiently Alleges Fraudulent Intent ....................... 24

    C.      The Amended Complaint Sufficiently Alleges Causation .................................... 26

II.     DEFENDANTS FORMED A RICO ENTERPRISE ...................................................... 28

III.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS'
    STATE LAW CLAIMS .................................................................................................. 30

CONCLUSION ........................................................................................................................... 31

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)....................................................................................................... 9

*Bank of China* v. *NBM L.L.C.*,
No. 01 Civ. 815, 2001 WL 1360299 (S.D.N.Y. Nov. 5, 2001) .............................. 27

*Bd. of Managers of Trump Tower* v. *Palazzolo*,
346 F. Supp. 3d 432 (S.D.N.Y. 2018)...................................................................... 24

*Billhofer* v. *Flamel Techs., SA*,
663 F. Supp. 2d 288 (S.D.N.Y. 2009)...................................................................... 18

*Blue Cross & Blue Shield of Minnesota* v. *Wells Fargo Bank, N.A.*,
No. 11 Civ. 2529, 2012 WL 1343147 (D. Minn. Apr. 18, 2012) ........................... 27

*Bowden* v. *Robinson*,
67 Cal. App. 3d 705 (4th Div. 1997) ....................................................................... 30

*Boyle* v. *United States*,
556 U.S. 938 (2009).......................................................................................... 10, 29

*Bracken* v. *MH Pillars Inc.*,
290 F. Supp. 3d 258 (S.D.N.Y. 2017)...................................................................... 30

*Bridge* v. *Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008).................................................................................... 21, 22, 26

*Burton* v. *Iyogi, Inc.*,
No. 13 Civ. 6926, 2015 WL 4385665 (S.D.N.Y. Mar. 16, 2015) .......................... 18

*Chambers* v. *King Buick GMC, LLC*,
43 F. Supp. 3d 575 (D. Md. 2014).......................................................................... 27

*Chanayil* v. *Gulati*,
169 F.3d 168 (2d Cir. 1999)..................................................................................... 22

*Cohen* v. *Trump*,
No. 10 Civ. 0940, 2014 WL 690513 (S.D. Cal. Feb. 21, 2014) ............................. 18

*De Sole* v. *Knoedler Gallery*,
974 F. Supp. 2d 274 (S.D.N.Y. 2013)...................................................................... 27

*Dolan* v. *PHL Variable Ins. Co.*,
No. 15 Civ. 1987, 2018 WL 1696650 (M.D. Pa. Apr. 6, 2018) ............................. 27

*Eclectic Properties E., LLC* v. *The Marcus & Millichap Co.*,
No. 09 Civ. 511, 2012 WL 713289 (N.D. Cal. Mar. 5, 2012)................................. 27

*Empire Merchants, LLC* v. *Reliable Churchill LLLP*,
902 F.3d 132 (2d Cir. 2018)..................................................................................... 11

*Equinox Gallery Ltd.* v. *Dorfman*,
  306 F. Supp. 3d 560 (S.D.N.Y. 2018)........................................................................ 29

*Evercrete Corp.* v. *H-Cap Ltd.*,
  429 F. Supp. 2d 612 (S.D.N.Y. 2006)........................................................................ 11

*Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*,
  545 U.S. 546 (2005)..................................................................................................... 30

*Fin. Guar. Ins. Co.* v. *Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015)....................................................................................... 28

*Fisk* v. *SuperAnnuities, Inc.*,
  927 F. Supp. 718 (S.D.N.Y. 1996)............................................................................ 18

*Freudenberg* v. *E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................... 18

*Galestan* v. *OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)....................................................................... 17

*Hecht* v. *Commerce Clearing House, Inc.*,
  897 F.2d 21 (2d Cir. 1990)............................................................................................ 9

*Hemi Grp., LLC* v. *City of New York, N.Y.*,
  559 U.S. 1 (2010)......................................................................................................... 26

*In re Evans*,
  81 F.3d 167 (9th Cir. 1996) ........................................................................................ 27

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................... 18

*In re Petrobas Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)................................................................. 19, 21

*In re Sumitomo Copper Litig.*,
  995 F. Supp. 451 (S.D.N.Y. 1998).......................................................................... 9, 11

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).......................................................................... 15, 16, 17

*In re Worldcom, Inc. Sec. Litig.*,
  No. 02 Civ. 3288 (S.D.N.Y.) ...................................................................................... 19

*Iowa Pub. Employees' Ret. Sys.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018).............................................. 13, 19, 26, 29

*Lerner* v. *Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006)......................................................................................... 9

*Lipton* v. *Nature Co.*,
  71 F.3d 464 (2d Cir. 1995).......................................................................................... 16

*Loreley Financing (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC*,
  797 F.3d 160 (2d Cir. 2017)................................................................................... 9, 27

*Lukaszuk* v. *Sudeen*,
  No. 02 Civ. 5143, 2007 WL 4699018 (E.D.N.Y. Nov. 27, 2007) ........................................... 27

*Manavazian* v. *Atec Grp., Inc.*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) .................................................................................. 18

*Martin Hilti Family Tr.* v. *Knoedler Gallery*,
  137 F. Supp. 3d 430 (S.D.N.Y. 2015).............................................................................. 10, 22

*McLaughlin* v. *Anderson*,
  962 F.2d 187 (2d Cir. 1992)................................................................................................... 9

*Montero* v. *City of Yonkers, New York*,
  890 F.3d 386 (2d Cir. 2018).................................................................................................. 8

*Moore* v. *PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999).................................................................................................. 9

*Neale* v. *Volvo Cars of N. Am., LLC*,
  794 F.3d 353, 357 (3d Cir. 2015).......................................................................................... 30

*Neder* v. *United States*, 527 U.S. 1 (1999)................................................................................. 11

*Needham & Co., LLC* v. *Access Staffing, LLC*,
  No. 15 Civ. 2487, 2016 WL 4399288 (S.D.N.Y. Aug. 12, 2016) ........................................... 24

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................................................. 17

*Oliver Wyman, Inc.* v. *Eielson*,
  282 F. Supp. 3d 684 (S.D.N.Y. 2017)................................................................................... 18

*Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ........................................................................................................ 20

*Payne* v. *Jones*,
  711 F.3d 85 (2d Cir. 2013).................................................................................................. 30

*Peterson* v. *Goldberg*,
  No. 02 Civ. 7375, 2005 WL 589753 (N.D. Ill. Feb. 25, 2005)................................................ 27

*Pyskaty* v. *Wide World of Cars, LLC*,
  856 F.3d 216 (2d Cir. 2017)................................................................................................ 30

*Reves* v. *Ernst & Young*,
  507 U.S. 170 (1993)............................................................................................................ 10

*Ryan* v. *Legends Hosp., LLC*,
  No. 11 Civ. 3110, 2012 WL 3834088 (S.D.N.Y. Aug. 1, 2012) ............................................. 30

*S.E.C.* v. *Curshen*,
  372 F. App'x 872 (10th Cir. 2010) ...................................................................................... 17

*Schutz* v. *Ne. Mortg. Corp.*,
  No. 05 Civ. 423, 2005 WL 1844409 (D. Conn. Aug. 1, 2005)................................................ 16

*Sedima, S.P.R.L.* v. *Imrex Co.*,
   473 U.S. 479 (1985).................................................................................................. 9

*Sussman-Automatic Corp.* v. *Spa World Corp.*,
   15 F. Supp. 3d 258 (E.D.N.Y. 2014) ................................................................... 18

*Time Warner Cable, Inc.* v. *DIRECTV, Inc.*,
   497 F.3d 144 (2d Cir. 2007)............................................................................ 16, 17

*U.S. Bank, N.A.* v. *PHL Variable Ins. Co.*,
   No. 12 Civ. 6811, 2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ............................ 16

*United States* v. *Armantrout*,
   411 F.2d 60 (2d Cir.1969)..................................................................................... 18

*United States* v. *Autuori*,
   212 F.3d 105 (2d Cir. 2000)......................................................................... *passim*

*United States* v. *Binday*,
   804 F.3d 558 (2d Cir. 2015).............................................................................. 24, 25

*United States* v. *Carlo*,
   507 F.3d 799 (2d Cir. 2008) ............................................................................. 24, 25

*United States* v. *Corey*,
   566 F.2d 429 (2d Cir. 1977) ................................................................................ 22

*United States* v. *Corsey*,
   723 F.3d 366, 373 (2d Cir. 2013)......................................................................... 11

*United States* v. *Fasciana*,
   226 F. Supp. 2d 445 (S.D.N.Y. 2002)................................................................... 22

*United States* v. *Finazzo*,
   2011 WL 3794076 (E.D.N.Y. Aug. 24, 2011)....................................................... 15

*United States* v. *Gordon*,
   710 F.3d 1124 (10th Cir. 2013) ........................................................................... 15

*United States* v. *Guadagna*,
   183 F.3d 122 (2d Cir. 1999)................................................................................. 25

*United States* v. *Levy*,
   No. 11 Cr. 62, 2013 WL 3832718 (S.D.N.Y. Jul. 15, 2013) ........................... 16, 17

*United States* v. *Lindsey*,
   850 F.3d 1009 (9th Cir. 2017) ............................................................................. 22

*United States* v. *Panza*,
   750 F.2d 1141 (2d Cir. 1984)............................................................................... 22

*United States* v. *Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970) .............................................................................. 18

*United States* v. *Simon*,
   839 F.2d 1461 (11th Cir. 1988) ........................................................................... 17

*United States* v. *Weaver*,
  860 F.3d 90, 95-96 (2d Cir. 2017) ................................................................ 11, 13, 14, 22

*Universal Health Servs., Inc.* v. *United States*,
  136 S. Ct. 1989 (2016) ............................................................................................. 11

*Verizon Directories Corp.* v. *Yellow Book USA, Inc.*,
  309 F. Supp. 2d 401 (E.D.N.Y. 2004) ....................................................................... 18

*Virginia Bankshares, Inc.* v. *Sandberg*,
  501 U.S. 1083 (1991) .............................................................................................. 20

*Vulcan Metals Co.* v. *Simmons Mfg. Co.*,
  248 F. 853 (2d Cir. 1918) ................................................................................... 16, 21

*Williams* v. *Affinion Grp., LLC*,
  889 F.3d 116 (2d Cir. 2018) ...................................................................................... 9

## STATUTES

18 U.S.C. § 1961 ............................................................................................... 10, 11

28 U.S.C. § 1332 .................................................................................................... 35

## RULES

Federal Rule of Civil Procedure 9 .............................................................................. 9, 11

Federal Rule of Civil Procedure 12 ................................................................. 1, 9, 26, 27, 28

## PRELIMINARY STATEMENT

The 185-page Amended Complaint in this case describes in detail a fraudulent scheme perpetrated by Defendants that lasted a decade and injured tens of thousands of Americans. At its core, the scheme was fraudulent promotion for hire: in exchange for millions of dollars in secret payments, Defendants used their carefully crafted reputation as successful entrepreneurs as well as their complex organization to fraudulently promote third-party companies offering business opportunities or training programs to consumers. Replete with more than 500 paragraphs of particularized allegations, the Amended Complaint explains with specificity how Defendants concocted, deployed, and replicated this fraudulent scheme—among other things, the Amended Complaint details the use of specific subsidiaries, cites specific licensing agreements, and sets forth numerous quotations from Defendants themselves. The Amended Complaint also recounts the experiences of four Plaintiffs who (along with thousands of others like them) were defrauded by this scheme. These particularized allegations more than satisfy the requirements of Federal Rule of Civil Procedure 12(b)(6).

Defendants nonetheless seek dismissal, asserting that the Amended Complaint fails to adequately plead racketeering activity or an association-in-fact for purposes of the RICO statute. Remarkably, one of Defendants' main arguments is that Plaintiffs could not have been defrauded because everyone already knew that the Trumps sell their name to the highest bidder. *See* MTD 22-23 ("That the business of the Trump family is to promote their name for money . . . is a fact with which our popular culture is virtually saturated."). While Defendants may seek to prove at trial that they had a well-known propensity to lie for profit, it is black letter law that such factual assertions provide no basis for dismissal at this stage. Defendants' other arguments similarly disregard the requirements of Rule 12, by ignoring unhelpful factual allegations, reading those

allegations in isolation rather than combination, misstating applicable law, and drawing unwarranted inferences in their own favor while denying Plaintiffs the reasonable inferences to which they are entitled. Defendants' motion should be denied.

## FACTUAL BACKGROUND

In the early 2000s, Defendants were in dire financial straits and needed a new way to make money. ¶¶ 54-55.[1] The Trump Organization—a collection of businesses operated and controlled by Defendants, ¶¶ 43-53—was saddled with debt after a series of failures and bankruptcies. ¶ 54.

Over the next several years, Defendants worked to rehabilitate their brand. ¶ 56. The television premiere of *The Apprentice* was an important part of this effort. *Id.* That show—and its successor, *The Celebrity Apprentice*—portrayed Trump to a national audience as an extraordinarily wealthy and successful businessman. ¶¶ 60, 65, 70. Producers of the show later described this portrayal as a "scam" and a "convenient vacation of the truth." ¶¶ 61-63. *The Apprentice* and *The Celebrity Apprentice* also catapulted Trump's children onto the national stage, and as a result, both Donald Trump Jr. and Ivanka Trump became more high-profile emissaries of the Trump Organization. ¶¶ 46-50, 52, 72. And the shows legitimized and elevated the Trump Organization itself: contestants vied for a seemingly prestigious position at the Trump Organization, often while seated before Trump in an elaborate boardroom set. ¶¶ 57, 59.

Defendants exercised substantial control over and enjoyed significant financial upside from these television shows—Trump Productions, LLC, which was operated and controlled by Defendants, owned half the rights, and Trump himself was an executive producer. ¶¶ 44, 58. As Ivanka Trump has explained, these shows were lucrative for Defendants in part because they provided Defendants with a platform through which they could promote and market the products

---

[1] Citations to paragraph numbers are to paragraphs in the Amended Complaint, ECF No. 77. Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Amended Complaint.

and services offered by friendly businesses. ¶ 73. Companies—especially ones struggling in some way—paid handsomely for the privilege of "sponsoring" episodes, and in some instances found additional ways to reward the Trump Organization for making that happen. ¶¶ 73, 76. To Defendants, this "transparent form of product placement" was "easy money." ¶¶ 74-75. It also pointed the way to the fraudulent scheme that gives rise to this lawsuit. ¶¶ 77-78.

The essence of that scheme was as follows. In exchange for millions of dollars in secret payments, Defendants offered the services of their enterprise to fraudulently promote third parties that were selling investments in business opportunities or training programs to ambitious, entrepreneurial individuals. ¶¶ 7-8. First and foremost, Defendants agreed to make and disseminate a consistent set of materially false and misleading statements about the third-party businesses and the nature of the investments they were offering. These statements were calculated to lead potential investors to believe that (1) the business opportunity or training program being promoted offered a realistic possibility of commercial success, (2) Defendants had inside information or had done appropriate diligence relating to the particular assertions Defendants were making, and (3) Defendants were endorsing the business opportunity or training program because they genuinely believed it offered a realistic possibility of commercial success, rather than because Defendants were being paid (collectively, the "Message"). *See* ¶¶ 8, 104-67, 328-57, 361-95.

Beyond this consistent set of lies and distortions, Defendants also agreed to give these third parties a broad right to use and associate with the Trump brand in marketing their products and investments. ¶ 11; *see also*, *e.g.*, ¶¶ 168-80. In structuring these branding and licensing deals, Defendants made use of various entities within the complex organization they had built, including, in one instance, Trump University, LLC. *See* ¶¶ 318-19, 358. Defendants also used their television

platform, as well as the LLCs that operated their golf courses and even a charitable foundation, to further promote and legitimize the third parties and their investments. ¶¶ 291-304, 310-11.

Defendants first agreed to perpetrate the scheme on behalf of ACN, a multilevel marketing company based in North Carolina. ¶¶ 3, 86. In early 2005, ACN made a general announcement to its members that it had entered into an agreement with the Trump Organization. ¶ 86. ACN told its members that the Trump endorsement was "designed to help you build your ACN business"— that is, to recruit new members. *Id*. The company acknowledged it had "never before" been endorsed by "someone of such stature," and that Trump's promotion of the company would, in the eyes of recruits, be a "huge testament to the integrity of the ACN Opportunity." ¶ 87.

Over the course of the following decade, Trump personally promoted, endorsed, and touted ACN and its business opportunity in numerous forums, including in recruiting videos, in print materials, on stage at more than a dozen large events, and in two episodes of *The Celebrity Apprentice*, where contestants seeking a job at the Trump Organization promoted ACN and Defendants Ivanka Trump and Donald Trump Jr. also appeared in support of the company. ¶¶ 88-103.[2] In all these forums, Defendants delivered the consistent Message, riddled with falsehoods, driving it home in the minds of potential recruits. ¶¶ 104-67; *see also* ¶¶ 178-79.

Defendants' fraudulent Message was intended to and did cause thousands of often financially unsophisticated recruits to invest in ACN. ¶¶ 168, 397, 404. ACN's own statements confirm the extraordinary power of the Message in driving investment decisions: ACN told its members that Trump was "promoting your business" to "get existing prospects off the fence." ¶¶ 170-75. As ACN's co-founder put it, "It's all about Trump!" ¶ 174. Indeed, the extraordinary

---

[2] These channels were not exclusive—videos were spliced and recycled and played at events, appearances at events were broadcast in videos, photographs of appearances at events or in videos were included in print materials, and clips of and references to *The Celebrity Apprentice* appearances were ubiquitous in ACN materials. ¶ 88. Much of this material is still used in connection with recruiting efforts to this day. ¶¶ 88, 309.

power of the Message in the minds of investors is precisely why ACN paid Defendants millions to disseminate it. ¶ 13.

Plaintiffs were among the thousands of recruits for whom the Message was the key factor that caused them to invest. ¶¶ 20-25, 168-280. Plaintiffs are a hospice worker, a self-employed formerly homeless man, a food delivery driver, and a mother of three who works at a national retail store. ¶¶ 181, 220, 236-37, 258-59. Like so many others who invested in ACN at Defendants' urging, Plaintiffs are generally unsophisticated with respect to financial and business matters—at least two of them did not attend college, and at the time of their recruitment none of them had ever purchased a single share of stock. ¶¶ 182, 221, 236, 258.

Each Plaintiff approached the ACN recruitment process with skepticism, and for each of them, Defendants' fraudulent promotion of ACN was the "turning point." ¶¶ 183-96, 220-25, 237-48, 260-68. After they signed up, as they struggled to recoup their initial investments, each Plaintiff was persuaded by Defendants' endorsement to invest more. ¶¶ 197-98, 205-10, 229-33, 250-53, 270-79. Each Plaintiff recalls specific statements constituting the Message that convinced them to invest. ¶¶ 192-93, 212-13, 226, 254, 264-65. Each Plaintiff also recalls being impressed by the broader association with the Trump brand, including through ACN's appearances on *The Celebrity Apprentice*. ¶¶ 189-91, 222-23, 242-44, 262-63, 266-68, 275-76. None of them would have signed up but for Defendants' fraudulent promotion of ACN. ¶¶ 195-96, 223, 244-45, 266-68.

The Message that pulled Plaintiffs and thousands of others like them into ACN was materially false in all respects. ¶¶ 9, 104-67. The ACN business opportunity did not offer a realistic possibility of commercial success, ¶¶ 109-12, 120-21, 124-29, 136; Defendants had done little to no diligence relating to the particular statements they were making, ¶ 167; and Defendants were

endorsing the ACN business opportunity because they were being paid millions of dollars to do so—a fact they consistently lied about and/or obscured from recruits, ¶¶ 137-56.

The falsity of the Message became apparent to Plaintiffs and class members only after they had invested. ¶¶ 216-19, 234, 255-56, 279-80. As they came to realize that Defendants had lied to them on the key issues that drove their decisions to invest, Plaintiffs eventually decided to cut their losses and quit the business. *Id.*

Defendants knew all along that they were defrauding troves of recruits. ¶ 18. Over time, they forged close bonds with ACN's founders and principals. ¶¶ 282-303, 310. An ACN founder bought property around a Trump golf club right around the time of its announcement, *see* ¶¶ 283-86, 288-89; ACN engaged with the Trumps on social media, *see* ¶ 287; and ACN and the Trump Organization sponsored or supported one another's charitable events, *see* ¶¶ 291-97, 310-11. One ACN principal even brought Trump onto the advisory board of the SUCCESS Foundation, a supposed non-profit associated with the multilevel marketing industry that promoted ACN and other companies like it (including to teenagers). ¶¶ 298-304. Defendants' close bonds with ACN's principals and other ties to the multilevel marketing industry gave them unique insight into how ACN's business opportunity operated in practice—knowledge that was unfortunately unavailable to Plaintiffs and others like them. ¶ 18.

Defendants' knowledge of ACN's practices, and the profitability that ACN's principals enjoyed, led Defendants to deepen the nature of their involvement when they replicated their scheme to fraudulently promote a second multilevel marketing company. ¶¶ 29-30. In 2009, Defendants signed another deal to deliver the Message on behalf of a multilevel marketing company—and this time, in exchange for royalty payments, Defendants used one of the LLCs they controlled to license the Trump name to the business, which rebranded itself "The Trump

Network." ¶¶ 312-20. The Trump Network then hired a senior ACN advisor. ¶ 320. In the following years, Defendants again disseminated the Message in various forums. ¶¶ 323-27. The Message was the same—Trump assured recruits that the business opportunity was risk-free, that they could "opt-out of the recession," and that "this is not a long shot." ¶¶ 328-32. He told recruits of the market demand for Trump Network products. ¶¶ 333-34. And he told them that he had done his diligence and was actively involved in running the business. ¶¶ 346-49.

As with ACN, principals at The Trump Network attested to the power of Trump's promotion, and Trump himself said that his brand and endorsement gave The Trump Network "a big advantage over other network marketing [companies] because of the fact that I am so well known." ¶ 337. And as with ACN, Trump Network victims, generally unsophisticated in financial matters, consistently report that it was the Message, delivered by Defendants, that caused them to invest. ¶¶ 339-41, 355-57. The numbers bear that out—in the first year following the Trump endorsement and rebranding, the company exploded from 5,000 participants to 20,000. ¶ 342. Also as with ACN, the Message was materially false in all respects. ¶¶ 335, 343, 350. The working-class victims who trusted Defendants lost thousands of dollars, and in the end, Defendants walked away, leaving the company saddled with judgments and the victims with nothing. ¶¶ 343-45.

Defendants deployed the same scheme with the Trump Institute, a third-party business that purported to offer a real estate training seminar. ¶¶ 358-95. Again, Defendants licensed the Trump name—this time using Trump University, LLC—and agreed to let the business make broad use of the Trump brand. ¶ 358. Defendants then delivered the Message in a wide range of forums in exchange for undisclosed payments. ¶¶ 359-60. Trump told recruits that the training they would receive was highly valuable and likely to lead to commercial success, that they would learn his "secret recipe" to success, or—as Trump put it in one letter that he signed as "Chairman, Trump

Institute"—they would learn "the strategies and techniques that are the reasons for my success." ¶¶ 361-65, 368. He concealed and misrepresented the nature of his involvement with the Trump Institute, assuring recruits he was helping to run the program, including by preparing course materials and selecting instructors. ¶¶ 372-74, 391-92. Again, as with the other Endorsed Entities, Trump's fraudulent promotion was critical to recruits' investment decisions. ¶ 389. Said one consumer: "This company is a Donald Trump company, so I felt it was legitimate." *Id*.

In reality, the Trump Institute was operated by a couple from Florida who ran an assortment of get-rich-quick schemes, and who have been the subjects of various regulatory and criminal proceedings. ¶¶ 377-78. The course materials were largely plagiarized, ¶¶ 369-71, and Trump had zero involvement in any aspect of the business he was promoting, ¶¶ 374, 393-95. The Better Business Bureau gave the Trump Institute an "F" rating, and, as part of an investigation, the Texas Attorney General compiled hundreds of pages of complaints in which consumers pleaded for help and described the Trump Institute as "a big scam." ¶¶ 381-90.

In short, Defendants' fraudulent scheme was a play that Defendants ran over and over again. Defendants identified third party companies selling a business opportunity or a training program to people trying to better themselves and pursue the American Dream. Defendants used their organization to defraud these people in exchange for millions of dollars in secret payments. And then Defendants walked away. As they repeatedly deployed this scheme and rebuilt their riches, Defendants left in their wake thousands of victims—unsuspecting Americans who admired the Trumps as seemingly successful businesspeople and made the tragic mistake to trust them.

## STANDARD OF REVIEW

On a motion to dismiss, a court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the non-moving party. *See Montero* v. *City of Yonkers,*

*New York*, 890 F.3d 386, 391 (2d Cir. 2018). To continue past a motion under Rule 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." In the RICO context, this rule applies only to predicate allegations of fraud. *See Moore* v. *PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999). Thus, Rule 9(b) does not apply to the other elements of a RICO claim, *see McLaughlin* v. *Anderson,* 962 F.2d 187, 194 (2d Cir. 1992), or to companion allegations of a RICO conspiracy, *see Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21, 26 (2d Cir. 1990). In the context of "complex civil RICO actions," Rule 9(b) requires "the plaintiff to delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998). With respect to the intent requirement, it is sufficient under Rule 9(b) to allege facts supporting "'a strong inference of fraudulent intent.'" *Loreley Financing (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC*, 797 F.3d 160, 171 (2d Cir. 2017) (quoting *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).

## ARGUMENT

To sustain a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must show "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams* v. *Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018). "RICO is to be read broadly"—a purpose "nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 497-98 (1985).

The RICO statute's definition of "enterprise" is "obviously broad," *Boyle* v. *United States*, 556 U.S. 938, 944 (2009), and includes any "group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4). A person "participates in" a RICO enterprise when he or she has any involvement whatsoever in its "operation or management." *Reves* v. *Ernst & Young*, 507 U.S. 170, 185 (1993). "In the Second Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Martin Hilti Family Tr.* v. *Knoedler Gallery*, 137 F. Supp. 3d 430, 476 (S.D.N.Y. 2015).

Here, Defendants tacitly concede that Plaintiffs have properly pleaded most of the elements of a RICO claim. Defendants argue only that the Amended Complaint lacks sufficient allegations regarding Defendants' racketeering activity and the existence of an association-in-fact. But as set forth more fully below, these arguments fail when tested against over 500 paragraphs of particularized factual allegations, all of which must be accepted as true at this stage. Plaintiffs here allege, at length, the scope and structure of Defendants' unlawful scheme to defraud, as well as Defendants' many acts in furtherance of that scheme and the significant losses attributable to it. Plaintiffs also allege in exacting detail how Defendants formed an association-in-fact and a separate legal enterprise, each with the shared purpose of earning revenue from the Endorsed Entities in exchange for conveying a false and misleading Message.

## I.    DEFENDANTS ENGAGED IN RACKETEERING ACTIVITY

Under RICO, racketeering activity includes mail and wire fraud. 18 U.S.C. § 1961(1). To assess allegations of such fraud, the Court must ask whether the Amended Complaint adequately pleads that Defendants undertook "(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." *United States* v. *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). Although, as noted, fraud must be pleaded with particularity, "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications,

is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451 at 456; *see also Evercrete Corp.* v. *H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006).

Defendants argue that the Amended Complaint fails to allege racketeering activity because it does not include sufficient allegations of a scheme to defraud, fraudulent intent, or loss causation. Defendants are wrong on all counts.

### A.     The Amended Complaint Sufficiently Alleges a Scheme to Defraud

A "scheme to defraud" is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *Autuori*, 212 F.3d at 115. The existence of such a scheme is "measured by a nontechnical standard" that directs attention to "fundamental honesty, fair play and right dealing in the general and business life of members of society." *Empire Merchants, LLC* v. *Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018).

Defendants argue that the Amended Complaint fails to allege a fraudulent scheme because it does not allege specific misstatements that were (1) sufficiently material to be actionable; (2) heard and relied upon by Plaintiffs; and (3) made by all Defendants. Each argument fails.

### 1.     Materiality

By definition, a fraudulent scheme must involve deceit that is material. *See Neder* v. *United States*, 527 U.S. 1, 25 (1999). Materiality looks "to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc.* v. *United States*, 136 S. Ct. 1989, 2002 (2016). Materiality is thus understood in context: "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [audience] to which it was addressed." *United States* v. *Corsey*, 723 F.3d 366, 373 (2d Cir. 2013); *see also United States* v. *Weaver*, 860 F.3d 90, 95-96 (2d Cir. 2017) (same). As Defendants concede, materiality is typically a mixed question of law and fact, and dismissal at the pleading stage based on lack of materiality is permitted only where the "alleged statements or omissions are 'so

obviously unimportant . . . that that reasonable minds could not differ on the question of their importance.'" MTD 15 (citation omitted).

### a.      Defendants' Material Misrepresentations

The Amended Complaint alleges, with particularity, dozens of material misrepresentations made by Defendants as part of their scheme to defraud. Here are just some examples:

- "ACN is leading the way in a new technology that will literally revolutionize the way we communicate with the ACN video phone. And trust me it's changing everything. The absolute truth is that this technology will be present in every home within the next several years." ¶ 22.

- "You have a great opportunity before you at ACN *without any of the risk most entrepreneurs have to take*." ¶ 107.

- "Network marketing has proven itself to be a *viable and rewarding source of income*." ¶ 113.

- "My advice about network marketing is to do your research, and put everything you've got into your product. Genuine enthusiasm is hard to beat, and *the odds will be with you*." ¶ 113.

- "ACN is the largest distributor of videophones anywhere in the world. They do half-a-billion dollars worth of sales a year." ¶ 127.

- "With the ACN Video Phone, they are leading the way in a communication revolution. Staying at the forefront of innovation is key to long-term business success, and ACN is doing just that." ¶ 132.

- Trump answered "no" when asked at a live ACN event, "Why do you keep coming back? What is it about ACN? Certainly not for any money." ¶ 145.

- "ACN is a great company. How do I know? Because we have *done a lot of research*." ¶ 163.

- "When evaluating a business opportunity, people need to look for strong leadership, a solid track record, success stories, a strong product people really need and want and a clear plan for the future. ACN has all of these things." ¶¶ 24, 117, 254.

- In a letter about the Trump Network, Trump stated, "Trump Network works with some of the *best nutritionists*, *scientists*, and *technologists* . . . [and] as a result, our products are *leaders in their categories*." ¶ 334.

- On the Trump Institute website, Trump claimed that prospective students would learn Trump's "secret recipe for success." ¶ 362.

- On the Trump Institute website, Trump stated, "I put all of my concepts that have worked so well for me, new and old, into our seminar. I'm teaching what I've learned." ¶ 373.

As alleged in the Amended Complaint, every single one of these statements is false. *See*

¶¶ 105-67 (ACN), 328-45 (Trump Network), 361-71 (Trump Institute). Defendants do not

seriously dispute that allegation. Instead, in a brief that includes strikingly few quotes or references to the specific misrepresentations Plaintiffs allege, Defendants generally argue that each and every false statement was inherently immaterial. Defendants effectively ask the Court to infer that nobody—not even generally unsophisticated investors—could possibly have credited or been influenced by anything Defendants said while promoting ACN, the Trump Network, and the Trump Institute. MTD 13-23. Such an across-the-board factual inference would be unreasonable at any stage of the case, but it is certainly inappropriate at the pleading stage, where Plaintiffs' allegations must be taken as true and inferences must be drawn in *their* favor—not Defendants'. *See Iowa Pub. Employees' Ret. Sys.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 313 (S.D.N.Y. 2018).

Indeed, it is reasonable to infer that each of the misrepresentations set forth above would have a "natural tendency to influence the decisionmakers to whom they were addressed." *Weaver*, 860 F.3d at 96. That conclusion is justified on the very face of the statements, which make precisely the kinds of claims that would to influence an investor's decisionmaking process. And it is corroborated by detailed allegations about how Defendants worked to cultivate, maintain, and secretly monetize a brand based on the impression of wildly successful entrepreneurship and commercial savvy. *See* ¶¶ 3, 54-79. In light of those efforts, the natural inference is that Defendants' statements would tend to influence their targets. "Trust me," Trump often said while making misrepresentations, and that is exactly what many people did. ¶ 13.[3]

Further, the Amended Complaint alleges that Defendants made huge sums of money from their fraudulent promotion of the Endorsed Entities. *E.g.*, ¶ 16. It is reasonable to infer that

---

[3] While Defendants invoke cases about sophisticated parties buying securities in a heavily regulated market, here the audience for Defendants' statements was generally unsophisticated. *See* ¶¶ 14, 21-25. It may be reasonably inferred that this audience would assign particularly formidable weight to the unequivocal endorsements and statements of a self-declared billionaire like Trump. *See* ¶¶ 168-280.

Defendants were paid so handsomely precisely because their representations were expected to shape investor behavior. Indeed, the contrary inference is manifestly unreasonable: nobody would have paid Defendants millions to make statements that were not likely to influence behavior.

Moreover, ACN continued to secretly pay Trump lavish sums to speak on the company's behalf even after Trump made many misrepresentations about its products, technology, value, and risk profile, which the leadership of ACN was uniquely well-positioned to know were false. *See* ¶¶ 17, 18, 139, 147. In fact, ACN expanded Defendants' role in promoting the Company, ¶¶ 298-304, entangled their other affairs with Defendants' ventures, ¶¶ 282-97, and publicly celebrated Defendants' success in drawing in new recruits, ¶¶ 101-03, 170-75. Given all this, it is reasonable to infer that Trump's misrepresentations were (and were intended to be) material.

The same is true for Defendants' misrepresentations concerning Trump's compensation from ACN. *See* ¶¶ 138-56; *contra* MTD 21-23. In at least one instance, Trump expressly and falsely denied that his relationship with ACN was based on receipt of "any money"—when he was asked, "why do you keep coming back? . . . Certainly not for any money," Trump answered, "no." ¶ 145; *see also* ¶ 152. Under any standard, this was a material misrepresentation.

Defendants argue that somehow the context of this blatant falsehood would have led any observer to realize that Trump was lying when he said he was not promoting ACN for any money. MTD 22. But that is not an inference to which Defendants are entitled in connection with a motion to dismiss. Trump's flat denial of any financial incentive would surely have "the natural tendency to influence the decisionmakers to whom they were addressed" in deciding whether to take his advice to invest in ACN. *Weaver*, 860 F.3d at 95; *see also* ¶¶ 157-58 (describing Federal Trade Commission documents that explain why a failure to disclose payment in exchange for celebrity endorsements will predictably affect audience response). Defendants also characterize Trump's

-14-

false denial as a "split-second utterance," MTD 22, even while they concede elsewhere that Trump's statements were all "carefully scripted," MTD 18. In any event, neither of these factual assertions provides any basis for dismissal now.

It is not only the false denial that is actionable—Trump's persistent failure to disclose his compensation when choosing to speak voluntarily about his reasons for endorsing ACN is also actionable. *See* ¶¶ 138-44, 146-52. Defendants argue that they cannot be held liable for omissions relating to their compensation as a matter of law because they lacked a fiduciary duty to say more. *See* MTD 21-22. But "where a party without a duty *elects* to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information." *United States* v. *Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016); *United States* v. *Finazzo*, No. 10 Cr. 457, 2011 WL 3794076 (E.D.N.Y. Aug. 24, 2011) (concealing receipt of kickbacks when negotiating a vendor contract is an actionable "half truth"). That rule controls here. Defendants sought to persuade people to invest in ACN. By speaking half truths when asked about their motives, Defendants created a false impression, and did so in an effort to persuade audience members to invest in ACN. It is reasonable to infer that potential investors would have reacted *very* differently to Trump's claims about ACN if Trump had said truthfully that his words were bought and paid for. Indeed, Plaintiffs have explicitly alleged that they would not have signed up if they had known Trump was being paid. *E.g.*, ¶¶ 193, 294. These half truths, moreover, amplified the materiality of every other misrepresentation already alleged, as they were uttered in an effort to enhance Defendants' own credibility in influencing investor behavior.

Defendants further object, asserting that "our popular culture is virtually saturated" with the understanding that "the business of the Trump family is to promote their name for money."

-15-

MTD 22-23. But again—as striking as that statement may be coming from the Trumps themselves—Defendants are not entitled to an inference at this stage that everybody already knew they were hucksters for hire who spoke only when paid to do so.

### b.    Defendants' Statements Were Not Mere Puffery

Defendants also try to dismiss the alleged misstatements as puffery. MTD 15-16. But Defendants mischaracterize both the applicable law and the allegations in the Amended Complaint.

As a general matter, some statements "are too general to cause a reasonable investor to rely upon them, and thus cannot mislead a reasonable investor." *In re Vivendi*, 838 F.3d at 245. Such puffery consists of "[s]ubjective claims about products, which cannot be proven either true or false," *Lipton* v. *Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995), as well as "exaggerated, blustering, and boasting statement[s] upon which no reasonable buyer would be justified in relying," *Time Warner Cable, Inc.* v. *DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007). Whether "a statement constitutes puffing as opposed to a material misrepresentation is often a close question that must be viewed within the context of the totality of circumstances." *U.S. Bank, N.A.* v. *PHL Variable Ins. Co.*, No. 12 Civ. 6811, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013). For this reason, courts hesitate "to make this factual determination on the basis of the pleadings alone." *Schutz* v. *Ne. Mortg. Corp.*, No. 05 Civ. 423, 2005 WL 1844409, at *2 (D. Conn. Aug. 1, 2005).

The identity of the speaker is critical to whether the doctrine can be applied at all. The puffery doctrine is predicated on the presumption that investors will disbelieve "what *the seller* says about *his own* opinions." *Vulcan Metals Co.* v. *Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918) (emphases added); *see also DIRECTV*, 497 F.3d at 159 ("The 'puffing' rule amounts to a *seller's* privilege to lie *his head off*, so long as he says nothing specific." (emphases added)). As Judge Crotty concluded in *United States* v. *Levy*, that presumption has considerably less force when *third parties* make statements about a company, especially while concealing (and lying

-16-

about) their financial motives. *See* No. 11 Cr. 62, 2013 WL 3832718, at *3 & n.3 (S.D.N.Y. July 15, 2013) (declining to instruct jury on puffery). The Tenth Circuit voiced the same concern in *S.E.C.* v. *Curshen*, 372 F. App'x 872 (10th Cir. 2010), which addressed a pump-and-dump scheme. "[P]uffing statements," the Tenth Circuit observed, "are typically made by the corporation or someone investors would know is associated with the corporation." *Id.* at 879. But while investors might "know how to devalue the optimism of corporate executives," they did not know to devalue statements by a third party that appeared to reflect "personal knowledge about the company" because they did not know he was being paid for those statements. *Id.* at 879-80 (emphasis omitted).

Applied here, that logic strongly militates against treating any of Defendants' statements as puffery given that Defendants were not principals of ACN. As a result, Plaintiffs' would not know to "devalue" Defendants' statements about ACN that appeared to be based on Defendants' own personal knowledge. The unsophisticated nature of the audience targeted by Defendants in a context where Defendants flaunted their prestige and insider knowledge further supports this conclusion. *See Autuori*, 212 F.3d at 118-19. But even without those presumptions, there is no basis at the pleading stage for treating the statements listed on page 12 as puffery. These are not statements lacking any discernible truth value, or so thoroughly brigaded with bluster that nobody could possibly believe them. *See DIRECTV*, 497 F.3d at 160. To the contrary, Defendants made specific, material misrepresentations of fact about the development of, market for, and total present value of specific products and services;[4] the level of investor risk inherent in several discrete

---

[4] *See In re Vivendi*, 838 F.3d at 245 (rejecting puffery defense where a company misrepresented its available cash for investing and second quarter earnings); *United States* v. *Simon*, 839 F.2d 1461, 1468 (11th Cir. 1988) (rejecting puffery defense where, in describing its products, the defendants "created advantages by placing otherwise general assertions about [their value] into a concrete, factual setting"); *Novak* v. *Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (rejecting puffery defense where defendants' statements that inventory situation was "in good shape" and "under control" was contrary to what defendants allegedly knew); *Galestan* v. *OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (rejecting puffery defense where references to "popularity" of refinancing program and "early

business opportunities, based on an appearance of insider information;[5] the general success rate of individual investors who participate in multilevel marketing schemes;[6] whether Trump had received any payment for his statements;[7] and whether Trump had been personally involved in creating certain educational materials that bore his name.[8] In other words, contrary to Defendants' implication, MTD 2, 19, Trump wasn't playing the role of some run-of-the-mill celebrity endorser, claiming that he had discovered a great shampoo that makes his hair extra shiny—he was making specific material factual misstatements as part of broad scheme to defraud.[9]

Defendants' statements were all capable of being proven false—and, as alleged, *were* false. ACN did not have a "new technology" that was "changing everything." ¶ 22. ACN participants

---

success with the rollout" were not so general as to make reliance unreasonable); *Burton* v. *Iyogi, Inc.*, No. 13 Civ. 6926, 2015 WL 4385665, at *8 (S.D.N.Y. Mar. 16, 2015) (rejecting puffery defense because it could be proven true or false whether defendants' services were offered by "tech experts"); *Sussman-Automatic Corp.* v. *Spa World Corp.*, 15 F. Supp. 3d 258, 271 (E.D.N.Y. 2014) (rejecting puffery defense where defendant falsely represented the origin of its products and whether they possessed specific certifications); *Verizon Directories Corp.* v. *Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 407 (E.D.N.Y. 2004) (rejecting puffery defense where defendants' commercials were "skillfully crafted . . . to subtly but firmly communicate" that one product will reach more consumers than another).

[5] *See Autuori*, 212 F.3d at 118-19 (rejecting puffery defense where business forecasts were falsely described as "good" and "credible"); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (rejecting puffery defense where defendant deliberately understated risks posed by investment strategy); *Freudenberg* v. *E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) ("[M]isstatements regarding risk management . . . are not 'puffery' where, as alleged here, they were 'misrepresentations of existing facts.'").

[6] *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) ("[C]laims or statements in advertising may go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it."); *United States* v. *Armantrout*, 411 F.2d 60, 64 (2d Cir.1969) (affirming mail fraud conviction where defendant "misrepresented to customers that they could" achieve the desired result of their investment "quickly and easily"); *Billhofer* v. *Flamel Techs., SA*, 663 F. Supp. 2d 288, 298-99 (S.D.N.Y. 2009) (rejecting puffery defense where press release characterized drug program as a "success" that had "generated considerable interest"); *Manavazian* v. *Atec Grp., Inc.*, 160 F. Supp. 2d 468, 481 (E.D.N.Y. 2001) (not puffery where defendants positively characterize "current and future business conditions" while being "aware that an 'adverse business trend' rendered statements misleading").

[7] *Oliver Wyman, Inc.* v. *Eielson*, 282 F. Supp. 3d 684, 700 (S.D.N.Y. 2017) (representation about average partner compensation was actionable as fraud even if "couched as ranges, averages, or in generalities"); *Fisk* v. *SuperAnnuities, Inc.*, 927 F. Supp. 718, 726 (S.D.N.Y. 1996) (representation that insiders would not receive compensation for sales of shares was actionable as fraud); *see also Freudenberg*, 712 F. Supp. 2d at 190 (no puffery defense available where statements "misrepresent existing facts").

[8] *See Cohen* v. *Trump*, No. 10 Civ. 0940, 2014 WL 690513, at *6 (S.D. Cal. Feb. 21, 2014) (holding that Trump's claims to be personally involved in Trump University were not puffery because they were either true or false).

[9] Further, unlike a movie star or professional athlete who might endorse products on the side, Defendant Trump, along with the other Defendants, spent years carefully crafting a brand and building a complex organization in order to perpetrate fraudulent promotion schemes in violation of RICO. ¶¶ 43-76.

were not avoiding "any of the risk most entrepreneurs have to take," ¶ 107, or entering a field

where "the odds will be with you," ¶ 113.[10] ACN was not doing "half-a-billion dollars worth of

sales a year." ¶ 127. ACN's instantly-obsolete "Video Phone" was not at "the forefront of

innovation." ¶ 132. The Trump Network had never worked with "the best nutritionists, scientists,

and technologists." ¶ 334. Trump had not played any role in putting "all of [his] concepts" into the

Trump Institute, and certainly was not "teaching" anything. ¶ 373. None of these factual statements

is puffery under binding Second Circuit precedent.[11]

To be sure, the Amended Complaint does include some statements by Defendants that,

standing alone, could be characterized as puffery. *E.g.*, ¶ 114 ("ACN approaches [direct selling]

with a fresh perspective"); ¶ 327 (Trump Network "is going to be something that's really

amazing"). But that does not turn Defendants' other misrepresentations into puffery-by-

association. To the contrary, even when "some of the alleged statements, viewed in isolation, may

be mere puffery, nonetheless, when (as here alleged) the statements were made repeatedly in an

effort to reassure [investors] about the Company's integrity, a reasonable investor could rely on

them as reflective of the true state of affairs at the Company." *In re Petrobas Sec. Litig.*, 116 F.

Supp. 3d 368, 381 (S.D.N.Y. 2015). Similarly here, Defendants' braggadocio and claims of insider

knowledge were part of a calculated effort to mislead and influence potential investors. At the very

least, that is a reasonable inference that should be drawn in Plaintiffs' favor at this stage. *Iowa*

*Pub. Employees'*, 340 F. Supp. 3d at 313.

---

[10] Defendants concede that statements "touting the durability of the 'direct selling' business model" come "close to a statement of fact, rather than of opinion or puffing." MTD 17. Defendants insist, however, that the Amended Complaint fails to allege falsity or materiality. Not so. Falsity is alleged at ¶ 113 and ¶ 120. And given that these false statements of fact were made in the context of actively pitching potential investors to pour their savings into a very specific direct selling business—ACN—it is reasonable to infer that they were likely to influence their target audience.

[11] This defeats Defendants' effort to distinguish *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (S.D.N.Y.) and *Autuori*, which Defendants otherwise concede stand for the proposition that a party *can* be held liable for fraud based on deliberate misstatements about a third party's investment opportunity. *See* MTD 17-19.

### c.   Defendants' Statements Were Not Mere Opinion

Defendants' argument that the alleged misstatements constitute non-actionable opinion statements similarly distorts both the allegations of the Amended Complaint and applicable law. MTD 14-15. As an initial matter, as already explained, *supra* at 12-16, the Amended Complaint includes many fraudulent misrepresentations of *fact*—none of which qualify as opinion statements. *See, e.g.*, *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (explaining the difference). For that reason alone, Defendants' arguments for dismissal based on the law of opinion statements are without merit.

Even as to other statements in the Amended Complaint that could, without context, be characterized as opinions, materiality is properly inferred. *E.g.*, ¶ 119 ("I work with a lot of companies and I can say with 100% confidence that you've made the right decision choosing ACN."); ¶ 130 ("I think [ACN's] new videophone is going to be tremendous."). For some of these statements, materiality may be inferred because Trump misrepresented his underlying research, creating a false impression that his belief was based "on extensive due diligence, inside information, and personal experience with the Investments." ¶ 12; *see also, e.g.*, ¶ 131 ("[O]ne of the beauties with ACN, that I've been able to determine after some research, is that you guys have . . . stayed ahead of [the pack] from a technological standpoint . . . ."). As the Supreme Court has explained, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare*, 135 S. Ct. at 1328.

Further, some of Defendants' supposed opinion statements also contained "embedded statements of fact" that were materially false and are not saved by association with an opinion. *See Omnicare*, 135 S. Ct. at 1327; *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1109 (1991)

(Scalia, J., concurring in part and concurring in judgment) (a statement might be "most fairly read as affirming separately both the fact of the [speaker's] opinion and the accuracy of the facts" given to support or explain it). For example, Trump repeatedly described ACN as a "great company," but then falsely attributed that claim to "hav[ing] *done a lot of research*." ¶ 163. It is reasonable to infer that such supposed opinions, with embedded misstatements, advanced the scheme to defraud.

Finally, even if some of Defendants' statements constituted opinions, they were not honestly held. *See Autuori*, 212 F.3d at 119; *Vulcan*, 248 F. at 856. Defendants worked closely with the founders of ACN and had ties with the principals at the Trump Network and Trump Institute. Many of the specific factual claims Defendants made about these entities—including statements about the value of ACN's technology, the soundness of its business model, and the risks that participants would face in pursuing the ACN business opportunity—were not only false, but objectively false in ways that it is reasonable to infer were known to all insiders. *See* ¶¶ 17-19, 29, 391-95. Accordingly, it is reasonable to further infer that Defendants' glowing endorsements, even when couched as opinions about the amazing opportunity available to investors, did not reflect their sincere views and were instead falsehoods meant to further the broader fraudulent scheme. *See, e.g.*, *Autuori*, 212 F.3d at 119 (liability for describing a project as "safe" despite insider knowledge of serious risk to investors); *In re Petrobas Sec. Litig.*, 116 F. Supp. 3d at 368, 380-81 (liability for describing internal controls as effective despite insider knowledge of corruption).

### 2.    Reliance

Defendants argue that Plaintiffs must base their allegations of racketeering activity exclusively on actionable statements made to them by Defendants. *See* MTD 16. But that is not an accurate statement of the law. In *Bridge* v. *Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), the Supreme Court held that mail and wire fraud do not require proof of reliance and that RICO liability is therefore not limited to misrepresentations received and relied upon by plaintiffs. *Id.* at

648. In *Bridge* itself, the plaintiffs had not received any misrepresentations from the defendants; rather, the defendant enterprise had made misrepresentations to a third party. *See id.* The Supreme Court nevertheless allowed the case to proceed, emphasizing that "nothing on the face of the relevant statutory provisions imposes" a reliance requirement. *Id.* Thus, a RICO case premised on a pattern of mail or wire fraud may proceed where *someone* received material misrepresentations, so long as those misrepresentations were part of a "scheme to defraud" and that same scheme proximately caused plaintiff's injuries. *See Weaver*, 860 F.3d at 95-96; *United States* v. *Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017). That is certainly the case here. In any event, as specifically alleged in the Amended Complaint, Plaintiffs did hear Defendants make many material misrepresentations. *See, e.g.*, ¶¶ 22, 107, 113, 115, 118, 149, 226, 254.

### 3.    Participation by Certain Defendants

Defendants' final argument concerning the scheme to defraud is that Plaintiffs fail to allege "any statement (of any kind) made to them by the Trump Corporation, Donald Trump, Jr., Eric Trump, or Ivanka Trump, or to plead with particularity facts establishing their knowledge of, or any agreement with respect to, any fraudulent statement allegedly made by Mr. Trump." MTD 20. This argument misrepresents the circumstances in which parties may be liable for participation in a scheme to defraud. *See Martin Hilti*, 137 F. Supp. 3d at 479-80.

The elements of mail and wire fraud include "the defendant's *knowing participation* in the scheme." *Chanayil* v. *Gulati,* 169 F.3d 168, 170-71 (2d Cir. 1999) (emphasis added). It does not matter if a defendant personally made fraudulent misrepresentations, so long as he or she "was one of the participants in a fraudulent scheme." *United States* v. *Fasciana*, 226 F. Supp. 2d 445, 452 (S.D.N.Y. 2002); *see also United States* v. *Corey*, 566 F.2d 429, 430 n.2 (2d Cir. 1977). Participation is often inferred from circumstantial evidence suggesting knowledge of the scheme to defraud. *See United States* v. *Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984).

-22-

Under this standard, the Amended Complaint properly alleges participation by Trump's adult children: they each "disseminated (and conspired to disseminate) the Message by, among other things, making false and misleading statements about the Investments, appearing in various publications and on television in support of the Endorsed Entities, and lending their own explicit and implicit endorsements, all without disclosing any compensation for those appearances." ¶ 10. Further, "all Defendants deliberately enhanced, amplified, and augmented the Message by, among other things, selling to the Endorsed Entities the right to use the Trump brand, licensing the Trump name to certain of the Endorsed Entities, and even arranging for ACN to appear (twice) on *The Celebrity Apprentice*." ¶ 11. Indeed, Donald Trump Jr. and Ivanka Trump appeared in both episodes of *The Celebrity Apprentice* featuring ACN, and Ivanka has explained that she and Donald Trump Jr. had "prominent roles" on the show, which they used as a "vehicle to promote and endorse brands." ¶¶ 72, 74; *see also* ¶¶ 95, 99-100, 103, 179, 301, 366. Thus, the "promotion and endorsement were a collective effort on behalf of the Trump family." ¶ 180.

Moreover, each of Trump's adult children held senior positions at, or otherwise exercised control over, entities included in or associated with the Trump Enterprise. *See* ¶¶ 38-40, 49-50. Given this informal, family-centric business structure—and given that each of the Trump Defendants played a significant role in one or more important aspects of the fraudulent scheme, while benefiting handsomely from it and engaging in further dealings with the founders of ACN— it is reasonable to infer that each of the Trump Defendants knowingly participated in the scheme.[12]

---

[12] Defendants contend that Ivanka Trump's memoir, published in 2009, somehow defeats an inference of knowing participation. MTD 20-21. But in fact her statements about product placement on *The Celebrity Apprentice* support an inference of her involvement—not lack of involvement—in the scheme at issue here. *See* ¶¶ 72-76. Similarly, Ms. Trump's "comfort[]" boasting about Defendants' use of *The Celebrity Apprentice*'s as an endorsement vehicle, MTD 20-21, only speaks to her brazenness and does not absolve her of liability.

Turning to the Trump Corporation itself, RICO liability arising from a fraudulent scheme is "appropriately imposed . . . where (1) [a] corporate defendant is a central figure in the RICO scheme and benefited from the scheme, and (2) the individual RICO actors are high-level corporate officers who controlled the corporation." *Needham & Co., LLC* v. *Access Staffing, LLC*, No. 15 Civ. 2487, 2016 WL 4399288, at *14 (S.D.N.Y. Aug. 12, 2016); *see also Bd. of Managers of Trump Tower* v. *Palazzolo*, 346 F. Supp. 3d 432, 459-60 (S.D.N.Y. 2018). Both requirements are satisfied here. The Trump Corporation, as the entity through which the individual Defendants controlled the Trump Organization and transacted business, was clearly a "central figure in the RICO scheme," and each Individual Defendant, as a senior officer, "had knowledge of or was recklessly indifferent toward the unlawful activity." *Bd. of Managers*, 346 F. Supp. 3d at 459; *see also* ¶¶ 5-6, 36.

## B.     The Amended Complaint Sufficiently Alleges Fraudulent Intent

It is hornbook law that fraudulent intent can be shown through allegations of a "fraudulent scheme that contemplated harm to the property interests of the victim." *United States* v. *Carlo*, 507 F.3d 799, 801 (2d Cir. 2007). Critically, the "property interests" protected by the mail and wire fraud statutes "include the interest of a victim in controlling his or her own assets." *Id.* at 802. As a result, "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss." *United States* v. *Binday*, 804 F.3d 558, 579 (2d Cir. 2015). It "suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Id.* In other words, where "the false representations are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Id.* at 578.

More generally, fraudulent intent "may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). Consistent with *Carlo*, the Second Circuit has "affirmed such an inference where the defendant's misrepresentations foreseeably concealed economic risk or deprived the victim of the ability to make an informed economic decision." *Binday*, 804 F.3d at 578.

As outlined above, the Amended Complaint alleges with particularity that Defendants made and disseminated material misrepresentations intended to affect their targets' "economic calculus." *Id.* at 570. Defendants also made and disseminated material misrepresentations concerning the "quality" and "adequacy" of the investment opportunities they were hawking. *Id.* at 579. Along the way, Defendants lied about and otherwise concealed their financial self-interest. At the pleading stage, it can be reasonably inferred that Defendants' extensive false statements— which were repeated for years across diverse national media platforms and to thousands of prospective investors—were made with the intent to persuade viewers and readers to invest in ACN, the Trump Network, and the Trump Institute "without the relevant facts necessary to make an informed economic decision." *Id*.

Defendants' response to the application of these long-accepted principles consists principally of an assertion that their misrepresentations were all immaterial puffery and opinion statements, which "bear no indicia of an intent to harm." MTD 27. That argument does not hold water, particularly in light of detailed allegations that Defendants' misrepresentations were material and part of a larger and successful effort to bring in recruits. *Supra* at 12-16. While Defendants also insist that their desire to earn money did not create motive for fraud because they would be paid "regardless of whether any participant sign up for or paid fees to ACN," MTD 27,

this argument ignores the requirements of Rule 12. *See Iowa Pub. Employees'*, 340 F. Supp. 3d at 313. Given the facts alleged, it is not reasonable to infer that Defendants would have made millions even if nobody signed up at their behest. The opposite inference—that Defendants were paid again and again precisely because of the extraordinary power of their Message, *supra* at 13-14—is further supported by allegations that Defendants ran the same fraudulent play three times and profited handsomely each time. This repeated pattern of material misrepresentations in the same industry, depriving audiences of facts necessary to informed economic decisions, strongly indicates fraudulent intent.

### C.     The Amended Complaint Sufficiently Alleges Causation

A RICO plaintiff must allege proximate causation. *See Hemi Grp., LLC* v. *City of New York, N.Y.*, 559 U.S. 1, 9 (2010); *Bridge*, 553 U.S. at 654. This requires more than a "remote" or "purely contingent" link, but is satisfied by "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi*, 559 U.S. at 9.

Here, the Amended Complaint alleges with exacting particularity that Defendants engaged in material misrepresentations to induce financially unsophisticated people to invest in opportunities that Defendants knew had little-to-no chance of commercial success. *See* ¶ 9, 18, 20, 105, 109, 120. Defendants' statements were critical in recruiting investors. *See* ¶¶ 172-73. Like many, "Plaintiffs made the fateful decision to invest in ACN *because of* the Trump Enterprise's promotion and endorsement." ¶ 20 (emphasis added). Moreover, after Plaintiffs signed up as IBOs, they relied on Defendants' statements in paying additional funds to ACN. *See* ¶¶ 197, 206-08, 212-13, 226, 233-34, 254-55. It was only when Plaintiffs, through their own experience, learned the falsity of Defendants' Message that Plaintiffs understood they had been defrauded, cut their losses, and got out. ¶ 20. "The Trump Enterprise's fraudulent Message was thus the cause of both the Plaintiffs' investments and the Plaintiffs' losses." ¶ 20; *see also* ¶¶ 13-14,181-280.

This is a classic example of proximate causation: Defendants duped Plaintiffs into making investments likely to fail; Plaintiffs invested in direct reliance on Defendants' false statements, thus giving up other investment opportunities; and Plaintiffs were harmed when the investments did, in fact, fail. In many different contexts, courts have held that a party who fraudulently misrepresents investment risk, or the value of a particular investment, is the proximate cause of his victims' ultimate losses attributable to that investment.[13] Similarly, courts have upheld proximate causation where defendants fraudulently induced plaintiffs to put their money into something that was other (and less valuable) than what the defendants had represented.[14]

Defendants tacitly concede that Plaintiffs have pleaded loss causation with respect to funds they paid to ACN in reliance on Defendants' statements after signing up to be IBOs. *See* MTD 24. But Defendants argue that Plaintiffs cannot connect Defendants' fraudulent scheme (which led them to invest in the first place) to the loss of their original investments, because those losses "could have" resulted from the "inherent challenges" of multilevel marketing. MTD 23-24. This argument, which relies upon multiple inferences in favor of Defendants and against Plaintiffs, is misplaced at the pleading stage. As a matter of law, "[t]he requirement, if any, to plead *a* causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." *Loreley*, 797 F.3d at 189; *see also id.* at 188-89 ("It is sufficient under Rule 12(b)(6) that the allegations themselves give Defendants 'some indication' of the risk

---

[13] *See, e.g.*, *In re Evans*, 81 F.3d 167 (9th Cir. 1996); *Blue Cross & Blue Shield of Minnesota* v. *Wells Fargo Bank, N.A.*, No. 11 Civ. 2529, 2012 WL 1343147, at *4 (D. Minn. Apr. 18, 2012); *Dolan* v. *PHL Variable Ins. Co.*, No. 15 Civ. 1987, 2018 WL 1696650, at *10 (M.D. Pa. Apr. 6, 2018); *Eclectic Properties E., LLC* v. *The Marcus & Millichap Co.*, No. 09 Civ. 511, 2012 WL 713289, at *14 (N.D. Cal. Mar. 5, 2012); *Lukaszuk* v. *Sudeen*, No. 02 Civ. 5143, 2007 WL 4699018, at *5 (E.D.N.Y. Nov. 27, 2007); *Peterson* v. *Goldberg*, No. 02 Civ. 7375, 2005 WL 589753, at *10 (N.D. Ill. Feb. 25, 2005).

[14] *See, e.g.*, *Chambers* v. *King Buick GMC, LLC*, 43 F. Supp. 3d 575, 603-04 (D. Md. 2014); *De Sole* v. *Knoedler Gallery*, 974 F. Supp. 2d 274, 310 (S.D.N.Y. 2013); *Bank of China* v. *NBM L.L.C.*, No. 01 Civ. 815, 2001 WL 1360299 (S.D.N.Y. Nov. 5, 2001).

concealed by the misrepresentations that plausibly materialized in Plaintiffs' ultimately worthless multimillion-dollar investment in these CDO notes."); *Fin. Guar. Ins. Co.* v. *Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015) ("[T]he purpose of the loss causation element is to require a plaintiff 'to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind,' not to make a conclusive proof of that causal link.").[15]

## II. DEFENDANTS FORMED A RICO ENTERPRISE

The Amended Complaint alleges with particularity that Defendants—together with other, related entities—comprised an association-in-fact enterprise. ¶¶ 5, 43-51, 426. The Amended Complaint further alleges that Defendant The Trump Corporation constituted a legal enterprise in itself, and was operated and controlled by the Individual Defendants. ¶¶ 6, 52-53, 427. Defendants do not contest the existence of the Trump Corp. Enterprise, which in itself satisfies RICO's enterprise requirement. Defendants instead assert a single argument relating only to the Trump Association-in-Fact: that Plaintiffs insufficiently allege that the members of that enterprise shared a common purpose. MTD 27-28. That argument fails for three reasons.

*First*, under Rule 12(b)(6), particularized and plausible allegations must be accepted as true and here, the Amended Complaint includes such allegations with respect to common purpose:

> The Trump Association-in-Fact and the Trump Corp. Enterprise (referred to collectively as the "Trump Enterprise") had the common purpose of earning revenue from the Endorsed Entities in exchange for conveying a false and misleading Message on behalf of the Endorsed Entities, namely: (1) that prospective investors would have a reasonable probability of commercial success if they bought into the Investments; (2) that Trump was promoting and endorsing the Investments because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid);

---

[15] Defendants further deny any responsibility for Plaintiffs' losses by insisting that Plaintiffs could have recouped their investments if only they had somehow caught a lucky break. MTD 23-24. However, it is inconsistent with Plaintiffs' particularized allegations for Defendants to assert that they did not cause losses when their misrepresentations caused Plaintiffs to make investments that Defendants presented as safe, but that were at best extremely risky and often worthless. *See* ¶¶ 9, 18, 105, 109, 120.

and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the Investments.

¶ 428. These particularized and plausible allegations, standing alone, are more than sufficient to withstand dismissal. *See Iowa Pub. Employees'*, 340 F. Supp. 3d at 313.

*Second*, these allegations are supported by many others detailing distinct but complementary actions taken by each member of the enterprise in pursuit of the common purpose. Defendant Donald J. Trump was the primary fraudulent spokesperson for all three of the Endorsed Entities. ¶¶ 105-67, 328-57, 361-95. Trump's adult children not only made "false and misleading statements about the Investments, [appeared] in various publications and on television in support of the Endorsed Entities, and [lent] their own explicit and implicit endorsements," ¶ 10, but also were "integral members of the management team" controlling the various entities within the Trump Association-in-Fact used to perpetrate their scheme, ¶¶ 5, 72; *see also* ¶¶ 38-40. As to those entities, Trump Productions, LLC co-produced *The Apprentice* and *The Celebrity Apprentice*, a primary platform used by Defendants to carry out their fraud, ¶¶ 44, 54-78; DSN Licensing, LLC and Trump University, LLC licensed the Trump name and brand to two of the Endorsed Entities— the Trump Network and Trump Institute, ¶¶ 44, 314-20 358, 374; and T International Realty, LLC, Trump National Golf Club, LLC, and TNCC Charlotte, LLC facilitated the scheme by, among other things, acting as intermediaries through which cash payments flowed between ACN and Defendants. ¶¶ 283-90. Accepting the allegations in the Amended Complaint as true, it is reasonable to infer that these individuals' and entities' complementary activities reveal a common purpose to enrich Defendants through unlawful means.

*Third*, common purpose may be inferred when "persons associated with the enterprise engaged in a pattern of [fraudulent] activity." *Equinox Gallery Ltd.* v. *Dorfman*, 306 F. Supp. 3d 560, 571 (S.D.N.Y. 2018); *see also Boyle*, 556 U.S. at 947 ("[T]he evidence used to prove the

pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce."). In other words, the existence of the fraudulent scheme itself may support an inference of common purpose. Here, as explained above, Defendants' pattern of racketeering activity is consistent only with a shared, illegal purpose.

## III.   THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS

According to Defendants, if Plaintiffs' RICO claims are dismissed, Plaintiffs' remaining state law claims must also be dismissed because Plaintiffs would fail to meet the diversity statute's amount-in-controversy requirements. *See* 28 U.S.C. § 1332(a), (d). This contention is meritless. *First*, Defendants' argument that CAFA's jurisdictional threshold would require a class with "at least 10,000" members, MTD 30, ignores allegations that Plaintiffs each lost more than a single $499 ACN registration payment. *E.g.*, ¶¶ 198-211. Doe, for example, alleges that she lost around $5,500. ¶¶ 196-219. Even if Doe sought recovery only of that amount—and she seeks more— Plaintiffs would meet CAFA's jurisdictional requirement with only 900 similar class members. *See also* ¶ 1, 41, 404, 410 (alleging tens of thousands of class members). *Second*, recoverable statutory and punitive damages are considered to be part of the amount-in-controversy. *See Bracken* v. *MH Pillars Inc.*, 290 F. Supp. 3d 258, 262 (S.D.N.Y. 2017). Here, Plaintiffs seek an array of non-economic damages permitted under state law. *See* ¶ 414; *see also Neale* v. *Volvo Cars of N. Am., LLC*, 794 F.3d 353, 357 n.1 (3d Cir. 2015). It is thus hardly a "legal impossibility" that Plaintiffs' class-wide claims could meet CAFA's $5,000,000 jurisdictional threshold. *Ryan* v. *Legends Hosp., LLC*, No. 11 Civ. 3110, 2012 WL 3834088, at *2 (S.D.N.Y. Aug. 1, 2012).[16]

---

[16] Plaintiffs have separately satisfied Section 1332(a) by alleging that at least one plaintiff may be entitled to recover more than $75,000. *See Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 566-67 (2005). For example, Plaintiff Doe alleges an economic loss of approximately $5,500, but also seeks additional punitive damages on her California fraud claim. *See Bowden* v. *Robinson*, 67 Cal. App. 3d 705, 714 (4th Div. 1997); *see also Payne* v. *Jones*, 711 F.3d 85, 102 (2d Cir. 2013). Defendants therefore cannot "demonstrate[e] to a legal certainty that [no] plaintiff could [] recover the amount alleged." *Pyskaty* v. *Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017).

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied.

Dated: March 7, 2019                              Respectfully submitted,

Roberta A. Kaplan, Esq.
John C. Quinn, Esq.
Joshua Matz, Esq.
Alexander J. Rodney, Esq.
Matthew J. Craig, Esq.
Emily C. Cole, Esq.

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
jmatz@kaplanhecker.com
arodney@kaplanhecker.com
mcraig@kaplanhecker.com
ecole@kaplanhecker.com

Andrew G. Celli, Jr., Esq.
Matthew D. Brinckerhoff, Esq.
O. Andrew F. Wilson, Esq.
Katherine Rosenfeld, Esq.
David Berman, Esq.

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center
New York, NY 10020
Telephone: (212) 763-5000
acelli@ecbalaw.com
mbrinckerhoff@ecbalaw.com
awilson@ecbalaw.com
krosenfeld@ecbalaw.com
dberman@ecbalaw.com

*Attorneys for Plaintiffs*

-31-