# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JANE DOE, LUKE LOE, RICHARD ROE, and
MARY MOE, individually and on behalf of all
others similarly situated,

<em>Plaintiffs</em>,

<em>v.</em>

THE TRUMP CORPORATION, DONALD J.
TRUMP, in his personal capacity,
DONALD TRUMP JR., ERIC TRUMP, and
IVANKA TRUMP,

<em>Defendants</em>.

No. 18 Civ. 9936

## OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

Roberta A. Kaplan, Esq.
John C. Quinn, Esq.
Joshua Matz, Esq.
Benjamin D. White, Esq.

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Telephone: (212) 763-0883

Andrew G. Celli, Jr., Esq.
Matthew D. Brinckerhoff, Esq.
O. Andrew F. Wilson, Esq.
Katherine Rosenfeld, Esq.
David Berman, Esq.

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center
New York, NY 10020
Telephone: (212) 763-5000

*Attorneys for Plaintiffs*

September 24, 2019

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT BACKGROUND AND PROCEDURAL HISTORY ............................................. 2

ARGUMENT .................................................................................................... 6

I.      PLAINTIFFS' CLAIMS AGAINST DEFENDANTS ARE NOT ARBITRABLE .......... 7

      A.      Defendants Cannot Invoke ACN's Purported Right to Arbitrate ......................... 8

            1.   The Doctrine of Equitable Estoppel Has No Application Here ...................... 8

            2.   Defendants Cannot Invoke a Purported Principal-Agent Relationship with ACN ............................................................................................. 15

II.     DEFENDANTS WAIVED THEIR RIGHT TO SEEK ARBITRATION AGAINST PLAINTIFFS ............................................................................................. 16

CONCLUSION .................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## CASES

*Bankers Conseco Life Ins. Co.* v. *Feuer*,
No. 16 Civ. 7646, 2018 WL 1353279 (S.D.N.Y. Mar. 15, 2018) ..................................... 10, 15

*Bautista et al.,* v. *Trump Ruffin Tower I, LLC*,
No. FG09437634, 2009 WL 6390698 (Cal. Sup. Ct. June 22, 2009)...................................... 20

*Choctaw Generation Ltd. P'ship* v. *Am. Home Assurance Co.*,
271 F.3d 403 (2d Cir. 2001).................................................................................................. 9

*Christakis* v. *Mark Burnett Prods., Inc.*,
No. 06 Civ. 11149 (D. Mass. 2006) ........................................................................................ 6

*Cintron* v. *Trump Org. LLC*,
No. 18 Civ. 06921 (S.D.N.Y.) .................................................................................................. 6

*Clifford* v. *Trump*,
No. 18 Civ. 2217 (C.D. Cal.) .................................................................................................. 6

*Com-Tech Assocs.* v. *Computer Assocs. Intern., Inc.*,
938 F.2d 1574 (2d Cir. 1991)............................................................................................ 16, 18

*Cooper* v. *Ruane Cunniff & Goldfarb Inc.*,
No. 16 Civ. 1900, 2017 WL 3524682 (S.D.N.Y. Aug. 15, 2017) .......................................... 15

*Cotton* v. *Slone*,
4 F.3d 176 (2d Cir. 1993)........................................................................................................ 17

*Denney* v. *BDO Seidman, LLP*,
412 F.3d 58 (2d Cir. 2005).............................................................................................. 12, 15

*Fensterstock* v. *Educ. Fin. Partners*,
No. 08 Civ. 3622, 2012 WL 3930647 (S.D.N.Y. Aug. 30, 2012) ................................... 13, 15

*Giannullo* v. *City of New York*,
322 F.3d 139 (2d Cir. 2003).................................................................................................... 16

*Gonder* v. *Dollar Tree Stores, Inc.*,
144 F. Supp. 3d 522 (S.D.N.Y. 2015)..................................................................................... 22

*Harris* v. *TD Ameritrade Inc.*,
338 F. Supp. 3d 170 (S.D.N.Y. 2018)..................................................................................... 19

*In re Checking Account Overdraft Litig.*,
780 F.3d 1031 (11th Cir. 2015) .............................................................................................. 16

*JLM Indus., Inc.* v. *Stolt-Nielsen SA*,
    387 F.3d 163 (2d Cir. 2004)....................................................................................... 9

*Jung* v. *Skadden, Arps, Slate, Meagher & Flom, LLP*,
    434 F. Supp. 2d 211 (S.D.N.Y. 2006)....................................................................... 22

*Kramer* v. *Hammond*,
    943 F.2d 176 (2d Cir. 1991)....................................................................... 17, 18, 20

*La. Stadium & Expo. Dist.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    626 F.3d 156 (2d Cir. 2010)....................................................................... 17, 18, 20

*Leadertex, Inc.* v. *Morganton Dyeing & Finishing Corp.*,
    67 F.3d 20 (2d Cir. 1995)................................................................................. 17, 20

*Mar. Ventures Intern., Inc.* v. *Caribbean Trading & Fid., Ltd.*,
    689 F. Supp. 1340 (S.D.N.Y. 1988).......................................................................... 16

*Medidata Sols., Inc.* v. *Veeva Sys. Inc.*,
    No. 17 Civ. 589, 2018 WL 1083968 (S.D.N.Y. Feb. 27, 2018), *aff'd,* 748 F. App'x 363
    (2d Cir. 2018)) ...................................................................................................... 8, 11

*Merrill Lynch Inv. Mgrs.* v. *Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2003).................................................................................. 15, 16

*Milligan* v. *CCC Info. Servs. Inc.*,
    920 F.3d 146 (2d Cir. 2019)....................................................................................... 8

*Nicosia* v. *Amazon, Inc.*,
    834 F.3d 220 (2d Cir. 2016)....................................................................................... 8

*O'Hare* v. *Gen. Marine Transp. Corp.*,
    740 F.2d 160 (2d Cir. 1984)..................................................................................... 12

*PPG Indus. Inc.* v. *Webster Auto Parts, Inc.*,
    128 F.3d 103 (2d Cir. 1997)................................................................................ 18, 19

*Ragone* v. *Atl. Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010).................................................................. 10, 11, 12, 14

*Ross* v. *Am. Exp. Co.*,
    547 F.3d 137 (2d Cir. 2008).................................................................. 10, 11, 13, 15

*Rush* v. *Oppenheimer & Co.*,
    779 F.2d 885 (2d Cir. 1985)..................................................................................... 22

*Schnabel* v. *Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012)....................................................................................... 7

*Sims* v. *Trump*,
No. 19 Civ. 00345 (D.D.C. 2019) ............................................................................................. 6

*Sokol Holdings, Inc.* v. *BMB Munai, Inc.*,
542 F.3d 354 (2d Cir. 2008) ............................................................................. 9, 10, 13, 14

*Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) ................................................................................................................. 7

*Sweater Bee by Banff, Ltd.* v. *Manhattan Indus., Inc.*,
754 F.2d 457 (2d Cir. 1985) ............................................................................................... 22

*Taracorp, Inc.* v. *NL Indus., Inc.*,
73 F.3d 738 (7th Cir. 1996) ............................................................................................... 12

*Volt Info. Scis., Inc.* v. *Bd. of Trs. of Leland Stanford Jr. Univ.*,
489 U.S. 468 (1989) ................................................................................................................. 7

## PRELIMINARY STATEMENT

Defendants' motion to compel Plaintiffs' claims into arbitration based on contracts that Defendants did not sign, and which say not one word about them, is far too little and way too late. In support of this effort, Defendants claim that when Plaintiffs agreed to arbitrate disputes with ACN, they must have understood they were also agreeing to arbitrate any disputes with Defendants. But Defendants did not sign any agreement with Plaintiffs, and the agreements Plaintiffs signed with ACN expressly limit arbitration to disputes between the signatories to those agreements. And Defendants were not affiliates or employees of ACN—they were fraudsters, paid in secret to lie about ACN and its business opportunity. Defendants have not cited a single case in which a court compelled arbitration in circumstances anywhere close to this. That is because, at bottom, arbitration is a matter of consent, and Plaintiffs did not consent to arbitration with Defendants.

Adding insult to injury, Defendants make this belated request after first choosing to litigate this case aggressively for the better part of a year. There is no question Defendants were aware of the arbitration agreements between Plaintiffs and ACN. Immediately after this case was filed, Defendants repeatedly cried foul about those agreements—in the very first substantive sentence they wrote to this Court, the Defendants argued that by suing them and not ACN, Plaintiffs were improperly seeking to "bypass contractually mandated arbitration." In filing after filing, Defendants stewed about these arbitration agreements, without ever remotely hinting that *they* might be able to invoke those agreements to compel arbitration of claims *against them* as opposed to ACN. Instead, they tactically chose to keep this baseless motion in their back pocket in the event they lost their motion to dismiss (which they did, in substantial part). Now, as discovery commences into their elaborate scam, Defendants suddenly announce their view that this case

should not be before this Court at all.  Because Defendants have offered no plausible justification for their transparently tactical delay, they have waived the right to seek to arbitrate Plaintiffs' claims at this late date.[1]

**RELEVANT BACKGROUND AND PROCEDURAL HISTORY**

<u>**Allegations in the Amended Complaint**</u>

Between 2013 and 2016, Plaintiffs were conned by Defendants into investing in ACN Opportunity, LLC ("ACN"), a multi-level marketing company.  When first introduced to the ACN business opportunity, Plaintiffs were hesitant to jump on board.  *See* Amended Complaint ("AC") ¶¶ 187–88 (at Doe's initial meeting she was at first "unconvinced" and "considered leaving the meeting"); AC ¶¶ 239–42 ("Initially, Roe was skeptical," and after conducting background research on the company he "remained unsure").  For each of the Plaintiffs, President Trump's endorsement was the crucial "turning point" that made them change their mind and invest. AC ¶¶ 183–96, 220–25, 237–48, 260–68.

The Amended Complaint is clear about why Trump's endorsement was so impactful: Plaintiffs believed they could trust Trump's representations because they had no reason to believe he was affiliated with (or paid by) ACN.  Indeed, Trump repeatedly vouched for the company while time-and-again obscuring and lying about the fact that he and his organization were being paid millions of dollars to do so.  AC ¶¶ 137–56.

Comforted by the fact that Trump's independence from ACN rendered his endorsement genuine and meaningful, Plaintiffs agreed to become Independent Business Owners ("IBOs") with ACN.  The IBO Agreements made very clear that IBOs were entering into an agreement with ACN and no one else:

---

[1] Despite the Court's focus on the issue of waiver, *see* Doc. No. 106, Defendants' brief argues the merits first and then addresses waiver.  For the sake of clarity, this brief follows that structure as well.

> I agree that as an IBO, I am an independent contractor responsible for my own business and not an agent, legal representative or employee of ACN or any carrier, supplier, service provider or other party with whom ACN transacts or contracts business ('ACN Providers').  <u>I acknowledge that my IBO relationship is with ACN Opportunity, LLC and not with any other ACN Provider.</u>

Doc. No. 114-1 (emphasis added).[2]

The relevant arbitration provision in the IBO Agreements itself is particularly narrow, and precise about the parties it covers.  In the key paragraph, the IBOs first agreed to indemnify ACN and its affiliates and business partners, and then agreed more narrowly to arbitrate disputes only with ACN:

> I agree to indemnify and hold <u>ACN, the ACN Providers and their respective shareholders, directors, officers and employees</u> harmless from any and all claims, damages, and expenses, including any attorney's fees, arising out of my actions or omissions in connection with this Agreement.  In the event of a dispute <u>between me and ACN</u> as to our respective rights, duties and obligations arising out of or relating to this Agreement, it is agreed that such disputes shall be exclusively resolved through binding arbitration.

Doc. No. 114-1 (emphases added).[3]

As the Amended Complaint details, Plaintiffs' experiences as IBOs were disastrous and they lost nearly every penny that they invested.  In short, Defendants had lied to them about the opportunity, and by relying on those lies, Defendants caused them serious harm.

## The Filing of This Case

Because Defendants' fraud was central to both their investment and their loss, Plaintiffs filed suit against Defendants.  In response, Defendants adopted an aggressive litigation defense

---

[2] Plaintiffs here cite the IBO Agreement attached as Exhibit A to Defendants' brief, Doc. No. 114-1.  There are slight variations between that version and the versions attached as Exhibit B, Doc. No. 114-2, and Exhibit C, Doc. No. 114-3, although the differences are not relevant for present purposes.

[3] The parties were directed to "assume only for purposes of [this] motion that Plaintiffs and the putative class members agreed with ACN to arbitrate as provided in the form arbitration agreement referenced at the conference, a copy of which shall be filed with Defendants' motion."  Doc. No. 106.

posture, "strenuous[ly]" objecting, for example, to Plaintiffs' request to proceed in this case under pseudonyms. Mot. at 2.   But while Defendants repeatedly referred to Plaintiffs' arbitration agreements in the initial stages of the litigation, they never once (until just recently) asserted that Plaintiffs' claims against them were subject to arbitration pursuant to the IBO Agreements.

More specifically, between the October 29, 2018 filing of the complaint and their transmission of a letter to Plaintiffs on June 19, 2019, Defendants repeatedly referred the Court to the arbitration provisions in the IBO Agreements but did not once remotely hint at their own purported right to enforce those agreements.   As the below chronology demonstrates, the arbitration provisions were front of mind for Defendants, yet Defendants never informed the parties or the Court of any intention to compel arbitration.   In fact, Defendants affirmatively represented the contrary.

- **November 30, 2018** – In their very first sentence of argument in this case, Defendants lamented—in opposition to Plaintiffs' motion to proceed pseudonymously—that: "This lawsuit should be seen for what it is: a ploy by savvy advocates to bypass contractually mandated arbitration with the entity to which Plaintiffs paid their money." Doc. No 46 at 1.   In other words, Defendants argued that the structure of Plaintiffs' claims *avoided* arbitration, rather than permitted it.   Moreover, as Defendants opposed Plaintiffs' motion to proceed under pseudonym, Defendants emphasized that the case was proceeding in open court rather than private arbitration, bemoaning the fact that Plaintiffs "wanted something else, something more, *and they apparently got it*." Doc. No. 46 at 22. (emphasis added).

- **December 6, 2018** – In a joint letter ordered by the Court, Defendants again repeatedly fumed about the fact that Plaintiffs' claims did *not* trigger the arbitration provision between Plaintiffs and ACN.   Moreover, Defendants listed for the Court their "[c]ontemplated [m]otions," Doc. No. 48 at 3, including references to class certification and summary judgment, without any hint of a motion to compel arbitration:

  - "In bringing this lawsuit, Plaintiffs elected to bypass contractually mandated arbitration against ACN—the entity to which they paid the money they now claim as damages—in favor of a vituperative and meritless case against the President and his family, filed one week before the midterm elections." Doc. No. 48 at 2.

  - "In becoming IBOs, Plaintiffs expressly agreed that disputes between themselves and ACN would be resolved through arbitration. . . . Plaintiffs' choice to disregard the straightforward dispute-resolution mechanism available to them for recovering from ACN the very damages they are now seeking, and instead to pursue an

invective-fueled lawsuit against the President and his family, unmistakably demonstrates Plaintiffs' ulterior motive." Doc. No. 48 at 2.

o Defendants also specifically represented to the Court that they would seek discovery from each Plaintiff to determine their "reasons for electing to forego their contractual right to pursue arbitration against ACN in favor of this litigation against Defendants." Doc. No. 48 at 5.

o In response to the Court's order that the parties provide a "brief description of any . . . motions that any party seeks to or intends to file, including the principal legal and other grounds in support of and opposition to the motion," Doc. No. 42 at 1, Defendants identified several motions that they contemplated filing or responding to: (i) a "motion to dismiss the complaint"; (ii) a "motion to stay discovery pending resolution of Defendants' motion to dismiss"; (iii) "Defendants anticipate opposing Plaintiffs' motion for class certification for failure to satisfy the requirements of Rule 23"; and (iv) Defendants "reserve[d] the right to move for summary judgment at an appropriate time." Doc. No. 48 at 4. Defendants said nothing about a contemplated motion to compel arbitration.

- **December 10, 2018** – Defendants filed a pre-motion letter regarding an anticipated motion to dismiss that made no reference to arbitration. Doc. No. 49.

- **December 10, 2018** – Defendants filed a pre-motion letter regarding an anticipated motion to stay discovery that made no reference to arbitration. Doc. No. 50.

- **December 20, 2018** – The parties had an initial conference with the Court, wherein Defendants made no reference to arbitration. Rather, Defendants represented that they were prepared to seek a wide array of discovery in this action. Doc. No. 59.

- **January 14, 2019** – Defendants filed an oversized motion to dismiss that contended in the facts section that "IBOs also agreed that any dispute between them and ACN would be exclusively resolved through binding arbitration," and attached the purportedly relevant IBO agreements, but made no argument with respect to their purported right to arbitrate. Doc. No. 65 at 6.

- **January 16, 2019** – Defendants served eight document preservation subpoenas on Plaintiffs' family and friends pursuant to the authority of this Court.

- **February 21, 2019** – Defendants filed a motion to dismiss Plaintiffs' amended complaint, which again contended in the facts section that "IBOs also agreed that any dispute between them and ACN would be exclusively resolved through binding arbitration," and attached the purportedly relevant IBO Agreements, but made no argument with respect to their purported right to arbitration. Doc. No. 84 at 6.

- **March 13, 2019** – Defendants opposed Plaintiffs' motion to strike the IBO Agreements that Defendants attached to their motion to dismiss. Defendants did not argue that the IBO Agreements were relevant because of their arbitration provisions, but only because they "form a part of the mix of information available to Plaintiffs when they agreed to become IBOs." Doc. No. 89 at 2.

- **March 14, 2019** – Defendants filed a reply brief in further support of their motion to dismiss, which made no reference to arbitration. Doc. No. 90.

- **July 19, 2019** – Eight months after Plaintiffs filed their complaint—and more than four months after their motion to dismiss was *sub judice*—Defendants represented to the Court that they "have determined that . . . Plaintiffs' claims [against Defendants] are arbitrable." Doc. No. 94.

**Defendants' Conduct in Other Cases**

The pattern in this case is strikingly different from the approach that these same Defendants have taken in recent cases they thought should be moved into arbitration.  In *Cintron* v. *Trump Org. LLC*, No. 18 Civ. 06921 (S.D.N.Y.), for example, the defendants were sued on July 9, 2018 in New York state court in relation to Donald Trump's alleged underpayment of his long-time personal driver in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*  Defendants removed the action to federal court on August 1, 2018 and moved to compel the case into arbitration seven days later.  *See* No. 18 Civ. 06921, Doc. No. 9.  Defendant Trump took a similar approach in *Clifford* v. *Trump*, No. 18 Civ. 02217 (C.D. Cal.).  There, Stephanie Clifford (a.k.a. Stormy Daniels) sued Trump on March 6, 2018 in California state court, seeking a declaratory judgment that a purported non-disclosure agreement between Trump, a Trump affiliate, and Clifford was not legally binding.  The defendants removed the action to federal court and then moved to compel arbitration on April 2, 2018, *see* No. 18 Civ. 02217, Doc. Nos. 20, 21, just seven days after Clifford filed an amended complaint.  *See also Sims* v. *Trump*, No. 19 Civ. 00345, Doc. No. 8 (D.D.C. 2019); *Christakis* v. *Mark Burnett Prods., Inc.*, No. 06 Civ. 11149, Doc. No. 11 (D. Mass. 2006).

## ARGUMENT

Defendants' motion to compel arbitration should be denied for two independent reasons.  *First*, Plaintiffs' claims against Defendants are simply not arbitrable because Plaintiffs have no arbitration agreement with Defendants and Defendants cannot invoke ACN's putative arbitration

rights here.  *Second*, Defendants have waived any supposed right to compel Plaintiffs' claims into arbitration in any event.

## I.    PLAINTIFFS' CLAIMS AGAINST DEFENDANTS ARE NOT ARBITRABLE

The Federal Arbitration Act "imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion."  *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (quotation marks omitted); *see also Volt Info. Scis., Inc.* v. *Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989) (the FAA "does not require parties to arbitrate when they have not agreed to do so").  The "threshold question facing any court considering a motion to compel arbitration is therefore whether the parties have indeed agreed to arbitrate."  *Schnabel* v. *Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

Here, it is undisputed that Plaintiffs did not enter arbitration agreements with Defendants. *See* Mot. at 5.  Nevertheless, Defendants contend that when Plaintiffs agreed to arbitrate with ACN, Plaintiffs were necessarily consenting to arbitrate disputes with Defendants as well.  That argument fundamentally misapprehends what this case is all about.  Plaintiffs' Amended Complaint alleges that Defendants defrauded them into investing with ACN by falsely portraying themselves as objective commentators who were formally independent of ACN.  Yet Defendants' current argument is that their relationship with ACN was so dependent, and so clear, that Plaintiffs must have known that when they signed agreements with ACN that they were coming to a meeting of the minds with the Trumps as well.  There is no support for that argument: the bottom line is that Plaintiffs and Defendants did not agree to arbitrate, and no source of law allows Defendants to continue to exploit Plaintiffs by relying upon any agreements that Plaintiffs had with ACN.

## A.    Defendants Cannot Invoke ACN's Purported Right to Arbitrate

Defendants contend that two independent principles allow them to invoke ACN's right to arbitrate: (i) "equitable estoppel"; and (ii) agency.  As discussed below, both contentions lack merit.

### 1.    The Doctrine of Equitable Estoppel Has No Application Here

It is black-letter law that the FAA "does not require parties to arbitrate when they have not agreed to do so." *Nicosia* v. *Amazon, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quotation marks omitted).  However, "under certain circumstances," courts may compel signatories to an arbitration agreement to arbitrate with a non-signatory. *Milligan* v. *CCC Info. Servs. Inc.*, 920 F.3d 146, 154 (2d Cir. 2019).  One such circumstance involves the doctrine of "equitable estoppel," whereby in rare cases a non-signatory to an arbitration agreement may enforce that agreement against a signatory if: "(1) the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed and (2) there is a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the non-signatory." *Medidata Sols., Inc.* v. *Veeva Sys. Inc.*, No. 17 Civ. 589, 2018 WL 1083968, at *2 (S.D.N.Y. Feb. 27, 2018) (quotation marks omitted) (Schofield, *J.*), *aff'd*, 748 F. App'x 363 (2d Cir. 2018) (unpublished) (noting that where the parties "never entered into an arbitration agreement . . . [it] ordinarily end[s] the analysis").

While Defendants must meet both prongs of the equitable analysis test, they cannot meet either here.  Specifically, they cannot show (i) that the issues underlying Plaintiffs' claims against them are intertwined with the IBO Agreements with ACN; or (ii) that Plaintiffs' relationship with the Defendants is such that Plaintiffs should be estopped from avoiding arbitration.

-8-

### a.   The Issues in This Case Are Not Intertwined With the IBO Agreements.

In arguing that the issues in this case are intertwined with the IBO Agreements, Defendants cite not a single provision of those agreements. Mot. at 12. Rather, to argue that Plaintiffs' claims are intertwined with the IBO Agreements, Defendants focus almost entirely on an acontextual reading of two words in Plaintiffs' 186-page, 44,819 word complaint— that ACN was "central to" Defendants' fraudulent scheme,[4] and that Trump's endorsement was "critical" in getting both recruits and existing IBOs to invest in the ACN business opportunity.

But Defendants misconstrue the applicable inquiry. The question is not whether the non-party signatory (here, ACN) is generally relevant to the claims against the non-signatory, but rather whether the issues in the case are intertwined with the arbitration *agreements* at issue. *See Sokol Holdings, Inc.* v. *BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008) (noting that the focus of the intertwinement question is whether "the subject matter of the dispute was intertwined with the *contract* providing for arbitration" (emphasis added)). Here, the subject matter of the dispute has to do with the false and misleading statements and omissions that the Trumps made and disseminated, which caused the Plaintiffs to suffer devastating losses. The issues in the case have to do with the Trumps' lies and distortions, and the effects that their fraud had on the victims. This simply does not satisfy the "intertwinement" requirement.

In *JLM Industries, Inc.* v. *Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004), for example, the plaintiffs' claims were held to be intertwined with contracts providing for arbitration because the claims turned on "allegedly inflated price terms" in the contracts themselves. *Id.* at 178. Similarly,

---

[4] Defendants portray the Amended Complaint as alleging that ACN was "central" to the claims against Defendants, Mot. at 12, but in fact what the Amended Complaint says is that the Trumps' promotion of ACN was central to a fraudulent scheme that the Trumps perpetrated for more than a decade and which involved other third-party companies as well. AC ¶ 16.

in *Choctaw Generation Ltd. Partnership* v. *American Home Assurance Co.*, 271 F.3d 403 (2d Cir. 2001), the plaintiffs' claims were intertwined with an arbitration agreement because they concerned a demand for a letter of credit "arguably [made] pursuant to a provision of the construction contract" that provided for arbitration. *Id.* at 403. Here, in stark contrast, Plaintiffs' claims do not require resolution of any term in *any* contract between Plaintiffs and ACN (and Defendants have not identified one).

### b.    Plaintiffs' Relationship with Defendants Does Not Allow Defendants to Invoke Plaintiffs' Agreements with ACN

In addition, in order for equitable estoppel to apply, "there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Ragone* v. *Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010) (citation omitted). Defendants' argument that they satisfy this test, and should be entitled to reap the benefits of the contracts between Plaintiffs and ACN, is that when Plaintiffs entered into those agreements, it was "predictable" (nay, "obvious") that "any dispute that might arise between them and ACN concerning the ACN business opportunity would likely implicate Mr. Trump." Mot. at 12–13. But this "likely to implicate" standard is definitely not the correct standard under the law.

Rather, the Second Circuit imposes a much higher bar than that before allowing parties to wield equitable estoppel to assert contract rights for which they never bargained. This is because any application of equitable estoppel in the context of arbitration must be "consistent with the basic principle that one does not give up one's right to court adjudication except by consent." *Sokol Holdings, Inc.*, 542 F.3d at 361. Consequently, a "necessary circumstance" for application of the doctrine is "a relationship among the parties which . . . support[s] the conclusion that [the

counterparty] had consented to extend its agreement to arbitrate to [the non-signatory]." *Id.*; *see also Ross* v. *Am. Exp. Co.*, 547 F.3d 137, 146 (2d Cir. 2008) (rejecting equitable estoppel argument where the "necessary circumstance of some relation between Amex and the plaintiffs sufficient to demonstrate that the plaintiffs intended to arbitrate this dispute is utterly lacking"); *Bankers Conseco Life Ins. Co.* v. *Feuer*, No. 16 Civ. 7646, 2018 WL 1353279, at *4 (S.D.N.Y. Mar. 15, 2018) ("[M]ere evidence of a relationship between the parties and similarities in subject matter will not justify estoppel.").

The Second Circuit has only found this relationship in relatively discrete circumstances. As the Court noted in *Ross*, equitable estoppel has generally been applied only to a limited category of relationships: (i) "affiliated corporate entities," (ii) where the non-signatory is a co-employer of the signatory; and (iii) where a non-signatory was "explicitly named [in the relevant agreement] as having certain tasks to perform under that contract."  547 F.3d at 144–46; *see also Medidata*, 2018 WL 1083968, at *2 ("co-conspirator[] and employer-employee . . . relationships are insufficient to compel arbitration under principles of equitable estoppel").

As hard as Defendants protest, their relationship with ACN does not remotely fit into any of these categories.  Defendants are not affiliated with ACN and certainly are not employees of the company.  And not only are Defendants nowhere to be found in the language of the IBO Agreements, the express terms of those contracts—which Defendants almost entirely ignore—refute any suggestion that the parties to those agreements envisioned Defendants being able to invoke them.  *See Ragone*, 595 F.3d at 127 (equitable estoppel requires "a careful review of . . . the contracts [that were] signed" (quotation marks omitted)).  In Section 3 of the IBO Agreements, for example, the IBOs explicitly affirmed that "I acknowledge that my IBO relationship is with ACN Opportunity, LLC and not with" "any carrier, supplier, service provider or other party with

whom ACN transacts or contracts business." Doc. No. 114-1.  Moreover, the arbitration provisions

themselves are targeted and precise in stating unmistakably that they apply only to ACN.  Indeed,

in the sentence preceding the arbitration provision, the IBOs agreed to indemnify "ACN, the ACN

Providers and their respective shareholders, directors, officers and employees," yet the arbitration

provision itself does not include this language, thereby making it clear that, at most, Plaintiffs

agreed to arbitration only with ACN:

> I agree to indemnify and hold ***ACN, the ACN Providers*** and their
> respective shareholders, directors, officers and employees harmless
> from any and all claims, damages, and expenses, including any
> attorney's fees, arising out of my actions or omissions in connection
> with this Agreement.  *In the event of a dispute between **me and ACN**
> as to our respective rights, duties and obligations arising out of or
> relating to this Agreement, it is agreed that such disputes shall be
> exclusively resolved through binding arbitration.*

Doc. No. 114-1 (emphases added).

In other words, at most, Plaintiffs agreed to indemnify ACN and a swath of other entities

in one sentence, but agreed to arbitrate *only* against ACN in the very next sentence.  This plain

language must be given its proper meaning:  Plaintiffs did not consent to arbitrate against anyone

but ACN.  *See O'Hare* v. *Gen. Marine Transp. Corp.*, 740 F.2d 160, 168 (2d Cir. 1984) ("Since

one specific arbitration provision did allow trustees to arbitrate when the *amount* of a delinquency

was in issue, the court reasoned *expressio unius* that the exclusion of the trustees from all other

parts of the arbitration section was intentional."); *see also generally Taracorp, Inc.* v. *NL Indus.,

Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) ("[W]hen parties to the same contract use such different

language to address parallel issues . . . it is reasonable to infer that they intend this language to

mean different things.").[5]  Because the IBO Agreements make clear that Plaintiff did not

---

[5] Further, this contractual language expressly cabining arbitration to specifically named and identified parties (the
IBOs and ACN), distinguishes the principal equitable estoppel cases on which Defendants rely, each of which involved
broad arbitration clauses that did not identify the specific parties that were subject to their terms.  *See Denney* v. *BDO

"consent[] to extend [their] agreement to arbitrate to [Defendants]," *Sokol Holdings, Inc.*, 542 F.3d at 361, Defendants' equitable estoppel argument clearly fails as a matter of law.[6]

        Further, the relationship of the parties also refutes the fanciful idea that Plaintiffs considered themselves to be entering into an agreement with the Trumps when they signed agreements with ACN. Plaintiffs did not know that Trump had a formal business relationship with ACN, and they had no reason to know about that relationship precisely because Trump obscured and lied about this very dynamic for his own financial benefit. For example:

> ACN promotional videos also failed to disclose that Trump was being paid for his endorsement. Every one of the Plaintiffs recalls watching multiple videos in which Trump endorsed and promoted ACN, and they do not recall any suggestion that Trump was being paid. This, in fact, gave Plaintiffs the (false) impression that Trump was not being paid by ACN for his endorsement. Indeed, if Trump's compensation from ACN had been disclosed, they would not have signed up and/or would have cut their losses earlier.

AC ¶ 138. This was a central feature of Plaintiffs' interactions with Trump.[7]

---

*Seidman, LLP*, 412 F.3d 58, 62 (2d Cir. 2005) ("If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved by facilitated negotiations . . . then such dispute, controversy or claim shall be settled by arbitration."); *Ragone*, 595 F.3d at 118 ("I shall submit . . . for final and binding arbitration . . . any and all claims or controversies arising out of my employment or its termination."); *Fensterstock* v. *Educ. Fin. Partners*, No. 08 Civ. 3622, 2012 WL 3930647, at *2 (S.D.N.Y. Aug. 30, 2012) (arbitration clause covered "[c]laims relating to . . . any and all aspects of my Account"); *Ross*, 547 F.3d 137, 140 (arbitration clause covered "[a]ny dispute, claim, or controversy . . . arising out of or relating to this Agreement.")

[6] These same provisions make clear that, even apart from equitable estoppel, Plaintiffs did not agree to arbitrate their specific claims. *Contra* Mot. 8–10. In addition, in making arguments about the terms of the IBO Agreements here, Plaintiffs do not waive and expressly reserve any other arguments as to the enforceability of the IBO Agreements, including but not limited to, unconscionability.

[7] *See* AC ¶ 137 (Trump "failed to disclose that he was, in fact, being paid millions of dollars for his ACN endorsement"); AC ¶ 148 ("Trump again affirmed that he was not endorsing ACN because he was paid do so.") AC ¶ 150 ("Every Plaintiff recalls watching videos featuring Trump and being left with the same understanding—that Trump's endorsement was not in exchange for any compensation from can."); AC ¶ 191 (Doe "was convinced that Trump believed that investing in ACN was a great business opportunity—and that that was why he was endorsing it"); AC ¶ 193 ("Doe had no idea Trump was being paid lavishly for his endorsement—the video made no mention of that. Doe thought Trump's only motivation in endorsing ACN was to help people like her make good business decisions."); AC ¶ 213 (Doe "recalls reading and relying on articles in *Success from Home* magazine featuring Donald Trump's promotion and endorsement of ACN, which she understood to be third-party validations of the business opportunities and training programs ACN offered that were entirely independent from ACN and the Trumps"); AC ¶ 233 ("Loe was again impressed by Trump's seemingly genuine support for the company"); AC ¶ 245 ("Roe would

Defendants argue that it somehow "mischaracterizes the Complaint" to focus on these myriad allegations demonstrating that Plaintiffs did not think (and did not have reason to think) that ACN and Defendants shared a formal business relationship.  Mot. at 14.  In Defendants' telling, the Amended Complaint documents sufficient consent for equitable estoppel because it alleges that ACN "overtly and aggressively market[ed] its *close relationship* with the Trumps." Mot. at 14 (emphasis added).  But that misses the point.  The equitable estoppel inquiry does not turn on the *depth* of the relationship between the non-signatory and a signatory, but on its *nature*, *i.e.*, whether the relationship "support[s] the conclusion that [the signatory] had consented to extend its agreement to arbitrate to [the non-signatory]."  *Sokol Holdings, Inc.*, 542 F.3d at 361. As the Amended Complaint makes clear, the relationship between the Trumps and ACN was presented to Plaintiffs as a personal one involving genuine admiration, not as a commercial one involving millions of dollars in secret payments.  What Plaintiffs were told about the relationship does not support the conclusion that Plaintiffs consented to extend their commercial contract with ACN to Trump.

Not surprisingly given the above, Defendants do not identify a single case applying the doctrine of equitable estoppel on facts remotely similar to those present here.  Rather, in each of Defendants' cases there was, unlike here, a known relationship between the parties that gave the party agreeing to arbitration a substantial basis to understand that it was consenting to arbitrate disputes with the non-signatory movant as well.  In *Ragone*, for example, the Second Circuit concluded that non-signatory ESPN could compel signatory Ragone into arbitration in light of an arbitration agreement she had with AVI because it was "plain that when Ragone was hired by AVI,

---

not have signed up for ACN if he knew that Donald Trump was being paid to endorse ACN.  He thought that Trump was endorsing ACN because Trump genuinely thought it was a good opportunity for someone in Roe's position.").

she understood ESPN to be, to a considerable extent, her co-employer."  595 F.3d at 127.  In other cases Defendants rely on, the courts similarly concluded that the parties' relationship was sufficient to allow for the application of equitable estoppel where there was, unlike here, *see infra* at 15–16, an undisputed and overt principal-agent relationship between the non-signatory and a signatory.  *See Cooper* v. *Ruane Cunniff & Goldfarb Inc.*, No. 16 Civ. 1900, 2017 WL 3524682, at *6 (S.D.N.Y. Aug. 15, 2017); *Fensterstock*, 2012 WL 3930647, at *5; *Bankers Conseco*, 2018 WL 1353279, at *7.  And finally, Defendants cite another category of inapposite cases in which the plaintiff indiscriminately grouped together signatory and non-signatory defendants in a single complaint alleging a unified conspiracy and then alleged that the relevant agreement containing the arbitration provision was itself part of that conspiracy.  *See Denney*, 412 F.3d 70; *Bankers Conseco*, 2018 WL 1353279, at *5; *see also Cooper*, 2017 WL 3524682, at *7 ("Where a plaintiff treats all defendants in a single unit in his complaint, it further supports estopping that plaintiff from shielding himself from arbitrating with certain defendants.").  But here, Plaintiffs do not allege that they were harmed by any conspiracy between Defendants and ACN.  Nor do Plaintiffs even allege that the Defendants were aware of—let alone were seeking to influence—the IBO Agreements.

## 2.  Defendants Cannot Invoke a Purported Principal-Agent Relationship With ACN

In an argument that Defendants relegate to a footnote, *see* Mot. at 12 n.4, Defendants contend that they may invoke ACN's arbitration agreements against Plaintiffs because Defendants were agents of ACN.  To be sure, "[t]raditional principles of agency law may bind a nonsignatory to an arbitration agreement."  *Merrill Lynch Inv. Mgrs.* v. *Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) (quotation marks omitted). But it is far from clear that this principle even applies where (as here) it is the nonsignatory that seeks to compel a signatory into arbitration.  *See Ross*, 547

F.3d at 143 n.3.  And regardless, Defendants argument fails for a more basic reason: Defendants have not come close to establishing any agency relationship between Defendants and ACN. Specifically, an agency relationship requires a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Optibase*, 337 F.3d at 130 (quoting Restatement (Second) of Agency § 1 (1958)); *see also Mar. Ventures Intern., Inc.* v. *Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1353 (S.D.N.Y. 1988) ("An essential element of an agency relationship is that the principal has the power to control the agent.").  The Amended Complaint is clear that the Trumps were in full control of how their brand was used throughout the period that they were defrauding people into investing in ACN.  *See* AC ¶ 178.  Defendants do not show otherwise.  In fact, their primary effort at establishing a principal-agent relationship with ACN is a pair of statements made by Plaintiffs' counsel in opposition to Defendants' motion to dismiss.  *See* Mot. at 12 n.4 (citing Doc. No. 86 at 4, 14); *but see Giannullo* v. *City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (a "memorandum of law . . . is not evidence at all").  This is woefully insufficient, and the Court should reject Defendants' hailmary agency argument out of hand.

## II.   DEFENDANTS WAIVED THEIR RIGHT TO SEEK ARBITRATION AGAINST PLAINTIFFS

Although Defendants contend that their motion to compel arbitration is "[t]imely,"  Mot. at 15, it is not.  As a result, Defendants have waived their right to compel arbitration against Plaintiffs.[8]

---

[8] Defendants spill significant ink discussing waiver (and equitable estoppel) as to "unnamed putative class members." Mot. at 15 n.5, 18–19.  But the argument is irrelevant because Defendants' motion only seeks to compel arbitration against the named Plaintiffs and seeks no relief as to absent putative class members. *See* Doc. No. 113.  Nor could it have.  *See In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015).

Case 1:18-cv-09936-LGS   Document 120   Filed 09/24/19   Page 22 of 29

Courts regularly conclude that parties waive their right to compel arbitration by actively participating in litigation that they later seek to shift into arbitration. *See, e.g.*, *Com-Tech Assocs.* v. *Computer Assocs. Intern., Inc.*, 938 F.2d 1574, 1578 (2d Cir. 1991) ("To permit litigants to exercise their contractual rights to arbitrate at such a late date, after they have deliberately chosen to participate in costly and extended litigation would defeat the purpose of arbitration: that disputes be resolved with dispatch and with a minimum of expense."). No bright-line rule dictates how much delay will lead to a waiver. Rather, courts assess the facts of each case and consider whether a movant's conduct is "largely inconsistent with its present assertion of its right to compel arbitration." *Leadertex, Inc.* v. *Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995). In making this determination, courts are generally guided by three factors: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *La. Stadium & Expo. Dist.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010). In assessing prejudice, courts look not only to the effects on the non-moving party, but also to whether the moving party has offered any justification for its delay. *See Kramer* v. *Hammond*, 943 F.2d 176, 179–80 (2d Cir. 1991). Defendants have pointed to no case (and there is none) in which a court belatedly compelled arbitration in circumstances like this case in the absence of any compelling justification for the moving party's delay in raising the issue.

As set forth above, in the over eight months that Defendants waited to assert their purported right to arbitrate, they repeatedly manifested their intent to litigate, not arbitrate, this case. During that time, the parties fully briefed, and the Court carefully considered and resolved, (i) Plaintiffs' motion to proceed pseudonymously, (ii) Defendants' motion to stay discovery, and (iii) Defendants' (second) Rule 12(b)(6) motion, which sought dismissal of the very claims

-17-

Defendants now contend should not be in this forum at all.  Moreover, Defendants took advantage of the Court's subpoena power by serving a battery of nonparty subpoenas on friends and family members of Plaintiffs, invoking a non-party discovery right they would not have had in arbitration. *See Cotton* v. *Slone*, 4 F.3d 176, 179 (2d Cir. 1993) ("Sufficient prejudice to infer waiver has been found when a party seeking to compel arbitration engages in discovery procedures not available in arbitration, makes motions going to the merits of an adversary's claims, or delays invoking arbitration rights while the adversary incurs unnecessary delay or expense." (citations omitted)).

Defendants posit that their enthusiastic use of this Court's power and authority is simply not relevant.  They contend that this Court should entirely ignore their delay because, they argue, Plaintiffs have not been prejudiced by it.  They are wrong—Defendants' chicanery has caused Plaintiffs significant prejudice.

For one, "[p]rejudice . . . refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *PPG Indus. Inc.* v. *Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997).  And Defendants have been quite candid about the "heads-I-win, tails-we-arbitrate" strategy that animated their motion to dismiss.  They admitted as much when they first informed Plaintiffs of their intent to compel arbitration: "[I]n the event the Court denies the pending motion to dismiss . . .  Defendants intend to move the Court for an order compelling Plaintiffs to arbitrate their claims against Defendants."  Doc. No. 94-1 at 1.  Inherent in this strategy is *precisely* the sort of prejudice that supports a finding of waiver.  *See Kramer*, 943 F.2d at 179 (describing prejudice as "when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration").

-18-

Prejudice also arises "due to excessive cost and time delay." *La. Stadium*, 626 F.3d at 159. Although Defendants contend without citation that "[l]itigation costs . . . as a matter of law do not support waiver," Mot. at 2, 17, they are wrong. *See Kramer*, 943 F.2d at 179 (prejudice "can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense"); *Com-Tech.*, 938 F.2d at 1577 (finding waiver where defendants' litigation "maneuvers put plaintiffs to considerable additional expense"); *cf. PPG Indus., Inc.*, 128 F.3d at 107 (explaining that "expense" is relevant to finding prejudice but that legal expenses are insufficient "without more" to justify waiver).

Plaintiffs are prejudiced in other ways as well. Not only did Defendants wait eight months to express an intent to arbitrate, they spent the entirety of that period inducing Plaintiffs' reliance on the fact that Defendants would litigate, not arbitrate. Defendants repeatedly referred to Plaintiffs' arbitration agreements but never remotely hinted at invoking their own purported right to compel arbitration. Indeed, Defendants chose not to identify a motion to compel arbitration as one of their "[c]ontemplated [m]otions" in a December 6, 2018 joint letter to the Court, Doc. No. 48 at 3, and they represented to the Court just days later that they would seek broad discovery in this action. *See* Doc. No. 59 at 20–22. Indeed, all of the filings and proceedings related to Defendants' motions to dismiss and stay discovery, Defendants' service of non-party subpoenas, and Plaintiffs' motion to proceed pseudonymously, would have been fundamentally different had Defendants announced any sort of view that this case should proceed into private arbitration rather than in court. Not only did all of the foregoing prejudice Plaintiffs, it was also an inefficient use of judicial resources and out of step with customary practice in this District. *See, e.g.*, *Harris* v. *TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 182 (S.D.N.Y. 2018) (addressing a motion to compel

-19-

arbitration or in the alternative to dismiss and noting that "[e]ven if the arbitration issue is not

considered jurisdictional, it should ordinarily be addressed first as a matter of judicial efficiency").

Perhaps most significantly, Plaintiffs have been forced to incur the prejudices caused by

Defendants' antics even though Defendants have no plausible explanation for their delay.  The

Second Circuit has repeatedly held that a party is intolerably prejudiced by a mid-litigation request

to arbitrate where the movant offers no "sound, nonprejudicial reasons to justify the delay."

*Kramer*, 943 F.2d at 180 (reversing district court's rejection of a waiver argument because the

movant offered "no such reasons"); *Leadertex, Inc.*, 67 F.3d at 26  (affirming finding of waiver

where movant's "proffered excuse for the delay . . . is somewhat disingenuous," such that the court

was "firmly persuaded that [the movant's] actions were inconsistent with its right to compel

arbitration"); *La. Stadium*, 626 F.3d at 160–61 (rejecting movant's argument against waiver as

"unsympathetic" after assessing in detail its proffered excuses for delay and rejecting each of them

as insufficient).[9]

Prior to the filing of the instant motion, Plaintiffs repeatedly pointed out to Defendants and

the Court that not only had Defendants failed to offer "sound, nonprejudicial reasons" for their

delay, Defendants had offered no explanation at all.  *See* Doc. No. 94-2 at 2 ("Defendants here

offer *no* reasons—let alone 'sound, nonprejudicial' ones—for their delay."); Doc. No. 104

---

[9] Here, we can be fairly certain that this was not some inadvertent error on Defendants' part since, as described above, Defendants and their affiliates themselves understand that common practice is to seek to move a case into arbitration early in a litigation, since they frequently do so.  *See, e.g.*, *Sims* v. *Trump*, No. 19-cv-00345, Doc. No. 8 (D.D.C. 2019); *Cintron* v. *Trump Org. LLC*, No. 18-cv-6921, Doc. No. 11 (S.D.N.Y. 2018); *Clifford* v. *Trump*, No. 18-cv-02217, Doc. Nos. 20, 21 (C.D. Cal. 2018); *Denson* v. *Trump*, No. 18-cv-2690 (S.D.N.Y. 2018), Doc. Nos. 8, 11; *Denson* v. *Trump*, No. 101617/2017 (Sup. Ct. N.Y. Cty. 2017); *Hill* v. *Trump Old Post Office LLC*, No. 2017 CA 007615 B (D.C. Super. Ct. 2017); *Gollaz* v. *Trump Ruffin Tower I, LLC*, No. 08A568165 (8th Judicial Dist. Ct. Clark Cty. Nev. July 25, 2008); *Ithaca Capital Invs. I S.A. et al.*, v. *Trump Panama Hotel Mgmt. LLC et al.*, No. 1:18-cv-00390, Doc. No. 25 (S.D.N.Y. 2018); *Morgan & Morgan, P.A.* v. *Trump Panama Hotel Mgmt. LLC et al.*, No. 1:18-cv-00110, Doc. No. 11 (D. Del. 2018); *Bautista et al.*, v. *Trump Ruffin Tower I, LLC*, 2009 WL 6390698, No. FG09437634 (Cal. Sup. Ct. June 22, 2009); *see also Christakis* v. *Mark Burnett Prods., Inc.*, No. 06 Civ. 11149, Doc. No. 11 (D. Mass. 2006); *Murray* v. *Trump Entertainment Resorts*, No. 15-cv-6039 (E.D. Pa. 2015); *Spicer* v. *Trump Entertainment Resorts*, No. 14-cv-3880 (E.D. Pa. 2015); *Watson* v. *Trump Plaza Hotel & Casino*, No. 14-cv-1287 (E.D. Pa. 2014).

("Defendants offer no explanation for their considerable delay in filing their motion—and none exists, beyond their flagrant desire for tactical advantage."). Defendants tried to glide past the point in each of their pre-motion submissions. *See* Doc. Nos. 94-1, 101, 104 at 8–9.

Defendants seem to have finally accepted that they must offer *some* justification for their delay. After (at least) two months of reflection, however, the best that Defendants can come up with is the following: As a result of this Court's December 20, 2018 order permitting Plaintiffs to proceed pseudonymously until the decision on the motion to dismiss, "Defendants did not know Plaintiffs' names and could not discover from ACN the arbitration agreements at issue" until that motion was decided. Mot. at 17. And without the executed arbitration agreements, Defendants contend, they were incapable of moving to compel arbitration.

This post-hoc explanation quickly falls apart under examination. *First*, by Defendants' own admission, they had themselves fully "determined that . . . Plaintiffs' claims are arbitrable" before the motion to dismiss was decided. Doc. No. 94; *see also* Doc. No. 94-1 (relying solely on the allegations in the Amended Complaint to argue that Plaintiffs' claims are arbitrable). And Defendants arrived at that determination without making any representation that Plaintiffs' pseudonymity would be an obstacle to a determination on arbitrability.

*Second*, Defendants attached to their motion to dismiss "samples of the agreements ACN used in the years in which Plaintiffs joined," and represented to the Court that they were "fair and accurate copies of documents Plaintiffs signed," as they do again here. Doc. No. 89 at 2; Mot. at 5 n.3. In short, by Defendants' own words, they have for some time been in possession of the documents they now claim are sufficient to support a motion to compel arbitration.

*Third*, Defendants have had ample opportunity to raise this new-found objection, but never did. Specifically, Defendants "strenuous[ly]" objected to Plaintiffs pseudonymity motion on a

variety of (plausible and implausible) bases, Mot. at 2, but never claimed (as they now do) that Plaintiffs' pseudonymity would prejudice their ability to move to compel arbitration.  *See* Doc. No. 46; *see also* Doc. No. 59 at 20–22 (defense counsel arguing at length about the supposed prejudice of the pseudonymity motion but making no reference to arbitration).

*Fourth*, at the outset of the case, Plaintiffs offered to share their identities with Defendants' counsel subject to certain protections, but Defendants were "unwilling to accept Plaintiffs' proposal," Doc. No. 48 at 3–4, even though that proposal presumably would have allowed Defendants to obtain the very arbitration agreements they now contend are necessary to compel arbitration.

And *finally*, to the extent the delay in discovering Plaintiffs' names resulted in a delay in Defendants' motion, it is inexplicable that Defendants themselves asked for a *complete stay*—not a partial stay—of discovery pending resolution of their motion to dismiss.

In other words, Defendants' after-the-fact explanation is bogus.  They have no justification for their delay, which undercuts all of Defendants' arguments against a finding of waiver.  Indeed, in *every single case* Defendants rely on to argue that there was no waiver here, the court was provided with—and found acceptable—a justification for the movant's delay.  *See Rush* v. *Oppenheimer & Co.*, 779 F.2d 885, 887–91 (2d Cir. 1985) (accepting justification that defendant moved to arbitrate within six weeks of the reinstatement of a punitive damages award that would not have been available in arbitration); *Sweater Bee by Banff, Ltd.* v. *Manhattan Indus., Inc.*, 754 F.2d 457, 463–66 (2d Cir. 1985) (accepting justification that, in a complaint with some arbitrable and other non-arbitrable claims, defendant could wait for an answer on a motion to dismiss before moving to arbitrate); *Gonder* v. *Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522, 527 (S.D.N.Y. 2015) (accepting justification that defendant moved to arbitrate within one week of removing the action

-22-

to federal court); *Jung* v. *Skadden, Arps, Slate, Meagher & Flom, LLP*, 434 F. Supp. 2d 211, 219 (S.D.N.Y. 2006) (accepting justification that defendant waited for 12(b)(6) ruling on threshold matters—rather than on the merits—and thus was not seeking to relitigate through its arbitration motion).  It simply is not (and cannot) be the law that a party is free to litigate in court for as long as it wants, holding a motion to compel arbitration in its back pocket for the tactically optimal moment, all without offering any defensible basis for the delay.

In sum, because Defendants' eight-month delay lacks *any* coherent explanation and causes Plaintiffs significant prejudice, Defendants have waived their right to compel Plaintiffs' claims into arbitration.

## CONCLUSION

For the reasons set forth above, Defendants' motion to compel arbitration should be denied.

Dated:  September 24, 2019

Respectfully submitted,

Roberta A. Kaplan, Esq.
John C. Quinn, Esq.
Joshua Matz, Esq.
Benjamin D. White, Esq.

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
jmatz@kaplanhecker.com
bwhite@kaplanhecker.com

Andrew G. Celli, Jr., Esq.
Matthew D. Brinckerhoff, Esq.
O. Andrew F. Wilson, Esq.
Katherine Rosenfeld, Esq.
David Berman, Esq.

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center
New York, NY 10020
Telephone: (212) 763-5000
acelli@ecbalaw.com
mbrinckerhoff@ecbalaw.com
awilson@ecbalaw.com
krosenfeld@ecbalaw.com
dberman@ecbalaw.com

*Attorneys for Plaintiffs*