## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE, LUKE DOE, RICHARD ROE, and MARY MOE, individually and on behalf of all others similarly situated, | |
| *Plaintiffs.* | |
| *v.* | No. 18 Civ. 9936 (LGS) |
| THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP JR., ERIC TRUMP, and IVANKA TRUMP, | |
| *Defendants.* | |

## MEMORANDUM OF LAW IN SUPPORT OF NONPARTIES JMBP, LLC AND METRO-GOLDWYN-MAYER STUDIOS INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

Marvin S. Putnam, Esq.
Jessica Stebbins Bina, Esq. (*pro hac vice*)

LATHAM & WATKINS, LLP
10250 Constellation Blvd. Suite 1100
Los Angeles, California 90067
Tel: (424) 653-5500
Fax: (424) 653-5501

*Attorneys for Nonparties JMBP, LLC and Metro-Goldwyn-Mayer Studios Inc.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................................1

RELEVANT BACKGROUND...........................................................................................3

I.     Nonparty JMBP Already Provided Significant Discovery to Plaintiffs. ...........................3

II.    JMBP's Production Demonstrated ACN's Treatment on *The Celebrity Apprentice*
Was Unremarkable..........................................................................................................4

ARGUMENT .....................................................................................................................6

III.   The Sought Evidence Would Likely Have No Value.......................................................7

IV.   The Remote, Unsubstantiated Possibility That Relevant Footage *Might* Exist Does
Not Justify the Undue Burden This Request Would Create For a Nonparty. ....................9

CONCLUSION ................................................................................................................10

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Arista Records LLC v. Lime Grp. LLC*,
   2011 WL 781198 (S.D.N.Y. Mar. 4 2011) ........................................................................10

*In re Biovail Corp. Sec. Litig.*,
   247 F.R.D. 72 (S.D.N.Y. 2007) ..........................................................................................7

*Citizens Union of City of New York v. Attorney General of New York*,
   269 F. Supp. 3d 124 (S.D.N.Y. 2017) .................................................................................9

*Collens v. City of New York*,
   222 F.R.D. 249 (S.D.N.Y. 2004) ........................................................................................7

*Concord Board Corp. v. Brunswick Corp.*,
   169 F.R.D. 44 (S.D.N.Y. 1996) ........................................................................................10

*Fears v. Wilhelmina Model Agency, Inc.*,
   2004 WL 719185 (S.D.N.Y. Apr. 1, 2004)......................................................................6, 9

*Int'l Soc'y for Krishna Consciouness, Inc. v. Lee*,
   1985 WL 315 (S.D.N.Y. Feb 28, 1985)............................................................................10

*Lemanik, S.A. v. McKinley Allsopp, Inc.*,
   125 F.R.D. 602 (S.D.N.Y. 1989) ........................................................................................9

*MacNamara v. City of New York*,
   2006 WL 3298911 (S.D.N.Y. Nov. 13, 2006) ..................................................................10

*Raza v. City of New York*,
   998 F. Supp. 2d 70 (E.D.N.Y. 2013) ..................................................................................6

*Tottenham v. Trans World Gaming Corp.*,
   2002 WL 1967023 (S.D.N.Y. June 21, 2002) .....................................................................9

*UMB Bank, N.A. v. Sanofi*,
   2017 WL 6398628 (S.D.N.Y. Nov. 22, 2017) .............................................................6, 10

## RULES

Fed. R. Civ. P. 26(b)(1) .........................................................................................................6

Fed. R. Civ. P. 45(d) ..............................................................................................................1

Pursuant to Rule 45(d) of the Federal Rules of Civil Procedure and this Court's order dated January 23, 2020 (Dkt. No. 146), JMBP, LLC ("JMBP") and Metro-Goldwyn-Mayer Studios Inc. ("MGM") respectfully submit this memorandum of law in opposition to plaintiffs' motion to compel from JMBP and MGM (Dkt. No. 156, the "Motion to Compel").

## INTRODUCTION

Nonparty JMBP *already* produced nearly 4,000 pages of documents, stored mostly offsite, on outdated systems, dating back more than a decade. The effort to obtain, search, and review these materials required substantial time and significant expense. Those 4,000 pages demonstrate that ACN, one of over 120 unique task partners featured over 16 seasons of *The Apprentice* and *The Celebrity Apprentice*, was treated like other such task partners. Declaration of Brian Edwards ("Edwards Decl.") ¶ 2. ACN acted no differently from other task partners appearing on the show, and paid similar fees for its participation. Declaration of Alexander J. Rodney (Dkt. No. 158, "Rodney Decl."), Ex. F; Declaration of Jessica Stebbins Bina ("Bina Decl."), Exs. 1, 2, 5-7. Its contract was negotiated by the same JMBP staff producers and attorneys. Bina Decl. Ex. 2. And like other task partners, ACN spent a very limited amount of time on set with the defendants in this action. Edwards Decl. ¶ 6; Bina Decl. Ex. 3. Yet plaintiffs nonetheless ask this Court to permit plaintiffs to conduct an even greater, far more burdensome fishing expedition into hundreds of hours of video footage, stored in obsolete formats and accessible only at tremendous burden to JMBP and MGM, based on pure conjecture and without *any* showing whatsoever that such fishing expedition will likely result in relevant evidence. This is not the proper purpose of discovery, and is most certainly unreasonable discovery from a nonparty. Plaintiffs' motion should be denied.

Plaintiffs' complaint is based on the *aired* episodes of *The Celebrity Apprentice,* which they have access to and which they allegedly watched and relied upon in connection with their

decision to invest in ACN. But plaintiffs persist in demanding *unaired* footage they indisputably never saw and thus admittedly could not have relied upon. Plaintiffs posit two unmeritorious reasons why such discovery should nonetheless be allowed. First, plaintiffs suggest that reviewing the unaired footage—which, due to covering multiple camera angles of every scene, includes *hundreds* of hours for each episode—will somehow help demonstrate that defendants controlled the editing process for the show and used it to positively portray ACN. Mot. at 2, 7. Of course, this is nonsense. After all, how could unaired raw footage illustrate who controlled the editing of that footage? Furthermore, for such editing to have any conceivable relevance, defendants would have had to have some role in determining what footage to include or not include in the show. But as JMBP has repeatedly explained to plaintiffs, defendants had no role in editing footage on *The Celebrity Apprentice*. Edwards Decl. ¶ 8; Bina Decl. Ex. 9. Rather, cutting and editing of cut footage was done entirely by the show's professional producers. *Id.* Thus, even were it possible to review hundreds of hours of footage and invent a cogent story as to why some portions, but not others, were included in two-hour television show, ***no such review can possibly demonstrate editorial control by the defendants here***.

Second, plaintiffs assert that some unaired footage might somehow demonstrate "the true nature of Defendants' relationship with ACN," including "the extent of Defendants' diligence into ACN, the falsity of Defendants' representations, [and] the intent underlying Defendants' representations." Mot. at 5-6. Plaintiffs, of course, in no way explain how the footage could possibly shed light on these matters. To the contrary, the documents *already* produced by JMBP demonstrate that whatever defendants' relationship was with ACN, it was established before ACN appeared on *The Celebrity Apprentice*, and thus unaired footage of the show could not possibly demonstrate defendants' prior diligence or the nature of defendants' relationships. Rodney Decl.

2

Ex. C.  Moreover, as those documents also demonstrate, the ACN representatives spent minimal time on the set, almost none of it with defendants, and the time spent with defendants was brief and largely scripted (JMBP also already produced the script).  *See* Bina Decl. Exs. 3, 8; Rodney Decl. Ex. H.  The odds that somewhere in this very large haystack there is a needle of evidence that would be somehow helpful to plaintiffs is infinitesimal, and wholly speculative.

Weighed against this speculation and irrelevance is the tremendous burden plaintiffs' request places on JMBP, a nonparty.  Plaintiffs' motion suggests that JMBP can readily locate and then simply show this limited subset of footage of ACN representatives interacting on the set of *The Celebrity Apprentice*.  Not so.  Accessing, identifying, and producing the requested footage would require a considerable effort.  Edwards Decl. ¶¶ 9-13.  The raw footage is voluminous, and stored in obsolete formats that would require equipment rental even to review.  *Id.* ¶¶ 10-11.  JMBP's parent, MGM, would also need to pull personnel from their daily tasks to find potentially responsive footage, and then either further divert those personnel or retain and pay outside legal counsel to review hundreds of hours of footage to identify tapes that are potentially responsive to plaintiffs' request.  *Id.* ¶¶ 10-11.  Additionally, should any responsive tapes actually be identified, these tapes would then need to be viewed by plaintiffs' counsel in a secure viewing room on the premises of MGM, with JMBP counsel in attendance.  *Id.* ¶ 12.  The diversion of personnel and resources for such a lengthy time creates an undue hardship on nonparty JMBP and its nonparty parent MGM, regardless of plaintiffs' willingness to pay financial costs.  *Id.* ¶ 13.  The Court should deny plaintiffs' motion to compel.

## RELEVANT BACKGROUND

I.     **Nonparty JMBP Already Provided Significant Discovery to Plaintiffs.**

In response to plaintiffs' subpoenas on itself and MGM, JMBP already produced more than 4,000 pages of documents.  Edwards Decl. ¶ 2.  This production includes JMBP's communications

3

with ACN and its representatives, all contracts between JMBP and ACN, all fees paid by ACN to JMBP in connection with its appearance on the show, the show dossiers for each episode ACN appeared on, the scripted introductions to ACN for both shows (as well as interactions with ACN representatives regarding those scripted introductions), and the ACN representatives' schedules while on set. *Id*. It also included the show materials ACN requested related to its advertising, and correspondence regarding the same. *Id*. And it included comparative materials so that plaintiffs could see ACN's task fee was consistent with that paid by other task partners. Rodney Decl. Ex. F. Additionally, counsel for JMBP provided several written explanations sufficient to answer plaintiffs' other requests, including the manner in which task partners were selected to appear on the show and Trump's lack of any editing role. Bina Decl. Ex. 9.

## II.      JMBP's Voluminous Document Production Demonstrates That ACN's Appearance on *The Celebrity Apprentice* Was Unremarkable.

Plaintiffs' motion baldly asserts that *The Celebrity Apprentice* played a "central role" in the defendants' alleged fraud. Yet they never explain how. To be clear, nearly every episode of *The Apprentice* and *The Celebrity Apprentice*, which collectively ran for 16 seasons (14 seasons with Trump as host), was built around contestants working with corporate sponsors to complete a "task." Edwards Decl. ¶ 4. ACN served as one such corporate sponsor, or "task partner," out of more than 120 such task partners. And the copious materials *already* produced by JMBP demonstrate that ACN's interaction on those episodes was typical and ordinary. Specifically, while the documents do demonstrate that persons affiliated with Trump introduced ACN to JMBP, Rodney Decl. Ex. C, they also demonstrate that representatives of JMBP and representatives of ACN dealt with each other just as JMBP dealt with all other show task partners. *E.g.*, Bina Decl. Ex. 2 (typical contract negotiations), Ex. 5 (ACN restricted in use of promotional materials), Ex. 6 (ACN limited to the standard number of featured executives), Ex. 7 (celebrity list not disclosed

4

to ACN). Regardless of Trump's recommendation, ACN would only have been chosen to appear on the show if the producers agreed that it would benefit the program and if an appropriate creative task could be devised by the creative team. *See, e.g.*, Edwards Decl. ¶ 5; Rodney Decl. Ex. C (letter by ACN representative to *The Celebrity Apprentice* representative explaining what ACN would offer in terms of outreach and ratings)); Bina Decl. Ex. 9 (letter explaining means by which task partners were chosen).

Once introduced, communication between ACN and JMBP was conducted through ACN's agents and producers employed by JMBP. *E.g.* Bina Decl. Exs. 1-3, 6-8. Like all companies appearing on the program, ACN and the shows' producer negotiated and entered into a "Task Agreement" (contract), laying out the specifics of the legal obligations of the parties. Rodney Decl. Ex. E. For the right to participate as a task partner on *The Celebrity Apprentice*, ACN paid ███████ to appear on the episode that aired on March 22, 2009 and ███████ to appear on the episode that aired on March 27, 2011. *Id*. Ex. F. The amounts ACN paid the production to appear on the two episodes at issue where wholly commensurate with the fees paid by other task partners on the same seasons. *Id*. And while plaintiffs try to make much of the fact that ACN's "brand and message [were] woven into an entire episode," creating an "on-air showcase of [ACN's] products," Mot. at 4, this too was standard for nearly every task partner and not unique to ACN. *See, e.g.,* Rodney Decl. Ex. G (describing episodes highlighting the offerings of task partners Snapple, Pedigree, Chicken of the Sea, and others); Bina Decl. Ex. 4 (press releases by other task partners highlighting their companies' participation).

ACN's appearance on *The Celebrity Apprentice* was shaped entirely through communications with show producers, who treated ACN as it did all other featured companies— in a professional business manner. *E.g.*, Bina Decl. Exs. 1, 2, 5-7. None of the defendants were

5

involved in any of the communications exchanged with ACN regarding the contractual agreement, the creative task, or the drafting of the scripted introductions. Edwards Decl. ¶ 3. This professional distance extended to the filming of the two episodes. While plaintiffs suggest there were "days" of on-camera interactions between defendants and ACN executives, the evidence does not support such a claim. Rather, ACN was given specific call times to appear for filming. *E.g.*, Bina Decl. Ex. 3. The bulk of each show's footage was the celebrity cast-mates carrying out the task, ***not*** ACN executives hanging out on set. As JMBP previously explained to plaintiffs, "Mr. Trump was typically filmed with task partners in only two instances: (1) at the beginning of an episode when introducing the task; and occasionally (2) outside the boardroom when discussing the casts' performance of the task with the task partners. The task partners were not otherwise present with Mr. Trump on set, and would not have been filmed together." Bina Decl. Ex. 9. The same is true with respect to the other defendants. Edwards Decl. ¶ 6.

## ARGUMENT

Under Rule 26 of the Federal Rules of Civil Procedure, discovery is permissible with respect to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Courts will deny disclosure when the minimal probative value or relevance of the proposed discovery is outweighed by the burden of production. *See Raza v. City of New York,* 998 F. Supp. 2d 70, 86 (E.D.N.Y. 2013). And when "discovery is targeted to non-parties, the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the nonparty." *UMB Bank, N.A. v. Sanofi,* 2017 WL 6398628, at *1 (S.D.N.Y. Nov. 22, 2017); *Fears v. Wilhelmina Model Agency, Inc.,* 2004 WL 719185, at *1 (S.D.N.Y. Apr. 1, 2004). To determine whether a subpoena imposes an "undue burden" on a nonparty, courts consider a variety of "factors including relevance, the need of the party for the documents, the breadth of the document request, the time

period covered by it, the particularity with which the documents are describes, and the burden imposed." *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007).

### III.   The Sought Evidence Would Likely Have No Value.

While discovery is broad, "courts should not grant discovery requests based on pure speculation that amount to nothing more than a 'fishing expedition.'" *Collens v. City of New York,* 222 F.R.D. 249, 253 (S.D.N.Y. 2004).   Here, the evidence already produced in this case demonstrates that plaintiffs' motion is just that—a speculative fishing expedition with no genuine probability of finding additional probative evidence.

Plaintiffs argue that examining the demanded footage will allow plaintiffs to see the "[d]ifferences between what was aired and what was unaired" and thus will reveal how the show "was cut to create misleading impressions about ACN." Mot. at 7.   However, as explained above, ***the defendants did not edit footage of* The Celebrity Apprentice**.   Edwards Decl. ¶ 8.   Trump did not review footage, suggest cuts, or edit the footage after it was shot prior to airing, nor did the other defendants. *Id.*   The actual producers of the show made all editorial decisions of the footage after it was shot. *Id.*   Thus, contrary to plaintiffs' assertions, comparing the unaired footage to the aired footage will not, and cannot, reveal anything related to the defendants' "intent," "control," or "knowledge."

Plaintiffs also argue that "all available evidence suggests that [the footage] captures relevant interactions and conduct by and between defendants (and their representatives) and ACN." Mot. at 7.   That is simply untrue—as any review of the actual evidence reveals.   Rather, exhibits I and J to the Rodney Decl. demonstrate that the *contestants* on the show (not defendants) had a 30-minute meeting with ACN representatives, and exhibit K is merely a script of the (very short) task delivery at the beginning of one of the episodes.   Likewise, plaintiffs provide no indication as to why limited, scripted interactions between the defendants and ACN on camera

7

would demonstrate anything different or apart from the mountain of evidence JMBP already produced. JMBP has already provided the scripts. Moreover, as explained above, task partners, including ACN, were infrequently on set, for maybe an hour or two over a two-day period, and would have had only limited interaction with defendants, typically only at the beginning of an episode when introducing the task, outside the boardroom when discussing the casts' performance of the task, and sometimes during the final presentation of the task. Edwards Decl. ¶ 6. These periods were short and focused. For example, the task debrief for ACN's appearance on Season 8—one of the only occasions when ACN executives were filmed with Trump—began filming at 3:30 p.m. and wrapped in time for Trump to be at the boardroom by 4:00 p.m. Bina Decl. Ex. 3. It is thus improbable that footage of this small interval would demonstrate anything other than takes of the parties' scripted lines.

Similarly, plaintiffs speculate that Ivanka Trump and Donald Trump, Jr. were "highly visible presences during filming," thus seemingly suggesting that relevant footage exists of other defendants with ACN executives. Mot. at 5. However, the only basis plaintiffs provide to support this theory are two news articles suggesting that Ivanka Trump and Donald Trump, Jr. spent time with *contestants* on set, not with any of the task partner executives. Rodney Decl. Exs. L, M. There is no reason to believe Ivanka Trump or Donald Trump, Jr. spent any time on camera with ACN executives beyond the limited scenes they filmed together. Edwards Decl. ¶¶ 6, 7.

On this record, there is no basis beyond rank speculation that the unaired footage contains anything even tangentially relevant to this case. The remote unsubstantiated possibility that defendants and ACN somehow *might have* been videotaped having a relevant conversation on the set of *The Celebrity Apprentice*, without any reason to believe such footage exists, or such conversation even occurred, does not justify this request for yet more discovery from a nonparty.

*See Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602, 608 (S.D.N.Y. 1989) ("parties should not be permitted to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so"); *Citizens Union of City of New York v. Attorney General of New York,* 269 F. Supp. 3d 124, 141 (S.D.N.Y. 2017) (information that "may or may not have been considered" does not justify turning discovery into a fishing expedition into non-public information"); *Tottenham v. Trans World Gaming Corp.,* 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) ("Discovery requests cannot be based on pure speculation or conjecture.").

## IV.    The Remote, Unsubstantiated Possibility That Relevant Footage *Might* Exist Does Not Justify the Undue Burden This Request Would Create For a Nonparty.

While the benefit to plaintiffs of granting their request is wholly speculative, the undue burden to JMBP and MGM is real and immediate.  As explained above, the volume of footage that would need to be reviewed to find potentially responsive footage is tremendous, and stored in outdated formats that would require equipment rental and additional personnel to review.  Edwards Decl. ¶¶ 9-11.  Due to the way the tapes are labeled, JMBP will be unable to easily assess which tapes are responsive, and will instead likely need to review hundreds of hours before even identifying potentially responsive footage.  *Id.* ¶ 10.  Then, due to the confidentiality and proprietary nature of the footage, its attorneys would have to supervise plaintiffs' counsel reviewing any footage identified for several days. *Id.* ¶ 12.

The diversion of personnel and resources for such a lengthy time creates an undue hardship on nonparty JMBP, even if the material at issue were relevant.  Such a burden is especially unwarranted due to the irrelevance of the requested footage.  When the responding party is not a party to the litigation, courts must be "particularly sensitive" to the burden production creates, and carefully weigh this burden against the probative value of the information sought, *Fears,* 2004 WL

719185, at *1, using factors such as relevance, the need for the materials, the breadth of the request, the time period covered by it, and the burden imposed. *Concord Board Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 53 (S.D.N.Y. 1996); *see also Arista Records LLC v. Lime Grp. LLC,* 2011 WL 781198, at *3 (S.D.N.Y. Mar. 4 2011); *UMB Bank, N.A. v. Sanofi,* 2017 WL 6398628, at *1 (S.D.N.Y. Nov. 22, 2017). Furthermore, when the requested material is only marginally relevant, "even a modest burden may be unjustified." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 1985 WL 315, at *9 (S.D.N.Y. Feb 28, 1985); *Concord,* 169 F.R.D. at 53.

The *remote possibility* that this proposed fishing expedition *might* turn up something that might lead to something relevant thus certainly cannot justify the substantial burden this request would create on nonparty JMBP. *See, e.g. Concord,* 169 F.R.D. at 53 (undue burden where subpoena would "subject numerous [nonparty] employees and managers in several branch offices to countless hours of research, analysis, and compilation"); *Artista,* 2011 WL 781198, at *3 ("even if the [requested materials] were somehow probative of plaintiffs' conduct...the burden of collecting, searching, reviewing, and producing all internal communications...would significantly outweigh any potential probative value, particularly here, where the burden would be imposed on non-parties."); *MacNamara v. City of New York,* 2006 WL 3298911, at *6 (S.D.N.Y. Nov. 13, 2006) (limited additional relevance of information did not justify burden where obtaining it would be "complicated and time-consuming"). Weighing the improbable relevance of the footage against the large burden to a nonparty, plaintiffs' motion to compel should be denied.

## CONCLUSION

For the foregoing reasons, MGM and JMBP respectfully request that the Court deny plaintiffs' motion to compel.

10

LATHAM & WATKINS LLP

By:  /s/ Jessica Stebbins Bina
       Jessica Stebbins Bina

Marvin S. Putnam
Jessica Stebbins Bina (*pro hac vice*)
10250 Constellation Blvd. Suite 1100
Los Angeles, California 90067
Tel: 424.643.5500

11