**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE, LUKE DOE, RICHARD ROE, and MARY MOE, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs.* <br><br> *v.* <br><br> THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP JR., ERIC TRUMP, and IVANKA TRUMP, <br><br> *Defendants.* | No. 18 Civ. 9936 |

**DECLARATION OF BRIAN EDWARDS IN SUPPORT OF NONPARTIES JMBP, LLC AND METRO-GOLDWYN-MAYER STUDIOS INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

I, Brian Edwards, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the President of Television Operations at Metro-Goldwyn-Mayer Studios Inc. ("MGM").  I am over eighteen years of age, and am competent to testify herein.  I make this declaration in support of JMBP, LLC ("JMBP") and MGM's opposition to plaintiffs' motion to compel video footage.  The facts set forth below are based on my personal knowledge, including information provided to me by others working at my direction as part of JMBP's and MGM's investigation in response to plaintiffs' subpoena.  If called as a witness, I could and would competently and truthfully testify to these matters.

**Document Production in Response to Plaintiffs' Subpoena**

2.      In response to plaintiffs' subpoena, I directed MGM personnel to search for responsive material.  As responsive correspondence dates back more than ten years, this search required MGM personnel to obtain data from JMBP email archives maintained offsite.  MGM

employees located responsive correspondence, and to date have produced more than 4,000 pages of documents to plaintiffs.  This includes JMBP's communications with ACN representatives, the contracts between JMBP and ACN, the fees paid by ACN in connection with its appearance on the show compared to the fees paid by other task partners in the same season, the show dossiers for each episode, the scripted introduction to ACN for both episodes (as well as the communications with ACN representatives regarding those scripted introductions), and the ACN representatives' full schedules while on set.  It also included the show materials related to advertising and correspondence regarding the same.

3.      Neither Donald Trump, nor any of his family members, were copied on any of the communications between JMBP and representatives of ACN that were located on the system.

### Relevant Facts About *The Celebrity Apprentice*

4.      *The Apprentice* and *The Celebrity Apprentice* collectively ran for 16 seasons (14 seasons with Mr. Trump as host).  Nearly every episode was built around contestants working with a corporate sponsor (called a "task partner") to complete a "task."  There were over 120 unique task partners featured over the 16 seasons.

5.      Task partners were generally selected for *The Celebrity Apprentice* in one of three ways. The first way would be through various large advertising agencies, who worked with the show's producers and communicated instances when clients of the agencies were interested in appearing on the show. A second way would be when task partners were recommended or introduced through Mr. Trump or his agents.  In either of the foregoing instances, the task partner would ultimately only be chosen to appear on the show if an appropriate creative task could be devised by the show's creative team to work with the task partner's product or brand, and if a mutually agreeable contract could be entered. The third way of selecting a task partner

would occur when the show's creative team devised a task but lacked an appropriate partner.  In those instances, a person from the show's production team would contact companies that offered a product appropriate for the task, with the goal of engaging the company for the particular task.  In addition to these three ways, the show's network, NBC, would occasionally suggest task partners, who would then be evaluated through the normal intake process.

6.      My understanding, based on my company's investigation into these matters, is that task partners were infrequently on camera, for maybe a couple of hours over a two-day period, and would have had only limited interaction with Donald Trump or members of his family, typically only at the beginning of an episode when introducing the task, outside the boardroom when discussing the cast's performance of the task, and sometimes during the final presentation of the task.  They were rarely on set with Mr. Trump, or any other judges, including Ivanka Trump, Eric Trump, and Donald Trump, Jr.

7.      While *The Celebrity Apprentice* was a reality show, the cameras were not filming at all times.  The cameras filmed multiple takes of portions of the show, such as when the task partner executives introduced the task.  And the cameras would film the contestants while they were completing the task—*i.e.* after the task partner executives left the set.  However, my understanding is that it is extremely unlikely that the cameras would have filmed the task partners outside of their role on the show, for example, during hallway interactions between task partners and defendants.

8.      Neither Mr. Trump nor any of the other defendants had control over the editing or cutting of any of the episodes of *The Apprentice* or *The Celebrity Apprentice*.  My understanding is that while Mr. Trump sometimes made suggestions about what portions of the "boardroom" section he believed should be included in the final show, the producers of the show made all

editorial decisions regarding the footage after it was shot.  Thus, comparing the shot footage to the aired footage would, at most, demonstrate the editorial judgment of the show's professional producers, and not that of any defendant.

### The Unaired Footage

9.     The raw footage from *The Celebrity Apprentice* is voluminous.  Each episode was shot over a two-day span, with numerous cameras shooting the same scenes from different angles.  Additionally, some tapes feature only audio, while others may feature only video.

10.     There are hundreds of hours of footage in connection with the two episodes featuring ACN.  The tapes are not labeled with any detail and thus it is unclear what portion of each episode is featured on a tape.  Thus, identifying footage potentially responsive to plaintiffs' request would be an extremely time-consuming and burdensome task.

11.     In addition, the footage is stored on types of videotape that are no longer regularly in use by the industry, and MGM and JMBP only maintain limited review decks for the old technology.  These review decks are not regularly maintained or serviced, and MGM and JMBP are unsure if they are in working condition.  Thus, in order to view this footage, JMBP would likely need to rent equipment.  Additionally, JMBP and MGM will need to either pull personnel from their daily tasks or retain outside legal counsel to review hundreds of hours of footage to identify tapes that are potentially responsive to plaintiffs' requires.

12.     Due to the sensitive and confidential nature of this footage, counsel for JMBP would also need to sit with plaintiffs' counsel while reviewing any footage identified.

13.     In sum, even if plaintiffs were to pay the substantial costs associated with equipment rental, overtime, and attorneys' fees, these steps would place a tremendous burden on the staff of JMBP and MGM.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 20, 2020
Beverly Hills, California