K3C7DOEC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JANE DOE, et al.,

4                  Plaintiffs,

5             v.                          18 Civ. 9936 (LGS)

6   THE TRUMP CORPORATION, et al.,

7                  Defendants.

8   ------------------------------x
                                          New York, N.Y.
9                                         March 12, 2020
                                          3:45 p.m.
10

11

    Before:
12
                        HON. LORNA G. SCHOFIELD
13
                                          District Judge
14
                        APPEARANCES (via telephone)
15
    KAPLAN HECKER & FINK LLP
16       Attorneys for Plaintiffs
    BY:  JOHN QUINN
17       ROBERTA KAPLAN
         ALEXANDER RODNEY
18
    EMERY CELLI BRINCKERHOFF & ABADY LLP
19       Attorneys for Plaintiffs
    BY:  DAVID BERMAN
20       OGILVIE WILSON

21   SPEARS & IMES LLP
         Attorneys for Defendants
22   BY:  JOANNA HENDON
         ANDREW KINCAID
23

24

25

K3C7DOEC

1          (In the robing room)

2          (Case called)

3          THE COURT:  Okay.  Good afternoon, counsel.  So I have

4    received your letters.  I have reviewed your letters.  I will

5    say though I know there was one that was just filed on March

6    11, which I think it today -- it's today or yesterday.  In any

7    event, I have not been able to study that one, although I have

8    looked at it.

9          I guess the place to start -- why don't we start with

10   the matter that's easiest, and that is the request for

11   production of documents that is outstanding.  And, as I

12   understand it, the parties essentially agreed to the production

13   of these documents.  They are from nine records custodians

14   using 21 search terms.  I understand there has been one piece

15   of a rolling production from defendants, but there is more.  So

16   let me ask the defendants:  How much more is there, and when

17   will it be produced?

18          MS. HENDON:  Joanna Hendon, your Honor, for the

19   defendants.  Good afternoon.

20          THE COURT:  Good afternoon.

21          MS. HENDON:  We have more, and we can start producing

22   it this month.  I have been in Los Angeles this week, and I am

23   hoping to get back to New York City, but we will be in a

24   position to continue rolling the production of those documents

25   this month.

K3C7DOEC

1         THE COURT:  OK.  So what I really want to know is how

2    much is left.  Let's start there.  We have 252 documents that

3    have been produced.  Is that a quarter of what there is?  Is

4    that half?  What's your estimate?

5         MS. HENDON:  Do you know, Mr. Kincaid, what the total

6    volume that we have following the review of the 190,000

7    documents, what we have to produce?

8         MR. KINCAID:  This is Andrew Kincaid from Spears &

9    Imes for the defendants.  I would estimate that the 252

10   documents we produced as about half as a rough estimate of the

11   total volume that we estimate producing at the end of the

12   relevance and privilege search.

13        THE COURT:  And what still needs to be done with the

14   documents that haven't been produced that is between here and

15   there and production?

16        MS. HENDON:  Nothing, your Honor.  It's just been a

17   matter of completing what was a very time consuming, lengthy

18   and substantial review.

19        THE COURT:  But, as I understand it, you now have

20   identified the documents that are responsive and not

21   privileged.  Do you need to do anything else to them before

22   they are produced?

23        MS. HENDON:  No.  I would like to look at them before

24   they go over, but I think that's something that can happen next

25   week.

K3C7DOEC

1          THE COURT:  OK.  So I'm going to ask that they be

2    produced by March 20, which is a week from tomorrow.

3          Then let's turn to the question of organizational

4    charts.  I know that the plaintiffs had said that they are

5    hampered by the fact that they don't understand the positions

6    of various correspondence and their relative seniority, and so

7    it's hard for them, I presume, to make sense of the documents

8    they have, as well as decide who the essential deponents might

9    be.  But I also understand that the defendants are saying that

10   this request covers 15 entities from basically 2005 to the

11   present and that is burdensome.

12         Have you all tried to talk to each other to come to

13   some agreement that makes this request as useful as possible to

14   the plaintiffs and as manageable as possible to the defendants?

15         MR. QUINN:  John Quinn from Kaplan Hecker, your Honor.

16   We did invite defendants to have the conversation, and we were

17   told on a meet and confer that it was a blanket refusal and

18   that we should feel free to move on it, so that's what we did.

19   We would certainly welcome that conversation and have tried to

20   be throughout this process as reasonable and accommodating as

21   possible.

22         THE COURT:  OK.  And, Ms. Hendon, what's the situation

23   with the organizational charts?

24         MS. HENDON:  The position is as follows, your Honor.

25   We think that essentially discovery is supposed to be

K3C7DOEC

proportional to the needs of the case, and the discovery that

the defendants have made already and in conversations I had

with Mr. Quinn we have been very up front, and the discovery we

provided shows this.

           The case today is about Mr. Trump's relationship with

ACN, his paid endorsement of ACN, the things he said about ACN,

and among what we produced to the plaintiffs are the contracts

between Mr. Trump and ACN.  The documents we produced make

clear -- and we have confirmed to plaintiffs -- that there are

no corporate entities involved in this transaction or

arrangement; it was personal to Mr. Trump.  The contracts are

with him, not a corporation.  And it's visible through the

documents that we produced -- again we have also asserted

this -- that it's been widely and repeatedly reported in

connection with many other legal proceedings involving

Mr. Trump and his businesses before he was President that

essentially Mr. Trump doesn't use e-mail, interacts with Rona

Graff his personal assistant for many years, interacts with

Ellen Weiselberg, interacts with Len Patton.  You know, there

is a small number of people that he dealt with on this issue.

           THE COURT:  Let me just interrupt for a second.  I

guess my question is:  If that's the case, I would think there

would not be a tremendous volume of organizational charts, if

they exist at all.  What do you know about the existence of the

documents?

K3C7DOEC

1          MS. HENDON:  There are some organizational charts

2    within the Trump organization, as you would expect, I think,

3    but we view this as sort of an effort to just get into, and

4    root around in, and understand Donald Trump's business

5    relationships and how Donald Trump's companies intersect and

6    interact with each other in a way that is divorced from any

7    articulable need or relevance to what is at this time, your

8    Honor, a very simple straightforward fraud case.

9          THE COURT:  Again, let me ask a question.  I apologize

10   for interrupting you repeatedly, but I'm trying to be efficient

11   here.

12         So who on behalf of Mr. Trump or the Trump

13   organization dealt with ACN about this endorsement

14   relationship?

15         MS. HENDON:  Mr. Trump, Rona Graff.

16         And, Andrew, will you supplement with any names I left

17   out.

18         MR. KINCAID:  Andrew Kincaid for Spears & Imes.

19   That's largely correct.  And to the extent that there are

20   additional individuals, they are apparent on the face any of

21   communications, but as Ms. Hendon noted a moment ago, the

22   contracts are with Mr. Trump personally, not through any

23   corporate entity, and as we said in meet and confer discussions

24   before, it's not clear to us -- and we haven't seen any

25   showing -- that organizational charts would lend any insight to

K3C7DOEC

1     that determination.

2             THE COURT:  All I'm trying to get at is if you think

3     it's just Mr. Trump -- and did you say Ms. Grass?

4             MS. HENDON:  Correct.

5             THE COURT:  And then perhaps others who you say whose

6     roles are apparent from the communications.

7             MS. HENDON:  Correct, exactly.

8             THE COURT:  Let me just ask the plaintiffs, what more

9     do you need to have an understanding of what your documents

10    mean and who your witnesses are?

11            MR. QUINN:  Thank you, your Honor.  John Quinn again

12    from Kaplan Hecker for the plaintiff.

13            First, to the point about Trump organization

14    employees.  Even based on the 252 documents we have received so

15    far, I have to say we don't agree with the characterization

16    that the defendants have given.  In addition to the individuals

17    they've mentioned, there is a vice president of marketing, or

18    someone who appears to be a vice president of marketing, who

19    was on communications about ACN and Success magazine.  Hope

20    Hicks, the former director of communications, appears on some

21    communications about ACN and Success magazine.  These people's

22    positions over time isn't apparent to us.  There are also

23    individual employees named whose names are simply new to us,

24    who are copied on e-mails about communications with ACN,

25    etcetera.

K3C7DOEC

1          But there are these individuals in the Trump

2     organization that we simply don't know what exactly their

3     position is, who they report to, and that may lead us to

4     additional custodians or deponents.

5          So it's simply not true that we have a clear picture

6     to what was going on in the Trump organization, and I think

7     defendants have conceded that Mr. Trump was using the employees

8     and the officers of The Trump Corporation in connection with

9     relevant events here.

10         So If there are organizational charts -- which Ms.

11    Hendon has acknowledged -- and those have already been compiled

12    and collected -- which we asked the defendants on a meet and

13    confer back in December and they confirmed -- certainly we need

14    those.

15         Even beyond just The Trump Corporation itself, the

16    mere fact that Donald Trump personally signed endorsement deals

17    doesn't change the fact that he then used a wider array of

18    entities and subsidiaries -- including, for example, Trump

19    Productions -- to then carry out the fraudulent scheme at issue

20    here.  Trump Productions was intimately involved in

21    communications about inviting ACN onto Celebrity Apprentice,

22    controlling the content of how ACN would be presented, and then

23    dealing with how that footage could be used in the future.  So

24    even beyond the Trump organization and the mere execution of

25    the agreements, there are the related entities outlined in the

1    complaint that were used to perpetrate the scheme.

2            THE COURT:  OK.  Let me just interrupt there, and I

3    will tell you what my thinking is on this.

4            I understand the arguments on both sides, but it

5    strikes me that the plaintiff's request is somewhat overbroad.

6            I think you, plaintiffs, are certainly entitled to

7    understand who the people were who were involved in this

8    matter, who they reported to, what positions they were in, over

9    what period of time, and even perhaps of relevance maybe what

10   their relationship was to each other in the corporate

11   structure.

12           On the other hand, it also seems entirely possible to

13   me that there are whole pieces of the Trump organization that

14   would appear in the charts that have nothing to do with any of

15   those people or this matter, and frankly that's just not

16   relevant.

17           What I would like you to do is talk to each other, and

18   again by next Friday the 20th agree, if you can, on how to deal

19   with this problem.

20           I told you what I think the plaintiffs are entitled

21   to.  I told you what I think the defendants are entitled to

22   withhold.  See if you can come up with an agreement on how you

23   are going to accomplish that and do it quickly, and put that in

24   a letter to me on the 20th.  OK?

25           MS. HENDON:  Yes, your Honor.  Thank you.

K3C7DOEC

1          MR. QUINN:  Understood.

2          THE COURT:  So the next issue is the scope of fact

3    discovery.  And let me just preface this by saying that my

4    individual rules place certain limits on the scope of ESI

5    discovery.  And of course we know that the Federal Rules of

6    Civil Procedure similarly place limits on discovery, for

7    example, the duration and number of depositions.

8          What I would just like to clarify is that I think

9    certainly my understanding with respect to my own rules -- but

10   even with respect to the federal rules -- is that these are

11   guidelines; they are not one size fits all for all cases.  And

12   my own rules are intended to try to get cases in front of me

13   that reasonably require more discovery so that there is more

14   judicial management and so that things can be done in a way

15   that is efficient and proportionate but at the same time of the

16   greatest use and relevance to the party seeking the

17   information.

18         So, I'm not going to hold anyone to the hour limits or

19   the custodian limits that are in my rules, but what I would

20   like to say is that it seems to me that the plaintiff needs to

21   be able to tell me who the additional custodians are.  And

22   actually you don't need to tell me; I frankly don't need to

23   know.  But you do need to have an understanding of who the

24   additional custodians are and have that discussion with the

25   defendants.

K3C7DOEC

```
 1         And I would urge the defendants to be reasonable.  To
 2    the extent those custodians have relevant information, and it's
 3    a matter of extending search terms to an electronic search, I
 4    would think that you should agree to a further production.  But
 5    I also think you probably want to talk to each other -- it
 6    sounds like there isn't enough talking going on that is
 7    cooperative here -- to figure out who the additional custodians
 8    are.  I will hear from the plaintiffs on that issue, if you'd
 9    like?
10         MR. QUINN:  Sure.  Thank you, your Honor.  John Quinn
11    from Kaplan Hecker.
12         At this point, as the Court knows, we got 252
13    documents from the defendants, so we are limited in our ability
14    to identify comprehensively the custodians that we would want.
15    Certainly, all the individuals who have been mentioned so far
16    both by defendant and then some of the additional names that I
17    mentioned would be on our list.  So that would be I believe 15
18    total individuals on the list I have in front of me associated
19    or affiliated in one way or another with the Trump
20    organization.  And certainly there could be more when we do
21    receive information about who people reported to and the like.
22         But certainly I welcome the Court's invitation to meet
23    and confer with defendants on this, with the understanding that
24    the parties won't be held to that limit, and I think we can
25    have a productive conversation and certainly make a first step
```

K3C7DOEC

1    at identifying some additional custodians based on the record

2    we now have.

3            THE COURT:  OK.  Ms. Hendon, anything you want to add?

4            MS. HENDON:  No, that's fine, your Honor.  I guess I

5    would like to add -- and I will be very brief -- and I wish I

6    said this at the outset, but I will say it now -- that it is

7    our position that now that our motion to compel arbitration is

8    pending, we are prejudiced every day by all of this

9    discovery -- in particular the third-party discovery -- but all

10   of it.  And your Honor has directed us to meet and confer and

11   make document production, and of course we are going to do

12   that, but it is our view that because of the prejudice to us,

13   that the motion we filed in September really ought to be

14   decided as promptly as possible now, so that in the event of an

15   adverse decision for my clients, we can promptly appeal it.

16           It is our view that an arbitrator should be making all

17   the decisions that your Honor is having to take time out of her

18   schedule to decide at this point.  But to your last comment, of

19   course we will meet and confer, and if they have identified six

20   more custodians, we will take that under advisement and of

21   course be reasonable.

22           THE COURT:  So here is what I would suggest.  I would

23   like to keep this thing moving, so if the remaining documents

24   are being produced by the 20th, what I would like is I would

25   like a joint letter on the 27th that tells me that you have

K3C7DOEC

1   reached agreement on the additional custodians, or telling me

2   that you've agreed except for, and then outline what the

3   remaining issues are, and I will then just rule on those

4   promptly so we don't get held up in extended meet and confer

5   sessions.

6           So then the issue is depositions, and I guess this is

7   a question for Mr. Quinn.  I detect some tension in your letter

8   in the sense that understandably you would like to get as many

9   documents as you can before taking depositions for the usual

10  good reasons.  On the other hand, you seem to be wanting to

11  take the depositions now and objecting to the fact that in your

12  view the defendants are obstructing the taking of depositions.

13          And I guess those two positions seem a little bit

14  inconsistent to me.  I want to keep things moving, but I think

15  that it makes sense for you to just get your documents first

16  for us to work out who the custodians are, to get the second

17  wave of production, and then deal with the deposition issue.

18  But you tell me, Mr. Quinn.

19          MR. QUINN:  Thank you, your Honor.  The Court's

20  comment is very well taken.  And that tension is really just a

21  product of our effort to as diligently as possible meet the

22  fact discovery cut-off set by the Court.  We obviously

23  ultimately made a unilateral request for a lengthier extension.

24  The Court entered a 60-day extension, and we are simply trying

25  to do the best we can to get all the discovery we need and take

K3C7DOEC

1   the most productive possible depositions bearing in mind that

2   deadline.

3          That said, what the Court has proposed in term of

4   getting the documents and trying to close the document

5   record -- or at least substantially close the document

6   record -- and then proceeding to depositions makes great sense

7   to us, provided that the overall discovery deadlines can be

8   adjusted to accommodate that.  Certainly it seems like a

9   sensible way to proceed, and we have no objection whatsoever to

10  doing that.

11         And I would just add in light of the recent events

12  around the Covid-19 pandemic, you know, that sort of

13  accommodation may make even more sense.  I think everybody on

14  the phone is likely aware of this, and I would just add I hope

15  everybody stays healthy -- many of us are probably joining

16  remotely -- especially as we think about depositions in a case

17  where, for example, Jane Doe, the first plaintiff described in

18  the complaint, resides in California and is a hospice worker

19  who works regularly with the elderly.  The logistics of

20  planning that deposition and doing it very quickly -- to say

21  nothing of the document issues the Court has raised -- I think

22  pose real challenges here.  So, again, as long as the overall

23  schedule can be adjusted appropriately, we have no objection to

24  the way the Court has proposed about how to proceed.

25         THE COURT:  OK.  Ms. Hendon, I assume you don't have

K3C7DOEC

1    any objection to that either.

2              MS. HENDON:  Well, I certainly object to the notion

3    that we're going to revisit and readjust the discovery schedule

4    more broadly.

5              Your Honor proposed getting document discovery done

6    before turning to the question of depositions.  That sounds

7    reasonable to me, but I would say that as often as my adversary

8    uses the word "diligent" to describe their approach to party

9    discovery, we received the first deposition notices addressed

10   to the defendants in this case on February 27.  That was days

11   before the close of fact discovery.  So, I have no problem

12   making document discovery first and turning to the issue of

13   depositions, but all that Mr. Quinn said about embedding

14   notions of expanded deadlines beyond that, you know, we object

15   to, because it's our position the plaintiffs have been anything

16   but diligent with respect to party discovery in this case.

17             THE COURT:  Wait, wait, wait.  Before we get into

18   this, I mean we're going down a road of finger pointing, and

19   you may both have legitimate views, but frankly I don't want to

20   get into it.  That isn't of particular concern to me.

21             My own view is I would like to keep this case moving

22   as quickly as possible for obvious reasons.  My apology for my

23   contribution to the delay with the arbitration agreement, but

24   that will be forthcoming soon I hope.

25             So here is what I would like to do.  We have documents

K3C7DOEC

1    by the 20th, additional custodians by the 27th.  Why don't you

2    figure out then what follows on that, in other words, given

3    that, how much longer it will take the defendants to produce

4    documents, and put that in the same letter to me on the 27th.

5    And if you can't tell me that, then you can write a separate

6    letter with that, how long it's going to take to produce those

7    documents by let's say April 1.

8            I'm going to schedule a conference for us to follow up

9    on this on April 2.  Let's do it April 2nd at 3 o'clock.

10           MS. HENDON:  Your Honor, it's Joanna Hendon.  I am

11   sorry to interrupt you, but I have an all day settlement

12   conference on April 2.  Would it be possible to pick a day

13   earlier in the week or the following week?

14           THE COURT:  Sure.  Why don't we do April 1.  And I

15   would like your letter then telling me what you think the

16   proposed timeframe is by the 30th, but feel free to include it

17   in the letter on the 27th, if you're able to do that.

18           And if you have agreed, and there doesn't seem to be

19   anything to discuss or resolve on April 1, then I will cancel

20   the conference.  But if there are any outstanding issues, we

21   can have a conference on the 1st, and I will just rule.  OK?

22           MS. KAPLAN:  Your Honor, Ms. Kaplan.  Depending upon

23   the coronavirus, Mr. Quinn and I may be on trial in London on

24   that date, so can we request that it be by phone?  If it's by

25   phone, we'll make sure we can do it.

K3C7DOEC

1          THE COURT:  Actually I think for the foreseeable

2     future we are doing everything by phone, so just make that

3     assumption.

4          MS. KAPLAN:  I also have doubts whether we will get to

5     London, your Honor, so...

6          THE COURT:  I was going to add that myself.  And there

7     is always the risk you won't be able to come back if you go.

8          So, anyway, I will put all of this in an order so that

9     there is some clarity.  If there is anything in the order

10    that's inconsistent with what I said, please follow the order.

11         Is there anything else that we need to talk about

12    today?

13         MS. HENDON:  This is Joanna Hendon, your Honor.  Some

14    of the items of dispute concern the number of years over which

15    defendants are review ESI material.

16         THE COURT:  Thank you for reminding me.  Could I ask a

17    question?

18         So I understand that the plaintiffs are saying that

19    this relationship between Mr. Trump -- I guess then

20    Mr. Trump -- and ACN started in 2005, but I also know that your

21    remaining causes of action are basically under state law.  And

22    I wonder -- I don't know the answer to this -- but I wonder if

23    the relevant period isn't governed by the statute of

24    limitations applicable to each of those claims.  Does anyone

25    know what the life of your claims are?  Mr. Quinn or

K3C7DOEC

1    Ms. Kaplan?

2            MR. QUINN:  Your Honor, we certainly have the dates on

3    which the plaintiff signed up and have made allegations as to

4    when the harm arose in terms of their failure to recoup their

5    investment.

6            Respectfully, on behalf of the plaintiff, the key

7    point with respect to the date range is that not only does the

8    relationship date back to 2005 -- which is when the relevant

9    agreements were signed and understandings were reached as to

10   how the endorsement would be given, how the message would be

11   shaped and how it could be used -- but the actual content that

12   we have alleged was fraudulent was created in 2006 for video

13   material, 2007 for print material, and the Celebrity Apprentice

14   episodes were filmed in 2009 and 2011, and as we outline in the

15   complaint, that same material was recycled and reused in

16   various ways, including with respect to each of the plaintiffs

17   and their decisions to enroll in the ACN business opportunity.

18           So, the creation of that material and the

19   circumstances around it are highly relevant to the fraud issue.

20   The truth of the statements, as well as the knowledge that the

21   defendants had, and the intent, that really is the time in

22   which the fraud itself is being concocted and the fraudulent

23   message is being recorded and written down.

24           THE COURT:  I'll stop you right there.  I understand

25   your point.  It sounds pretty persuasive to me, but I haven't

K3C7DOEC

1    heard from Ms. Hendon.

2           MS. HENDON:  Your Honor, when the statements were

3    created and when these disks were created is irrelevant to

4    their case.  We don't have schemes and conspiracies in RICO

5    anymore.  We have allegations that four people went to meetings

6    where these disks were played, and the disks contained

7    allegedly materially false and misleading statements and

8    omissions.  You know, what was said and done and how --

9           THE COURT:  Wait one second though.  I don't

10   understand, and perhaps you can help clarify.

11          One is my recollection -- but I haven't gone back and

12   reread my decision on the motion to dismiss -- my recollection

13   is the reason we're still even here in federal court is because

14   of CAFRA jurisdiction.  There are classes, and although there

15   was a nationwide class alleged, there were also state

16   subclasses I think from California and Pennsylvania, and I

17   don't remember what other states, and, therefore, there are

18   class members whose injuries may go back to a particular time.

19   But I also understand Mr. Quinn to be saying that the

20   fraudulent statements -- in other words, discovery around the

21   fraud and whether it was intentional, knowledgeable,

22   etcetera -- dates to the time that they were made, and that

23   predates the five year period.  So maybe you can address that,

24   Ms. Hendon.

25          MS. HENDON:  I guess I say the same thing.  How is it

K3C7DOEC

relevant when these statements were created and the disks were
made?  Some were maybe made in 2005, others were made later.
What matters to every plaintiff's cause of action, and what is
relevant to every plaintiff's cause of action, is not how were
the disks made and in whose studio were they shot and who
drafted the language that is used by Mr. Trump on the disks.
What matters is whether that language contained materially
false or misleading statements of omissions.  That's what the
trier of fact is going to have to assess.  The disk could have
been made in the 19th Century, but what is on them and what the
defendants say they heard, that's going to be the issue.

            And if you waive the request -- I mean I understand
the facial appeal of what Mr. Quinn said, but how this risk was
developed -- whether it's 2005, 2006  or 2010 -- is of no
bearing at all on whether the words spoken by Mr. Trump were
false and misleading -- none whatsoever.  All of these state
law claims have statutes of limitation periods.

            THE COURT:  Let me ask a question though.  Isn't there
an element of both intent and -- I guess for lack of a better
word -- truth?

            For example, let's say Mr. Trump made a recorded
statement in 2006 and he either believed it was true at the
time, or it actually was true at the time, and somehow it got
aired later.  Wouldn't that be completely relevant to his
defense?

K3C7DOEC

1          MS. HENDON:  He's going to defend that he thought

2     these statements were true when he made them, but it doesn't

3     matter what the pieces of paper are that exist in someone's

4     file or across their ESI from 2005 on that subject.  His state

5     of mind is his state of mind, and we're going to do defend on

6     that, but we're not going to do that by bringing forward

7     documents from 2005, I promise you.  I'm not going to resist

8     discover to the other side and then make my defense using the

9     same documents.

10          THE COURT:  So let me just make a ruling here so that

11     we don't go on and on about this.

12          MS. KAPLAN:  Your Honor, may I just say one more

13     thing.  Last I heard fraud was an intentional tort, so we have

14     to show that at the time he made them he intended them to be

15     untrue.  And all the documentation that may or may not exist

16     about what he was going to say when he said it, and whether it

17     was true, is highly relevant.

18          THE COURT:  So stop.  Let me ask you to stop there.  I

19     understand both of your positions; here is my ruling.

20          My ruling is that I will allow discovery back to 2005,

21     but you need to take care with respect to any particular

22     request or search term that it makes sense to go back to that

23     period for that request.

24          In other words, I can conceive of requests that there

25     is no reason to go back that far, and others where it does make

K3C7DOEC

1    sense, so I'm going to allow requests to go back to 2005,

2    provided you have a good relevance argument and you're prepared

3    to defend it when and if the defendants object.

4           Let me also say to the defendants, I expect an honest

5    assessment of relevance from you so that you won't bring

6    arguments to me that something isn't relevant when it clearly

7    is.  OK?

8           MR. QUINN:  Understood, your Honor.

9           MS. HENDON:  We would of course give you an honest

10   assessment of relevance.

11          THE COURT:  I appreciate that.  And you have been

12   forthcoming with the Court so far, and I appreciate that.

13          So let's stop there.  I will issue an order as to

14   those issues.  Are there any other issues that need to be

15   addressed now particularly with respect to document discovery,

16   so that we can be productive in the next couple of weeks?

17          MR. QUINN:  Nothing further from plaintiff, your

18   Honor.  Thank you.

19          MS. HENDON:  Nor from the defense, your Honor.  Thank

20   you.

21          THE COURT:  All right.  Thank you very much.  We are

22   adjourned.

23

24

25