K49VDOEC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JANE DOE, LUKE LOE,
RICHARD ROE, MARY MOE,

                Plaintiffs,

            v.                        18 CV 9936 (LGS)

THE TRUMP CORPORATION, DONALD
J. TRUMP, DONALD TRUMP JR.,
ERIC TRUMP, IVANKA TRUMP,
                                      REMOTE TELECONFERENCE
                Defendants.

------------------------------x
                                      New York, N.Y.
                                      April 9, 2020
                                      10:55 a.m.

Before:

                    HON. LORNA G. SCHOFIELD,

                                      District Judge

                        APPEARANCES

EMERY CELLI BRINCKERHOFF & ABADY
        Attorneys for Plaintiffs
BY:  ANDREW G. CELLI
        OGILVIE A. F. WILSON
        -AND-
KAPLAN HECKER & FINK
BY:  JOHN C. QUINN
        ALEXANDER J. RODNEY
        ROBERTA A. KAPLAN

SPEARS & IMES
        Attorneys for Defendants
BY:  JOANNA C. HENDON
        ANDREW L. KINCAID
```

K49VDOEC

1                        APPEARANCES (continued)

2

3    SQUIRE PATTON BOGGS
         Attorneys for Nonparty ACN Opportunity, LLC
     BY:  STEPHANIE E. NIEHAUS

4

5    LATHAM & WATKINS
         Attorneys for Nonparties MGM and JMBP
     BY:  JESSICA STEBBINS BINA

6

7    ALSO PRESENT:  DANIEL FLORES, In-house Counsel (MGM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K49VDOEC

1          (Remote teleconference)

2          THE COURT:  Hi, it's Judge Schofield.

3          (Case called)

4          THE DEPUTY CLERK:  Before we begin, I'd like to remind

5     the parties of several rules and restrictions that are in

6     effect due to the novel coronavirus.

7          First, while members of the press and public have a

8     presumptive access to this proceeding, either live or

9     telephonically, recording or broadcasting of this proceeding is

10    still prohibited by policy of the Judicial Conference of the

11    United States.  Violation of these prohibitions may result in

12    sanctions, including removal of court-issued media credentials,

13    restricted entry to future hearings, denial of entry to future

14    hearings, or any other sanctions being necessary by the Court.

15         Second, we have a court reporter.  Your appearances

16    have been noted for the record.  But in order to maintain an

17    accurate record, I'm going to ask each counsel to please state

18    your name before you speak, each time you speak.

19         And we're here before The Honorable Lorna G.

20    Schofield.

21         THE COURT:  Good morning.

22         Before we start, could you tell me for the plaintiffs,

23    who will be speaking?

24         MR. QUINN:  Yes, your Honor.  Good morning.

25         It's John Quinn from Kaplan, Hecker & Fink.

K49VDOEC

1              I'll take the lead on behalf of plaintiffs today, as

2       to one of the motions before the Court relating to ACN and our

3       motion to compel discovery.  There may be certain details where

4       my co-counsel, Mr. Wilson, will jump in and provide some of

5       those details; but otherwise, I'll take the lead on behalf of

6       plaintiffs today.

7              THE COURT:  Okay.  Thank you.

8              And who will be speaking on behalf of defendants?

9              MS. HENDON:  Good morning, Judge.  It's Joanna Hendon

10      for Spears & Imes.

11             THE COURT:  Good morning.

12             And who will be speaking on behalf of ACN?

13             MS. NIEHAUS:  Good morning, your Honor.

14             This is Stephanie Niehaus from Squire Patton Boggs.

15             THE COURT:  Okay.  Good morning.

16             And who will be speaking on behalf of the MGM

17      entities?

18             MS. STEBBINS BINA:  Good morning, your Honor.

19             This is Jessica Stebbins Bina of Latham & Watkins.

20             I'll be speaking.

21             THE COURT:  All right.  Thank you.  And is there any

22      other counsel on the line who intends to speak?  For example,

23      do we have counsel on behalf of Ms. Butcher?

24             No.  Okay.  Then let's proceed.

25             Let me tell you what I wanted to do here, what the

K49VDOEC

1   agenda is, and then we can start.

2          First, I think everybody is probably aware of my

3   decision yesterday denying the defendants' motion to compel

4   administration; that will obviously affect some of our

5   discussion today.

6          As far as agenda items, we have the matters involving

7   ACN.  Principally, it is plaintiffs' motion to compel

8   production by ACN, which, of course, is not a party to this

9   action; ACN is a third party.

10         We also have two disputes that were separately raised

11  by ACN.  One is ACN's request for relief from my order; and

12  then subsequently the protective order permitting plaintiffs to

13  proceed anonymously.  And the other additional ACN matter

14  involves their application to quash the subpoena of Anne

15  Butcher, with whom they have a contractual relationship.

16         So those are the ACN issues.

17         Next, I wish to address the MGM subpoena issues,

18  plaintiffs' motion to compel production by the nonparty MGM

19  entities.

20         And third, I would address defendants' application to

21  revisit the issue of the plaintiffs proceeding under pseudonym.

22         So let (inaudible) the ACN issue and plaintiffs'

23  motion to compel production by nonparty ACN.

24         First, let me say, I have your various submissions.  I

25  have reviewed them.  But I will hear from you briefly if you

K49VDOEC

1    would like to be heard.  Since it's plaintiffs' motion, I'll

2    hear from the plaintiff first.

3          MR. QUINN:  John Quinn from Kaplan Hecker.

4          And thank you, your Honor.

5          Plaintiffs' motion to compel discovery from ACN is a

6    straightforward discovery motion that should be granted.  As I

7    mentioned at the top of the conference, my co-counsel,

8    Mr. Wilson, of Emery Celli, can address some of these issues in

9    greater detail.

10         But by way of introduction, I would note that ACN has

11   been in receipt of a Rule 45, subpoena pursuant to the

12   jurisdiction of this Court, since September of 2019.  ACN has

13   categorically refused to produce a single document or to

14   negotiate on scope, even after the Court ordered it to do so.

15         ACN is a critical nonparty that is in unique

16   possession of highly relevant material relating to what

17   defendants said about ACN, whether it was true or false, and

18   the size and scope of the class of victims that that fraud

19   affected.  And ACN's burden arguments are entirely

20   unsubstantiated and insufficient.

21         I'd be happy to address in more detail, your Honor,

22   any aspects of those specific issues which I think get quickly

23   tied up in ACN's principal objection, which has to do with its

24   cross-motion to compel arbitration.

25         THE COURT:  Okay.  I understand your arguments as to

K49VDOEC

1   the subpoena itself.  I remind you that the principal argument

2   of ACN is that the dispute over the subpoena needs to be

3   arbitrated.  So if you would like to briefly address that,

4   again, I I've read your (inaudible), but feel free to give me a

5   brief summary.

6           MR. QUINN:  Thank you, your Honor.

7           And again still, for transcript purposes, John Quinn

8   of Kaplan Hecker.

9           ACN's cross-motion to compel arbitration fundamentally

10  misapprehends the jurisdiction of this Court and ACN's role as

11  a nonparty subpoena recipient in this action, as ACN's complete

12  lack of supporting case law underscores.  To the contrary,

13  Chief Judge McMahon's decision in *Baleron* really is the

14  beginning and the end for ACN in this motion.  Chief Judge

15  McMahon said forcefully and clearly in that decision, and I

16  quote:  "No American court of which I am aware would ever

17  accept that a party to an arbitration was shielded by

18  arbitrable rule from producing evidence in an American lawsuit

19  pursuant to a discovery demand or subpoena."

20          But let me say just a little bit more.

21          ACN describes the scope of its requested relief a

22  little inconsistently in its papers.  Sometimes it seems to be

23  asking the Court to compel this entire case into arbitration;

24  and other times it seems to be seeking that the Court cleave

25  off its discovery obligations and compel just that issue into

1    arbitration.

2              I'll briefly address each of those requests, both of

3    which are squarely at odds with basic principles of law.

4              First, a nonparty like ACN simply cannot walk into a

5    lawsuit between other parties and seek to compel their dispute

6    into arbitration.  ACN hasn't cited and we haven't found a

7    single case in which any court has ever issued an order like

8    that.  The only authority that does bear on that issue holds

9    that a nonparty lacks standing to compel an action between

10   other parties into arbitration.  For example, the *Andrews* case,

11   2015 Westlaw 7770681, strikes a motion to compel from a

12   nonparty based on its nonparty status.

13             Turning to the other formulation of ACN's request, a

14   nonparty cannot somehow cleave off and compel arbitration of

15   its discovery obligations under a valid Rule 45 subpoena.  The

16   Judiciary Act of 1789 gave federal courts power over nonparty

17   discovery.  As early as 1911, in the *American Lithograph* case,

18   the Supreme Court recognized that authority as essential to the

19   very existence and Constitution of a court of common law.

20             In the *Morton Salt* case in 1950, the court was clear

21   that that power derives from and is coextensive with a federal

22   court's power to decide the cases and controversies properly

23   before it.  So ACN's discovery obligations can't be cleaved

24   off; they are not separate from this Court's power to decide

25   and preside over this case.

1              I already mentioned Judge McMahon's decision in the

2      *Baleron* case.

3              Judge Kaplan's decision in the *Garlock* case may be

4      even more squarely analogous on the facts.

5              Just very briefly, in that case, Ernst & Young had

6      developed certain innovative new tax shelters called contingent

7      deferred swaps or CDS.  And Ernst & Young engaged a law firm to

8      issue opinion letters stating that this new tax shelter was

9      more likely than not to survive IRS scrutiny.  Plaintiff

10     purchased these shelters in reliance on those opinions and sued

11     the law firm, alleging malpractice, breach of fiduciary duty,

12     and other claims.  And then they served a subpoena on Ernst &

13     Young, seeking evidence as to whether Ernst & Young genuinely

14     believed that these shelters would survive scrutiny.

15             Judge Kaplan upheld that subpoena.  Ernst & Young had

16     argued that it had arbitration agreements with plaintiff

17     purchasers, and that those arbitration agreements somehow

18     modified or prevented nonparty discovery in the plaintiff's

19     lawsuit against the law firm.

20             Judge Kaplan, as well as two federal courts in

21     California, rejected that argument out of hand.  And Judge

22     Kaplan squarely held that a nonparty's arbitration agreement

23     with the plaintiff -- and again, I quote, "plainly has no

24     bearing upon the availability of discovery against it as a

25     nonparty witness in an action against another entity."

K49VDOEC

```
 1            THE COURT:  I'm going to stop you there, only because
 2    we have a long agenda and I understand the argument.
 3            So thank you.
 4            I'd like to hear from ACN now.
 5            MS. NIEHAUS:  Yes.  Good morning, your Honor.
 6            You know, I think the unprecedented --
 7            THE COURT:  Wait, wait, wait.  Sorry.  I'm sorry.
 8            Every time you speak you need to say who you are.  I
 9    know this is (inaudible).
10            MS. NIEHAUS:  My apologies.
11            This is Stephanie Niehaus, on behalf of ACN.
12            Your Honor, quite frankly, the case law that the
13    plaintiffs have cited in all of their filings is inapposite.
14    The Veleron case, they cherry-picked a quote.  The Garlock case
15    is also distinguishable in that ACN has attempted to file
16    arbitrations here, and that is bound up in our request, as you
17    know, for relief from the Court's orders allowing the
18    plaintiffs to proceed under pseudonym.
19            THE COURT:  Let me ask this:  First of all, there does
20    seem to be a little bit of ambiguity, as Mr. Quinn pointed out,
21    as to your position.  I guess I had assumed that you were
22    simply seeking to compel arbitration of this dispute, and that
23    you were not somehow trying to suggest that you had standing to
24    move the entire dispute to which you are not a party to
25    arbitration.  But could you confirm that?
```

K49VDOEC

1          MS. NIEHAUS:  Well, your Honor, I mean, I think that

2     there's a line somewhere, and the plaintiffs have made that

3     difficult in the way they've positioned this case procedurally.

4          But we do believe that any dispute with ACN would come

5     within the arbitration provision in the IBO agreement.  So that

6     certainly extends to the dispute that plaintiffs have raised in

7     this Court over the appropriate scope of discovery and what

8     they are able to compel from ACN.  But it also goes really to

9     the entire matter, given that the entire matter implicates a

10    dispute with ACN.  And that has just become evident with the

11    plaintiffs' motion to compel and the position that they've

12    taken on that.  So the motion to compel does extend to --

13          THE COURT:  Wait, wait, wait.

14          You're not disputing though that ACN is not a party to

15    the lawsuit before me; and that ACN, therefore, has no standing

16    to make an application to move the dispute into some other

17    forum, or are you?

18          MS. NIEHAUS:  Well, we certainly don't dispute that

19    ACN is a nonparty.  And that also is bound up in the discussion

20    over the appropriate scope of discovery here.

21          But the complaint that plaintiffs have filed and the

22    way they have approached the discovery with respect to ACN

23    really highlights that there is a greater dispute here with

24    ACN, whether or not they've brought claims.  And it's clear

25    that that was strategic to avoid their contractual obligations

K49VDOEC

1    to ACN.  So, you know, fundamentally, it may be that the entire

2    dispute needs to be heard before an arbitrator.

3         THE COURT:  I assume you've seen my ruling.  Are you

4    aware of any case where a court has compelled arbitration of a

5    dispute on the motion of a nonparty?

6         MS. NIEHAUS:  I am not aware of any such (inaudible),

7    but would appreciate an opportunity to research and brief that,

8    if that's a turning point for your Honor's decision here.

9         I think this is -- you know, I think both parties have

10   struggled to find applicable case law, because I'm not aware of

11   any situation where parties have so blatantly attempted to

12   avoid their contractual obligations to arbitrate by

13   strategically pleading around them.

14        THE COURT:  Well, I would just say that plaintiffs are

15   entitled to sue whomever they want; and they are not compelled

16   to sue parties who, for whatever reason, they don't -- they

17   don't want to sue.  And typically, the parties who are not sued

18   don't complain about not having been sued.  So it's an

19   interesting position you're taking.

20        I think I had one other question.  And I guess my

21   other question is similar, but narrower.  Are you aware of any

22   cases where a nonparty has persuaded a court that a discovery

23   dispute -- in other words, a third-party subpoena -- has to be

24   arbitrated, and that the Court doesn't have the power of the

25   jurisdiction to do that -- sorry, to adjudicate the third-party

K49VDOEC

subpoena?

MS. NIEHAUS:  I don't think either party here has cited a case on point because, again, I think this is an unprecedented situation.  But we certainly have cited case law to your Honor that indicates that the discovery dispute is properly within the scope of an arbitrator's review.

THE COURT:  Thank you.

Let me rule then first on this initial issue of whether the discovery dispute should be arbitrated.  And my ruling, which you may have guessed by my questions, is that the answer to that question is no, this discovery dispute is properly adjudicated in this Court.  And there are principally two reasons:

The first is that the dispute isn't within the scope of the arbitration agreement.  We all know that the initial question in any motion to compel arbitration or application to compel arbitration is whether the dispute is within the scope of what is required to be arbitrated.  And here, the arbitration clause encompasses only the dispute "as to the respective rights, duties, and obligations arising out of or relating to" the IBO agreement.

Plaintiffs' discovery requests here arise out of and relate to this lawsuit.  And the lawsuit is about defendants' purported bad acts, not about plaintiffs' rights, duties, or obligations under the IBO agreement.  And therefore, the first

1   basis for my holding is that the dispute isn't within the scope

2   of the agreement.

3          The second reason though is that the Court doesn't

4   have jurisdiction to compel arbitration of this discovery

5   dispute.  Plaintiffs' case law stating a federal court cannot

6   compel arbitration of claims over which they do not have

7   independent jurisdiction is persuasive to me.  A federal court

8   does not have independent jurisdiction over a discovery dispute

9   and, therefore, Section 4 of the Federal Arbitration Act is not

10  available.

11         I'm relying here or citing *Vaden v. Discover Bank*, 556

12  U.S. 49, 66, which held that a party seeking to compel

13  arbitration under the FAA may gain a federal court's assistance

14  only if, save for the agreement, the entire actual controversy

15  between the parties as they have framed it could be litigated

16  in federal court.

17         I am also relying on *Landau v. Eisenberg*, 922 F.3d

18  495, 497 (2d Cir. 2019), which says Section 4 of the FAA does

19  not enlarge federal court jurisdiction and, therefore, district

20  courts should look through the petition to the underlying

21  substantive controversy to determine whether the claim arose

22  under federal law.  Specifically, a district court should

23  assume the absence of the arbitration agreement and determine

24  whether it would have jurisdiction under Title 28 without it.

25         And so for those reasons, I find that I have

K49VDOEC

1   jurisdiction, and I am the adjudicator who must adjudicate this

2   discovery dispute.  So that is what I intend to do.

3        I would also just note that I am not going to accept

4   additional briefing on the issue of compelling arbitration.  I

5   would note that if -- well, we'll talk about that later, I

6   suppose.  I won't note anything else along those lines right

7   now.

8        To the extent that ACN is asking me to compel

9   arbitration of the entire dispute because they believe that it

10  is in some way a dispute with ACN, I don't agree with that

11  characterization, and I reject the proposition that they have

12  the standing to do that or that it's appropriate in any way to

13  do that.

14       So let me move on to another closely related issue

15  before we get to the issue of relevance and overbreadth.

16       There was an argument by ACN that at least class

17  discovery should be stayed pending any decision on the

18  defendants' arbitration motion because the arbitration

19  provision between ACN and the plaintiffs essentially

20  prohibits -- requires arbitration and prohibits any collective

21  or class proceeding.  Since this case will be proceeding in the

22  district court as opposed to arbitration, I think that argument

23  is moot.

24       So I'd like to turn now specifically to the relevance

25  and overbreadth questions.  And I guess what I would like to do

K49VDOEC

1    is start by making sure we are talking about the same standard,

2    and that is set forth in Rule 26, which says that the scope of

3    discovery is basically anything that's relevant to a claim or

4    defense, and proportionate to the needs of the case.  And the

5    rule lists the various factors.  I think they are nonexclusive

6    factors that bear on proportionality.

7              And so the first question is relevance.  And so I

8    heard Mr. Quinn essentially make his relevance argument.  I am

9    happy to hear from Ms. Niehaus in response on relevance.

10             MS. NIEHAUS:  Well, your Honor, I think our argument

11   really turns more on the proportionality issue, although we

12   have a couple of additional arguments.  I just want to, if I

13   could, go back to the class issue, which I think we have two

14   issues there.  And one is a prematurity issue as well, in that

15   we've objected to some of the discovery that plaintiffs have

16   sought from ACN on the basis that it's premature before any

17   class has been certified.  And that dispute was outlined in the

18   papers, I think, reasonably well there.  So I want to make sure

19   we don't lose sight of that one.

20             But in terms of relevance, there are a couple of

21   requests that we have objected to in terms of relevance.  And

22   the one that comes to mind -- I mean, we're dealing with, you

23   know, quite a few areas of inquiry here, as outlined in the

24   subpoena.

25             But plaintiffs have sought a tremendous amount of

K49VDOEC

discovery into ACN's financials, its revenue stream, over an

extremely broad period of time.  And as we noted in our

opposition papers, there's just no discernible relevance

between ACN's revenues and whether the various Trump-related

defendants defrauded or misrepresented anything about the

nature of ACN's business to these individual IBOs.

The tremendous amount of information sought --

THE COURT:  Could I ask a question?

And first of all, I acknowledge that you are

representing a nonparty.  And although the rule applies equally

to -- the rule on what is producible applies equally to Rule 45

subpoenas, it seems to me that the fact that you're a third

party tips the proportionality analysis somewhat or affects it

should be considered in the proportionality analysis.  And so I

think it's not appropriate to burden third parties with

requests that are unduly broad.

But my real question is a process question.  I gather

that you and the plaintiffs have never really engaged on the

issue of trying to narrow the requests so that they are more

efficient and responsive.  Is that right or am I

misunderstanding?

MS. NIEHAUS:  I think that's -- we've tried, on a

number of occasions, to have discussions.  We've hit a couple

of fundamental roadblocks, the most significant of which is the

protective order language.  We had proposed some revisions to

K49VDOEC

the protective order language.  We were not involved in

negotiating the protective order.  I'm not aware of any

authority that suggests that nonparties can't have separate

confidentiality orders that are sufficiently protective of

their interests as nonparties.

And so we've asked for some revisions to protect ACN's

interests, and the plaintiffs have flatly refused those

requests, which has prevented us from producing any

information.  And it's just simply incorrect for Mr. Quinn or

any of the other of plaintiffs' counsels to represent that we

refuse to produce documents --

THE COURT:  Can I -- are the proposed revisions

limited to the identity of the plaintiffs or are there other

kinds of revisions that you'd asked for?

MS. NIEHAUS:  We had proposed some them in-line

revisions to the nondisclosure agreement attached as the

schedule, I think, to the protective order, in order to

preserve ACN's right to pursue arbitration against the IBOs.

It was their jurisdictional revision to acknowledge that ACN

doesn't submit to the jurisdiction of the Court.  And they are

aimed, in part, at preserving ACN's right to pursue separate

arbitration for breach of the IBO agreement.

And so we have agreed to produce some information in

response to the subpoena; we've just been prevented in doing so

because we have reached an impasse on the confidentiality

1    order.

2              THE COURT:  Okay.  Thank you for that clarification.

3              MR. WILSON:  Your Honor?

4              THE COURT:  Yes.

5              MR. WILSON:  This is Andrew Wilson, for the

6    plaintiffs.  When at the appropriate time I could be heard on

7    the protective order issue.

8              THE COURT:  Well, now is a good time.

9              MR. WILSON:  So, your Honor, the proposed -- we have a

10   protective order in this case, of course; and our position is

11   that it's perfectly suitable to protect ACN's interests.  ACN

12   has asserted the objection that it described in its responses

13   and objections to the subpoena.  You have those at Bourland

14   Exhibit B, where the first objection that ACN asserts is that

15   anything that it responds in complying with the subpoena they

16   object to, to the extent it implicates their arbitration

17   rights.

18             But they wanted more, and they proposed their own

19   language at Bourland Exhibit C with a redline.  And our

20   position is that requiring the plaintiffs to stipulate and

21   agree that nothing in the nondisclosure agreement impacts ACN's

22   arbitration rights was overbroad and unnecessary.  To the

23   extent that the Court prefers, we would agree to an individual

24   NDA and protective order for ACN.  But we would ask that any

25   changes to that order simply allow ACN to preserve its rights

K49VDOEC

1     rather than require the plaintiffs to stipulate to those

2     rights.

3            But I think that there's a path forward on the

4     protective order that's either requiring ACN to stand on its

5     objections and using the current protective order, which we

6     think is the simplest course, or to have a protective order

7     solely for ACN, but that that protective order simply allows

8     ACN to assert its objections rather than make any affirmative

9     statements one way or the other about those rights.

10           THE COURT:  Okay.  So I think what I'd like to do

11    is -- I think it's premature -- well, give me just a minute.

12           I think it's premature for me to try to adjudicate

13    particular discovery requests and particular differences

14    concerning the protective order.

15           I would say a couple of things.

16           First, I think it's clear that some of plaintiffs'

17    requests are overbroad.  Frankly, that's not unusual; usually

18    the requests are a starting place for serious negotiation, and

19    I gather that that negotiation was thwarted here, in part,

20    because of the protective order.

21           So let me just say that I'd like you to go talk to

22    each other about the protective order.  I don't think it's

23    unreasonable for ACN to ask for certain additional or different

24    provisions in its protective order, given its different

25    positions *vis-à-vis* the plaintiffs, *vis-à-vis* the lawsuit.

K49VDOEC

1          I also think that it's perfectly reasonable for ACN to

2     want to preserve its rights and not concede anything in

3     complying with the subpoena.  But I also think that it's

4     perfectly appropriate for the plaintiffs not to have to concede

5     anything in the course of agreeing to the confidentiality terms

6     over ACN's actions.  And so what I do -- I ask the parties to

7     go back and discuss that.

8          Since it's been raised, let me also talk about the

9     class certification issue.  I know that the position of ACN is

10    that class discovery is premature (inaudible) class is

11    certified.  I agree to some extent, but I think it's more

12    nuanced than that.  I think the law is pretty clear that at

13    least some initial class discovery is appropriate in part so

14    that the class certification motion can be made.  And so I

15    would ask the parties to confer with each other about class

16    discovery that is appropriately cabined for the stage of the

17    litigation that we're in.

18         And then with respect to the actual production of

19    documents, I will order the parties to meet and confer, but

20    with the understanding that ACN needs to produce relevant

21    documents consistent with the dictates of Rule 26 concerning

22    the scope of discovery.  And I would also suggest that the

23    parties consider, rather than just voluminous document

24    productions, whether there might be more efficient ways for ACN

25    to provide some of the relevant information or to provide only

1    relevant information and not information that is -- really has

2    no bearing on the lawsuit.  So, for example, interrogatory

3    (inaudible) or a summary chart or something of that nature

4    might be more appropriate than a large document production on

5    particular topics.

6          So what I'd like you to do is go back, meet and confer

7    on that.  Give me a letter in two weeks and tell me where

8    things stand.  And I'll figure out whether we need to meet

9    again.  I am hoping not.  I am hoping that with this framework,

10   that the parties can talk to each other and be reasonable in

11   addressing what the scope of discovery should be.  Various

12   lawyers usually can do that after they get over, sort of, the

13   threshold fundamental issues.

14         Let me just say something about the time frame of the

15   documents that need to be produced.  I know it's been a point

16   of contention.  I'd like the parties to meet and confer on this

17   as well.  But I would say that the time frame applicable may

18   well vary depending on the request.

19         And just as an example, if the request is about the

20   nature of the relationship between ACN and defendants, then

21   information about the commencement and evolution of the

22   relationship would seem to me to be relevant.  On the other

23   hand, if the request is about marketing materials, then

24   limiting the time period to the class period would seem to be

25   relevant.  And so I would ask you to consider the appropriate

1    time frame with respect to individual requests and the

2    relevance of the time frame with respect to that request.

3              Any questions?

4              MR. QUINN:  No questions from the plaintiffs, your

5    Honor.  And we understand and appreciate the Court's guidance

6    on all of those matters.

7              THE COURT:  Okay.

8              MR. WILSON:  Your Honor, I actually -- this is Andrew

9    Wilson, for the plaintiff.

10             I do have one clarifying question.

11             THE COURT:  Yes.

12             MR. WILSON:  Your Honor's ruling is quite clear that

13   it's appropriate to have discovery at this stage concerning

14   class issues.  And I just wanted to draw our attention to the

15   fact that the timing objections that ACN has asserted are

16   really limited to only ten of the requests; and they are

17   requests that seek data that directly relate to class issues:

18   The numbers of people who applied, who signed up, and related

19   financial terms.

20             And so I just wanted to be clear that as we meet and

21   confer, we certainly have heard the Court and will work with

22   ACN to narrow the requests.  But as a category, those requests,

23   namely, numbers 22 to 32, that deal with classwide issues, are

24   appropriate for discovery.  Because I think that --

25             THE COURT:  Well, let me just interrupt here and I'll

K49VDOEC

clarify my thinking.

I'm not looking at your particular requests, so I'm not going to bless them in the way they are stated.  But what I would say is that there are well-understood requirements of what you need to show in order to obtain class certification, including things like numerosity.  And so issues that go to the requirements of Rule 23 I would think are fair game at this point.

In terms of proving the merits of your case, independent of Rule 23 considerations, with respect to a class, I think, might appropriately wait for determination on class certification.  But I'm willing to hear argument as to any particular issue you can't agree on.

But what I'm really trying to do is since basically nothing has happened so far between the plaintiffs and ACN, I would like to just get the ball rolling, get something started.  And if there are additional things that need to be picked up at some later point, we can do that.  Okay?

MR. WILSON:  This is Andrew Wilson, for the plaintiffs.  Thank you very much, your Honor.

THE COURT:  Okay.  So now what I'd like to turn to is ACN had requested release from the order permitting plaintiffs to proceed anonymously so that ACN can commence arbitration proceedings against them.  And I gather from Ms. Niehaus's comments earlier, that the nature of that is for breach of the

K49VDOEC

1    IBO agreement.  Is that right, Ms. Niehaus?

2               MS. NIEHAUS:  Yes, primarily.  I mean, I think we have

3    some additional potential causes of action and requests for

4    relief in arbitration; but, yes, we view plaintiffs as being in

5    breach of the IBO agreement on several grounds.

6               THE COURT:  Okay.  And I'm curious, what are those

7    grounds?  Are they divorced from what's going on in the lawsuit

8    or related?

9               MS. NIEHAUS:  They are related.  And I am a little

10   circumspect here because I'm aware that there are members of

11   the press on the line here.  And as was indicated in some of

12   our previous filings, I mean, one of the fundamental issues

13   here is that ACN bargained for private arbitration; and so, you

14   know, we view those issues as being, you know, within that

15   private realm.

16              THE COURT:  Okay.  I understand what you're saying.

17              So I've read your submissions.  And what I'd like to

18   do is rule on them and then perhaps make a comment.

19              Basically, I don't believe that ACN has standing to

20   ask for relief basically that, in this lawsuit, the plaintiffs

21   should not be proceeding anonymously.  That is based on *AT&T*

22   *Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005), which

23   says that permissive intervention is the proper method for a

24   nonparty to seek modification of a protective order.

25              But (inaudible) that although I don't think you have

1   standing to change the terms on which the case is being

2   litigated, that is, plaintiffs being disclosed or not, I think

3   you and the plaintiffs certainly have the power to negotiate

4   whatever terms you think are appropriate in the protective

5   order.  As I gather from a very brief look at what the

6   plaintiffs want, it didn't look as though they were asking for

7   plaintiff-specific materials and, therefore, it may not even be

8   an issue that arises in your own negotiations.

9           But, in any event, to the extent that you're asking me

10  for relief at this time that is broader than the scope of your

11  protective order, I'm going to deny that.

12          Then -- yes.

13          MS. NIEHAUS:  May I actually request reconsideration

14  of that?  I think that the permissive intervention framework is

15  slightly misplaced.  And I read through plaintiffs' submission,

16  and that was my reaction to it.  Because in those cases and

17  amici and key (ph) cases, specifically on the other cases

18  cited, the Court was addressing a request of a complete

19  stranger to the litigation to essentially clone discovery for

20  purposes of another case, and found that permissive

21  intervention was the correct procedural mechanism there.

22          In this case, we've already been dragged into this

23  litigation; we're properly before the Court.  And what we are

24  asking for is very limited relief, not broad relief from the

25  protective order, but very limited relief for the Court to

K49VDOEC

1   require the plaintiffs to disclose their identities to ACN so

2   that ACN can vindicate its contractual rights.  In this case,

3   the plaintiffs are using the Court's order allowing them to

4   proceed under aliases as both a sword and a shield.  And it's

5   fundamentally unfair, and it compromises -- considerably

6   compromises ACN's contractual rights.

7               THE COURT:  Let me address that in two ways.

8               First, the motion for reconsideration is denied.

9               In my view, ACN is a stranger to these proceedings.

10   You are really just a witness here.  And what you're asking for

11   is some kind of relief that is independent of your role in the

12   litigation.  Your role in the litigation is simply as a

13   third-party witness.  What you're asking is for me to compel

14   the plaintiffs to disclose their identity to you for reasons

15   that have nothing to do with this litigation so that you can

16   commence a separate lawsuit against them, which that doesn't

17   seem appropriate to me here.

18               However, what I will also say is I don't really have

19   any interest, as the judge presiding over this lawsuit, in

20   whether or not you arbitrate or don't arbitrate or commence

21   arbitration proceedings against the plaintiffs.  You have an

22   agreement with them; it's certainly within your right to do

23   that.

24               And what we'll discuss in a few minutes is the issue

25   of whether the plaintiffs can continue to proceed anonymously

K49VDOEC

1      in this case.  The question of the impact on third parties may

2      be relevant to that discussion.

3               So let me just leave it at that.

4               The last dispute directly related to ACN is ACN's

5      application to quash the Anne Butcher subpoena.  But I think

6      that was filed just yesterday.  I don't have a response from

7      plaintiffs; I don't have a response from Butcher.  So I'm going

8      to table that and ask for a letter response from both.  And

9      I'll put that in the written order that follows today's

10     proceeding.

11              MS. HENDON:  Your Honor, I'm sorry, it's Joanna Hendon

12     for the defendants.  I did not mean to interrupt, but I wanted

13     to be heard on the last issue, if I might, before we turn

14     to another one.

15              THE COURT:  Sure.

16              MS. HENDON:  As your Honor is aware, the defendants

17     joined in ACN's request for relief from the protective order.

18     We also separately made the application that you've alluded to,

19     that plaintiffs be required to revisit the pseudonymity

20     question more broadly.

21              But on the first issue that was just discussed, the

22     defendants obviously have an interest here, because we have

23     largely plaintiff-specific discovery that we need from ACN.

24     And our ability to get any of that at all is defeated by ACN's

25     ability -- inability at this time, given the terms of the

K49VDOEC

 1    protective order, to comply and provide either side with

 2    plaintiff-specific discovery.

 3             So while I think --

 4             THE COURT:  I'd like to just interrupt you for a

 5    minute.

 6             I had intended to talk about your application that

 7    plaintiffs no longer proceed under pseudonyms a little bit

 8    later.  But since you've raised it, let me just say that I --

 9    first of all, just to review the history of this, I had made a

10    ruling with findings allowing the plaintiffs to proceed

11    anonymously, but that was a ruling that was limited to the

12    period before the decision on your motion to dismiss.  And then

13    the parties agreed to a protective order that, in effect,

14    continued that practice.  And as I understand it, the

15    defendants now want to revisit that for the reasons that you've

16    just explained.

17             I understand that the plaintiffs oppose that; they

18    view it as a motion to reconsider; they think it is not

19    appropriate now.  I don't agree with that.  I think that it is

20    an issue that is fairly raised at various points in the

21    litigation, because I think that the propriety of allowing the

22    plaintiffs to proceed anonymously varies at different points in

23    the litigation.

24             What I would like to do is I would like you to talk to

25    each other again, and meet and confer on the issue of whether

K49VDOEC

```
1     they should be able to proceed anonymously and, if so, to what

2     extent.  Either the current protective order strikes a middle

3     ground between complete public disclosure of their identity and

4     having no one know who they are.

5            And so what I'd ask is for you to revisit the question

6     now, given the state of litigation, given the need for the

7     defendants to obtain plaintiff-specific discovery.  Given the

8     impact on third parties like ACN, I'd like you to talk about

9     that, and then give me a letter in -- what should we say -- two

10    weeks, telling me what your -- where you are on that.  What I'm

11    hoping is that you will agree to a new protective order that

12    takes into consideration some of these factors.

13           To the extent that you can't, then at that point I

14    might want to hear about specific issues; because at the moment

15    the arguments are quite broad.  And then we'll take it from

16    there.  But I'd like you to talk to each other first, with the

17    guidance that I've just given you.

18           MS. HENDON:  That's fine.

19           It's Joanna Hendon, your Honor.

20           I just wanted to say two things.

21           We objected very strongly to the terms of the

22    protective order that your Honor ultimately signed.  And also,

23    just to be very clear, we will, of course, meet and confer with

24    plaintiffs on these issues and follow your Honor's guidance.

25           But the core and critical issue for us, so nobody is
```

1    surprised, is our ability to give the names that we have to

2    ACN, because that is the key and core repository of

3    plaintiff-specific information.  And it's going to be our

4    ability to reach agreement on that point -- as well as

5    others -- but critically on that point, that is going to, I

6    think, drive whether there's agreement or not.  We just can't

7    proceed without that.

8            THE COURT:  What I hear you telling me is that it is

9    unlikely you're going to reach agreement for all the reasons

10   we've been talking about this morning.

11           But I'd like you --

12           MS. HENDON:  That's my concern.

13           THE COURT:  It is my concern, as well.  I have seen

14   parties who negotiate in good faith accomplish incredible

15   things, and that's what I'm hoping will happen here.

16           So to the extent you can't agree, obviously I will

17   rule.  But I respect your clients' need to get discovery about

18   the plaintiffs, and I think the plaintiffs understand that.

19           MR. QUINN:  Your Honor, if I may just very briefly, we

20   do and we will certainly work with defendants and with ACN to

21   try to resolve these issues.  I do have some optimism that we

22   might be able to do so.

23           I think from plaintiffs' perspective, at a fundamental

24   level, there is simply a sharp distinction between facilitating

25   discovery in this case, where we are willing to work with

K49VDOEC

defendants and ACN, and we understand why defendants do want to

provide confidential information to ACN to facilitate

plaintiff-specific discovery, and we've got no conceptual

problem with that.  And we've already expressed some openness

to ACN's specific reservations in the protective order NDA.

            But there's a sharp distinction between that, where I

think we can hopefully find some agreement, versus

modifications designed to facilitate a separate arbitration

which we don't believe is an appropriate purpose for

modification or for the provision of confidential identity

information.

            So within that framework, we're very happy to

negotiate with both ACN and defendants, and we will do so and

report to the Court.

            MS. NIEHAUS:  This is Stephanie Niehaus, for ACN.

            On that point, I think we also are going to have a

fundamental problem because, you know, I understand your Honor

saying that the Court is really not concerned with whether or

not ACN proceeds with arbitration against the plaintiffs.  But

it is the Court's current order and plaintiffs' unwillingness

to disclose their identities that is standing in the way of ACN

initiating those arbitrations.  It is the only thing standing

in the way of ACN initiating those arbitrations.  And if

plaintiffs are not willing to disclose their identities so that

we can file those claims, we will need the Court's

K49VDOEC

1    intervention.

2              THE COURT:  I understand.

3              I don't view it as my role to facilitate your filing

4    of claims.  But I also don't view it as my role to create

5    barriers that are solely to prevent you from filing your claim.

6    That is something that is not in my domain or jurisdiction.

7    That is subject to your arbitration agreement, and I don't

8    intend to interfere with that.

9              And so what I would like to do is just focus on the

10   case that is before me, what the legitimate needs of the

11   parties are for discovery -- some of that means discovery from

12   you -- and then we'll take it from there.  So let's not get

13   ahead of ourselves.

14             But I just want to be clear to the plaintiffs, as

15   well, that I don't view it as my role to help you prevent any

16   arbitration against the plaintiffs by ACN, or vice-versa, to

17   promote it.

18             So I think that means we're done with the ACN issues.

19             I'd like to move on to the MGM subpoena now.

20             And let me just find my appearance sheet here.  We

21   have Ms. Stebbins Bina, right?

22             MS. STEBBINS BINA:  Yes, your Honor.

23             THE COURT:  Okay.  So just to tee it up, I know that

24   plaintiffs have brought a motion to compel your clients, which

25   I'm going to call the MGM entities, to produce certain

1    materials; and that over the course of months, the parties --

2    or the plaintiff has narrowed that request to certain

3    off-screen footage -- in other words, footage that was ever

4    aired -- of two television episodes of the *Celebrity*

5    *Apprentice*, where ACN featured.  And one was in March 2009, and

6    one was in March 2011.

7         And I understand that the MGM entities oppose the

8    request primarily on relevance and burden grounds.

9         So let me begin with a question to Ms. Stebbins Bina:

10        Has your client made an effort to actually locate the

11   tapes that are at issue here, so that we are not talking

12   hypothetically, but about reality?

13        MS. STEBBINS BINA:  Your Honor, we have not gone to

14   look for these specific tapes, but we have engaged in this

15   exercise in connection with other litigations.  So we have a

16   very good sense of what it involves.

17        Part of why we are resisting this discovery is to

18   attempt to avoid what is the very time-consuming and cumbersome

19   effort of locating the file that might be on point.  Each

20   episode has hundreds of audiovisual files.  And because they

21   were produced over a decade ago by a company that MGM later

22   acquired, they are in a variety of formats and they are not

23   labeled.

24        We can find the ones for these episodes, but in order

25   to find which ones might have the ACN witnesses on them would

K49VDOEC

1    actually involve the very burden we are trying to avoid, i.e.,

2    reviewing hundreds of hours of footage for each episode.

3            THE COURT:  So I guess, just to cut to the chase on --

4    well, let's cut to the chase on that.  Because as we know, the

5    plaintiffs have offered to basically pay for whatever the costs

6    are of producing -- or at least the reasonable cost of

7    producing these materials.

8            I understand you're saying that -- the issue isn't

9    really one of dollars -- although time ultimately translates

10   into money -- but it's that it would take a long time.  And I

11   guess what I don't understand is, so there are hundreds of

12   hours of video footage that were created for the March 2009

13   episode, and the same for the March 2011 episode.  And only a

14   little bit of that was put together, spliced together, to

15   create the episode, and the rest is all just off-screen

16   footage.  Is that right?

17           MS. STEBBINS BINA:  The rest has never aired, your

18   Honor.  There's a variety of kinds of footage, right.  Some of

19   it is portions of the footage that was aired, like, for

20   instance, someone might say something, and then, you know, it

21   didn't quite sound right, so it's repeated, and things like

22   that.

23           There is all of the footage of the contestants

24   completing their tasks.  There are multiple camera angles for

25   most scenes; so at any point when everyone is in one room,

K49VDOEC

1      there won't be just one camera on them, there will be two or

2      three or four cameras; there will also be simultaneous audio

3      footage going.

4              So to find, for instance, let's say, a 30-minute set

5      of footage where Mr. Trump and the ACN executives were in a

6      room together, might involve, you know, a half a dozen

7      different video and two or three different audio clips, all of

8      that same -- that same scene at the same time, if that gives

9      you some idea.

10             THE COURT:  Here's what I don't understand:  It seems

11     to me that an argument can be made that all of the footage has

12     some potential relevance to the claims and defenses here.  Why

13     not just take these hundreds of hours of footage for these two

14     episodes -- because you said you could find those -- you know,

15     put them in a room with the plaintiffs' representatives, and

16     put a paralegal in the room or some other -- you know, some

17     junior lawyer, somebody who can make sure that nothing is

18     tampered with, and then let the plaintiffs figure out what is

19     relevant.  Because we're not talking about, I think, anything

20     sensitive here; we're just talking about hundreds of hours of

21     footage, most of which was deemed to be not useful (inaudible).

22             MS. STEBBINS BINA:  Your Honor, there was some

23     interference on the line; I didn't hear the last bit of what

24     you said.  I'm not sure if someone went off mute.

25             THE COURT:  I think you get my gist.  Why not just let

K49VDOEC

1    the plaintiffs figure that out?

2          MS. STEBBINS BINA:  Well, so, your Honor, it's not

3    quite that simple.  We need to rent the machines, we need to

4    find a location, we need to get -- there's several different

5    kinds of machines that will need to be rented.  My clients'

6    offices are currently shut down for the foreseeable future for

7    COVID-19.  So it's not clear that this process could even begin

8    for probably two months.  So there are a number of logistical

9    barriers.

10         There's also some issues -- because both of these

11   episodes were of the *Celebrity Apprentice*, and there are a

12   number of contractual obligations to celebrity participants

13   about when and how their footage could be shown, and to whom it

14   could be shown and things of that nature, that do weigh on the

15   privacy interests of persons who are not at issue in this

16   litigation at all.

17         So to avoid any of those issues, I think it would need

18   to be reviewed first by my clients in order to essentially

19   bring out only those portions that deal with the ACN witnesses,

20   and not, you know, either contestants on the show or other

21   celebrities on the show, all of whom have privacy issues in

22   terms of their footage being shown.  So those are some of the

23   concerns.

24         Your Honor, I'd also like to be heard on the question

25   of relevance, because I think we tie in the question under Rule

K49VDOEC

1    26 of relevance and proportionality.  And obviously, the

2    greater the relevance, the lower the burden -- the less weight

3    a burden objection has.

4            THE COURT:  Let me just preempt that, because I

5    actually had a question for the plaintiffs.

6            And that is that, as I understand it and as has been

7    represented here, the defendants did not make any of the

8    editing decisions with respect to the tapes; and that the

9    so-called actual producers of the show were the ones who were

10   responsible for the editing.  And if that's the case, then what

11   is the relevance of these tapes?

12           MR. QUINN:  Your Honor, this is John Quinn, again,

13   from Kaplan Hecker.

14           I think the answer to that is twofold:

15           First and foremost, while line producers might have

16   actually made the edits themselves, the defendants were

17   producers and co-owners of the show; these line producers

18   worked for them.  And Mr. Trump in particular was an executive

19   producer of the show, was their boss.  So these are defendants'

20   agents making editing decisions, and those decisions are

21   relevant.

22           Even beyond that, as MGM itself acknowledges in the

23   Edwards declaration at ECF 175, paragraph 8, Mr. Trump himself

24   did offer at least some editorial input.  You know, they argue

25   it was just a little bit, it was --

K49VDOEC

1          THE COURT:  But I thought the editorial input was

2     about the boardroom scenes.

3          MR. QUINN:  It may have been.  I think they do say

4     that is usually what the input was about.  But those boardroom

5     scenes also include discussion of ACN and its business, or

6     unaired footage might have included more of that.

7          So any editorial input, direct or indirect, is of

8     extraordinary relevance, given the context, which is that these

9     are seminal moments in the history of ACN; they derive (ph)

10    enormous amounts of recruitment, as ACN's own publicly issued

11    documents have said.

12         THE COURT:  What is the basis for your belief that

13    defendants ultimately controlled the editorial content,

14    regardless of what these producers did, or given what these

15    producers did on defendants' behalf?

16         MR. QUINN:  Again, I think the basis is twofold.

17         First, it's a matter of public record that Donald J.

18    Trump was an executive producer on the show.  And beyond that,

19    Trump Productions was a 50 percent co-owner of the show.  So I

20    think for both of those reasons, these line producers

21    ultimately were working for defendants, at least in part.

22         And I think one additional point, your Honor, on

23    relevance here, which is even beyond the question of editing,

24    we're talking here about video and audio recordings of the

25    defendants and their representative with key ACN executives, in

K49VDOEC

```
 1    a room, in person, at the very time that they are shaping the
 2    message that will be presented to viewers about ACN.  That
 3    evidence is highly relevant in and of itself.  Defendants were
 4    already party to a promotion and endorsement agreement with
 5    ACN, which was not disclosed to investors.  And here they are
 6    in a room where they are crafting a presentation of ACN's
 7    business, after which a very small portion of that footage is
 8    made public.
 9              THE COURT:  Okay.  I understand --
10              MS. HENDON:  Could I be heard?
11              For the defendants, your Honor, Joanna Hendon.
12              Very briefly.
13              THE COURT:  Let me hear from Ms. Stebbins Bina first,
14    and then I'll hear from Ms. Hendon.
15              MS. STEBBINS BINA:  Thank you, your Honor.
16              This is Ms. Stebbins Bina from Latham.
17              So I'd like to respond to a number of different points
18    that were just made by counsel, because I don't think they are
19    supported by the evidence.  And frankly, that's part of our
20    concern here, is there really is just rank speculation as to
21    the relevance of this footage.
22              The first is this idea that somehow because Donald J.
23    Trump was an executive producer credited on *The Apprentice*,
24    that line producers were reporting to him.  That's not
25    consistent with the evidence that's been presented in this case
```

K49VDOEC

and it's not consistent with reality.  In any television

production there are credited producers and they have different

roles on the show.

        The only evidence in the record is that the

professional producers of the show were exclusively responsible

for editing footage; and then none of the defendants in this

case had any role in that.  And that's undisputed, unrebutted

evidence that's been put in in connection with this motion.

        Related to that, the boardroom scenes, as anyone who

watched *The Apprentice* will remember, are the scenes in which

Mr. Trump -- now President Trump -- was discussing which cast

member was going to be fired.  So they are explaining

themselves and why they did, you know, a good job on the task

or a bad job on the task.  They have nothing to do with

representations about whatever task a partner was involved that

week or the representations on the show.

        The other idea that they've presented here, that

somehow on the -- you know, on the air there were

modifications, either they were crafting some presentation of a

cast partner, is not true either.

        Those scenes were scripted primarily.  We've provided

the scripts.  We provided all the negotiations between the

show's producers and ACN about what those scripts should be,

the back-and-forth.  We've provided 4,000 pages of

correspondence, literally all the correspondence my clients

K49VDOEC

 1    ever had with the ACN entities or their agents, that show the

 2    script's formation, show the negotiations between the lawyers,

 3    show that, you know, the defendants in this case weren't

 4    involved in it.

 5         So the suggestion that, you know, for the 30 minutes

 6    or so that Mr. Trump might have been -- or any of the other

 7    defendants might have been in the same room with the ACN

 8    defendants -- I'm sorry, the ACN parties, while they were being

 9    filmed on scripted content -- and there's something incredibly

10    illuminating about what I understand plaintiffs' claims to be,

11    which is that they were not aware that there were relationships

12    between -- contractual relationships between defendants and ACN

13    at the time they chose to become ACN sellers.  It just seems

14    really wildly speculative that there would be anything of even

15    the slightest relevance that could be seen in that footage.

16         THE COURT:  Let me ask a question.  Are you saying

17    that on these unaired tapes where the defendants and ACN

18    representatives are both on the tape, or both in the same room

19    and it's captured on tape, that the entirety of their

20    communications were scripted; that there was no possibility or

21    opportunity for them to say anything that wasn't scripted?

22         MS. STEBBINS BINA:  Your Honor, when you're filming a

23    reality television show, there is always the possibility that

24    somebody will say something unscripted; and certainly I think

25    there may have been ad-libbing from time to time.

1          But the sections that -- as reflected in the Edwards

2     declaration, there are really only two times that the

3     defendants and the task partner -- in this case ACN -- would

4     have been on set together, even in the same building.  And

5     those are the presentation of the task, and then there's a

6     debrief at the end where they discuss the performance.

7          The presentation of the task is scripted.  There may

8     be a very minor variation from that script, but it's scripted.

9     And we've already produced the scripts to the plaintiff.

10          The evaluation of the task isn't scripted, but it's

11     still very -- it's a particular purpose; it's the scene at the

12     end of the show where the cast partner -- in this case, ACN --

13     discusses how the two teams did at the task; did they do a good

14     job on the commercial, did they do a bad job on the commercial,

15     which team did better, was it the boys or the girls who had the

16     better presentation.  That takes like -- I think the call time,

17     as we put forth in our evidence, is literally 30 minutes where

18     they are even in the same room.  And it's tightly focused on

19     that particular task.

20          So the odds of there being something, you know, unique

21     or relevant to this lawsuit is extraordinarily low to begin

22     with.  And then even if there were something, the editorial

23     choices of the line producers of what to put on television, I

24     just don't see how that has any bearing one way or the other on

25     the claims or defenses in this case, because it isn't something

K49VDOEC

1    that any of the defendants had control over.  That footage was

2    shot, it went to the professional producers on the show, they

3    edited it presumably to get good ratings and have compelling

4    television.  Those aren't issues in this case, to my

5    understanding.

6                THE COURT:  Okay.  Ms. Hendon?

7                MS. HENDON:  Nope.  All of the arguments that I would

8    have made have been made, your Honor.  Thank you.

9                THE COURT:  Okay.  Can I hear from the plaintiffs.

10               MR. QUINN:  Yes, your Honor.  Thank you.

11               John Quinn again from Kaplan Hecker.

12               I'd say a few things in response.

13               First, it's difficult to respond on the facts of some

14   of these points because we don't have the discovery.  So when

15   Ms. Stebbins Bina notes that certain points are unrebutted,

16   that's simply because they've put in an affidavit and we don't

17   have discovery with which to test any of those assertions.

18   And, of course, the standard isn't whether we can now establish

19   that there definitely exists some incredibly illuminating and

20   highly relevant discovery.  That's simply not the standard.

21               MGM has conceded that there is footage that was

22   unaired of the defendants and ACN representatives in a room.

23   They have conceded there was some ad-libbing.  Of course, there

24   are also -- there's also footage of both defendants and ACN

25   separately communicating with contestants and others.  And all

K49VDOEC

1   of that was in the context of ACN as a corporate sponsor and

2   its business, therefore being a subject of discussion.

3          I think if there were emails between the defendants

4   themselves and ACN executives from this time period immediately

5   surrounding the filming of the seminal and important episodes,

6   I think there's no question that those emails would be a proper

7   subject of discovery.

8          So I think that the only complicating factor here is

9   the format and the method of retention which presents purely a

10  burden issue and one that we've addressed fully, both by

11  agreeing to accommodate MGM and be reasonable in our approach

12  to these issues, our agreement to cover all of their costs, and

13  the protective order that has been entered into (inaudible)

14  addresses the confidentiality (inaudible).

15         THE COURT:  I'd like to just inquire about the

16  comparison you just made with emails.

17         I could see footage that was clearly highly relevant,

18  and footage that ends up not being relevant.  And you're right,

19  the test isn't for you to establish at this point the high

20  probative value of what you're -- or on the other hand, the

21  relevance is part of the balancing test.  And I guess if we

22  were talking about search terms, for example, and burden, if

23  there were a search term that would greatly increase the

24  burden, but seemed to be of limited probative value, I could

25  see ruling that perhaps that was just too burdensome.

K49VDOEC

```
1              But my real question is this:  I think you make a good
2     point that you don't really have discovery here.  Were you
3     planning to take discovery of the MGM entities, in addition to
4     what you already have?
5              MR. QUINN:  I don't believe at this point that there's
6     any outstanding discovery we are seeking from MGM other than
7     this category of unaired footage.  Other than that, we've been
8     able to reach agreement with respect to documents and all other
9     issues.  So there are no other open discovery issues.
10             THE COURT:  What I mean is, for example, you might
11    want to take somebody's deposition about the editorial process
12    over there and the editorial input that the executive producer
13    and the other defendants may have had.  And that would be
14    helpful in itself, regardless of what the answers were, I mean
15    it's helpful to one side or the other.  But it might also shed
16    some light on this request for unaired footage.
17             What's your reaction to that?
18             MR. QUINN:  I certainly take the Court's point.  I
19    think -- I have two reactions.
20             First, notwithstanding the editorial issues, the fact
21    would still remain that this is recording of conversations
22    between the key players at a key moment about how ACN's
23    business will be presented to a national audience.  So a
24    record, a recording of those conversations is relevant separate
25    and apart from the editorial issues.
```

1          And then I think that the format of storage where

2     these recordings simply exist -- they are designated by

3     episode, but otherwise they are simply a pile of footage --

4     makes it harder for us to narrow the requests any more than we

5     already have, which was to narrow to unaired footage recorded

6     in connection with these two episodes.  So while certainly one

7     of the targeted (inaudible) and limited as possible, I'm not

8     sure that we can, absent just reviewing the footage at this

9     point.

10          THE COURT:  Would your client be amenable to basically

11     be spending the time going through the footage?  I mean I

12     understand there are other logistical issues, but you more or

13     less agreed to pay for these by renting the equipment and

14     putting it somewhere.

15          But would your client or you, I guess, be amenable to

16     paying for -- or forget paying, for reviewing the hundreds of

17     hours of footage relating to these two episodes to figure out

18     what is relevant?

19          And then I guess the related question is, you know,

20     we've heard from counsel for the MGM entities that they have

21     contractual restrictions on who can be shown what, although

22     that was said at a very high level of generality.

23          What is your thought about that?  I'm just trying to

24     figure out how to solve this in a way that's fair to everybody.

25          MR. QUINN:  Sure.  I appreciate that and appreciate

K49VDOEC

1     the question.

2              To the Court's first question, absolutely yes, we are

3     prepared and willing to undertake the review and then to meet

4     and confer about any pieces of the footage that we believe are

5     relevant or are proper discovery, to then meet and confer with

6     MGM to try to reach some agreement on what set of materials,

7     you know, is proper discovery.  So absolutely yes on that.

8     And, of course, we will be accommodating in every way possible

9     to minimize the burden on MGM and, in view of the current

10    COVID-19 pandemic, to do this in a way that is healthy and safe

11    for all involved.  So absolutely yes on that question.

12             As to the second question, I think that this is a sort

13    of a new argument from MGM.  I don't recall them raising

14    previously specific contractual agreements with some of the

15    contestants and confidentiality issues.  I think my initial

16    reaction to that is that the protective order in place provides

17    appropriate protection.  This is, of course, you know, somewhat

18    commonplace that materials produced in litigation subject to a

19    confidentiality order, you know, have contractual

20    confidentiality commitments associated with them.

21             So my initial reaction is that the protective order

22    would be an answer to those concerns; but, of course, we are

23    prepared to meet and confer on that too.

24             THE COURT:  I guess --

25             MS. STEBBINS BINA:  Your Honor?

1          THE COURT:  (Inaudible) they may be contractually

2     prohibited from sharing certain information without getting the

3     permission of people.  And I'm not sure that addresses the

4     protective order.

5          So here's what I'm going to do:  I find that the

6     material is relevant because of largely arguments that we've

7     heard from the plaintiff.  I'm not going to repeat the

8     arguments.  What I hear and understand is that there may be

9     logistical issues.

10         What I would like you to do is meet and confer about

11    overcoming those logistical issues, because it seems to me

12    appropriate that the tapes from these two episodes be made

13    available to the plaintiffs.  They are willing to go through

14    all of them.  If the better way to proceed is for the MGM

15    entities to go through them first, that's something that needs

16    to be explored.

17         And so I'd like you to go back and talk to each other

18    more about the contractual constraints, how MGM would really

19    like to handle this, and then present it to me, and I'll make a

20    final ruling.  Because I feel like there's still areas that

21    need to be explored here.

22         MS. STEBBINS BINA:  Your Honor, may I ask a brief

23    clarifying question?  And it may be that this is part of our

24    meet and confer.

25         This is Ms. Stebbins Bina.

1          My understanding prior to five minutes ago has been

2     that plaintiffs were only seeking those portions of the tapes

3     where the -- where the ACN representatives were on screen

4     either with or without the defendants in this case.  It seems

5     like they may now be seeking all of the unaired footage for the

6     episodes.  I'm not sure --

7          THE COURT:  Can I interrupt?

8          That was my idea.  Your complaint was we can find all

9     the footage for these two episodes, and it is too burdensome

10    for us to pick out what is precisely relevant, and therefore we

11    don't want to produce anything.

12         And so what I wondered is whether that burden could be

13    shifted to the plaintiffs, to have them go through the hundreds

14    of hours of tapes to pick out what is relevant, and then

15    relieve you of some of that burden.

16         MS. STEBBINS BINA:  I understand, your Honor.

17         I think because of the contractual issues that I

18    raised earlier, as well as other contestant privacy issues, it

19    would probably be -- notwithstanding the burden -- better for

20    us to go through them in the first instance.

21         But I just wanted to make sure that your Honor hadn't

22    made a broader ruling that every scrap of footage was relevant

23    to the case.  It seems like your Honor is willing (inaudible)

24    regarding relevance, relates to those portions where the ACN

25    persons are filmed.

K49VDOEC

1          THE COURT:  Since that's what they asked for and that

2     is what seems most relevant, I'm happy to focus on that.

3          And I wondered -- and thank you for clarifying --

4     whether you might decide, on balance, that you would rather

5     bear the burden of going through the tapes and finding the

6     relevant portions versus having to deal with the complications

7     of having the plaintiffs bear that burden, because they are

8     relative burdens.

9          So in light of that, what I'm going to rule then is

10    that to basically grant the plaintiffs' motion to compel the

11    tapes.  I find that they are highly relevant for the reasons

12    that the plaintiffs have put on the record.  Although I

13    recognize there is some burden, it seems to me that the burden

14    is surmountable and, in some ways, better or preferable to the

15    burden of approaching this in some other way.

16         And so that's my ruling.

17         I think we have already dealt with the anonymity

18    issue, which was the last issue.  And so that is my agenda.

19         Is there anything else we must discuss today?  I know

20    we've been going for quite a while.

21         MR. QUINN:  Nothing further from plaintiffs, your

22    Honor.

23         THE COURT:  Thank you.

24         MS. STEBBINS BINA:  This is Ms. Stebbins Bina.

25         The only clarifying question I have -- and this may

K49VDOEC

1    not be necessary -- I'm not sure what the discovery cutoff is

2    in this case, being a nonparty.  I do anticipate it will be a

3    month or more before our clients can even access the office,

4    most likely two months.  I assume that that won't be an issue

5    if the production timeline is necessitated to be later because

6    of COVID-19.

7               THE COURT:  The unfortunate reality for reasons well

8    beyond this case are that we all are constrained by COVID-19.

9    And so I'm not going to be unreasonable about that.

10              And so all I'd ask is you confer with the plaintiffs,

11   and both sides do the best you can and be reasonable and

12   sensitive to people's needs during this time.

13              So thank you, everyone.  Thank you for your patience.

14              I will issue a written order.  To the extent it

15   differs from anything I've said on the transcript, please

16   follow the order and not what I have said.

17              Thank you.  Have a good day.  Bye.  Be safe.

18              MR. QUINN:  Thank you, your Honor.

19              MS. STEBBINS BINA:  Thank you, your Honor.

20                              *    *    *

21

22

23

24

25