## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE MCKOY, MILLARD WILLIAMS, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP JR., ERIC TRUMP, and IVANKA TRUMP,<br><br>*Defendants*. | No. 1:18-cv-09936-LGS<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PARTIES ......................................................................................................... 12

    A.    Plaintiffs ............................................................................................ 12

    B.    Defendants ........................................................................................ 13

JURISDICTION AND VENUE ........................................................................ 14

FACTS ............................................................................................................ 15

I.      THE TRUMP ENTERPRISE ..................................................................... 15

    A.    The Trump Association-in-Fact ...................................................... 15

    B.    The Trump Corp. Enterprise ............................................................ 18

II.    BETWEEN THE EARLY AND MID-2000S, TRUMP REINVENTED HIS BRAND, AND THE TRUMP ENTERPRISE BEGAN TO CONCOCT ITS FRAUDULENT SCHEME ........................................................................... 18

III.   THE TRUMP ENTERPRISE AGREES TO ENDORSE AND PROMOTE ACN THROUGH A PERVASIVE AND WIDELY DISSEMINATED MESSAGE ............... 31

    A.    The ACN "Business Opportunity" Needed High-Profile Endorsement To Recruit and Maintain Investors ................................................................. 31

    B.    The Trumps Disseminated the Message Through ACN Videos ........................... 35

    C.    The Trumps Disseminated the Message Through Print and Online Media .......... 36

    D.    Trump Disseminated the Message at ACN Events ................................................ 41

    E.    The Trumps Disseminated the Message Through National Primetime Television ..................................................................................... 43

IV.   THE TRUMP ENTERPRISE KNOWINGLY CONVEYED A CONSISTENT FRAUDULENT MESSAGE ABOUT ACN .................................................... 46

    A.    The Trump Enterprise Falsely Represented that the ACN Business Opportunity Offered Consumers a Reasonable Probability of Commercial Success ....................................................................................... 46

        1.    Trump Misrepresented ACN's Risk-Profile ............................................. 47

        2.    Trump Falsely Claimed That ACN's Business Model (and Direct-Selling in General) Provided a Viable Source of Income for Prospective Investors. ..................................................................... 50

        3.    Trump Misrepresented the Commercial Viability of ACN's Products, Especially the ACN Video Phone. .................................................. 54

B.     The Trump Enterprise Falsely Represented that Trump Genuinely Supported ACN and Failed To Disclose That He Was Being Paid Lavishly for His Endorsement .......................................................................................... 59

C.     The Trump Enterprise Falsely Represented that the Trumps' Endorsement Was Predicated on Appropriate Due Diligence and Personal Experience with ACN's Business ..................................................................................... 67

V.     THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF ACN WAS THE KEY FACTOR IN PLAINTIFFS' INVESTMENT DECISIONS ..................................................... 69

A.     Catherine McKoy ........................................................................... 75

B.     Millard Williams ............................................................................ 84

C.     Markus Frazier ............................................................................... 88

D.     Lynn Chadwick .............................................................................. 93

VI.    THE TRUMP ENTERPRISE AND ACN'S CO-FOUNDER WERE INVOLVED IN SIDE DEALS THAT FACILITATED MONEY FLOW BETWEEN THEM .......... 99

A.     ACN's Co-Founder Bought Property Around The Trump Organization's Major Golf Course Development in North Carolina ............................................. 99

B.     ACN Has Paid the Trump Enterprise To Hold Charitable Golf Tournaments at Trump Golf Clubs ....................................................................... 101

C.     Trump Joined the Advisory Board of the SUCCESS Foundation, an Affiliate of *Success from Home* Magazine, Which Distributed Millions of "Personal Development" Books to Teens .......................................................... 106

VII.   THE TRUMP ENTERPRISE'S ONGOING PROMOTION AND ENDORSEMENT OF ACN ....................................................................................... 109

VIII.  THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF THE TRUMP NETWORK ....................................... 113

A.     Ideal Health Background & DSNC Licensing Deal .......................... 114

B.     Background on The Trump Network .............................................. 115

C.     Trump Promoted and Endorsed the Trump Network with a Widely Distributed and Pervasive Message ............................................... 116

D.     Trump Falsely Represented That Consumers Had a Reasonable Probability of Commercial Success in The Trump Network ................................. 120

E.     Trump Falsely Represented that He Was Endorsing The Trump Network Because It Was His Company and Because He Genuinely Believed It Would Be a Success .................................................................................. 128

IX.  THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND
     ENDORSEMENT OF THE TRUMP INSTITUTE........................................................ 132

     A.   Trump Falsely Represented That Consumers Had Reasonable Probability of
          Commercial Success in The Trump Institute........................................................ 134

     B.   Trump Falsely Represented that He Supported the Trump Institute Because
          He Believed It Offered a Reasonable Probability of Commercial Success
          (Rather than Because the Trump Enterprise Was Being Paid).......................... 145

     C.   Trump Falsely Represented that His Endorsement Was Predicated on
          Appropriate Due Diligence and/or Inside Information ....................................... 153

X.   CLASS ALLEGATIONS ............................................................................................. 154

CAUSES OF ACTION ............................................................................................................. 161

COUNT ONE ............................................................................................................................. 161

COUNT TWO: ............................................................................................................................ 168

COUNT THREE: ........................................................................................................................ 169

COUNT FOUR .......................................................................................................................... 171

COUNT FIVE: ........................................................................................................................... 175

COUNT SIX .............................................................................................................................. 176

COUNT SEVEN ......................................................................................................................... 179

COUNT EIGHT .......................................................................................................................... 181

PRAYER FOR RELIEF ............................................................................................................. 184

JURY DEMAND ......................................................................................................................... 185

Plaintiffs Catherine McKoy, Millard Williams, Markus Frazier, and Lynn Chadwick, on behalf of themselves and others similarly situated, allege, upon personal knowledge as to themselves and information and belief as to other matters, as follows:

## INTRODUCTION

1.      This case is about four working-class Americans, and tens of thousands more just like them, who were deliberately defrauded by Donald J. Trump, his family, and the corporation that bears their name.  The Trumps conned each of these victims into giving up hundreds or thousands of dollars—losses that many experienced as devastating and life-altering.  Surely the Trumps dismissed these amounts (and the lives they wrecked) as trivial.  But by defrauding so many for so long, the Trumps made millions.

2.      For more than a decade, Defendants The Trump Corporation, Donald J. Trump, Donald Trump Jr., Eric Trump, and Ivanka Trump (the latter four, collectively, the "Individual Defendants") have operated a large and complex enterprise with a singular goal:  to enrich themselves by systematically defrauding economically marginalized people looking to invest in their educations, start their own small businesses, and pursue the American Dream.

3.      Central to Defendants' fraudulent scheme was a company called ACN, a multi-level marketing company ("MLM") that offers a business opportunity to individual participants. From 2005 to at least 2015, Defendants received millions of dollars in secret payments to promote and endorse ACN.  In return, Donald J. Trump ("Trump") told prospective investors that "[y]ou have a great opportunity before you at ACN without any of the risks most entrepreneurs have to take," and that ACN's flagship videophone was doing "half-a-billion dollars' worth of sales a year."  Trump also told investors that he had "experienced the opportunity" and "done a lot of research," and that his endorsement was "not for any money." Not a word of this was true.

4.      In the minds of many Americans, the Trump brand was once synonymous with entrepreneurial success.  Indeed, Trump spent years cultivating a brand for himself and his family based on the impression that he was a successful entrepreneur.  Defendants conducted the affairs of their enterprise as a fraudulent scheme to leverage that brand, and use a series of false and misleading statements and omissions, to ensnare vulnerable consumers in certain so-called business opportunities and training programs like ACN.

5.      Defendants' association-in-fact enterprise included an array of holding companies, operating companies, licensing companies, a production company, a real estate company, and two of the Trump golf clubs (collectively, the "Trump Association-in-Fact").  The members of the Trump Association-in-Fact did not share common ownership, nor were they all wholly owned, directly or indirectly, by Defendants.  Nevertheless, at all relevant times, the Trump Enterprise was operated, directed, and controlled by Defendants.  Allen Weisselberg, the Chief Financial Officer of "The Trump Organization," testified at a June 2015 deposition that The Trump Corporation was "the operating entity that we use," and that the Individual Defendants had the authority to sign checks "over all our entities."  Defendant Donald Trump Jr. testified in a 2011 deposition that "[w]e kind of run a little bit like a mom-and-pop," and Defendant Ivanka Trump wrote in 2009 that she and Donald Trump Jr. were "integral members of the management team."

6.      Defendant The Trump Corporation, as a legal entity and enterprise (the "Trump Corp. Enterprise," and, together with the with Trump Association-in-Fact, the "Trump Enterprise"), was operated, directed, and controlled by the Individual Defendants.

7.     Between 2005 and at least 2015, the Trump Enterprise fraudulently promoted and endorsed the business opportunities and training programs (collectively, the "Investments") offered by at least three consumer-facing companies:

A.     ACN Opportunity, LLC ("ACN"), an MLM;

B.     TTN, LLC (d/b/a "The Trump Network"), another MLM; and

C.     Business Strategies Group, LLC (d/b/a "The Trump Institute"), a live-seminar program that purported to sell Trump's "secrets to success" in extravagantly priced seminars.

8.     In exchange for large, secret payments from these companies (collectively, the "Endorsed Entities"), the Trump Enterprise deliberately misled consumers by delivering a common and consistent message:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the Investments; (2) that Trump was endorsing and promoting the Investments because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on Defendants' extensive due diligence, inside information, and personal experience with the Investments (collectively, the "Message").

9.     The Message was materially false.  The Investments did not—and could not—offer a reasonable probability of success.  Nor was Trump endorsing the Investments because he believed they would.  Defendants were aware that the vast majority of consumers would lose whatever money they invested in the business opportunities and training programs the Endorsed Entities offered.  It was, after all, the potential to profit from consumers' unrecouped investments that drew the Trump Enterprise to the Endorsed Entities in the first place.  And while Defendants claimed to have conducted extensive diligence and research, and to have access to inside

information or personal experience with the Investments, those claims too were false and misleading.

10.     The Message was delivered primarily by Trump himself, who made materially false and misleading statements about the nature of the Investments, as well as about his own incentives, diligence, and experience, in person at the Endorsed Entities' events and in numerous written publications and videos.  But Trump was not alone:  Defendants Donald Trump Jr., Eric Trump, and Ivanka Trump each also disseminated (and conspired to disseminate) the Message by, among other things, making false and misleading statements about the Investments, appearing in various publications and on television in support of the Endorsed Entities, and lending their own explicit and implicit endorsements, all without disclosing any compensation for those appearances.

11.     In addition, all Defendants deliberately enhanced, amplified, and augmented the Message by, among other things, selling to the Endorsed Entities the right to use the Trump brand, licensing the Trump name to certain of the Endorsed Entities, and even arranging for ACN to appear (twice) on *The Celebrity Apprentice*—a primetime national television show that the Trumps used for what Defendant Ivanka Trump has called a "transparent form of product placement."  Ms. Trump noted that "the show's producers (including my father, naturally) are being compensated handsomely for the 'free' airtime" they offered to corporate sponsors.  And one of those very producers described the program as a "convenient vacation [from] the truth," especially for businesses that "weren't actually doing very well"—businesses like ACN.  The use of the Trump brand and these appearances on *The Celebrity Apprentice* were intended to create (and did create) a veneer of legitimacy and an impression of success, which further encouraged consumers to take the Message seriously and rely on it.  This veneer of legitimacy was further

enhanced by Trump's involvement with SUCCESS Foundation, a nonprofit with which ACN's founders had close ties, and which purported to distribute "personal development" books to millions of teens.

12.     As they conveyed the Message, Defendants repeatedly failed to correct the impression they had deliberately taken steps to create—namely, the impression that Trump was endorsing the Investments because he genuinely believed that the Investments offered a realistic probability of commercial success, and that this belief was predicated on extensive due diligence, inside information, and personal experience with the Investments.  All of the Defendants willfully failed to disclose their financial ties to—and quid pro quo arrangements with—the Endorsed Entities.

13.     The Message had the effect Defendants intended, and for which the Trump Enterprise was lavishly paid.  Trump's seemingly genuine endorsement brought prospective investors to the table and helped them overcome any lingering reservations about the Investments.  Indeed, for the working people who fell prey to the Investments, the Trump endorsement was typically the first thing they learned about the Investments, the reason they took an interest, and the determining factor in their decision to invest.  "Trust me," Trump often said in endorsing and promoting the Investments.  Unfortunately, far too many victims did.

14.     Many of the Trump Enterprise's victims were then and are now among the most economically marginalized and vulnerable Americans.  Indeed, the victims were specifically targeted *because* they were not experienced in financial and commercial matters.

15.     Those consumers did not achieve the success the Message promised.  To the contrary, Plaintiffs have suffered considerable financial loss because of their reliance on the false and willfully misleading Message.

16.    As alleged above, ACN—short for American Communications Network—was central to the aspect of Defendants' fraudulent scheme that is challenged by this action.  From 2005 to at least 2015, Defendants, through the Trump Enterprise, received millions of dollars in secret payments to promote and endorse ACN.  These secret payments took the form of speaking fees for Trump's appearances in ACN-related videos, publications, and events; payments for ACN's appearances on *The Celebrity Apprentice*; and fees for ACN golf tournaments held at Trump golf clubs.  All of this was deliberately concealed from unsuspecting ACN recruits.

17.    In exchange for these undisclosed payments, Trump, acting in concert with and through the members of the Trump Enterprise that Defendants controlled, repeatedly, explicitly, and bombastically endorsed ACN, in myriad formats and forums.  Defendants and the Trump Enterprise made, disseminated, and conspired to disseminate numerous knowingly false and misleading statements concerning the value of ACN's technology, the soundness of its business model, and the level of risk participants would face in pursuing the ACN business opportunity.

18.    Defendants were fully aware that these statements were false and misleading.  Not only did the Trump Enterprise have a longstanding commercial relationship with ACN, but Trump himself boasted of having close personal and financial ties to ACN's founders and principals, and Defendants Donald Trump Jr., Eric Trump, and Ivanka Trump all regularly appeared alongside and were photographed with those founders and principals.  Further, during the time that Defendants were endorsing and promoting ACN, a Trump company (and member of the Trump Association-in-Fact) opened a realty office at the golf course that had just been rebranded the Trump National Golf Club in Mooresville, North Carolina, and entities controlled by an ACN co-founder bought multiple properties nearby.  In addition, information that was accessible to Defendants (but not to the consumers to whom they were pitching the ACN

business opportunity) made clear that the likelihood of commercial success for an average new participant was miniscule.

19.     In addition to making knowingly false and misleading statements about the nature of the ACN business opportunity, Defendants made and disseminated false and misleading statements indicating that Trump was endorsing the company because he believed that the ACN business opportunity offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid), as well as statements designed to assure consumers that they had done extensive research before endorsing ACN and had experience with the ACN business opportunity.  All available evidence is to the contrary.

20.     The Trump Enterprise's fraudulent promotion and endorsement of ACN had the desired effect on Plaintiffs.  Indeed, Plaintiffs made the fateful decision to invest in ACN because of the Trump Enterprise's promotion and endorsement.  As the truth behind the Message emerged, Plaintiffs eventually realized that they had been scammed, cut their losses, and quit the business.  The Trump Enterprise's fraudulent Message was thus the cause of both the Plaintiffs' investments and the Plaintiffs' losses.

21.     Plaintiff Catherine McKoy is a resident of California who works as a hospice caregiver.  In 2014, McKoy attended a meeting for prospective ACN recruits.  As she listened to the presentations, McKoy was skeptical and unpersuaded.  But then she saw a promotional video prominently featuring Trump.  Trump's endorsement was a turning point.  McKoy watched clips of ACN appearing on *The Celebrity Apprentice*, where Trump, Donald Trump Jr., and Ivanka Trump stood alongside the founders and praised the company.  Among other things, McKoy specifically recalls hearing and relying on Trump's statement that "You have a great opportunity before you at ACN without any of the risk most entrepreneurs have to take."  She listened as

Trump said that investing in ACN was a great business opportunity—and that the strength of the business opportunity was why he was endorsing it.  She believed he had researched ACN extensively, and that his statements were supported by his own research.  McKoy had no idea Trump was being paid lavishly for his endorsement—the video made no mention of that.  McKoy joined ACN then and there.  Despite her limited resources, McKoy wrote a check for the $499 registration fee, in reliance on Trump's endorsement.  In the two years that followed, McKoy paid thousands of dollars in fees and expenses to attend ACN events and host ACN meetings in an effort to succeed with the business.  But, ultimately, she had extremely limited success—she earned a single check for $38.  Eventually, McKoy realized that ACN was not at all what Trump had described, and that she was just going to continue losing money.  When her next annual renewal date came up, McKoy decided not to renew her position.

22.     Plaintiff Millard Williams is a self-employed resident of California.  Williams first heard about ACN in mid-2014 when he was working for the Salvation Army in Los Angeles, California.  A colleague approached Williams and invited him to an informational meeting in Los Angeles.  At that meeting, Williams saw a promotional video prominently featuring Trump.  Williams had watched *The Celebrity Apprentice* a few times and had seen Trump present himself as a savvy, experienced, and knowledgeable entrepreneur who had achieved remarkable wealth and celebrity.  One of the things that Williams recalls relying on was Trump's statement that "ACN is leading the way in a new technology that will literally revolutionize the way we communicate with the ACN video phone.  And trust me it's changing everything.  The absolute truth is that this technology will be present in every home within the next several years."  Critically for Williams, Trump also promoted ACN as a "good moneymaking opportunity" and said that he was glad to be a part of ACN because he genuinely

believed the company provided a path to commercial success.  Trump's endorsement was the key factor in Williams's decision to invest in the ACN business opportunity.  Despite being homeless at the time, Williams paid the $499 registration fee with a loan from a colleague.  Though Williams worked hard and attended more than 25 or 30 meetings, Williams never received any income from ACN.  Williams came to realize that, contrary to what Trump had said in the promotional videos, ACN was not a good moneymaking opportunity, and he decided not to renew his membership.

23.     Plaintiff Markus Frazier is a resident of Maryland who works as a food delivery driver.  Frazier first learned about ACN in mid-2016.  Though Frazier was initially skeptical about investing in ACN, he decided to look up ACN on YouTube—and the first thing that caught his eye was a video of Trump and Ivanka Trump from *The Celebrity Apprentice*, where the Trumps stood next to two of the ACN founders, Greg Provenzano and Tony Cupisz, and endorsed ACN, and Trump said he knew the company well.  As with other Plaintiffs, the video was the turning point for Frazier.  Frazier believed that Trump was a successful businessman who knew how to make money and that, by promoting ACN, Trump was telling others that they too could make money and become successful business owners like him.  As substantiation for that belief, Frazier remembers hearing Trump say that "When evaluating a business opportunity, people need to look for strong leadership, a solid track record, success stories, a strong product people really need and want and a clear plan for the future.  ACN has all of these things."

24.     Though Frazier was not able to afford the $499 registration fee at first, he saved up and paid a few months later.  After signing up, Frazier incurred multiple additional fees and expenses connected with his participation in ACN.  At no time did Frazier recover any of the money that he invested.  Eventually, Frazier recognized that he was not making any money from

ACN and that Trump's message was false.  Frazier then stopped engaging with ACN and did not renew his position.

25.     Plaintiff Lynn Chadwick is a resident of Pennsylvania.  Chadwick signed up with ACN in April 2013.  Like so many others, she was recruited into ACN at a local meeting, the centerpiece of which was a promotional video prominently featuring Trump's endorsement. Chadwick watched intently as Trump described ACN as a great, sophisticated company, and as he touted and praised ACN's products, even suggesting that he used the products himself.  Most of all, Chadwick was moved by Trump's statement that there was huge potential to make money with ACN.  Chadwick did not have the money to sign up right away, but on her next pay day, Chadwick paid the $499 registration fee.  She spent nearly two years working hard to pursue the business opportunity, buying and studying training and promotional materials, pitching the products and the business opportunities, and attending numerous meetings.  Her repeated exposure to Trump's false and misleading statements kept her investing for a while.  Indeed, at every meeting, organizers reminded participants about Trump's involvement.  Chadwick remembers relying on various statements from Trump including that "There are a few simple things a company must have in order for me to believe in it . . . and ultimately for the company to be a success.  ACN has all these things and more."  But despite her hard work, Chadwick was not able to make money, and ultimately she realized that she had been misled by Trump's endorsement.  At the end of 2014, she cut her losses and left the company.

26.     But for Defendants' fraudulent promotion and endorsement of ACN, acting through the Trump Enterprise, Plaintiffs would not have paid the initial fee to sign up with ACN, would not have paid renewal fees, would not have incurred expenses attending meetings and

traveling to conventions, would not have purchased business tools and incurred other expenses in attempting to recruit customers and other participants, and would not have forgone other income.

27.     ACN was not the only consumer-facing company selling a business opportunity or training program for which Defendants agreed to disseminate the Message through the Trump Enterprise in exchange for secret payments.

28.     In 2005, Trump licensed his name to Business Strategies Group, LLC (d/b/a "The Trump Institute"), a company that purported to sell Trump's secrets for success in the real estate business in the form of extravagantly priced multi-day training seminars.  In reality, a substantial amount of the content sold to those hungry to learn Trump's insights for success in real estate investing was plagiarized from other sources, and Trump had nothing to do with the purported teachings of the so-called "Institute."

29.     In addition, during its years of doing business with ACN, the Trump Enterprise was so impressed with its profitability that, in 2009, Defendants, acting through the Trump Enterprise, made a deal with another MLM, which purported to sell vitamins and other similar commodity products through a network of independent distributors.  Unlike the deal with ACN, Defendants agreed to license the Trump brand to the MLM, which was then dubbed the Trump Network.  This deal was an effort on the Trump Enterprise's part to deepen its involvement with the MLM industry—reflecting Defendants' knowledge, based on its close relationship with ACN, that the widespread losses of average investors in these sorts of MLMs can generate enormous profits for the owners.  Shortly after signing the licensing deal with the Trump Enterprise, the Trump Network hired an ACN advisor to redesign its own compensation plan.

30.     The Trump Enterprise was paid in secret to endorse and promote the Trump Network from 2009 until the end of 2011, shortly before the Trump Network collapsed.  As with

ACN, Defendants, acting through the Trump Enterprise, made or disseminated a series of knowingly false statements about the retail demand for its products, and the likelihood of success for the participants in its business opportunities, as well as statements designed to mislead consumers into believing that the endorsement was genuine and predicated on appropriate diligence, inside information, and personal experience.

31.     As a result of Defendants' fraudulent promotion and endorsement of the Investments Defendants are liable for a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c); conspiring to violate RICO, 18 U.S.C. § 1962(d); false advertising under California Business and Professions Code § 17500; unfair competition under California Business and Professions Code § 17200; unfair and deceptive trade practices under the Maryland Consumer Protection Act; unfair and deceptive acts under the Pennsylvania Unfair Trade Practices and Consumer Protection Law;  common law fraud; and common law negligent misrepresentation.

## PARTIES

### A.     Plaintiffs

32.     Plaintiff Catherine McKoy is a resident, citizen, and domiciliary of California, who participated in the ACN business opportunity from 2014 to 2016 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

33.     Plaintiff Millard Williams is a resident, citizen, and domiciliary of California, who participated in the ACN business opportunity from 2014 to 2015 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

34.     Plaintiff Markus Frazier is a resident, citizen, and domiciliary of Maryland, who participated in the ACN business opportunity from 2016 to 2017 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

35.     Plaintiff Lynn Chadwick is a resident, citizen, and domiciliary of Pennsylvania, who participated in the ACN business opportunity from 2013 to 2014 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

B.      **Defendants**

36.     Defendant The Trump Corporation is a corporation incorporated under the laws of the State of New York, with a principal place of business at 725 Fifth Avenue, New York, New York, 10022.  The Trump Corporation is itself an enterprise within the meaning of 18 U.S.C. § 1961(4) and is also the principal operating company for the collection of companies known as The Trump Organization.  Along with Defendant Donald J. Trump and the other Individual Defendants, The Trump Corporation operates the Trump Association-in-Fact.

37.     Defendant Donald J. Trump is currently the President of the United States, although he is sued here in his personal capacity only.  At all times relevant to this Complaint, Trump was the Director, President, Chairman and sole shareholder of The Trump Corporation. Trump is a resident, citizen, and domiciliary of New York.

38.     Defendant Ivanka Trump is Defendant Donald J. Trump's daughter.  She currently acts as Advisor to the President of the United States, although she is sued here in her personal capacity only.  Ivanka Trump was Vice President of The Trump Corporation from 2009 to 2017, and Executive Vice President of TNGC Charlotte, LLC from 2011 to 2017, Trump National Golf Club, LLC from 2008 to 2017, and T International Realty, LLC from 2012 to 2017.  Ivanka Trump is a resident, citizen, and domiciliary of New York.

39.     Defendant Donald Trump Jr. is Defendant Donald J. Trump's son.  During the relevant time period, Donald Trump Jr. held senior executive positions at, or otherwise exercised

control over, entities included in or associated with the Trump Enterprise.  Donald Trump Jr. is a

resident, citizen, and domiciliary of New York.

40.    Defendant Eric Trump is Defendant Donald J. Trump's son.  During the relevant

time period, Eric Trump held senior executive positions at, or otherwise exercised control over,

entities included in or associated with the Trump Enterprise.  Eric Trump is a resident, citizen,

and domiciliary of New York.

## JURISDICTION AND VENUE

41.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because

this action arises under the laws of the United States; 28 U.S.C. § 1332, because the parties are

completely diverse in citizenship and the amount in controversy exceeds $75,000; and 18 U.S.C.

§ 1964(c), because Plaintiffs assert claims under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  This Court also has subject-matter

jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because

this is a class action, including claims asserted on behalf of a nationwide class, filed under

Rule 23 of the Federal Rules of Civil Procedure; there are at least tens of thousands of putative

class members, each of whom, like Plaintiffs, suffered at least $500 in damages; the aggregate

amount in controversy exceeds the jurisdictional amount or $5,000,000; and Defendants are

citizens of a State different from that of Plaintiffs and members of the Class.  This Court has

supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C § 1367, because those

claims are substantially related to Plaintiffs' claims under federal law.  Declaratory relief is

available pursuant to 28 U.S.C. §§ 2201 and 2202.

42.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2)

because, among other things, Defendants reside in this District, and a substantial part of the

transactions and events giving rise to Plaintiffs' claims occurred in this District.

## FACTS

### I.   THE TRUMP ENTERPRISE

#### A.   The Trump Association-in-Fact

43.   At all times relevant to this Complaint, the Trump Association-in-Fact was an association-in-fact within the meaning of 18 U.S.C. § 1961(4), comprised of a network of companies and individuals that shared a common purpose of earning revenue from the Endorsed Entities in exchange for conveying the false and misleading Message.  In other words, the mission of the Trump Association-in-Fact was to carry out the scheme to defraud consumers.

44.   The Trump Association-in-Fact was made up of a network of companies and individuals that carried out the scheme under Defendants' direction and control.  The Trump Association-in-Fact included several companies within the group of companies that operate under the banner of "The Trump Organization."  Known members of the Trump Association-in-Fact, which were also members of the Trump Organization, included the following:

a)   Defendant The Trump Corporation;

b)   Defendant Donald J. Trump;

c)   Defendant Ivanka Trump;

d)   Defendant Donald Trump Jr.;

e)   Defendant Eric Trump;

f)   Trump Productions, LLC ("Trump Productions"), which co-produced *The Celebrity Apprentice* in association with Mark Burnett Productions;

g)   DSN Licensing, LLC, which licensed Trump's name and brand to The Trump Network;

-15-

h)  Trump University, LLC, which licensed Trump's name and brand
to the Trump Institute;

i)  T International Realty, LLC ("Trump International Realty"), a
Delaware LLC that is engaged in the business of acquiring and
developing property;

j)  Trump National Golf Club, LLC, a New York LLC that operates
the Trump National Golf Club in Westchester County, New York;
and

k)  TNGC Charlotte, LLC, a Delaware LLC that operates the Trump
National Golf Club in Mooresville, North Carolina.

45.    The identities of other members of the Trump Association-in-Fact are currently
unknown but are expected to be identified through the discovery process.

46.    The members of the Trump Association-in-Fact did not share common ownership,
nor were they all wholly owned, directly or indirectly, by Defendants.  Nevertheless, at all
relevant times, the Trump Association-in-Fact was operated, directed, and controlled by
Defendants.  Defendants approved, authorized, and/or either specifically or tacitly directed,
ratified or participated in the acts of the Trump Association-in-Fact detailed in this Complaint.

47.    Allen Weisselberg, the Chief Financial Officer of "The Trump Organization,"
testified at a June 2015 deposition that The Trump Corporation was "the operating entity that we
use," and that Trump and his children were among the small group of people who had the
authority to sign checks "over all our entities."  In a 2011 deposition, Defendant Donald Trump
Jr. testified:  "We kind of run a little bit like a mom-and-pop in that sense . . . .  I guess there is

an organizational chart, but in theory, there is not too many levels. . . . Could I make one? Yes. Is there one officially? Not that I'm aware of."

48.     Ivanka Trump served as a Vice President of The Trump Corporation from 2009 to 2017, and Executive Vice President of TNGC Charlotte, LLC from 2011 to 2017, Trump National Golf Club, LLC from 2008 to 2017, and T International Realty, LLC from 2012 to 2017.

49.     At various times during the relevant period, Donald Trump Jr. was an Executive Vice President of The Trump Organization, the President of TNGC Charlotte LLC, and a manager and Executive Vice President of T International Realty LLC. Donald Trump Jr. also has been reported to have "had his hands in just about every Trump project over the years."[1] Donald Trump Jr. is also a trustee of The Donald J. Trump Revocable Trust.

50.     At various times during the relevant period, Eric Trump was CEO of the Trump Corporation and The Trump Organization, the President of T International Realty LLC, CEO of Trump Productions LLC, and President of the Eric Trump Foundation (now known as Curetivity). Eric Trump is also chairman of the advisory board of the Donald J. Trump Revocable Trust.

51.     The Individual Defendants also have served for years as the directors of the Donald J. Trump Foundation (the "Trump Foundation"). In June 2018, the New York Attorney General filed suit against the Trump Foundation and its directors, alleging a "pattern of illegal conduct," including "improper and extensive political activity, repeated and willful self-dealing transactions, and failure to follow basic fiduciary obligations or to implement even elementary corporate formalities required by law." *See* Petition ¶ 1, *People of the State of New York* v.

---

[1] Julia Ioffe, *The Real Story of Donald Trump Jr.*, GQ (June 20, 2018), https://www.gq.com/story/real-story-of-donald-trump-jr.

*Donald J. Trump*, Index No. 451130/2018 (June 14, 2018), ECF No. 1.  The New York Attorney General sought, among other things, "to dissolve the Foundation for its persistently illegal conduct, [and] enjoin its board members from future service as a director of any not-for-profit authorized by New York law."  *Id*.  In December 2018, the Trump Foundation agreed to dissolve.

### B.   The Trump Corp. Enterprise

52.     At all times relevant to this Complaint, The Trump Corporation was an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Trump Corp. Enterprise"), operated, directed and controlled by high-level executives, including without limitation Defendants Donald J. Trump, Ivanka Trump, Donald Trump Jr., and Eric Trump, who worked together to generate revenue from the Endorsed Entities in exchange for conveying the false and misleading Message. The mission of the Trump Corp. Enterprise was to carry out the scheme to defraud consumers.

53.     The Trump Enterprise and the Trump Corp. Enterprise are referred to collectively as "The Trump Enterprise."

## II.   BETWEEN THE EARLY AND MID-2000S, TRUMP REINVENTED HIS BRAND, AND THE TRUMP ENTERPRISE BEGAN TO CONCOCT ITS FRAUDULENT SCHEME

54.     In the early 2000s, The Trump Organization was in dire straits.  It was saddled in debt left over from Trump's extravagances in the early 1990s.  In 1995, Trump had rolled up The Trump Organization's hotel and casino businesses into a public company, Trump Hotels & Casino Resorts, Inc.  In the years that Trump was the company's chairman, the company lost more than $1 billion and was in the red every year from 1995 to 2005.  It filed for bankruptcy in 2004 (the fifth corporate bankruptcy filing in Trump's career).  Shareholders and creditors suffered devastating losses.  Indeed, Trump's Taj Mahal casino in Atlantic City went bankrupt

even though Trump's father, Fred Trump, reportedly made at least one quiet loan to the casino by buying $3 million in chips and not using them.[2]

55.     By the early 2000s, Trump himself was living on a personal allowance from a syndicate of banks as part of their deal to restructure the organization's debt.  The New York tabloid press often ridiculed Trump for continuing to live a lavish lifestyle while his empire crumbled around him.  He needed a way to restore his brand—and to start making money again.

56.     Trump began rebuilding his brand and public persona in the early 2000s.  His real breakthrough in this comeback came when he agreed to host the reality television show, *The Apprentice*, and its successor, *The Celebrity Apprentice*.[3]

57.     In 2002, Mark Burnett, the creator of the highly successful reality television show, *Survivor*, approached Trump with the idea for *The Apprentice*.  The pitch was that the show would feature "Trump's whole empire—Trump Tower, the casinos, the hotels, the helicopter and the jet, the opulent apartment, and the splendor of Mar-a-Lago."[4]  Each episode would feature contestants competing in business-oriented tasks, with Trump evaluating their performance and "firing" each episode's least impressive competitor.  The ultimate prize at the end of the season was a job at The Trump Organization.

58.     Trump loved the idea, and soon the deal was done.  On the air beginning in January 2004, *The Apprentice* was produced by Mark Burnett Productions in association with Trump Productions, LLC, a company within the Trump Enterprise that was effectively controlled by Defendants.  Mark Burnett and Trump were executive producers, and Trump Productions, LLC owned 50% of the show.

---

[2] *See* Netflix, *Dirty Money*, Season 1, Episode 6:  *The Confidence Man* (2018).
[3] *See generally* Michael Kranish & Marc Fisher, *Trump Revealed* 210–20 (2016).
[4] *See* Michael Kranish & Marc Fisher, *The Inside Story of How "The Apprentice" Rescued Donald Trump*, Fortune (Sept. 8, 2016), http://fortune.com/2016/09/08/donald-trump-the-apprentice-burnett/.



59.     In 2007, *The Apprentice* became *The Celebrity Apprentice*.  Instead of ordinary

people competing for a job at The Trump Organization, contestants were celebrities who

competed to win cash donations for their nominated charities. Defendants Donald Trump Jr.,

Ivanka Trump, and Eric Trump, were all advisors to *The Apprentice* and *The Celebrity*

*Apprentice*, and each appeared on dozens of episodes.

60.     These shows portrayed Trump to an audience of millions around the country as a

credible and authoritative voice in the world of business—a man portrayed, in the words of

biographers Michael Kranish and Marc Fisher, as "supremely competent and confident,

dispensing his authority and getting immediate results."  Far from the hard-scrabble Queens-to-

Brooklyn-to-Manhattan property developer whose empire was collapsing under debt, Trump was

presented to the world as a highly successful and fabulously wealthy entrepreneur and

businessman.  As Trump boasted in a voice-over at the start of an episode:

> I'm the largest real-estate developer in New York.  I own buildings all
> over the place.  Model agencies, the Miss Universe pageant, jetliners,

golf courses, casinos, and private resorts like Mar-a-Lago. . . .  I've mastered the art of the deal and have turned the name Trump into the highest-quality brand.  And as the master, I want to pass along some of my knowledge to somebody else.





61.    In contrast to the image of Trump projected to the television audience, *The Apprentice*'s producers candidly acknowledged that their portrayal of Trump was pure fiction.

One of the producers commented that the producers intended Trump's persona on *The Apprentice* to be a satirical figure:

> How funny is it to have this washed-up, 5-time bankruptcy guy, who lives in a golden palace that other people are paying for—that he is now the "executive in charge of this big corporation"?[5]



62.     Of the show's impact on its audience, the producer commented that "a lot of people who watched the show believed in Donald Trump that we were presenting, in this character . . . [but] it was a scam, that was entertainment."  Trump's character was "a construct, almost from the very beginning."  In a podcast interview with producer Bill Pruitt, an NPR reporter noted that "it's not just that they ignored the offensive comments, the producers, editors

---

[5] *See* Netflix, *Dirty Money*, Season 1, Episode 6:  *The Confidence Man* (2018).

cut out other bad stuff, too, and they played up the good stuff"—in other words, they "helped

create a Donald Trump who wasn't the real Donald Trump."[6]

63.     Pruitt expanded on this theme as follows:

> BILL PRUITT:  . . . the jet was, you know, questionable whether it
> would fly that week.  The helicopter was up for sale, I believe.  We
> didn't know if we were going to have it next week.
>
> KELLY MCEVERS:  Huh.  But that's not the way you made it look . . . .
>
> BILL PRUITT:  Not at all.
>
> KELLY MCEVERS:  . . . In that opening sequence.
>
> BILL PRUITT:  Exactly.
>
> KELLY MCEVERS:  Oh, my gosh. You created a fiction, a fictional
> billionaire.
>
> BILL PRUITT:  Well, he had been a billionaire.  I mean, everything we
> said about him was truthful.  It's what we didn't say about him.  Do you
> know what I mean?  ***It was a convenient vacation of the truth***. . . .  [A]
> cultural icon emerged because we weren't necessarily truthful about our
> portrayal.[7]

64.     *The Apprentice* was a hit, both financially and for Trump's larger project to

restore his brand.  As one commentator put it: "*The Apprentice* really overnight repositioned

[Trump] in the American imagination as the embodiment of dealmaking savvy, capable

entrepreneur, and business success."[8]

---

[6] Kelly McEvers, *Trump Stories:  The Apprentice*, NPR (Oct. 11, 2017),
https://www.npr.org/templates/transcript/transcript.php?storyId=555768139.
[7] *Id*. (emphasis added).
[8] *See* Netflix, *Dirty Money*, Season 1, Episode 6:  *The Confidence Man* (2018).



65.     A defining aspect of Trump's rebuilt brand was the notion that Trump was very rich.  *The Apprentice* portrayed him as enjoying the trappings of extraordinary wealth.  Trump was shown in private jets, at luxury golf courses, surrounded by beauty pageant contestants, and strolling through the marble-and-brass excess of his Trump Tower apartment.

66.    A court document reportedly filed on Trump's behalf in December 2009—at the peak of the success of *The Celebrity Apprentice*—explained the centrality of this perception of wealth to Trump's brand:

> Critical to Trump's success in business is the fact that he is widely recognized by both the financial community and the public as a skilled, successful businessman, who has financial resources totaling ***billions of dollars***. . . .  Trump's ability to close deals and secure financing for his projects depends on investors trusting his ***reputation and net worth***.

(emphases added).



67.    Trump has a long and storied history of wildly exaggerating his net worth.  In one notorious account, Trump told an author in early 2005 that he was worth "five to six" billion dollars—a significant increase from the "four to five billion dollars" Trump had told the same

author before.  A brochure for one of Trump's clubs around the same time claimed he was worth "$9.5 billion."[9]  The author conducted further research, and was told by people who claimed "direct knowledge" of Trump's finances that his net worth was "somewhere between $150 million and $250 million."[10]

68.    When the author published this account, Trump sued the author in the Superior Court of New Jersey on the basis that the author had defamed him by understating his wealth. The Superior Court granted summary judgment in the author's favor, holding that Trump had failed to prove that the author published the statements regarding Trump's wealth with actual malice.  In affirming the Superior Court's decision, the Appellate Division held that there was no "reliable information" contradicting the author's reports and that the author had no "obvious reasons to doubt the veracity" of his sources' statements.[11]  The court noted that "Trump's estimates of his own worth changed substantially over time," and quoted from Trump's deposition in the case:

> Q:  Now, Mr. Trump, have you always been completely truthful in your public statements about your net worth of properties?
>
> A:  I try.
>
> Q:  Have you ever not been truthful?
>
> A:  My net worth fluctuates, and it goes up and down with markets and with attitudes and with feelings, even my own feelings, but I try.
>
> Q:  . . . You said that the net worth goes up and down based upon your own feelings?
>
> A:  Yes, even my own feelings, as to where the world is, where the world is going, and that can change rapidly from day to day. . . .  So yeah, even my own feelings affect my value to myself.

[9] *See* Michael Kranish & Marc Fisher, *Trump Revealed* 293–308 (2016).
[10] *Id.*
[11] *Trump* v. *O'Brien*, 422 N.J. Super. 540, 557, 29 A.3d 1090, 1101 (App. Div. 2011).

. . .

Q:  When you publicly state what you're worth, what do you base that number on?

. . .

A:  I would say it's my general attitude at the time that the question may be asked. And as I say, it varies.[12]

69.     The Court also noted that the document that Trump principally relied on to establish that he was a billionaire had "limited value as an accurate representation of Trump's net worth" as it was "not audited" and disclosed on its face "significant departures from generally accepted accounting principles."[13]

70.     Put simply, through *The Apprentice* and other means, Trump painted himself as a billionaire who had achieved the pinnacle of financial success.  But, in reality, Trump consistently exaggerated his wealth and success, and hid from his audiences any evidence by which they could assess his true financial position (and that of The Trump Organization).

71.     In the mid-2000s, to capitalize on Trump's rebuilt brand and massive exposure, Defendants concocted a scheme to use Trump's brand and reputation to promote other businesses and brands that were willing to pay for the privilege, as Ivanka Trump has explained.

72.     In her 2009 book, *The Trump Card*, Ivanka Trump explained that her and Donald Trump Jr.'s "prominent roles" on *The Celebrity Apprentice* made them "almost instant celebrities."[14]  In Ivanka Trump's words, "Don and I were cast as high-profile emissaries for my father's company, and the Trump 'brand' seemed to transition in real estate and media circles into more of a family brand.  Because of our roles on the show, people were suddenly inclined to

---

[12] *Id.* at 555–56.
[13] *Id.* at 554.
[14] Ivanka Trump, *The Trump Card* 186–87 (2009).

take us more seriously than they might have otherwise."[15]  They also became more powerful officials within—and more prominent representatives of—The Trump Organization, including through high-level positions at The Trump Corporation and other Association-in-Fact entities.  Ms. Trump explained that the celebrity she and her brothers achieved through their television appearances had an "immediate impact at the Trump Organization, where [they] suddenly slotted in as integral members of the management team," noting that "in fact, we'd held those positions all along, but in our own, low-key way."[16]  Ms. Trump similarly told CBS news that, through *The Apprentice*, she and her brothers "became more visible as a part of the organization and a part of what the Trump brand stands for."[17]

73.     According to Ms. Trump, "I discovered early on that I had an intuitive understanding of marketing."[18]  Ms. Trump has said that, "[a]s an ambassador of the Trump organization, I spend a lot of time thinking about branding considerations."[19]  The Trump brand, as she sees it, communicates "luxury and uncompromising quality," and that brand has "been the cornerstone of our business."[20]  The family's "worldwide media exposure," including through *The Apprentice* and *The Celebrity Apprentice*, has "created tremendous value" for that brand, as well as those associated with it.[21]  Equally as important, Ms. Trump has recognized that inviting key partners to appear on *The Celebrity Apprentice* provides them with a marketing benefit for which they might reward the Trump Organization—after one networking contact "appeared on

---

[15] *Id.*

[16] *Id.*

[17] Dan Schawbel, *Branding Advice from Ivanka Trump* (Mar. 17, 2010), https://www.cbsnews.com/news/branding-advice-from-ivanka-trump/ (quoting Ivanka Trump).

[18] Ivanka Trump, *Women Who Work* 35 (2017).

[19] Dan Schawbel, *Branding Advice from Ivanka Trump* (Mar. 17, 2010), https://www.cbsnews.com/news/branding-advice-from-ivanka-trump/ (quoting Ivanka Trump).

[20] Ivanka Trump, *The Trump Card* 190 (2009).

[21] *Id.*

an episode of Celebrity Apprentice," Ms. Trump said that their relationship "has come full circle,

as his company sells my collection online."[22]

74.     Ms. Trump has been crystal clear that Defendants used *The Apprentice* and *The*

*Celebrity Apprentice* as a vehicle to promote and endorse brands:  "In a world obsessed with

branding and celebrity, our partners are very impressed to see this kind of validation of their

decision to work with the Trump brand. They love the fanfare and the positive spillover to our

joint efforts."[23]  While Ms. Trump has said that "You can't put a price on that kind of

exposure,"[24] the Trumps did indeed put a price on it:

> [Apprentice producer Mark] Burnett and Trump negotiated with NBC to
> retain the rights to income derived from product integration, and split the
> fees. ***On set, Trump often gloated about this easy money***. One producer
> remembered, "You'd say, 'Hey, Donald, today we have Pepsi, and
> they're paying three million to be in the show,' and he'd say, 'That's
> great, I just made a million five!'"[25]

75.     Ms. Trump further explained that these arrangements constituted "a transparent

form of product placement":

> During the 2009 season of Celebrity Apprentice, I managed to integrate
> my role at the Trump Organization with my television persona in such a
> way that it reinforced my jewelry brand. . . .  You see, one of the
> hallmarks of my father's television show has been the brand-backed
> tasks or projects the contestants are assigned.  These invariably involve a
> corporate sponsor, which naturally looks to integrate its product or
> service into our story line so that there's a clear carryover benefit to its
> business. ***Think of it as a transparent form of product placement***, but
> you can be sure that NBC and the show's producers (including my

---

[22] Ivanka Trump, *Women Who Work* 68 (2017).
[23] Ivanka Trump, *The Trump Card* 189 (2009).
[24] *Id.* at 241.
[25] Patrick Radden Keefe, *How Mark Burnett Resurrected Donald Trump as an Icon of American Success*,
The New Yorker (Jan. 7, 2019), https://www.newyorker.com/magazine/2019/01/07/how-mark-burnett-
resurrected-donald-trump-as-an-icon-of-american-success (emphasis added).

father, naturally) are being compensated handsomely for the "free" airtime.[26]

76.     Producer Bill Pruitt has explained that the show was particularly good at promoting businesses that in reality were struggling:

> KELLY MCEVERS (podcast host): Think about it. Donald Trump was getting paid a salary by NBC to have this huge platform where he could promote his businesses, even when some of those businesses weren't actually doing very well.
>
> BILL PRUITT:  The brands, you know, like Taj Mahal—it was enormously difficult to promote that because you walk in there, and you see, you know, neons falling.  It was the Ta Mahal or something. You know, there was no J because the neons were out.  [Laughter].  They just hadn't had the opportunity to replace it yet. It wasn't a priority because the carpets were already rotting, and, you know, it just stank to high heaven.
>
> . . .
>
> KELLY MCEVERS:  In helping make "The Apprentice," Bill says he was a good con artist. . . .  And on "The Apprentice," his con helped take Donald Trump all the way to the White House.[27]

77.     Having rehabilitated Trump's personal image and created a false brand of extraordinary wealth and success, elevated Trump's children to national celebrities, and created a massively popular platform to promote struggling businesses that were willing to pay, Defendants concocted a further scheme to use the rehabilitated Trump brand, their national celebrity, and their platform, as well as their casual willingness to make false and misleading statements, to defraud consumers who were inspired by Trump's apparent wealth and success.

78.     Beginning in 2005, the year after *The Apprentice* first aired, Defendants used the Trump Enterprise to operate a fraudulent scheme in which companies that offered training

---

[26] Ivanka Trump, *The Trump Card* 239 (2009) (emphasis added).
[27] Kelly McEvers, *Trump Stories:  The Apprentice*, NPR (Oct. 11, 2017), https://www.npr.org/templates/transcript/transcript.php?storyId=555768139.

programs and/or business opportunities to ambitious and entrepreneurial consumers paid the

Trump Enterprise in secret in exchange for the Trumps' conveying the Message, with the full

weight of Trump's personal brand and his family's brand behind it.  Defendants' conspired and

knowingly designed their scheme to defraud consumers and enrich themselves.

79.     The operation of the scheme with respect to each of the Endorsed Entities is

detailed below.

III.    **THE TRUMP ENTERPRISE AGREES TO ENDORSE AND PROMOTE ACN THROUGH A PERVASIVE AND WIDELY DISSEMINATED MESSAGE**

A.      **The ACN "Business Opportunity" Needed High-Profile Endorsement To Recruit and Maintain Investors**

80.     ACN is a multi-level marketing company that offers a business opportunity to

"Independent Business Owners" ("IBOs").  IBOs are required to pay an initial sign-up fee and an

annual renewal fee for the privilege of selling ACN's products.  As of the 2013-2016 time

period, the sign-up fee was $499 and the renewal fee was $149.

81.     According to the ACN compensation plan, IBOs can earn small commissions on

sales and billing to customers who purchase ACN products and services through that IBO, with

additional bonuses for meeting sales targets.  IBOs can also earn money by recruiting others to

sign up as IBOs.  When an existing IBO recruits a new IBO, the recruit becomes part of the

existing IBO's "downline."  IBOs can receive a commission on the sales and bills generated by

members of their downline.

82.     ACN forbids IBOs from engaging in mass-marketing or advertising.  Instead, the

lifeblood of ACN's recruiting operation is small group events hosted by IBOs in their own

homes or at local hotels and event spaces.  IBOs are encouraged to identify "warm" leads among

friends, family, and other contacts and to invite them to small group meetings at their homes.  To

help them in their sales and recruitment efforts, ACN sells IBOs a series of "Business Tools,"
including promotional DVDs and magazines, as well as "Your Business Assistant," a web
application IBOs can use to manage both their downlines and customers.

83.     At these small-group recruiting events, hosts will typically play the DVDs and
distribute the materials they have bought from ACN.  The aim is both to sell ACN's products and
services and to "share the opportunity" to become an IBO.  These small meetings are the primary
mechanism through which consumers are persuaded to make the initial investment to become an
IBO.



84.     In order to keep IBOs motivated to invest in promotional materials and business
tools after they have signed up, ACN stages ticketed multi-day events.  These events, often billed
as large "Training Events" or "International Conventions," include both large rallies held in
arenas, with guest speakers who encourage IBOs to make continued investments in ACN, as well
as smaller seminar-style break-out sessions.  These conventions are not merely business
conferences at which participants meet to network and hear from industry experts:  they are

motivational rallies, designed to stoke enthusiasm and convince IBOs that they can make a profit

if they just keep investing and trying to build their downline.  These events themselves are

another source of substantial revenue for ACN.





85.    In order to make both the small-group recruiting meetings and the larger

motivational rallies successful, it was critical for ACN to obtain high-profile celebrity

endorsement.  Enter the Trump Enterprise.



86.     ACN first announced that the Trump Enterprise had agreed to promote and endorse ACN in the Q4 2005 edition of *ACN Newsmagazine*, ACN's quarterly magazine sent to IBOs.  The announcement stated that Trump would be "featured in a variety of print and video media over the coming months, *all designed to help you build your ACN business*."[28] The announcement also said that Trump would "speak to important points, edifying ACN—the company and vision."[29]  The magazine quoted Trump touting ACN.[30]

87.     Not long after Trump's endorsement was first announced, the Q2 2006 issue of ACN Newsmagazine explained to investors the unprecedented significance of Trump's endorsement.  The magazine emphasized Trump's global entrepreneurial stature and the impact it had on bolstering ACN's integrity in the eyes of investors:

> This endorsement serves as a ***huge testament to the integrity*** of the ACN Opportunity—***never before*** has a company in the direct selling industry received an endorsement from ***someone of such stature***.  Donald J. Trump is an ***entrepreneurial icon***.  He's a multi-billionaire, Founder and CEO of The Trump

---

[28] *Donald Trump & ACN*, ACN Newsmagazine, Q4 2005, at 2 (emphasis added).
[29] *Id.*
[30] *Id.*

Organization, a ***globally-renowned*** property mogul, Executive Producer and host of *The Apprentice*, Founder of Trump University, and a best-selling author.

(emphases added).[31]

88.     Following the announcement, the Trump Enterprise endorsed and promoted ACN through four principal channels:  (1) in ACN videos distributed for IBOs to screen at home meetings; (2) in features in print and online media, including in ACN-branded magazines; (3) at ACN events; and (4) during episodes of *The Celebrity Apprentice*.  Through each of these channels, as alleged more fully and with greater detail in Section IV below, the Trump Enterprise conveyed a common, consistent, and pervasive Message.  The overall reach of the Message across these channels was enormous, allowing the Trump Enterprise to convey the Message to millions of potential investors.  And these channels were not separate or independent:  Clips of ACN videos were played at events, live event appearances were recorded and incorporated into ACN videos, screenshots and photos from events appeared in print materials, and screenshots of print materials appeared in videos—all of which was disseminated to, recirculated among, and relied on by prospective investors and IBOs for years afterward.

## B.     The Trumps Disseminated the Message Through ACN Videos

89.     Trump was featured prominently on multiple versions of the "ACN Opportunity Disc," a series of promotional CDs and DVDs that IBOs used consistently to pitch the ACN business opportunity to prospective recruits.  (Other Individual Defendants appeared as well.)  IBOs were encouraged to purchase copies of the Opportunity Disc in bulk from ACN, so that they could play the videos on the disc at meetings with potential recruits and sell or give copies of the disc to other ACN participants to do the same.  The Opportunity Disc was updated

---

[31] *Baltimore International Training Event Sept. 8-10, 2006,* ACN Newsmagazine, Q2 2006, at 2.

frequently, sometimes more than once per year.  Each edition of the Opportunity Disc during the

period of Trump's endorsement included prominent footage of Trump giving his personal

endorsement to ACN and the business opportunity it offered.  Indeed, the same footage of Trump

was reused frequently in successive editions with only minor editing between editions.  The

effect was consistent:  during the relevant time period, the Message was conveyed in every

edition of the Opportunity Disc in substantially the same form.



### C.    The Trumps Disseminated the Message Through Print and Online Media

90.    Trump appeared regularly in ACN print materials, including *ACN Newsmagazine*,

a quarterly publication by ACN, where he touted the company and the business opportunity.

91.     From August 2013 to around February 2015, Trump also regularly contributed "inspirational note[s]" to ACN's blog.[32]  Trump's posts were designed to motivate and encourage IBOs to persevere with ACN.  The posts also encouraged readers to attend ACN events at which Trump was scheduled to speak.

92.     ACN also was featured frequently and prominently in *Success from Home*, a monthly magazine that purportedly included reporting on the network marketing and direct-selling industry but, in reality, exclusively published content sponsored by companies in that industry.  ACN encouraged IBOs to buy copies of the magazine, touting it as "A Valuable Third-Party Validation Tool" for its business model and the direct-selling industry generally, and exhorting IBOs to "put one in the hands of each of your top prospects!"[33]  Trump also encouraged ACN IBOs to use copies of the magazine to "*legitimize [their] business*" in the eyes of potential recruits.[34]  But, far from being an independent and objective source, *Success from Home* was and is owned by Success Partners, whose mission is to provide paid marketing services for MLM businesses.  Indeed, Success Partners identifies ACN as a "client" on its website.[35]

93.     Examples of ACN's features in *Success from Home* abound.  The April 2007 edition featured ACN's founders on the cover.  According to an ACN newsletter, the edition contained "128 pages of company information, success stories and an article by Donald J. Trump

---

[32] *See, e.g.*, Donald J. Trump, *From the Mind of Donald J. Trump*, ACN (Aug. 7, 2013), *available at* https://web.archive.org/web/20150126184008/http://acninc.com:80/news/donald-j-trump-messages/2013/08/07/acn-donald-j-trump.

[33] *Success from Home Magazine Featuring ACN,* ACN Newsmagazine, Q4 2005, at 6; *see also Home Sweet Home,* ACN Newsmagazine, Q2 2007, at 6.

[34] Donald J. Trump, *From the Mind of Donald J. Trump*, ACN (Aug. 7, 2013), *available at* https://web.archive.org/web/20150126184008/http://acninc.com:80/news/donald-j-trump-messages/2013/08/07/acn-donald-j-trump.

[35] Our Clients, Success Partners, http://www.successpartners.com/#section-1.

on the power of network marketing."[36]  In a May 2007 article entitled "Why Network Marketing?  Donald J. Trump's Response," Trump explained that "the network marketing business is designed to bring you to the top, not keep you at the bottom."[37]

94.    ACN was also featured in *Success from Home*'s April 2008 issue, which ACN touted as including "page after page of all the reasons why ACN is THE vehicle for individuals to achieve their dreams," and being "[p]acked with 132 pages of success stories from ACN's top leaders; complete company history, product and training information, and validation of the direct-selling industry from best-selling authors and advisors."[38]

95.    Trump was featured in or contributed to issues of *Success from Home* published in April 2007, April 2008, August 2010, August 2011, July 2012, September 2013, September 2014, and August 2015.  Defendants Donald Trump Jr., Ivanka Trump, and Eric Trump were also featured in *Success from Home*, and a similar MLM publication, *Success*, in June 2008, July 2012, and August 2015.



---

[36] *Home Sweet Home,* ACN Newsmagazine, Q2 2007, at 8.
[37] *Why Network Marketing?  Donald J. Trump's Response*, Success from Home, May 2017, at 71.
[38] *A New Day at ACN,* ACN in Action: North America (Feb. 17, 2008), *available at* https://web.archive.org/web/20080228151209/http://www2.acnin.com:80/acninaction/2008/action217.htm



# THE WIZARD OF WINNING

by Barbara Seale





If there is a man anywhere in the world who knows a great business when he sees it, it's **Donald J. Trump.** The multibillionaire has developed commercial real estate, hotels and golf courses across the globe. He has written best-selling business books such as *The Art of the Deal, Think Like a Millionaire, The Midas Touch* and his latest book, *Time to Get Tough.* He even hosts his own television reality programs, *The Apprentice* and *The Celebrity Apprentice.* Clearly, he recognizes a winner, and for the last six years the winning business opportunity he has endorsed is ACN.

---

# THE WIZARD OF WINNING

## Why Trump Chose ACN



The direct selling industry provides a viable business option for someone looking for a new opportunity.

## You're Hired!



## Enduring Endorsement

"The ACN co-founders are men of integrity who put the needs of their people above their own needs."

—Donald Trump

THE ☆ CELEBRITY APPRENTICE

### D.     Trump Disseminated the Message at ACN Events

96.     Between 2006 and 2015, Trump disseminated the Message during at least fourteen appearances at major ACN events held in auditoriums across the United States and overseas.  Trump was by far ACN's most important speaker—indeed, in 2014, the ACN website stated that Trump "[set] the record for the most appearances from the ACN stage by any ACN special guest speaker."[39]  His appearances included the following events:  ACN's International Training Event in Baltimore, Maryland, around September 8–10, 2006; ACN's International Convention in Fort Worth, Texas, around February 23–25, 2007; ACN's International Training Event in East Rutherford, New Jersey, around June 27–29, 2008; ACN's International Training Event in Charlotte, North Carolina, around June 26–28, 2009; ACN's International Convention in San Jose, California, around February 19–21, 2010; ACN's 2010 International Training Event in Charlotte, North Carolina, around September 10–12, 2010; ACN's International Convention in Barcelona, Spain, around March 18–20, 2011; ACN's International Training Event in San Jose, California, around June 24–26, 2011; ACN's International Convention in Charlotte, North Carolina, around February 17–19, 2012; ACN's 20th Anniversary International Training Event in Charlotte, North Carolina, around February 15–18, 2013; ACN's International Training Event in San Jose, California, around December 6–8, 2013; ACN's Canada International Training Event in Toronto, Ontario, around May 31, 2014; ACN's International Convention in Barcelona, Spain, around June 27–29, 2014; and ACN's International Convention in Charlotte, North Carolina, around February 13–15, 2015.

---

[39] *Catching the Eye of a Billionaire: Donald J. Trump and ACN,* ACN, *available at* https://web.archive.org/web/20140717125753/http://acninc.com:80/trump.







97.     Attendees paid substantial sums to attend these events.  For example, tickets to watch Trump's speech from an overflow room next to the main hall at the September 2006 event in Baltimore cost $99.  Tickets to the June 2008 event in East Rutherford were $150.  And tickets to the February 2012 event in Charlotte ranged from $149 to $189 each.

98.     In many instances ACN made substantial efforts to prevent recording of these appearances—including by banning the use of cameras or smartphones and sending security guards through the crowd with flashlights to enforce the prohibition.  Nevertheless, many of these appearances were recorded and various clips were incorporated into official and unofficial promotional materials, as well as made available online, for years afterward.  Many are still available online and elsewhere, and more are expected to be obtainable through the discovery process.

**E.     The Trumps Disseminated the Message Through National Primetime Television**

99.     On two separate occasions, the Trump Enterprise facilitated an appearance by ACN and promoted it on *The Celebrity Apprentice*, a national primetime television show. According to the *Hollywood Reporter*, the first such episode, which aired March 22, 2009, reached 12.4 million viewers.  The second episode, which aired March 27, 2011, reached 8.58 million viewers, according to the *Los Angeles Times*.

100.     Defendants Trump, Donald Trump Jr., and Ivanka Trump each appeared alongside ACN representatives in both episodes.  And not only did Trump disseminate the Message on primetime television on both occasions, but, in anticipation of each episode's release, ACN also issued press releases further touting the Message, on February 24, 2009, and March 16, 2011, respectively.



101.    These appearances achieved the Trump Enterprise's goals.  For example, shortly

after the second episode was screened, on April 1, 2011, Debbie Davis, an ACN "Senior Vice

President and Circle of Champions Member," wrote on ACN's Company Blog that:

> This primetime opportunity has simply changed the game.  Because of
> the show, many representatives were able to talk to people they've never
> talked with before, and . . . many of those people may have never heard
> of the ACN home-based business opportunity.  When Mr. Trump
> acknowledged our Co-Founders as "friends" of his, at that moment,
> ACN was *oozing with credibility in everyone's eyes.*

(emphasis added).[40]



---

[40] Debbie Davis, *ACN & The Celebrity Apprentice: Next Steps*, ACN (Apr. 1, 2011),
http://acninc.com/news/company/2011/04/01/acn-celebrity-apprentice-follow-up-next-steps-debbie-davis/.

102.    Davis continued:  "Ask everyone on your list if they watched *The Celebrity Apprentice* last Sunday. . . .  [T]hat question has become the easiest, most successful way for me to share this opportunity with someone new."[41]

103.    As alleged above, *The Celebrity Apprentice* episodes were heavily edited and scripted to create false impressions, including with respect to Trump himself and the businesses and brands that payed for the privilege of being promoted on the show.  The ACN episodes too were heavily edited and presented ACN as an appealing business opportunity.  In light of the benefits to the Trumps of this misleading presentation, their role as producers on the show, their influence with respect to their own brand, and their claims about remuneration to themselves personally, Plaintiffs allege on information and belief that Defendants exercised substantial editorial control over these episodes and deliberately caused those episodes to present a false and misleading picture of the ACN business opportunity.



---

[41] *Id.*

## IV.   THE TRUMP ENTERPRISE KNOWINGLY CONVEYED A CONSISTENT FRAUDULENT MESSAGE ABOUT ACN

104.   Through all four channels described above, the Trump Enterprise deliberately misled consumers into believing a common and consistent false Message—(1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN business opportunity; (2) that Trump was promoting and endorsing the ACN business opportunity *because* he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, inside information, and personal experience with ACN.  Each part of that Message was knowingly false.

### A.   The Trump Enterprise Falsely Represented that the ACN Business Opportunity Offered Consumers a Reasonable Probability of Commercial Success

105.   Throughout the relevant period, the Trump Enterprise falsely represented to consumers they would have a reasonable probability of commercial success if they bought into the ACN business opportunity (the "Success Claim").  The Trump Enterprise conveyed the Success Claim to consumers through appearances by Trump himself, as well as his children, in each of the channels of distribution described above—video, print and online media, in-person events, and national television broadcasts.

106.   The Trump Enterprise built the Success Claim on three false pillars:  in his appearances on behalf of ACN, Trump falsely misrepresented (1) the level of risk inherent in the ACN business opportunity; (2) the potential profitability to consumers of the ACN business opportunity and MLMs in general; and (3) the market for ACN's products and services.

1.   *Trump Misrepresented ACN's Risk-Profile*

107.    Trump repeatedly misrepresented ACN's risk profile to consumers, falsely

claiming that investing in ACN was a low-risk entrepreneurial venture.  Chief among the

vehicles for disseminating this false message was the ACN Opportunity Disc, a video that was

distributed to prospective investors.  In that video, Trump stated:

> You have a great opportunity before you at ACN ***without any of the***
> ***risks most entrepreneurs have to take***.  You have the ability to market
> breakthrough technology before it hits the critical mass.  I've
> experienced the opportunity that exists when you're able to jump ahead
> of the curve, and ACN gives you that opportunity.

(emphasis added).  Trump repeated this claim over and over again—this statement appeared in

*every* edition of ACN Opportunity Disc released from 2010 to 2013.  Every one of the Plaintiffs

recalls hearing and relying on it.

108.    Trump doubled down on his claim during his in-person endorsements, going so

far as to suggest that ACN was risk-free.  Onstage at ACN's International Convention in

Barcelona, Spain, in March 2011, Trump explained to the auditorium that:

> A lot of the [ACN] people that I've met had their job for two or three
> years, and all of a sudden they started leaving out of their job and going
> full-time at ACN because they're making more money with ACN.  So I
> like it because ***it really takes the risk out***.  It ***takes a lot of the risk out of***
> ***the decision***.

(emphases added).



109.    Investigations by regulatory agencies, however, show that the ACN business opportunity was high risk and that investors had a miniscule probability of commercial success. In multiple jurisdictions in the United States and throughout the world, a common and consistent finding has emerged:  consumers have not (and could not) achieve a reasonable probability of financial success by investing in the ACN business opportunity.

110.    For example, a Montana Commissioner of Securities and Insurance ("CSI") investigation reviewed ACN internal documents as part of an investigation into its business practices.  The CSI found that the IBOs recruited in Montana in the previous year paid approximately $234,812 in membership and convention fees and supplies to ACN, but received only $16,615 in compensation.  In one year, the average Montana IBO paid $752.60 to ACN, but received only $53.25 in compensation.  In other words, these IBOs had costs associated with their investment in the ACN business opportunity that were over ten times greater than their returns.

111.    A French investigation into ACN reached similar findings.  During its investigation, the French Directorate General for Competition Policy, Consumer Affairs and Fraud Control ("DGCCRF") modeled the earnings potential of ACN IBOs, using records furnished by ACN.  The DGCCRF concluded that "*only 1 percent of people recruited could claim a satisfactory income*, while 99 percent either lose money or at best earn a monthly income of €28.20" (approximately US$35) (emphasis added).  Moreover, the DGCCRF projected that even comparably successful IBOs within ACN could earn only a paltry income.  For example, an IBO who had as many as 50 direct clients and 72 clients in their network earned only €2.35 monthly (approximately US$3), while an IBO who had as many as 40 direct clients and 350 clients in their network earned only €79.70 monthly (approximately US$98).  The projections suggested that the vast majority of IBOs lost money regardless of their client configurations.  Even if an IBO acquired six clients, 15 direct clients and six network clients, or 20 direct clients and 18 network clients, the IBO was projected to lose between €376 (approximately US$458) and €613 (approximately US$747) annually.

112.    In addition, ACN's own reports in Canada confirm that consumers did not have a reasonable probability of commercial success.[42]  According to ACN, the average "active" ACN Canada IBO earned only approximately CA$500 in one year.  Previous versions of the same reports reveal even lower earnings.  For example, according to Sergio Pareja of the University of New Mexico, the average ACN Canada active IBO "earned approximately [CAN] $400" in a single year.[43]  Even these figures, however, do not reveal the full extent of IBOs' losses.  As Pareja explained, ACN's figures showed gross earnings that did not take account of expenses

---

[42] Unfortunately for Plaintiffs, Trump did not mitigate the Success Claim by reference to any such disclosures, nor did ACN make disclosures of such granularity in the United States.

[43] Sergio Pareja, *Sales Gone Wild: Will the FTC's Business Opportunity Rule Put an End to Pyramid Marketing Schemes?*, 39 McGeorge L. Rev. 83, 129 n.306 (2008).

incurred by IBOs; nor did those figures identify the percentage of *non-active* IBOs, who were categorically excluded from the calculation.

      2.   *Trump Falsely Claimed That ACN's Business Model (and Direct-Selling in General) Provided a Viable Source of Income for Prospective Investors.*

113.    Not only did Trump misrepresent ACN's risk profile, but also Trump falsely claimed that the ACN business opportunity (and the MLM business model in general) was highly profitable for investors. Trump stated that "direct selling"—a component of the MLM business model—"is actually one of the oldest, most respected business models in the world, and has stood the test of time, most importantly." Every one of the Plaintiffs recalls hearing this statement and relying on it. In an extract from his book, *Why We Want You to Be Rich*, which was published in *Success from Home*, Trump (and his co-author) stated that

> Network marketing has proven itself to be a ***viable and rewarding source of income***. . . . My advice about network marketing is to do your research, and put everything you've got into your product. Genuine enthusiasm is hard to beat, and ***the odds will be with you***.

(emphases added).[44]

114.    Plaintiffs and class members also heard and relied on numerous similar statements:

- "Direct selling puts the people element back into business. And for thousands and thousands of people, that means good business and a solid opportunity."[45]

- "Direct selling is actually one of the oldest, most respected business models in the world. And has stood the test of time most importantly. ACN approaches it with a fresh perspective that you won't find anywhere else."[46]

---

[44] Donald J. Trump, *Why Network Marketing?,* Success from Home, Aug. 2011, at 96.
[45] Anne Archer, *Thinking Big with Donald Trump and ACN*, Success from Home, Sept. 2014, at 68.
[46] *The ACN Opportunity*, ACN Opportunity Disc (2010).

115.    In addition, far from encouraging prospective IBOs to exercise caution in a tough economic climate during the peak of the global financial crisis, Trump claimed that the MLM industry was "growing when many others are suffering massive losses."[47]  Every one of the Plaintiffs recalls hearing this statement and relying on it.

116.    Trump provided further assurances:  "ACN has a reputation for success.  Success that's really synonymous with the Trump name and other successful names and you can be part of it."  Every one of the Plaintiffs recalls hearing this statement and relying on it.

117.    Trump and other Individual Defendants continued the same theme elsewhere.  In the *Success from Home* magazine, Trump repeatedly praised ACN's business model as presenting a "good business and a solid opportunity" for "thousands and thousands of people."[48]  Likewise, in *Success from Home*, Defendant Eric Trump described ACN as "an incredible company,"[49] and, in an article published on ACN's website, Eric Trump said that the "Co-Founders of ACN are some of the most incredible people I know."[50]  Speaking from a position of apparent authority as a self-proclaimed business expert, Trump portrayed ACN as a business with strong fundamentals and sound management:

> When evaluating a business opportunity, people need to look for strong leadership, a solid track record, success stories, a strong product people really need and want, and a clear plan for the future.  ACN has all of these things.

---

[47] Anne Archer, *Direct Selling in the Age of Donald J. Trump*, Success from Home, Aug. 2010, at 22.
[48] *Id.*
[49] Mark Maremont, *Magazine Touts Trump's Lucrative Ties to Multilevel Marketing Firm*, Dow Jones, Aug. 19, 2015.
[50] *ACN Commits to $100K Titanium Sponsorship for Third Consecutive Year*, ACN (July 15, 2015), *available at* http://web.archive.org/web/20150719165029/http://acninc.com/news/es/company/2015/07/15/acn-commits-100k-titanium-sponsorship-third-consecutive-year.

118.    In sum, Trump told his audiences:  "I know what it takes to be a success, and ACN has a winning business model.  And I mean—winning."  This statement was reproduced in video recordings time and time again and every one of the Plaintiffs recalls hearing this statement and relying on it.



119.    Plaintiffs and class members also heard and relied on numerous similar statements:

- "It's my absolute pleasure to speak to you on behalf of ACN.  I work with a lot of companies and I can say with 100% confidence that you've made the right decision choosing ACN."[51]

- "There are a few simple things a company must have in order for me to believe in it . . . and ultimately for the company to be a success.  ACN has all these things and more."[52]

- "I've found there are two types of people:  Those who take action and those who let opportunity pass them by.  Which one are you?"[53]

---

[51] *Welcome to ACN*, ACN Opportunity Disc (2012).
[52] ACN Opportunity Disk (2010).
[53] *The ACN Opportunity*, ACN Opportunity Disc (2010).

- "The ACN co-founders love this company and all those years of success that they have already had are going to build a strong future of success."[54]

-  "ACN provides you with everything you need to be successful. All the training, support and tools, combine that hard work and commitment and you'll be well on your way to living the lifestyle that you deserve."[55]

120.    Trump's claims about the profitability of the ACN business opportunity was false. As alleged above, only 1% of IBOs were able to earn a satisfactory income—every regulatory agency to have studied the matter has concluded that the costs to IBOs greatly exceeds their returns.  Moreover, the losses were not just limited to ACN's IBOs.  Contrary to Trump's statements, such losses were endemic to MLM and direct-selling opportunities.  As Jon M. Taylor, President and co-founder of the nonprofit Consumer Awareness Institute, has written, loss rates in the multi-level marketing industry are "extraordinary."  Taylor concluded that, "[b]ased on available company data, approximately 99.7% of all MLM participants lose money—spending more on company purchases and promotion and operating expenses than they receive in commissions from the company."  Taylor lists ACN as one such company.

121.    Finally, consumer complaints bureaus have received a litany of complaints about the "business opportunity" offered by ACN.  Countless IBOs made no money at all.  For example, one said:  "I trusted a very good friend and paid out $500.00 and never saw any income from this business."[56]  Another said:  "I did everything I was supposed to and have not made a dollar."[57]

---

[54] Anne Archer, *Thinking Big with Donald Trump and ACN*, Success from Home, Sept. 2014, at 67.
[55] *Welcome to ACN*, ACN Opportunity Disc (2012).
[56] Review No. 832927, Pissed Consumer (Apr. 19, 2016), https://acn.pissedconsumer.com/very-very-bad-idea-20160419832927.html.
[57] Review No. 601509, Pissed Consumer (Feb. 27, 2015), https://acn.pissedconsumer.com/rip-off-acn-is-a-scam-all-the-way-beware-20150227601509.html.

3.   *Trump Misrepresented the Commercial Viability of ACN's Products,
Especially the ACN Video Phone.*

122.     In addition to misrepresenting the risk profile and profitability of the ACN

business model, Trump misrepresented the commercial viability of ACN's products.  When

Trump first began endorsing the company, ACN dedicated an important part of its business to

reselling third-party telephone and internet utility plans through IBOs.  In late 2008, however,

ACN moved into selling a "videophone," a desktop telephone with a screen and camera that

allowed users to have conversations using voice and video.  The videophone was a central

component of ACN's sales strategy for many years.  During this period, Trump repeatedly

praised ACN's "great product"—its "new ACN Video Phone."

123.     Trump stated that "ACN is leading the way in a new technology that will literally

revolutionize the way we communicate with the ACN video phone."  Trump told prospective

investors to "trust me it's changing everything."  Trump personally vouched for its value:  "No

matter who you are, no matter what you do, everyone can find value in this technology.  With

my busy schedule the ACN video phone keeps me personally connected to my contacts around

the world without ever leaving my office."  And Trump vouched for the commercial viability of

ACN's technology in the strongest possible terms:  "The absolute truth is that this technology

will be present in every home within the next several years."  That was not, in fact, the absolute

truth.

124.     In fact, ACN's videophone was anything but great—the product was doomed

almost from the outset.  The videophone was essentially a desktop, wired telephone with a video

screen and webcam in addition to the usual handset and keypad.  It required an internet

connection to work.  And, because an ACN videophone could only be used to make video calls

to other ACN videophones, both parties to a call had to subscribe to ACN services to use the

phone's video capabilities.  The ACN videophone was in direct competition with easily

accessible video calling software (including Skype) and was soon eclipsed by smartphones with

video calling capability.  In short, based on information available to Defendants (but not readily

available to Plaintiffs or class members), there was no proven market for the phone, no reason to

expect consumers would demand the phone, and nothing to suggest a standalone videophone was

a desirable product in light of its competition.



125.    Information available to the Trump Enterprise (but unfortunately not readily

available to Plaintiffs or class members) reflected the ACN videophone's dim commercial

prospects.  Worldgate Communications, Inc. was a small company that sold "digital video

phones directly or through agents to telecommunications service providers who have a digital

voice and video management and network infrastructure."[58] In late 2008, Worldgate was on the

---

[58] *Company Overview of WorldGate Communications, Inc.,* BLOOMBERG, available at
https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=36713.

brink of collapse.[59]  It had been delisted from the NASDAQ in 2007 and suspended operations

for some time during 2008.[60]  Its managers doubted it could continue as a going concern.[61]

126.    In December 2008, a mere three months before ACN appeared on *The Celebrity Apprentice* for the first time, ACN agreed to buy 300,000 videophones from Worldgate and to provide $1.2 million in funding for Worldgate.  The same month, WGI Investor LLC, an entity owned indirectly by ACN co-founder Robert Stevanovski and his wife, agreed to purchase a 63% stake in Worldgate in exchange for $1.45 million and the assumption of $5.1 million in debt.[62]

127.    In the 2009 episode of *The Celebrity Apprentice* featuring ACN, Trump said that "ACN is the largest distributor of videophones anywhere in the world.  They do half-a-billion dollars worth of sales a year."  This revenue representation was abjectly false.



---

[59] *See generally* WorldGate 10-K Annual Report at 6 (2009), available at
https://www.sec.gov/Archives/edgar/data/1030058/000114420410017605/v179472_10k.htm.
[60] *Id.* at 45.
[61] *Id.* at 6.
[62] *Id.* at 21

128.    Even if ACN sold each and every one of the 300,000 videophones it ordered in one year, at the retail price of $300, for example, that would only amount to $90 million in sales.

129.    In addition, ACN's order for 300,000 units from Worldgate came nowhere close to making ACN the "largest distributor of videophones" in the world.

130.    At an ACN convention in June 2009, Trump continued to claim ACN had a "great product."  Trump stated that ACN was a "leader in the field," and assured participants that they were in the "right business."  He had previously told ACN participants that "I think [ACN's] new videophone is going to be tremendous."  But there was neither a basis for Trump to assert that ACN was a "leader" in the field of telecommunications hardware generally nor videophones specifically.

131.    Trump repeatedly represented that ACN's videophone products were technologically superior to their competition.  In one video, he said:

> I would say, knowledge is so important, especially when you're dealing in high-tech kind of things like you. . . .  With ACN it's really knowledge, and one of the beauties with ACN, that I've been able to determine after some research, is that **you guys have stayed ahead of the pack. You've stayed ahead of it from a technological standpoint**, from a knowledge standpoint. And in your world, I think the word knowledge is so important.

(emphasis added).

132.    Onstage at an ACN event, Trump said that:

> Breakthrough products like the ACN Video Phone reveal ACN's commitment to pioneering technologies of the future.  With the ACN Video Phone, they are leading the way in a communication revolution. Staying at the forefront of innovation is key to long-term business success, and ACN is doing just that.[63]

---

[63] Anne Archer, *Direct Selling in the Age of Donald J. Trump*, Success from Home, Aug. 2010, at 22.



133.    Trump repeatedly claimed that this technological superiority would lead to robust consumer demand for the video phones.  In an ACN Opportunity Disc released around 2010, Trump said:

> Imagine seeing the person you're talking to, not just hearing their voices. No matter who you are, no matter what you do, ***everyone can find value in this technology***.  With my busy schedule, the ACN video phone keeps me personally connected to my contacts around the world, without ever leaving my office.

(emphasis added).  This could not possibly be true.

134.    To put it beyond doubt, in a 2010 edition from *Success from Home*, Trump was quoted as saying that the video phone was "changing communications as we know it. . . .  It's a product that practically sells itself."[64]

---

[64] Anne Archer, *Direct Selling in the Age of Donald J. Trump*, Success from Home, Aug. 2010, at 21.

135.     In ACN's press release announcing its appearance in the 2011 season of *The Celebrity Apprentice*, ACN again referred to its "latest video phone" as "revolutionary" and quoted Trump as saying:

> I think the ACN Video Phone is amazing.  It's connecting people face-to-face regardless of where they are.  I simply can't imagine anybody using this phone and not loving it.[65]

136.     Trump's statements regarding the technological superiority of the video phone and expected consumer demand were false and misleading.  ACN's videophone was less technologically advanced than any of its competitors, which also offered their competitive products at lower prices.  For example, as alleged above, desktop applications such as Skype offered voice and video calling at far lower costs than ACN's videophone plan.  Indeed, the market's reception showed ACN videophone was anything but amazing.  In March 2011, mere days before the 2011 episode of *The Celebrity Apprentice* aired, Worldgate announced that it was in a "cash crunch" and would fire 65% of its workforce (leaving it with 15 employees).  That same month, ACN revised downward its agreement to buy 300,000 videophones.

**B.     The Trump Enterprise Falsely Represented that Trump Genuinely Supported ACN and Failed To Disclose That He Was Being Paid Lavishly for His Endorsement**

137.     Trump repeatedly told his audiences that he endorsed ACN because he believed it offered a reasonable probability of commercial success.  He touted ACN's commercial prospects and his regard for its founders.  And he failed to disclose that he was, in fact, being paid millions of dollars for his ACN endorsement.

---

[65] *ACN Goes Primetime with Encore Appearance on Donald J. Trump's* The Celebrity Apprentice, ACN (Mar. 16, 2011), *available at* https://web.archive.org/web/20130627214919/http://www.acnpresskit.com/documents/ACN-Celebrity-Apprentice-NBC-Trump-Press-Release.pdf.

138.    ACN promotional videos also failed to disclose that Trump was being paid for his endorsement.  Every one of the Plaintiffs recalls watching multiple videos in which Trump endorsed and promoted ACN, and they do not recall any suggestion that Trump was being paid.  This, in fact, gave Plaintiffs the (false) impression that Trump was not being paid by ACN for his endorsement.  Indeed, if Trump's compensation from ACN had been disclosed, they would not have signed up and/or would have cut their losses earlier.



139.    The same practice continued at various events.  For example, in his speech at ACN's 2008 International Convention in East Rutherford, New Jersey, Trump stated that he had just "extended" his "partnership with ACN," because "when you have knowledge of something, and you really believe in something, it's very easy to give an endorsement.  ***And I give my endorsement*** 100 percent" (emphasis added).[66]  Neither Trump nor ACN disclosed to the audience that Trump was paid for this appearance, though he was paid lavishly for each appearance—at times millions of dollars for delivering a single speech.[67]

---

[66] *Learn 3 Networking Secrets from Donald Trump on Effective MLM Marketing*, YouTube (Apr. 5, 2010), www.youtube.com/watch?v=NsIQSku1ioI.
[67] James V. Grimaldi & Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, The Wall Street Journal (Aug. 13, 2015), https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

140.     Onstage at ACN's 2009 International Training Event in Charlotte, North Carolina, Trump noted it was the "fourth time I've felt like I'm part of you."  He praised ACN's founders, saying, "I really understand these guys," having "been with them for over three years as their friend."  He concluded: "I mean that, and if I didn't, I wouldn't be here."[68]

141.     Trump was the "keynote speaker" at ACN's 2010 International Training Event in Charlotte, North Carolina, where he was misleadingly billed as a "multi-billionaire entrepreneur."[69]  At the convention, he was interviewed by Darren Hardy, publisher of *Success from Home*.  In the interview, Trump emphasized his liking for ACN's founders, saying that he had "developed a real liking for Greg [Provenzano] and Robert [Stevanovski]," and that "I really enjoy and use your product . . . . I really like it a lot.  I use it when I can."[70]  Trump also said that "ACN is going to become a major sponsor of *The Apprentice*," and suggested that he would "put in a little special flavor because I really feel strongly about the company."[71]

142.     Trump was the guest speaker at ACN's 2011 International Convention in Barcelona, Spain, where he was again interviewed onstage by Hardy.  Asked why he had "such affinity for ACN," Trump explained that he "really like[s] the guys," who "have really become friends of mine."[72]  He continued to explain that he "give[s] lots of money to charity, and [the ACN founders] contribute to my charities.  They really have been very generous. . . .  These are

---

[68] *ACN Donald Trump TRUMP CLT*, YouTube (Mar 4. 2010), https://www.youtube.com/watch?v=EziHMkg5GfI.
[69] *ACN Welcomes Representatives to Hometown for International Training Event,* ACN (Aug. 30, 2010), http://acninc.com/news/press-releases/2010/08/30/acn-welcomes-representatives-to-hometown-for-international-training-event/.
[70] *Donald Trump Interviewed by Darren Hardy Part 1*, YouTube (Mar. 26, 2011), https://www.youtube.com/watch?v=rj0tlNg5WGM.
[71] *Donald Trump Interviewed by Darren Hardy Part 3*, YouTube (Mar. 27, 2011), https://www.youtube.com/watch?v=x7Uq0dl9DsA.
[72] *Convention Internationale Barcelone 2011 Iterview de M. Donald J. Trump,* YouTube (Apr. 10, 2011), https://www.youtube.com/watch?v=l081iz5QAEk.

good guys.  And I just felt I had a little bit of an obligation. . . .  [It] was a pain in the ass to get

here."[73]  (There is little evidence to support Trump's claims about giving lots of money to

charity.)

143.    At an ACN convention shortly thereafter, Trump explained to great applause:  "I

do speeches because I like doing it."[74]

144.    In a 2012 edition of the ACN Opportunity Disc, Trump elaborated on his reasons

for supporting the company:

> I've been working with ACN for a few years now.  Since that time I have
> developed a great relationship with ACN, and the more I learn about
> them, the more I like and respect them.  I see incredible potential in the
> things they're doing now, and are planning in the future.

145.    At ACN's 20th Anniversary International Training Event in Charlotte, North

Carolina, in February 2013, ACN announced that Trump was now an "exclusive" endorser.

Onstage at the event, Hardy asked Trump, "why do you keep coming back?  What is it about

ACN? ***Certainly not for any money***" (emphasis added).[75]  Trump answered:  "No."[76]



---

[73] *Id.*

[74] *Trump Loves ACN,* YouTube (Feb. 22, 2012), https://www.youtube.com/watch?v=53I_vIjFsMs.

[75] *Donald Trump 1 of 5 at ACN's 20th,* YouTube (Feb. 18, 2013)
https://www.youtube.com/watch?v=bY_g7Ws3C3Q.

[76] *Id.*

146.    Hardy continued, "It's for the love of the organization.  Tell us why you love ACN?"[77]  Trump replied:

> [T]he reason I'm doing it is because I really have a just a special relationship with the founders, they are good people, they are hard workers, they love what they are doing, they love the people in the room. . . . [T]hey are really good people with great ideas and they want to help other people.[78]

147.    Trump continued to say that he had "agreed to extend the relationship for a substantial period of time . . . .  Again, because of my relationship with the founders."[79]  After Hardy noted that Trump had "[chosen] to become exclusive with ACN,"[80] Trump said, "It's true. It's an honor.  Believe me."[81]

148.    At the June 2014 ACN International Convention in Barcelona, Trump again affirmed that he was not endorsing ACN because he was paid to do so.  He claimed he was "a fan of the founders and the vision" of ACN, and continued to say that he was "not an owner of ACN" so he did not "really need this," but that he "respect[s] what the owners are doing."

149.    Plaintiffs and class members relied on numerous similar statements:

- "I do this . . . because I love it because I think this is a great company and I love these ACN audiences!"[82]

- "I've known the ACN co-founders for years and I must tell you, I've gotten to know them very well. And the level of integrity there is amazing.  They love the people involved in ACN.  They want to do

---

[77] *Id.*

[78] *Id.*

[79] *Donald Trump 2 of 5 ACN 20th,* YouTube (Feb. 18, 2013) https://www.youtube.com/watch?v=8l3ilD5j4WA.

[80] This "exclusive" agreement appears to have been reached shortly after the Trump Network collapsed in late 2011.

[81] *Donald Trump 2 of 5 ACN 20th,* YouTube (Feb. 18, 2013) https://www.youtube.com/watch?v=8l3ilD5j4WA.

[82] Anne Archer, *Thinking Big with Donald Trump and ACN,* Success from Home, Sept. 2014, at 66–67.

well for the company and for the people at ACN—far beyond themselves."[83]

- "I've watched this company grow . . . .  I've been a fan of the company.  I think it's terrific and the ACN leadership is terrific."[84]

-  "I love the leadership at ACN. These co-founders know what they are doing.  They know where they are going. I've always had a good feeling about ACN; I just feel good about it.  A company is only as good as the people at the top, and ACN has good people behind it."[85]

150.    Every Plaintiff recalls watching videos featuring Trump and being left with the same understanding—that Trump's endorsement was not in exchange for any compensation from ACN.

151.    Trump's representations that he genuinely supported ACN out of admiration for its business and affection for its founders were knowingly misleading.  During the period of his endorsement, Trump never disclosed to his audiences that he was paid vast sums of money for each appearance as an ACN guest speaker.

152.    To the contrary, Trump affirmatively claimed that he did not endorse ACN for the money.  For example, in the August 2011 issue of *Success from Home*, Trump was quoted as saying:

> When Trump was negotiating with ACN, Inc. to represent the company and speak at their events, he made it clear that he would not be doing it "for the money."  He has plenty of money, so something else had to be the deciding factor.  For him, it came down to the four ACN co-founders.[86]

153.    Trump reiterated this message repeatedly at ACN's events.

---

[83] *Id*. at 68.
[84] *Id*.
[85] *Id*.
[86] Anne Archer, *Catching the Eye of a Billionaire*, Success from Home, Aug. 2011, at 23.

154.     No Plaintiff can recall any instance in which Trump disclosed that he was being paid.  To the contrary, each Plaintiff recalls having precisely the opposite understanding after hearing Trump's statements.

155.     In direct contradiction to his many years of statements and omissions indicating that he was not doing it "for the money," Trump admitted years later that his speaking fees amounted to "a substantial amount of money, even if you're rich."[87]  Plaintiffs are not presently aware of just how much Trump and the Trump Enterprise were paid for Trump's endorsement.  But the evidence now available suggests that the amounts were staggering—especially compared to the income of the average ACN IBO.  According to Trump's 2015 financial disclosures, ACN Inc. paid him $450,000 each for three in-person appearances between May 2014 and February 2015.[88]

156.     Similarly, in neither the 2009 nor the 2011 episode did Trump or the Trump Enterprise disclose that ACN had paid the producers of *The Celebrity Apprentice* handsomely to be featured on the show.  But, years later, Trump admitted that ACN "paid a lot of money to go on the show," saying that "it was like a two-hour advertisement, as opposed to a 30-second commercial."[89]  Although Plaintiffs are not aware how much ACN paid for its appearances on *The Celebrity Apprentice*, public reports have estimated that the company paid between $5–9 million to appear in a single episode.[90]  Plaintiffs are unaware of which entity within the Trump Enterprise received these payments, or whether other parties shared in the payments.

---

[87] James V. Grimaldi & Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, The Wall Street Journal (Aug. 13, 2015),https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.
[88] Donald J. Trump, Office of Government Ethics Disclosure Form, July 22, 2015.
[89] James V. Grimaldi & Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, The Wall Street Journal (Aug. 13, 2015), https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.
[90] *Id.*

157.     The Federal Trade Commission (the "FTC"), the agency charged with protecting

the nation's consumers, has long emphasized the importance of disclosing clearly and

conspicuously compensation for endorsement activities—and that failing to do so misleads

consumers.  Indeed, as part of its consumer protection mandate, the FTC issues specific guidance

concerning the use of endorsements.[91] In the FTC's view, endorsers must disclose "connections"

with, including monetary compensation they receive from, sellers of advertised products "that

might materially affect the weight or credibility of the endorsement."[92]

158.     The FTC succinctly explains why endorsers must clearly and conspicuously

disclose "material connections" with sellers of products:

> Suppose you meet someone who tells you about a great new product.
> She tells you it performs wonderfully and offers fantastic new features
> that nobody else has. Would that recommendation factor into your
> decision to buy the product? Probably.
>
> Now suppose the person works for the company that sells the product—
> **or has been paid by the company to tout the product. Would you want
> to know that when you're evaluating the endorser's glowing
> recommendation? You bet.** That common-sense premise is at the heart
> of the Federal Trade Commission's (FTC) Endorsement Guides.

(emphases added).[93]

159.     In recent years, the FTC has taken a more vigorous approach towards those who

fail to comply with its advice.  Indeed, in 2017, the FTC announced that its staff had issued in

---

[91] 16 C.F.R. Part 255.

[92] *Id.*; *see also FTC Staff Reminds Influencers and Brands to Clearly Disclose Relationship*, Federal Trade Commission (Apr. 19, 2017), https://www.ftc.gov/news-events/press-releases/2017/04/ftc-staff-reminds-influencers-brands-clearly-disclose ("FTC Reminder").

[93] *The FTC's Endorsement Guides:  What People Are Asking*, Federal Trade Commission (Sept. 2017), https://www.ftc.gov/tips-advice/business-center/guidance/ftcs-endorsement-guides-what-people-are-asking.

excess of 90 letters reminding celebrities to disclose material connections with relevant parties when promoting or endorsing products.[94]

160.     In addition to requiring disclosure of an endorser's material connections, the FTC states that endorsements "must reflect the honest opinions, findings, beliefs, or experience of the endorser."[95] The FTC again explains the responsibility that a celebrity endorser assumes when she or he elects to make a paid endorsement:

> The celebrity has **decided to earn money by providing an endorsement**. With that opportunity comes the **responsibility** for the celebrity or his or her legal representative to **ensure in advance** that the celebrity does **not say something that does not "reflect [his or her] honest opinions, findings, beliefs, or experience**."

(emphases added).[96]  Indeed, in the FTC's view, even if a celebrity is only reading from a script that was written by the advertiser, the endorser may have "an obligation to make **reasonable inquiries** of the advertiser that there is an **adequate basis** for assertions that the script has them making" (emphasis added).[97]

161.     Trump's persistent failure to disclose that he was being paid for his endorsement of ACN was wholly inconsistent with these basic consumer-protection principles.

**C.     The Trump Enterprise Falsely Represented that the Trumps' Endorsement Was Predicated on Appropriate Due Diligence and Personal Experience with ACN's Business**

162.     Trump reassured his audiences that they could trust what he was saying about ACN by making further false statements about the basis for his statements.  In particular, Trump claimed that he conducted appropriate due diligence into ACN before agreeing to endorse it.  In

---

[94] FTC Reminder.
[95] 16 C.F.R. § 255.1(a).
[96] 74 Fed. Reg. 53124-01, 53128 (quoting 16 C.F.R. § 255.1(a)).
[97] *Id.* at 53128–29.

so doing, he implied that his diligence confirmed that ACN presented a reasonable probability of

commercial success for prospective IBOs.  Trump also claimed that he had personally

experienced the ACN opportunity and that his endorsement was based on that experience.

163.    For example, in announcing his endorsement in 2005, Trump said:  "ACN is a

great company.  How do I know?  Because we have *done a lot of research*."[98]  Later, in another

ACN Opportunity Disc, Trump explained his process for deciding to endorse ACN, saying "*we

do a lot of research on companies* before we agree to do something like I'm doing for you.  And

ACN's a great company."[99]

164.    Trump echoed these false statements during his in-person appearances.  When

explaining to a live audience in 2008 why he had decided to extend his endorsement, Trump said

that "when you have knowledge of something . . . it's very easy to give an endorsement 100

percent."[100]  And Trump repeated this message in interviews for *Success from Home*.  As the

August 2011 issue put it:

> When Trump was initially deciding to work with ACN, his organization
> did a great deal of research on the company and took a hard look before
> deciding to endorse ACN and its products.[101]

A later issue stated reiterated Trump "only chooses" to invest "after performing due

diligence."[102]

---

[98] *Donald Trump & ACN,* ACN Newsmagazine*, Q4 2005, at 2.
[99] *ACN Interview with Donald Trump #3*, YouTube (Apr. 3, 2008),https://www.youtube.com/watch?v=sMpnCXmMrxM.
[100] *Learning 3 Network Secrets from Donald Trump on Effective MLM Marketing*, YouTube (Apr. 5, 2010), www.youtube.com/watch?v=NsIQSku1ioI.
[101] Anne Archer, *Catching the Eye of a Billionaire*, Success from Home, Aug. 2011, at 24; *see also* Anne Archer, *Direct Selling in the Age of Donald J. Trump*, Success from Home, Aug. 2010, at 20.
[102] Beth Douglass Silcox, *Recognizing a Winner*, Success from Home, Sept. 2013, at 74.

165.    In a video on an ACN Opportunity Disc, Trump similarly claimed that, "I've experienced the opportunity that exists when you're able to jump ahead of the curve, and ACN gives you that opportunity."

166.    In addition to claiming he had conducted research into and had personal experience with ACN's business model, Trump claimed to have conducted specific research into its videophone product.  Affirming the importance of "knowledge" when dealing with "high-tech" products, Trump claimed, "I've been able to determine after some research" that ACN's technology had "stayed ahead of the pack."[103]

167.    But all available information is to the contrary.  As Trump told the *Wall Street Journal* in 2015, "I'm not familiar with what [ACN] do[es] or how they go about doing that."[104] He went on to say, "and I make that clear in my speeches"[105]—yet another blatant falsehood.

## V.    THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF ACN WAS THE KEY FACTOR IN PLAINTIFFS' INVESTMENT DECISIONS

168.    Trump's fraudulent message was highly material in the minds of investors, as ACN itself acknowledged—all the more so because the Trump Enterprise used the Trump brand to bolster the Message, and permitted ACN to do the same.  This use of the Trump brand and association with Trump was also extremely powerful in the minds of investors.  Indeed, in numerous published testimonials, IBOs attributed their decision to join ACN to Trump's endorsement.

---

[103] *ACN Interview with Donald Trump #3*, YouTube (Apr. 3, 2008), https://www.youtube.com/watch?v=sMpnCXmMrxM.

[104] James V. Grimaldi and Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, THE WALL STREET JOURNAL, Aug. 13, 2015, available at https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

[105] *Id.*

169.     For example, one IBO described leaving her job as a dental hygienist to join ACN after a patient left her a copy of the Opportunity Disc:

> One special day, however, it was a patient who was looking out for Kim when she told her all about ACN and left behind an Opportunity Disc. 'She really drove home two major points that made an impression: first, **that Donald Trump endorsed the company**, and second, that the disc she had given me would take less than 10 minutes to take a look at.' . . . As soon as she watched the videos, she signed up right away.

 (emphasis added).

170.     ACN itself proudly boasted of its relationship with Trump and the legitimacy the Trump brand afforded the company.  As one edition of the ACN Opportunity Disc put it:

> We're attracting attention in very high places, and among **the world's most successful business leaders.**  One such leader is billionaire entrepreneur Donald Trump, who has **built his career on recognizing an exceptional opportunity when he sees it.**

(emphases added).  Every one of the Plaintiffs recalls hearing this statement.

171.     ACN's prime-time features on *The Celebrity Apprentice* massively boosted ACN's business.  Indeed, a narrator in one of ACN's own video clips makes clear just how impactfully the Message was delivered through *The Celebrity Apprentice*:

> The excitement around ACN's revolutionary video phone is spreading and the **world is taking notice**.  After a personal invitation from Donald Trump himself, ACN was featured on an episode of the Celebrity Apprentice, NBC's hit reality television show.  ACN's video phone took center stage during this episode as the cast of celebrities launched the ACN video phone to the world.  And this is only the beginning.

(emphasis added.)

172.     In June 2010, *Direct Selling News* reported that ACN "had tremendous growth after its video phone was featured on Donald Trump's *The Celebrity Apprentice*."  Provezano was quoted as saying that ACN's performance was "spectacular" in the first quarter of 2010.  In 2012, Provenzano explained that, from ACN's perspective, "having Donald Trump endorse our

organization would be the epitome of an endorsement."[106]  As an article in *Success from Home*

noted, "[t]he endorsement is truly a direct seller's dream.  After all, Trump personifies the will to

win.  He is an entrepreneurial icon, nobody can outwork him and he is a fan of network

marketing."[107]

173.    ACN made crystal clear that Trump's brand was an impactful recruiting tool for

investors in two principal ways:  first, it attracted the interest of prospective investors and

second, it would help close the deal with prospective recruits.  As *ACN Newsmagazine*

explained, the ACN Opportunity Disc was designed to "pique interest in ACN and ***get existing***

***prospects off the fence***," including by using "the ***powerful*** endorsement of Donald J. Trump"

(emphases added).[108]

174.    ACN executives repeatedly emphasized that the Trump brand would heighten the

impact of his endorsement in the minds of prospective investors.  ACN co-founder Tony Cupisz

was quoted as saying "You've got that incredible disc with Donald Trump on it . . . whoever

hands out the most of those discs will get the most results. . . .  ***Donald Trump is promoting***

***your business for you***" (emphasis added).[109]  Co-founder Mike Cupisz noted that Trump's

support for ACN was unparalleled: "We have got Donald ***Trump***—a ***multi-billionaire***—giving

us ***the highest level endorsement than any other network marketing company has ever had in***

***history***" (emphases added).[110] Greg Provenzano, ACN's co-founder and president, boasted in his

"President's Message" about the significance and singularity of Trump's endorsement—and the

enormous value it would have because of its impact on investors:

---

[106] Barbara Seale, *The Wizard of Winning,* Success from Home, July 2012, at 76.
[107] *Id.*
[108] *Baltimore International Training Event Sept. 8–10, 2006*, ACN Newsmagazine, Q2 2006, at 2.
[109] *Id.*
[110] *Id.*

One of the ***most important tools*** available to ACN representatives today is obviously the Donald J. Trump endorsement. ***It's all about Trump*** this quarter at ACN—and all about what Trump can do for you! . . .

How much would it be worth to have Mr. Trump sit in your living room and ***personally endorse*** ACN as you present the ACN Opportunity to your prospects? It would be ***priceless***—and ACN is making that happen. . . .

Mr. Trump is ***extremely selective*** in his speaking engagements and in the companies he chooses to work with—and he ***chose ACN***!

(emphases added).

175.    Finally, ACN's appearance on *The Celebrity Apprentice* "added credibility for [ACN] like none other."[111] As Provenzano put it in an interview in *Success from Home*:

It was the ***biggest meeting night in ACN history***! Independent business owners held opportunity meetings in hotels, theaters, restaurants and other venues to introduce ACN in a whole new way through the episode, providing a new platform for them to share the ACN home-based business with their prospects. And the interest didn't die down during commercial breaks, as independent business owners used commercials as prime opportunities to answer questions, host contests about ACN and the episode, and to share our opportunity through presentations and talks. . . . ***The wave of momentum the episode created is truly incredible***!"

(emphases added).[112]

176.    The repeated references to Trump's wealth were a key part of the use of his brand to boost ACN's business. Potential investors were led to credit Trump's assessments of ACN as a business opportunity because of his portrayal as exceedingly wealthy—after all, a purportedly self-made billionaire must know a thing or two about making money. But, as alleged above, Trump's apparent wealth was largely an illusion—in the words of a producer of *The Apprentice*, "a convenient vacation [from] the truth."[113]

---

[111] Anne Archer, *Catching the Eye of a Billionaire*, Success from Home, Aug. 2011, at 24.
[112] *Id.*
[113] Kelly McEvers, *Trump Stories: The Apprentice*, NPR (Oct. 11, 2017), https://www.npr.org/templates/transcript/transcript.php?storyId=555768139.

177.     Thus, it was not only the Message conveyed by Trump that so misled investors.  It was ACN's ability to associate itself with the Trump brand—a right that ACN secretly bought from the Trump Enterprise—that drove the fraudulent message home and pushed investors to overcome lingering doubts and invest in the ACN business opportunity.

178.     Throughout the period of his endorsement, Defendants were in full control of how the Trump brand was used to bolster ACN in the eyes of potential investors.  Indeed, ACN directed IBOs that they could only use materials featuring Trump that were created by ACN itself, because ACN had "exclusive and *limited* permission to reference Donald J. Trump and use his image on ACN created material that has been *approved by* the Trump organization" (emphases added).

179.     This brand association was not limited to Trump himself.  Defendants Donald Trump Jr., Ivanka Trump, and Eric Trump each appeared repeatedly alongside ACN co-founders in photographs and other materials and associated themselves with the brand.  For example, since at least 2013, the Eric Trump Foundation (now known as Curetivity) has hosted ACN's charity golf tournaments.  During these events, the Trumps appeared in photographs with ACN representatives, which were later publicized on social media and elsewhere.   In 2013 and 2014, Donald Trump Jr. and Eric Trump were photographed golfing with ACN's co-founders. Defendant Eric Trump served as a "captain" for ACN's 2014 Ronald McDonald House Celebrity Golf Tournament.  Eric Trump also authorized ACN to use his image and statements in recruiting and promotional videos.  Following the event, ACN published a photograph of Defendant Eric Trump with ACN's chairman and co-founder Robert Stevanovski, telling ACN's followers that Stevanoski "spent the day playing with Eric Trump."  In 2015, ACN co-founder Stevanoski was photographed at the Eric Trump Foundation's annual fundraising dinner.  And

ACN donated at least $300,000 to the Eric Trump Foundation between 2013 and 2015.  In the

eyes of the victims, Defendants and ACN legitimized each other through their cross-branding in

these appearances.





180.     In February 2015, ACN published on its Facebook page an album containing

photographs of four ACN representatives—including Manny Provenzano, son of ACN

cofounder Greg Provenzano—in Donald J. Trump's private plane, at a taping of the season finale

of *The Celebrity Apprentice*, and at the subsequent after-party at Trump Tower.  The album

description stated, "Due to ACN's continued relationship with Donald J. Trump, we were invited

to return to New York with him on his private jet and get exclusive access to the live finale of

The Celebrity Apprentice."  The album contained a photograph of Eric Trump standing with the four representatives, which included the caption: "Our VIP Access continued after the show! We got to chat with the stars of #CelebrityApprentice and members of the Trump family!"  The promotion and endorsement were a collective effort on behalf of the Trump family.  As a June 2008 edition of *Success* explained, in an article titled "Trump Power," Donald Jr., Ivanka, and Eric are where "Donald Trump's professional life and family life intersect."[114]

### A.    Catherine McKoy

181.    Plaintiff McKoy is resident, citizen, and domiciliary of California.  McKoy signed up as an ACN IBO in mid- to late 2014 and pursued the business opportunity for approximately two years.  Throughout that time, she also worked as a hospice caregiver, often working twelve-hour shifts, seven days a week.  McKoy continues to work as a hospice caregiver to this day.

182.    McKoy did not attend college.  She does not have a retirement-savings plan or life insurance.  Until this year, she has never purchased a stock or a bond.

183.    McKoy was invited to her initial ACN meeting by her friend, Plaintiff Millard Williams.  McKoy had first met Williams about five years earlier through a social club, and they connected because of their mutual interest in business and current events.  McKoy and Williams were ambitious, entrepreneurial, and eager to invest in themselves.

184.    One day in mid- to late 2014, Williams called McKoy and told her that he had joined ACN.  He said that he thought that the company was a great opportunity for them both to make money, and invited her to join him at an ACN meeting.  McKoy was intrigued.  She knew that, like herself, Williams really needed and wanted to make money.  They were both struggling financially.  McKoy agreed to attend.

---

[114] Mike Seemuth, *Trump Power*, Success, June 30, 2008.

185.    The meeting was held in a large meeting room at a hotel in Los Angeles.  There were about 75 people there:  a mix of current ACN IBOs at various levels, as well as potential recruits.  The recruits were encouraged to sit right up front.

186.    The meeting began with speeches by three more senior ACN IBOs.  The first speaker talked at some length about ACN's charitable giving, and told recruits that, if they signed up for ACN, they would not need to make charitable donations, since a substantial portion of their investment would support charitable causes.  McKoy, a charitable person who regularly made donations to St. Jude despite her extremely limited means, liked what she was hearing.

187.    The next IBO talked more about how to pursue the business opportunity.  She emphasized the importance of getting one's own family involved in the company.  McKoy thought this sounded okay, but she was unconvinced.

188.    The third speaker was a senior ACN IBO.  McKoy did not care for him at all.  She was extremely put off by her sense that he was talking down to people, fancying himself as better than lower-level IBOs.  She thought he seemed arrogant.  She considered leaving the meeting.

189.    Next, the organizers of the meeting played a seven- to eight-minute promotional video prominently featuring Donald Trump.  This video was the turning point for McKoy.  McKoy thought very highly of Trump.  She was entrepreneurial and ambitious, and she thought of Trump as a highly successful businessman with many accomplishments.  In addition, McKoy's mother had been a viewer of *The Celebrity Apprentice* and frequently told McKoy all about it.  She emphasized how impressive Trump was—how good he seemed at business.

190.    As she watched the video, McKoy was very impressed by the Trumps' endorsement of ACN.  She watched as he said that ACN IBOs could make real money from their involvement in the company, which he said was already worth millions.  Then she watched clips

of ACN's appearance on *The Celebrity Apprentice*.  McKoy saw the Trumps stand alongside the founders and praise the company.

191.    Based on what she knew about Trump and *The Celebrity Apprentice*, McKoy was convinced by his statements that ACN was a great opportunity.  McKoy trusted Trump.  She was convinced that Trump believed that investing in ACN was a great business opportunity—and that that was why he was endorsing it.  And she believed that, like any businessman promoting a business opportunity, he had researched ACN extensively and that his statements were supported by his own research and experience.

192.    Trump concluded with a call to action to induce McKoy and prospective investors to invest in ACN's business opportunities and training programs:  "I've found there are two types of people:  Those who take action and those who let opportunity pass them by. Which one are you?"  McKoy recalls this statement having a significant impact on her decision to invest in ACN.

193.    McKoy believed that Trump had her best interests at heart.  She believed that Trump was already very rich, and she thought to herself, "what would he want with my $500?" She thought, "he already has a lot of money, he's not trying to scam me."  McKoy had no idea Trump was being paid lavishly for his endorsement—the video made no mention of that. McKoy thought Trump's only motivation in endorsing ACN was to help people like her make good business decisions.  As a result, McKoy trusted Trump when he said that ACN was "one of the best businesses" and that participants could make a lot of money from investing in ACN. McKoy concluded that Trump would not have associated himself with ACN, brought the company onto his show, and given it such huge publicity if it were not a genuine opportunity that offered a strong likelihood of a good return.

194.     Moreover, based on the way Trump talked about ACN in the video, McKoy believed that Trump himself had invested in the ACN business opportunity and had made money from it.  She believed that if Trump had made money with ACN, she could too.

195.     After seeing Trump in the video, McKoy was convinced.  Based on the speeches she had seen up to that point, she would not have joined.  However, Trump's endorsement sold her on the opportunity.  She told others at the meeting that she had not liked the third speaker, but that she had been convinced by Trump.

196.     McKoy joined ACN then and there.  She wrote a check for the $499 registration fee and became an IBO.  She also signed up for an upcoming trip for a larger ACN meeting in Palm Springs, California.

197.     More senior IBOs told McKoy that Palm Springs would be a great way to begin her career with ACN.  They also told her that there would be a "special guest" and an opportunity to "meet someone very special," and implied that it would be Donald Trump. McKoy wanted to go to Palm Springs for many reasons:  she was excited about the convention; she wanted to be successful in ACN; she believed the convention was necessary for her success; but, above all, she wanted to meet Donald Trump.

198.     Having paid the $499 registration fee, McKoy had very limited funds.  Despite her limited resources, McKoy used her most recent paycheck to pay for her event expenses, including her registration fee and her share of a car rental, hotel room, and food.  She shared a hotel room with four other women.  She also purchased training materials and other business tools to help her succeed with ACN.  McKoy's cumulative expenses from the convention totaled almost $1,500.  Throughout the event in Palm Springs, Trump's endorsement was featured prominently, although Trump himself did not appear.

199.    After the event in Palm Springs, McKoy returned to Los Angeles and remained fully committed to ACN.  More senior IBOs told her that, to be successful, she had to attend ACN meetings like the one where she had first signed up.  Each meeting cost $20, and McKoy often attended two per month.

200.    These meetings were held in one of two hotels in Los Angeles.  The program at every meeting was essentially the same:  speeches by more senior IBOs, recognition of IBOs who claimed they were "making money" (rarely was a specific number given), and, the centerpiece of it all, the promotional video featuring Trump's endorsement.

201.    McKoy felt substantial pressure to attend these meetings.  Attending these meetings often caused McKoy to miss shifts providing hospice care, which reduced McKoy's income.

202.    McKoy worked tirelessly to recruit her friends and family and sell them services.  She hosted events at her home for her family to inform them about ACN.  McKoy invested money and considerable time providing food and supplies for these events, preparing her house and cooking food.  Ultimately, she had extremely limited success.  In her first few months, McKoy was able to recruit one of her sisters as an IBO, but just two days later, her sister demanded her money back.  McKoy, wanting to do right by her sister, refunded her sister's $499 investment herself.

203.    McKoy also was able to recruit three of her cousins as customers.  Two of her cousins purchased a TV plan and one changed his cell phone plan.

204.    Based on those customers, McKoy received a check from ACN for $38.  It was the only income she would ever receive from the company.

205.    As the months wore on, McKoy began to get discouraged.  But each time she began to lose confidence, she would blame it on herself and try to change her approach because she believed that she was doing something wrong.

206.    Throughout McKoy's time in ACN, including at the regular meetings, more senior IBOs constantly touted Trump's endorsement of ACN.  They said things like, "If you are successful enough with ACN, then you can meet Donald Trump," and told her that Trump would help individual IBOs with their businesses if they put in enough work.  McKoy understood that Trump was invested in the company financially and that he had a personal stake it its success.

207.    About six months after she first signed up, McKoy attended a national ACN convention in Cleveland, Ohio.  She was wary of spending the money, but her upline told her that it could not be missed.  They emphasized the community, the training and, importantly, that Trump might be there as a special guest.  At the local meetings leading up to the convention, McKoy's upline played even more Trump videos than usual, whipping up excitement among the IBOs.  McKoy knew that she could not miss out on opportunity to learn about business from Trump—and she decided to go.

208.    McKoy purchased a convention ticket and gave her upline money for flights and her share of a hotel room, van service, and miscellaneous expenses.  Again, McKoy hoped and expected that Trump would appear personally.  And again, McKoy was disappointed.  Although Trump did not appear, photos and videos featuring Trump were prominently displayed throughout the convention.

209.    McKoy had to return from the convention a day earlier than the rest of her group, and when she got to the airport, she realized that the ticket her upline had given her was one-way

only.  She had to purchase a return ticket herself.  Her total investment in attending the Cleveland convention was approximately $2,000.

210.    Some months later, McKoy attended another multi-day event, this time in Detroit, Michigan.  Again, she invested substantial amounts of money to attend the event, in the hopes of seeing or meeting Donald Trump.  Again, he did not appear, but his endorsement was central to the event.

211.    Not long after the Detroit event, McKoy's friend, Plaintiff Millard Williams, who had first recruited her to the business, decided not to renew his IBO position for a second year. Williams, who was homeless at the time, simply had no funds to continue pursuing the business opportunity.  Though she was disappointed that Williams would not continue with ACN, McKoy herself decided to soldier on, and she paid the annual renewal fee of $150.

212.    During her initial recruitment and throughout her experience with ACN, McKoy recalls hearing and relying on various statements from Trump that formed part of the Message, including:

- "It's my absolute pleasure to speak to you on behalf of ACN.  I work with a lot of companies and I can say with 100% confidence that you've made the right decision choosing ACN."

- "I've been working with ACN for a few years now.  Since that time, I've developed a great relationship with ACN and the more I learn about them, the more I like and respect them.  I see incredible potential in the things they are doing now and are planning in the future."

- "ACN has a reputation for success.  Success that is really synonymous with the Trump name, and you can be a part of it."

- "You have a great opportunity before you at ACN without any of the risk most entrepreneurs have to take."

- "I've experienced the opportunity that exists when you're able to jump ahead of the curve and ACN gives you that opportunity."

- "I've found there are two types of people: Those who take action and those who let opportunity pass them by.  Which one are you?"

213.    During her time as an IBO, McKoy also recalls reading and relying on articles in *Success from Home* magazine featuring Donald Trump's promotion and endorsement of ACN, which she understood to be third-party validations of the business opportunities and training programs ACN offered that were entirely independent from ACN and the Trumps.  For example, McKoy recalls reading and relying on the following statements by Trump in *Success from Home*:

- "Direct selling puts the people element back into business.  And for thousands and thousands of people, that means good business and a solid opportunity."

- "I've known the ACN co-founders for years and I must tell you, I've gotten to know them very well.  And the level of integrity there is amazing.  They love the people involved in ACN.  They want to do well for the company and for the people at ACN–far beyond themselves."

- "I love the leadership at ACN.  These co-founders know that they are doing. . . .  A company is only as good as the people at the top, and ACN has good people behind it."

- "The ACN co-founders love this company and all those years of success that they have already had are going to build a strong future of success."

- "I've watched this company grow . . . .  I've been a fan of the company.  I think it's terrific and the ACN leadership is terrific."

- "I do this . . . because I love it because I think this is a great company and I love these ACN audiences!"

214.    These statements in *Success from Home* magazine further comprised, bolstered, and augmented the Message and encouraged McKoy to persevere with ACN.

215.    For a time, McKoy continued attempting to recruit both customers and IBOs, bringing family members to the local ACN events.  She was mindful of how much money she

had invested in the ACN business opportunity and was eager to find a way to recoup her investment. But eventually she too simply ran out of money to invest.

216.    At one point in her second year with ACN, McKoy came to one of the regular meetings without a recruit. Her upline criticized her and told her she would never make money if she did not bring people to the regular meetings. McKoy thought to herself that she had been bringing people to the meetings for more than a year and had only made $38. Despite her strenuous efforts, she simply was not making money. She began to have real doubts about the company. And she was becoming uncomfortable with the idea of trying to recruit people into the company—she did not see how she could tell people ACN was a good thing when she was more and more convinced that neither they nor she could make a profit.

217.    Not long thereafter, the location of the regular meeting was moved to the house of an IBO. As she paid the fee to enter the meeting, McKoy thought to herself, I really am spending a lot.

218.    At the meeting, it became clear to McKoy that the statements Trump was making about ACN were not true and that ACN did not provide average IBOs with a realistic chance of making a profit. She realized that she had been scammed. Trump was selling a dream to people like her—people who were struggling financially, were really desperate, and would leap at a promise of the kind of success Trump embodied. It was her last meeting.

219.    McKoy realized that it was a lost cause and that she was just going to continue losing money. It was at this point that McKoy cut her losses and ceased to participate in ACN. When her next annual renewal date came up, McKoy decided not to renew her position.

### B.      Millard Williams

220.      Plaintiff Williams is resident, citizen, and domiciliary of California.  Williams first heard about ACN in mid-2014 when he was working for the Salvation Army.  Williams was homeless at the time.  A colleague approached Williams and told him about an opportunity to make money by joining ACN.  The colleague invited Williams to join him at an information meeting.

221.      Williams did not attend college.  He has never purchased stocks.  And Williams does not have life insurance or a retirement savings plan.

222.      The meeting was held at a hotel in Los Angeles.  The meeting began with some short speeches by ACN representatives, followed by a seven- to eight-minute promotional video, which prominently featured Trump.  Williams believed at the time that Trump was a highly successful businessman.  Williams had watched *The Celebrity Apprentice* a few times and had seen Trump present himself as a savvy, experienced, and knowledgeable entrepreneur who had achieved remarkable wealth and celebrity.  In the ACN video, Trump spoke about his entrepreneurialism, describing how he had started businesses and become very successful.  Critically for Williams, Trump promoted ACN as a good moneymaking opportunity.  Trump also said that he was glad to be a part of ACN because he genuinely believed the company provided a path to commercial success.

223.      The Trump endorsement in the video was the key factor that made Williams decide to invest in the ACN business opportunity.  Williams thought that, if a successful businessperson like Trump believed in the company, it was worth Williams's own time and effort.

224.    After the video, an ACN regional vice president gave a formal presentation.  After that presentation, and some speeches by other ACN members, Williams was asked to join ACN—for a $499 registration fee.

225.    Williams was homeless at the time and did not have the money to pay the registration fee.  But Williams's colleague—the one who had first introduced him to the company and invited him to the meeting—offered to loan Williams the money.  Although $499 was a very significant amount of money for Williams, he believed it was worth going into debt because he thought, based largely on Trump's endorsement, that he would recoup his investment if he worked hard to build a business within ACN.

226.    During his initial recruitment and throughout his experience with ACN, Williams also recalls hearing and relying on various statements from Trump that formed part of the Message, which included:

- "It's my absolute pleasure to speak to you on behalf of ACN.  I work with a lot of companies and I can say with 100% confidence that you've made the right decision choosing ACN."

- "I've been working with ACN for a few years now.  Since that time, I've developed a great relationship with ACN and the more I learn about them, the more I like and respect them.  I see incredible potential in the things they are doing now and are planning in the future."

- "Direct selling is actually one of the oldest, most respected business models in the world.  And has stood the test of time most importantly. ACN approaches it with a fresh perspective that you won't find anywhere else.  I know what it takes to be a success and ACN has a winning business model, and I mean winning."

- "ACN has a reputation for success.  Success that is really synonymous with the Trump name, and you can be a part of it."

- "You have a great opportunity before you at ACN without any of the risk most entrepreneurs have to take."

- "I've experienced the opportunity that exists when you're able to jump ahead of the curve and ACN gives you that opportunity."

- "I've found there are two types of people: Those who take action and those who let opportunity pass them by.  Which one are you?"

- "ACN is leading the way in a new technology that will literally revolutionize the way we communicate with the ACN video phone.  And trust me it's changing everything.  The absolute truth is that this technology will be present in every home within the next several years."

- "No matter who you are, no matter what you do, everyone can find value in this technology.  With my busy schedule, the ACN video phone keeps me personally connected to my contacts around the world, without ever leaving my office."

227.   After he signed up, Williams began trying to recruit other IBOs and sell ACN services.  He had very limited success.  Williams was only able to recruit one other IBO, fellow Plaintiff Catherine McKoy.  He also sold a handful of services to friends.  Williams registered some of the services in his own name, even though they were intended for a friend who had promised to foot the bill.  Ultimately, Williams's friend was unable to pay because the prices of the services got too high, and Williams was stuck with a bill that he too was unable to pay.  The unpaid charges remain on his credit report to this day.

228.   Williams never received any income whatsoever from ACN.

229.   Williams's inability to succeed with ACN was not due to lack of effort.  Williams attended 25 to 30 meetings, each costing between $10 to $20.  These meetings were held approximately twice per month in one of two hotels in Los Angeles.  The program at every meeting was essentially the same:  speeches by more senior IBOs, recognition of IBOs who claimed they were "making money" (rarely was a specific number given), and, the centerpiece of it all, the promotional video featuring Trump's endorsement.

230.   Williams felt substantial pressure to attend these meetings; when he missed a meeting, he was criticized and shunned by more senior IBOs.  Attending these meetings often

caused Williams to forgo opportunities to earn income performing one-off projects as a mechanic or handyman.

231.    Williams also attended three larger ACN events during the year he spent in the company:  a multi-day event in Palm Springs, California, a national convention in Cleveland, Ohio, and another multi-day event in Detroit, Michigan.

232.    Williams was unable to pay for his own event tickets, flights, lodging, and miscellaneous expenses.  In dire straits, Williams borrowed money from his fellow team members so that he could attend these events, hopeful that if he continued investing in pursuing the ACN business opportunity he would ultimately recoup his initial investment.

233.    Like McKoy, Williams thought Trump might surprise the audience at the national convention in Cleveland by appearing on stage personally.  While Trump did not appear in person, his endorsement of the company was center stage.  Photos of Trump and word of his endorsement were widespread, and a promotional video prominently featuring Trump was played on large screens in the convention arena.  When Trump came on the screen, the entire arena was transfixed.  For his part, Williams was again impressed by Trump's seemingly genuine support for the company and left the convention re-inspired and reinvigorated, believing that ACN could still be a good business opportunity.

234.    After a few more months of meetings, expenses, debt, and zero income to show for it all, Williams stopped believing in the company.  He knew that he had only lost money so far and could not see a path to making any money in the future.  Contrary to what Trump had said in the promotional videos, Williams concluded ACN was not a good moneymaking opportunity.  When the time came for his next annual renewal, he chose not to pay the fee.

### C.     Markus Frazier

235.     Plaintiff Frazier is a resident, citizen, and domiciliary of Maryland.  He was an active IBO for less than one year, from November 2016 until November 2017, when he let his registration lapse.

236.     Markus Frazier currently works as a food delivery driver.  He does not have life or health insurance.  He has never purchased a stock or bond.  He does not have a retirement account.  And he has never owned a home or had a mortgage.

237.     Frazier first learned about ACN in mid-2016.  At the time, he was living with his mother and brother and working for a fast-food restaurant in Columbia, Maryland

238.     One day in mid-2016, Frazier was working an afternoon shift when a customer beckoned Frazier over and told Frazier he had a business opportunity for him.  The customer said he was involved with ACN gave Frazier his business card bearing the ACN logo, showed Frazier an ACN magazine, and told Frazier to give him a call if he was interested.

239.     Initially, Frazier was skeptical.  He was not sure the business would be worth his time and effort.  But Frazier was spending most of his time as a food-delivery driver and was not making very much on tips.  He wanted to change his life for the better.

240.     About two weeks later, Frazier called the number on the business card the ACN participant had given him to learn more about the potential opportunity.  The ACN participant texted Frazier a link to an informational video that boasted of the lifestyle ACN would provide and encouraged Frazier to join an online conference with other ACN IBOs and potential recruits. Frazier joined the online conference later that evening, where he viewed a presentation providing more detail about ACN.  At the end of the presentation, Frazier was told that each recruit would have to pay $499 if they wanted to "start a business."

241.    After the online conference, the ACN participant who had given him the business card immediately called Frazier and pressed Frazier to sign up, but Frazier said that he would have to think about it.  Five hundred dollars was more than Frazier could afford.  The ACN participant then invited Frazier to attend a convention in his hometown, Columbia.

242.    Intrigued, Frazier decided to do some additional research on ACN.  Frazier first looked at the Better Business Bureau's website.  He saw that ACN had an A rating, but that there were some complaints, including from customers who had tried the phone service, who were not satisfied, and had tried to end the service, but kept getting bills.  Because the comments did not match ACN's rating, Frazier remained unsure.  He decided to look up ACN on YouTube.  The first thing that caught his eye was a video of Trump from *The Celebrity Apprentice*.

243.    Frazier was excited to see Trump.  He clicked on the link and watched the video. For about eight minutes, he watched as the celebrity contestants performed different pitches to sell ACN video phones.  As part of the clip, Donald Trump and Ivanka Trump stood next to two of the ACN founders, Greg Provenzano and Tony Cupisz, and endorsed ACN, saying that he knew the company well.  Trump then let the founders speak as he remained alongside them.

244.    Trump's statements were a turning point for Frazier.  Frazier was fascinated by Donald Trump.  He believed that Trump was a successful businessman who had many kinds of businesses, including Trump Towers in New York City and a casino in Atlantic City and, thus, a wide range of business expertise.  Frazier also knew Ivanka Trump from her appearances on *The Celebrity Apprentice* and believed that the Trumps really knew how to make money. Consequently, the Trumps' endorsement of the company meant a lot.  Frazier believed that by promoting the company, the Trumps were telling others that they too could make money and become successful business owners like him by investing in ACN.  Ultimately, for Frazier,

Donald Trump in particular *was* business.  He believed that if Donald Trump said that ACN was

great, then it must be true.  After watching this video, Frazier was inclined to sign up with ACN

and decided to attend the convention.

245.    Frazier would not have signed up for ACN if he knew if that Donald Trump was

being paid to endorse ACN.  He thought that Trump was endorsing ACN because Trump

genuinely thought it was a good opportunity for someone in Frazier's position.

246.    Frazier attended the convention.  He was excited about the ACN opportunity and

how much he could make compared to his fast-food job.  But he still could not afford the $500

initiation fee.  The customer followed up with Frazier over the phone a few days later.  When the

customer asked Frazier what he was thinking about ACN, Frazier said he was not sure because

he did not have the money.  The customer kept calling Frazier.  During these conversations,

Frazier would tell the customer that he was not planning to commit to ACN now because it was

too much money.  But because of Trump's endorsement, he wanted to sign up—if only he could

find a way to afford it.

247.    One weekend, in the beginning of November 2016, Frazier and his mother went

to a nearby casino.  Frazier got on a slot machine and he quickly won $300.  He immediately put

this in his bank account.  Later that night, he won $200 from a lottery ticket.  At that moment,

something clicked:  Frazier realized he had enough money for the ACN registration fee.  He put

the money directly into his account and decided he would sign up.

248.    Frazier then called the ACN participant who gave him the business card and told

the participant that he was ready to sign up.  The participant remained on the phone with Frazier

as he filled out his registration form and paid the $499 registration fee.

249.     The participant, who would now become Frazier's ACN "mentor," invited him to his house that evening to help train Frazier on how to best use the ACN tools.

250.     After this training, Frazier quickly attempted to establish his own success in the company.  He did this both by trying to convince potential customers to purchase ACN services and trying to convince others to join ACN as IBOs.  He first tried to recruit his mother as a customer.  She said no.  Then, about a month later, he visited a friend who had a high electric bill.  Frazier thought maybe he could help by providing alternative services through ACN. Frazier attempted to use the ACN pitch to sell the services, but his friend was skeptical and did not purchase any services.  Finally, Frazier tried to use social media as a recruiting tool.  He sent the link to the ACN recruitment video to his friends using Snapchat, but received nothing in response.

251.     During his first month of ACN, Frazier's mentor repeatedly called him and would always give him an ACN motivational speech.  Frazier was motivated at first but began to get discouraged when he was unable to recruit any additional customers or recruits.  Toward the end of his second month, around the start of 2017, Frazier, who followed ACN on multiple social media accounts, including Facebook, Instagram, and YouTube, started seeing that ACN was posting videos saying that it was not a scam.  These videos caught Frazier's eye, but he did not think much of it at the time.

252.     Then, in early 2017, Frazier's mentor invited him to a local seminar on a Saturday morning.  He paid $10 to attend a similar presentation that he had seen months earlier—he watched the same video featuring Trump, a slideshow, and then participated in a session about how to pitch ACN.

253.    After the class, Frazier was again feeling more motivated to sell and promote

ACN.  Frazier had already reached out to his family and friends, who had not signed up.  He

tried to talk to people at work, including a new hire who was not making much money.  Frazier

made the pitch and gave the new hire his mentor's number, but does not believe the new hire

ever signed up.

254.    During his initial recruitment and throughout his time with ACN,  Frazier recalls

hearing and relying on various statements from Trump that formed part of the Message,

including the following:

- "It's my absolute pleasure to speak to you on behalf of ACN.  I work with a lot of companies and I can say with 100% confidence that you've made the right decision choosing ACN."

- "I've been working with ACN for a few years now.  Since that time, I've developed a great relationship with ACN and the more I learn about them, the more I like and respect them.  I see incredible potential in the things they are doing now and are planning in the future."

- "Direct selling is actually one of the oldest, most respected business models in the world.  And has stood the test of time most importantly.  ACN approaches it with a fresh perspective that you won't find anywhere else.  I know what it takes to be a success and ACN has a winning business model, and I mean winning."

- "ACN has a reputation for success.  Success that is really synonymous with the Trump name, and you can be a part of it."

- "ACN provides you with everything you need to be successful.  All the training, support and tools, combine that hard work and commitment and you'll be well in your way to living the lifestyle that you deserve."

- "You have a great opportunity before you at ACN without any of the risk most entrepreneurs have to take."

- "You have all of the basics to be an unbelievable company well into the future."

- "When evaluating a business opportunity, people need to look for strong leadership, a solid track record, success stories, a strong product

-92-

people really need and want and a clear plan for the future. ACN has all of these things."

- "I've experienced the opportunity that exists when you're able to jump ahead of the curve and ACN gives you that opportunity."

- "I've found there are two types of people: Those who take action and those who let opportunity pass them by.  Which one are you?"

255.    Around March 2017, Frazier again saw the videos about ACN *not* being a scam on his social media feed.  At this point, Frazier began to become skeptical of the company.  He found it questionable that the company was having to produce videos that it was *not* a scam and answer questions such as, "Is ACN a pyramid scheme?"  Instead of convincing Frazier that ACN was not a scam, these videos had the opposite impact:  Frazier began to become concerned that ACN *was* a scam.  Frazier recognized that he was not making any money and did not see how he *could* make any money.  It was at this point that Frazier began to realize that Trump's message was false—he realized he had wasted his time and money on ACN.

256.    Frazier then stopped engaging with ACN.  By this time, his mentor had stopped reaching out to him.  He really had no reason or motivation to continue.  In October 2017, Frazier received an email asking him to renew his ACN registration.  He ignored the email, and as a result, his account was terminated.

257.    Frazier incurred multiple expenses as an ACN IBO.  First, he paid the $499 registration fee.  Second, he paid $10 to attend the seminar.  Third, he paid his expenses for travel to and from ACN events.  Finally, Frazier spent his free time recruiting ACN customers and recruits.  At no time did Frazier recover any of the money that he invested in ACN.

### D.    Lynn Chadwick

258.    Plaintiff Chadwick is a resident, citizen, and domiciliary of Pennsylvania. Chadwick works at a national retail store.  Chadwick has never purchased stocks or bonds, does

not have health insurance, does not own a car, has never had a mortgage or owned a home.  Nor does Chadwick have any specific understanding of the stock market.

259.    Chadwick signed up as an ACN IBO in April 2013.  At the time, she was living in a small town in Pennsylvania with her husband and three children.  Chadwick, who was working in customer services at a manufacturing company, was the primary breadwinner for the household, while her husband was in and out of jobs.

260.    Chadwick's niece initially connected her to ACN.  Chadwick originally attended an ACN award ceremony to support her niece at a hotel in Pennsylvania.  Besides Chadwick, there were about twelve other participants in the room.  Soon after she arrived, it became clear to Chadwick that the main purpose of the event was for the existing IBOs to recruit her and other guests to ACN.

261.    The event began with short introductions from the ACN IBOs in the room.

262.    Next, the organizers played a promotional video, which lasted about five minutes and prominently featured Trump.  The video is what led Chadwick to decide to commit to ACN. Chadwick was already extremely impressed by Trump.  She was a regular viewer of *The Celebrity Apprentice* and she knew him to be an extremely wealthy, savvy businessman.  She believed in his ability to make money.

263.    The narrator in the video said that "ACN made network marketing history when it received the personal endorsement of Mr. Trump" and that Trump has "has continued to praise the company, its co-founders, and home-based business opportunities."  The narrator referred to ACN's two appearances on *The Celebrity Apprentice* as both highly impactful on its success and reflective of the success it offers IBOs:  "The excitement around ACN is spreading and the world is taking notice. After receiving personal invitations from Donald J. Trump himself, ACN was

featured on two episodes of *The Celebrity Apprentice*, NBC's his reality television show, in 2009 and again in 2011." During this narration, the video showed images of Trump walking into an ACN convention and of ACN appearing in *The Celebrity Apprentice* alongside Trump, Ivanka Trump and Donald Trump Jr.

264.     Trump said in the video that "ACN has a reputation for success. Success that is really synonymous with the Trump name, and you can be a part of it." Trump also said: "When evaluating a business opportunity, people need to look for strong leader, a solid track record, success stories, a strong product people really need and want, and a clear plan for the future. ACN has all of these things."

265.     Trump also advised viewers that investing in ACN's business opportunities and training programs lacked the risks associated with most investments and that he had experienced those opportunities himself: "You have a great opportunity before you at ACN without any of the risk most entrepreneurs have to take. You have the ability to market breakthrough technology before it hits the critical mass. I've experienced the opportunity that exists when you're able to jump ahead of the curb and ACN gives you that opportunity." Trump concluded with a call to action to induce Plaintiffs to invest in ACN's business opportunities and training programs: "I've found there are two types of people: Those who take action and those who let opportunity pass them by. Which one are you?" This line was so impactful on Chadwick that she had almost memorized it verbatim.

266.     Chadwick was gripped by the power of the Trump family brand in general—she recalled that Ivanka Trump and Donald Trump Jr. featured on *The Apprentice*, which she watched regularly.

267.    As the film played, Chadwick was struck by Trump's powerful endorsement of ACN.  She watched him describe ACN as a lucrative business opportunity.  He praised the ACN products, and even alluded to the fact that he used ACN products and services himself.  Most importantly, Chadwick was impressed by Trump's statement that investors in ACN had enormous potential to make money, because of the way it was designed.

268.    After the video, Chadwick knew that she was going to sign up for ACN.  She believed that joining the company was a lucrative opportunity; she imagined that, by following Trump and investing in the company, she would receive something in return.  Chadwick very much needed the extra money to support her children, one of whom was about to enter college.  Largely because of the video, Chadwick believed ACN was the way she could generate additional income.

269.    Chadwick was ready to sign up immediately, but she had to wait until her payday, the next Friday, when she would be able to cover the registration fee.  Given that Chadwick's annual salary was only $36,000, paying the registration fee was going to be a big risk; the $499 was not the small change the ACN recruiters made it out to be.  Nevertheless, Chadwick believed it would be worth it.  As soon as her paycheck cleared, she paid the $499 registration fee.

270.    To ensure that she was fully prepared to pitch ACN's products effectively, Chadwick immersed herself in information about the company.  She explored the website, watched videos, and read pamphlets.  Only then did Chadwick begin to make her recruitment lists and to think about approaching her friends and other potential customers.

271.    Chadwick remembered receiving and reading *Success from Home* magazine frequently, which would arrive along with an accompanying DVD, and on several occasions featured Donald Trump endorsing ACN.

272.     Chadwick also began to attend ACN meetings to widen her network and continue to develop her skills.  Meetings occurred almost every weekend and cost between $5 and $10 to attend.  Each Saturday morning, Chadwick would leave her family at home and drive to a meeting in Delaware or Pennsylvania.  In total, Chadwick attended about 25 meetings during her time with ACN.

273.     In addition to the meetings, Chadwick attended four Revolution Weekends. These were extended seminars that lasted from Friday night through mid-day Sunday.  Chadwick paid $49 to $69 to attend these weekends, in addition to expenses.

274.     Chadwick was not particularly excited about spending her weekend with ACN IBOs rather than her husband and children, but she believed her upline who told her that these meetings were important and necessary for her success.  The meetings consisted of trainings on how best to recruit IBOs and customers.  They also included presentations and videos intended to motivate and impress IBOs.

275.     Trump was often referenced at these meetings.  Meeting organizers would remind IBOs of Trump's involvement with and endorsement of ACN; they would consistently reiterate that such a successful, wealthy, businessman saw value in and supported the company. Chadwick was even given the opportunity to take a picture with a cutout of Trump.

276.     At the meetings Chadwick attended, organizers also continually promoted the story of Casey Snyder.  Snyder is an ACN IBO from nearby Pennsylvania who worked his way up in ACN to the role of Regional Vice President.  IBOs would describe Snyder's trajectory through the company and explain that ACN had not only helped Snyder become wealthy, but also that it had allowed him to achieve a celebrity-like status.  They would highlight that he had been a judge on *The Celebrity Apprentice*.  Stories of Snyder's success, including his connection

to Trump, were especially motivational for Chadwick; it was powerful to see that an ordinary person from her area could become such a successful businessman and enter the elite world of someone like Trump.

277.     Chadwick would leave meetings and the Revolution Weekends excited about ACN and the opportunity.  She believed that she could become the next Snyder if she tried hard enough.  Yet, repeatedly, she would have the wind blown out of her sails.  While Chadwick applied what she learned at these meetings to her efforts to recruit IBOs and sell additional services, she was nevertheless unable to find success.  When she did find potential clients, she received no support from the IBOs who had recruited her and promised to mentor her.

278.     Despite her lack of success with ACN, Chadwick still had faith in the company. In fact, she renewed her registration for an additional year and she even purchased a registration for her son.  While Chadwick spent the last money she had, she was committed to making her investment in ACN work.

279.     During the second year of her participation in ACN, Chadwick paid for, but ultimately did not attend, a national convention in Los Angeles.  Despite the fact that it was extremely difficult for Chadwick to find money to pay for the registration fee and to travel across the country, Chadwick believed attending the convention was necessary for her to succeed. After paying the non-refundable registration fee, however, it became clear that the costs associated with attending the convention would be too high for Chadwick.

280.     Finally, in December 2014, Chadwick realized that she was not going to make any money in ACN.  Chadwick stopped working with ACN and chose not to renew for another year.

*       *       *

281.    The Trump Enterprise's fraudulent promotion and endorsement of ACN alone constitutes a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§ 1961 *et seq.*, and further constitutes mail and wire fraud under federal law, false advertising under California Business and Professions Code § 17500, unfair competition under California Business and Professions Code § 17200, unfair and deceptive trade practices under the Maryland Consumer Protection Act, unfair and deceptive acts under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, common law fraud, and common law negligent misrepresentation.

## VI.    THE TRUMP ENTERPRISE AND ACN'S CO-FOUNDER WERE INVOLVED IN SIDE DEALS THAT FACILITATED MONEY FLOW BETWEEN THEM

282.    Over the years, the Trump Enterprise built a close relationship with ACN and its co-founders.  Upon information and belief, the various interconnections and deals between ACN and the Trump Enterprise were yet another way that money flowed between the two, in quid pro quo arrangements that were not disclosed to the vulnerable consumers hearing Trump's pitch.

### A.    ACN's Co-Founder Bought Property Around The Trump Organization's Major Golf Course Development in North Carolina

283.    In March 2012, TNGC Charlotte, LLC (a member of the Trump Enterprise, and an entity of which Defendants Donald Trump Jr. and Ivanka Trump were executive officers,) agreed to acquire The Point Lake and Golf Club in Mooresville, North Carolina, and rebranded it the Trump National Golf Club ("TNGC Charlotte").  That same month, ACN co-founder Robert Stevanovski and his wife, Sonya Stevanovski, registered Pasicor LLC ("Pasicor") in North

Carolina.  The Stevanovskis used corporate entities managed by Pasicor to acquire several parcels of land near TNGC Charlotte.[115]

284.    On March 28, 2012, the day before Pasicor was registered, Augusta Lee Capital Partners LLC ("Augusta Lee") was registered in North Carolina.  Pasicor was appointed its managing member.  Two days after it was registered, Augusta Lee paid $7.3 million to purchase a 110-acre property known as "Augustalee" in Cornelius, North Carolina, nearby TNGC Charlotte.[116]

285.    On April 30, 2012, Langtree Development Group LLC and Langtree Capital Partners LLC (the "Langtree Companies") were registered in North Carolina with Pasicor as their managing member.  The Langtree Companies purchased multiple properties around the Lake Norman waterfront nearby TNGC Charlotte.[117]

286.    Meanwhile, the following year, Trump announced the opening of Trump International Realty Charlotte, a real estate brokerage based at TNGC Charlotte.  Trump International Realty Charlotte is a brokerage specializing in "luxury homes for sale in Lake Norman, Charlotte, Mooresville, Cornelius, Davison, Huntersville and Statesville, all in the Lake Norman region of North Carolina."

287.    The personal relationship was ongoing at the same time.  For example, when Donald J. Trump tweeted about the birth of Ivanka Trump's child in October 2013, ACN retweeted Trump's tweet, and responded to Trump and Ms. Trump, writing:

---

[115] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: Pasicor, LLP (2017).
[116] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: Augusta Lee Capital Partners, LLC (2017).
[117] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: Langtree Capital Partners, LLC (2017).

"@realDonaldTrump Congratulations to @IvankaTrump on the birth of her beautiful baby boy, and to grandfather @realDonaldTrump as well!"

288.    On June 30, 2014, West Catawba Avenue LLC was registered in North Carolina with Pascior as its managing member.  In July 2014, West Catawba Avenue LLC purchased a property at 19620 W. Catawba Avenue, in Cornelius, North Carolina (near Lake Norman) for $2.275 million.  Xoom Energy, an ACN subsidiary, leased a suite in an office building at that site.  In August 2017, West Catawba Avenue LLC sold the property for $3.1 million.[118]

289.    Plaintiffs have limited information about these real estate deals, but expect that discovery would shed more light on any connections between these transactions and the Trump Enterprise, including Trump International Realty.

290.    In addition, in August 2015, the wedding of Provenzano's daughter, Autumn Moheyer, was held at the TNGC Charlotte.

### B.    ACN Has Paid the Trump Enterprise To Hold Charitable Golf Tournaments at Trump Golf Clubs

291.    The financial ties between ACN and the Trump Enterprise were not limited to payments for Trump's endorsement and the real estate deals in North Carolina.

292.    From 2013 to 2016, ACN Global Reach Charities, Inc. ("ACN Global Reach"), a non-profit affiliated with ACN, staged annual celebrity golf tournaments that were hosted at TNGC Charlotte.  Although these events were billed as fundraisers for Ronald McDonald House, the Trump Enterprise appears to have been paid substantial sums to host the events.  By associating Trump and ACN and their respective brands and businesses with charitable causes,

---

[118] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: West Catawba Avenue LLC (2017).

the Trump Enterprise created another veneer of legitimacy in the eyes of ACN's members and

potential recruits—while pocketing large sums of money.





293.     In 2013, ACN Global Reach reportedly raised $213,000 from the golf tournament. It reported $86,000 in expenses in raising this amount.  It is unclear how much of that expense amount was paid to the Trump Enterprise for hosting the tournament (and, in so doing, further promoting and endorsing ACN).

294.     In 2014, ACN Global Reach reported a "record-breaking" $228,750 raised from the tournament.  Tax filings later revealed that it incurred $107,674 in expenses for the event, including $15,788 in "rent/facility" costs and $22,128 in food and beverage costs.

295.     In 2015, ACN Global Reach reported another "record-breaking" $287,560 from the tournament.  Tax filings revealed that it incurred $112,718 in expenses for the event, including $25,046 in "rent/facility" costs and $21,625 in food and beverage costs.

296.     In 2016, ACN Global Reach raised a "record-breaking" $261,500 from the tournament.  Tax filings revealed that it incurred $118,000 in expenses for the event, including $18,871 in "rent/facility" costs and $28,312 in food and beverage costs.

297.     ACN's payments to the Trump golf clubs were not limited to direct payments for hosting ACN Global Reach events.   In each of 2013, 2014 and 2015, ACN purchased a "Titanium" level sponsorship, priced at $100,000, to the Annual Golf Invitational & Auction Dinner hosted by Defendant Eric Trump and the Eric Trump Foundation.  The events were fundraisers for the St. Jude Children's Research Hospital.  The events were hosted at the Trump International Golf Club in Westchester, New York, which is owned by an entity within The Trump Organization.  It is unclear how much of ACN's sponsorship donation was paid over to the Trump club.







C.   **Trump Joined the Advisory Board of the SUCCESS Foundation, an Affiliate of *Success from Home* Magazine, Which Distributed Millions of "Personal Development" Books to Teens**

298.   In March 2009, during production of the first *The Celebrity Apprentice* episode featuring ACN, Trump also became involved in a nonprofit organization called the SUCCESS Foundation.  As described in one edition of *Success from Home*, in 2009, "when Trump learned through ACN about the SUCCESS Foundation, a nonprofit that provides personal development books for teens, he signed onto the advisory board."[119]  The article announcing Trump's involvement noted that "Trump has become a household name synonymous with success" and included a full-page cover image depicting teens on stage at an event, with the headline:  "The TRUMPS of TOMORROW."



---

[119] Sarah Paulk, *The Trumps of Tomorrow,* Success from Home, Vol. 5, No. 4, at 86.

299.     SUCCESS Foundation aimed to reach a huge number of teens with advice on how to "create their goals," "fulfill their potential," and embrace "the principles that are the fundamentals to success."  In reality, it was laying groundwork with a new generation of potential recruits.  And it was a massive operation:  the Foundation set an "honorable goal of distributing 10 million copies of *SUCCESS for Teens* free of charge to nonprofit youth-development organizations."  There were also other publications, such as a Success for Teens "Facilitator's Guide," which purported to teach young people "a philosophy of self-actualization."[120]  The Executive Director (who had a long history with direct selling) candidly noted, "If you give these away, the information is bound to impact someone."[121]



300.     ACN's President, Greg Provenzano, sat alongside Trump on the advisory board. As explained in *Success from Home*, "[a]s a proponent and major supporter of the SUCCESS

---

[120] SUCCESS Foundation, *Facilitator's Guide for Success for Teens*, at III (2008).
[121] Sarah Paulk, *The Trumps of Tomorrow,* Success from Home, Vol. 5, No. 4, at 86.

Foundation, Provenzano and ACN introduced Trump to the organization because of his affinity for personal development and the effect it has on youth."[122]  The article went on:

> "Perhaps no one knows better than Mr. Trump the importance of personal development for our youth and the direct impact it can have on their future," Provenzano says.  "This understanding, combined with his personal relationship with ACN, resulted in him enthusiastically accepting a position on the board."

> Provenzano understand what a boon it is to the SUCCESS Foundation to have Trump associated with it.  "Having someone with Mr. Trump's reputation on the board is the greatest endorsement there is," Provenzano says.  "With his help, the SUCCESS Foundation can continue doing what it does best:  providing our youth with the personal-development tools they need to build successful tomorrows."[123]

301.   The same article announcing Trump's involvement with SUCCESS Foundation and its books for teens also referred extensively to Trump's children ("Donald Jr., Ivanka and Eric, who all now work with the Trump dynasty") and to the "incredibly marketable and profitable brand" associated with the Trump name—"a brand his children, the next generation, now take part in."[124]  The children all appeared in a photo in the very same article, along with a caption naming each of them:





Donald Trump with son Eric, daughter Ivanka and son Donald Jr.

---

[122] *Id*.
[123] *Id*.
[124] *Id*.

302.     In an interview transcribed in the article, Trump said, "I think children learn by example" and "I'm happy to lend my support to charitable organizations like the SUCCESS Foundation that make a difference on the next generation of leaders."[125]   And the SUCCESS Foundation was happy to have him.  According to Fleming:

> The Trump name is a brand in itself.  To have that brand affiliated with the SUCCESS Foundation obviously gives us credibility.  For the public at large, he is someone who most people have heard of, and whose name is synonymous with achievement.  That results in attracting possible donors who are looking for a good cause to donate to and an ease in finding vehicles of distribution for the book.  In addition, it will help us gain the attention of teenagers who may be readers of this book.  We, at the foundation, are ecstatic about his participation.[126]

303.     Trump's involvement with SUCCESS Foundation lent a gloss of legitimacy to ACN's efforts to reach a new generation of potential recruits.  Thus, Trump's involvement with the SUCCESS Foundation is yet another example of him selling his image and brand to lend purported credibility to ACN, and also is emblematic of his many close ties to ACN and its co-founders.

304.     The SUCCESS Foundation Advisory Board disappeared from the SUCCESS Foundation's website in or around May 2016.

## VII.   THE TRUMP ENTERPRISE'S ONGOING PROMOTION AND ENDORSEMENT OF ACN

305.     In August 2015, just days after a *Wall Street Journal* reporter interviewed Trump about his relationship with ACN, ACN deleted all references to Trump from its website, stating

---

[125] *Id*.
[126] *Id*.

that it did so "in conjunction and with the full support of the Trump organization" because of Trump's presidential campaign.[127]

306.    In an article published on August 13, 2015, the *Wall Street Journal* reported that Trump had "not only endorsed ACN, he twice featured the company on his former reality TV Show, 'The Celebrity Apprentice.'"[128]  The article quoted some of Trump's statements promoting and endorsing the ACN videophone and then reported that, in fact (and contrary to Trump's statements), "the ACN video phone was in trouble.  It sold poorly in part because it only worked with other ACN video phones, unlike Skype's video-calling technology."  The article further reported that ACN "had slashed orders for the phone from its supplier, which laid off 70% of its staff just before the show aired and later filed to liquidate in federal bankruptcy court."  Critically, the article reported that "[t]he bad news about the phones was never mentioned by Mr. Trump on the show, nor did he disclose to viewers he had been paid by ACN for appearances over the years."

307.    The article recognized that Trump's promotion and endorsement of ACN posed a threat to his presidential campaign:  "Mr. Trump, who currently leads the field of Republican candidates for president, bills himself on the campaign trail as a straight talker and says he will use his business savvy to solve America's problems."

308.    Recognizing this threat, Trump attempted to distance himself from ACN.  He stated (falsely):  "I do not know the company.  I know nothing about the company other than the

---

[127] James V. Grimaldi & Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, The Wall Street Journal (Aug. 13, 2015), https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

[128] *Id.*

people who run the company. . . .  I'm not familiar with what they do or how they go about doing that, and I make that clear in my speeches."[129]

309.    Notwithstanding Trump's purported dissociation from ACN in August 2015, numerous videos remain on YouTube and other streaming services with footage of Trump's endorsement of ACN, including in ACN's appearances on *The Celebrity Apprentice*.  These videos have continued to induce people to sign up to ACN after Trump purportedly ended his endorsement.

310.    Moreover, despite the claimed separation between Defendants and ACN, the financial ties between ACN and the individuals with ties to the Trump Enterprise have remained.  For example, in September 2017, ACN sponsored a hole at the annual golf tournament for the Eric Trump Foundation (now known as Curetivity).[130]

311.    In addition, on August 14, 2017, ACN held its Seventh Annual Ronald McDonald House Celebrity Golf Tournament at Trump National Golf Club in Mooresville, North Carolina.  Photographs of the event confirm the timing and location:

---

[129] *Id.*
[130] Dan Alexander, *Eric Trump's Old Foundation Apparently Held Secret Event at Trump-Owned Golf Club*, Forbes (Sep. 18, 2017), https://www.forbes.com/sites/danalexander/2017/09/18/eric-trumps-old-foundation-apparently-held-secret-event-at-trump-owned-golf-club/#67e53e665759.





## VIII.   THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF THE TRUMP NETWORK

312.    A few years after the beginning of its relationship with ACN, the Trump

Enterprise sought to deepen its involvement in the MLM industry.  In 2009, Defendants entered

into a licensing agreement with Ideal Health, another MLM.  As part of the agreement, Ideal

Health was officially re-branded "The Trump Network."  The Trump Network deal reflected the

Defendants' attempt to capitalize on what they had learned from their relationship with ACN:

that owners of MLMs could reap enormous profits fueled by widespread losses at the expense of

average investors' initial investments.  With the promise of such riches, Trump agreed to

promote and endorse The Trump Network, in exchange for royalty payments, as well as

additional fees contingent upon ongoing promotional activities.  Thus, in the Trump Network

deal, Defendants gave even more access to use the Trump brand than had been agreed upon with

ACN, in exchange for a greater share of the upside.

313.    From 2009 until December 2011, the Trump Enterprise received secret payments

to endorse and promote the Trump Network.[131] As they had done repeatedly with ACN,

Defendants, acting through the Trump Enterprise, made or disseminated a series of knowingly

false statements (1) that prospective investors would have a reasonable probability of

commercial success if they bought into the Trump Network; (2) that Trump was promoting and

endorsing the Trump Network because he believed that they offered a reasonable probability of

commercial success (rather than because the Trump Enterprise was being paid); and (3) that

Trump's endorsement was predicated on Defendants' extensive due diligence, inside

information, and personal experience with the Trump Network.  And as with ACN, the use of the

---

[131] *See* Adam Feuerstein & Damian Garde, *Donald Trump and the Vitamin Company that Went Bust*, STAT News (Nov. 4, 2015), https://www.statnews.com/2016/03/02/donald-trump-vitamin-company/.

Trump brand amplified Trump's fraudulent message and encouraged potential investors to take it seriously.

### A.    Ideal Health Background & DSNC Licensing Deal

314.    Ideal Health, Inc. was founded in 1997 by Lou DeCaprio and brothers Scott and Todd Stanwood.  From its inception, the company sold dietary supplements, health-related products, and customized vitamins as part of an MLM business model.

315.    Between 1999 and 2004, at least twenty different complaints were submitted to the Federal Trade Commission ("FTC") by both salespeople and customers of Ideal Health, according to FTC records.[132]  Complaints from Ideal Health salespeople stated that they had invested thousands of dollars in the company and had received no returns on the work or investment.  In addition, customers of the company submitted complaints stating that the vitamin supplements sold by the company had caused illnesses and that Ideal Health had refused their requests to cancel their subscriptions and continued charging for the vitamins.

316.    In 2007, Ideal Health was under-capitalized and looking for a strategic partnership that could help grow brand recognition and expand its existing network of sales representatives. In early 2008, the Stanwood brothers and DeCaprio were introduced to Trump to discuss a possible partnership.

317.    In January 2009, "TTN, LLC"—TTN may stand for The Trump Network—was registered in the state of Delaware.  Corporate records show that the company planned to "engage in the marketing, selling and distributing of health and wellness products."[133]  Scott and

---

[132] Federal Trade Commission, Aug. 16, 2004 Freedom of Information Act Request Response: Consumer Complaints to Federal Trade Commission (FTC).

[133] TTN, LLC Foreign Limited Liability Company Application for Registration, The Commonwealth of Massachusetts, Secretary of the Commonwealth, Corporations Division (Jan 10, 2011).

Todd Stanwood, as well as DeCaprio, were listed as the company's managers.  Shortly after

TTN, LLC's formation, Ideal Health agreed to "conduct its business exclusively" through TTN,

LLC, essentially merging the corporate activities with the new business entity.

318.    On March 4, 2009, TTN, LLC entered into a licensing agreement with DSN

Licensing, LLC, a member of the Trump Enterprise.[134]  According to court records, Ideal Health,

Inc. created TTN, LLC as a wholly owned subsidiary for the specific purposes of its licensing

agreement with DSN Licensing, LLC.[135]

319.    The initial agreement between DSN Licensing, LLC and Ideal Health stated that

"Ideal [Health] would license various trademarks principally owned by, and the likeness of, Mr.

Trump, to utilize in [Ideal Health's] direct marketing efforts."[136]  In addition, Trump agreed

"personally to promote and support The Trump Network, including, without limitation, to appear

personally at a number of Company events each year and to appear on the Company's marketing

and promotional videos and other materials."[137]

320.    Shortly after the deal, a senior advisor and "Top-Rank" representative at ACN,

Marty Hale, was brought on board at the Trump Network as Chief Strategist to help redesign the

compensation plan and ensure some of the same success that Trump had experienced with ACN.

**B.**     **Background on The Trump Network**

321.    The Trump Network, as the new venture was named, was an MLM that purported

to sell an array of diet supplements and multivitamins.  As is typical with MLMs, The Trump

Network relied on participants to sell the products, person-to-person, and to recruit others to do

---

[134] Compl. ¶ 37, *Ideal Health, Inc.* v. *Blechman,* No. 1:09 Civ. 10791 (D. Mass. Apr. 12, 2010).
[135] *Id.*
[136] *Id.* ¶ 36.
[137] *Id.*

the same.  Each additional salesperson that someone recruited to The Trump Network would become a member of the recruiter's "downline" sales team.  The incentive to continue to build out one's own "downline" sales team was inherent in the structure of the scheme; for each commission of The Trump Network products sold, a percentage of that commission would pass to each "upline" recruiter, with the individuals at the top of the pyramid earning the greatest income.  Those salespeople then, in turn, would recruit additional people to become part of their own downline sales team, and so on, with each additional salesperson undertaking to resell The Trump Network products, and a percentage of each sale funneling all the way up the pyramid.

322.    Becoming a Trump Network salesperson, however, was costly.  Beginner sales representatives were told to buy a starter kit of products costing nearly $497,[138] and encouraged to attend expensive seminars.  In order to join at the "FastStart Gold" level, a marketer could spend about $600 just to purchase a kit of sample products, even before paying to attend a seminar or purchasing additional supplies.[139]

### C.    Trump Promoted and Endorsed the Trump Network with a Widely Distributed and Pervasive Message

323.    Shortly after DSN Licensing, LLC entered an agreement with the Trump Network, Trump widely disseminated false statements promoting and endorsing the Trump Network.  Trump's false statements were distributed through various channels, including television infomercials, news outlets, printed promotional and editorial material, and in-person promotional events.

---

[138] Julianna Goldman & Laura Strickler, *Behind the collapse of the "recession-proof" Trump Network*, CBS News (Apr. 12, 2016), https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/.

[139] Jessica Pressler, *If I Can't Trust Donald Trump, Who Can I Trust? The Donald Has a New Scheme. Seller Beware*, New York Magazine (Jan. 23, 2011), http://nymag.com/nymag/features/70831/index2.html#print.



324.    *First*, Trump featured prominently in infomercials promoting The Trump

Network, beginning with a 2009 infomercial announcing The Trump Network's official

launch.[140]   The infomercial simulated a television talk-show in which a host interviewed Trump

about his thoughts on The Trump Network to frequent applause from actors portraying an

excited studio audience.

325.    *Second,* Trump took advantage of opportunities to disseminate false statements

about The Trump Network through news outlets.  For example, in December of 2010, he issued a

press release announcing that former contestants from *The Apprentice* would be joining The

---

[140] *The Trump Network—Donald Trump and Ideal Health Team Up*, YouTube (Dec. 6, 2009),
https://www.youtube.com/watch?v=fK9AhOo3Fj0 (The Trump Network YouTube channel).

Trump Network.[141]   The same month Trump also discussed the strength of The Trump Network

business model with reporters from the Boston Globe,[142] among others.

326.    *Third,* Trump's false statements touting the Message, described more fully below,

appeared in numerous printed promotional materials of The Trump Network, as well as dozens

of interviews with reporters about the Trump Network business opportunity.  Moreover, between

the years of 2009 and 2011, for example, at least two different letters addressed to potential

Trump Network investors or marketers and signed by Trump personally were posted to The

Trump Network website.[143]

---

[141] The Trump Network, *NBC's The Apprentice Leads Candidates to The Trump Network*, PR Newswire (Dec. 10, 2010), https://www.prnewswire.com/news-releases/nbcs-the-apprentice-leads-candidates-to-the-trump-network-111679704.html.

[142] Erin Ailworth, *Firm's New Moniker May be its Trump Card: After Partnering with the Donald, the Former Ideal Health Takes Off,* Boston Globe (Dec. 7, 2010), http://archive.boston.com/business/articles/2010/12/07/firms_new_moniker_may_be_its_trump_card/.

[143] Julianna Goldman & Laura Strickler, *Trump's Failed Venture: Vitamin Business Fails After Get Rich Quick Pledge*, CBS This Morning (Apr. 12, 2016), *available at* https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/; *How Trump's "recession-proof" supplement venture failed*, CBS This Morning (Apr. 12, 2016), *available at* https://www.youtube.com/watch?v=opA9gBmcQkw; *see also* Tim Murphy, *The Trump Files: The Saga of Donald Trump's Short-Lived Weight-Loss Program*, Mother Jones (Oct. 3, 2016), https://www.motherjones.com/politics/2016/10/trump-files-weight-loss-snazzle-snaxxs/.



327.    *Fourth*, Trump appeared as the keynote speaker at several in-person promotional

events for The Trump Network.  For example, Trump spoke at the 2009 Trump Network launch

in Miami, Florida, heralding the launch of The Trump Network to a room of several thousand

people: "[The Trump Network] is not a long shot," he proclaimed. "This is going to be something that's really amazing."[144]





**D.     Trump Falsely Represented That Consumers Had a Reasonable Probability of Commercial Success in The Trump Network**

328.     Throughout the relevant period, Trump frequently misrepresented the nature of

The Trump Network's business model and offered false and misleading promises of success.

Trump's statements promoting The Trump Network, and his depiction in countless promotional

---

[144] *Trump Speaks at Miami Launch 2009* (Apr. 1, 2010), YouTube, https://www.youtube.com/watch?time_continue=1&v=XyRE5MN8jrA; *see also* Ian Tuttle, *Add Another Yuuge Failure to Trump's Pile: The Trump Network*, National Review (Mar. 8, 2016), https://www.nationalreview.com/2016/03/donald-trump-networks-failure-harmed-small-investors/.

materials, were intentionally calculated to give the false impression that The Trump Network

Investment opportunity offered a reasonable probability of commercial success for those who

invested in it.



329.    Trump made repeated statements calculated to cause the listener to believe that

investing in The Trump Network was a sound financial decision, that it was without risk, and

that it would provide sufficient return to save them from the threat of financial ruin in the wake

of the recession.  From 2009 until 2011, Trump traveled around the country promoting The

Trump Network and promising people that it was a safe investment.[145]  During his in-person

---

[145] *How Trump's "recession-proof" supplement venture failed*, CBS This Morning (Apr. 12, 2016), *available at* https://www.youtube.com/watch?v=opA9gBmcQkw, at 1:48.

appearances, Trump spoke to large crowds and enthusiastically gave The Trump Network scheme his personal stamp of approval, referencing his own track record of success.[146]

330.    In a 2009 infomercial heralding the launch of The Trump Network, Trump specifically targeted vulnerable individuals suffering from the effects of the economic recession: "The Trump Network wants to give millions of people renewed hope and with ***an exciting plan to opt-out of the recession***," he said. "I hope you're going to join us" (emphasis added).[147]



331.    Similarly, in an open letter to potential investors, signed by Trump personally and posted on the Trump Network website in or around 2009, Donald Trump wrote:  "The Trump Network can provide you with a solution to help you and your family create a more secure

---

[146] *Trump Speaks at Miami Launch 2009* (Apr. 1, 2010), YouTube, https://www.youtube.com/watch?time_continue=1&v=XyRE5MN8jrA; *see also* Ian Tuttle, *Add Another Yuuge Failure to Trump's Pile: The Trump Network*, National Review (Mar. 8, 2016), https://www.nationalreview.com/2016/03/donald-trump-networks-failure-harmed-small-investors/.
[147] *The Trump Network—Donald Trump and Ideal Health Team Up*, YouTube (Dec. 6, 2009), https://www.youtube.com/watch?v=fK9AhOo3Fj0.

future.  Diversifying is a way to protect your income so that you can continue to do what you know and love, and still make money."

332.    And at a 2009 appearance in Miami, Florida, for the official launch of the Trump Network, Trump made similar statements extolling the commercial prospects for those who invested in The Trump Network: "When I did 'The Apprentice,' it was a long shot.  ***This is not a long shot***.  ***This is going to be something that's really amazing . . . . We are going to be the biggest in the industry***" (emphasis added).[148]

333.    Trump also made misrepresentations about the products that The Trump Network sales representatives sold.

334.    For example, in an open letter posted on the Trump Network website titled "A Personal Letter from Donald J. Trump" and containing Donald Trump's personal signature at the bottom, Trump wrote that the "Trump Network works with some of the ***best nutritionists***, ***scientists***, and ***technologists*** . . . [and] as a result, ***our*** products are ***leaders in their categories***— designed to help improve your health and wellness, putting you on a path to the lifestyle you've always wanted" (emphases added).[149]

---

[148] *Id.*

[149] *A Personal Letter from Donald J. Trump*, Trump Network, *available at* https://web.archive.org/web/20120103185757/http://trumpnetwork.com/About/HowIsDonaldInvolved.aspx.

**A Personal Letter from Donald J. Trump**

**Welcome To The Trump Network™**

 I am pleased to be part of this great company and glad you are taking time to learn more about it. The vision for The Trump Network goes far beyond the individual products. The Trump Network is designed to help you become the very best you can be—physically and mentally.

Todd, Scott, and Lou understand that to be successful you have to surround yourself with the best and the brightest. The Trump Network works with some of the best nutritionists, scientists, and technologists. As a result, our products are leaders in their categories—designed to help improve your health and wellness, putting you on a path to the lifestyle you've always wanted.

**The First Step Toward Your Ideal Lifestyle**
The mission at The Trump Network is to empower you to become all that you were meant to be.

**A Financial Solution You Can Believe In**
The Trump Network offers you something you can believe in—products that help make people healthier, an opportunity for you to make as much money as you want, based on your own efforts, and the training and support to help you succeed.



Donald J. Trump
Chairman and President
The Trump Organization

335.     A few years later, however, when questioned about reports that The Trump Network products were ineffective and based on flawed or non-existent science, Trump representatives told reporters that Trump was never personally involved in the creation of The Trump Network's products and that he did not guarantee their effectiveness.[150]  Trump did not own the company or make the products, an attorney speaking on Trump's behalf claimed.[151]

336.     Trump encouraged investors to rely on his statements by emphasizing his record of success in business and assuring prospective recruits that his past achievements assured their success.

---

[150] *How Trump's "recession-proof" supplement venture failed*, CBS This Morning (Apr. 12, 2016), *available at* https://www.youtube.com/watch?v=opA9gBmcQkw.
[151] *Id.*

337.     In a 2010 interview with the *Boston Globe*, for example, Trump said that "The Trump Network has a big advantage over other network marketing concerns because of the fact that I am so well known."[152]  He continued:  "It is very important for me to be associated with success, [so] it's very important for me that the Trump Network be a big success."[153]

338.     As with ACN, the fact that the Trump Enterprise had sold the Trump Network a license to use the Trump brand dramatically increased the impact of Trump's false and misleading statements.  For example, in a 2011 interview with *New York Magazine*, when asked about his decision to partner with Trump, DeCaprio explained the critical importance of having the Trump endorsement in getting people to invest:  "When you think of Donald Trump as a brand, what do you think of? . . .  Prestige products, best in class, really being successful."[154]  DeCaprio went on to note that "[n]o matter what happens, [Trump] can come back out of the ground like a phoenix and get right back on top again.  He represents entrepreneurialism for this country.  He represents *success.*"[155]

339.     In one Trump Network infomercial, a man explains that he left a "six-figure job" to join Trump's new business when he "realized . . . how huge this is gonna be."[156]  Another man said that when he learned that Trump was starting his own company, "[i]t [was] a no brainer."[157]  He continued, explaining that Trump's involvement "brings so much to the industry.  It brings

---

[152] Erin Ailworth, *Firm's New Moniker May be its Trump Card: After Partnering with the Donald, the Former Ideal Health Takes Off*, Boston Globe (Dec. 7, 2010), http://archive.boston.com/business/articles/2010/12/07/firms_new_moniker_may_be_its_trump_card/.
[153] *Id.*
[154] Jessica Pressler, *If I Can't Trust Donald Trump, Who Can I Trust? The Donald Has a New Scheme. Seller Beware*, New York Magazine (Jan. 23, 2011), http://nymag.com/nymag/features/70831/index2.html#print.
[155] *Id.*
[156] *The Trump Network—Donald Trump and Ideal Health Team Up*, YouTube (Dec. 6, 2009), https://www.youtube.com/watch?v=fK9AhOo3Fj0.
[157] *Id.*

credibility, it brings us to a new level, because everyone recognizes and trusts that Trump brand name, and so, when we talk business, Trump means business."[158]

340.    Trump's statements—and the use of the Trump brand—had the desired effect. Vulnerable consumers relied on his assurances; they believed him when he promised that the Trump Network was a low-risk way to escape the financial impacts of the Recession, and that if people worked hard enough, they would make a good return.

341.    For example, Eileen and George Kelley, two Florida residents and retired college professors, spoke about their experience with the Trump Network in a 2016 CBS investigative report.  "They were sowing hope there, to a lot of people, in the middle of the Recession," George Kelley stated.  Eileen Kelley elaborated:  "I was sold on the product, and the message, and the testimonials, and then, of course, Donald Trump coming on."[159]



342.    The experiences of Eileen and George Kelley were typical of other investors in The Trump Network.  In the months following the launch of the newly rebranded Trump

---

[158] *Id.*
[159] Julianna Goldman & Laura Strickler, *Trump's Failed Venture: Vitamin Business Fails After Get Rich Quick Pledge*, CBS This Morning (Apr. 12, 2016), https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/.

Network, recruitment increased significantly.  In just one year, the company recruited 15,000

new participants, growing from 5,000 to 20,000 after securing the Trump endorsement.[160]  In a

2010 press release, the company stated that it had grown "373 percent" since partnering with

Trump.[161]  According to a complaint filed by Dean Blechman with the Supreme Court of New

York in Suffolk County in 2009, at the time that Ideal Health announced the deal with Trump

Corporation to rebrand the company as The Trump Network, company leadership told its

existing network of marketers that they expected the company's revenue to grow to $1 billion.[162]

343.    Trump's statements that The Trump Network offered a reasonable probability of

commercial success were false.  In reality, the chances of commercial success were miniscule.

Approximately a year after its official launch, the company stopped regularly paying its

salespeople.[163]  In 2009, for example, a former salesperson told reporters that she was making

"six figures, enough to support her children as a single mom."[164] After barely a year, however,

the paychecks stopped, and the salesperson "lost her house and car."[165]

---

[160] Erin Ailworth, *Firm's New Moniker May be its Trump Card: After Partnering with the Donald, the Former Ideal Health Takes Off*, Boston Globe (Dec. 7, 2010),
http://archive.boston.com/business/articles/2010/12/07/firms_new_moniker_may_be_its_trump_card/.
[161] The Trump Network, *NBC's The Apprentice Leads Candidates to The Trump Network*, PR Newswire (Dec. 10, 2010), https://www.prnewswire.com/news-releases/nbcs-the-apprentice-leads-candidates-to-the-trump-network-111679704.html.
[162] Compl. ¶ 26, *Blechman* v. *Ideal Health, Inc.*, No. 09 Civ. 2617 (E.D.N.Y. June 16, 2019) (attached to Notice of Removal).
[163] Ana Swanson, *The Trump Network Sought To Make People Rich but Left Behind Disappointment,* Washington Post (Mar. 23, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/03/23/the-trump-network-sought-to-make-people-rich-but-left-behind-disappointment/?utm_term=.9b13221c0f9c.
[164] *3 Trump-backed companies that raise troubling questions*, CBS News (Jan. 27, 2016), https://www.cbsnews.com/news/3-companies-that-raise-questions-about-the-trump-brand/.
[165] *Id.*

344.    In December 2011, Trump's licensing agreement with Ideal Health expired and was not renewed.[166]  By 2012, the company was sold and renamed Bioceutica LLC,[167] and people who had bought into Trump's promises of success lost everything.  George and Eileen Kelley, for example, who invested their retirement savings into The Trump Network precisely because of Trump's assurances, lost nearly $10,000 in only a couple of years.[168]

345.    By 2012, numerous judgements totaling in excess of $1.75 million were awarded against The Trump Network, Inc., TTN, LLC, Scott Stanwood, Todd Stanwood, and DeCaprio in various state courts.

### E.    Trump Falsely Represented that He Was Endorsing The Trump Network Because It Was His Company and Because He Genuinely Believed It Would Be a Success

346.    When Ideal Health partnered with Defendants in 2009, the name and face of the company was changed and rebranded, but the fundamental products and business model remained the same.  Nonetheless, Trump promoted The Trump Network products and business opportunities as if it were a new venture that he himself had created, in which he had personally invested, and upon which he had conducted appropriate due diligence.  Trump sent a message that investors should trust him because he had access to superior information than they did upon which he had based his investment decisions.

---

[166] Ike Swetlitz, *Donald Trump, Bad Science, and the Vitamin Company That Went Bust,* STAT News (Mar. 2, 2016), https://www.statnews.com/2016/03/02/donald-trump-vitamin-company/.

[167] *See Bioceutica Review: Neutraceuticals, Cosmeceuticals & Retail*, Behind MLM (Jan. 26, 2016), http://behindmlm.com/mlm-reviews/bioceutica-review-neutraceuticals-cosmeceuticals-retail/; *see also* Ted Nuyten, *The Trump Network Sold to Antoine Nohra*, Business for Home (Feb. 18, 2012), https://www.businessforhome.org/2012/02/the-trump-network-sold-to-antoine-nohra/.

[168] Julianna Goldman & Laura Strickler, *Trump's Failed Venture: Vitamin Business Fails After Get Rich Quick Pledge*, CBS This Morning (Apr. 12, 2016), https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/.

347.    He suggested that his belief was predicated on, among other things, his personal

stake in the company.  He failed to disclose to consumers that he did not, in fact, own a majority

of the company or that he was being paid for each of his promotional statements and

endorsements.

348.    In a 2016 investigation into The Trump Network, for example, CBS reported that

Donald Trump had personally signed a letter addressed to Trump Network marketers, that

plainly stated: "I believe in the Trump Network products."



349.    Moreover, at his appearance at The Trump Network launch in 2009, Trump told

attendees: "It's going to be our company as a group."[169]  He assured them: "We're all going to be

successful together."[170]  Trump was conveying to eager listeners that he wanted them to join a

business of which he was a part and whose success he would ensure.

---

[169] *Trump Speaks at Miami Launch 2009* (Apr. 1, 2010), YouTube,
https://www.youtube.com/watch?time_continue=1&v=XyRE5MN8jrA.
[170] *Id.*

350.    Trump urged people to believe in his endorsement of The Trump Network and to trust his judgment, all the while obfuscating his lack of actual involvement in the company.  As alleged above, a Trump Enterprise entity, DSN Licensing LLC, and Ideal Health had entered into a simple licensing agreement in which DSN Licensing LLC received payments for Trump's promotions and endorsements of the company in exchange for the use of the Trump name and brand.  Trump was neither the owner nor the operator of the Trump Network, but created that impression in the minds of potential recruits.

351.    A June 2008 proposal from then-President of Ideal Health, DeCaprio, to Cathy Glosser, former executive Vice President of Global Licensing for The Trump Organization, provides additional insight into the details of the agreement between DSN Licensing LLC and Ideal Health.[171]  According to the proposal, The Trump Organization would receive an initial licensing fee of $1 million, as well as a 17 percent equity stake in Ideal Health, Inc., additional income, and "cash distributions."[172]  In return, Trump would, among other things, attend the company's Annual National Meeting as a keynote speaker, participate in two of the company's leadership conferences "with compensation," participate in two conference call interviews with the founders and two audio and video productions.[173]  Finally, Trump would agree to have his image and quotes used in company marketing and recruiting materials.[174]

352.    Notably, the proposal stated that under the terms of the agreement, Trump would agree to allow The Trump Network to use "his image and quotations for press releases and marketing materials *with [Trump's] approval*, which will not [] be unreasonably withheld"

---

[171] Exhibit 3 to Declaration of Dean Blechman, *Ideal Health, Inc.* v. *Blechman,* No. 1:09 Civ. 10791 (D. Mass. Apr. 12, 2010).
[172] *Id.*
[173] *Id.*
[174] *Id.*

(emphasis added).[175]  As was the case with ACN, because Trump's image could only be used with his approval, the Trump Enterprise very likely approved the company's statements about Trump's endorsement and role in The Trump Network.

353.    In addition to Trump's own endorsement, the Trump Enterprise also facilitated the endorsement of, and participation in, The Trump Network by several former contestants from *The Apprentice.*  In a 2010 press release discussing those endorsements, Trump echoed the idea that he was endorsing The Trump Network because he genuinely believed in the company:

> When I started The Apprentice television show, everyone told me it was a long shot.  We are now in our 10th season.  ***The Trump Network is not a long shot.***  I want people to be successful, and to enjoy what they are doing.  ***I see unbelievable enthusiasm for the company's products and business model.***

(emphasis added).[176]

354.    Trump's misrepresentation about the meaning of, and motivations for, his endorsement succeeded in bringing many new recruits to The Trump Network.  In the span of a little over two years, thousands of people were induced to invest in the business opportunities offered by The Trump Network because of Trump's seemingly genuine endorsement and false statements about the company.

355.    For example, Richard Chester, a marketer for The Trump Network, based out of Long Island, New York, told *New York Magazine*:  "Who in their right mind would not go with something Donald Trump is promoting?"[177]  Chester explained that although he was initially

---

[175] *Id.*

[176] The Trump Network, *NBC's The Apprentice Leads Candidates to The Trump Network*, PR Newswire (Dec. 10, 2010), https://www.prnewswire.com/news-releases/nbcs-the-apprentice-leads-candidates-to-the-trump-network-111679704.html.

[177] Jessica Pressler, *If I Can't Trust Donald Trump, Who Can I Trust? The Donald Has a New Scheme. Seller Beware*, New York Magazine (Jan. 23, 2011), http://nymag.com/nymag/features/70831/index2.html#print.

hesitant to join, promotional videos of Donald Trump on The Trump Network's website convinced him. He said: "I felt like he was speaking to me. This is a man who was down in the dumps and came back! Now everything he touches turns to gold!"[178]

356.    Chester went on: "I feel like in [Donald Trump's] heart, he wants to help people who are down and out," Chester said. "If I thought he was just in it for the money, I wouldn't do it."[179]

357.    Alex Izzo, another former sales representative or "marketer" of The Trump Network, was quoted in the same article explaining her motivation for deciding to quit her job to become a marketer full-time: "People have said, 'This is Donald Trump's network-marketing company? I want in,'" Izzo said.[180] "I was talking to a woman the other day and she said, 'If I can't trust Donald Trump, who can I trust?' And I said, 'You're *totally* right.'"[181]

## IX.    THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF THE TRUMP INSTITUTE

358.    At some point between 2005 and early 2006, Trump University, LLC entered into a licensing agreement with Business Strategies Group, LLC to form the "Trump Institute." The Trump Institute was a live-seminar program that purported to sell Trump's "secrets to success" in the real estate business in several extravagantly priced seminars. Trump agreed to endorse and promote the Trump Institute lectures and products in exchange for franchise fees and secret lump-sum payments.

359.    As with ACN and The Trump Network, the Trump Enterprise disseminated the Message as it related to the Trump Institute pervasively. It used various channels to disseminate

---

[178] *Id.*
[179] *Id.*
[180] *Id.*
[181] *Id.*

the Message, including television infomercials, advertorials, and printed promotional materials. For example, in informercials, Trump promoted the purported successes of the Trump Institute and the quality of the Seminar contents, including the "Donald Trump Way to Wealth" seminar.[182]  In addition, Trump disseminated false statements about the Trump Institute in printed promotional materials mailed to consumers across the country.  In a promotional mailing, for example, Trump's signature is prominently featured on a letter to potential Trump Institute recruits, extolling the quality of the information contained in "The Trump Institute's Way to Wealth" seminar series.[183]  And Trump was prominently emblazoned on promotional materials displayed on the Trump Institute website.



---

[182] *Donald Trump Way to Wealth Seminars infomercial (2007)*, YouTube (Jan. 22, 2017), https://youtube.com/watch?v=0Ogz-wuN40I; *Donald Trump Way to Wealth*, YouTube (July 25, 2008), https://www.youtube.com/watch?v=775yy9Rusc4.
[183] Mailing, "The Trump Institute's Way To Wealth" (Feb. 2009); *see also* Sam Stein, *Trump Tried to Get Bush's Labor Secretary to Attend His Get-Rich-Quick Seminar*, Huffington Post (Dec. 28, 2016), https://www.huffingtonpost.com/entry/donald-trump-elaine-chao_us_57abaeb9e4b0ba7ed23f0993.



360.    The Message as applied to the Trump Institute was substantively the same as the

Message applied to The Trump Network and ACN.  As with ACN and The Trump Network,

Trump falsely represented that (1) prospective students would have a reasonable probability of

commercial success if they invested in the training program offered by the Trump Institute;

(2) Trump was endorsing the Institute because he believed it offered a reasonable probability of

commercial success (rather than because the Trump Enterprise was being paid); and (3) his

endorsement was predicated on Defendants' extensive due diligence, inside information, and

personal experience with the Trump Institute.

### A.    Trump Falsely Represented That Consumers Had Reasonable Probability of Commercial Success in The Trump Institute

361.    From the period of 2005 until 2009, Donald Trump appeared in numerous

television infomercials, and online and printed promotional materials for the Trump Institute.  In

all these promotions, Trump emphatically stated that by participating in the Trump Institute

seminars, students would learn industry secrets and advice from him about how to succeed in the

real estate business, which would afford them a reasonable probability of commercial success.

Ultimately, he promised that the skills taught would help people make money and become successful in the real estate business, just as he did.

362.    The website and other materials directly predicated the reasonable probability of success promised with the fact that Trump was intimately involved in the Institute.  On the Trump Institute's website, for example, Trump falsely claimed that prospective students would learn Trump's "secret recipe for success" and other tactics to "improve their lives through financial success."[184]  The website proclaimed that "there are two great ways to create wealth— owning a business and investing in real estate.  Donald Trump is a master of both, and his strategies for both have been packed into this seminar."[185] Promotional materials promised that by attending Trump Institute seminars, customers could learn the "right knowledge and the right mindset to create unlimited riches."[186]



---

[184] *The Seminar*, The Trump Institute , *available at* https://web.archive.org/web/20080703213536/http://www.trumpinstitute.com/seminar.php.
[185] *Id.*
[186] *Id.*



363.    Repeatedly, Trump's assurances of success were premised on the fact that the

seminars purportedly contained his personal knowledge and advice about how to succeed in the

real estate market.  Another infomercial from 2007, for example, proclaimed that at the "Donald

Trump Way to Wealth" seminars, customers would "learn the secrets and strategies that have

made Donald Trump a billionaire!"[187] Trump personally promised that customers would, among

other things, learn "the Trump way to get cash back when you buy a property."[188]  "There are

---

[187] *Donald Trump Way to Wealth Seminars informercial (2007)*, YouTube (Jan. 22, 2017)
https://www.youtube.com/watch?v=0Ogz-wuN40I.
[188] *Id.*

many, many great deals out there, and I'm going to teach you how to find them" he continued.[189]
The infomercial also featured clips of what appear to be interviews with actual customers who
had recently attended one of the "Way to Wealth" seminars: "Everything he touched turned to
gold, and now it's rubbing off on us the same way," a man says, while standing in the middle of
what appears to be the lobby of a busy hotel convention center.[190]  "I think it's the greatest thing
I've ever gone to.  Better than a college education," asserts another.  "Learn from the best. That's
how I see it, that's why I'm here, that's why I came."[191]

364.    Extensive promotional materials also heralded the Trump Institute seminars as
containing "Donald Trump's 'secret recipe' for success—a combination of the right knowledge
and the right mind set to create unlimited riches" the Trump Institute website promised.[192]  "As
you'll discover, there are two great ways to create wealth—owning a business and investing in
real estate.  Donald Trump is a master of both, and his strategies for both have been packed into
this seminar."[193]

365.    In a promotional mailing from the Trump Institute, prospective customers
received what appeared to be a personal letter, written and signed by Trump, in his capacity as

---

[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *The Seminar*, The Trump Institute , *available at*
https://web.archive.org/web/20080703213536/http://www.trumpinstitute.com/seminar.php; *see also* Alex
Leary, *In Trump Institute, Donald Trump Had Florida Partners With a Record of Fraud*, Tampa Bay
Times (Jun. 20, 2016), http://www.tampabay.com/news/politics/stateroundup/in-trump-institute-donald-
trump-had-florida-partners-with-a-record-of-fraud/2283767.
[193] *The Seminar*, The Trump Institute , *available at*
https://web.archive.org/web/20080703213536/http://www.trumpinstitute.com/seminar.php; *see also* Alex
Leary, *In Trump Institute, Donald Trump Had Florida Partners With a Record of Fraud*, Tampa Bay
Times (Jun. 20, 2016), http://www.tampabay.com/news/politics/stateroundup/in-trump-institute-donald-
trump-had-florida-partners-with-a-record-of-fraud/2283767.

"Chairman, Trump Institute."[194]  "What you have in your hands right now is my personal invitation for you and your guest to attend a special event featuring a hand-picked member of my organization who will teach you many of the strategies and techniques that are the reasons for my success," it read.[195]  "This is what I have learned the hard way, in the streets, fighting to grow my empire."[196]

366.    The Trump Enterprise further promoted and endorsed the Trump Institute through a separate company, Trump Mortgage, that Donald Trump Jr. has described as "really my baby."[197]  Trump Mortgage was a company based in Trump Tower and licensed by The Trump Organization that refinanced and originated a range of commercial and residential mortgages, including subprime mortgages.  As early as May 2006, Trump Mortgage listed The Trump Institute as one of its "Trusted Partners," according to an archived version of the Trump Mortgage website.[198]  The Trump Mortgage website featured the following endorsement and promotion of the Trump Institute:

> The Trump Institute is a nationwide learning organization based on the vast knowledge and insight Donald J. Trump has garnered during his renowned career.  The Institute hosts The Donald Trump Way to Wealth Seminar in multiple cities, on a weekly basis, throughout the year.  This seminar provides a powerful, practical introduction to the wealth-building strategies in real estate and business that have made Trump one of the most successful and respected businessmen of our time.[199]

---

[194] Mailing, "The Trump Institute's Way to Wealth" (Feb. 2009); *see also* Sam Stein, *Trump Tried to Get Bush's Labor Secretary to Attend His Get Rich Quick Seminar*, Huffington Post (Dec. 28, 2016), https://www.huffingtonpost.com/entry/donald-trump-elaine-chao_us_57abaeb9e4b0ba7ed23f0993.

[195] *Id.*

[196] *Id.*

[197] Stephanie Fitch, *The Real Apprentices; At 60, Donald Trump is preparing for the day when he turns the family real estate empire over to his son Don Jr. and daughter Ivanka. He has taught them well.*, Forbes (Oct. 9, 2006).

[198] *Our Trusted Partners*, Trump Mortgage, https://web.archive.org/web/20060522190349/https://www.trumpmortgage.com/aboutus/trusted_partners.php.

[199] *Id.*

367.    Later in 2006, Trump Mortgage marketed to customers a "TRUMP Corporate Mortgage Program" that included access to Trump Institute seminars, according to a November 2006 archived webpage.[200]

368.    A description of the "Donald Trump Way to Wealth" seminar on the Trump Institute website explained to prospective customers that at the seminar they would learn about the secrets to Donald Trump's success.  The website proclaimed:  "The Donald Trump Way to Wealth Seminar . . . provides a powerful introduction to the wealth-building strategies in real estate and business that have made Donald Trump a multi-billionaire."[201]



**The Trump Institute**

*The Donald Trump Way to Wealth Seminar*

This seminar will introduce you to Donald Trump's "secret recipe" for success - a combination of the right **knowledge** in the right **mindset** to create unlimited riches.

As you'll discover, there are two great ways to create wealth - owning a business and investing in real estate. Donald Trump is a master of both, and his strategies for both have been packed into the seminar.

You can have all of this priceless knowledge and much, much more. But you must be willing to **take action**.

---

[200] *Trump Mortgage, LLC*
https://web.archive.org/web/20061122173247/https://www.trumpmortgage.com/corporate/..
[201] *About Us*, Trump Institute , *available at* https://web.archive.org/web/20080703213608/http://www.trumpinstitute.com/aboutus.php.

# The Trump Institute's Way To Wealth

What you have in your hands right now is my personal invitation for you and your guest to attend a special event featuring a hand-picked member of my organization who will teach you many of the strategies and techniques that are the reasons for my success.

At this special event, you will discover many of my unique wealth creating secrets and strategies that I use to buy and sell real estate and that I also use in many of my highly profitable businesses.

This is the type of inside information that you'll not find in any books, tapes or manuals anywhere. **This is what** I have learned the hard way, in the streets, fighting to grow my empire and fighting to stay on top.

Here's just a sample of what you'll learn:

• **How to get cash back when you buy a property** • How to get other people to jump-start your business • **How to finance your business without putting up your home for personal liability** • How to get the government to buy your product and rent your properties • **How to negotiate with bankers and win BIG!** • How to be your own boss Forever! • **How to build your retirement account quickly and live the lifestyle of your dreams** • How to stop paying high taxes • **How to structure your business organization for maximum profit and protection** • And much, much more.

Seating is definitely limited and I expect to have a full house filled with people like you who want a piece of the good life. The exact dates, times and locations are listed on the back of your invitation. Please feel free to invite one guest. Call today!

Sincerely,
Donald J. Trump

Chairman, Trump Institute

**FREE!**
*Special Edition*

P.S.    This invitation and the enclosed tickets have been sent only to those that have demonstrated a desire and a willingness to be successful. I promise it will be well worth your time and to prove it, I am giving everyone who attends one of my best selling books, *Think Like a Billionaire*, as a bonus. Call the toll-free number on the back of this invitation or visit www.trumpwd.com today to confirm your reservation, as seating is limited!





369.    But these statements were plainly false.  Trump had no actual involvement in the creation of course materials.  No matter how much people paid to attend the seminars, they would never actually be able to learn what Trump had to teach, because he never spent any time reviewing the course materials or drafting the contents.  In fact, large portions of the materials sold as part of the Trump Institute seminars were plagiarized from another source.

## An Example of the Copied Text

At least 20 pages of the Trump Institute instructional book were copied entirely or in large part from a book in a set titled "Real Estate Mastery System." Highlighted here is an example of some of what was duplicated.

**From the book published first in 1995 by Success magazine**

Consider the following example to illustrate the use of a purchase money mortgage in residential properties. Seller A is asking $80,000 for a single-family residence. Buyer B likes the house but only has $10,000 for a down payment. The lending institution will only loan $64,000 on the house. To be able to sell the house, Seller A agrees to take a purchase money mortgage for $6,000 from Buyer B. In addition to taking this purchase money mortgage, Seller A is willing to accept a lower priority of claim if Buyer B should default. In this case, the lending institution has the first claim because it has a first mortgage. The purchase money mortgage is a second mortgage.

Real Estate Mastery System: Mortgage and Finance, Success magazine

**From the book published in 2006 by the Trump Institute**

Consider the following example: Seller A is asking $80,000 for a single-family residence. Buyer B likes the house, but only has $10,000 for a down payment. The lending institution will only loan $64,000 on the house. To be able to sell the house, Seller A agrees to take a purchase money mortgage for $6,000 from Buyer B. In addition to taking this purchase money mortgage, Seller A is willing to accept a lower priority of claim if Buyer B should default. In this case, the lending institution has the first claim because it has a first mortgage. The purchase money mortgage is a second mortgage.

Billionaire's Road Map to Success, the Trump Institute

370.    One of the products marketed by the Trump Institute was a workbook containing tips and strategies for ways to acquire wealth in real estate and other related businesses.[202]  In 2016, the *New York Times* reported that substantial portions of the content of the course materials

---

[202] *See* Jonathan Martin, *Trump Institute Offered Get Rich Schemes with Plagiarized Lessons*, New York Times (Jun. 29, 2016), https://www.nytimes.com/2016/06/30/us/politics/donald-trump-institute-plagiarism.html.

contained in the workbook, called "Billionaire's Roadmap to Success," had been plagiarized

from a book that was part of a collection of training materials titled "Real Estate Mastery System,"

published in 1995 by *Success*.[203]  As alleged above, Trump was an advisory board member of the

SUCCESS Foundation in 2009, an affiliate of the *Success* magazine.  In addition, Trump and his

family have been featured in articles in *Success*, which detailed Trump's relationship with ACN.



---

[203] *Id.*



371.    In 2016, the *New York Times* reported that Susan G. Parker, the editor of the

Trump Institute manual, said that she was hired to write the manual after responding to a

Craigslist ad and that she certainly never met Donald Trump or received any guidance from him

about what to write in the manual.  Instead, Parker said that she wrote it based on her own

personal knowledge about real estate and a cursory review of prior books that Trump had

written.[204]

---

[204] *Id.*

### B.   Trump Falsely Represented that He Supported the Trump Institute Because He Believed It Offered a Reasonable Probability of Commercial Success (Rather than Because the Trump Enterprise Was Being Paid)

372.    Trump falsely represented that he was endorsing the Institute because he believed it would result in a reasonable probability of commercial success (and not because he was being paid).  For example, the "FAQ" section of the Trump Institute website explicitly misstated the basis for Trump's endorsement.  "Why did Donald Trump create the Trump Institute?" read one question.[205]  "America has been very good to Mr. Trump," the answer explained, "and this is his way of giving back knowledge to those who want to learn more about becoming successful."[206]



373.    In yet another Trump Institute infomercial, Trump asserted that if customers attended the seminar titled "The Donald Trump Way to Wealth," they would learn about his personal advice and real estate knowledge.  "I put all of my concepts that have worked so well for me, new and old, into our seminar," he proclaimed.[207]  "I'm teaching what I've learned. And *I'm real*" (emphasis added).[208]  The infomercial was staged to look like an interview between Donald Trump and a reporter-narrator.  "In continuing that effort to share his knowledge," the interviewer explained directly to the camera, "he has created the Trump Institute . . . so his

---

[205] *FAQ*, Trump Institute, *available at* https://web.archive.org/web/20080703213552/http://www.trumpinstitute.com/faq.php#g1.
[206] *Id.*
[207] *Donald Trump Way to Wealth*, YouTube (July 25,. 2008), https://www.youtube.com/watch?v=775yy9Rusc4.
[208] *Id.*

methods of success can be taught to anyone who wants to have that power, knowledge, and know-how."[209]



374. Trump and the Trump Enterprise intentionally concealed the nature of the licensing agreement with the Trump Institute, the fact that Trump received large fees to license out the Trump brand, and the fact that the Trump Enterprise had no ownership or day-to-day control over the operation of the company. To the contrary, the Trump Institute was initially created as part of a business plan involving Trump University, Donald Trump's online university that has been widely investigated and accused of operating fraudulent business practices. Some of the key allegations against Trump University involved misleading advertisements that Trump himself would be integrally involved in the selection of professors and course materials when, in fact, he was not. While Trump had a majority interest in Trump University, he had no personal equity stake in the Trump Institute. As Alan Garten, then executive vice president and general counsel of The Trump Organization, told the *Huffington Post* in 2016: "The Trump Institute was a licensee of Trump University and was not owned or controlled by Mr. Trump or any of his companies."[210]

---

[209] *Id.*
[210] Christina Wilkie, *Trump Institute Fired Veteran for 'Absences' after He Was Deployed to Afghanistan*, Huffington Post (Apr. 22, 2016), https://www.huffingtonpost.com/entry/trump-institute-fired-veteran_us_5718fda7e4b024dae4f1517e.

375.    In fact, the Trump Institute deal was the culmination of an effort by the Trump Enterprise to find and partner with individuals who had run legally problematic live seminars in the past.  In a July 2012 deposition taken as part of the New York Attorney General's investigation into Trump University, President of Trump University Michael Sexton explained that when he and Trump were searching for people to license the live seminar business out to, they did, in fact, consider several different companies with relevant experience.

376.    Sexton further explained that they later planned to bring the Trump Institute live seminar business "back in-house" at Trump University once they understood the business of producing live seminars better.  That is, Trump and Sexton were looking to *learn* the live seminar business from their licensing partner.

377.    Ultimately, he explained, they decided to license to Michael and Irene Milin, a Florida couple who owned and operated another live seminar company called National Grants Conferences ("National Grants").  Over a period of decades, the Milins operated a variety of get-rich-quick schemes in which they sold educational seminars and materials that purported to teach people how to easily obtain wealth.  In each case, the companies were accused of making false promises; luring customers in with deceptive marketing; using aggressive sales tactics to persuade people to buy increasingly expensive products; and providing little accountability in the way of customer service or refunds, according to news articles.[211]

---

[211] Gideon Resnick, *Trump's Get Rich Seminar Partnered With Couple Prosecuted for Fraud*, Daily Best (Apr. 7, 2016), https://www.thedailybeast.com/trumps-get-rich-seminar-partnered-with-couple-prosecuted-for-fraud; Drew Garber, *Meet the Shadowy Jewish Couple at the Center of the Trump Institute Scandal*, Forward (July 9. 2016); Alex Leary, *In Trump Institute, Donald Trump had Florida Partners With Record of Fraud,* Tampa Bay Times (July 3, 2016); Jonathan Martin, *Trump Institute Offered Get-Rich Schemes With Plagiarized Lessons*, New York Times (June 29, 2016), https://www.nytimes.com/2016/06/30/us/politics/donald-trump-institute-plagiarism.html; Spencer Woodman, *Documents Show Just How Trump Suckered Students of the Trump Institute Felt*, The Nation (March 28, 2016), https://www.thenation.com/article/documents-show-just-how-suckered-students-of-the-trump-institute-felt/.



378.    In June 2007, 33 state attorneys general (and the attorney general of Guam)
signed a letter to the Federal Trade Commission, noting the Milins' deceptive trade practices
through National Grants.[212]  And in January 2010, then-Texas Attorney General Greg Abbott
sued National Grants and its executives Mike and Irene Milin, Matt Orlando and Gail Amen in
Harris County District Court in Texas, alleging that National Grants had misled consumers.[213]
National Grants did not admit any wrongdoing, but the action resulted in their being barred from
conducting the kind of deceptive advertising they had previously used.

---

[212] Letter from Attorneys General to the Federal Trade Commission (June 18, 2007).
[213] Assurance of Voluntary Compliance, *In re: Proven Methods Seminars*, *LLC*, No. 2010-04032 (Harris
Cty. Dist. Ct. Jan. 21, 2010).



379.    The Milins effectively ran the Trump Institute.  The Trump Institute even shared

office space in Boca Raton, Florida, with the Milins' other companies, according to Florida

corporate records.

380.    The Trump Institute even shared staffers with the Milins' other companies.

According to an April 2016 article in the *Daily Beast*, for example, National Grants used its

staffers and office space to help operate the Trump Institute.[214]  Two such staffers were speakers

Rick Wiseman and Saen Higgins, who had worked as salespeople for National Grants before

---

[214] Gideon Resnick, *Trump's Get Rich Seminar Partnered With Couple Prosecuted for Fraud*, Daily Best (Apr. 7, 2016), https://www.thedailybeast.com/trumps-get-rich-seminar-partnered-with-couple-prosecuted-for-fraud.

doing the same work for the Trump Institute.[215]  There was also "recycled NGC material" in Trump Institute pitches, including a story about how Wiseman obtained over $100,000 in government money to renovate his Utah home.

381.    The Milins ran the Trump Institute in a similarly problematic way.  In 2009, the Better Business Bureau gave the Trump Institute an F rating.[216]  This was reflective of the overall experience that consumers had with the company during the years it was operational.

382.    Records compiled by Attorneys General across the country during the years that Trump Institute was in operation also demonstrate widespread dissatisfaction with the Trump Institute seminars by customers who could not receive refunds and felt as though they had been scammed out of thousands of dollars.

383.    As part of a 2010 investigation into Trump-entity for-profit education schemes, for example, then-Texas Attorney General Greg Abbott had compiled about 400 pages of documents and complaints that had been filed against the Trump Institute (and Trump University), according to reporting by *The Nation* in 2016.[217]  Included in Abbott's documents were complaints that were not only submitted to the Texas Attorney General's office, but also

---

[215] Joe Mullin & Jonathan Kaminsky, *Firm's Claims for Grants Get Legal Scrutiny,* Sacramento Bee (July 5, 2006), *available at* https://drive.google.com/file/d/0B4yHJZsoGnJBeHVJVzNtQ3NZbW8/view; *see also* Joe Mullin * Jonathan Kaminsky, *Trump University and the Art of the Get Rich Seminar*, ARS Technica (Apr. 29, 2016), https://arstechnica.com/tech-policy/2016/04/we-witnessed-the-birth-of-trump-university/.
[216] Douglas Feiden, *Trump U. Hit by Complaints from Those Who Paid Up to 30G, And Say They Got Very Little in Return*, NY Daily News (May 30, 2010), http://www.nydailynews.com/news/trump-u-hit-complaints-paid-30g-return-article-1.44632.
[217] Spencer Woodman, *Documents Show Just How Suckered Students of the Trump Institute Felt*, The Nation (Mar. 28, 2016), https://www.thenation.com/article/documents-show-just-how-suckered-students-of-the-trump-institute-felt/.

filings from Better Business Bureaus in the states of Florida and New York, where there were additional Trump Institute and Trump University offices.[218]

384.   The Trump Enterprise profited enormously from this fraud.  The Trump Institute seminars and course material could cost participants tens of thousands of dollars in total fees.  At the initial "free" seminars, for example, participants were prodded to purchase an additional three-day conference, a "Wealth Building Weekend," for $1,500.[219]

385.   In its first full year of operation, the Trump Institute held about 120 different seminars in 30 different cities across the country.[220]

386.   As one man wrote in a complaint to the Florida Attorney General's office about a 2009 seminar:  "They are using our money to make money."[221]  Another complaint from a woman who wrote to the Attorney General's office requesting aid in receiving a refund of $19,000, after she was allegedly misled about the Trump Institute by its advertising, stated: "We spent numerous hours placing calls & most times were only able to leave a message in a general mailbox or were disconnected without allowing a voicemail."  "Trump Institute took our money, did not provide any mentoring service, is virtually unavailable by phone, email or fax and has failed to live up to their agreement."

387.   Another student wrote to the Florida Attorney General's office seeking help in obtaining a refund from Trump Institute:  "Please help me. . . .  I was laid off work for the first

---

[218] *Id.;see also* Scott Maxwell, *Trump Funds Bondi as the AG Considered a Probe*, Orlando Sentinel (Oct. 15, 2013), http://articles.orlandosentinel.com/2013-10-15/news/os-scott-maxwell-bondi-trump-20131015_1_attorney-general-pam-bondi-donald-trump-campaign-event.

[219] Gideon Resnick, *Trump's Get Rich Seminar Partnered with Couple Prosecuted for Fraud*, The Daily Beast (Apr. 7, 2016), https://www.thedailybeast.com/trumps-get-rich-seminar-partnered-with-couple-prosecuted-for-fraud.

[220] Alex Leary, *In Trump Institute, Donald Trump Had Florida Partners with a Record of Fraud*, Tampa Bay Times (Jun. 20, 2016), http://www.tampabay.com/news/politics/stateroundup/in-trump-institute-donald-trump-had-florida-partners-with-a-record-of-fraud/2283767.

[221] *Id.*

time in my life and really need this money to support my family.  $1,400 is so much money for

my family."[222]  Another woman wrote a complaint directly addressed to Donald Trump, which

was then forwarded to the Attorney General's office:  "Mr. Trump, I am an 85-year-old woman

living on a fixed, modest income.  The monthly payment your organization has been deducting

from my bank account is creating an ongoing hardship for me."[223]

388.    Another complaint submitted in 2010 by a Connecticut couple explained that they

attended a Trump Institute seminar and were led to believe by the person conducting the seminar,

"that he was absolutely broke and his wife was about to leave him and he found the Trump

Institute which saved his life."  A few days later, the couple received a phone call from someone

at the Trump Institute who convinced them to sign up for a more extended program.  "This man

knew that we were already in a lot of debt and we were going to pay for this part [on] credit card

and the other part my husband was to borrow from his 401k retirement Plan," the complaint

stated.  A few days later, when the course materials and the contract did not arrive in the mail,

the couple tried to cancel their membership and receive a refund.  Several phone calls and over

ten days later, they were told that their membership was past the cancellation date and they

would not be able to receive a refund.  "The Trump Institute failed us by not . . . staying true to

their word," they wrote.

389.    Another Florida resident submitted a complaint to the Attorney General's office

in 2010, seeking help obtaining a refund from the Trump Institute.  The customer had been

waiting several months for a response from the Trump Institute regarding a refund.  "[T]he

---

[222] Spencer Woodman, *Documents Show Just How Suckered Students of the Trump Institute Felt*, The
Nation (Mar. 28, 2016), https://www.thenation.com/article/documents-show-just-how-suckered-students-
of-the-trump-institute-felt.
[223] Alex Leary, *In Trump Institute, Donald Trump Had Florida Partners with a Record of Fraud*, Tampa
Bay Times (June 30, 2016) https://www.tampabay.com/news/politics/stateroundup/in-trump-institute-
donald-trump-had-florida-partners-with-a-record-of-fraud/2283767.

company . . . [is] trying to get rid of me!" the complaint states.  "This company is a Donald Trump company, so I felt it was legitimate."

390.    A California resident wrote to the Florida Attorney General's office in January of 2010, explaining that he had paid $12,000 for a real estate course over a year earlier and has since been unable to get a refund.  "I received nothing" from the course, he wrote.  "I have called repeatedly to get a refund . . . I think this is a big scam.  Can you help me?"

### C.    Trump Falsely Represented that His Endorsement Was Predicated on Appropriate Due Diligence and/or Inside Information

391.    In addition to misrepresenting the probability of prospective students' commercial success based on the material and the nature of his own involvement and compensation, Trump repeatedly misstated that he had access to inside information regarding the Institute and that he was intimately aware of the educational content in which he was asking students to invest.

392.    As part of Trump's claim that he was intimately familiar with the content of the Trump Institute's educational services, he suggested that he himself had chosen the course material.  Trump claimed that he has "put all of [his own] concepts" into the seminars for people to learn from.[224]  "Additional educational materials will be for sale at the seminar" is written across the bottom of the screen during one portion of one of the infomercials.

393.    Not only was it patently false that Trump had authored the course materials (as alleged above), but Trump's own attorneys made clear just how little diligence Trump had done on the Institute he was endorsing.  For example, when Alan Garten, then-executive vice president and general counsel of The Trump Organization, spoke to the *New York Times* in 2016, he claimed that Donald Trump was "obviously" unaware of the plagiarism issue, since he had

---

[224] *Donald Trump Way to Wealth*, YouTube (July 25 2008), https://www.youtube.com/watch?v=775yy9Rusc4.

little actual involvement with the Trump Institute in the first place.[225]  Garten underscored that the Trump Institute was simply a "short-term licensing deal," though Trump's own statements at the time were directly to the contrary.[226]

394.     Moreover, Garten directly contradicted Trump's many assertions that he was involved in designing the Trump Institute program and in selecting mentors.  Garten stated that "[t]he Trump Institute was a licensee of Trump University and was not owned and controlled by Mr. Trump or any of his companies."  Garten continued, "As such, Mr. Trump had nothing whatsoever to do with the employment of any of the Trump Institute's employees or mentors."[227]

395.     In his 2012 deposition, Sexton said that he did not "believe" that anyone at The Trump Organization would have reviewed the Trump Institute's curriculum.[228]  He further emphasized that Trump, personally, "would never do that."[229]

## X.    CLASS ALLEGATIONS

396.     Plaintiffs bring this action on their own behalf and pursuant to Federal Rule of Civil Procedure 23(a), each of the three subdivisions of Rule 23(b), and Rule 23(c)(4).

397.     Plaintiffs seek certification of a nationwide class under Rule 23(b)(1)(A) and/or 23(b)(2) consisting of all persons and entities who invested in, subscribed to, or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "Nationwide Equitable Class") for

---

[225] *See* Jonathan Martin, *Trump Institute Offered Get Rich Schemes with Plagiarized Lessons*, New York Times (Jun. 29, 2016), https://www.nytimes.com/2016/06/30/us/politics/donald-trump-institute-plagiarism.html.
[226] *Id.*
[227] Christina Wilkie, *Trump Institute Fired Veteran for 'Absences' After he was Deployed to Afghanistan*, Huffington Post (Apr. 22, 2016), https://www.huffingtonpost.com/entry/trump-institute-fired-veteran_us_5718fda7e4b024dae4f1517e.
[228] Sexton Dep. at 126, *Makaeff* v. *Trump University, LLC,* No. 10 Civ.00940 (S.D. Cal. July 25, 2012).
[229] *Id.* at 127.

purposes of asserting common law fraud and common law negligent misrepresentation claims, and claims under RICO.

398.   Plaintiffs Catherine McKoy and Millard Williams also seek certification of a class or subclass under Rule 23(b)(1)(A) and/or 23(b)(2) consisting of all persons and entities who, from California, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "California Equitable Class") for purposes of asserting statutory claims under California law.

399.   Plaintiff Markus Frazier also seeks certification of a class or subclass under Rule 23(b)(1)(A) and/or 23(b)(2) consisting of all persons and entities who, from Maryland, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "Maryland Equitable Class") for purposes of asserting statutory claims under Maryland law.

400.   Plaintiff Lynn Chadwick also seeks certification of a class or subclass under Rule 23(b)(1)(A) and/or 23(b)(2) consisting of all persons and entities who, from Pennsylvania, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "Pennsylvania Equitable Class") for purposes of asserting statutory claims under Pennsylvania law.

401.   The proposed Nationwide Equitable Class, the proposed California Equitable Class, the proposed Maryland Equitable Class and the proposed Pennsylvania Equitable Class are referred to collectively as the "Equitable Classes."

402.   The prosecution of separate actions by individual members of the Rule 23(b)(1)(A) and (b)(2) Equitable Classes would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

403.    Defendants have acted, or failed to act, on grounds generally applicable to the Rule 23(b)(1)(A) and (b)(2) Equitable Classes, thereby making appropriate final injunctive and declaratory relief with respect to the Equitable Classes as a whole.

404.    The individual members of the Rule 23(b)(1)(A) and (b)(2) Equitable Classes are so numerous that joinder is impracticable.  The precise size of the each of the Equitable Classes is not yet fully known but easily meets the threshold for certification.  In each of the years from 2011 to 2016, ACN reported that it had 200,000 IBOs.[230]  Moreover, single conventions held by ACN in the United States multiple times a year during the same period drew typically at least 15,000 IBO attendees each.[231]

405.    Second, Plaintiffs seek certification of a nationwide class under Rule 23(b)(3) consisting of all persons and entities who invested in, subscribed to or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an amount equal to or more than those payments from ACN (the "Nationwide Damages Class") for purposes of asserting common law fraud and common law negligent misrepresentation claims, and claims under RICO.

406.    Plaintiffs Catherine McKoy and Millard Williams also seek certification of a class or subclass under Rule 23(b)(3) consisting of all persons and entities who, from California, invested in, subscribed to or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an amount equal to or more than those payments from ACN (the "California Damages Class") for purposes of asserting statutory claims under California law.

---

[230] *ACN*, Direct Selling News, https://www.directsellingnews.com/company-profiles/acn/.
[231] *See, e.g.*, Lisa Krass, *ACN Hosts 20th Anniversary in Charlotte*, PRWeb (Feb. 20, 2013), https://www.prweb.com/releases/acn/events/prweb10450330.htm; *ACN Welcomed Nearly 15,000 Independent Business Owners to San Jose, CA for Its International Training Event*, Business Wire (Dec. 13, 2012), https://www.businesswire.com/news/home/20121213006232/en/ACN-Welcomed-15000-Independent-Business-Owners-San; *The Opportunity of a Lifetime*, Success from Home, July 2012, at 26-27.

407.    Plaintiff Markus Frazier also seeks certification of a class or subclass under Rule 23(b)(3) consisting of all persons and entities who, from Maryland, invested in, subscribed to or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an amount equal to or more than those payments from ACN (the "Maryland Damages Class") for purposes of asserting statutory claims under Maryland law.

408.    Plaintiff Lynn Chadwick also seeks certification of a class or subclass under Rule 23(b)(3) consisting of all persons and entities who, from Pennsylvania, invested in, subscribed to or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an amount equal to or more than those payments from ACN (the "Pennsylvania Damages Class") for purposes of asserting statutory claims under Pennsylvania law.

409.    The proposed Nationwide Damages Class, the proposed California Damages Class, the proposed Maryland Damages Class and the proposed Pennsylvania Damages Class are referred to collectively as the "Damages Classes."

410.    The individual members of the Damages Classes are so numerous that joinder is impracticable.  The precise size of the each of the Damages Classes is not yet fully known but easily meets the threshold for certification.  In each of the years from 2011 to 2016, ACN reported to have 200,000 IBOs.[232]  Moreover, single conventions held by ACN in the United States multiple times a year during the same period drew typically at least 15,000 IBO attendees each.[233]

---

[232] *ACN*, Direct Selling News, https://www.directsellingnews.com/company-profiles/acn/.
[233] *See, e.g.*, Lisa Krass, *ACN Hosts 20th Anniversary in Charlotte*, PRWeb (Feb. 20, 2013), https://www.prweb.com/releases/acn/events/prweb10450330.htm; *ACN Welcomed Nearly 15,000 Independent Business Owners to San Jose, CA for Its International Training Event*, Business Wire (Dec. 13, 2012), https://www.businesswire.com/news/home/20121213006232/en/ACN-Welcomed-15000-Independent-Business-Owners-San; *The Opportunity of a Lifetime*, Success from Home, July 2012, at 26-27.

411.   All of the members of the Damages Classes have been injured as a result of Defendants' conduct.

412.   Third, as an alternative to seeking class certification under Rule 23(b), Plaintiffs may also seek certification of the classes defined above, but limited to specific identified common issues under Rule 23(c)(4).

413.   Plaintiffs reserve the right to amend the definitions of the Classes if discovery and/or further investigation reveal that the Classes should be expanded or otherwise modified.

414.   There are numerous questions of law and fact common to the Equitable Classes and the Damages Classes (collectively, the "Classes").  Chief among them are whether Defendants actions, as described in this Complaint violated RICO or the consumer protection statutes of California, Maryland or Pennsylvania, or constituted common law fraud or common law negligent misrepresentation.  These common issues predominate over any individual issues pertaining to the members of the Damages Classes and include, without limitation, whether:

a)   The Trump Association-in-Fact is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

b)   The Trump Corporation is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

c)   Defendants operated, directed, and controlled the Trump Association-in-Fact;

d)   The Individual Defendants operated, directed, and controlled the Trump Corp. Enterprise;

e)   Defendants engaged or conspired to engage in a pattern of mail fraud, indictable under 18 U.S.C. § 1341;

f) Defendants engaged or conspired to engage in a pattern of wire fraud, indictable under 18 U.S.C. § 1343;

g) Defendants promoted the ACN business opportunity with false and misleading statements;

h) Defendants engaged in a scheme to defraud members of the Classes;

i) Members of the Classes are entitled to an award of treble, statutory, punitive damages, attorneys' fees, and expenses;

j) Members of the Classes are entitled to equitable relief, and if so, the nature of such relief;

k) Defendants' conduct injured members of the Classes and whether those injuries, including monetary and out of pocket pecuniary losses, are compensable.

415.     Defendants' practices and the claims alleged in this complaint are common to all members of the Classes.

416.     The violations and injuries suffered by Plaintiffs are typical of those suffered by members of the Classes.  Plaintiffs, like all members of the Classes, are individuals who were lured into investing in the ACN business opportunity and incurred costs and suffered losses as a result of Defendants' misrepresentations and scheme to defraud.  The Classes will benefit from the remedial and monetary relief sought in this action.

417.     Plaintiffs and their counsel will adequately and fairly protect the interests of all members of the Class because they have the requisite personal interest in the outcome of this litigation and they have no interest antagonistic to others in the Classes.

418.     Plaintiffs are represented by counsel competent and experienced in federal class

action, consumer protection, and RICO litigation.  Kaplan Hecker and Fink LLP ("KHF") is a

prominent New York City law firm whose lawyers have extensive experience litigating complex

civil cases and in civil rights litigation.  Emery Celli Brinckerhoff & Abady LLP ("ECBA") is

also a prominent New York City law firm with extensive experience in class action lawsuits, and

in consumer and civil rights litigation.  ECBA served as class counsel in *Sykes* v. *Mel Harris &*

*Associates, LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012) (certifying Rule 23(b)(2) and (3) classes of

hundreds of thousands of persons injured by fraudulent scheme to obtain default judgments in

violation of, *inter alia*, RICO and the New York Consumer Protection Act), *aff'd*, 780 F.3d 70

(2d Cir. 2015).

419.     A class action is the superior method for a fair and efficient adjudication of this

matter in that Defendants have acted in a manner generally applicable to the Classes, joinder of

all members of the Classes is impracticable, and a class action may avoid numerous separate

actions by class members that would unduly burden the courts.

420.     Additionally, the damages suffered by class members of at least $500 each,

although substantial, are small in relation to the extraordinary expense and burden of complex

litigation, and it is therefore highly unlikely that any significant number of individual actions will

be pursued, particularly because members of the Classes are primarily low-income individuals

with limited access to counsel.  Hence, their rights under the law may well be meaningless

without certification of a class action seeking common redress.

421.     This case can be efficiently and easily managed as a class action.

**CAUSES OF ACTION**

**COUNT ONE**:        **Racketeering in Violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**

422.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

423.     Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

424.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Trump Association-in-Fact through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

425.     The Individual Defendants are "persons" within the meaning of 18 U.S.C. 1961(3) who conducted the affairs of the Trump Corp. Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

426.     At all times relevant to this Complaint, the Trump Association-in-Fact was an association-in-fact within the meaning of 18 U.S.C. § 1961(4), comprised of a network of companies and associates that shared a common purpose, including but not limited to (i) Defendant The Trump Corporation; (ii) Defendant Donald J. Trump; (iii) Defendant Ivanka Trump; (iv) Defendant Donald Trump Jr.; (v) Defendant Eric Trump; (vi) Trump Productions; (vii) DSN Licensing, LLC; (viii) Trump University LLC; (ix) Trump International Realty; (x) Trump National Golf Club, LLC; and (xi) TNGC Charlotte, LLC.

427.     At all times relevant to this Complaint, the Trump Corp. Enterprise was legal entity and an enterprise within the meaning of 18 U.S.C. § 1961(4) operated, directed, and controlled by the Individual Defendants.

428.    The Trump Association-in-Fact and the Trump Corp. Enterprise (referred to collectively as the "Trump Enterprise") had the common purpose of earning revenue from the Endorsed Entities in exchange for conveying a false and misleading Message on behalf of the Endorsed Entities, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the Investments; (2) that Trump was promoting and endorsing the Investments because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the Investments.  The Enterprise's pursuit of this common purpose by the actions alleged in this Complaint amounted to the conduct of a scheme to defraud Plaintiffs (the "Fraudulent Scheme").

429.    The Individual Defendants exercised substantial control over the Trump Enterprise through the following means:

  A.    directing the business activities of The Trump Corporation and its subsidiaries and affiliates to carry out the Trump Enterprise;

  B.    approving marketing and advertising materials which featured Trump's name, likeness and/or voice, including materials produced by ACN, the Trump Institute, and Trump Network;

  C.    authorizing companies within the Trump Enterprise to license the right to use Trump's name to other companies, including the Trump Institute and Trump Network.

  D.    authorizing companies within the Trump Enterprise to enter into arrangements that facilitated payments from the Endorsed Entities

to the Trump Enterprise in consideration for Defendants'

fraudulent promotion and endorsement of the Investments.

430.    Defendant The Trump Corporation exercised substantial control over the

Association-in-Fact entities through its position as the principal controlling and operating entity

under The Trump Organization umbrella.

431.    At all relevant times, the Trump Association-in-Fact had an ascertainable

structure that was separate and distinct from Defendants, and its operations were separate from

the pattern of racketeering activity in which Defendants engaged.  The Trump Corporation, by

virtue of its status as a legal corporation, is separate and distinct from the Individual Defendants

who operated, directed, and controlled the Trump Corp. Enterprise.

432.    In carrying out the Fraudulent Scheme, the Trump Enterprise engaged in interstate

commerce and/or its activities affected interstate commerce, including because the businesses

that Trump endorsed offered their products nationally and because Trump made appearances in

several states in conducting the Enterprise.

433.    Under the direction of Defendants, the Trump Enterprise had an ongoing

organizational framework for carrying out its objectives and functioned as a continuing unit with

a common purpose.  Each participant in the Trump Enterprise had a systematic linkage to each

other participant through corporate ties, contractual relationships, financial ties, and the

continuing coordination of their activities.

434.    By engaging in the Fraudulent Scheme, Defendants conducted the affairs of the

Trump Enterprise through a pattern of racketeering activity.  The racketeering activity was made

possible by the regular and repeated use of the facilities, services, legal entities, and employees

of the Trump Enterprise.

435.    Defendants carried out the Fraudulent Scheme through numerous acts of mail and wire fraud, which acts are indictable under 18 U.S.C. §§ 1341 and 1343, respectively, and thus constitute racketeering activity within the meaning of 18 U.S.C. § 1961(1).  Defendants used thousands of interstate mail and wire communications to create and perpetuate the Fraudulent Scheme, through communications between and among Defendants and members of the Enterprise, money transfers, false statements, misrepresentations, and misleading omissions alleged in this Complaint.  These acts of mail and wire fraud together constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

436.    The pattern of racketeering activity commenced in late 2005, when Trump began to endorse ACN.  The pattern extended to Trump's endorsement of The Trump Network and Trump Institute.  The pattern continued until at least August 2017, when the ACN Charity golf tournament was hosted at the TNGC Charlotte. Though the pattern of racketeering extended to the Trump Network and the Trump Institute, the Trump Enterprise's fraudulent promotion and endorsement of ACN alone constitutes a pattern of racketeering activity.

437.    Defendants' use of the mails in furtherance of their Fraudulent Scheme included communications from and between Defendants and members of the Enterprise, in addition to the following communications sent by interstate mail to Plaintiffs, class members, and other third parties via U.S. mail or commercial carrier by Defendants, at their behest, with their express authorization, or consistent with reasonable expectations, and which involved knowingly false statements, misrepresentations, and misleading omissions:

      A.     The ACN Opportunity Discs featuring the Trumps;

      B.     Issues of ACN Newsmagazine featuring the Trumps and/or detailing Trump's endorsement of ACN;

C.     Issues of *Success from Home* magazine and *Success* magazine featuring the Trumps and/or detailing Trump's endorsement of ACN;

D.     Episodes of *The Celebrity Apprentice* featuring ACN and Individual Defendants that were distributed in physical media (such as DVDs);

E.     Promotional materials for Trump Institute containing Trump's name and image;

F.     Advertising materials for the Trump Institute containing a signed letter from Trump promoting the *Donald Trump Way to Wealth* seminar;

G.     Advertising materials for Trump Network containing Trump's name, image, and promotional statements.

438.    Defendants' use of interstate wire services in furtherance of their Fraudulent Scheme included email communications and money transfers from and between Defendants and members of the Enterprise, in addition to the following communications that were broadcast or distributed using interstate wire services or other interstate electronic media by Defendants, at their behest, with their express authorization, or consistent with reasonable expectations, and which involved the knowingly false statements, misrepresentations, and misleading omissions:

A.     Videos of Trump's speeches at ACN events that were posted on YouTube;

B.     Posts authored by Trump on ACN's blog;

C.   Videos of Trump's speeches at Trump Network events that were posted on YouTube;

D.   Posts authored by Trump on the Trump Network's website;

E.   Promotional videos featuring Trump for Trump Network that were posted on YouTube;

F.   Promotional videos featuring Trump for the Trump Institute that were posted on YouTube.

439.   Throughout the relevant time period, on or about the dates set forth below, Plaintiffs received the Message about ACN that was at the core of the Fraudulent Scheme through the following fraudulent mail and/or wire communications:

A.   In mid-to-late 2014, Plaintiff McKoy viewed an ACN DVD in which Trump delivered the Message directly to viewers at an ACN recruitment meeting in Los Angeles.  The Message was repeated in and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff McKoy also viewed.

B.   Plaintiff McKoy also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

C.   Plaintiff McKoy also received the Message at ACN conferences in 2015 in Cleveland, Ohio, and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

D.      Plaintiff McKoy also received the Message from reading Trump's statements and images in *Success from Home* and *Success* magazines throughout the relevant period.

E.      In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Williams viewed an ACN DVD in which Trump delivered the Message directly to viewers.

F.      Plaintiff Williams also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

G.      Plaintiff Williams also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

H.      Around mid-2016, Plaintiff Frazier received the Message by watching video of Trump from an episode of *The Celebrity Apprentice* featuring ACN.  The Message was repeated and augmented by other clips featuring Trump's promotion and endorsement of ACN.

I.      Around mid-2013, Plaintiff Chadwick received the Message by watching a promotional video prominently featuring Trump at an event held at a hotel in Pennsylvania.  The Message was repeated in and augmented by other clips featuring Trump's promotion and endorsement of ACN.

440.    In reliance on the Message conveyed by Defendants in furtherance of the Fraudulent Scheme, Plaintiffs and class members invested in ACN, incurred expenses in connection therewith, and suffered loss and damage thereby.

441.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs and class members would not have been injured.  Thus, Plaintiffs' and class members' injuries were directly and proximately caused by the pattern of racketeering activity described above.

442.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs and class members for three times the damages Plaintiffs and class members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT TWO:    Conspiracy to Conduct the Affairs of a Racketeering Enterprise, 18 U.S.C. § 1962(d)**

443.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

444.    Defendants have agreed and conspired to violate 18 U.S.C. § 1962(c), as set forth above, in violation of 18 U.S.C. § 1962(d). Defendants have intentionally conspired and agreed to directly, and indirectly, conduct and participate in the conduct of the affairs of the Trump Enterprise through a pattern of racketeering activity.

445.    Defendants knew that their predicate acts of mail and wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to further their scheme to defraud hopeful investors.

446.    As a direct result and proximate result of Defendants' conspiracy, and the multiple overt acts taken by all Defendants in furtherance of that conspiracy, Plaintiffs and class members have been injured in their business and property.

**COUNT THREE:**     **Dissemination of Untrue and Misleading Public Statements in Violation of California Business and Professions Code § 17500 *et seq*.**

447.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.  Plaintiffs Catherine McKoy and Millard Williams ("California Plaintiffs") assert Count Three on behalf of themselves and members of the California classes.

448.     Defendants are "persons" within the meaning of California Business & Professional Code § 17506.

449.     California Business & Professions Code § 17500 prohibits the dissemination, in any manner or means, of any untrue or misleading statements or representations concerning property or services.

450.     Defendants violated California Business & Professions Code § 17500 by disseminating to the public a false and misleading Message on behalf of the ACN, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into ACN; (2) that Trump was endorsing and promoting ACN because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the ACN business opportunities.

451.     On or about the dates set forth below, Plaintiffs McKoy and Williams received the following fraudulent statements by Trump:

> A.     In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff McKoy viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented

by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff McKoy also viewed.

B.     Plaintiff McKoy also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles during which ACN DVDs prominently featuring Trump's endorsement were played.

C.     Plaintiff McKoy also received the Message at ACN conferences in 2015 in Cleveland, Ohio and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

D.     Plaintiff McKoy also received the Message from reading Trump's statements and images in *Success from Home* and *Success* magazines throughout the relevant period.

E.     In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Williams viewed an ACN DVD in which Trump delivered the Message directly to viewers.

F.     Plaintiff Williams also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles—during which ACN DVDs prominently featuring Trump's endorsement were played.

G.     Plaintiff Williams also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

452.    As set forth in this Complaint, Defendants knew, or by exercise of reasonable care should have known, that the statements regarding ACN were false and misleading. The statements referenced above, which Defendants disseminated to the public, were material and likely to deceive a reasonable consumer.

453.    As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding ACN.

454.    Plaintiffs McKoy and Williams and members of the California classes invested in ACN, and incurred expenses in connection therewith, as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

455.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs McKoy and Williams and members of the California classes would not have been injured.  Thus, their injuries were directly and proximately caused by Defendants' dissemination of untrue or misleading statements and representations of property or services to individuals within the state of California, in violation of California Business & Professions Code § 17500.

456.    In accordance with California Business & Professions Code § 17500, Plaintiffs McKoy and Williams and members of the California classes request that this Court enter such orders or judgments as may be necessary, including disgorgement of any money Defendants obtained by false advertising, and for such other relief as may be appropriate.

**COUNT FOUR**:    **Unfair Competition in Violation of California Business and Professions Code § 17200 *et seq*.**

457.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.  Plaintiffs McKoy and Williams assert Count Four on behalf of themselves and members of the California classes.

458.     Defendants are "persons" within the meaning of California Business & Professions Code § 17021.

459.     Defendants have violated California Business & Professions Code § 17200's prohibition against "unlawful, unfair, or fraudulent" business practices by disseminating materially false and misleading representations about ACN to Plaintiffs McKoy and Williams.

460.     Defendant's actions constitute "unfair" business acts and practices within the meaning of California Business & Professions Code § 17200.  Defendants' practices offend public policy and are unethical, oppressive, unscrupulous and violate the laws stated herein.  Moreover, Defendants' conduct has caused substantial injury to Plaintiffs McKoy and Williams and members of the California classes.  The gravity of Defendants' wrongful conduct significantly outweighs any purported benefits that can be attributed to such conduct.

461.     Defendants' actions also constitute fraudulent business acts and practices within the meaning of California Business & Professions Code § 17200.  Defendants' omissions regarding the nature of Trump's relationship with the ACN, as well as Defendants' assertions regarding the quality and value of the investing in ACN and the likelihood of financial success, were all intended to deceive consumers like Plaintiffs McKoy and Williams.

462.     On or about the dates set forth below, Plaintiffs McKoy and Williams received the following fraudulent statements by Trump:

> A.     In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff McKoy viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff McKoy also viewed.

B.      Plaintiff McKoy also received the Message at ACN meetings she attended
every two weeks throughout late 2014 to late 2015 at two hotels in Los
Angeles, during which ACN DVDs prominently featuring Trump's
endorsement were played.

C.      Plaintiff McKoy also received the Message at ACN conferences in 2015 in
Cleveland, Ohio and Detroit, Michigan, during which videos featuring
Trump conveying the Message were prominently displayed.

D.      Plaintiff McKoy also received the Message from reading Trump's
statements and images in *Success from Home* and *Success* magazines
throughout the relevant period.

E.      In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff
Williams viewed an ACN DVD in which Trump delivered the Message
directly to viewers.

F.      Plaintiff Williams also received the Message at approximately 25 to 30
ACN meetings he attended every two weeks throughout late 2014 to late
2015 at two hotels in Los Angeles, during which ACN DVDs prominently
featuring Trump's endorsement were played.

G.      Plaintiff Williams also received the Message at ACN conferences in 2015
in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan,
during which videos featuring Trump conveying the Message were
prominently displayed.

463.    As set forth in this Complaint, Defendants knew or, by exercise of reasonable care
should have known, that the statements regarding the property and services of ACN were false

and misleading.  The statements referenced above, which Defendants disseminated to the public, were material and likely to deceive a reasonable consumer.

464.    As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

465.    Plaintiffs McKoy and Williams and members of the California classes invested in ACN, and incurred expenses in connection therewith, as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

466.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs McKoy and Williams and members of the California classes would not have been injured.  Thus, Plaintiffs' and California class members' injuries were directly and proximately caused by Defendants' conduct, including unlawful, fraudulent and unfair business practices in violation of California Business & Professions Code § 17200 *et seq.*

467.    Defendants' conduct was also unlawful in violation of California Business & Professions Code § 17200's prohibition against business practices which constitute violations of other statutes, including California Business & Professions Code § 17500.

468.    In accordance with California Business & Professions Code § 17200, California Plaintiffs and members of the California classes request that this Court enter such orders as judgment as may be necessary, including disgorgement of any money Defendants gained by unfair competition, and for such other relief as may be appropriate.

**COUNT FIVE:**     **Unfair and Deceptive Trade Practices in Violation of Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-301**

469.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.  Plaintiff Frazier asserts Count Five on behalf of himself and members of the Maryland classes.

470.     Maryland's Consumer Protection Act ("MCPA") prohibits any unfair or deceptive trade practices, including "false or misleading representations of any kind" which have the "capacity, tendency, or effect of deceiving or misleading customers."  Md. Code Ann., Com. Law § 13-301(1).  The statute further prohibits all "deception, fraud, false pretense, false premise, misrepresentation, or knowing concealing, suppression, or omission of any material fact" with the intent to induce reliance "in connection with the promotion or sale of any consumer goods . . . or service."  Md. Code Ann., Com. Law § 13-301(9).

471.     Defendants engaged in deceptive trade practices in violation of the MCPA by knowingly disseminating to the public a false and misleading Message regarding ACN, namely: (1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN; (2) that Trump was endorsing and promoting ACN because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the ACN business opportunities.

472.     Defendants used mail and wire communications to create and disseminate false statements, misrepresentations, and misleading omissions, to Plaintiff Frazier and members of the Maryland classes.

473.     On or around mid-2016, Plaintiff Frazier received the fraudulent Message by watching video of Trump from an episode of *The Celebrity Apprentice* featuring ACN.  The

Message was repeated in and augmented by other clips featuring Trump's promotion and endorsement of ACN.

474.    As set forth in this Complaint, Defendants intended that Plaintiff Frazier and members of the Maryland classes rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

475.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiff Frazier and members of the Maryland classes would not have been injured.  Thus, his injuries were directly and proximately caused by Defendants' dissemination of untrue or misleading statements and representations regarding property or services to individuals within the state of Maryland in violation of Md. Code Ann., Com. Law § 13-301(9).

476.    Plaintiff Frazier and members of the Maryland classes are entitled to equitable relief, actual damages and attorneys' fees under Md. Code Ann., Com. Law § 13-408(a), in an amount to be proven at trial, and any other just and proper relief available under the Maryland CPA.

**COUNT SIX**:          **Unfair and Deceptive Acts or Practices in Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") 73 Pa. Stat. Ann. § 201-2(4) *et seq*.**

477.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.  Plaintiff Lynn Chadwick asserts Count Six on behalf of herself and members of the Pennsylvania classes.

478.    Defendants are "persons" within the meaning of 73 Pa. Stat. Ann. § 201-2(2).

479.    Section 201-2(4)(ii) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law prohibits business acts or practices that "caus[e] likelihood of confusion or of

misunderstanding as to the sources, sponsorship, approval or certification of goods or services."
73 Pa. Stat. Ann. § 201-2(4)(ii).  Section 201-2(4)(iii) prohibits business acts or practices that
"caus[e] likelihood of confusion or of misunderstanding as to affiliation, connection or
association with, or certification by, another."  73 Pa. Stat. Ann. § 201-2(4)(iii).

480.    Section 201-2(4)(v) further prohibits business acts or practices which include
"[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients,
uses, benefits or quantities that they do not have or that a person has a sponsorship, approval,
status, affiliation or connection that he does not have."  73 Pa. Stat. Ann. § 201-2(4)(v).

481.    Section 201-2(4)(vii) prohibits business acts or practices which include
"[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods
are of a particular style or model, if they are of another."  73 Pa. Stat. Ann. § 201-2(4)(vii).
Finally, section 201-2(4)(xxi) prohibits "[e]ngaging in any other fraudulent or deceptive conduct
which creates a likelihood of confusion or misunderstanding."  73 Pa. Stat. Ann. § 201-2(4)(xxi).

482.    Defendants violated 73 Pa. Stat. Ann. § 201-2(4)(ii), (iii), (v), (vii), and (xxi) by
disseminating to the public a false and misleading Message on behalf of ACN, namely:  (1) that
prospective investors would have a reasonable probability of commercial success if they bought
into ACN; (2) that Trump was endorsing and promoting investment in ACN because he believed
that it offered a reasonable probability of commercial success (rather than because the Trump
Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due
diligence, insider information, and personal experience with the ACN business opportunities.

483.    Around mid-2013, Plaintiff Chadwick received the fraudulent Message by
watching a promotional video prominently featuring Trump at an event held in a Pennsylvania

hotel.  The Message was repeated in and augmented by other clips featuring Trump's promotion and endorsement of ACN.

484.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

485.    As set forth in this Complaint, Defendants knew or, by exercise of reasonable care should have known, that the statements regarding the property and services of ACN were false and misleading.  The statements described above, which Defendants disseminated to the public, were material and likely to deceive a reasonable consumer.

486.    As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

487.    Plaintiff Chadwick and members of the Pennsylvania classes invested their money in ACN as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

488.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiff Chadwick and members of the Pennsylvania classes would not have been injured.  Thus, Plaintiffs' and Pennsylvania class members' injuries were directly and proximately caused by Defendants' dissemination of untrue or misleading statements and representations of property or services to individuals within the state of Pennsylvania, in violation of 73 Pa. Stat. Ann. § 201-2(4)(ii), (iii), (v), (vii), and (xxi).

489.    In accordance with 73 Pa. Stat. Ann. § 201-9.2, Plaintiff Chadwick and members of the Pennsylvania classes are entitled to treble their actual damages or $100, whichever is greater, equitable relief and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a).  Plaintiff

Chadwick and members of the Pennsylvania classes are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT SEVEN**:     **Common Law Fraud**

490.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

491.    As alleged herein, Defendants intentionally made false representations of material fact regarding the nature of the ACN business opportunities, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN business opportunities; (2) that Trump was endorsing and promoting the ACN business opportunities because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, experience, and/or access to inside information about the ACN business opportunities.

492.    On or about the dates set forth below, Plaintiffs received the following fraudulent statements by Trump:

> A.    In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff McKoy viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff McKoy also viewed.

> B.    Plaintiff McKoy also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los

Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

C.   Plaintiff McKoy also received the Message at ACN conferences in 2015 in Cleveland, Ohio and Detroit Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

D.   Plaintiff McKoy also received the Message from reading Trump's statements and images in *Success from Home* and *Success* magazines throughout the relevant period.

E.   In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Williams viewed an ACN DVD in which Trump delivered the Message directly to viewers.

F.   Plaintiff Williams also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

G.   Plaintiff Williams also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

H.   Around mid-2016, Plaintiff Frazier received the Message by watching video of Trump from an episode of *The Celebrity Apprentice* featuring ACN.  The Message was repeated in and augmented by other clips featuring Trump's promotion and endorsement of ACN.

I.      Around mid-2013, Plaintiff Chadwick received the Message by watching a promotional video prominently featuring Trump at an event held in a Pennsylvania hotel.  The Message was repeated in and augmented by other clips featuring Trump's promotion and endorsement of ACN.

493.    As set forth in this Complaint, Defendants knew or, by exercise of reasonable care should have known that the statements regarding the property and services of Investments ACN were false and misleading. The statements referenced above, which Defendants disseminated to the public, were likely to deceive a reasonable consumer and therefore were material.

494.    As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

495.    Plaintiffs and class members invested their money in ACN as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

496.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs and class members would not have been injured. Thus, Plaintiffs' and class members' injuries were directly and proximately caused by Defendants' conspiracy and making and dissemination of untrue or misleading statements and representations of property or services to members of the public in violation of the law.

497.    Plaintiffs and class members are entitled to equitable relief and damages in an amount to be proven at trial.

**COUNT EIGHT**:    **Common Law Negligent Misrepresentation**

498.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

499.     As alleged herein, Defendants negligently made material misrepresentations of fact regarding the nature of ACN.  Defendants' misrepresentations were furnished for the purpose of influencing Plaintiffs' and class members' financial choices (and ultimately inducing them to invest in the Endorsed Entities' business opportunities and training programs).

500.     As alleged herein, Defendants negligently made false representations of material fact regarding the nature of the ACN business opportunities, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN business opportunities; (2) that Trump was endorsing and promoting the ACN business opportunities because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, experience, and/or access to inside information about the ACN business opportunities.

501.     On or about the dates set forth below, Plaintiffs received the following negligent misrepresentations Trump:

> A.     In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff McKoy viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff McKoy also viewed.

> B.     Plaintiff McKoy also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

C.     Plaintiff McKoy also received the Message at ACN conferences in 2015 in Cleveland, Ohio and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

D.     Plaintiff McKoy also received the Message from reading Trump's statements and images in *Success from Home* and *Success* magazines throughout the relevant period.

E.     In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Williams viewed an ACN DVD in which Trump delivered the Message directly to viewers.

F.     Plaintiff Williams also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

G.     Plaintiff Williams also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

H.     Around mid-2016, Plaintiff Frazier received the Message by watching video of Trump from an episode of *The Celebrity Apprentice* featuring ACN.  The Message was repeated in and augmented by other clips featuring Trump's promotion and endorsement of ACN.

I.     Around mid-2013**,** Plaintiff Chadwick received the Message by watching a promotional video prominently featuring Trump at an event held in a

Pennsylvania hotel.  The Message was repeated in and augmented by other clips featuring Trump's promotion and endorsement of ACN.

502.     As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

503.     Defendants had no reasonable grounds for believing that the misrepresentations were true and failed to exercise reasonable care and/or diligence in communicating the misrepresentations.  Defendants' misrepresentations were material to the reasonable consumer, and therefore reliance upon such representations may be presumed as a matter of law.

504.     Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs and class members would not have been injured.  Thus, Plaintiffs' and class members' injuries were directly and proximately caused by Defendants' conspiracy and making and dissemination of untrue or misleading statements and representations of property or services to members of the public in violation of the law.

505.     Plaintiffs and class members are entitled to equitable relief and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.     An order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.     A judgment declaring that Defendants have committed the violations of law alleged in this case;

C.     Award actual, compensatory, statutory, consequential damages;

D.     Award punitive and treble damages;

-184-

E.    Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendants' ill-gotten gains, to ensure an effective remedy;

F.    Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees;

G.    Enjoin Defendants from continuing to falsely market and advertise, conceal material information from the public, and commit unlawful and unfair business acts and practices; and order Defendants to engage in a corrective notice campaign;

H.    Award declaratory relief;

I.    Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

J.    Grant such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

Dated: September 13, 2021

Respectfully submitted,

/s/ Roberta A. Kaplan
Roberta A. Kaplan, Esq.
John C. Quinn, Esq.
Joshua Matz, Esq.
Alexander J. Rodney, Esq.
Matthew J. Craig, Esq.
Emily C. Cole, Esq.

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
jmatz@kaplanhecker.com
arodney@kaplanhecker.com
mcraig@kaplanhecker.com
ecole@kaplanhecker.com

Andrew G. Celli, Jr., Esq.
Matthew D. Brinckerhoff, Esq.
O. Andrew F. Wilson, Esq.
Katherine Rosenfeld, Esq.
David Berman, Esq.

EMERY CELLI BRINCKERHOFF ABADY WARD &
MAAZEL LLP
600 Fifth Avenue at Rockefeller Center
New York, NY 10020
Telephone: (212) 763-5000
acelli@ecbawm.com
mbrinckerhoff@ecbawm.com
awilson@ecbawm.com
krosenfeld@ecbawm.com
dberman@ecbawm.com

*Attorneys for Plaintiffs*