```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                        Docket #18cv9936
MCKOY, et al.,                     : 1:18-cv-09936-LGS-SLC

                    Plaintiffs,    :

   - against -                     :

THE TRUMP CORPORATION, et al.,     : New York, New York
                                     May 18, 2022
                    Defendants.     :

------------------------------------ :

                       PROCEEDINGS BEFORE
                  THE HONORABLE SARAH L. CAVE,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:         KAPLAN HECKER & FINK LLP
                        BY:  ROBERTA KAPLAN, ESQ.
                             JOHN QUINN, ESQ.
                        350 Fifth Avenue, 63rd Floor
                        New York, New York 10118

                        EMERY CELLI BRINCKERHOFF ABADY
                        WARD & MAAZEL LLP
                        BY:  ANDREW WILSON, ESQ.
                        600 Fifth Avenue, 10th Floor
                        New York, New York 10020
```

```
Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>APPEARANCES (CONTINUED):</u>

```
For Defendants:      ROBERT & ROBERT, PLLC
                     BY:  CLIFFORD ROBERT, ESQ. (via telephone)
                          MICHAEL FARINA, ESQ.
                     150 Broad Hollow Road
                     Melville, New York 11747

                     LEWIS BRISBOIS BISGAARD & SMITH LLP
                     BY:  PETER SHAPIRO, ESQ.
                     77 Water Street, Suite 2100
                     New York, New York 10005


For Nonparty -       NELSON NIEHAUS LLC
ACN Opportunity,     BY:  STEPHANIE NIEHAUS, ESQ.
LLC:                 200 Park Avenue, Suite 1700
                     New York, New York 10017
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                                                    4
 2          THE CLERK:  Your Honor, this is in the matter
 3  of McKoy, et al. versus The Trump Corporation, et al.,
 4  18cv9936.  Counsel, please state your appearance for
 5  the record.
 6          MS. ROBERTA KAPLAN:  Your Honor, Roberta
 7  Kaplan from Kaplan Heck, I'm here with my partner,
 8  John Quinn.
 9          HONORABLE SARAH L. CAVE (THE COURT):  Okay, good
10  afternoon, to both of you.  Hi.
11          MR. ANDREW WILSON:  Good afternoon, Andrew Wilson
12  from the law firm of Emery, Celli Brinckerhoff Abady Ward &
13  Maazel, also for the plaintiffs.
14          THE COURT:  Okay, good afternoon.  All right, and I
15  understand we have someone on the phone?
16          MR. CLIFFORD ROBERT:  Yes, good afternoon, Your
17  Honor, Clifford Robert on behalf of the defendants.
18          THE COURT:  Okay, good afternoon.  All right, and
19  who do we have in the courtroom?
20          MR. MICHAEL FARINA:  Good afternoon, Your Honor,
21  Michael Farina from Robert & Robert, also on behalf of
22  the defendants.
23          THE COURT:  Okay, good afternoon.
24          MR. PETER SHAPIRO:  And, finally, Peter Shapiro
25  from Lewis Brisbois Bisgaard & Smith, also for defendants.
```

```
 1                                                      5
 2          THE COURT:  Okay, good afternoon, to all of you,
 3  nice to meet you.
 4          MS. STEPHANIE NIEHAUS:  Your Honor, I apologize,
 5  I don't know where you would like me to sit --
 6          THE COURT:  Okay.
 7          MS. NIEHAUS:  I'm Stephanie Niehaus from
 8  Nelson Niehaus on behalf of nonparty ACN Opportunity,
 9  you indicated your preference that we appear today, as
10  well, so --
11          THE COURT:  Yes.  Yes, do you want to take a
12  seat at the defendants' table, do you mind?
13          MS. NIEHAUS:  I sure can.
14          THE COURT:  Since I will be addressing you and
15  I don't want to have to shout.
16          MS. NIEHAUS:  No problem.
17          THE COURT:  All right, and if you're
18  comfortable, when you're speaking if you want to take
19  your mask off, that's fine with me.
20          All right, so we have a few issues to cover
21  today and I thought we would start with document
22  issues and leave the deposition, list of depositions
23  and the number of depositions to the end because some
24  of the document issues may, resolving that may help to
25  know what to do about depositions.
```

```
 1                                                        6
 2          So let's start with the ACN documents, so I
 3   guess it's good that you're here, Ms. Niehaus.  So
 4   let's start with the Eric Trump Foundation related
 5   document, documents related to the promotion of ACN.
 6   So I'm hoping we can just get into a little bit more
 7   detail about the connection and what it is the
 8   plaintiffs are looking to find by, I guess they're
 9   looking for agreements, communications and other
10   documents relating to involvement of ETF and the
11   endorsement of ACN.
12          MR. JOHN QUINN:  Yes, Your Honor, thank you,
13   John Quinn again from Kaplan Hecker on behalf of the
14   plaintiffs and the putative classes.  So I think the
15   amended complaint, the second amended complaint makes
16   clear that the charitable donations piece has a couple
17   of facets to it.  One, we alleged that ACN, itself,
18   hosted charitable golf tournaments at Trump affiliated
19   golf clubs and in so doing that significant amounts of
20   money were paid over in, you know, purported fees and
21   expense payments, things like that, food and beverage
22   fees, et cetera.
23          In addition to that, that channel, ACN,
24   itself, hosting tournaments at Trump clubs, we had
25   some reason to allege, and there's some allegation in
```

7

1

2  the second amended complaint that ACN and/or people

3  affiliated with ACN were also making very significant

4  donations to the Eric Trump Foundation, you know, as

5  part of a broad discussion, you know, pursuant to

6  discussions with the defendants, and that some of

7  those funds in turn were being paid back to Trump

8  affiliated clubs and entities including entities that

9  are, are identified in the second amended complaint.

10          The discovery we've been able to do so far

11  from nonparties, defendants have not produced these

12  materials, but from nonparties bears that out very

13  substantially.  And I brought copies of some of these

14  documents and I'd be happy to share them with the Court and

15  I have copies for opposing counsel.  You know, but in short

16  we have, among other things, a Form 990 from 2016, this was

17  part of a FOIL production from the New York Attorney

18  General's Office, a 990 from 2016 that says, among

19  other things --

20          THE COURT:  For ETF?

21          MR. QUINN:  Yes.

22          THE COURT:  Okay.

23          MR. QUINN:  That says, among other things, that

24  35 percent of that entity was owned by a family member of

25  the defendants.  Let me just make sure I've got that

8

document in front of me, Your Honor.

THE COURT:  Okay.  And so that would show,
tend to show what about the plaintiffs' claims, does
that go to damages or does that go to the conspiracy
or?

MR. QUINN:  I think the fundamental idea is
that it helps to illuminate the full ways in which ACN
was compensating the defendants for this relationship.
Right, the defendants were promoting ACN very directly in a
whole variety of channels --

THE COURT:  Okay.

MR. QUINN:  On ACN promotional videos, written
publications, blog posts, also in other publications,
*Success* magazine, for example, and then defendants had ACN
on "The Celebrity Apprentice."  In addition to all of that,
defendants were appearing side by side with ACN executives
at charitable events hosted by ACN and charitable events
hosted by the defendants.  And in connection with that a lot
of money was flowing back and forth.

THE COURT:  Okay.

MR. QUINN:  So the 990 basically says 35 percent,
you know, is owned by a family member of the president, the
very next year the Eric Trump Foundation fundamentally
reorganizes itself, renames itself Curetivity, we've pursued

9

1

2  that entity through nonparty discovery and their counsel has

3  essentially told us it's a brand new entity, they don't have

4  anything from prior to 2017, only the defendants would have

5  that information.

6          THE COURT:  All right.

7          MR. QUINN:  In those New York Attorney General

8  documents we see, in addition to this 990, very

9  significant payments form Eric Trump Foundation to

10 Trump clubs. There's a check, a single check, for

11 example, $100,000 to one of the Trump entities for

12 hosting fees, no further description.

13         THE COURT:  Okay.

14         MR. QUINN:  There's a significant check to the

15 Eric Trump Wine Manufacturing Company.  Really just

16 check after check as well as expense sheets that show

17 these very significant payments.  So we're seeing

18 funds flowing in significant volume from ACN to the

19 Eric Trump Foundation, and then from the Eric Trump

20 Foundation to Trump related LLCs that are benefiting

21 the individual defendants.  And while we allege the ACN

22 payments, we didn't have reason at that point to allege ACN

23 co-founders, but the same New York AG production also

24 includes documents indicating $100,000 donations from ACN's

25 principal founder, Robert Stevanovski, for example.

1

2          And then we do see a smattering in defendants'

3  production of email communications within the Trump

4  Organization in which a lot of enthusiasm is expressed

5  about, you know, about these donations and in which --

6          THE COURT:  The donations from the ACN founders?

7          MR. QUINN:  ACN, and one of the emails says ACN

8  and its partners, presumably referring to Mr. Stevanovski

9  who made the $100,000 donation.  And there's discussion in

10 some of those emails, too, about Eric Trump wanting to

11 reciprocate those payments from ACN, wanting to show his

12 partnership, questions about whether he'll appear at the ACN

13 events to reflect, you know, these significant donations

14 that are being made.  So this is just a part of the broader

15 relationship in which ACN is providing, and its partners,

16 are providing significant amounts of money to the Trump

17 Organization and in various ways the Trump Organization and

18 its individual, and the individual defendants are

19 communicating to the public their endorsement and promotion

20 of ACN, their efforts to legitimize it and present it as a

21 charitable and good company, and to stand alongside it. And

22 then that close relationship, itself, is something that

23 former President Trump repeats throughout his endorsements

24 of ACN, that he's close with these founders, that they

25 played golf together, that he knows them to be good guys and

1

2  that that is one of the reasons people should listen to his

3  endorsement and invest in the ACN business opportunity.

4       THE COURT:  Okay.  So you have a lot it sounds like

5  already on this issue, so I'm trying to figure out what, so

6  you're looking for formal agreements between the Trump,

7  between the Eric Trump Foundation and ACN, for example, you

8  don't otherwise have that in any discovery that you've

9  gotten from a party in the case?

10       MR. QUINN:  With respect to agreements it's

11  correct that we don't. I don't know, of course, whether

12  those exist or whether these are simply communicated about

13  by email and people then make donations. I'd say the primary

14  thing we're looking for here really is completeness. You

15  know, we know ACN and that Robert Stevanovski were making

16  very significant payments to Eric Trump Foundation, we know

17  that the Eric Trump Foundation for the same golf tournaments

18  that were being sponsored was paying money back to Trump

19  clubs.  But while we found glimmers of that from the New

20  York AG FOIL productions, we don't have it in any

21  comprehensive and complete way.

22       THE COURT:  Okay, what about something from the

23  Eric Trump Foundation though that just showed donations made

24  by ACN or any of its founders, do you have, is that

25  something you've already gotten or that you can get from a

```
 1                                                    12
 2  party in the case?
 3          MR. QUINN:  That I think would have to come from
 4  the defendants.
 5          THE COURT:  Okay.
 6          MR. QUINN:  So the Eric Trump Foundation kind of
 7  recreated itself as an entity called Curetivity in 2017, we
 8  pursued them, they've given us some documents from post
 9  2017, but that really misses the key period --
10          THE COURT:  Okay.
11          MR. QUINN:  Which was leading up to 2016, and
12  their understanding as communicated to us is that those
13  documents would be with defendants.
14          THE COURT:  Okay.
15          MR. QUINN:  So I think the kind of chart that Your
16  Honor is describing, just information sufficient to
17  show really all donations and payments from ACN and
18  then maybe in connection with those same tournaments
19  information sufficient to show payments of expenses of
20  any other fees to Trump associated or Trump affiliated
21  private entities and LLCs. I think that and, you know,
22  related communications, and we can work on any
23  targeted search terms for that, that's really the sum
24  total of what we're looking for.
25          THE COURT:  Sorry, the second category I'm
```

13

1
2  just not as clear about, payments of expenses or fees

3  from the Eric Trump Foundation back to any Trump

4  related entity?  That seems very broad and, you know,

5  money is fungible, so just because money went, came

6  from ACN into the Eric Trump Foundation and went back

7  out, you know, we can't mark those bills necessarily.

8  So how do we narrow that so that we're focused on, you

9  know, contemporaneous, you know, if $100,000 comes in

10 on Monday and then goes back out on Tuesday, then

11 there's an inference, but if it's months later, weeks

12 later, it's not as obvious.

13          MR. QUINN:  Yeah, I think some sort of time

14 limitation like that sounds appropriate.  Also, most

15 if not all of these donations, at least the ones I'm

16 aware of, were in connection with particular events or

17 tournaments, ACN was sponsoring a hole or giving money

18 to a charitable event.  So maybe just information

19 sufficient to show expense payments relating to those

20 events.

21          THE COURT:  Do we have a list of those

22 specific events or is that something you could

23 generate?

24          MR. QUINN:  Only from the list of donations we

25 know about some of them.

1                                                                14

2              THE COURT:  Okay.  But there couldn't have

3    been that many golf tournaments, maybe there were, I

4    don't know, are we talking dozens or a handful or

5    hundreds?

6              MR. QUINN:  I think for the ones that ACN,

7    itself, was hosting at Trump clubs, I believe we

8    included a list in the second amended complaint that

9    we found from social media or other public sources.

10   That's a pretty discrete list, I think it was one a

11   year for some number of years.

12             THE COURT:  Okay.

13             MR. QUINN:  As for Eric Trump Foundation

14   events that ACN or its founders sponsored or

15   contributed to, we just don't know without seeing

16   those sponsors, but I don't have any reason to think

17   that it's more than a dozen events.

18             THE COURT:  Okay, thank you.  All right, do

19   the defendants want to speak to this issue first or should

20   I just go to Ms. Niehaus to address this?

21             MR. ROBERT:  I'll address this, Your Honor, this

22   is Clifford Robert on behalf of the defendants.

23             THE COURT:  Okay, Mr. Robert.

24             MR. ROBERT:  The point of the complaint, the

25   amended complaint which is 498 paragraphs, uses a broad

15

1

2  stroke and makes a series of claims against the defendants.

3  And previously the Court properly dismissed plaintiffs' RICO

4  claims and the only remaining State Court claims are very

5  narrow in nature. The type of information that the

6  plaintiffs are trying to obtain from the Eric Trump

7  Foundation would not lead to anything relevant with

8  regard to the narrow scope of claims that are left in

9  this case.  They've already received emails from Eric

10  Trump as well as from Mr. Trump's assistant, Lynn

11  Patton (phonetic), which discuss the issues that I

12  think it was, counsel just spoke about.  They're going

13  to be taking a deposition of Eric Trump, we've already

14  agreed to produce Lynn Patton for a deposition, they

15  can ask questions at that point as to what, if any,

16  monies ACN gave in terms of contributions to the

17  Foundation and did they sponsor a foursome at a golf

18  outing or a hospitality tent. But to make the Eric

19  Trump Foundation to have to go through providing

20  information beyond that which is provided by the

21  defendants in this case, and beyond that which they would be

22  able to explain at a deposition, I think will not lead to

23  anything relevant and will basically reinstate the RICO type

24  claims that have previously been dismissed.

25           THE COURT:  Okay, thank you, Mr. Robert.  Ms.

 1

 2  Niehaus.

 3          MS. NIEHAUS:  Yes, hi, good afternoon, Your

 4  Honor. I don't actually understand --

 5          THE COURT:  Yes, just put the mic over by her,

 6  please.  Thanks.

 7          MS. NIEHAUS:  Good afternoon.

 8          THE COURT:  Better.

 9          MS. NIEHAUS:  I don't actually understand this

10  particular dispute to involve ACN at this point, it

11  was not a dispute that was identified in the discovery

12  letter that the plaintiffs submitted with respect to

13  ACN.

14          THE COURT:  Okay.

15          MS. NIEHAUS:  It does, I believe, touch on

16  some issues about the involvement of the founders that

17  we can discuss when we get to the founders' deposition

18  question, but I don't believe at this point plaintiffs

19  have sought any discovery directly from ACN about the

20  Eric Trump Foundation.

21          THE COURT:  All right, thank you.

22          MR. QUINN:  Yeah, Your Honor, for plaintiffs I

23  would just --

24          THE COURT:  All right, I'm sorry, you were

25  talking about ACN so I'm still new to this case so I'm

17

1
2  trying to keep everybody straight.

3          MR. QUINN:  If I might also, Your Honor, just

4  clarify one point.

5          THE COURT:  Yes.

6          MR. QUINN:  The Form 990 that I referred to is

7  a Form 990 for the Eric Trump Foundation.

8          THE COURT:  Right.

9          MR. QUINN:  The mention of 35 percent

10 ownership by a member of the president's family is in

11 connection with the entities to which the Eric Trump

12 Foundation was making significant payments.

13         THE COURT:  Okay.

14         MR. QUINN:  So in that sense I think it's

15 corroborated.

16         THE COURT:  Okay.  All right, well, Mr.

17 Robert, if we were to just ask the Eric Trump

18 Foundation to search and provide, say, a spreadsheet

19 or a list of donations by ACN or the ACN founders, is

20 there still an objection to having to do that, that

21 doesn't seem very burdensome?

22         MR. ROBERT:  It still would, Your Honor, only

23 because I think it enters into a slippery slope of

24 letting this case get beyond that which it is. If

25 they'd like to ask Mr. Trump these questions at his

1
2  deposition, they're more than able to do that.  If

3  they're not satisfied with the answers that he gives,

4  they can make further application to the Court. But,

5  again, we're now going to an institution that's not a

6  party to this case, not my client in this case, and

7  asking them to have to produce information.

8          THE COURT:  Well, right, but if the allegation

9  -- well, let me let you put it in your own words, Mr.

10  Quinn, which claim would you say this information goes

11  to, the claim that's still in the case?

12          MR. QUINN:  Certainly as to all the fraud

13  claims and I think as well to the negligent misrep

14  claims.  We're talking about the various, really two

15  distinct elements, one, these charitable tournaments

16  and these joint appearances and these public

17  communications of support of one another's charitable

18  nature is a part of the broader promotional

19  endorsement efforts.  And, you know, maybe even more

20  directly, this flow of funds form ACN and its founders

21  back to the individual defendants, including the Trump

22  Corporation, is a part of the compensation, it's what

23  the, it's what motivated the fraud in question, we

24  allege the fraud was undertaken for the purpose of

25  receiving remuneration from ACN and this was one form

19

1   of that remuneration.

2          THE COURT:  Go ahead, Mr. Robert.

3          MR. ROBERT:  Your Honor, if I may?

4          THE COURT:  Yep, go ahead.

5          MR. ROBERT:  There's a causative link that's

6   missing here, we're now talking about charitable

7   contributions that ACN and its founders made to the

8   Eric Trump Foundation. They had a commonality in the

9   interests of the charitable causes that they like, I

10  believe it was St. Jude's Hospital that was one of the

11  largest recipients of funds from the Eric Trump

12  Foundation and that ACN's principals and Mr. Trump

13  both had a soft spot for St. Jude's hospital. So the

14  fact that they made contributions to the Eric Trump

15  Foundation and then what, if anything, the Eric Trump

16  Foundation did with those funds in terms of its

17  expenses would be irrelevant.

18         If Your Honor is suggesting just simply the

19  issue of what payments were made to the Eric Trump

20  Foundation from the principals of ACN and ACN, that's

21  certainly something I could discuss with the client.

22         THE COURT:  Yes, I think that would be helpful

23  because what I worry about is Mr. Trump sitting in his

24  deposition and saying there may have been donations by

1

2  ACN but I don't remember the details, and then we're

3  kind of right back where we started. And, you know,

4  we're right back in the same place.  And so it's much

5  easier to envision Ms. Kaplan and Mr. Quinn being able

6  to show as an exhibit to Mr. Trump here's a list of

7  the donations from ACN and then ask him, you know,

8  further detailed questions about particular donations

9  or particular events.  So, and since Mr. Quinn was

10  carefully using the word sufficient, the phrase

11  sufficient to show, it seems to me that a list of the

12  donations really would be all that would be called for

13  and specifically the time period before 2017 is what

14  you're saying, Mr. Quinn. So starting when, going from

15  when to when, Mr. Quinn?

16          MR. QUINN:  So the relationship here began in

17  2005, but understandably I believe some of those

18  earlier years there are limited records.  So I think

19  for that relevant period, to the extent records exist,

20  and we understand that in some of those earlier years

21  they don't.

22          THE COURT:  When, do we know when the Eric

23  Trump Foundation was created?

24          MR. QUINN:  I know it sort of dissolved and

25  rebranded in 2016.

21

1

2          THE COURT:  Right.

3          MR. QUINN:  I actually don't have that in

4     front of me.

5          THE COURT:  Okay.

6          MR. QUINN:  But certainly if that was at any

7     point during the relevant period we'd agree and

8     understand that it would start then.

9          THE COURT:  Mr. Robert, do you know when the

10    Eric Trump Foundation was created?

11         MR. ROBERT:  I don't, Your Honor, and I just

12    want to understand, what is the window we're talking

13    about here, I know the end date --

14         THE COURT:  That's what we were trying to

15    figure out.

16         MR. ROBERT:  Okay.

17         THE COURT:  Let's just say hypothetically that

18    the Eric Trump Foundation was created in 2011,

19    obviously then the time period that we would be asking

20    you to look in the Foundation's records for donations

21    from ACN or its founders would just be from 2011

22    through 2017.

23         MR. ROBERT:  We'll have to take that back to

24    the client, Your Honor.

25         THE COURT:  Yes, okay, hold on one second.

1

2          MR. SHAPIRO:  If I could just add a note, I

3    just took a look at the complaint, in paragraph 179

4    it's alleged that at least since 2013 the Eric Trump

5    Foundation has hosted the charity golf tournaments.

6          THE COURT:  Okay, thank you, Mr. Shapiro. So

7    it sounds like approximately, Mr. Robert, we're

8    talking about the period 2013 plus or minus a little

9    bit through the end of 2017. So the question to pose

10   to your client would be searching its records and

11   producing a list or a spreadsheet of donations that

12   the Eric Trump Foundation received from ACN or one of

13   its founders/partners, whatever it is they're called,

14   could you undertake to do that?

15         MR. ROBERT:  Absolutely, Your Honor.

16         THE COURT:  Okay, great.

17         MR. QUINN:  Your Honor, if I might just

18   clarify one point on the 2013?

19         THE COURT:  Sure.

20         MR. QUINN:  So, again, ACN, itself, was

21   hosting its own tournaments at Trump clubs and then

22   was also donating to the Eric Trump Foundation which

23   was also hosting events.  The complaint alleged that

24   the first ACN hosted tournament was in 2013, there may

25   well have been donations to Eric Trump events prior to

23

1

2    that.

3             THE COURT:  Okay.

4             MR. QUINN:  So I just, to the extent they

5    exist or that the organization did I'd ask that we

6    just check back earlier.

7             THE COURT:  Okay.  So if it's possible to find

8    out if they went earlier than 2013, but I guess I'm

9    also not hearing that we necessarily need an

10   exhaustive list of every donation but rather we're

11   trying to get a sense of the spectrum and how much,

12   how many donations there were roughly because it goes

13   to the endorsement efforts that are involved.

14            So if you could investigate that for us, Mr.

15   Robert, using approximately 2013, or maybe a little

16   bit before that, depending on when ACN and the Eric

17   Trump Foundation became involved with each other.

18            MR. ROBERT:  Yes, Your Honor.

19            MR. QUINN:  Your Honor, briefly on the date

20   issue, I mean I'm looking at a communication January,

21   2014, in which a Trump Organization employee is saying to

22   Eric Trump in email, ACN and their partners are great to

23   us at the club.  So as early as January, 2014, there's

24   this recognition of sort of special status and of money

25   flowing in from these people.

1

2        THE COURT:  Okay.  All right, I think that

3   covers that one.  All right, let's talk about

4   compensation. So I'm struggling with, the individual

5   defendants' compensation is what we're talking about and I'm

6   struggling with understanding why if one of the Trump

7   entities paid one of the Trump children who are defendants

8   in this case, $10 million a year, so what, what does that

9   tells us about the fraud?

10       MR. QUINN:  Yeah, well I think two distinct points

11  here, too, Your Honor, one is I do think it matters

12  whether they were paid $100,000 or a $1 million, or

13  $10 million, I'd reference the *Quattrone* case from the

14  Second Circuit, which I think we have in our letter

15  but just in case, that's 441 F.3d 153, 187, where the

16  Circuit is upholding the admission in a criminal case,

17  but upholding the admission of evidence about salary

18  in order to show specifically that that salary

19  established a motive or the misconduct in question.  A

20  salary of $100,000 might motivate somebody to push

21  some boundaries, a salary of $10 million might

22  motivate somebody to push other boundaries, or to push

23  those boundaries further.

24       THE COURT:  Well, right, but if we're --

25  compensation from which entity though, if it's the

1

2   Trump Corporation I can imagine just from what we all

3   sort of know that's in the public sphere, the Trump

4   children do a lot of different things for the Trump

5   Corporation, none of which have anything to do with

6   ACN or the issues in this case.

7          MR. QUINN:  Right, and that's why we've just

8   asked again on an annual basis information sufficient

9   to show, just on that point total number per year is

10  more than sufficient, we can all argue whatever

11  inferences should be drawn from that.  The more

12  specific point about discreet entities is, you know,

13  this was a complex organization, we're doing our best

14  to kind of unspool it from the documents we've gotten

15  and from the public records.  But it does seem like to

16  the extent there are Form 990s and other documents we

17  can put our hands on, multiple individual defendants

18  are holding different officer and director positions

19  at lots of different LLCs that benefit significantly

20  when, for example, somebody pays $2 million to go on

21  "Celebrity Apprentice," a big chunk of that money goes

22  to a specific production LLC.  We just want to take

23  basic discovery, how much of that money then in turn

24  flowed back to the individual defendants who then

25  showed up on those episodes and said wonderful

praising things about ACN's video phone.

THE COURT: Right, so you get me there, what I'm getting less is the big picture and how that is, would ever be admissible or help one way or the other? In other words, it's going to be so broad as to really not be that helpful, whereas I see your point. If there is something that, an ACN related event and there's a payment that goes straight through, but what I understood Mr., the defendants' letter to be saying is that there was no such stream of payments directly related to ACN. And so that's, the information that would be most helpful to you doesn't exist, so that's why they were proposing a request for admission, so why isn't a request for admission on this point going to resolve the issue?

MR. QUINN: So I think the request for admission they proposed is essentially that there was no sort of performance based compensation, right, you did a great job with ACN, here's a bonus. We're just trying to understand the basic architecture, if $2 million from ACN is paid into Trump Productions LLC for the benefit of appearing on "The Celebrity Apprentice," how much of that money is benefitting, for example, Ivanka Trump who then appears on that

1

2  episode?

3          THE COURT:  Right.

4          MR. QUINN:  So it may be that there's no

5  performance bonus, but just by virtue of their officer

6  and director positions, they're benefitting, they're

7  getting some percentage of every dollar that's going

8  into LLCs, we're trying to just at a very basic level

9  map and understand that.

10          THE COURT:  Okay.

11          MR. QUINN:  If their general total

12  compensation sort of stretches the bounds of where

13  inferences might be drawn, we understand that, I think

14  the more important priority from our perspective is if

15  we can trace funds into a Trump LLC, whether by way of

16  the Eric Trump Foundation or the production company,

17  understanding how, if at all, does that payment to LLC

18  in turn actually benefit the individual defendants

19  here, that's the link in the chain that we're missing

20  and we're trying to get some discovery.

21          THE COURT:  Well, so can we get at this a

22  different way through asking the defendants, I mean you

23  are going to depose the defendants, themselves, and you can

24  ask them do they know whether they received any compensation

25  related to ACN and, if so, when and in what amount and then

1

2  we can back our way into that.  But I'm just struggling

3  with, if we were to wade into the general ledger and all the

4  accounting records that's one thing, and I'm not suggesting

5  that we do that, but I'm struggling with how we get at the

6  narrower question that you're talking about?  Mr. --

7           MR. QUINN:  If I may?

8           THE COURT:  Yes, go ahead.

9           MR. QUINN:  One additional suggestion that

10 occurred to me actually this morning.

11          THE COURT:  Yes.

12          MR. QUINN:  So the defendants in their letter do

13 concede yes, payments to LLCs benefit the officers and

14 directors of those LLCs.

15          THE COURT:  Of course.

16          MR. QUINN:  We're trying to put some kind of

17 number on that, understanding that we don't want to get into

18 the general ledger.  One thought, we tried to get our hands

19 publicly on the LLC agreements that govern these entities

20 and show who the officers and directors are, some production

21 of just the basic kind of LLC governance information, what's

22 the governing agreement and who are the officers and

23 directors.

24          THE COURT:  Which entities are we talking about?

25          MR. QUINN:  We've got a defined term for the

1

2  entities and I can kind of go through them --

3        THE COURT:  Yes.

4        MR. QUINN:  But it's essentially a series of

5  controlled entities --

6        THE COURT:  Okay.

7        MR. QUINN:  The Trump Corporation, itself, Trump

8  Organization, Inc., and then certain LLCs that were involved

9  in either the production of the TV show or that ran, at

10 least as far as we believe, it ran and owned the golf clubs

11 at which these events were being held and where all the fees

12 were being paid. I think generally speaking they fall into

13 those buckets but we have a defined term in some of the

14 discovery requests.

15       THE COURT:  Right.  Mr. Roberts, do you want to

16 speak to this, as well?

17       MR. ROBERT:  I do, Your Honor.  This is going

18 so far afield in terms of the claims that are left in

19 the case and it goes back to a phrase I used a little

20 bit earlier which was the link in the causation here.

21 Payments that ACN made to the defendants in the case,

22 okay, we said send a request for admissions, we'll answer

23 those questions in a deposition.  But to suggest that now

24 the plaintiffs are entitled to information of the

25 compensation of these defendants from their corporate

entities, there is no way that can lead to anything that

would be relevant in this case, it would be incredibly

intrusive and, in addition, they are now seeking information

from eleven nonparties in addition to the Trump Corporation

which is named. So are they entitled to what, if any, monies

flowed from ACN to the Trump Corporation, to President Trump

and to the others, yes, we've already said we'll provide

that information, they can ask it at the depositions.

Anything more than that will lead nowhere, it's just for

their lawyeristic need to want to know this information.

          MS. KAPLAN: If I may, Your Honor?

          THE COURT:  Sure.

          MS. KAPLAN:  So I would respectfully request,

this is Roberta Kaplan from Kaplan Hecker, that the

Trump children did not appear on "Celebrity

Apprentice" to promote ACN for free.  It wasn't an act

of charity for them, they were being compensated for

that just like their father was. And so we are

entitled to see the degree of compensation they got at

a minimum for Trump Productions which is the entity

that received the monies from ACN in order to appear,

they didn't get to, they weren't chosen to be on the

show out of merit, they were chosen to be on the show

because they paid Mr. Trump to be on the show, and we

1

2  are entitled to know the other people on those shows

3  who said great things about what a great business

4  opportunity ACN is, we want to know how they were paid, as

5  well.

6            So if we limit it to that and we get the

7  governing documents about the Trump Production LLC to see

8  what the kids got out of that, that would be a way of

9  getting at this issue. But just to say, yeah, we were

10 paid, but we can't tell you how much, is not an answer.

11           THE COURT:  Right.  Okay, thank you.  What if we

12 were to narrow it to that, Mr. Robert, and so if we focus

13 on Trump Productions LLC and does the LLC agreement for

14 that entity and any payments that went from ACN to Trump

15 Productions LLC to one of the Trump children?

16           MR. ROBERT:  I still think, Your Honor, that

17 goes well beyond the scope of what would be

18 appropriate here because at the end of the day they

19 could ask questions as to how much the Trump children

20 were paid be on "Celebrity Apprentice." I'm sure

21 they'll ask President Trump the same question and

22 they'll answers to that, but to then have the internal

23 governing documents of various Trump organizations or

24 Trump companies which are not named defendants in this

25 case, again, I don't see how that's relevant to the claims

1

2   here.

3            Ms. Kaplan wants to make the argument that she

4   wants to know how much money was paid, well if we're going

5   to give her a response to a request for admissions, that's

6   going to be a statement under oath and the depositions are

7   going to be under oath. I think anything more than that is

8   overly intrusive, certainly at this point before the

9   defendants have been deposed.

10           THE COURT:  Well but we're just, hopefully you can

11  hear me, I'm just talking about one LLC, just the Trump

12  Production entity. And so, again, my fear is that, yes, it's

13  great that we have the depositions but my fear is that the

14  answer to the question is going to be I'm sure I did but

15  there's an agreement that says how much I got or there's an

16  email that says how much I got related to, you know, this

17  particular show of "Celebrity Apprentice" that I appeared on

18  and then again we're right back in the same place. So would

19  you be willing to discuss with your client information about

20  the Trump Productions LLC entity that could be searched

21  with respect to ACN related payments that flowed

22  through Trump Productions to one of the Trump

23  children?

24           MR. ROBERT:  Well, of course, Your Honor,

25  anything you instruct me to speak with my client of

                                                                    33

course I will.  The issue comes when we talk about

flow through.  I can certainly discuss with my client

the issue of what they were paid from Trump

Productions LLC if we talk about what the time period

in question is --

            THE COURT:  Right.

            MR. ROBERT:  And we'll figure out if that

suffices the issue. But it's this flow through thing

which is where I'm having a bit of disconnect.

            THE COURT:  I understand and you're correct to

critique me for being vague on that.

            MR. ROBERT:  I didn't mean to do that, Your

Honor.

            THE COURT:  It's all right.  So we obviously

know what episodes of "Celebrity Apprentice" the Trump

children appeared on, right, so could the plaintiffs

provide to Mr. Robert a list of those episodes that

we're interested in and then we could just narrow the

time period to, you know, a week or two after that or,

I don't know, we'll have to find out what the payment

cycle was. But if Ivanka Trump appeared on a

"Celebrity Apprentice" episode on May 1st, would there

be a payment within the following 30 days or something

that would come from the Trump Productions entity, am

                                                                    34

1

2   I characterizing that correctly?

3            MR. QUINN:  I think so, Your Honor. I mean

4   just to clarify with a little more detail around the

5   Productions LLC in particular, the records we've been

6   able to kind of put our hands on suggest, at least

7   with respect to ownership, that the Trump Productions

8   LLC essentially ran up entirely to Donald J. Trump, it

9   was the first level 99 percent owned by him

10  personally, then there's a managing member which, in

11  turn, is owned 99 percent by a trust of which he's the

12  sole beneficiary. So ownership wise that entity seems

13  to roll up almost exclusively to former President

14  Trump.

15           THE COURT:  Okay.

16           MR. QUINN:  So I do think the question if

17  we're narrowing to that entity is essentially how were

18  they compensated for their participation in the TV

19  show.

20           THE COURT:  Okay.

21           MR. QUINN:  And if that's just an annual

22  salary I think on that point we'd be entitled to know

23  what that salary was --

24           THE COURT:  Okay.

25           MR. QUINN:  So we can just kind of divvy that

```
 1                                                      35

 2  up among the episodes.

 3            THE COURT:  Okay.

 4            MR. QUINN:  So I think that's what the focused

 5  question I think would be for Productions.

 6            THE COURT:  Okay.

 7            MR. SHAPIRO:  Can I speak to that briefly?

 8            THE COURT:  Yes, let me just Mr. Robert if

 9  he's following. So what we're trying to get at, Mr.

10  Robert, is if one of the Trump children appeared on a

11  "Celebrity Apprentice" episode and the plaintiffs will

12  give you a list of the episodes that they're

13  interested in, was there compensation that then went

14  to the child, and I'm sorry to use the phrase child,

15  but offspring of that appeared on the episode from the

16  Trump Productions LLC entity, and would that have been

17  paid, you know, seriatim per episode or was it an

18  annual compensation or something else?

19            MR. ROBERT:  I understand what you're asking,

20  Your Honor, and I'll speak to my client about it, I

21  got it.

22            THE COURT:  Okay, thank you.  Mr. Shapiro.

23            MR. SHAPIRO:  The point I would just make --

24            THE COURT:  Just put the mic closer to your

25  mouth and you can take your mask down.
```

```
 1                                                          36
 2          MR. SHAPIRO:  The point I'd just make for
 3  clarification is it's my understanding that the
 4  offspring were on all or most of the episodes over
 5  many seasons. We're really I think just talking about
 6  two episodes here that featured ACN, and why we would
 7  need to delve into how they were paid for, you know,
 8  tens, if not hundreds of other episodes of television
 9  shows is beyond me. I think we should just be looking
10  at the episodes that involved ACN.
11          THE COURT:  That's why Mr. Quinn was agreeing
12  to provide us just with the episodes that are relevant
13  in this case.
14          MR. SHAPIRO:  Right.
15          MS. KAPLAN:  And we can, believe it or not, I
16  became a lawyer, Your Honor, because I'm not very good
17  at math. But if there are 12 episodes a year and
18  they're paid X for an annual salary, even I can do
19  that division.
20          THE COURT:  Okay.
21          MS. KAPLAN:  We're not going to argue that it
22  was for shows beyond.
23          THE COURT:  Super.  All right, so, Mr. Robert,
24  you'll look into that for us then?
25          MR. ROBERT:  Yes, Your Honor.
```

1

2          THE COURT:  Okay.

3          MR. ROBERT:  Yes, Your Honor.

4          THE COURT:  Moving onto the transcripts of, in

5   the other cases.  And so on this one, Mr. Quinn or

6   someone else on your team, if you could explain to me

7   more which cases we're talking about.  There may be a

8   lot of types of litigations involving these entities,

9   and so I can envision some that have nothing to do

10  with the issues that are in this case, so how do we

11  focus on ones that are relevant, that is ones that

12  involve another scheme of the same modus operandi or,

13  you know, some other specifics to narrow this down?

14         MR. QUINN:  Sure.  So I think the limitations

15  that we've proposed thus far and included in the

16  requests and in the discussions with the defendants

17  were, number one, that we'd seek transcripts only from folks

18  who are going to be deposed in this case, as well, so not

19  other transcripts.

20         THE COURT:  Okay.

21         MR. QUINN:  And, second, that it would be limited

22  to transcripts from actions or investigations that involved

23  allegations of fraud by any of the same universe of entities

24  that we had this defined term for, which include some

25  governance entities, some specific LLCs, many of which are

1

2  named in the complaint.

3          You know, I think if we wanted to be even more

4  targeted than that, I think that the tightest limiter I can

5  come up with is that, it would be cases or investigations

6  relating to business fraud that had something to do with the

7  endorsement or promotion of a consumer facing company, or

8  good or service. And here I'm thinking just as an example,

9  you know, from public records we know that in connection

10  with Trump University, for example, which is another entity

11  that, you know, the brand was sort of lent to in an even

12  more prominent way, I mean in the sense that the university

13  was named after Trump.

14          THE COURT:  Right.

15          MR. QUINN:  There was litigation, I'm aware of

16  two federal cases that alleged forms of business fraud

17  in connection with the endorsement and promotion of

18  Trump U and the docket in at least one of them

19  indicates that at least Mr. Trump was deposed I think

20  actually on two different days, in December, 2015, and

21  January, 2016.  So that's about as narrow a set as I

22  could think of but if there are cases and

23  investigations involving business fraud allegations

24  that involve endorsement or promotion to consumers,

25  and anybody who is going to be deposed here was

deposed in those cases, I think that's the smallest

universe of transcripts I can come up with.

THE COURT:  Okay, thank you.  Mr. Robert, will

you address this?

MR. ROBERT:  Yes, Your Honor.

THE COURT:  Okay.

MR. ROBERT:  Yes, please. I still think this

is an incredibly broad and intrusive request.  Again,

it's a limited case of what's out there.  The

remaining state claims, the use of what they could do

with these transcripts would be far outside what they

need to prove any of the elements in this case and it

would be trying to be used for a prohibited use of other

alleged misconduct that took place.  At a minimum it

would, you know, their definition of fraud as they're even

saying is still incredibly broad. I mean here the

allegations, when you boil it down to its simplest form,

is it's alleged that the defendants allegedly touted an

independent company despite knowing it to be worthless,

that's their claim.  So am I now to understand that they

only want a transcript if it exists if the defendants are

being sued and that's the claim?  Because what they're

talking about, other things, you know, it's not a surprise

and it's a matter of public record, my client is sued

40

1

2 routinely, all of them are.

3          THE COURT:  Right.

4          MR. ROBERT:  Plaintiffs' counsel in this case is

5 actually suing them in a few cases.

6          THE COURT:  Um-hmm.

7          MR. ROBERT:  So to suggest that we would go

8 through everything, I just think it's intrusive and I don't

9 think it's appropriate on the limited claims that are left

10 in this case.

11          THE COURT:  Right. Well, but I mean there are, Mr.

12 Robert, there are some consumer state, there's some state

13 law consumer fraud claims that are still in the case. So do

14 you know if there are other cases, I mean this is

15 essentially a multilevel marketing, sort of a pyramid type

16 scheme, are there other litigations that involve those type

17 of allegations because that testimony could be admissible on

18 the topic of modus operandi, they also could be admissions

19 by a party, there are a number of ways in which that

20 testimony would be admissible. But if we're narrowing it to

21 consumer type fraud cases, that's hopefully a much smaller

22 universe. And again, we're just talking about if it's

23 somebody who's being deposed in this case.

24          MR. ROBERT:  So am I understanding that it would

25 be, if it's a multilevel marketing claim or fraud involving

```
 1                                                    41
 2  the defendants in this case for a period of, let's say, five
 3  years, that's something certainly I can go back to the
 4  client with.
 5            THE COURT:  And, again, a witness who is being
 6  deposed in this case.
 7            MR. ROBERT:  Understood.
 8            THE COURT:  Yes.
 9            MR. ROBERT:  Understood, Your Honor.
10            MS. KAPLAN:  Not just multilevel marketing
11  schemes, Your Honor, the Trump University case, Trump
12  University was not a multilevel marketing scheme, it
13  was a similarly allegedly fraudulent scheme to
14  promote, to get unsuspecting consumers to give their
15  money over to the Trumps in exchange for something
16  that was far less than what was promised.
17            THE COURT:  Right.
18            MS. KAPLAN:  That's the crux of our case here.
19  We're not, we're not going to even have to prove that
20  it's a multilevel marketing scheme.
21            THE COURT:  Oh, no --
22            MS. KAPLAN:  All we have to prove at trial is
23  that they paid for something and Mr. Trump lied about
24  what they were getting, that's the fraud.
25            THE COURT:  Okay.
```

42

1

2          MR. ROBERT:  I would respectfully --

3          THE COURT:  Go ahead.

4          MR. ROBERT:  I would respectfully disagree

5    with what's being said. There are no allegations in

6    here that any way constitute a fraud on behalf of

7    President Trump or any of the defendants here.  They're

8    just trying to make something out of nothing here. But if

9    Your Honor wants us to endeavor on this very limited

10   issue, again, to move things along I'm happy to speak

11   to the client about it.

12         THE COURT:  Okay. I mean what we're focused

13   on, Ms. Kaplan is taking issue with my limiting it to

14   a multilevel marketing fraud but a consumer facing

15   fraudulent misrepresentation case I think is what

16   we're focused on.  And, again, limited to the

17   deponents in this case.  And so I think in terms of

18   the burden that should narrow it significantly and for

19   now let's just go back five years from now, so back to

20   2017, and we'll see what that gets us. So if you can

21   investigate that, Mr. Robert, as well.

22         MR. ROBERT:  Yes, Your Honor.

23         MS. NIEHAUS:  Your Honor, I'm sorry to

24   interrupt here, I just want to be clear on behalf of

25   ACN, ACN is not a party to this litigation.

43

1

2          THE COURT:  I understand.

3          MS. NIEHAUS:  And ACN is a currently operating

4   legitimate direct sales company. So I just, I don't

5   know if we're on the record or not --

6          THE COURT:  We are.

7          MS. NIEHAUS:  I want to protect the record in

8   terms of my client is not an MLM fraudulent scheme,

9   they operate legally, they operate pursuant to

10  regulations, so I just don't want there to be a

11  statement on the record that ACN is a multilevel

12  marketing pyramid scheme.

13         THE COURT:  This is a discovery conference,

14  I'm not making any findings of fact or conclusions of

15  law, I'm just simply describing what the plaintiffs'

16  allegations are and trying to hone in on exactly what

17  it is they're alleging. And so my characterization

18  should not be taken out of context, I'll just say

19  that.

20         MS. NIEHAUS:  Thank you, Your Honor.

21         MS. KAPLAN:  Your Honor, one point --

22         THE COURT:  Yes.

23         MS. KAPLAN:  According to our records, Mr.

24  Trump's deposition was taken in the Trump University

25  case on December 10, 2015, and January 21, 2016.

```
 1                                                  44
 2            THE COURT:  Okay.
 3            MS. KAPLAN:  So we can go back to the
 4   beginning of 2015.
 5            THE COURT:  Okay.  So at a minimum, Mr.
 6   Robert, we're honing in on the depositions that took
 7   place in the Trump University litigation, those may
 8   have gone back farther than five years but let's
 9   include that in the scope of what you're asking about,
10   okay?
11            MR. ROBERT:  Yes, Your Honor.
12            THE COURT:  Okay.  Can you just give me one
13   second, I have a four o'clock conference that I need
14   to just -- thank you.
15            All right, so now let's move on to ACN, I
16   think it makes sense to finish up the document issues.
17   So Mr. Quinn or Ms. Kaplan, where are we on I guess
18   the non-email documents?
19            MR. QUINN:  So I think we've got some good
20   news and some updates here and a proposal for a way
21   forward that I think ought to hopefully cut through
22   some of it.
23            THE COURT:  Great.
24            MR. QUINN:  So on the non-email documents, I
25   think we effectively resolved the questions about what
```

1

2 I might call the composition of ACN's IBO base, you

3 know, the people participating.

4          THE COURT:  Okay.

5          MR. QUINN:  We've gotten incremental numbers

6 about how that population changed over time with sign

7 ups and renewals and dropouts, and we had an issue

8 about some baseline issues to give overall scale,

9 we've been able to resolve that.

10          THE COURT:  Okay.

11          MR. QUINN:  Some of the arithmetic doesn't

12 totally work so we may have a couple of follow-up

13 questions or deal with it at deposition, but I think

14 high level we've dealt with that issue.

15          THE COURT:  Okay.

16          MR. QUINN:  The second issue for the non-email

17 documents relates to essentially the truth or falsity

18 of promotional statements that were made that

19 indicated to people there's essentially no risk to

20 this and you can make real profit.  We allege those

21 representations were false and so we're trying to get

22 sufficient information that would show essentially the

23 performance of an average IBO, what could somebody

24 actually expect when they got involved.

25          And, you know, here we kind of hit some

1

2  logjams mostly because the representations coming back

3  from ACN are we just don't track that information in

4  that way. There was a long series of correspondence

5  that followed like sort of Charlie and Lucy with the

6  football where we just kept trying to propose

7  different ways of getting at it and ACN telling us

8  that's not how the records work either.

9          You know, I will say, and we put this in our

10  letter, it's somewhat difficult to accept some of

11  their representations. We do have filings from a civil

12  case showing a detailed portal in which IBOs can

13  access all of their information at a very granular

14  level, in Canada ACN makes disclosures about the

15  average income and performance of specific IBOs. When

16  the Montana Securities Commission came asking, ACN was

17  able to provide that information and then findings

18  were made by the Montana Securities Commission about

19  individual performance. I will concede that was also a

20  number of years ago, but it sort of indicates that the

21  information is there when ACN needs it.

22          So we've had some difficulty there. What ACN

23  has given us most recently is sort of aggregate

24  company level information, you know, here's what's

25  being paid out to the IBOs writ large and here's how

47

1

2  some of the revenues and some of the other things

3  work.  We'll have a lot of questions about that, you

4  know, these aren't GAP financial statements --

5          THE COURT:  Okay.

6          MR. QUINN:  They're PDFs that were produced to

7  us.  And as we do the division and try to understand

8  it, you know, I think there's a lot there but our

9  suggestion at this point would be, you know, I think

10  we've kind of exhausted the issue and probably

11  exhausted Ms. Niehaus' patience with our meet and

12  confers.  So, you know, I think we're in agreement

13  that a 30(b)(6) is going to make sense, we got some

14  correspondence and objections last night to the

15  30(B)(6) notice, on this topic I expect we can work

16  them out.

17          THE COURT:  Okay.

18          MR. QUINN:  So essentially our proposal would

19  be maybe we put a pin in that issue, we can ask them

20  questions about the records at a 30(b)(6) and if there

21  is more follow-up to do we'll try to do it in a

22  targeted way then and otherwise we may just need to

23  live with what we have.

24          THE COURT:  Super, okay, that's great to hear.

25  Are you in agreement on that issue, Ms. Niehaus?

48

1

2          MS. NIEHAUS:  Yes.

3          THE COURT:  Okay.

4          MS. NIEHAUS:  I think we can work through

5    that. There's a topic in the 30(b)(6) that I expect

6    we'll be meeting and conferring on next week.

7          THE COURT:  Okay, great.  All right, so then

8    the emails and the ESI, it looks like we're down to

9    just a handful of search terms.

10         MR. QUINN:  Yeah, we've made here, too, a lot of

11   concessions to try to get to agreement. The universe has

12   come down a lot, you know, I struggle to make some of the

13   concessions because, of course, who knows what we're leaving

14   on the table and there's been pretty limited email coming

15   back from the defendants.  But in all events we've made some

16   concessions and I think broadly speaking here, too, we have

17   found some agreement. There's a set of 22,305 responsive

18   documents including families that covers all the search

19   terms we've proposed and I think the only question at this

20   point really is whether the plaintiff should be required to

21   pay attorney review time to conduct a privilege review of

22   those documents to just give some context to that.

23         The estimate for that review, for that

24   attorney review, is $20,000.  We've already paid all

25   of the vendor costs which have been very significant

1                                                                    49

2    here, not faulting anyone for that, we did run some

3    broad terms at first so there was a lot of processing

4    and other costs.  But we've paid by my math $85,000 in

5    those costs, so on that basis we're not prepared to

6    pay additional privilege review and we've also made

7    clear we'll agree to enhanced claw back procedures if

8    that's helpful, but $85,000 in costs which, you know,

9    we're continuing to cover going forward in our view is

10   more than sufficient and if ACN wants to conduct a

11   privilege review, it's their prerogative.  But we're

12   not sure that that cost should be borne by plaintiffs,

13   especially since, you know, ACN does seem to have

14   plenty of money to pay lawyers to challenge these

15   discovery obligations which they took all the way to

16   the Supreme Court, or to sue our individual plaintiffs

17   in arbitrations and seek injunctions, there's money

18   there for attorneys expect apparently not to review

19   the documents for privilege. So I think that's the

20   only --

21           THE COURT:  I mean they're not a party in this

22   case, so it's not an uncommon request, I can say that.

23   Okay.

24           MS. NIEHAUS:  Your Honor, I think Mr. Quinn

25   largely explained where we're at accurately. I did

50

give them an update on April 29th by email that we had

continued to work with the e-discovery vendor and have

reduced the document set using the revised search terms

and a deduping against a prior production set and then with

email threading to 14,425 documents, inclusive of

families.

            THE COURT:  Okay.

            MS. NIEHAUS:  Our position does remain that

plaintiffs should be required to pay the review cost

of that, and what we mean by review cost is through

the e-discovery vendor we would engage a team of

contract lawyers to conduct a privilege and

confidentiality review. It wouldn't be me sitting

there at a computer, thank goodness, looking at 14,000

documents, right?

            THE COURT:  Right.

            MS. NIEHAUS:  What that doesn't include though

is my time to train up a contract review team to

liaise with the, to liaise with the vendor, probably

to spot check, make some additional productions.  The

estimate from the vendor is $14,000 just for the

contract attorneys to review.

            We acknowledge that plaintiffs have suggested

some claw back provisions but, frankly, Your Honor,

51

2  that's not sufficient because they've also insisted

3  that we include former in-house counsel's files in the

4  document set.  We cannot possibly come up with, you

5  know, privilege terms because we're going back to 2008

6  here, I have no idea which, I'm sorry, law firm she

7  was working with, she is no longer even with the

8  company.

9        THE COURT:  Okay.

10        MS. NIEHAUS:  And, frankly, you know, with due

11  respect to counsel, they did challenge 16 documents

12  that we had redacted from one of our agent's

13  productions. So I'm not confident that a claw back

14  provision here would be suitable or sufficient to

15  protect ACN's interests.  ACN is an outside party,

16  they have exhausted a tremendous amount of resources

17  already in complying with discovery obligations. This

18  case, and, frankly, enforcing their rights which

19  they're entitled to a privilege review, they're

20  entitled to rely on good faith arguments about the

21  rights and obligations of ACN and its IBOs.

22        So I don't think it's unreasonable to request

23  that plaintiffs cover the cost of the review, we're

24  ready and willing to go forward with that as soon as

25  we have the commitment from them to pay for that.

```
 1                                                      52

 2   Again, I'm not asking them to pay for my time.

 3            THE COURT:  Sure, I understand.  So the in-

 4   house counsel, remind me of her name?

 5            MS. NIEHAUS:  Pauline Jones.

 6            THE COURT:  Jones, okay.  So what if we just,

 7   since, if the plaintiffs are insisting that her

 8   documents be included, what if we just had them pay

 9   for the costs of reviewing, the privilege review of

10   her section of the $14,000?

11            MS. NIEHAUS:  Right, Your Honor, I'm not sure

12   that that covers it because, you know, the documents

13   that were challenged, for example, there was a

14   production made by another nonparty entity operated as

15   an agent of ACN in coordinating the appearances of

16   Donald Trump, for example, that was the marketing

17   consultants, we've referred to that production, Anne

18   Archer Butcher and Dolphin.  And, you know, the

19   privilege claim there was that Anne Archer Butcher was

20   acting as an agent and she was copied on emails

21   involving some legal advice.  So there are other

22   documents that we're aware of that could potentially

23   be in this set that wouldn't necessarily be a Colleen

24   Jones custodial document but that might contain

25   privileged information.
```

```
 1                                                           53
 2              I also don't know if after Ms. Jones'
 3     departure her successor was, you know, coordinating
 4     with other outside counsel. I don't have a list of
 5     counsel that ACN employed over time to be able to say
 6     these 12 search terms should be run so we can isolate the
 7     vast majority of privilege documents.  We just, we have
 8     no good way to approach that so the best way I can
 9     come up with to protect ACN and, frankly, its
10     confidentiality interest, as well, not just privilege,
11     is to conduct a review. I mean we have reduced the set
12     now, I think the original count was 120,000, so we
13     have worked with plaintiffs to reduce that set
14     significantly but the cost to a nonparty of $14,000 is
15     not reasonable.  And, frankly, Judge Schofield's
16     individual rules wouldn't even allow it for a party.
17              MR. QUINN:  Your Honor, if I may?
18              THE COURT:  What?
19              MR. QUINN:  Just two clarifications and then a
20     proposal. By way of clarification, we did challenge
21     certain entries in a privilege log, of course, there's
22     been no suggestion that in doing so we, you know,
23     mishandled any privileged information or did anything
24     other than comply with the applicable rules including
25     with respect to sealing and otherwise.
```

                                                              54

1

2          As to the inclusion of ACN's in-house counsel,

3    our request was simply that the external documents be

4    included, internal communications only could be

5    excluded, we recognized they were likely to be

6    privileged but she was often, it appears, kind of an

7    external facing person negotiating key agreements, et

8    cetera and so we requested that that set be included.

9          All that said, it's very good news obviously

10   from our perspective that the cost is now down to 14,

11   when we thought we were at 20 I think at the end of

12   the day we thought if we ended up splitting that, that

13   would be a perfectly sensible outcome. And so we're

14   still prepared to do that if it makes sense for us to

15   cover 10 I think we could live with that and it would

16   only leave $4,000 in remaining costs.

17          THE COURT:  Could we do 10 and 4?

18          MS. NIEHAUS:  Your Honor, not to quibble over

19   math because I know it's none of our strong suits, but

20   I think that's still not taking into account the fact

21   that there are additional costs and there have been

22   costs incurred to date. And we, you know, detailed in

23   our letter, the internal costs, which we can't even

24   put a value on, of our, we have one chief information

25   officer, he had to handle all of this which takes him

```
 1                                                         55
 2   away from his day to day business. We have the clients
 3   that have to interface with me to try to sort through
 4   all these details, and then we have my time on top of
 5   that.
 6              So I think asking them to bear the full
 7   $14,000 is still not unreasonable given all the other
 8   costs that ACN is absorbing in complying with their
 9   discovery obligations here.
10              THE COURT:  Is there anything we can do to
11   carve out anything else from the 14 to get that any
12   smaller?
13              MR. QUINN:  I think if put to that choice,
14   Your Honor, we might rather swallow the 14 because
15   we've chopped this down about as much as we can.
16              THE COURT:  All right.
17              MR. QUINN:  I would reiterate we're covering
18   all the external costs, too, which are 85 and
19   counting, but --
20              THE COURT:  Well do want to swallow the 14 or
21   do you want to find a way to cut it down further?
22              MR. QUINN:  I think we'll swallow the 14, Your
23   Honor, thank you.
24              THE COURT:  All right.
25              MS. KAPLAN:  You drive a hard bargain.
```

```
 1                                                        56
 2              THE COURT:  We have a deal.  We have a deal,
 3    so all right.  So let's, the last issue on ACN is
 4    depositions but I think it makes sense to talk about
 5    all the depositions together. So let me start with
 6    whether there's been any change, I think the letter on
 7    this came in at the beginning of April, so has
 8    anything changed since the letters in terms of the
 9    parties' ability to make progress on these issues?
10              MR. QUINN:  Not in terms of any ability to
11    make progress.
12              THE COURT:  Okay.
13              MR. QUINN:  We're still seeking 25 and the
14    defendants have not agreed to anything above 10.
15              THE COURT:  Okay.
16              MR. QUINN:  There may be some, you know, if we
17    want to really get into the details of exactly who we'd want
18    to depose, some of the specific numbers per categories we've
19    given, I could probably be a little more specific as to
20    where our current thinking is.
21              THE COURT:  Okay.
22              MR. QUINN:  But aside from those kinds of very
23    small changes nothing else in the status.
24              THE COURT:  Okay, are we still agreed that the
25    five defendants are being, that there's four individual and
```

57

1
2  one 30(b)(6) for the defendants?

3          MR. QUINN:  Yes, unless the defendants say

4  otherwise, but my understanding is we are still in

5  agreement.

6          THE COURT:  And do we have dates for those?

7          MR. QUINN:  We did, some of which were --

8          THE COURT:  Mr. Shapiro is shaking his head --

9  sorry.

10          MR. QUINN:  We did, we've taken those off the

11  calendar in part because the sequencing here on both

12  sides I think will be a factor and then just the

13  overall limit will affect schedule.

14          THE COURT:  Okay, so those five are, I think

15  we're good and we're agreed. All right, so then let's

16  talk about the Trump Corporation employees, am I right

17  that the parties were in agreement about Ms. Graff

18  (phonetic) and Lynn Patton, that they would both be

19  deposed?

20          MR. QUINN:  Yeah, I think --

21          MR. ROBERT:  This is -- I'm sorry.

22          THE COURT:  Go ahead, Mr. Robert.

23          MR. ROBERT:  Yes, we agree to produce them.

24  Yes, Your Honor.

25          THE COURT:  All right, and you're making me do

58

1

2   math again so we're in very perilous territory.

3           MR. QUINN:  Yeah, if held to ten we might

4   reserve the right to try to choose one of those two if

5   we had to come up with ten total.

6           THE COURT:  Okay.

7           MR. QUINN:  But in pretty much any other

8   scenario then, yes, we want to depose those two and

9   the defendants have agreed.

10           THE COURT:  Go ahead, Mr. Robert.

11           MR. ROBERT:  And, Your Honor, they had also

12   asked for an Amanda Miller who we had agreed to

13   produce and back in 2020 the plaintiffs had deposed

14   two former ACN employees. So if you take the five

15   defendants, the two former that they already have is seven,

16   Ms. Graff, Ms. Patton and Ms. Miller would bring us to ten.

17           THE COURT:  Okay.  So Ms. Miller has been deposed

18   or you've agreed that she can be deposed?

19           MR. ROBERT:  We've agreed to produce her, they had

20   asked that they wanted her. Then I think the plaintiffs had

21   said, well, we're not sure based on where the limitation

22   will be.

23           THE COURT:  Okay, yep, that's ten.

24           MR. QUINN:  Exactly.

25           THE COURT:  All right.  So who else, your letter

1

2  says six to eight, so who beyond, and Ms. Miller is also a

3  Trump Corporation employee?

4          MR. QUINN:  Yes.

5          MR. ROBERT:  She's worked in marketing, whether

6  she's an actual employee now I can't speak to but she would

7  be someone who we'd produce. And I also would note that they

8  served a 30(b)(6) on ACN so technically they are already at

9  11 and I believe they served subpoenas on the individual

10  officers of ACN, I think they served 4 of them.  So I

11  think we need to address that in part as well.

12          THE COURT:  Okay.

13          MR. QUINN:  This is precisely what I'm

14  clarifying, Your Honor, in the event that we were held

15  to ten depositions, I think it's unlikely we would use

16  three of them on Rona Graff, Lynn Patton and Amanda

17  Miller, we'd have to make some hard choices there.

18          THE COURT:  Okay.

19          MS. KAPLAN:  Your Honor, let me just say, I

20  never thought I'd get old enough to pull the age card

21  but I've gotten there, Your Honor, and I've been

22  litigating in this courthouse now for some 25 years,

23  I've never seen a complex commercial case involving

24  fraud in the Southern District of New York where the

25  parties were held to 10 depositions.  That's not --

1

2          THE COURT:  Just to take some of the air out

3   of the room, I'm not inclined to limit you to 10 but

4   I'm trying to get to what people can live with. So

5   just to not bury the weed, but I am trying to keep it

6   as low as possible so that we're not duplicating

7   because I am mindful that, you know, for ACN, for

8   example, that they are a nonparty, for the "Celebrity

9   Apprentice" contestants, they're nonparties and

10  they're celebrities and who knows what their

11  availability is.

12          MS. KAPLAN:  I have a feeling they might enjoy

13  getting deposed in this case, Your Honor, but we'll

14  see.

15          THE COURT:  I have yet to meet anybody who

16  enjoyed being deposed.

17          MS. KAPLAN:  Celebrities may be the only

18  category --

19          THE COURT:  I don't know.  I don't know.  So,

20  all right, let's talk about Ms. Butcher, do we know if

21  she's amenable to being deposed?

22          MR. QUINN:  We don't know the answer to that,

23  Your Honor.

24          THE COURT:  Okay.

25          MR. QUINN:  It's been something we've put in

                                                                        61

1

2    all those letters, we haven't heard opposition.

3              THE COURT:  Okay.

4              MR. QUINN:  I don't think it would surprise

5    anyone.

6              THE COURT:  Mr. Robert, are you able to speak

7    to Ms. Butcher?

8              MR. ROBERT:  I believe someone from ACN would

9    be in a better position to speak to her than I would.

10             THE COURT:  Is that you, Ms. Niehaus?

11             MS. NIEHAUS:  She's actually represented by

12   separate counsel, Deana Davidian.

13             THE COURT:  Okay.

14             MS. NIEHAUS:  And I don't know their position

15   on depositions.

16             THE COURT:  Has she been subpoenaed?

17             MR. QUINN:  She had, I mean partly, Your Honor

18   --

19             THE COURT:  Because you thought, because of

20   the dispute.

21             MR. QUINN:  Exactly, with the limit in place

22   we hadn't wanted to start serving more than 10

23   depositions.

24             THE COURT:  Okay.  All right, and she would

25   talk about the communications that Ms. Niehaus was

```
 1                                                 62
 2   referencing earlier, right, the, where she was sort of
 3   acting as the agent of the Trump Corporation, I think,
 4   right?
 5             MS. NIEHAUS:  She actually, she was a
 6   contractor, and the contract was with ACN, she was paid by
 7   ACN, she was employed by ACN to liaise with former
 8   President Trump for conventions and articles that he, his
 9   byline was put on in various magazines.
10             THE COURT:  Over what period of time, do we know
11   roughly, like a long time or --
12             MS. NIEHAUS:  It was a significant period of
13   time.
14             THE COURT:  The other thing I'm trying to do is
15   not all these people necessarily need seven hours, too,
16   so, for example, the celebrities, I'm guessing those are
17   two hours maybe if that long, and so, you know, if we're
18   looking at a deposition that's seven hours maybe we have
19   --
20             MS. KAPLAN:  Your Honor, if we have some sense
21   of the volume, you know, we can work it out.  For
22   example, I'll give you an example, Hope Hicks is on
23   our list because there's an extremely relevant email
24   that she wrote.
25             THE COURT:  Okay.
```

1

2          MS. KAPLAN:  I can't imagine her deposition

3   would take more than an hour or two max.  But, again,

4   it's hard without --

5          THE COURT:  Understand.  Understand.

6          MS. KAPLAN:  You understand the problem, I'm

7   kind of bargaining against myself.

8          THE COURT:  Yes.

9          MS. KAPLAN:  Which I'd prefer not to do.

10          THE COURT:  I understand.  All right, well,

11   Mr. Robert, if I'm inclined to give the plaintiffs

12   more than 10 but less than 25, but then also to limit,

13   especially some of the nonparty depositions to

14   significantly less than 7 hours, do you think you'd be

15   able to negotiate with plaintiffs' counsel to try to

16   reach an agreement on the exact number?

17          MR. ROBERT:  If they are realistic in terms of

18   who they want and how much time they want with them,

19   I'm always willing to have a conversation.  But, you

20   know, if you're going to give me 19 names that's not

21   going to go anywhere, but if they limit it to 12 or 13

22   or something we talk about how much time they need,

23   I'm certainly willing to have that conversation.

24          MS. KAPLAN:  What I do, Your Honor, I've done

25   this in other cases, is we have an hour limit, because

```
 1                                                        64

 2   to address particularly your concern.

 3              THE COURT:  Yes.

 4              MS. KAPLAN:  So if you took, for example, this

 5   kind of math I can do, if you took 20 depositions

 6   times 7 hours which is the standard, 140, somewhere in

 7   the range of 120 to 140 hours that we could allocate,

 8   we will stick with those parameters.

 9              THE COURT:  Yes, I did that in another

10   complicated, actually Judge Pitman did it and I

11   inherited it, but, yes, so then we're counting not by

12   depositions but by hours. But at the same token, we're

13   not using that to get back up to 25. I mean I'm still

14   thinking that somewhere between 10 and 15 is a

15   reasonable number, but I can see, you know, a couple

16   of people who might be an hour and so that might have

17   the number creep, you know, back up a little bit.

18              So with those sort of vague parameters to

19   encourage the parties to meet and confer, what I can

20   also tell you just as to ACN, I am inclined to deny

21   without prejudice the request to take the founders'

22   depositions, just take the 30(b)(6). And then if

23   there's some burning issue that comes up in the

24   30(b)(6) that was not answered, then if you could meet

25   and confer with their counsel in the first instance
```

65

1

2     and if you can't agree then come to me. But it seems

3     to me the fairest thing is to not be trudging all four

4     of them in there and trying to cover as much as we can

5     in the 30(b)(6) deposition as, can you agree with

6     that, Ms. Niehaus?

7                 MS. NIEHAUS:  Yes, thanks, Your Honor.

8                 THE COURT:  Okay.  Can you live with that?

9                 MR. QUINN:  I'll flag that one of the four

10    founders has a number of discreet areas in which there

11    was more individual conduct, including individual

12    donations, some solicitation of the defendants to also

13    promote another business that he was associated with, some

14    property purchases that seemed to have been tied to a

15    development. So there's a number of areas that are unique to

16    that person and I don't know that a corporate representative

17    can speak to, so I'll just flag that that is likely going to

18    be an issue but, of course, happy to proceed with the

19    30(b)(6) first.

20                THE COURT:  I hear you, I also, at some point

21    depositions get to be a diminishing utility, too, and if you

22    know the events that he was involved in and you know the

23    donations and you know the properties, think about whether

24    you really need to, what you need to ask him about and

25    whether you are likely to get that much more information.

1                                                                    66

2              All right, so if we set a range of, I think 140 is

3       too high, but let's aim for 100 hours total --

4              MS. KAPLAN:  But that's less than 15 depositions,

5       Your Honor, can we aim for 105 which is 15?

6              THE COURT:  Okay, 105.

7              MS. KAPLAN:  I had to use my calculator.

8              THE COURT:  I was not going to be able to do

9       that on my own.

10             MR. QUINN:  And if I may, Your Honor, there

11      was mention of this, there were two depositions

12      several years ago, ACN former employees who public

13      record suggested they had some knowledge and while we

14      were able to we went and took those depositions.

15             THE COURT:  Okay.

16             MR. QUINN:  So I don't know if we're including

17      those, I'd suggest we try to put those to the side and

18      deal with what's in front of us but I just want to --

19             THE COURT:  I would include them for now

20      because we're talking about 105 hours on the

21      plaintiffs' side for the whole case. But, you know,

22      what I can tell you, if we get to 106 or 107, I'll be

23      reasonable, but if we get to 115, 120, I think that's

24      farther outside the range of where I want you all to

25      end up.

1

2          MR. QUINN:  Understood.

3          THE COURT:  Okay.  And on the defendants'

4  side, have you taken the plaintiffs' depositions yet,

5  Mr. Robert?

6          MR. ROBERT:  Mr. Shapiro has taken two of the

7  plaintiffs so far so I can let him address that.

8          THE COURT:  So we have two to go.

9          MR. SHAPIRO:  Two to be scheduled.

10          THE COURT:  Okay.  So we'll set a rough goal

11  of 105 hours on the plaintiffs' side and what I would

12  encourage you to do is meet and confer on that sooner

13  rather than later and if there are any that you can't

14  agree on, that you can raise that with me and we can

15  jump on the phone together.  Okay, and then deny

16  without prejudice the request to take the individual

17  ACN depositions subject to the 30(b)(6) and I'll deny

18  that without prejudice and if you want to renew it,

19  fine.

20          MS. KAPLAN:  One more issue, Your Honor, I'm

21  already thinking ahead to trial, given these

22  limitations, we're not going to waste time at

23  deposition authenticating documents or doing things

24  like that.

25          THE COURT:  Okay.

1

2          MS. KAPLAN:  We assume that Your Honor will

3  want the parties to work that out in a cooperative

4  fashion through interrogatories or other things like

5  that.

6          THE COURT:  Right, stipulations, all that kind

7  of thing, yes.  Subject to, you know, this case will

8  be tried in front of Judge Schofield so I'm not

9  undermining anything she may want you to do, but in

10  general judges like it the more the parties can agree

11  on alone.

12          All right, so should we have another check-in

13  in a couple of weeks to just make sure that we've, you

14  know, Mr. Robert, I would encourage you to talk to

15  your client about the document issues and get back to

16  the plaintiffs --

17          MR. ROBERT:  Yes, absolutely.

18          THE COURT:  But then I guess I would like to

19  know where everybody is so that we're moving all this

20  forward. Let me just remind myself of your schedule.

21          MR. QUINN:  Yeah, I was going to turn to that,

22  Your Honor.

23          THE COURT:  Yes.

24          MR. QUINN:  So the current case management

25  plan sets a deadline for close of fact discovery of

1

2  June 29th, the parties have been in touch and have both

3  been saying to one another now for several, I mean we

4  raised some of these document issues back in March.

5            THE COURT:  Yes.

6            MR. QUINN:  So just the process of further

7  meet and confers took time, so both sides I think have

8  acknowledged there's going to be a need to come to the

9  Court and that we hoped we could work something out on

10  that. We've made a revised scheduling proposal, the

11  defendants indicated that they wanted to kind of see

12  how today went so that's also something we can meet

13  and confer about or address today, whatever Your Honor

14  wants.

15            THE COURT:  If we're going to talk in a couple

16  of weeks I'd prefer not to just jump to extending it

17  too much longer because, you know, we extend it too

18  much past July and then we lose people, so it's kind

19  of a wasted effort. So I'd prefer to keep your feet to

20  the fire a little bit and see how much we can get done

21  before we lose people in August.

22            MR. QUINN:  Sure.

23            THE COURT:  So hold on one second, let me just

24  pull up the calendar to see, and thank you all for

25  coming here today, by the way, I think next time we

1

2       can probably talk by phone.  How is 12:00 on June 8th

3       by phone?

4               MR. QUINN:  I think that looks okay for us,

5       Your Honor.

6               MR. ROBERT:  Fine for me, Your Honor.

7               THE COURT:  Mr. Robert, how is that for you?

8               MR. ROBERT:  That's fine, Your Honor, thank

9       you.

10              THE COURT:  Okay, any objections, anybody in

11      the room?  Okay.

12              MS. NIEHAUS:  Your Honor, will you require

13      ACN's attendance at that conference?

14              THE COURT:  Hopefully not, I think -- I think

15      what we'll do is we'll put you down for the conference

16      on the 8th and by the Friday before I'll have you just

17      do a joint status letter and hopefully we've resolved

18      all that and we don't need you, Ms. Niehaus.

19              MR. QUINN:  Yeah, I would just add, Your

20      Honor, I think given the need to now complete this

21      email review and get those documents produced,

22      unlikely we'll have the ACN 30(b)(6) by then so I

23      think it's unlikely that these other disputes will be

24      teed up in turn.

25              THE COURT:  Well, again, if -- let's see where

71

1

2  we are then and if you're in the position then to be,

3  you know, renewing, if you haven't taken the 30(b)(6)

4  then it's sort of a moot point and we may just have to

5  address it down the road once you're further along.

6  Okay, so the Friday before is June 3rd, so by the end

7  of the day on June 3rd if the parties could put in a

8  short letter just listing kind of the open issues I

9  think I'm up to speed on them now so I don't need a

10  lengthy letter but I'll give you five pages to give me

11  a status update.

12        Anything else then we should cover today from

13  the plaintiffs' perspective?

14        MR. QUINN:  Nothing further from the

15  plaintiffs, thank you, Your Honor.

16        THE COURT:  Okay, Mr. Robert?

17        MR. ROBERT:  Nothing, Your Honor, thank you.

18        THE COURT:  Okay, anybody else in the room

19  want to raise anything?  Okay, very good, thank you

20  all, this was very helpful, we're adjourned.

21        (Whereupon the matter was adjourned.)

22

23

24

25

72

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, McKoy, et al. versus

The Trump Corporation, et al., Docket No. 18cv9936, was

prepared using digital electronic transcription equipment

and is a true and accurate record of the proceedings.




Signature _____ *Carole Ludwig* _____

                CAROLE LUDWIG

Date:  May 24, 2022