**UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK**

---

CATHERINE MCKOY, MARKUS FRAZIER, and
LYNN CHADWICK, individually and on behalf of all
others similarly situated,

        *Plaintiffs*,

v.

THE TRUMP CORPORATION, DONALD J. TRUMP,
in his personal capacity, DONALD TRUMP, JR., ERIC
TRUMP, and IVANKA TRUMP,

        *Defendants*.

No. 1:18-cv-09936-LGS-SLC

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO EXCLUDE DR. PETERSON'S EXPERT
OPINIONS AND TO PRECLUDE DR. HAIR'S
SUPPLEMENTAL DECLARATION**


Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883


Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................iii

INTRODUCTION ............................................................................................................................... 1

ARGUMENT ....................................................................................................................................... 2

I.   DR. PETERSON'S OPINIONS SHOULD BE EXCLUDED UNDER *DAUBERT* .............. 2

    A.   Dr. Peterson's Heterogeneity Opinion is Based on Four Irrelevant Surveys. ............. 2

    B.   Dr. Peterson's Heterogeneity Opinion is Unreliable Under *Daubert* ........................ 4

    C.   The Celebrity Spokesperson Opinion is Similarly Flawed ........................................... 6

II.  DR. HAIR'S UNTIMELY DECLARATION SHOULD BE PRECLUDED ......................... 8

CONCLUSION .................................................................................................................................. 11

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Advanced Analytics, Inc. v. Citigroup Glob. Markets, Inc.*,
  301 F.R.D. 31 (S.D.N.Y. 2014) ........................................................................................... 10

*Apple v. Atl. Yards Dev. Co., LLC*,
  No. 11 Civ. 5550, 2015 WL 11182422 (E.D.N.Y. Mar. 31, 2015) ........................................ 6

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002) ................................................................................... 4

*Chen-Oster v. Goldman, Sachs & Co.*,
  No. 10 Civ. 6950, 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ............................................ 7

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ......................................................................................................... 1, 4

*Fleming v. Verizon N.Y., Inc.*,
  No. 3 Civ. 5639, 2006 WL 2709766 (S.D.N.Y. Sept. 22, 2006) .......................................... 10

*Fractus, S.A. v. Samsung*,
  No. 9 Civ. 203, 2011 WL 7563820 (E.D. Tex. Apr. 29, 2011) .......................................... 1, 6

*Frydman v. Verschleiser*,
  No. 14 Civ. 8084, 2017 WL 1155919 (S.D.N.Y. Mar. 27, 2017) ........................................ 10

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ..................................................................................... 7

*In re Motel 6 Sec. Litig.*,
  161 F. Supp. 2d 227 (S.D.N.Y. 2001) ................................................................................. 10

*Lidle v. Cirrus Design Corp.*,
  No. 8 Civ. 1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) ............................................ 9

*Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc.*,
  No. 2 Civ. 3691, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) .............................................. 7

*Medisim Ltd. v. BestMed LLC*,
  861 F. Supp. 2d 158 (S.D.N.Y 2012) ................................................................................ 1, 5

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017) ................................................................................... 9

*Morritt v. Stryker Corp.*,
  No. 7 Civ. 2319, 2011 WL 3876960 (E.D.N.Y. Sept. 1, 2011) ........................................ 9, 10

*Patterson v. Balsamico*,
  440 F.3d 104 (2d Cir. 2006) .................................................................................................. 9

*Price v. L'Oréal USA, Inc.*,
  No. 17 Civ. 614, 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) .................................................... 7

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997) ............................................................................................................ 5

*Roniger v. McCall*,
  No. 97 Civ. 8009, 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000) ............................................. 1, 5

*S.E.C. v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................................................................... 6

**Rules**

Fed. R. Civ. P. 26(a) ........................................................................................................................ 8, 9

Fed. R. Civ. P. 26(e) ............................................................................................................................ 9

Fed. R. Civ. P. 37(c)(1) ............................................................................................................ 2, 9, 10

**Other Authorities**

Federal Trade Commission, *Business Guidance Concerning Multi-Level Marketing* (2018) ............ 5

## INTRODUCTION

As set forth in Plaintiffs' motion for class certification, discovery has established that Donald J. Trump's fraudulent statements about ACN were at the center of ACN's recruiting pitch for a decade, and that those statements were both consistent and highly impactful in driving sign-up decisions. *See* ECF 532 at 8-12, 22-23, 25 n.17. Faced with that record, Defendants turn to Dr. Robert A. Peterson, a longtime advocate for direct selling with extensive financial ties to the industry, who opines that: (1) ACN IBOs "had heterogenous reasons for joining" ACN; and (2) the "use of a celebrity spokesperson"—*i.e.*, Donald Trump's endorsement of ACN—"was not a leading factor" in those decisions. ECF 551 at 15; *see also* ECF 552-18 at 13-14. The problem for Defendants is that, by his own admission, Peterson's opinions are not based on facts, data, or analysis about ACN IBOs. Instead, as Peterson testified, his opinions rest solely on broad industry surveys, mostly conducted in other contexts long before this litigation, that are all about "direct selling generally"—"not about ACN." Peterson Tr. 248:14-15.

Because these general surveys do not "fit" the population that is actually relevant here, Peterson's opinions must be excluded. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (applying Rule 702); *see also, e.g.*, *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 179 (S.D.N.Y 2012) (excluding expert opinion where expert "surveyed the wrong universe of respondents" by failing to sufficiently narrow population); *Roniger v. McCall*, No. 97 Civ. 8009, 2000 WL 1191078, at *3-4 (S.D.N.Y. Aug. 22, 2000) (excluding expert testimony as "too general" where opinion was based on employment study that "concerns the nation as a whole" and was not tailored to plaintiff's profession or region).

In fact, Peterson's own survey opinions have previously been excluded for being too general and not sufficiently "tied to" the facts of the case. *Fractus, S.A. v. Samsung*, No. 9 Civ. 203, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011). The same result should hold here.

Plaintiffs also move, pursuant to Rule 37(c), to preclude the "supplemental" declaration of Dr. Joseph F. Hair that Defendants filed as an exhibit to their class certification opposition after expert discovery closed. Despite not once using the word "heterogeneity" in his expert report or at his deposition, Hair now chimes in on Defendants' heterogeneity argument with new opinions that ACN IBOs are "diverse" and "heterogeneous." ECF 552-20 ¶¶ 2, 3. Defendants' belated disclosure was made via public filing (with no prior service on Plaintiffs) more than eleven weeks after the deadline for rebuttal expert reports, ECF 456 ¶ 3(d), approximately three weeks after Hair's deposition, and two weeks after the parties certified the close of expert discovery in a joint letter, ECF 548. The Rules here are clear: when a party fails to timely comply with its Rule 26(a) obligations, it "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Defendants have not provided any justification for their latest violation of the expert discovery deadlines set by the Court, ECF 456 ¶ 3(d), and Hair's declaration is plainly prejudicial because it offers, at this late stage, new expert opinions untested by discovery or deposition.

## ARGUMENT

### I. DR. PETERSON'S OPINIONS SHOULD BE EXCLUDED UNDER *DAUBERT*

#### A. Dr. Peterson's Heterogeneity Opinion is Based on Four Irrelevant Surveys

Peterson opines that there is "heterogeneity" in IBOs' motivations for joining ACN based on four surveys. ECF 552-18 at 13-14. As set forth below, these surveys were commissioned and/or conducted by organizations like the Direct Selling Association ("DSA"), the national trade association for direct selling companies, Peterson Tr. 31:17-32:3; the Direct Selling Education Foundation ("DSEF"), a foundation funded by direct selling companies that describes itself as a "goodwill ambassador" for the direct selling industry, *id.* 34:18-34:25, 36:13-37:15; or by Peterson

2

himself as part of his own work in support of the direct selling industry, ECF 552-18 at 6-8.[1] None was designed or conducted for purposes of this case.[2] And, critically, as Peterson conceded, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Peterson Tr. 145:13-17. In fact, for three of the four surveys, there is no indication that even a single respondent was an ACN IBO. *Id.* 167:16-168:3.

**Direct Selling Association Survey**. The first survey that Peterson relies on is a 2014 survey commissioned by the DSA that claims to have surveyed respondents from 61 of the DSA's nearly 200 member companies. *Id.* 206:1-12. The DSA's published data does not identify which direct selling companies were represented in the survey, and accordingly, there is no evidence in the record to suggest that ACN was among those whose participants were polled. Indeed, when asked at his deposition "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Peterson conceded "▮▮▮▮▮▮▮▮," and said he could not even hazard a guess because he "▮▮▮▮▮" have "▮▮▮▮▮▮▮▮▮" with the survey's process or design. *Id.* 140:2-6, 200:21-25.

**AARP Survey**: The second survey that Peterson relies on is a 2017 survey commissioned by the AARP that asked current or former participants in 84 different multilevel marketing ("MLM") companies about their decision to join. The AARP report identified a number of the MLM companies whose participants were represented in the survey pool, but ACN was not on the list. Accordingly, at his deposition, Peterson admitted that he did not have "▮▮▮▮▮▮▮▮▮▮" whether ACN participants were represented in the AARP survey's data set. *Id.* 251:13-25.

**National Direct Selling Turnover Survey**: The third survey that Peterson relies on is a 2017 survey that he conducted with a grant from the DSEF, examining direct selling participants' decision to leave their direct selling company. *Id.* 26:13-22, 267:19-269:18. Of the 953 respondents polled,

---

[1] Peterson has worked with the direct selling industry "for more than 35, 36 years," serves on the Academic Advisory Council of the DSEF, and has received hundreds of thousands of dollars in funding from the direct selling industry. *See* Peterson Tr. 34:13-17, 39:3-6, 43:17-44:8, 49:13-18, 50:3-11.

[2] Peterson Tr. 200:21-25, 206:5-10, 252:10-14, 267:16-25. Per Rule III.B.3 of Your Honor's Individual Rules, Plaintiffs have submitted the full transcript of Peterson's deposition to chambers and limited the excerpts in Exhibit 1 to 15 pages.

3

only two had any association with ACN—which Peterson acknowledged amounted to just 0.2% of the survey population. *Id.* 268:11-269:3.

**Gig Survey**: The fourth survey that Peterson relies on for his heterogeneity opinion is a survey that he conducted in 2022—though not for this litigation, *id.* 206:5-10—asking 1,001 "███████ ███████████████████████," their reasons for entering "█████████." ECF 552-18 at 8. To clarify: 95% of the respondents did not even report involvement with direct selling generally—let alone with ACN. And as for ACN, Peterson admitted at his deposition that he did not have any basis to think that any ████████████████████████████████████████████ ████████████████. Peterson Tr. 167:16-168:3.

On the basis of these four general surveys, Peterson opines that there is "heterogeneity among direct sellers with respect to the reasons underlying their decision to become a direct seller." ECF 552-18 at 13.³ Peterson then summarily asserts, with no analysis or explanation, that "[t]o the extent that the survey results presented in the report generalize to ACN distributors, and I believe they do, the ACN distributors do not constitute a homogeneous class of individuals." *Id.* at 14.

### B. Dr. Peterson's Heterogeneity Opinion is Unreliable Under *Daubert*

The district court, as the gatekeeper of expert testimony, is charged with "ensur[ing] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The relevance prong requires that an expert's testimony "fit" the issues in the case by having a "valid scientific [or other technical] connection to the pertinent inquiry." *Id.* at 591-92. An expert opinion fails to meet the standard and "should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002).

---

³ Remarkably, even as he offers this opinion, Peterson also concedes that, ████████████████████████ ████████████████████████████████. *Id.*

4

Here, Peterson's heterogeneity opinion should be excluded because there is an "analytical gap" between Peterson's analysis of broad industry data about direct sellers, multi-level marketers, and gig workers generally[4] and the opinions he offers about ACN IBOs specifically. *Roniger*, 2000 WL 1191078, at *3-4 (excluding expert testimony as "too general to be reliable" where opinion was based on study that "concerns the nation as a whole" and was not tailored to plaintiff's profession or region). Indeed, when it comes to survey testimony, "if the wrong universe is surveyed, the results are likely to be irrelevant." *Medisim*, 861 F. Supp. 2d at 179 (cleaned up) (excluding expert that surveyed, in consumer confusion case, persons likely to shop at stores that sold the at-issue product without ensuring respondents were likely to purchase the product); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (affirming decision disregarding expert report at summary judgment where report was based on data about "general population" rather than specific population at issue).

By his own admission, none of Peterson's general surveys were "████████████." Peterson Tr. 145:15-21. And of course, ACN is a unique company, with a highly complex compensation plan, Ex. 3; bespoke policies and procedures, Ex. 4; and of course, a unique recruiting pitch featuring Donald Trump. In fact, Peterson has himself previously cautioned, in the context of critiquing another expert witness's report, that direct selling companies employ "unique" processes for "recruiting, rewarding, and retaining direct sellers" and that failure to grasp these "complexities" can result in "misunderstanding and faulty inferences." Peterson Rebuttal Report, *Lavigne v. Herbalife Ltd.*, 18 Civ. 7480 (C.D. Cal. Mar. 8, 2021), ECF 332-1 at 133. The FTC agrees: "[m]ulti-level marketing is a diverse and varied industry, employing many different structures and methods of selling."[5] Accordingly, if Peterson wanted to rely on broad industry survey data to draw conclusions

---

[4] Even these general framings differ in meaningful ways. In fact, Peterson himself has criticized another expert witness for conflating direct selling and multi-level marketing. *See* Peterson Rebuttal Report, *Lavigne v. Herbalife Ltd.*, No. 18 Civ. 7480 (C.D. Cal. Mar. 8, 2021), ECF 332-1 at 134 ("Lalich's opinions and conclusions derive from the faulty premise that direct selling and multi-level marketing are one and the same; they are not.").

[5] Fed. Trade Comm'n, *Business Guidance Concerning Multi-Level Marketing* (2018), https://www.ftc.gov/business-guidance/resources/business-guidance-concerning-multi-level-marketing.

5

about ACN IBOs, the burden was on him to provide some analysis to "establish" that the former is a reliable basis for the latter. *See, e.g.*, *Apple v. Atl. Yards Dev. Co., LLC*, No. 11 Civ. 5550, 2015 WL 11182422, at *8 (E.D.N.Y. Mar. 31, 2015). Peterson did not even try to do so.[6]

All that Peterson offers is the following line in his report: "To the extent that the survey results presented in the report generalize to ACN distributors, and I believe they do, the ACN distributors do not constitute a homogeneous class of individuals." ECF 552-18 at 14. The "[t]o the extent" clause all but concedes that he has not made, or even tried to make, any actual showing of representativeness. And the unadorned statement, "I believe they do," is plainly inadequate as a matter of law: "The law is clear that mere ipse dixit is not appropriate expert testimony because it is not based on reliable methodology, as *Daubert* requires." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013).

Another federal court has previously excluded Peterson's expert testimony because it was based on surveys not sufficiently "tied to" the issues in the case. *Fractus*, 2011 WL 7563820, at *1 (excluding survey testimony focused on internal cellphone antennas in general, rather than plaintiff's antenna in particular). Peterson has made the same fatal error again here. Because Peterson's heterogeneity opinion constitutes nothing more than "extrapolat[ions] from unrepresentative data, his testimony is properly subject to exclusion." *Apple*, 2015 WL 11182422, at *7.

### C. The Celebrity Spokesperson Opinion is Similarly Flawed

Peterson did conduct one survey specifically for this case—a "Celebrity Spokesperson Survey," which purports to examine the impact of a celebrity endorsement on participants' decisions to join

---

[6] The Eastern District's decision in the *Apple* case is instructive. There, the court excluded a statistician's testimony where the expert relied on national workforce data to draw conclusions about five New York labor unions. *Id*. at *6-9. The court explained that "[t]he basic flaw in plaintiff's reasoning is their assumption that national survey data is necessarily representative of the New York union members in the five trades at issue." *Id*. at *6. The mere fact that the union members at issue were a "subset" of the broader workforce did not establish representativeness—"[t]hat is a non-sequitur." *Id*. at *8. Rather, the expert must actually "demonstrate that a sufficiently large (and representative) subset of respondents in the survey was drawn from the appropriate" population. *Id*. at *7 (quoting Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 379 (3d ed. 2011)). And the expert there was "silent on the question of representativeness." *Id*. at *8. Because the expert did not "establish" representativeness with respect to the specific population at issue, the testimony "f[e]ll[] short of the modest showing required by *Daubert*." *Id*. Exactly the same reasoning applies here.

6

MLMs. ECF 552-18 at 8-12. But remarkably, even though he designed the survey for this case, Peterson chose to not survey ACN IBOs, and instead surveyed participants in direct selling companies generally. Peterson Tr. 331:4-11 (agreeing Celebrity Spokesperson Survey was "███████████████" and was "█████████████████████████████"). When asked why he chose not to survey ACN IBOs, since that is the relevant population, Peterson had no sensible explanation—he did not identify any impediment to designing such a survey. *See id.* 332:15-334:25. As a result of the overbroad survey design, only a single respondent reported any affiliation with ACN. ECF 552-18 at 12. The Celebrity Spokesperson Survey therefore suffers from all the same flaws as the four general surveys described above and should be excluded for the same reasons.

In addition, exclusion is appropriate because the survey's respondent pool—a mere 36 participants—is far too small a sample from which to draw meaningful conclusions. *See Price v. L'Oréal USA, Inc.*, No. 17 Civ. 614, 2020 WL 4937464, at *8 (S.D.N.Y. Aug. 24, 2020) (Schofield, J.) (excluding expert testimony, in part, because testimony was based on a "small sample size" of "only" 105 respondents); *see also Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc.*, No. 2 Civ. 3691, 2004 WL 326708, at *9 (S.D.N.Y. Feb. 23, 2004) (rejecting sample size of 52 respondents). This is particularly true where, as here, the expert has made no effort to "show that his data is 'a fair proxy'" for the population at issue. *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2022 WL 814074, at *8 (S.D.N.Y. Mar. 17, 2022) (excluding portion of expert opinion that relied upon seventeen data points).[7]

---

[7] What's more, Peterson admitted in his deposition that even among the small pool of respondents, several gave nonsensical answers and were obviously confused. *Cf. In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 950-51 (C.D. Cal. 2015) (excluding survey in part on basis that expert conceded answers "indicate[] some misunderstanding among the survey respondents"). For example, when asked to name the celebrity that endorsed their MLM company, one respondent gave the name of a fictional toothpaste brand. Peterson Tr. 369:13-370:7. Another respondent, when asked to name the direct selling company they worked for, gave the name Kirkland, a line of merchandise at Costco stores, not a direct selling company. *Id.* at 375:5-16. Neither these respondents nor any other respondents were excluded, even as Peterson admitted that some were plainly confused. *Id.* 368:24-369:10, 370:5-7, 370:22-372:4, 374:6-375:4.

## II. DR. HAIR'S UNTIMELY DECLARATION SHOULD BE PRECLUDED

After Peterson's deposition laid bare the incurable deficiencies in his analysis outlined above, Defendants attempted to fortify their heterogeneity arguments with new opinions from their expert Hair, which they presented in a "supplemental" declaration submitted with their class certification opposition papers. ECF 552-20 ¶ 1.

This declaration is not some mere correction or clarification. Hair did not once use the word "heterogeneous" in his expert report or deposition, but he now proposes to testify that ACN IBOs are "diverse" and "heterogeneous." ECF 552-20 ¶¶ 2, 3. By his own admission, Hair is offering these new opinions "█████████████████████████████████████████████." ECF 552-20 ¶ 1. And Defendants, in turn, try to rely on them in their opposition. ECF 551 at 15.

Hair's untimely declaration also includes new claims about the IBO population (without citation, so who knows where this supposed information is coming from), including that IBOs cannot be expected to earn income for as long as six months after joining, ECF 552-20 ¶¶ 5, 7, and that some IBOs may have never attended ACN training events, *id.* ¶ 10. Hair even asserts that the income of a typical ACN IBO was "█████" something different than what Plaintiffs' expert Dr. Bosley calculated based on the record evidence produced by ACN, *id.* ¶ 16, even though Hair testified repeatedly at his deposition that he █████████████████████████████████████ █████████. Hair Tr. 19:5-21:2, 71:14-19.

This is a textbook violation of Rule 26(a), which requires that an expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Here, as noted above, Defendants' belated disclosure of new expert opinions was made via public filing more than eleven weeks after the original deadline for rebuttal expert reports, ECF 456 ¶ 3(d), more than five weeks after the deadline Judge Cave set

8

for supplemental reports, ECF 514 ¶ 2,[8] approximately three weeks after Hair's deposition, and two weeks after the parties certified the close of expert discovery in a joint letter to Judge Cave, ECF 548.

Where, as here, a party fails to comply with its Rule 26(a) obligations, it "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). When considering whether to preclude evidence under Rule 37, courts consider: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (cleaned up). All four factors weigh in favor of preclusion here.

*First*, Defendants have not presented any explanation, let alone a sufficient justification, for this untimely declaration. Though styled as a "supplement," ECF 552-20 ¶ 1, the declaration neither corrects Hair's rebuttal report nor cites any information that was previously unknown or unavailable to him.[9] *See* Fed. R. Civ. P. 26(e)[10]; *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 572 (S.D.N.Y. 2017) (expert's "additional analysis of . . . data" that "was available to him prior to submitting his initial expert report" was not proper supplement). The unjustified nature of Defendants' late disclosure alone "weighs very strongly in favor of preclusion." *Morritt v. Stryker Corp.*, No. 7 Civ. 2319, 2011 WL 3876960, at *6 (E.D.N.Y. Sept. 1, 2011).

---

[8] Indeed, this untimely declaration is just the latest in an unrelenting series of disclosure failures by Defendants, which already prompted Judge Cave to direct Defendants' experts to serve supplemental reports to address a series of private meetings orchestrated by defense counsel between their experts and ACN executives—meetings at which substantial information was exchanged but no records were kept. *See* ECF 510, 514. To be clear, this new declaration is unrelated to that issue, and well after the deadline for those supplemental reports in any event.

[9] To be clear, Hair does cite the deposition of Bosley, which obviously occurred after reports were served, but the propositions for which Hair cites her deposition were all included in her reports, and in any event, the rules do not permit Hair a second round of reports to address the deposition testimony of other experts.

[10] For this reason, Hair's declaration is also improper under Rule 26(e), which is not "a vehicle to permit a party to serve a deficient [44-page] opening report and then remedy the deficiency through the expedient of a 'supplemental' report." *Lidle v. Cirrus Design Corp.*, No. 8 Civ. 1253, 2009 WL 4907201, at *5-6 (S.D.N.Y. Dec. 18, 2009).

*Second*, even assuming that Defendants' untimely disclosure is important to their case, that fact "only serves to underscore the inexcusable quality of its delayed submission." *Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, 301 F.R.D. 31, 41 (S.D.N.Y. 2014); *see also Frydman v. Verschleiser*, No. 14 Civ. 8084, 2017 WL 1155919, at *3 (S.D.N.Y. Mar. 27, 2017) (overruling objections to order striking expert reports and finding it "incredible" where parties waited until after expert disclosure deadline to disclose reports "critical to their case").

*Third*, Hair's declaration is highly prejudicial to Plaintiffs, because discovery is closed, a "firm" trial date has been set, ECF 507, 543, and Plaintiffs have already briefed their motion for class certification. *See In re Motel 6 Sec. Litig.*, 161 F. Supp. 2d 227, 243-44 (S.D.N.Y. 2001) (excluding affidavit submitted in support to summary judgment, in part because "Plaintiffs were not able to depose [expert] regarding his newly asserted opinions"). This is precisely the type of sandbagging of adversaries that Rule 37(c)(1) was designed to prevent. *Fleming v. Verizon N.Y., Inc.*, No. 3 Civ. 5639, 2006 WL 2709766, at *8 (S.D.N.Y. Sept. 22, 2006) (excluding declarations submitted in opposition to summary judgment where moving party "made its motion for summary judgment based on what it thought to be all of the evidence accumulated in discovery").[11]

*Fourth*, a continuance is inappropriate under the circumstances. Just a few weeks ago, the parties jointly certified the close of discovery, after more than three years. ECF 548. The parties have completed class certification briefing and are now in the midst of briefing Defendants' motion for summary judgment. ECF 559. And as noted, the Court has twice directed that the trial date next January is "firm." ECF 507, 543. Reopening discovery now would only reward Defendants' gamesmanship while prejudicing Plaintiffs with significant additional expense and the risk of delay. *Frydman*, 2017 WL 1155919, at *3 (finding delay would prejudice nonoffending party).

---

[11] Reopening discovery at this late stage is no answer either. *See Morritt*, 2011 WL 3876960, at *7 (collecting cases that found prejudice where discovery would have to be reopened).

## CONCLUSION

For the foregoing reasons, the Court should exclude Peterson's expert opinions and preclude Hair's "supplemental" declaration.

Dated: May 5, 2023
      New York, New York

                */s/ John C. Quinn*
                Roberta A. Kaplan
                John C. Quinn
                Christopher R. Le Coney
                Maximillian L. Feldman

                KAPLAN HECKER & FINK LLP
                350 Fifth Avenue, 63rd Floor
                New York, New York 10118
                Tel: (212) 763-0883
                rkaplan@kaplanhecker.com
                jquinn@kaplanhecker.com
                cleconey@kaplanhecker.com
                mfeldman@kaplanhecker.com

                Andrew G. Celli, Jr.
                Matthew D. Brinckerhoff
                O. Andrew F. Wilson
                Vasudha Talla
                Nick Bourland

                EMERY CELLI BRINCKERHOFF
                ABADY WARD & MAAZEL LLP
                600 Fifth Avenue at Rockefeller Center
                New York, New York 10020
                Tel: (212) 763-5000
                acelli@ecbawm.com
                mbrinckerhoff@ecbawm.com
                awilson@ecbawm.com
                vtalla@ecbawm.com
                nbourland@ecbawm.com

                *Attorneys for Plaintiffs*