# EXHIBIT 9

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3          FOR THE SOUTHERN DISTRICT OF NEW YORK
 4  ----------------------------------------X
 5  CATHERINE MCKOY, MILLARD WILLIAMS,
 6  MARKUS FRAZIER, and LYNN CHADWICK
 7  individually and on behalf of all
 8  others similarly situated,           Index No.
 9                                       1:18-cv-09936-
                                         LGS
10                  Plaintiffs
11              v.
12  THE TRUMP CORPORATION, DONALD J. TRUMP,
13  in his personal capacity, DONALD TRUMP
14  JR., ERIC TRUMP, and IVANKA TRUMP,
15                  Defendants.
16  ----------------------------------------X
17
18             ** CONFIDENTIAL **RHONA GRAFF
19             DEPOSITION OF RHONA GRAFF
20                   July 28, 2022
21
22
23  Reported by:
24  MARY F. BOWMAN, RPR, CRR
25  JOB NO. 213092
```

Page 86

Graff - Confidential

2  another contract in that series?
3  A.   Correct.
4  Q.   So we have seen January of 2006.
5  We saw February 2008, an execution copy
6  that you weren't sure whether it got
7  finalized.  We saw January of 2009.  And
8  now we are seeing January 14, 2011, is that
9  right?
10 A.   Correct.
11 Q.   And here, again, you can see that
12 the title refers to an appearance and
13 endorsement agreement, 2011 to 2013, right?
14 A.   Correct.
15 Q.   The first line says it's entered
16 into January 14, 2011, right?
17 A.   Correct.
18 Q.   And you can see at the bottom of
19 the page, the signatures of both Robert
20 Stevanovski and Donald J. Trump?
21 A.   Correct.
22 Q.   Again, there is a collection of
23 documents here.  The first two pages appear
24 to be two copies of that same agreement,
25 right?

Page 87

Graff - Confidential

2  A.   Yes.
3  Q.   They both bear signatures, right?
4  A.   Correct.
5  Q.   And, again, do you have any
6  reason to doubt that this was a final,
7  executed, binding agreement?
8  A.   No, I do not.
9       MR. ROBERT:  Objection to form.
10      You can answer.
11 A.   Oh, I'm sorry.
12      No, I do not.
13 Q.   Again, you can see this is a
14 collection of documents that spans through
15 Bates number TTO_007499, right?
16 A.   Yes.
17 Q.   And the last document is an email
18 that appears to have been printed out by
19 you, right?
20 A.   That is correct.
21 Q.   So, again, is it your
22 understanding that this is a collection of
23 documents maintained by you in a hard-copy
24 file?
25 A.   I believe that's correct.

Page 88

Graff - Confidential

2  Q.   Okay.
3       And let's mark one more.
4       (Exhibit 12, document, Bates
5       stamped TTO_000478, marked for
6       identification, as of this date.)
7  Q.   Okay.  We have handed you
8  Exhibit 12, which is a document produced by
9  defendants bearing Bates number TTO_000478.
10      Do you see that?
11 A.   Yes, I do.
12 Q.   And this is a contract that does
13 not have a header on it, right?
14 A.   Correct.
15 Q.   The first line refers to an
16 appearance agreement, right?
17 A.   Correct.
18 Q.   It says it is entered into as of
19 February 13, 2013, correct?
20 A.   Yes.
21 Q.   And this document is
22 significantly longer than the contracts
23 that we have seen thus far, right?
24 A.   Correct.
25 Q.   The others were all about --

Page 89

Graff - Confidential

2  either exactly about one page or exactly
3  one page, right?
4  A.   Correct.
5  Q.   This is closer to ten or a dozen
6  pages, is that correct?
7  A.   Correct.
8  Q.   You can see on the page ending in
9  the Bates number 486 that it does bear the
10 signatures of both Robert Stevanovski and
11 Donald J. Trump, right?
12 A.   That is correct.
13 Q.   Do you have any reason to doubt
14 that is a final, binding, executed
15 agreement?
16      MR. ROBERT:  Objection to form.
17      You can answer.
18 A.   No, I do not.
19 Q.   So we talked a little bit about
20 the 2006 and 2008 agreements and your role
21 or lack of role with respect to those.
22      With respect to these other
23 agreements, the January 2009, January 2011,
24 and February 2013, did you have a role in
25 negotiating these or communicating about

Page 90

Graff - Confidential

1  these contracts on Mr. Trump's behalf?
2      A.   I think that would be fair to
3  say.
4      Q.   What was the typical process in
5  your recollection for these agreements
6  being negotiated?  Who prepared the first
7  draft?
8      A.   There would usually be -- to the
9  best of my recollection, there would
10 usually be a phone call from Anne Archer
11 saying, We are ready to discuss the new
12 contract, and she would talk, to the best
13 of my recollection, you know, what ACN had
14 in mind, how many speaking engagements,
15 what the extent of them were.
16          I think in the early days they
17 were mostly based in the United States, I
18 think.  They wanted to go more
19 international.  We got into some of that.
20 We talked a little bit about money, you
21 know, what -- I think what they were
22 prepared to offer, what I thought was
23 reasonable ballpark for Mr. Trump.  And any
24 of their other details, were there any

Page 91

Graff - Confidential

1  other obligations, you know, from
2  Mr. Trump.
3      Q.   How involved was Mr. Trump in
4  that process and at what point?
5      A.   Well, certainly, when it came to
6  the negotiated fee, he was the final say so
7  on all of that.
8          He was also the final say so in
9  regard to where he would speak and how much
10 time he would commit.
11          I think he was less inclined to
12 do international speaking engagements and
13 appearances because he just didn't like
14 traveling.  And I think he did it a few
15 times but he preferred not to.  And just
16 how much time would be required of him.
17          So he had a lot of input on those
18 areas.
19      Q.   The first thing you mentioned
20 there was the fee.
21          Is it fair to say that was an
22 important term from Mr. Trump's perspective
23 as you understood it?
24      A.   A speaking fee?

Page 92

Graff - Confidential

1          That was a general term he used
2  for all his speaking engagements.
3      Q.   Was it something Mr. Trump was
4  particularly focused on?
5      A.   You mean, what the amount of the
6  fee was?
7      Q.   Yes.
8      A.   Yeah.  He was a businessman.  Any
9  deal that he did, he was always, you know,
10 how does that, you know, benefit me?  What
11 are my -- what do I make from it?
12     Q.   And, to your knowledge, did the
13 fee that ACN was paying for each of these
14 appearances increase over time throughout
15 the course of the relationship?
16     A.   Without, again, looking at the
17 specifics, I believe it did over time.
18     Q.   And was that pursuant to guidance
19 that you were getting from Mr. Trump
20 personally?
21     A.   It was probably a combination,
22 yes.
23     Q.   A combination of Mr. Trump's
24 guidance and what else?

Page 93

Graff - Confidential

1      A.   I mean, some -- there were more
2  speeches as the years went on, so,
3  obviously, he would get more money because
4  there were more speeches and maybe more of
5  a time commitment.
6          Did his rate go up per speech?
7          It may have over time, but I
8  don't know the specifics.
9      Q.   If the contract said that, you
10 certainly wouldn't be surprised, is that
11 fair?
12     A.   I think that's fair.
13     Q.   Do you recall negotiating for
14 control over the content of the speeches or
15 about what ACN could say about Mr. Trump?
16     A.   I don't recall negotiating those
17 issues.
18     Q.   What about the terms relating to
19 logistics, ACN's payment of airplane
20 tickets, and those sort of things, do you
21 remember negotiation about that?
22     A.   I don't know if it was so much a
23 negotiation.  I mean, those were the terms.
24 That's maybe a better use of it.

Page 94

Graff - Confidential

But there was a standard -- when the contract was signed, there were -- I think there were dates when they had to pay by, and those are possibly standard in any deal that we did with anybody.

Q. I just want to mark one more document just as we are talking about this process of developing the contracts.

(Exhibit 13, document, Bates stamped TTO_007514, marked for identification, as of this date.)

Q. So we have marked now as Exhibit 13 a document produced by defendants bearing the Bates number TTO_007514.

A. Correct.

Q. Exhibit 13 is an email from Anne Archer Butcher to you dated March 10, 2015. Do you see that?

A. I do.

Q. And looking at this email, does this appear to be a communication as a part of the process you described where Ms. Butcher is beginning the process of

Page 95

Graff - Confidential

talking about a new agreement, and you're discussing with her what the terms of that agreement will be?

A. Yes, I think that's accurate.

Q. And you can see, as with some other documents, there appears to be some handwriting on this document, right?

A. Correct.

Q. In fact, if you look closely at the bottom right, it appears almost that there -- as you described earlier, that there is a sticky note that has been placed on the bottom right-hand corner, right?

You can see it sort of obscures the text of the email?

A. Yeah, I do.

Q. Is this consistent with the practice you described where there were emails you would print for Mr. Trump and place in his inbox, and he would provide feedback in writing and put it in his outbox?

A. I think that's fair, yes.

Q. Just to be clear, the handwriting

Page 96

Graff - Confidential

on the sticky note at the bottom right, is that your handwriting?

A. I believe that is -- yeah, I'm pretty sure that's mine.

Q. There is marker -- you know, a thicker font both on the sticky note and document itself.

Is that Mr. Trump's handwriting?

A. It is.

Q. You can see there are two instances of Mr. Trump's handwriting. The first has an arrow pointing to a paragraph a little less than halfway down the page.

Do you see that?

A. I do.

Q. And they refer to -- it refers to three potential speaking events in 2015, right?

A. Correct.

Q. And you can see that the handwriting says, "1 million dollars, more money and pay for my plane."

Do you see that?

A. I do.

Page 97

Graff - Confidential

Q. So is that consistent with the kind of term Mr. Trump was focused on as you were describing the process?

A. I think that's fair, yes.

Q. And then on the sticky note in the bottom right, you can see your note maybe three or four lines from the bottom, there is some reference to potential -- a little hard to read, but I think it says, (as read): International speech in Seoul, Korea --

A. In September.

Q. In September, right.

And Mr. Trump appears to have underlined "Seoul" and says, "Too far."

Do you see that?

A. Yes.

Q. Is that also consistent with the travel-related term he was focused on, in your experience?

A. Correct.

Q. Do you recall at any point in the negotiation of any of these agreements anybody at The Trump Organization

Page 98

```
 1            Graff - Confidential
 2  negotiating for greater access to diligence
 3  information about ACN?
 4        MR. ROBERT:  Objection to form.
 5        You can answer.
 6     A.    Not to my knowledge.
 7     Q.    All right.  Let me mark the next
 8  document.
 9        (Exhibit 14, document, Bates
10        stamped TTO_004386, marked for
11        identification, as of this date.)
12     Q.    All right.  We have marked
13  Exhibit -- as Exhibit 14 a document
14  produced by defendants bearing the Bates
15  number TTO_004386.
16        Do you recognize this document?
17     A.    I don't recall it.
18     Q.    It appears to be an email
19  exchange between Anne Archer Butcher and
20  you in or around January 2008.  Does that
21  seem right?
22     A.    Um-hm.  Yes.
23     Q.    Do you recall that you were
24  having discussions with Ms. Butcher in and
25  around that time about the ACN
```

Page 99

```
 1            Graff - Confidential
 2  relationship?
 3     A.    Probably.  You know, I can't say,
 4  again, with 100 percent assurance, but I
 5  would say that makes sense.
 6     Q.    Let's start with Ms. Butcher's
 7  email to you.  That's the one that starts
 8  on the second half of the first -- first
 9  email of the chain.
10        Ms. Butcher emails you on
11  January 24, 2008, and the first line says,
12  "Nice speaking with you again, as always."
13        Do you see that?
14     A.    I do.
15     Q.    Do you recall the conversation
16  that Ms. Butcher is referring to there?
17     A.    No, I do not.
18     Q.    Any reason to doubt that you had
19  a conversation with Ms. Butcher around that
20  time?
21     A.    No reason to doubt.
22     Q.    And the way she says that, "Nice
23  speaking with you again, as always,"
24  suggests by this point you have had a
25  number of conversations with Ms. Butcher,
```

Page 100

```
 1            Graff - Confidential
 2  is that fair to say?
 3     A.    I guess it's fair to say.  I
 4  think it is just a nice way of being
 5  polite, which I often say to people as
 6  well.
 7     Q.    Sure.
 8        It would be unusual to say
 9  something like that if it is the first
10  conversation she is referencing, right?
11     A.    If it's the first conversation,
12  yes.
13     Q.    The second paragraph says, "For
14  the New York ACN meeting, we will follow
15  Mr. Trump's recommendation for the charity.
16  I believe you have a charity selected, and
17  we are happy to do whatever we can to make
18  it a tremendous success."
19        Do you see that?
20     A.    I do.
21     Q.    Do you recall any discussion with
22  ACN about Mr. Trump making a recommendation
23  to ACN about a charity?
24     A.    I don't recall.
25     Q.    When it says, "I believe you have
```

Page 101

```
 1            Graff - Confidential
 2  a charity selected," do you know what
 3  charity that's referring to?
 4     A.    I have an idea, but I don't know
 5  if it is fair for me to guess.
 6     Q.    Understanding that you don't have
 7  a specific or certain recollection, what's
 8  your best understanding based on your
 9  experience?
10     A.    I just know Mr. Trump had a
11  particular affinity for Police Athletic
12  League.  So in those days, it would make
13  sense that that would be a charity that he
14  elected to be the recipient of this, but I
15  can't confirm it.
16     Q.    What about the Eric Trump
17  Foundation, was that, to your knowledge, in
18  existence at the time and something that
19  Mr. Trump was aware of?
20     A.    I was not aware of anything to do
21  with the Eric Trump Foundation.
22     Q.    Do you have any understanding
23  based on your experience and interactions
24  with Ms. Butcher why Mr. Trump would be
25  making a charity recommendation to ACN?
```

Page 110

Graff - Confidential

2  A. Correct.
3  Q. And is that consistent with your
4 recollection that the earlier deal in
5 January of 2006 was something Ms. Glosser
6 worked on and that by this time, January of
7 2008, you were communicating with
8 Ms. Butcher?
9  A. Yes.
10     What I'm not clear on is Cathy
11 would send to her at The Trump
12 Organization -- I'm just a little confused
13 on the timing.
14     But why this was sent to me and
15 not to Cathy, if Cathy was still there.
16  Q. Got it.
17     And if you recall, we saw a draft
18 agreement from just a few days after this,
19 February of 2008, with the handwriting at
20 the top that says, "Nothing to do with
21 Cathy Glosser."
22     Do you remember that?
23  A. Right.
24     I don't remember seeing that. I
25 don't know who wrote it.

Page 111

Graff - Confidential

2  Q. You may not remember at the time,
3 but you remember seeing it a little earlier
4 this morning?
5  A. Yes, yes, I do.
6  Q. Putting those two together,
7 you're just not remembering why it is that
8 Ms. Glosser seems to be sort of less
9 involved in these discussions at this time?
10  A. I don't recall. Correct.
11  Q. Okay.
12     In the second paragraph of your
13 email, you write to Ms. Glosser, "What they
14 are offering seems very reasonable and more
15 palatable for DT as he would not need to do
16 any traveling."
17     Do you see that?
18  A. I do.
19  Q. Again, is that consistent with
20 some of the terms he expressed interest in
21 about minimizing travel or excessive
22 travel?
23  A. Yes, I think that would be fair
24 to say.
25  Q. And then in your next sentence,

Page 112

Graff - Confidential

2 you write, "My main concern is the
3 reputation of ACN as I have heard mixed
4 reports about them."
5     Do you see that?
6  A. I do.
7  Q. Do you recall having a concern
8 about ACN?
9  A. I don't recall what I was
10 specifically referring to in this "mixed
11 reports." I don't remember that.
12  Q. Well, let's take this one step at
13 a time.
14     Just as a general matter, in
15 January of 2008, as you're communicating
16 with Ms. Butcher about potential new
17 agreements and extensions of the agreement
18 or changes to the agreement, do you
19 remember having any concern about ACN?
20  A. I don't remember that standing
21 out.
22  Q. What do you mean by "that
23 standing out"?
24  A. I don't remember thinking that
25 this is something that we need to be

Page 113

Graff - Confidential

2 concerned about.
3  Q. You did write here, though, that
4 you have a concern about the reputation of
5 ACN, right?
6  A. Right, but I don't know what the
7 basis of that was for. I don't recall.
8  Q. So your best understanding
9 sitting here today is that reading this
10 email, it does appear you have a concern at
11 the time but you can't remember now having
12 such a concern?
13  A. Correct. And I follow it up
14 saying that I have had no reason to doubt
15 based on my relationship with them.
16     So --
17  Q. Well, you write in the next
18 sentence, "That being said, everyone I have
19 worked with there has been extremely
20 professional and easy to deal with," right?
21  A. Correct.
22  Q. You don't say that that mitigates
23 any concern about the reputation of ACN, do
24 you?
25  A. Does it mitigate?

Page 114
Graff - Confidential
I think it basically says, I -- I don't really have any concerns that would cause a problem in the relationship.
I don't really know how to address this. I don't recall it. So -- I don't know how to answer that.
Q. You do refer here to having a concern with ACN, right?
A. That's what it says in this statement, yes.
Q. So you don't doubt in January of 2008 you did, in fact, have a concern with ACN?
A. I'm trying to recall what happened. I might have read a news clipping somewhere or I may have gotten an email from a stray person saying it. Maybe I based it on that.
I don't really know what the basis of my concern was.
Q. But you don't doubt you had one, right?
A. I guess there must have been something that was -- I felt I needed to

Page 115
Graff - Confidential
reference, but I don't know what it was.
Q. And you referred specifically here to a concern about the reputation of ACN, right?
A. Um-hm.
Q. Do you know what you meant by that, "the reputation of ACN"?
A. I'm guessing. I don't like to guess, but it may have been a newspaper article that I read or maybe a stray email from somebody who said, I didn't have a good experience. Maybe it was based on that.
Q. And when you reference such an email, someone saying, I didn't have a good experience, do you mean didn't have a good experience trying to pursue the ACN business opportunity and make money with ACN?
A. You know, I can't -- I can't call out a specific thing, but I think I remember maybe there was a person who went to one of his speeches, I didn't enjoy it, I didn't get anything from it, or whatever.

Page 116
Graff - Confidential
You always have -- any time you are dealing with the general -- the public, there are always going to be -- I mean, out hotel division, our golf division, there are always people complaining about everything. So, you know, how serious does one take it?
You know, I don't recall the specific instance.
Q. You also refer to news reports somewhere in your mind.
Do you remember what the nature of the news reports was about ACN?
A. I don't. You know, I don't recall anything specific.
Q. Do you ever remember hearing or reading anything about concerns or accusations that ACN was a pyramid scheme?
A. I may have read one or two articles, and I think what I did with them is I would send them on to Anne Archer and say, What's this about? You know, it's news to me.
Q. Can you place that in time in any

Page 117
Graff - Confidential
way? Do you remember when you may have read articles like that about ACN?
A. No, I don't.
This was a period of how long? I mean, I don't recall. I really don't recall.
Q. And you said that your practice, if you read or heard such a thing, was to send it to Anne Archer and ask, What's going on?
A. To the best of my recollection, that's what I would do.
Q. Do you remember any other steps that you took in response to those kinds of articles or concerns?
A. I can't particularly -- I can't recall a specific instance.
Q. Do you remember, aside from the term "pyramid scheme," any other concerns, whether from news reports or otherwise, about consumer fraud or ACN being a scam or anything along those lines?
A. Well, I never heard the term "pyramid scheme." You used that. I'm not

Page 118

Graff - Confidential

aware of that.
          Nothing in particular.
     Q.   What about in general? What do you remember, if anything, seeing that was concerning about ACN? How would you describe it?
     A.   Well, I think, as a multilevel marketing company, I think that, you know, there were people that just, in general, the whole industry were, you know, not too sure of what it was about. There were some questions about it. Not specifically ACN, but in general, what that business model was.
     Q.   So you were then -- you were generally aware that network marketing or multilevel marketing companies, that there were concerns about those companies and specifically whether they were scams?
     A.   Not early on. Only when I maybe read a scattered newspaper article about it.
          It was not something I focused on. My job was to work on whatever the

Page 119

Graff - Confidential

contract was, make sure it happened. I really didn't get into that nitty-gritty. It wasn't my role or my interest.
     Q.   Are you aware of anyone at The Trump Organization who was responsible for investigating that issue or had responsibility for determining that, or is that something that you left to Ms. Butcher and raised questions with Ms. Butcher about?
     A.   I don't think there is a specific person. We saw an email from Cathy Glosser earlier where she asked about their background and their history, and she asked for some documentation.
          So, again, I don't know how that proceeded, how it was handled. I'm assuming that she felt satisfied with whatever information she got to proceed.
          So I didn't feel it was my position to question it.
     Q.   Aside from that email from Ms. Glosser and you sometimes sending questions on to Ms. Butcher, are you aware

Page 120

Graff - Confidential

of any process at any time at The Trump Organization to vet ACN or diligence these sorts of concerns?
     A.   Not that I'm aware of.
     Q.   At the time you sent this email in January -- on January 25 of 2008 referring to these -- being concerned about ACN, Mr. Trump had already filmed several videos for ACN, right?
     A.   I have to look at the agreements. I mean, that makes sense based on the agreements but --
     Q.   Yeah, and this is a discussion about extending a relationship, right?
          So it wouldn't surprise you that Mr. Trump had by that point filmed several videos and appeared at several events?
     A.   Yes, correct.
     Q.   "Correct" meaning that would not surprise you?
     A.   It would not surprise me.
     Q.   Let's mark the next exhibit.
          (Exhibit 15, document, Bates stamped ACN009867, marked for

Page 121

Graff - Confidential

identification, as of this date.)
     Q.   We have marked as Exhibit 15 -- this is a document that was produced by ACN. It bears the Bates number ACN009867, and with the exception of the very top email, the FYI, which is internal to ACN, you can see this is an exchange between you, Ms. Butcher and a person named Allan VanBuhler at ACN, is that right?
     A.   Correct.
     Q.   Who was Mr. VanBuhler?
     A.   He's a name that I rarely interacted with, and I'm really not sure of what his role was.
     Q.   He was an employee at or executive at or a person associated with ACN?
     A.   With ACN, right, but I'm not sure -- I see his title is global vice president of marketing. But someone I rarely interacted with.
     Q.   And you can see that your -- this email exchange is taking place on January 24 and January 25 of 2008, right?

Page 138
Graff - Confidential

1 from September of 2010 from a reporter,
2 Stuart Watson, to you.
3     A.    Okay.
4     Q.    And the email reads (as read):
5 Mr. Trump will be in Charlotte this weekend
6 to give a speech to ACN sales reps.  I'd
7 like to talk to him before that time to get
8 his reactions to allegations by the State
9 of Montana that ACN is a "pyramid
10 promotional scheme."
11         Do you see that?
12    A.    Yes.
13    Q.    Do you remember seeing this email
14 from this reporter?
15    A.    I don't remember this particular
16 email.
17    Q.    Now that you see it, does it
18 refresh your recollection?
19    A.    Not particularly.
20    Q.    Do you recall anything about the
21 state of Montana accusing ACN of being a
22 pyramid scheme?
23    A.    No, I do not.
24    Q.    Does this refresh your

Page 139
Graff - Confidential

1 recollection more generally about hearing
2 at times reports that ACN was a pyramid
3 scheme?
4     A.    Again, I have received over the
5 period of time, you know, some complaints.
6 I don't -- I don't recall them being
7 referred to as "pyramid schemes."
8     Q.    Right.  I think you said you have
9 some recollection of both reading news
10 reports and also receiving emails from
11 third parties.
12    A.    Right.
13    Q.    And that those had some concerns
14 in them or raised some concerns about ACN,
15 right?
16    A.    Correct.
17    Q.    You just don't specifically
18 recall the use of the term "pyramid
19 scheme"?
20    A.    I think that's fair to say, yes.
21    Q.    Looking at this email from 2010,
22 a reporter did inform you or state to you
23 that the State of Montana accused ACN of
24 being a pyramid scheme?

Page 140
Graff - Confidential

1     A.    Yes.  It's there in black and
2 white, yes.
3     Q.    And then, you forwarded that
4 e-mail to Anne Archer Butcher and asked her
5 to call you, right?
6     A.    Correct.
7     Q.    Is that consistent with the
8 practice that you described when receiving
9 reports about concerns about ACN?
10    A.    Yes.  I believe I had mentioned
11 that just earlier, that if I had some kind
12 of negative inquiry, I would -- my first
13 reaction was to send it on to Anne and let
14 her address it.
15    Q.    Got it.
16         Can you recall any process at any
17 time, either from you or by The Trump
18 Organization, to address those concerns
19 other than correspondence and communication
20 with Ms. Butcher?
21    A.    No, I can't.  No, I do not.
22    Q.    I also want to go back to one
23 other piece of testimony from this morning.
24         You remember referring to the

Page 141
Graff - Confidential

1 Police Athletic League as a charity that
2 Mr. Trump had a relationship with or some
3 affinity for and that may have come up in
4 connection with ACN?
5     A.    Correct.
6     Q.    We will mark that Exhibit 18.
7         (Exhibit 18, document, Bates
8         stamped TTO_003695, marked for
9         identification, as of this date.)
10    Q.    Exhibit 18 is an email produced
11 by defendants with the Bates number
12 TTO_003695.
13         Again, we are jumping around a
14 little bit in time, but this is an email
15 from May of 2012 from a Jami Landi, the
16 director of development at the Police
17 Athletic League, and it is addressed to
18 you, right?
19    A.    Correct.
20    Q.    And the subject line reads,
21 "Rhona, can you pass on to Mr. Trump,"
22 right?
23    A.    I don't even -- I don't know what
24 an IBO is.  Okay.

Page 166

Graff - Confidential

didn't deal with Success directly. Best of my recollection, it was usually Anne Archer who generated a story about it. You know, she would send it to us to review. We would look through it, make sure that we were comfortable with what the content was, maybe edit a little bit, and then, ultimately, she would be given the okay to proceed.

Q. Who at the organization typically led that work, to review and potentially edit those articles?

A. To the best of my recollection, I did, to a degree. Meredith did, to a degree. And we would often show it to one of our attorneys to look through as well, to the best of my recollection.

Q. Do you remember which specific attorney you showed any of those to?

MR. ROBERT: I'm going to instruct the witness, you can give the name of the attorney but not the discussion with the attorney.

A. Correct.

Page 167

Graff - Confidential

There were multiple -- over the course of the many agreements that we had with ACN, there were several different attorneys that I worked with.

Q. Specifically in reviewing Success Magazine articles?

Do you have any specific recollection of sharing a Success Magazine article with an attorney?

A. Not just the articles, with the contracts. Obviously, we had an in-house attorney look at the contracts before they were signed.

But I'm trying to remember the names of the attorneys. If you threw out some names, I could tell you yes, but I'm trying to remember because none of them were there when I left. They had been long gone.

Q. I guess I'm trying to ask, leaving aside the contracts for a moment and focusing specifically on the Success Magazine articles, do you have any specific recollection of sharing a draft of a

Page 168

Graff - Confidential

Success Magazine article with a lawyer?

A. I don't have a specific memory. I think that was my practice, to do that.

Q. You would have done that by email, right?

A. I would have forwarded -- my practice would have been to forward their draft -- Anne Archer's draft of the proposed article and asked them to look through it and see if there were any red flags there that we should be aware of.

Q. Okay.

So you don't have any specific recollection of doing that but believe you may have, and if you did, it would be in the email records, right?

A. It should be. That was my practice. So, hopefully, it's there.

Q. You can't remember the names of any lawyers that were involved with that?

A. Again, if you threw out some names. I mean, I just -- one of them was -- name was Jonathan. I can't remember -- there was a heavyset gentleman.

Page 169

Graff - Confidential

I can't recall off the top of my head. I'd know the names if I saw them, but I just can't recall.

Q. Okay.

So we talked for just a moment here about Success Magazine. I want to go back to The Success Foundation.

Do you recall that entity in any way separate and apart from the magazine or --

A. I just -- I may have known at the time, but now, I can't recall what the distinction was.

Obviously, it's an offshoot or something do with the magazine. I don't really know what the relationship is or was.

Q. If you could try to find Exhibit 10.

A. I have it right here on top.

Q. Perfect.

This is the one -- it's the January 2009 endorsement agreement --

A. Correct.

Page 1

```
 1

 2   UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ---------------------------------------X
     CATHERINE MCKOY, MILLARD WILLIAMS,
 4   MARKUS FRAZIER, and LYNN CHADWICK
     individually and on behalf of all
 5   others similarly situated,              Index No.
                                             1:18-cv-09936-
 6                     Plaintiffs,           LGS
              v.
 7
     THE TRUMP CORPORATION, DONALD J. TRUMP,
 8   in his personal capacity, DONALD TRUMP
     JR., ERIC TRUMP, and IVANKA TRUMP,
 9
                       Defendants.
10   ---------------------------------------X

11                  ** CONFIDENTIAL **

12

13      VIDEOTAPED DEPOSITION OF AMANDA MILLER

14               New York, New York

15             Monday, June 27, 2022

16

17

18

19

20

21

22

23   Reported by

24   JEFFREY BENZ, CRR, RMR

25   JOB NO. 212683
```

Page 158

Miller - Confidential

date.)

THE WITNESS: Thank you.
MR. ROBERT: This is 14?
MR. BARKAI: Yes, this is Exhibit 14.
A. Okay.
Q. All right. Ms. Kennedy, you've been handed a document that's been marked as Exhibit 14. It's Bates-stamped ACN 001078 through 1079. This is a document that's been produced by ACN to both parties, both plaintiffs and defendants.
    Looking at the first email here, the email from Maryann Klustner on March 26, 2014, do you know who that is?
A. I don't.
Q. You didn't know her before she sent this email to you?
A. I did not.
Q. Do you know why she sent this email to you in particular?
A. It could have gone through the press inbox at the Trump Organization and been forwarded to me. I'm not sure.
Q. Were emails from the press inbox

Page 159

Miller - Confidential

generally forwarded to you?
A. Yes.
Q. Were you the only person to whom they were forwarded?
A. I don't know.
Q. But consistently emails from the press inbox would go to you?
A. Yes.
Q. Do you recall this email?
A. I don't.
Q. Did you receive a lot of complaint emails like this in your position at the Trump Organization?
A. I don't know.
Q. Do you recall getting emails like this about ACN being a scam?
A. I don't know.
Q. Do you see that this email refers to ACN as a scam?
A. I see that, yes.
Q. Do you recall getting emails about ACN being a pyramid scheme?
A. I do not recall.
Q. You see that this email refers to ACN

Page 160

Miller - Confidential

as being a pyramid scheme?
A. I see that, yes.
Q. Does this strike you, looking at this email, like this was the first time that that had ever occurred or like it might have occurred at other times? Give me a sense of how often you think that might have been happening in 2014.
A. I truly do not know.
Q. What, in your words, is a pyramid scheme?
A. I don't know, actually.
Q. Would it have concerned you at the time, in 2014, to receive an email like this stating that ACN was a scam or a pyramid scheme?
A. Because I didn't -- don't -- today -- at the time and today don't know much about ACN's business. It probably -- I wouldn't have really thought too much about it, honestly.
Q. At the time -- sorry. Go ahead. Are you finished?
A. No. I think often in business there could be individuals who are upset with the outcome of something, so, in business, I -- you

Page 161

Miller - Confidential

know, again, I don't know the details of this, and I wasn't familiar with ACN's business and so I don't know this individual, so I had no reason to believe either way anything about this.
Q. At the time, though, in this time period, you had an understanding that there was some relationship between Donald Trump and ACN, right?
A. That's correct.
Q. So, would it not have concerned you to receive an email indicating that ACN was a scam or a pyramid scheme?
A. Obviously, I -- I read email and forwarded it on to the person who I thought handled the ACN relationship. Again, because I did not know much about them as a business, it wouldn't have concerned me, because I don't -- I didn't really know anything about them, and it wouldn't be uncommon for people to file complaints or express complaints about something.
    So I -- again, because I don't know who Maryann was, I wasn't sure the validity of her claim, so I forwarded it along to the person

Page 162

Miller - Confidential

who worked on the ACN stuff.
Q. And that was who?
A. Rhona Graff.
Q. Did you investigate whether it was true that ACN was a scam or a pyramid scheme?
A. I did not.
Q. To your understanding, what would be the standard response or policy from the Trump Organization when you would receive an email like this?
A. I would forward it along to the person who worked on that particular business unit.
Q. What would be an example of doing that in another context?
A. If someone sent a note, and I'll use something positive. If somebody sent a note saying that they have a wonderful experience at Trump Doral and they really enjoyed their time there, I would -- and it just was an unsolicited email that was sent to me, I would forward that along to the hotel general manage and say, FYI, great job.
So it would depend what they were -- what the topic was.

Page 163

Miller - Confidential

Q. And in the case when it wasn't something positive like that but instead was something negative along these lines, do you have an understanding of whether the Trump Organization had any kind of policy to investigate those kinds of complaints?
A. In my role, I would just raise it to the person who was most involved in that business unit.
Q. And in this particular case, do you have an understanding of what the follow-up was from the email that you sent on to Ms. Graff?
A. I don't know.
Q. Now, Ms. Kennedy, after the Trump presidential campaign started in 2015, talk to me a little bit about how work on the campaign intersected with work at the Trump Organization from your perspective.
A. Can you be more specific?
Q. Sure. So, you were working on the campaign a little bit from the -- at least at the exploratory committee stage, right?
A. Yes.
Q. And you're working at the Trump

Page 164

Miller - Confidential

Organization as well, right?
A. That's correct.
Q. So, how did the presence of the campaign at the time inform your work on marketing and branding for the organization?
A. They were separate, from my view, because my work in real estate was supporting our properties across the world, so I still had my duties as the day-to-day marketing person working on brochures, collateral pieces for those developments.
And then anything I did separately for the campaign to provide support for them, really was generally separate, from -- from how I recall.
Q. And then aside from your own day-to-day work, did the existence of the campaign change your approach to marketing and branding strategy?
A. I'm not sure when -- when exactly the time period was, but when Mr. Trump turned over the company to his children, I believe at that period in time we had some changes to our marketing approach. We were no longer using

Page 165

Miller - Confidential

Mr. Trump's image to promote different real estate properties. But I believe that was a -- I'm not sure when exactly that took place.
Q. I believe you said when the Trump Organization received emails through the press email inbox, those emails would end up being forwarded to you, right?
A. Yes.
Q. And then more generally, when the Trump Organization received press inquiries, were those inquiries also directed at you?
A. I'm sorry, can you repeat that?
Q. Sure. When the Trump Organization received press inquiries, were those press inquiries directed at you?
A. Directed at me personally?
Q. Correct.
A. Or were just forwarded to me?
Q. Well, either way. So first, were they directed at you personally? So if a member of the press wanted to speak -- wanted to communicate with the organization, would they do so through you?
A. Yes. If -- if a member of the press

Page 1

```
 1

 2   UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ----------------------------------------X
     CATHERINE MCKOY, MILLARD WILLIAMS,
 4   MARKUS FRAZIER, and LYNN CHADWICK
     individually and on behalf of all
 5   others similarly situated,              Index No.
                                         1:18-cv-09936-LGS
 6                     Plaintiffs,
              v.
 7
     THE TRUMP CORPORATION, DONALD J. TRUMP,
 8   in his personal capacity, DONALD TRUMP
     JR., ERIC TRUMP, and IVANKA TRUMP,
 9
                       Defendants.
10   ----------------------------------------X

11                  ** CONFIDENTIAL **

12

13       VIDEOTAPED DEPOSITION OF MEREDITH McIVER

14                  New York, New York

15               Tuesday, July 12, 2022

16

17

18

19

20

21

22

23   Reported by

24   JEFFREY BENZ, CRR, RMR

25   JOB NO. 213091
```

Page 114

McIver - Confidential

working on a commercial -- I have a little bit of background in advertising.

Someone else does the demographics, the target market, the product placement, the origin of ingredients. I mean, they can -- you could spend three months before you could write a paragraph if you're really getting into the research. And, that's done by a different department.

By the time it gets to me, it's kind of a done deal. I never looked into is this a -- a valid -- is this product valid. Does Coca-Cola hurt people or, you know, do we have an offense issue here, that's really -- that's something else.

So, I kind of viewed it that way, but it was a done deal by the time it got to me. It wasn't for me to go almost insubordinate in a way to go and fact check or double-check. And so that's kind of my position.

Q. But to go back to something you were saying earlier about, you know, you recognize a line about comfort zone, for example.

A. Yeah.

Page 115

McIver - Confidential

Q. Were there certain standard phrases or passages that you thought were appropriate to include in public-facing communications?

A. Think big just keeps coming back because that was just so attached to him. And he used it a lot over the years, even in a later book that he did with someone. And that was sort of his logo in a way. Trump, think big.

That's the one that keeps coming back. Is that what you're asking?

Q. Yeah. I think I'm asking -- what would you do to ensure that a piece of writing that you were asked to review was not only in his voice, in terms of tempo or timbre but also included the sort of substantive message that he wanted to deliver?

A. My involvement on that level, I felt that it wasn't really my position, my role. I didn't -- if something was way off, I guess I'd note it, but I don't remember.

I kind of took it for granted by the time it reached me, that it had been vetted.

Whereas I think a lawyer looking at it or someone might be more concerned with -- I

Page 116

McIver - Confidential

didn't want it to be, you know, hurtful to people or something, but like I said, I -- it wasn't my job to vet or to do the research on certain things.

My work was primarily with book -- book-related things or business things with Robert Kiyosaki, that kind of thing. And Robert already had -- you know, he was quite established, so it wasn't like I was going to go and -- and vet Robert Kiyosaki.

He was, like, brought in and I was told we were going to do a book with him, that kind of thing. I don't know, does that answer it too?

Q. Yeah. Let me -- let me try to -- it does help to answer it, but let me try to ask this a different way.

So, you said earlier, roughly, that there were certain standard sound bites or phrases --

A. Sound bites.

Q. -- that Mr. Trump used?

MR. ROBERT: Objection to form.

But you can answer.

Page 117

McIver - Confidential

Q. Would you agree with that?

MR. ROBERT: You can answer the question.

A. Yes, there -- there were certain things that were, you know, connected to him, or people would say, Oh, that sounds like Donald Trump, that kind of thing.

Q. And again looking at Exhibit 7, you said that the attachments to Exhibit 6 were close enough in message, in addition to tone.

A. Uh-huh.

Q. So, when you were reviewing this, and by "this," I mean the attachment to Exhibit 6, you thought that the substance here was generally consistent with Mr. Trump's standard message. Is that right?

MR. ROBERT: Objection to form.

You can answer.

A. Seemed -- yeah.

For example, even here, he says, Come to New York, we still have them here. So, you know, that kind of thing. That kind of slapdash attitude. That's -- maybe not slapdash, but he would say things like that.

Page 130

McIver - Confidential

Q. Do you know what Success From Home Magazine is?
A. No.
Q. Is it attached to Success Magazine?
A. I --
Q. Oh, I don't know. I'm sorry, I don't know. I don't know.
MR. ROBERT: He's the one asking the questions.
A. No, I don't recall this magazine.
Q. Okay. What -- what -- do you recall -- do you know what the relationship between ACN and Success From Home Magazine is?
A. No.
If there is one, I don't know.
Q. Okay. And -- and as we just read, Ms. Marcello wrote to Ms. Graff, Can you please have it approved.
So it appears that The Trump Organization would approve these articles for Success Magazine. Is that right?
A. It would seem that way, yeah.
Q. And who The Trump Organization had authority to approve them?

Page 131

McIver - Confidential

A. I would say whoever -- well, I guess Rhona and me, possibly. I don't remember, say, reading this.
And I don't know how ACN came in, if it came through licensing department or ACN -- I mean -- Cathy Glosser and licensing. I don't recall how it arrived.
So a lot of times, things, if they came from another department, say the golf department or something came in, they would have first eyes on it. So I don't know who would read this first in our group, whether it would be licensing, Rhona, me, all of us.
Q. But then eventually it would come to you?
A. I would say most of the time it would come to me.
Q. And just going back to Exhibit 10, if you look at the top email in the chain, this appears to be an email from Ms. Graff to you dated May 15, 2013.
Do you recognize this email?
A. I don't -- I just don't remember it. It was a long time ago.

Page 132

McIver - Confidential

Q. But there's no reason to think you didn't actually receive this email, right?
A. No, I can't imagine -- I may have like, you know, glossed over it, depending on what I was doing.
But -- yeah.
Q. And Ms. Graff wrote, Mer, can read and edit if necessary. Let me know what you think of this.
Did you review this article?
A. I may have. I really can't recall if I did or not.
Q. Generally, if Ms. Graff sent something to you and asked you to review it, would it be your normal practice to review it?
A. Oh, yes, yeah.
Q. What was the process for reviewing these types of pieces for accuracy?
A. Oh.
I have to say when it came to accuracy, or vetting, it wouldn't be me. Because I really did look at it more from a not necessarily cosmetic standpoint, but that it kind of sounded like him, that the tone was

Page 133

McIver - Confidential

right, but I didn't delve into what was being said necessarily.
I -- I'm not going to check, I'm not going to fact check, because I didn't have the time. I didn't feel it was my -- my position.
Q. Do you have an understanding of whose job it was to fact check things?
A. No. I don't know. Legal, it seems to me, would have -- would review.
Q. Do you know if legal reviewed this piece, for example?
A. No. And I think most of the time it's like the deals were -- some things that are a little more heavy duty, heavyweight, would require that more.
I just -- actually I never thought about it. I would just, like -- if it lands on my desk, I figure, you know, it's okay, it's good to go. Just look at it and make sure there aren't glaring mistakes or typos or the wrong words, that kind of thing.
Like I said, it was a little cosmetic in that sense, from my standpoint, from what I was doing.

1

2              UNITED STATES DISTRICT COURT

3          FOR THE SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------------------X

5    CATHERINE MCKOY, MILLARD WILLIAMS,

6    MARKUS FRAZIER, and LYNN CHADWICK

7    individually and on behalf of all

8    others similarly situated,          Index No.

9                                        1:18-cv-09936

10                 Plaintiffs            (LGS)

11              v.

12   THE TRUMP CORPORATION, DONALD J. TRUMP,

13   in his personal capacity, DONALD TRUMP

14   JR., ERIC TRUMP, and IVANKA TRUMP,

15                 Defendants.

16   ---------------------------------------X

17

18               ** CONFIDENTIAL **

19       DEPOSITION OF CATHY HOFFMAN GLOSSER

20               September 14, 2022

21

22

23   Reported by:

24   MARY F. BOWMAN, RPR, CRR

25   JOB NO. 216654

```
                                                Page 54                                                  Page 55
 1            Glosser - Confidential                      1            Glosser - Confidential
 2        You can answer.                                 2   that interim period where you were sort of
 3    A.  I mean, I don't know what you've                3   covering for Ms. Foerderer?
 4   seen.                                                4    A.   Yes.
 5    Q.  I mean the ones we have looked at               5    Q.   And you can see in the top email
 6   together, where there were the USA Today             6   on the page that's the last email in the
 7   thing --                                             7   chain, you write to Ms. Butcher, "I met
 8    A.  Yes, I don't recall seeing                      8   with Donald today and we are prepared to
 9   anything else.                                       9   move forward."  Right?
10    Q.  All right.  Let's look at one                  10    A.   Yes.
11   more email from this period.                        11    Q.   Do you recall the discussion or
12            (Exhibit 5, document, Bates                12   the meeting with Mr. Trump that is
13        stamped TTO_007351, marked for                 13   referenced there?
14        identification, as of this date.)              14    A.   I do not.
15    Q.  Okay.  Ms. Glosser, Exhibit 5 is               15    Q.   Okay.
16   another email produced to us in hard copy           16            In the second paragraph, you
17   from The Trump Organization's files.  This          17   write, "I believe we discussed your sending
18   one bears the Bates TTO_007351.                     18   me some information on ACN for our files.
19            This is kind of late January,              19   I know you said that they are a
20   2006, an email exchange between you and             20   telecommunications company, but I would
21   Anne Archer Butcher.                                21   really like some background information on
22            Do you see that?                           22   them.  I think you had said that Norma was
23    A.  Yes.                                           23   sent some info.  Would you please be kind
24    Q.  Is this -- as best you can recall              24   enough to forward information to my
25   or infer from the document, is this during          25   attention.  I appreciate it."

                                                Page 56                                                  Page 57
 1            Glosser - Confidential                      1            Glosser - Confidential
 2            Do you see that?                            2   recall ever receiving information beyond
 3    A.  Yes.                                            3   what we have seen in the emails we have
 4    Q.  I guess a couple of questions.                  4   looked at so far?
 5            So first, when you say, "I think            5        MR. ROBERT:  Objection to form.
 6   you had said that Norma was sent some                6            You can answer.
 7   info," do you know whether you were                  7    A.   Yeah, I don't recall.
 8   referring to the information that we have            8    Q.   Did you ever see -- we talked a
 9   seen in Ms. Foerderer's files, these USA             9   bit in the licensing context how you might
10   Today clippings and other blurbs and                10   diligence a potential partner.
11   information?                                        11            With respect to ACN, did you ever
12    A.  I have no idea what it's                       12   see product manufacturing information,
13   referring to.                                       13   company financials, those sorts of
14    Q.  Were you aware of any information              14   documents or information?
15   beyond that, as best you can recall?                15    A.   I don't recall.
16    A.  No.                                            16    Q.   Okay.
17    Q.  It sounds like you're essentially              17            (Exhibit 6, document, Bates
18   asking Ms. Butcher to resend to you                 18        stamped TTO_000616, marked for
19   whatever she had previously sent to                 19        identification, as of this date.)
20   Ms. Foerderer, is that how you read that?           20    Q.   Okay.  Exhibit 6 is a document
21    A.  Correct.                                       21   produced to us by The Trump Organization
22    Q.  Do you know whether she actually               22   with the Bates TTO_000616.
23   did send you any information about this?            23            This is a memo from you to Allen
24    A.  I have no idea.                                24   Weisselberg and some others, including a
25    Q.  Is it fair to say then you don't               25   copy of a signed endorsement agreement with
```