# EXHIBIT 7

Page 1

1                    David Merriman

2           UNITED STATES DISTRICT COURT

3        FOR THE SOUTHERN DISTRICT OF NEW YORK

4     CATHERINE MCKOY, MILLARD

5     WILLIAMS, MARKUS FRAZIER, and

6     LYNN CHADWICK individually and

7     on behalf of all others

8     similarly situated,           Index No.
                                    1:18-cv-09936-LGS
9                 Plaintiff

10    Vs.

11    THE TRUMP CORPORATION, DONALD J.

12    TRUMP, in his personal capacity,

13    DONALD TRUMP JR., ERIC TRUMP,

14    and IVANKA TRUMP,

15                Defendants.

16

17              Videotape Deposition of
                     David Merriman
18              Thursday August 18, 2022
                     At 9:48 a.m.
19

20

21
      Reported by LeShaunda Cass-Byrd, CSR, RPR
22

23

24

25    JOB NO. 215262

Page 186

David Merriman

2  A.    But they were inviting -- they were open to
3  all IBOs if they chose to -- to come.
4  Q.    Got it.
5        And that was the name we saw in like the
6  Detroit flier, for example, or some of the other
7  documents, right, international event?
8  A.    Yes.
9  Q.    Okay.  In paragraph 6, you can see that
10 Mr. Trump grants ACN a royalty free license to use the
11 video, as well as recordings of the speeches, but
12 solely for purposes of promoting ACN to current or
13 perspective IBOs; is that right?
14 A.    Yes.  That is what it says.
15 Q.    And ACN did, in fact, use that content in
16 the opportunity disc and another ACN created
17 promotional materials we've talked about this morning?
18 A.    Yes.
19 Q.    Okay.  You can put that to the side for a
20 moment.  I would ask you, this is one of those I will
21 ask you to keep handy, because we may look back at it.
22 A.    Okay.
23       (Plaintiff Exhibit 22 was marked for
24    identification.)
25       MR. QUINN:  Give us just a moment.

Page 187

David Merriman

2  There is an attachment to it, put them
3  together.
4        It's the attachment you can see
5  reflected here.
6        MR. ROBERT:  So this is -- both is
7  Exhibit 22?
8        MR. QUINN:  Correct.  These are all
9  together.  You can see the Bates are
10 sequential and the cover note refers to an
11 attachment.
12 BY MR. QUINN:
13 Q.    All right.  Let's look first at the cover
14 e-mail, this is a February 2006 e-mail from Allan Van
15 Buhler to Chip Barker, copied to Greg Provenzano and
16 Robert Stevanovski, right?
17 A.    Yes.
18 Q.    And February 2006, that is when this
19 endorsement agreement that we just looked at,
20 Exhibit 21, was executed, right?
21 A.    Yes.
22 Q.    So these are just a few days apart.
23       Okay.  And Mr. Van Buhler says, "I met with
24 the founders" -- just pause there.
25       Is that, again, generally consistent with

Page 188

David Merriman

2  your understanding that the -- the four founders we've
3  talked about had the decisionmaking authority with
4  respect to the Trump/ACN relationship?
5  A.    Yes.
6  Q.    Okay.  And he says, "Met with the founders
7  late this afternoon, and we agreed on the attached
8  plan," right?
9        Do you see that there?
10 A.    Yeah.  I see that.
11 Q.    All right.  So let's look at the
12 attachment.
13 A.    Okay.
14 Q.    This is an Excel sheet that was produced
15 natively, but we've gone ahead and printed it because
16 this one is much more manageable than some of the ones
17 we looked at this morning.
18       This is a spreadsheet that, first, up at
19 the top, reflects the contractual payment obligations
20 that we just talked about, right, a million dollars
21 for a video recording, and then another million
22 dollars for three speaking -- speaking at three
23 events?
24 A.    Yeah.  It's a total of a million dollars.
25 I'm not sure the timing was all February.  But, yes, a

Page 189

David Merriman

2  total of a million dollars.
3  Q.    Right.  But the -- just the basic
4  architecture, a million for the video taping and a
5  million for three speaking events.  That is the same
6  basic structure reflected in the endorsement
7  agreement?
8  A.    Yes.  That's correct.
9  Q.    And then the second part of this
10 spreadsheet is a -- I mean, is this a forecast, or a
11 projection of CD/DVD sales?
12 A.    Well, that's what the e-mail says, that
13 it's a forecast.
14 Q.    Right.  So this -- this was a projection of
15 sales from ACN to IBOs of CDs or DVDs featuring
16 Mr. Trump, right?
17 A.    That is what it says.

Page 190

David Merriman

2  (Reporter clarification.)
3
4   A.   That is what Allan Van Buhler was
5  forecasting, yes.
6   Q.   Okay. And that's -- as he says in his
7  e-mail, this was the plan that the founders agreed on,
8  right?
9   A.   That is what it says, yes.
10  Q.   And was this the ACN opportunity disc, or
11 some other recording of Trump footage, if you know?
12  A.   I'm not sure.
13  Q.   Okay. Well, let's look at the -- let's
14 look at another document that is a few months later.
15      (Plaintiff Exhibit 23 was marked for
16      identification.)
17 BY MR. QUINN:
18  Q.   Okay. So we've now handed you Exhibit 23,
19 which is a document produced by ACN with the Bates
20 ACN008438. I'm looking at the start of the chain.
21 This is a October 24th, 2006, e-mail, so about eight
22 months later from Sheila Marcello to four founders,
23 Allan Van Buhler, and Dave Stevanovski, right?
24  A.   That is what it says. Yes.
25

Page 191

David Merriman

2
3   A.   That is what it says. Yes.
4   Q.   So just drawing the inference, would this
5  appear to be the actual results that -- in the last
6  e-mail Mr. Van Buhler was sort of trying to forecast?
7   A.   That or similar.
8   Q.   Okay. And here, you can see kind of across
9  the first and second page, there is a table that
10 calculates numbers of discs sold and, you know,
11 various channels. But at the bottom of the first
12 page, you can see the heading is Opportunity Discs,
13 right?
14  A.   Oh, yes. Yes.
15  Q.   Okay. So the subject line says, "Trump
16 Discs," the actual table says "Opportunity Discs."
17 Doesn't that indicate to you that, you know, these
18 various e-mails discussing Trump CD/DVD or Trump discs
19 are references to the opportunity disc?
20  A.   Well, this one is clear. I'm not positive
21 about the other ones.
22  Q.   Are you aware of any separate Trump CD or
23 DVD that was something, other than the opportunity
24 disc?
25  A.   I'm not.

Page 192

David Merriman

2   Q.   Okay. And is it fair to say the
3  opportunity disc, starting in 2006 and continuing on,
4  featured Mr. Trump?
5   A.   I'm not sure exactly when we started
6  selling those discs with the feature that included
7  Mr. Trump.
8   Q.   Okay.
9   A.   Or President Trump.
10
11
12
13  Q.   Okay. All right. You can put that to the
14 side.
15      So we were looking at a February 2016 -- or
16 excuse me, February 2006 contract which included both
17 video and live events, and I think we saw that was
18 signed on February 6th, 2006. ACN then announced
19 Mr. Trump's endorsement a few days after that at an
20 event in Fort Worth, Texas; is that right?
21  A.   That wasn't the first event that he
22 attended. It wasn't in Fort Worth, so I'm not sure of
23 that timing.
24  Q.   So I agree with you, the first event he
25 attended, I think, was in Baltimore a little later in

Page 193

David Merriman

2  2006; is that right?
3   A.   The first event was Baltimore. Yes.
4   Q.   Okay. So I think this was an earlier event
5  at which ACN announced that he would -- that he was
6  endorsing the company and would be at future events;
7  does that right?
8   A.   Okay. I'm not sure. We would have
9  announced him. I'm not sure when and where we did
10 that.
11  Q.   Okay. But no reason to dispute that it was
12 February 2006?
13  A.   I don't have reason to.
14  Q.   Okay. Let's just look at a couple of
15 e-mails.
16      (Plaintiff Exhibit 24 was marked for
17      identification.)
18 BY MR. QUINN:
19  Q.   All right. Exhibit 24 is an e-mail
20 produced by ACN with the Bates ACN004319.
21      Do you see the first e-mail in that chain
22 is an e-mail from Rob Hoops to a whole long list of
23 people at ACN, including you, from February 16th,
24 2006?
25  A.   Yes. I see that.

Page 210

David Merriman

BY MR. QUINN:
Q. Okay. So I will just, on the record here, reserve all rights because this is all very new information. And let me just ask a number of follow-up questions about that.
First, you said that there was a meeting in Mr. Trump's office with President Trump. Was that the February 2016 meeting for which -- or February 2006 meeting for which we saw the draft thank-you note to Kathy Glosser?
A. I don't know.
Q. So you don't know when that meeting took place?
A. No, I don't.
Q. You said that an individual associated with The Trump Organization made some sort of follow-up requests for documents; is that right?
A. Follow up, and they had some discussions, some questions, and then they requested documents from that phone call.
Q. Who was that individual, The Trump Organization?
A. Robert, and I do not recall.
Q. Is there any other source of information

Page 211

David Merriman

about who that individual might have been?
A. No that we would have, no.
Q. Do you know if that request was made verbally or in writing?
A. It was verbal.
Q. It was a verbal request?
A. It was a phone call.
Q. What specific documents were requested?
A. I don't know if he gave me details in terms of the documents requested. But I think there was some information -- they just want some information on the company, that sort of thing.
Q. When you say "he gave me details," you mean Mr. Stevanovski may know the answer to that question but didn't tell you what it was?
A. No, I'm saying, he may have said what some of those were -- some of those things were, but I don't recall exactly what he said in terms of, if there were specific documents that he said he provided. But they provided information that was requested.
Q. Let's just stick with the question. We will come to the provision in a second. Just tell me, as best you can remember, what Mr. Stevanovski told

Page 212

David Merriman

you were the categories or specific documents requested?
A. He said that there was information that was requested about the company. So I assume that may have been -- or I interpreted that, or he said something along the lines of, you know, what do we do, who do we sell with. You know, there may have been some financial information or other information requested, but just, you know, general information about the company.
Q. Yeah, you're using words like may have, so I need to just back up and be very clear here. What exactly did Mr. Stevanovski tell you was requested?
A. He had a conversation with that individual, and based on their discussion after answering certain questions, certain information was requested and those documents were sent to him.
Q. And did Mr. Stevanovski tell you what information was requested, leaving aside any suggestions that you might have about what's possible, did he say anything more than certain information was requested?
A. If he did, I don't recall that detail.
Q. Okay. And then, let's turn to the

Page 213

David Merriman

provision. Do you know, as ACN's representative, what, if any, documents or categories of documents were actually provided?
A. No, I don't.
Q. How would that information have been provided, by e-mail?
A. Oh, no. I think it was information that was sent to him.
Q. In what form, how was that information sent?
A. Basically, it was paper documents that were sent.
Q. So someone sent by FedEx, something like that?
A. Likely, yes.
Q. How many documents?
A. He didn't specify.
Q. What categories or subjects of documents?
A. He didn't specify.
Q. So an unknown number of pages, unknown categories, unspecified documents, were sent in some sort of box or envelope to The Trump Organization?
A. That's my understanding, yes.
Q. And Mr. Stevanovski might know more about

Page 214

David Merriman

what those were, but you don't have any more information about them?

A. Yeah, he didn't seem to recall any more details about it.

Q. Do you know whether that included any information about IBO earnings, enrollment numbers, average length of time with the company, anything about the IBO experience?

A. I don't.

Q. Any reason to believe one way or the other?

A. No.

Q. Other than what you're describing here -- well, I guess, let me ask you this. Just looking back at your declaration where you wrote any inquiries to into ACN's products or services likely would have been verbal and not recorded, do you stand by that as accurate, even following this conversation with Mr. Stevanovski?

A. Yeah, my understanding is that if he asked questions about the product or services, you know, Mr. Stevanovski would have been able to answer. We offer Flash Wireless services, we used Sprint, we use Verizon, you know, so we sell for other big name companies. So I'm sure when the person was asking for

Page 215

David Merriman

information, they wanted to know who we were doing business with, because those companies wouldn't just do business with, you know, any company.

So you know we were already doing -- had contracts and did business with some very large telecommunications and home services companies in the country and in the world.

Q. Okay. I'm just going to, again, on the record, reserve all rights as a lot of repetition of conversation, and I think some statements there about what may have been in mind of The Trump Organization person. So I'm just going to reserve all rights with plaintiffs with respect to that testimony.

There is also, as this paragraph in your declaration in paragraph 10 goes on, it says, "ACN is aware that on at least one occasion, ACN's videophones were provided to Donald Trump and his family for their use personally and in a promotional video. And videophones also were provided in connection with ACN's appearances on the Celebrity Apprentice," right?

A. Yes.

Q. And then the next sentence reads, "In addition, during the period 2005 to 2016, information related to ACN's products and services was publicly

Page 216

David Merriman

available through ACN's website, all of which would have been accessible to defendants," right?

A. Correct.

Q. Is that the sort of information that was sent to The Trump Organization that you're now describing and copying?

A. What type of information?

Q. The type that you describe here, information related to ACN's products and services that was publicly available through ACN's website?

A. So the different products and services we sold, you know, obviously, would have been -- it would have been pointed out to them if those were available there. There may have been more information sent as well, but -- and then there probably would have been more information, too, in terms of the companies that we dealt with or were under contract with outside of the U.S.

Q. All right. So you said both may have and probably in that answer. I'm going to just ask you to only say what you know in terms of what actually happened, and if you don't know that's fine.

Do you know whether information about ACN's products, services, or IBOs was sent to the defendants

Page 217

David Merriman

that was nonpublic information?

A. I don't know.

Q. You're not aware of any such information that was sent?

A. I'm not aware if it was or wasn't sent.

Q. Okay. All right. We can put those to the side.

We talked a bit earlier about ACN's relationship was Success from Home magazine?

Do you remember that?

A. Yes.

Q. And following the execution of this first agreement in 2006, at various times, ACN also facilitated the placement of content featuring Mr. Trump or other members of his family or organization in Success from Home magazine, right?

A. I believe those were the same. So when ACN had a contract with Success from Home magazine to be featured, I believe that's when the Trumps were also included in that.

Q. Got it. So from 2006 through, let's say, 2016, insofar as ACN was featured Success from Home magazine, it's your understanding that all of those features also featured included the Trumps.

```
                                                   Page 222
 1                       David Merriman
 2   live events, that contract didn't -- didn't require or
 3   contemplate features or appearances from Success from
 4   Home magazine, did it?
 5       A.    No, it did not.
 6       Q.    So this was essentially a -- a favor or an
 7   additional proposal ACN was making, and that at least
 8   at first, The Trump Organization was sort of pushing
 9   back on, right?
10       A.    Well, something ACN proposed, and based on
11   this, initially in November of 2006, they said -- I
12   don't know when the decision changed.
13       Q.    Okay.  Let's move forward in time a little
14   bit.
15             So we've looked at the 2006 agreement.  I
16   want to make sure that we get through all of them
17   today.  You're aware that following the 2006
18   endorsement agreement, ACN and Donald Trump executed
19   another agreement in February of 2008?
20       A.    Yes.
21       Q.    Before we mark the agreement itself, in the
22   lead up to that agreement being executed, did anyone
23   at The Trump Organization raise with ACN any concerns
24   about reputational issues or so-called mixed reports?
25       A.    I don't recall that, no.
```

```
                                                   Page 223
 1                       David Merriman
 2       Q.    Okay.
 3             (Plaintiff Exhibit 29 was marked for
 4       identification.)
 5   BY MR. QUINN:
 6       Q.    Okay.  Exhibit 29 is a document produced to
 7   us by The Trump Organization with the Bates
 8   TTO-000591.
 9             Do you see that?
10       A.    Yes.
11       Q.    And it appears to be a hard copy file that
12   was retained.  You can see there's a little bit of
13   writing and check marks on it, but the document itself
14   also appears to be an executed agreement, right,
15   signed both by Robert Stevanovski and Donald Trump and
16   entered into in February of 2008?
17       A.    Yes.
18       Q.    All right.  If you look at paragraph 1,
19   paragraph 1, again, contemplates Mr. Trump filming a
20   video, right, participating in the production of video
21   content?
22       A.    Yes.
23       Q.    He's also this time agreeing to film what
24   are called video pick ups, right, the shorter videos
25   that ACN can use at events or other places like that?
```

```
                                                   Page 224
 1                       David Merriman
 2       A.    Yes.  I see that term referenced, yes.
 3       Q.    And this time, in exchange for that, ACN
 4   pays Mr. Trump 2.2 -- sorry -- $2.25 million, right?
 5       A.    Yes.
 6       Q.    That's more than double the fee for the
 7   video-recording portion in the last contract, right?
 8       A.    Yes.
 9       Q.    Do you know whether that increase in fee
10   was requested by Mr. Trump or The Trump Organization,
11   where that change came from?
12       A.    I don't know.
13       Q.    Okay.  But ACN was willing to pay the
14   higher fee, right?
15       A.    Yes.
16       Q.    And was that because, as of this time,
17   February of 2008, ACN was finding that its -- its
18   endorsement agreement relationship with Mr. Trump was
19   successful and positive for ACN?
20       A.    Well, based on the fact that we had a
21   signed agreement, it must have been -- it was being a
22   positive thing for ACN, yes.
23       Q.    Okay.
24       A.    So we renegotiated and extended, pursuant
25   to agreement to be -- or perfect --
```

```
                                                   Page 225
 1                       David Merriman
 2             (Reporter clarification.)
 3       A.    Well, perfect in my language with that.
 4   It's not an extension, but it was a new agreement.
 5       Q.    And if you -- if you sort of look through
 6   this agreement, there's no reference in this one to
 7   live events.
 8             Do you know -- do you know why that is?
 9       A.    I don't know why that is, no.
10       Q.    Okay.  If you look at the second page,
11   then, in paragraph 9, it says that ACN will pay an
12   additional 3,330 -- I am sorry -- it will pay an
13   amount a little over $300,000 -- that's a series of
14   3's -- in order for Mr. Trump to satisfy his remaining
15   obligation under the 2006 agreement, i.e., to appear
16   at a third speaking event.
17             Is that how you read that?
18       A.    Yes.
19       Q.    And just to be clear, then, the February
20   2006 agreement called for three events, and by the
21   time this February 2008 agreement was signed, it looks
22   like Mr. Trump has spoken at two, and is now
23   contracting to speak at the third?
24       A.    Correct.
25       Q.    Okay.
```

Page 278

David Merriman

2  A. Correct. Correct.
3  Q. Okay. So this appearance for ACN in March
4  of 2009, it was sort of a major event for the company,
5  right?
6  A. Yes.
7  Q. It created a lot of marketing buzz and, you
8  know, just buzz around ACN at the time, right?
9  A. Yes. Yes.
10 Q. And it helped -- I mean, it increased IBO
11 recruiting numbers pretty significantly, right?
12 A. Yes. It had an impact, yes.
13 Q. Would you describe it as significant -- as
14 significant impact?
15 A. I mean, it was good, but I know it was
16 good.
17 Q. All right. I want to actually -- we are
18 going to jump ahead in time a little bit. I'm going
19 to look at a clip from the 2011 episode where there
20 was discussion about the 2009 episode and the impact
21 that it had.
22     MR. ROBERT: Can we take five minutes
23   whenever are you are at a good point?
24     MR. QUINN: Why don't I do this clip,
25   and then we take a break.

Page 279

David Merriman

2     MR. ROBERT: Fine.
3  BY MR. QUINN:
4  Q. All right. So per usual practice here, we
5  are going to mark Exhibit 46.

[redacted]

Page 280

David Merriman

[redacted]

8  Q. All right. Let's take a break.
9     THE VIDEOGRAPHER: The time on the
10   monitor is 4:40 p.m., and we are off the
11   record.
12    (Recess taken.)
13    THE VIDEOGRAPHER: The time on the
14   monitor is 4:52, and we are back on the
15   record.
16 BY MR. QUINN:
17 Q. All right. Let's -- we have been talking
18 about the 2009 Celebrity Apprentice episode. Let's
19 move forward into 2010. Do you recall that regulators
20 in the State of Montana commenced a regulatory
21 proceeding involving ACN in 2010?
22 A. Yes.
23 Q. And did ACN ever receive any diligence or
24 information requests from The Trump Organization
25 concerning those proceedings or any allegations made

Page 281

David Merriman

2  in those proceedings?
3  A. I don't recall what the correspondence was
4  with The Trump Organization about them.
5  Q. All right. Well, again, you're a 30(b)6
6  witness, so on behalf of the company, to the best of
7  your knowledge and information, were there any
8  diligence or information requests from The Trump
9  Organization about the Montana proceedings?
10 A. I just recall that we did -- things were
11 resolved, which was quickly. We made them aware of
12 that at the time.
13 Q. So when you say I just recall, then does
14 that mean that you're not aware of, despite your
15 experience and preparation, of any requests from them
16 for information about those allegations or
17 proceedings?
18 A. I recall that there was a conversation with
19 The Trump Organization before. And then once it was
20 resolved, which was just a couple of weeks later,
21 letting them know that it was resolved.
22 Q. Was that conversation initiated by ACN or
23 requested by The Trump Organization?
24 A. I don't recall who initiated. We probably
25 -- ACN probably initiated it.

Page 318

David Merriman

2  A.   Yes. Yes.
3  Q.   And if you flip to the last page of the
4  document, there is an attachment. And the heading is
5  "Mutual Termination of Appearance Agreement," right?
6  A.   Yes.
7  Q.   And the third line references the February
8  13th, 2013, agreement that we've seen, right?
9  A.   Yes.
10 Q.   And this is the formal termination of that
11 contract, right?
12 A.   That is correct.
13 Q.   And it's agreed as of June 20, 2015?
14 A.   Yes.
15 Q.   And signed by both Robert Stevanovski and
16 Donald Trump, right?
17 A.   Yes.
18 Q.   Okay. So that was -- that was after
19 Mr. Trump announced that he was running for president,
20 right?
21 A.   Correct.
22 Q.   And can you describe what the nature of the
23 discussion was about the termination and why that came
24 about.
25 A.   Well, Mr. Trump would be running for

Page 319

David Merriman

2  president, so he couldn't continue to fulfill his
3  duties with the ACN agreement.
4  Q.   Meaning he couldn't appear at live events
5  and --
6  A.   Yes. He would be pretty busy.
7  Q.   At the time that this was signed or
8  afterwards, did ACN re-collect from its IBOs physical
9  opportunities discs, Success from Home magazines,
10 those kinds of materials?
11 A.   We definitely took all of the materials
12 down and stopped selling them and all of that. In
13 terms of collect, I don't recall us collecting any
14 documents. I don't recall exactly what we did then.
15 Q.   Okay. Let's take a look back now, if you
16 can find it, at Exhibit 19 which was the enrollment
17 and drop-off numbers that were part of your
18 declaration. I think it should be labeled as Exhibit
19 19.
20 A.   I thought you told me to save it. Got it.
21 Q.   Okay. All right. So looking, again, at
22 Exhibit 19, which, just for the record, is a one-page
23 document with the Bates ACN 00006785.
24      In June of 2015 -- at the end of June 2015,
25 when that document was signed, [redacted]

Page 320

David Merriman

1  [redacted]
2  [redacted]
3  A.   Right.
4-25 [redacted]

Page 321

David Merriman

1-15 [redacted]
16 Q.   Okay. All right. You can set that to the
17 side.
18      There was one more document attached to
19 your declaration I want to look through.
20      (Plaintiff Exhibit 56 was marked for
21 identification.)
22 BY MR. QUINN:
23 Q.   Either attached to your declaration or
24 otherwise produced to us. So I'm marking this
25 document now for the first time.

```
                                                              Page 1
 1            UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4   ----------------------------------------X

 5   CATHERINE MCKOY, MILLARD WILLIAMS,

 6   MARKUS FRAZIER, and LYNN CHADWICK

 7   individually and on behalf of all

 8   others similarly situated,         Index No.

 9            Plaintiffs,               1:18-cv-09936-

10            v.                        LGS

11   THE TRUMP CORPORATION, DONALD J. TRUMP,

12   in his personal capacity, DONALD TRUMP

13   JR., ERIC TRUMP, and IVANKA TRUMP,

14            Defendants.

15   ----------------------------------------X

16

17               ***CONFIDENTIAL***

18         DEPOSITION OF ANNE ARCHER BUTCHER

19                 AUGUST 23, 2022

20

21   REPORTED BY:  PATRICIA Y. SCHULER, CSR NO. 11949

22

23

24

25   JOB NO. 215263
```

Page 50

1  THE WITNESS: I can't recall.
2  BY MR. QUINN:
3  Q. Leaving aside the specific dates of
4  specific agreements, do you recall that there were
5  a couple video shoots with Mr. Trump --
6  A. Yes.
7  Q. -- or ACN?
8  A. Yes.
9  Q. The practice for those sorts of shoots,
10 was it that ACN in collaboration with you would
11 prepare an initial draft of bullet points or
12 scripts or those sorts of things for Mr. Trump's
13 consideration and review?
14     MS. DAVIDIAN: Object to form.
15     THE WITNESS: Could you repeat your
16 question, please?
17 BY MR. QUINN:
18 Q. Yeah. In fact, let me ask it
19 differently. For a video shoot like that, what was
20 the process of preparing talking points and scripts
21 and guides for the video shoot?
22     MS. DAVIDIAN: Object to form.
23     THE WITNESS: It depended on the
24 particular video shoot.
25 BY MR. QUINN:

Page 51

1  Q. Okay. Well, let's start with the 2006
2  one. How did that one work?
3  A. The talking points that ACN might like,
4  they gave me, and then it was given to Mr. Trump's
5  office to review. And some of them were not
6  acceptable, some of them were, but, of course, this
7  thing allows him to be spontaneous and answer only
8  what he wants anyway, so they were only conceptual.
9  BY MR. QUINN:
10 Q. Right. Edits could be made on the spot,
11 too, right, the day of in the teleprompter and that
12 sort of thing?
13     And you understand -- what was the video
14 footage for, in your understanding? What was the
15 filming for?
16     MS. DAVIDIAN: Object to form.
17     THE WITNESS: I negotiated the filming so
18 that we could announce to the ACN independent
19 representatives that he was going to be at their
20 event, their next event.
21     The events were very educational, but,
22 you know, if Tony Robbins was going to be there,
23 you would use footage of Tony Robbins. It would be
24 generic footage, but this is trying to move into a
25 nongeneric sort of presentation.

Page 52

1  So it was to create that nongeneric, he's
2  speaking to ACN. He knows who he's speaking to,
3  and he's going to allow it to be used in advance of
4  the event.
5  BY MR. QUINN:
6  Q. It was also utilized in ACN promotional
7  materials, right? DVD and websites and those sorts
8  of things?
9  A. Once we filmed it, I was not responsible
10 for how it was used, other than getting clearance
11 from Trump's organization.
12 Q. Sure. I'm understanding that; just
13 trying to get your understanding of what the
14 purpose of the filming was.
15     So if you look at Paragraph 6 of this
16 contract, you start about four or five lines down,
17 there's a sentence that reads, "ACN's permitted use
18 would include but not be limited to use and
19 activities promoting ACN and its vision to ACN
20 sales representatives or use in sales, training,
21 and motivational aids prepared for ACN's sales
22 representatives"? Right?
23 A. Right.
24 Q. Just above that, it also refers to CDs
25 and DVDs to promote ACN to sales representatives,

Page 53

1  right?
2  A. Right.
3  Q. So you understand that that was also a
4  contemplated purpose of the video filming, right,
5  that it would be incorporated into those sort of
6  promotional materials?
7  A. Right. So that they could invite others.
8  It was like an invitation, but it wasn't for the
9  public.
10 Q. Right. So it's directed to either ACN
11 IBOs or ACN representatives or people they might
12 want to show that video to in order to invite them,
13 right?
14 A. Yes.
15 Q. And I think we've established the basic
16 process was ACN drafted the materials, you sent
17 them over to the Trump -- to Mr. Trump or to his
18 office or representatives. They would sometimes
19 send back edits or feedback, which is a process
20 that continued right up through the filming itself,
21 including some extemporaneous speaking.
22     Is all of that accurate as a matter of a
23 general practice?
24 A. Yes.
25 Q. And then once a DVD or a CD was prepared,

Page 78

1  Trump organization, not me.
2      Q.  I guess before we look at the document,
3  why do you say that?
4      A.  Because I didn't interact with the
5  Success From Home organization; I interacted with
6  ACN.
7      Q.  I think you said that if Success would
8  have been involved, it would have been through the
9  Trump organization.
10     A.  Oh, I'm sorry.  I meant ACN.
11     Q.  Just wanted to clarify that.
12     A.  Thank you for the clarification.
13     Q.  All right.  We'll go ahead and mark the
14  next document.
15         (Exhibit 10 was marked for
16          identification.)
17  BY MR. QUINN:
18     Q.  Exhibit 10 is a document produced by your
19  counsel with the Bates No. AAB00001745.
20         Do you see that?
21     A.  Yeah.
22     Q.  And at the bottom of that first page, you
23  can see an email from Katie Mapel at ACN to you and
24  to Sheila Marcello where she says, "Anne, the
25  magazine made a few additional tweaks to the Trump

Page 79

1  piece due to space," right?
2      A.  Yes.  That's exactly the process I was
3  talking about.
4      Q.  Right.  And I was just going to confirm
5  that too, so that that's consistent with what you
6  described.
7          Insofar as the Success magazine people
8  had any input on content, it was communicated to
9  you through ACN, right?
10     A.  Yes.  And that's not really a content,
11  that's space.
12     Q.  Sure.  Understood.
13         Now, I think you said that you also sent
14  these materials to Rhona Graff and made sure that
15  the Trump organization's edits or feedback was
16  incorporated, right?
17     A.  Yes.
18     Q.  And the Trump side did sometimes make
19  revisions or edits, right, to these Success From
20  Home pieces?
21     A.  Yes.
22         MS. DAVIDIAN:  Before we get to another
23  document, we've been going about an hour and 15
24  minutes.  Is it okay if we take a five-minute
25  break?

Page 80

1          MR. QUINN:  Sure.
2          THE VIDEOGRAPHER:  Ready to go off the
3  record?
4          MS. DAVIDIAN:  Yes.
5          THE VIDEOGRAPHER:  Going off the record
6  at 10:41 a.m.
7          (Recess taken.)
8          THE VIDEOGRAPHER:  We're back on the
9  record at 10:57 a.m.
10         (Exhibit 11 was marked for
11          identification.)
12  BY MR. QUINN:
13     Q.  Good morning, again, Ms. Butcher.  I want
14  to shift gears a little bit and just sort of work
15  through the chronology of the contractual
16  relationship.
17         So let's mark as our next exhibit.  This
18  is going to be Exhibit 11.  Exhibit 11 is a
19  document produced to us by the Trump organization
20  with the Bates No. TT0_007255.
21         I'll represent to you our understanding
22  is that this, too, is a hard copy file that was
23  maintained at the Trump organization.  So somebody
24  printed out this email, and we've had some
25  testimony that the handwriting appears to belong to

Page 81

1  Norma Foerderer, if that's helpful to you.
2          But I want to look at the email itself.
3  So this is an email from you to Norma Foerderer,
4  dated September 29, 2005.
5          Do you see that?
6      A.  Um-hmm.
7      Q.  And who was Norma Foerderer?
8      A.  Norma was in the role that Rhona Graff
9  was in later.  She retired before the project
10  actually started with Mr. Trump.
11     Q.  So then at some point between here and
12  February of 2006 when the endorsement agreement was
13  signed, that role changed; is that right?
14     A.  Yes.
15     Q.  You begin the email, if you look down,
16  you know, past the headers, you write, "Dear
17  Ms. Foerderer, I enjoyed speaking with you and
18  would be delighted to further discuss the services
19  of Mr. Trump as host of a corporate video and
20  speaking engagements for ACN."
21         Do you see that?
22     A.  Yes.
23     Q.  Did you have a conversation with her
24  prior to sending this, a phone call or something?
25     A.  Yes.

Page 82

1  Q.  You told us earlier that there was some
2  initial outreach, you kind of had trouble getting
3  through, and you were told to go back.
4      How does this fit in that timeline?
5  A.  Yes.  That's why I'm smiling because I
6  had lots of conversations to try and get through
7  and finally I had.
8  Q.  Were those conversations with people
9  other than Ms. Foerderer?
10 A.  Yes.
11 Q.  Do you remember who they were?
12 A.  Legal and PR, whoever those people were
13 at the time.
14 Q.  And then eventually, someone pointed you
15 to Ms. Foerderer, is that --
16 A.  Yes.
17 Q.  So what do you recall about the phone
18 call you referenced here?
19 A.  This was after many phone calls with her.
20 Q.  With Norma Foerderer?
21 A.  Um-hmm.  Where she finally asked me to
22 put in writing what we were discussing, which I
23 did.
24 Q.  What do you recall about those phone
25 calls?  What was the basic back and forth?

Page 83

1  A.  Very investigative.
2  Q.  By which side, what do you mean by that?
3  A.  Norma wanted to know more about the
4  company, more about the founders, more about me,
5  more about everything before she would even allow
6  me to put it in writing and send this to her or
7  even agree to respond.
8  Q.  And were you able to answer her
9  questions?  I mean, how did you respond to that?
10 A.  Yes.
11 Q.  And that was just a series of phone calls
12 before any correspondence or written communication?
13 A.  Um-hmm.
14 Q.  Is this the first written communication
15 you're aware of?
16 A.  I don't really remember.
17 Q.  Do you remember any written communication
18 before this?
19 A.  No, but I didn't remember about this
20 either.
21 Q.  Okay.
22 A.  It's a long time ago.
23 Q.  Understand.  The word -- the phrase we
24 lawyers use is refreshing.  Sometimes things
25 refresh your recollection as we look at them.  But

Page 84

1  okay, but sitting here today, you're not aware of
2  any written correspondence prior to this, just a
3  series of phone calls between you and
4  Ms. Foerderer?
5  A.  Exactly.
6  Q.  You go on in your first paragraph to
7  refer to ACN as the "World's largest direct selling
8  telecommunications company"?
9  A.  Yes.
10 Q.  Where did that information come from?
11 A.  That would have come from ACN's PR.
12 Q.  You go on to say, "Mr. Trump stands for
13 vision, resilience, and entrepreneurial success,
14 traits that ACN finds very admirable"?
15 A.  Yes.
16 Q.  Is that consistent with your
17 understanding of what ACN was looking for by
18 pursuing this relationship with Mr. Trump?
19 A.  Yes.
20 Q.  You go on to say in your next paragraph,
21 "I understand the honorarium fee is 300,000 for a
22 single speaking engagement."
23     Do you see that?
24 A.  Yes.
25 Q.  Was that something Ms. Foerderer told

Page 85

1  you?
2  A.  Yes.
3  Q.  And then you go on and outline a proposal
4  in which there would be three appearances as well
5  as a video recording for a total fee of $2 million;
6  is that right?
7  A.  Yes.
8  Q.  And that generally matches the 2006
9  agreement we looked at earlier, right?
10 A.  Yes.
11 Q.  You describe yourself in the email as a
12 producer representing ACN exclusively for this
13 project.
14     Do you see that?
15 A.  Yes.
16 Q.  And that's generally consistent with the
17 role you've described here, right?
18 A.  Yes.
19 Q.  How were you compensated in that role?
20 Were you paid by commission or in some other way?
21 A.  I was paid a percentage of the project.
22 Q.  The project meaning the amounts ACN would
23 pay to Mr. Trump?
24 A.  Yes.
25 Q.  And that was -- was that 10 percent?

Page 86

1    A.   It was sometimes 10 percent, sometimes
2  less depending on the particular project.
3    Q.   Right.  It was 10 percent for all the
4  Trump agreements and 5 percent for the Celebrity
5  Apprentice appearances?
6    A.   For the first Celebrity Apprentice.
7    Q.   Okay.  And what was the second?
8    A.   10.
9    Q.   And then all the specific payments, ACN
10 to Trump, that was 10 percent commission to you,
11 right?
12   A.   Yes.
13   Q.   At the end of your email to
14 Ms. Foerderer, you say, "I look forward to
15 discussing the project."  If you then flip through
16 the document itself, after you give your contact
17 information, there are a series of other documents
18 kind of appended to this that reference USA today.
19        Do you see those?
20   A.   Yes.
21   Q.   Is this material that you sent to
22 Ms. Foerderer as sort of background, or do you
23 recall what this is?
24   A.   I don't.
25   Q.   Do you recall sending her anything in

Page 87

1  background beyond what you just described on the
2  phone?
3    A.   No.
4    Q.   Okay.
5    A.   I don't mention those things in here, do
6  I?
7    Q.   You don't, that's true.  The email itself
8  doesn't give any indication.  They were just stored
9  together in the Trump organization's files.
10        So I'm wondering, is it your
11 understanding perhaps they hold these themselves,
12 perhaps you sent them to them?
13   A.   She was very precise in asking me to
14 present exactly what we had discussed, and that's
15 what I did in the letter.  That's what was used for
16 the agreement.  I don't remember any of this other
17 stuff.
18   Q.   Let me just show you one other thing.
19        (Exhibit 12 was marked for
20        identification.)
21 BY MR. QUINN:
22   Q.   We have marked as Exhibit 12 a document
23 produced by ACN with the Bates No. ACN014847.  This
24 is an email from you to Robert Stevanovski the very
25 same day, right, September 29, 2005?

Page 88

1    A.   Um-hmm.
2    Q.   This is sort of a few hours earlier,
3  right?
4    A.   Right.
5    Q.   And you say to Mr. Stevanovski -- the
6  subject line "4 USA Today ads."  And you say,
7  "Thanks, Robert," right?
8    A.   Yes.
9    Q.   Does that refresh your recollection in
10 any way that --
11   A.   No, it doesn't.
12   Q.   Okay.  So just -- your best recollection
13 is other than the email itself outlining the
14 proposal and describing the company, you don't
15 remember sending Ms. Foerderer anything?
16   A.   No.
17   Q.   And I guess, sorry, just to be clear,
18 when you say, "No," you mean, no, I don't recall;
19 that's correct?
20   A.   No, I don't recall.  I don't even recall
21 sending her this letter.  It's very nice seeing it.
22   Q.   Okay.
23        (Exhibit 13 was marked for
24        identification.)
25 ///

Page 89

1  BY MR. QUINN:
2    Q.   So we have marked as Exhibit 13 the
3  document bearing the Bates No. TTO_007252.  This
4  was produced to us by the Trump organization.  And
5  this is another paper file that we understand
6  Ms. Foerderer printed out and wrote on.
7         But the document itself is an email from
8  you to Ms. Foerderer -- it's actually two emails
9  that were stored together, both from you to Ms.
10 Foerderer in early November 2005; is that right?
11   A.   What did you just ask me?  Can you state
12 it again?
13   Q.   Yeah.  Leaving aside the handwriting,
14 where, again, we understand this was a paper file
15 that Ms. Foerderer may have written, on.  It was
16 maintained by the Trump organization, that the
17 documents that were printed are two emails from you
18 to Ms. Foerderer from early November 2005; is that
19 right?
20   A.   Um-hmm.  Yes.
21   Q.   If we start with the November 4 email,
22 which is on the second page of the document, this
23 is roughly five weeks after the September email we
24 just saw; is that right?
25   A.   Um-hmm.

Page 166

1  point in time about how large the events were?
2  A.  Yes.
3  Q.  You can put that to the side.
4       (Exhibit 24 was marked for
5       identification.)
6  BY MR. QUINN:
7  Q.  For the record, I'm going to facilitate
8  the chat on there, this is an email exchange
9  produced by the Trump organization with Bates No.
10 TTO_004154.
11 A.  Okay.  Thank you.
12 Q.  Sure.  So again, this is an email
13 exchange between you and Rhona Graff from
14 February 2013 about an event in Charlotte?
15 A.  Yes.
16 Q.  And if you look at the first paragraph of
17 your email to Ms. Graff, you say, "I know you
18 received my text, but I wanted to take a moment to
19 say again, the Charlotte event could not have been
20 better.  The arena was packed to the rafters, and
21 the crowd was very excited when Mr. Trump stepped
22 on the stage.  It was an actual roar!"
23      Do you see that?
24 A.  Yes.
25 Q.  Is that also, you know, a fair summary of

Page 167

1  these events as you recall them through the period
2  of Mr. Trump's involvement with ACN?
3  A.  Yes.
4  Q.  So it's fair to say -- this is now 2013,
5  so towards the end of the relationship, is it fair
6  to say that this was a consistent reaction from the
7  people in attendance throughout the relationship?
8  A.  Yes.
9  Q.  And you can see that you assure her that
10 the ACN cofounders also, or at least Greg and
11 Robert, you know, thought this was a home run and a
12 really positive experience.
13      Was that also consistent throughout these
14 appearances?
15 A.  Yes.
16 Q.  You can put that to the side.
17      (Exhibit 25 was marked for
18      identification.)
19 BY MR. QUINN:
20 Q.  So we paused there to talk a bit about
21 the events.  I think we had been through the '06
22 agreement.  I want to talk a little bit about the
23 next agreement that was entered in January of 2008.
24 A.  We're going backwards in time, right?
25 Okay.

Page 168

1  Q.  Yeah, we took a pause to talk about the
2  consistency around the events, but let's keep
3  working through the relationship now.
4      And so while the witness takes a look at
5  the document, for the record and the folks on the
6  Zoom, the Bates is TTO_004386, and this is
7  Exhibit 25.
8      So this email, Exhibit 25, this is an
9  exchange between you and Ms. -- well, an email from
10 you to Ms. Graff, and she then forwards it to
11 Ms. Glosser.  And you're reaching out about
12 continuing the contractual relationship at this
13 point, right?
14 A.  Um-hmm.
15 Q.  And if you look at the last -- your last
16 paragraph on the first page, you say, "We would
17 like to again -- excuse me.
18      "We would again like to make the offer to
19 Mr. Trump for celebrity endorsement services while
20 eliminating any need for Mr. Trump to appear in
21 person at the events.  We would love to renew the
22 agreement for three years with the same use on DVD
23 and the Internet and simply film with Mr. Trump and
24 include video greetings to the ACN participants at
25 the specific events."

Page 169

1       Do you see that?
2  A.  I do.
3  Q.  Do you recall discussion around this time
4  about an agreement that would be limited to the
5  video filming and not include live events?
6  A.  No, actually, I don't.
7  Q.  But that does seem to be what this is --
8  A.  Yeah.
9  Q.  -- suggesting?
10 A.  That's what this says.  And this is 2008?
11 He did continue coming to the events.  I don't know
12 what this is about.
13 Q.  So if you look a few paragraphs up, you
14 can see there's a reference there that says, "For
15 Meadowlands, Saturday afternoon on June 28 looks
16 good," right?
17 A.  Um-hmm.
18 Q.  So that's ultimately looking forward to
19 six months to a potential event.
20 A.  Um-hmm.
21 Q.  Right?  Does that clear it up in your
22 mind at all or help you remember what was being
23 discussed at the time?
24 A.  No, because this paragraph you're
25 referring to says that he wouldn't come to the

Page 1

1                 Robert Stevanovski

2           UNITED STATES DISTRICT COURT

3         FOR THE SOUTHERN DISTRICT OF NEW YORK

4              Index No. 1:18-cv-09936-LGS

5    CATHERINE MCKOY, MILLARD

6    WILLIAMS, MARKUS FRAZIER, and

7    LYNN CHADWICK, individually and

8    on behalf of all others

9    similarly situated,

10        Plaintiffs,

11   vs.

12   THE TRUMP CORPORATION, DONALD J.

13   TRUMP, in his personal capacity,

14   DONALD TRUMP, JR., ERIC TRUMP,

15   and IVANKA TRUMP

16        Defendants.

17

18              Videotape Deposition of
                   Robert Stevanovski
19               Friday, March 17, 2023
                    At 2:00 p.m.
20

21

22

23   Reported by LeShaunda Cass-Byrd, CSR, RPR

24   TSG Job No. 223126

25

Page 82

1            Robert Stevanovski
2    Q.   All right.  Let my just show you those
3  documents that she references.
4            (Plaintiff Exhibit 17 was marked for
5  identification.)
6  BY MR. QUINN:
7    Q.   So, again, a little out of order.  Exhibit
8  17 is a document referenced in Dr. Cunningham's
9  declaration with the Bates number ACN 200181 through
10  185.
11   A.   Uh-huh (affirmative).
12   Q.   Now that I have shown you this document, do
13  you recognize it?
14   A.   Can we take one document at a time?
15   Q.   Sure.  She says she received them as a set,
16  so I'm asking if you recognize the set?
17   A.   I don't recognize the set.  I wasn't part
18  of providing any of this information.
19   Q.   Okay.  If you look on the second page,
20  there is a reference to strive for five, four IBOs.
21  She talks about this a bit in her report.  Do you
22  recall any discussion about promotions that ACN ran
23  like this?
24   A.   Yes.
25   Q.   What do you recall about that?

Page 83

1            Robert Stevanovski
2    A.   Just a simple statement that, you know,
3  ACN -- I think it was for energy, I don't know, mobile
4  I.  Don't recall exact services, but basically, that
5  ACN, you know, had, you know, forever promotions that
6  allows to you get huge discount or free service on
7  services.  That's -- a lot of people join for that
8  reason.  They look at it as a way to get a free
9  service.
10   Q.   All right.  And these were promotions that
11  ACN ran at it's discretion from time to time, right,
12  and they changed over time?
13   A.   To my knowledge -- again, to the best of my
14  knowledge, we've always had them.  It might have
15  changed, like, instead of getting four you might have
16  to get five, instead of five, you might have to get
17  seven.  But to my knowledge, we always had them.
18   Q.   You've always had some version of a
19  promotional program relating to go products or?
20   A.   Well, we always had many versions of
21  promotional products.  We always had a lot of
22  promotions, either products that we own ourselves, or
23  partners, be it, AT&T, Verizon, or Direct TV.  I think
24  we are talking about this specific thing.  But yes, we
25  always had these promotions always.

Page 84

1            Robert Stevanovski
2    Q.   All right.  But they ebbed and flowed and
3  changed.  They were rolled in and rolled out, right?
4  They evolved over time?
5    A.   They didn't role in and role out.  We
6  always had them.  But the criteria for them, might --
7  like I said, instead of getting four, maybe you needed
8  six, instead of five we needed seven, so we've always
9  had them.
10   Q.   These sorts of promotions are managed
11  outside of ACN's competition plan, right?  They are
12  not set forth in a compensation plan, they are set
13  forth in documents like this?
14   A.   Well, I don't know if I can disagree or
15  agree with you there.  It's part of the compensation
16  plan.  Every IBO sees it and gets it.  They know it
17  exists.  It's part, I would say, indirectly the
18  compensation.  If you can join a company and save 60
19  bucks a month by not paying your cellphone or save 150
20  bucks a month by not paying your electric bill, to me,
21  that seems like the right compensation.  So I would
22  say it's part of the compensation, and IBO always had
23  that available to them just like they did everything
24  else.
25   Q.   All right.  So there were a lot of

Page 85

1            Robert Stevanovski
2  pronounces there, and I think we talked past each
3  other.
4            I was asking about the formal document,
5  like the one we looked the at earlier.  It was updated
6  as of July 2014, the ACN IBO compensation plan
7  document itself.
8            You are aware of that document, right, the
9  conversation?
10   A.   Well -- yes.  The 2014, we had, you know --
11  again, it may vary what's included in that depending
12  on what you look at it in 2009 or '12 or '18 or today.
13   Q.   Right.  I understand that there were
14  various version of the compensation plan over time.
15  But I'm just asking, these sorts of promotions,
16  acquire five customers, get your own service free,
17  et cetera, those sorts of promotions are not governed
18  by the ACN IBO compensation plan documents.  They are
19  run separately from that; isn't that true?
20   A.   Again, I don't think it's fully true.  Like
21  today, if you pull a document or competition today,
22  all of that is part that.
23   Q.   I'm not asking for a document on
24  compensation, I'm asking about the ACN compensation
25  plan document in the form that we looked at earlier?