# EXHIBIT 11

```
IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

                   DISTRICT OF NEW YORK

             Index No. 1:18-cv-09936-LGS


***********************************

CATHERINE McKOY, MILLARD WILLIAMS,
MARKUS FRAZIER, and LYNN CHADWICK
individually and on behalf of all
others similarly situated,

        Plaintiffs,

  vs.

THE TRUMP CORPORATION, DONALD J. TRUMP,
in his personal capacity,
DONALD TRUMP, JR.,
ERIC TRUMP, and IVANKA TRUMP,

           Defendants.

***********************************




        The deposition of JOSEPH F. HAIR, Ph.D., taken at

        the Regus Offices at RSA Battle House Tower, 11

        North Water Street, 10th Floor, Mobile, on March

        20, 2023, commencing at approximately 9:12 a.m.



Stenographically Reported by
L. Alan Peacock, RDR, CRR, CCR,
Notary Public, State of Alabama
TSG REPORTING NO.: 223078
```

Page 138

1    Q.   And are you aware that Mr. Trump, in
2  talking about ACN, often told ACN -- told audiences
3  that ACN was different than any other direct selling
4  company that they'd ever seen before?
5    A.   I recall some statements like that.
6    Q.   All right.  Let's go back to page 20 and
7  just kind of finish out Section 5.
8         This is your last paragraph of Section 5.
9  You write, "A more realistic way of describing the
10 earnings distribution characteristics of ACN IBOs is
11 they are similar to business organizations in the US
12 in general in which a large proportion of workers
13 earned lower wages while upper-level C-suite and
14 senior management positions earned considerably
15 higher compensation."
16        Do you see that?
17   A.   Yes, sir.
18   Q.   Do you stand by that?  I mean, sitting
19 here today, do you think that's a good comparison
20 for the ACN earning distributions amongst IBOs?
21   A.   I'm simply saying that the distribution of
22 ACN is a large number of people at the lower end
23 making lower income compared to the top bin.
24 Honestly, I have no idea what ACN executives are,
25 but I'm assuming it's higher, which maybe I

Page 139

1  shouldn't, but still.
2    Q.   But just the idea is that it's a big
3  group --
4    A.   It's a broad brush.
5    Q.   But there's a big group of people earning
6  very little or maybe zero, and there is this top bin
7  at the top earning a lot more.  Big picture; right?
8    A.   Uh-huh (positive response).
9    Q.   Can you think of any businesses, you know,
10 the sort of business organizations that you describe
11 here where an employee has to pay $500 just for the
12 right to show up at work on day one?
13   A.   Well, you're talking about a different
14 kind of company.  This is an incentive-based
15 company.  So the structure of MLMs is different than
16 companies where you can go in with little or no
17 skills, which you obviously can with MLM as well.
18 And if you start at quoted 7.25 an hour -- it's
19 higher other places, but if you start at the minimum
20 wage, you're probably going to continue making the
21 minimum wage.  You never have the prospect of
22 earning much more.
23   Q.   Okay.  Just to come back to the question,
24 though, you can't think of a non-MLM business where
25 the employee has got to pay $500 just to show up and

Page 140

1  start on day one; right?
2    A.   I can't -- I'm sort of dragging back to my
3  memory, thinking that sometimes they do have to buy
4  some kind of kit or have access -- whatever.  But,
5  no, I don't want to put that -- because I really
6  can't recall.
7         MR. QUINN:  Okay.  So I can go on to the
8      next section or we can take a lunch break.  How
9      do you guys feel?
10        MR. SHAPIRO:  I think lunch now would be a
11     good idea.
12        MR. QUINN:  Let's go off the record.
13        THE VIDEOGRAPHER:  There being no
14     objections, going off record at 12:38 p.m.
15        (A LUNCHEON RECESS WAS HELD FROM 12:38
16        P.M. TO 1:26 P.M.)
17        THE VIDEOGRAPHER:  Back on the record at
18     1:26 p.m.
19 BY MR. QUINN:
20   Q.   Good afternoon, Dr. Hair.
21   A.   Thank you.  Good afternoon to you.
22   Q.   We're going to move forward in your report
23 now, on to Section 6.  That section begins on
24 page 20 with the heading "Business Ventures are
25 Never Low-Risk."

Page 141

1         Do you see where I'm referring to?
2    A.   Yes, sir.
3    Q.   I actually want to start with a sentence
4  on page 21.  So if you'll turn one page.
5         Do you see that first line there says,
6  "All new business ventures involve a high risk of
7  failure."
8         Do you see that?
9    A.   I see.
10   Q.   And if we again kind of limited ourselves
11 to financial failure, that's true of ACN then as
12 well; right?
13   A.   When you say it's true, are you saying
14 that ACN is a high level of risk?
15   Q.   Yeah, that's my question.  You can say,
16 "All new business ventures involve a high level of
17 risk."  So I'm just confirming that all new business
18 ventures includes the ACN business venture.
19   A.   They do.  But remember I qualified that
20 and said failure might be lack of success.  And you
21 qualified it and said financial; so . . .
22   Q.   All right.  But in your words, then, the
23 ACN business venture involves a high level of risk
24 of failure?
25   A.   Yes.

Page 142

1  Q.  But in your view, ACN does not represent
2  itself as low-risk; correct?
3  A.  Well, as I recall and from my reading,
4  they don't ever talk about risk.
5  Q.  They also -- in those meetings with the
6  ACN folks, they told you that they don't ever
7  represent themselves as low-risk; right?
8  A.  They may have.  That's not a dominant
9  feature, but, yeah, they may have.
10 Q.  Just to narrow it down, we marked your
11 declaration earlier as Exhibit 2.  I think it's in
12 your -- in the pile there.
13 A.  I think it's in the pile.  If I said it in
14 that document, then I -- I was thinking that's two
15 weeks, three weeks closer to it.  So if I said it in
16 the document, I'm not disagreeing with what I said
17 in the document.
18 Q.  Just to make sure that the record is
19 clear, then, the last sentence of paragraph 3 on
20 paragraph number 3 on page 2 says, "During these
21 conversations, one of the executives commented that
22 in communicating with IBOs, whether new or existing,
23 as well as in company meetings, the term 'low risk'
24 was not used to characterize the ACN."
25 A.  I wrote this, and I stand by it.

Page 143

1  Q.  And, in fact, ACN is not low risk; right?
2  That's right?
3  A.  Correct.
4  Q.  So if someone did represent ACN as low
5  risk, that would be false?
6  A.  I don't want to speak for someone else,
7  what their definition would be of low risk or high
8  risk.  People have different experiences.  So I
9  share with you my perception.  I don't want to
10 comment on someone else and their use of an
11 adjective like that.
12 Q.  In your perspective, ACN is not low risk;
13 it's, in fact, high risk?
14 A.  Correct.
15 Q.  You also remark a little later in your
16 report, if somebody did diligence or research into
17 ACN, they would conclude pretty easily that it's not
18 low-risk; right?  Is that your view?
19 A.  In general, yes.
20 Q.  Okay.  During your meetings with the ACN
21 executives, did you talk about any statements that
22 Donald Trump made about ACN's risk profile?
23 A.  I don't recall talking in that meeting,
24 but I do recall elsewhere.  And so it could have
25 happened.  I just don't recall talking about the

Page 144

1  Trump thing because I remember Donald Trump making
2  some statements about risk in some of his videos or
3  whatever.  So yeah.
4  Q.  But don't recall any discussion about
5  those statements with the ACN folks?
6  A.  Not during that meeting.
7  Q.  But as we saw in your declaration, you did
8  talk about what ACN itself says, what ACN's own
9  statements are; right?  You did talk about them?
10 A.  Yes.
11 Q.  So they told you that ACN never represents
12 itself as low risk.  Did you make any effort to look
13 into that, to check whether what they were telling
14 you was true?
15 A.  No, because I already had pretty much -- I
16 don't know.  That was sort of the middle, but I had
17 formulated and already -- I mean, I had expressed my
18 perception of the risk level already and didn't
19 change it based on those meetings.
20 Q.  Okay.  I want to show you -- so we looked
21 into some of that, and I'm going to just show you
22 two versions of ACN's website.
23         (DEPOSITION EXHIBIT 18 WAS MARKED FOR
24         IDENTIFICATION.)
25 BY MR. QUINN:

Page 145

1  Q.  Dr. Hair, we've marked as Exhibit 18 what
2  I will represent to you is a printout of a part of
3  ACN's website called "Success Stories."
4      Do you see that document, Exhibit 18?
5  A.  I see the document.  Were you referring to
6  something specific on here?
7  Q.  Yeah.  So if you'd turn to the second
8  page, you can --
9  A.  I only have one.  The back side?
10 Q.  Yes.
11     Do you see there in the upper right-hand
12 corner -- this is ACN's own website -- they write
13 "low risk, low cost."
14     Do you see it right there?
15 A.  Yes.
16 Q.  You've never seen that before?
17 A.  No, sir.
18 Q.  Does that strike you as inconsistent with
19 what ACN folks told you during your meeting with
20 them?
21 A.  Well, all I'm saying is that's what
22 they -- they didn't refer to this, and I don't -- I
23 do recall that my statements are correct.
24 Q.  Your statement about just recounting what
25 they told you; right?

Page 178

1  to just sort of complete that.  So let's jump ahead
2  a little bit to Section 10, and we'll come back to
3  Section 9.
4      Do you see Section 10 begins on page 40
5  towards the bottom of the page?  It looks like
6  you're already there.
7      A.   Yes, sir.
8      Q.   And you start in that section, you quote
9  Dr. Bosley's conclusion that "The compensation plans
10 encourage spending money."
11     Do you see that?
12     A.   Correct.
13     Q.   And you don't really seem to disagree;
14 right?  Your response is, well, it takes money to
15 make money; right?
16     A.   Correct.
17     Q.   And on the next page, you -- if you'll
18 turn the page to 41, on the second paragraph there,
19 somewhat similarly, you quote Dr. Bosley as saying
20 that the expenses, including the sign-up fee right
21 at the beginning of the ACN experience, create,
22 quote, an immediate negative profitability hole that
23 the IBO has to climb out of.
24     Do you see that?
25     A.   Yes, sir.

Page 179

1      Q.   And, again, you don't seem to disagree.
2  In fact, your response is yes, that is likely to
3  occur; right?
4      A.   If they choose to buy it.
5      Q.   Well, here we're talking about the sign-up
6  fee; right?  That's mandatory.  They have to spend
7  $500 just to begin; right?
8      A.   Well, if they pay $499 on that day, then
9  they haven't earned anything.
10     Q.   Right.  So by definition they're in an
11 immediate profitability hole.
12     A.   If you're -- using her terminology.
13 Honestly, I've never seen that terminology anywhere.
14 So we get the common meaning here.  But according to
15 her terminology, yes.
16     Q.   And common meaning.  I think we understand
17 each other, that they're out 500 bucks and haven't
18 made anything back yet.
19     A.   Right.
20     Q.   And so as you go on from there, you
21 acknowledge in the pages that follow that certain
22 kinds of expenses that IBOs either have to incur or
23 might incur.  So we've talked about some of these,
24 but I want to just make sure that we've got a full
25 picture.

Page 180

1      So first of all, there's the sign-up fee
2  of $499; right?
3      A.   Right.
4      Q.   And that's mandatory.
5      There's the renewal fee if you want to
6  continue past the first year.  That's $149?
7      A.   That's right.
8      Q.   And as I think we established earlier too,
9  there's a monthly fee to access and use the Your
10 Business Assistant website, right.  That's 39.99 a
11 month?
12     A.   Yes, sir.
13     Q.   And in addition to that, opportunity discs
14 and magazine bundles are available for purchase;
15 right?
16     A.   They are available.
17     Q.   And then there are the tickets to events,
18 which can be as high as $190; right?
19     A.   If you choose to go.
20     Q.   And if you choose to go, I think we
21 covered too, you know, there's going to be some
22 additional expenses not paid to ACN for lodging and
23 meals and travel and the like?
24     A.   Correct.
25     Q.   And -- what you say -- when you say at the

Page 181

1  bottom of page 42 in the last line there --
2      A.   Are you talking about the last paragraph,
3  "yes, IBOs pay"?
4      Q.   You say, "Yes, IBOs pay for the marketing
5  materials, but the ACN marketing materials appear to
6  provide an excellent method for developing and
7  applying new skills or honing previous skills to
8  increase the likelihood of economic success and
9  financial returns."
10     Do you see that?
11     A.   Uh-huh (positive response).
12     Q.   You haven't done any -- first of all, what
13 do you mean by "appear to provide"?
14     A.   Well, I didn't say they do.  I simply said
15 they appear to.  So . . .
16     Q.   Is that based on seeing some of them as
17 you prepared your report or --
18     A.   I've only seen descriptions, like
19 magazines and other kinds of things.  I have not
20 seen specifics, no.
21     Q.   So you haven't obviously, then, done any
22 quantified analysis of what's on certain things and
23 how to value that or -- you know, it's more of a
24 general comment based on descriptions you've seen?
25     A.   Yes, sir.

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF NEW YORK

 3                 Index No.  1:18-cv-09936-LGS

 4

 5   CATHERINE McKOY, MILLARD      )
     WILLIAMS, MARKUS FRAZIER,     )
 6   and LYNN CHADWICK,            )
     individually and on behalf    )
 7   of all others similarly       )
     situated,                     )
 8                 Plaintiffs,     )
                                   )
 9        -vs-                     )
                                   )
10   THE TRUMP CORPORATION,        )
     DONALD J. TRUMP, in his       )
11   personal capacity, DONALD     )
     TRUMP, JR., ERIC TRUMP, and   )
12   IVANKA TRUMP,                 )
                                   )
13                 Defendants.     )
     _____)

14

15

16           VIDEO DEPOSITION OF MARK CRANDON

17       (CONDUCTED REMOTELY VIA VIDEOCONFERENCING)

18                    March 10, 2023

19

20

21

22

23   Reported by:

24   ANNE M. TORREANO, CSR 10520, RPR, CCRR, LCR, CCR

25   JOB NO. 223456
```

Page 158

1        ATTORNEY SHAPIRO:  Objection to form.
2        THE WITNESS:  I didn't offer that as --
3  as -- I didn't state that that was what was my
4  expectation, or I didn't have any information that
5  that was a goal as well.
6  BY ATTORNEY LE CONEY:
7        Q.  Right.  And you're not offering an opinion
8  today that it would have been reasonable to say that
9  the ACN videophone would be in every home in America
10 at any given point, are you?
11       A.  No.
12       ATTORNEY LE CONEY:  Okay.  We have an
13 exhibit we'd like to introduce, which I believe is
14 Exhibit 17.
15       (CRANDON EXHIBIT 17 MARKED.)
16       ATTORNEY LE CONEY:  And before you hit
17 play, Mr. Crandon, this is video footage from 2010
18 and 2011 produced to us in this case concerning --
19 well, you'll see what the video is.
20       (Video played.)
21 BY ATTORNEY LE CONEY:
22       Q.  Mr. Crandon, you don't have any
23 information -- you don't have any belief that that
24 was a reasonable statement at that time, do you?
25       A.  That to me was just -- was a paid -- a paid

Page 159

1  promoter who is reading -- who is just making some
2  blustery statements, which is reasonable for paid
3  promoters to make.  I don't know where -- where he
4  got his information to say that from.
5        Q.  But you can't identify any information to
6  support that statement about every home in America,
7  can you?
8        A.  That was beyond the scope of what I was
9  looking at.
10       Q.  Your report discusses the ACN videophone at
11 length, does it not?
12       A.  It discusses the market for -- for the
13 products and the comprehensive environment for video
14 products, for videophones, for video-calling
15 products.
16       Q.  Correct.  And it discusses, as you said,
17 the market for videophone and video-calling
18 products, and it discusses the ACN videophone at
19 length.  Can you identify any information or
20 analysis in your report or elsewhere that we've
21 discussed today to support a claim that the ACN
22 videophone would be in every home in America?
23       A.  Again, this is beyond -- beyond the --
24 beyond the scope of what I was looking at of what
25 their -- what the target market -- or what the --

Page 160

1  not the target market, what the market size they
2  want to go after and the number of units they want
3  to sell.  I don't have any access to what -- to what
4  the business -- the business goals that make up that
5  claim would be.
6        Q.  So the answer is no, though.  You have no
7  information to support that claim, it sounds like?
8        A.  I don't have any information.
9        ATTORNEY LE CONEY:  I think we're done.
10       Thank you, Mr. Crandon, for your time.
11       Peter, thank you.
12       Ms. Torreano and Mr. Reidt, thank you.
13       THE WITNESS:  Thank you.  Have a good day,
14 have a good weekend.
15       THE VIDEOGRAPHER:  No other questions,
16 Counsel?  Okay.  This concludes the deposition of
17 Mark Crandon.  The number of media units used was
18 one, containing six video clips.  We're going off
19 the record.  The time is 1:53.
20       (DEPOSITION CONCLUDED AT 1:53 P.M. PST)
21
22
23
24
25

Page 161

1              J U R A T
2
3   I,            , do hereby certify under
4   penalty of perjury that I have read the foregoing
5   transcript of my deposition taken on            ;
6   that I have made such corrections as appear noted
7   herein in ink, initialed by me; that my testimony as
8   contained herein, as corrected, is true and correct.
9
10  DATED this ____ day of _____,2023,
11  at _____,          .
12
13
14
15
16
17  _____
18        SIGNATURE OF WITNESS
19
20
21
22
23
24
25

*McKoy, et al., v. The Trump Corporation, et al.*, Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Stacie Bosley
November 18, 2022
Confidential – Subject to Protective Order

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP JR., ERIC TRUMP, and IVANKA TRUMP,<br><br>*Defendants*. | No. 1:18-cv-09936-LGS |

## EXPERT REPORT OF STACIE BOSLEY

**November 18, 2022**



47

McKoy, et al., v. The Trump Corporation, et al., Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Stacie Bosley
November 18, 2022
Confidential – Subject to Protective Order



*McKoy, et al., v. The Trump Corporation, et al.*, Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Kevin Lane Keller
November 18, 2022
Confidential – Subject to Protective Order

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated,<br>   Plaintiffs,<br><br>v.<br><br>THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP JR., ERIC TRUMP, and IVANKA TRUMP,<br>   Defendants. | No. 1:18-cv-09936-LGS |

## EXPERT REPORT OF KEVIN LANE KELLER

**November 18, 2022**

*McKoy, et al., v. The Trump Corporation, et al.*, Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Kevin Lane Keller
November 18, 2022
Confidential – Subject to Protective Order

would request stories that they wanted to hear. So he might have told that story in Baltimore, but they want to hear in in California. And they want to hear it again in Texas… And then he would get this huge audience response, and, you know. Anyway, that's my experience of their favorable response to him being at their events."[196]

142. Internal ACN documents and publicly available videos of Mr. Trump speaking at ACN events corroborate that ACN event attendees were extremely enthusiastic for Mr. Trump.[197] When Mr. Trump's endorsement was first announced to ACN's IBOs at an event, ACN founder Robert Stevanovski commented in an internal email that "we got the biggest response that we ever got at [an] event with [an] announcement. The reps are more excited [than] I ever had seen them."[198]

143. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████[199]

---

[196] Butcher Deposition, at 129:07, 131:5-131:9, 131:16-131:20.
[197] *See, e.g.,* TTO_009016; TTO_009705- TTO_009708.
[198] ACN004304, at 304.
[199] ACN013993- ACN013995, at ACN014008.



144. The increased audience enthusiasm and attendance at events where Mr. Trump spoke serve as further indications of the success of his endorsement. When asked how the events featuring Mr. Trump differed from other ACN events, Ms. Butcher declared that "the enthusiasm of the reps definitely increased. You could tell that by the noise in the audience, the cheering, the clapping. They were very excited to have him there."[202]

145. Ms. Butcher further quantified the success of Mr. Trump's endorsement by discussing how event attendance quickly increased over the course of ACN's relationship with Mr. Trump.

---

[200] ACN013993- ACN013995, at ACN014008.

[201] ACN013993- ACN013995, at ACN014000.

[202] Butcher Deposition, at 145:03-145:06.

McKoy, et al., v. The Trump Corporation, et al., Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Kevin Lane Keller
November 18, 2022
Confidential – Subject to Protective Order

"not for any money."[212] This would have also increased Mr. Trump's trustworthiness, likeability, and credibility among the target audience.

153. The Trump Endorsement was forceful and strongly made.

   a. Both Mr. Trump and ACN regularly reinforced associations between ACN and key Trump brand associations such as success, leveraging the perceived fit between the Trump brand and the ACN Opportunity.

   b. Mr. Trump's statements about ACN – purportedly based on his research – were highly positive, with Mr. Trump repeatedly emphasizing the quality of ACN's products, that ACN's business model was proven and successful, and that the ACN Opportunity had a "proven track record and it's creating millionaires."[213]

   c. The Trump Endorsement was consistently featured across a number of different marketing and communication platforms ensuring wide reach for this positive endorsement.

154. Based on the available evidence, the Trump Endorsement significantly increased IBO signups during the Trump Endorsement period. ACN was very satisfied with the Trump Endorsement, electing to re-up his contract, and the reaction among prospective IBOs was reported to be extremely enthusiastic.

---

[212] "Donald Trump w/ Darren Hardy - ACN - Charlotte - 2013," April 14, 2020, https://www.youtube.com/watch?v=EFkbcWz2Gtw.

[213] "Donald Trump ACN Business Model," March 14, 2009, https://www.youtube.com/watch?v=KmIMb9BxmSM.

*McKoy, et al., v. The Trump Corporation, et al.,* Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Michael Gartenberg
November 18, 2022
Confidential – Subject to Protective Order

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated<br><br>*Plaintiffs*,<br><br>v.<br><br>THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP JR., ERIC TRUMP, and IVANKA TRUMP,<br><br>*Defendants*. | No. 1:18-cv-09936-LGS |

## EXPERT REPORT OF MICHAEL GARTENBERG

**November 18, 2022**

*McKoy, et al., v. The Trump Corporation, et al.,* Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Michael Gartenberg
November 18, 2022
Confidential – Subject to Protective Order

9. The research methods that I used to conduct my assignment required the compilation, evaluation, and analysis of facts and data available to me, including publicly available market data from U.S. government sources and industry participants, articles from public media, and product reviews on the Internet. This is the type of information that I have regularly relied on to provide research analysis to clients throughout my career as a personal technology analyst. I also reviewed and analyzed documents produced and deposition testimony provided during discovery in this case. The research methods that I used to conduct my assignment are reliable, valid, and of the type used by leading IT research and advisory firms in practice.

### III.     Summary of Opinions

10. Applying the methods I describe above, in my expert opinion, ACN's videophone was not a commercially viable personal technology product at any point during the period it was offered from 2006 through 2015. Based on my review of consumer technology product market trends, there was never a market for a desktop-based videophone such as ACN's at any point from 2006 through 2015 because such desktop videophones were continually eclipsed and outperformed by other products throughout the period, as outlined below:

- In 2006, when ACN launched its videophone, there was virtually no market for desktop videophones, notwithstanding the efforts of multiple competitors. By the time the first ACN videophone was introduced in 2006, desktop videophones were already available to U.S. consumers but had failed to achieve any meaningful traction in the market, which illustrates both that desktop videophones were not a new idea and that consumers did not want them. In contrast, Skype launched video calling via desktop computer software in 2006 and already had 6 million registered users in the U.S. that year. As a new entrant into this market environment, ACN's videophone was dead on arrival because consumers already had easy access to broadband and had widely adopted personal computers that would allow them to take advantage of Skype and other peer web-based video calling options that only proliferated and improved from 2006 onward.