UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP, JR., ERIC TRUMP, and IVANKA TRUMP, <br><br> Defendants. | No. 1:18-cv-09936-LGS-SLC |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Kaplan Hecker & Fink LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 564-0883

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ............................................................................... ii-iv

PRELIMINARY STATEMENT ............................................................................... 1

FACTS ............................................................................................................................ 3

I.       COMMON EVIDENCE WILL SHOW TRUMP FRAUDULENTLY
ENDORSED THE ACN IBO OPPORTUNITY ..................................................... 3

          A.    Trump's ACN Endorsement Deal .................................................. 3

          B.    Few Participants Recouped their Investment, Let Alone Profited
from the IBO Opportunity ............................................................ 5

          C.    Trump Consistently Repeated the Same Fraudulent Statements
Concerning the IBO Opportunity During His Endorsement Period ........... 5

                1.    Fraudulent Statement #1: Trump Misrepresented the Risk
of Investing in the IBO Opportunity ................................. 6

                2.    Fraudulent Statement #2: Trump Misrepresented the Commercial
Viability of ACN's Products and Services, Especially the ACN
Video Phone ......................................................................... 7

                3.    Fraudulent Statement #3: Trump Misrepresented the True Reason
for His Endorsement of the IBO Opportunity—That ACN Had
Paid Him Millions of Dollars ............................................. 7

                4.    Fraudulent Statement #4: Trump Misrepresented that He Had
Performed Due Diligence in Evaluating the IBO Opportunity ........ 8

          D.    Trump Consistently Communicated the Fraudulent Statements to
Prospective IBOs Through ACN's Various Marketing Platforms ............. 8

                1.    The Opportunity Discs ....................................................... 9

                2.    In-Person Speeches at ACN Conventions ...................... 10

                3.    *Success* and *Success from Home* Magazines ................ 10

                4.    *The Celebrity Apprentice* ................................................ 10

                5.    ACN's Website ................................................................... 11

II.      PLAINTIFFS ARE REPRESENTATIVE OF THE CLASSES ........................... 11

i

ARGUMENT ...................................................................................................................12

    I.       FOUR CLASSES SHOULD BE CERTIFIED UNDER RULE 23(b)(3) .............12

           A.     The Four Proposed Classes ........................................................................12

           B.     Legal Standard for Class Certification .......................................................12

           C.     The Classes Satisfy Rule 23(a) ..................................................................13

           D.     The Classes Satisfy Rule 23(b)(3) .............................................................18

                 1.     Common Questions of Liability and Damages Predominate.........19

                2.     Class Treatment Is a Superior Method to Resolve the Disputes....27

    II.     IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY AN ISSUE
           CLASS PURSUANT TO RULE 23(c)(4) ........................................................28

    III.    CONCLUSION ...................................................................................................30

TABLE OF AUTHORITIES

**Cases**

*Allegra v. Luxottica Retail N. Am*.,
    341 F.R.D. 373 (E.D.N.Y. 2022) ............................................................................ 14, 16

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .............................................................................................. 19, 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) .................................................................................................... 13

*Belfiore v. Procter & Gamble* Co.,
    311 F.R.D. 29 (E.D.N.Y. 2015) ................................................................................. 14

*Betances v. Fischer*,
    304 F.R.D. 416 (S.D.N.Y. 2015) ............................................................................... 18

*Cazares v. AVA Rest. Corp.*,
    No. 15 Civ 477, 2017 WL 1229727 (E.D.N.Y. Mar. 31, 2017) .................................. 18

*Charron v. Pinnacle Grp. N.Y. LLC*,
    269 F.R.D. 221 (S.D.N.Y. 2010) ............................................................................... 18

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ................................................................................. 19

*Cordes & Co. Fin. Servs., Inc. v. AG. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ......................................................................................... 16

*Damassia v. Duane Reade, Inc.*,
    250 F.R.D. 152 (S.D.N.Y. 2008) ............................................................................... 14

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ....................................................................................... 16

*Doe v. The Trustees of the Univ. of Penn.*,
    270 F. Supp. 3d 799 (E.D. Pa. 2017) ........................................................................ 20

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) .......................................................................... 18, 27

*Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ................................................................................. 15

*Flores v. Anjost Corp.*,
    284 F.R.D. 112 (S.D.N.Y. 2012) ............................................................................... 13

*Floyd v. City of New York*,
    283 F.R.D. 153 (S.D.N.Y. 2012) ............................................................... 13

*Ge Dandong v. Pinnacle Performance Ltd.*,
    No. 10 Civ. 8086, 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ................ 23, 24, 25, 26

*Ginsburg Dev. Cos., LLC v. Carbone*,
    134 A.D.3d 890 (2d Dep't 2015) ............................................................. 20, 29

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ..................................................................... 17

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019) ....................................................... 13, 15, 29, 30

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ...................................................................... 18

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................... 16

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ............................................................. 13, 14, 15, 17

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ............................................................................ 26

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ..................................................................... 21, 28

*J.A.O. Acquisition Corp. v. Stavitsky*,
    8 N.Y.3d 144 (2007) ................................................................................ 22

*Johnson v. Nextel Comms. Inc.*,
    780 F.3d 128 (2d Cir. 2015) ..................................................................... 14, 19

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413 (1996) .............................................................................. 22

*Landau v. Viridian Energy PA LLC*,
    223 F. Supp. 3d 401 (E.D. Pa. 2016) ......................................................... 29

*McBean v. City of New York*,
    260 F.R.D. 120 (S.D.N.Y. 2009) ............................................................. 18

*Mikhlin v. Oasmia Pharm. AB*,
    No. 19 Civ. 4349, 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021) ..................... 28

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)............................................................................ 3, 21

*Nielson Co. (U.S.), LLC v. Success Sys., Inc.*,
   112 F. Supp. 3d 83 (S.D.N.Y. 2015).............................................................. 20, 29

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
   165 F. Supp. 3d 937 (S.D. Cal. 2016)................................................................. 20

*Padilla v. Maersk Line, Ltd.*,
   271 F.R.D. 444 (S.D.N.Y. 2010) .......................................................................... 14

*Peete-Bey v. Educ. Credit Mgmt. Corp.*,
   131 F. Supp. 3d 422 (D. Md. 2015).......................................................... 20, 22, 29

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.*,
   No. 16 Civ. 3059, 2019 WL 5320390 (S.D. Cal. Oct. 21, 2019) ...................... 29

*Ries v. Ariz. Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012).......................................................................... 14

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)................................................................................. 19

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)........................................................................... 13, 15

*Rodriguez v. It's Just Lunch, Intern.*,
   300 F.R.D. 125 (S.D.N.Y. 2014) ................................................................... passim

*Scott v. Quay*,
   338 F.R.D. 178 (E.D.N.Y. 2021) .......................................................................... 17

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
   256 F.R.D. 284 (D. Conn. 2009)........................................................................... 27

*Sykes v. Mel Harris & Assocs., LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012) .......................................................................... 18

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008).................................................................................. 12

*Toy v. Metro. Life Ins. Co.*,
   593 Pa. 20 (2007).................................................................................................. 22

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .............................................................................................. 19

*United States v. City of New York*,
     No. 07 Civ. 2067 WL 3174084 (E.D.N.Y. July 8, 2011) ................................................. 29

**Rules**

Federal Rule of Civil Procedure 23 ........................................................................... passim

**Other Authorities**

5 Moore's Fed. Prac. § 23.86[2] ................................................................................... 28

**PRELIMINARY STATEMENT**

Plaintiffs Cathy McKoy, Markus Frazier, and Lynn Chadwick ("Plaintiffs") are working-class Americans who were defrauded by Defendant Donald J. Trump ("Trump") into paying a sign-up fee to join a multi-level marketing ("MLM") business, ACN, as so-called Independent Business Owners ("IBOs"). Plaintiffs bring this action to recover the fees they and other similarly-situated IBOs each paid to participate in the ACN scheme in reliance on Trump's false and misleading claims that the ACN MLM program (the "IBO Opportunity") was a low-risk, high-reward business venture. Plaintiffs seek class certification for a nationwide common law class and for three separate additional classes for class members with claims under the laws of California, Pennsylvania, and Maryland (collectively "the Classes").

Trump was ACN's marquee celebrity endorser for nearly a decade. Throughout that time, he made, and the other Defendants facilitated and echoed, false and materially misleading statements about the IBO Opportunity (the "Fraudulent Statements"). Trump's messaging consistently included the following four Fraudulent Statements: (1) that IBOs would likely profit financially from the IBO Opportunity; (2) that ACN offered "breakthrough" commercially-viable products; (3) that Trump was endorsing ACN because he loved the IBO Opportunity business model, not because he was being handsomely paid; and (4) that Trump had extensively vetted the IBO Opportunity before deciding to endorse it. Each of these statements was completely false.

In reality, the average IBO *lost* money with ACN and never approached the revenue needed to recoup the hefty upfront fees that ACN charged them to join the IBO Opportunity. Meanwhile, ACN paid Trump millions for his endorsement. And ACN made sure to get its money's worth, placing Trump's Fraudulent Statements front and center in its marketing materials. ACN included the Fraudulent Statements ██████████████████████████████ ███████████████████████████████████████████. ACN featured Trump as

its keynote speaker at events around the country, where he raved about the IBO Opportunity in front of tens of thousands of IBOs and prospective IBOs. ACN also featured Trump and the Fraudulent Statements in promotional magazines and on its website. As a result, every prospective IBO from 2006 to 2015 heard the Fraudulent Statements when they were being pitched to join the IBO Opportunity.

Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs seek to certify one nationwide class for Plaintiffs' common law fraud and negligent representation claims, and three additional state law statutory classes—one for each respective named Plaintiff's state law claims. The state laws governing the class claims are materially indistinguishable from one another and Plaintiffs can prove them through common proof.

The Rule 23(a) prerequisites are handily met. Plaintiffs' overarching common claim— that Trump's Fraudulent Statements were false and material—should be adjudicated on a class-wide basis. Hundreds of thousands of IBOs heard the Fraudulent Statements when they were pitched the IBO Opportunity. The classes pose common questions of law and fact, including whether Trump's Fraudulent Statements were false and misleading, whether Trump injured the class members, and whether the class members are entitled to damages. Common proof will establish that Trump uniformly communicated the Fraudulent Statements to prospective IBOs and that the class members reasonably relied on them when they paid to enroll in the IBO Opportunity. Plaintiffs' claims are the same as the absent class members they seek to represent: all were injured by the Fraudulent Statements and will benefit from the relief sought. Plaintiffs and their counsel will vigorously prosecute this action, as they have done to date.

Rule 23(b)(3) is appropriately applied to the proposed Classes because common issues predominate. The core question in this case is whether Trump misrepresented in the Fraudulent

Statements that the IBO Opportunity was a viable, low-risk venture. This common question predominates because the Fraudulent Statements were materially uniform, repeated by Trump like a mantra (often based on copycat talking points), and republished by ACN throughout the entirety of Trump's endorsement. Moreover, common issues predominate because the Classes can use common evidence that they relied on Trump's uniform Fraudulent Statements, which induced Plaintiffs to enroll in the IBO Opportunity. It is an "appropriate subject[] for class certification because [Trump's] standardized misrepresentations may be established by generalized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002).[1]

## FACTS

**I.     COMMON EVIDENCE WILL SHOW TRUMP FRAUDULENTLY ENDORSED THE ACN IBO OPPORTUNITY**

From 2006 to 2015, Trump was paid to endorse the IBO Opportunity. As ACN's key endorser, Trump made the Fraudulent Statements concerning the IBO Opportunity, which were disseminated widely, including through videos on promotional discs that ACN sold to hundreds of thousands, if not millions, of its IBOs to use to recruit prospective IBOs. In reality, the IBO Opportunity was nothing like the low-risk, high-reward opportunity Trump consistently described. According to ACN's internal data, ████████████████████████████████████ ████ Meanwhile, Trump pocketed millions from ACN in exchange for his endorsement of the IBO Opportunity—all while concealing that he was a paid endorser.

### A.     Trump's ACN Endorsement Deal

While Trump was a paid endorser of ACN from 2006 to 2015 (the "Endorsement Period"), ACN IBOs tried to make money recruiting new qualifying IBOs and making sales of telecommunications services, including cell phone service, repackaged or bundled by ACN, *see*

---

[1] Citations throughout this brief have been cleaned up to omit non-substantive brackets and the like.

Ex. 1 at 60:4-62:11,[2] as well as the ACN videophone, which was not commercially viable, *see* Ex. 3 ¶ 10. During the Endorsement Period, hundreds of thousands of people signed up to become IBOs in all 50 states. *See* Ex. 2; Ex. 3 at 2.[3]

In 2006, ACN agreed to pay Trump $1 million to record promotional video content, which would be used "solely for purposes of promoting ACN to current or [pro]spective IBOs," and an additional $1 million to speak at three ACN live events. Ex. 1 at 184:10-186:14; *see* Ex. 5 at TTO617. Trump appeared in-person at ACN conventions and also recorded a set of promotional videos for ACN in 2006. Ex. 1 at 198:4-17. ACN executives were thrilled by the excitement Trump was generating for the IBO Opportunity. One wrote: "We got the biggest response that we ever got at an event with an announcement." Ex. 6.

In 2008, ACN agreed to pay Trump an additional $2.25 million to record more video content promoting the IBO Opportunity (which he did using materially similar and, in many cases, identical talking points). *See* Ex. 7. Trump inked additional endorsement agreements with ACN in 2009 and 2011, each of which required Trump to appear at four live ACN events in exchange for $1.5 million and $1.6 million, respectively. *See* Ex. 8; Ex. 9; Ex. 1 at 239:6-240:17, 250:23-251:17. ACN and Trump entered into a final agreement in 2013, which provided that, in exchange for $4.5 million, Trump agreed to "promote ACN's network business to ACN's sales force and shall promote nothing else" at ten ACN events, and to make himself available to film short promotional video clips, create a "weekly inspirational note," and appear in articles in certain magazines. Ex. 10 at TTO478-79; *see* Ex. 1 at 296:16-301:23. ACN and Trump terminated the endorsement agreement in 2015 after reporters began to ask questions. *See* Ex. 11.

---

[2] Citations to "Ex." are to the exhibits annexed to the March 10, 2023 Declaration of Matthew D. Brinckerhoff ("Brinckerhoff Decl.").

[3] ███████████████████████████████████████████████████████

**B.      Few Participants Recouped their Investment, Let Alone Profited from the IBO Opportunity**

All new IBOs were required to pay a $499 sign-up fee to ACN. Ex. 1 at 40:3-14. The initial IBO term ran for one year. *Id.* at 42:23-43:7. After that, IBOs were required to pay an annual $149 renewal fee to maintain their IBO status. *Id.* at 42:23-43:7, 157:15-25. IBOs were also encouraged to be their own "initial customer source" by purchasing ACN products and services themselves, Ex. 12 at ACN010984; *see* Ex. 1 at. 51:18-52:2, and to buy ACN marketing materials and tickets to attend ACN events, Ex. 1 at. 51:18-52:2, 125:12-126:7.

According to Professor Stacie Bosley's analysis of ACN data, the IBO Opportunity did not offer "a reasonable prospect of economic success with low risk" because it did "not provide meaningful opportunities to earn money." Ex. 13 ¶ 12. ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
████████████

**C.      Trump Consistently Repeated the Same Fraudulent Statements Concerning the IBO Opportunity During His Endorsement Period**

As detailed below, throughout the Endorsement Period, Trump made the same Fraudulent Statements to IBOs and prospective IBOs, using the same misleading language and themes in all contexts. Whether he was speaking live, on video, or in written articles, he uniformly and falsely represented that prospective IBOs would likely succeed financially if they joined the IBO Opportunity. Trump's repeated core misrepresentations included: (1) the IBO Opportunity was a low-risk endeavor that provided a viable source of income for prospective IBOs; (2) ACN's products and services were cutting-edge and highly desirable; (3) Trump was endorsing the IBO

Opportunity because he believed it offered a reasonable probability of success, rather than because he was being paid; and (4) Trump's endorsement of the IBO Opportunity was based on his extensive due diligence.

### 1. Fraudulent Statement #1: Trump Misrepresented the Risk of Investing in the IBO Opportunity

Trump raved that prospective IBOs would likely profit from the IBO Opportunity, which he consistently described as a low-risk venture. These Fraudulent Statements concerning the risk of the IBO Opportunity were prominently featured on video discs that were sold to IBOs from at least 2006 to 2015 for the purpose of recruiting prospective IBOs, known as ACN Opportunity Discs. *See* Ex. 14 at ACN023081. On the Opportunity Discs, Trump said "ACN has a winning business model," Ex. 15, described ACN as using "a model with a proven track record" that is "creating millionaires,"[4] and told prospective IBOs: "You have a great opportunity before you at ACN without any of the risks most entrepreneurs have to take" and "ACN has a reputation for success. Success that is really synonymous with the Trump name and other successful names and you can be a part of it," Exs. 17-22. On the Opportunity Discs, Trump also assured viewers that ACN had "strong leadership, a solid track record, success stories, a strong product people really need and want and a clear plan for the future." *Id.* Trump repeated these same statements in other ACN media. For example, in an article published in *Success from Home* magazine, Trump said MLM has "proven itself to be a viable and rewarding source of income" and is a "solid opportunity," and assured readers: "the odds will be with you." Ex. 16 at SPH1131, 1204.

---

[4] "Donald Trump ACN Business Model," March 14, 2009, https://www.youtube.com/watch?v=KmIMb9BxmSM.

2.    **Fraudulent Statement #2: Trump Misrepresented the Commercial Viability of ACN's Products and Services, Especially the ACN Video Phone**

On the Opportunity Discs, Trump repeatedly offered his glowing assessment of the commercial viability of ACN's products and services. Trump claimed that ACN gave prospective IBOs "the ability to market breakthrough technology before it hits the critical mass. I've experienced the opportunity that exists when you're able to jump ahead of the curve and ACN gives you that opportunity. Believe me, it's ultimately a dream come true." Exs. 17-22. He similarly stated that ACN has "a strong product people really need and want." *Id.*

3.    **Fraudulent Statement #3: Trump Misrepresented the True Reason for His Endorsement of the IBO Opportunity—That ACN Had Paid Him Millions of Dollars**

Trump further misled prospective IBOs by concealing that his endorsement had been bought by ACN for millions of dollars. Trump let prospective IBOs believe that his endorsement was motivated purely by his love of ACN's business model and success. In ACN promotional videos, Trump gushed: "I've really fallen in love with ACN. I've known them a long time now and I'm still here."[5] ACN's website likewise described Trump's endorsement as follows: "So why does one of the busiest men in business take time out for ACN? Because he loves and believes in the industry – and more importantly, he believes in ACN!"[6]

According to Dr. Kevin L. Keller, these statements that Trump's belief in ACN, rather than money, motivated his endorsement, "would lead prospective and current IBOs to see Mr. Trump as a more trustworthy source of information about ACN," which, in turn, would "enhance

---

[5] MLMTrainingLive, "Learn 3 Networking Secrets From Donald Trump on Effective MLM Marketing," YouTube (Apr. 5, 2010), https://www.youtube.com/watch?v=NsIQSku1ioI (3:37-3:45).
[6] ACN, "Trump Partnership," ACN Inc. (Feb. 9, 2014),
https://web.archive.org/web/20140209092808/http://acninc.com/trump-partnership#.

the persuasiveness of Mr. Trump's endorsement in encouraging prospective IBOs to invest in the

ACN [IBO] Opportunity." Ex. 23 ¶ 119.

### 4.    Fraudulent Statement #4: Trump Misrepresented that He Had Performed Due Diligence in Evaluating the IBO Opportunity

Trump also falsely represented that he had researched and vetted the IBO Opportunity.

Trump claimed he had "read great reports on ACN, and glowing reports," Ex. 24 at 1:26:37-

1:27:04, that he had "been able to determine after some research" that ACN has "stayed ahead of

the pack," Ex. 26 at 14:07-14:12, and "We do a lot of research on companies before we agree to

do something like I'm doing for [ACN]. And ACN's a great company," *id.* at 13:44-13:51. None

of that was true.

The prospective IBOs who heard these statements had no idea that Trump had never

researched or otherwise performed due diligence concerning the IBO Opportunity. At his

deposition in this case, Trump admitted that he does not know anything about how the IBO

Opportunity worked—he does not know what the acronym "ACN" stands for, what an IBO is,

how people became IBOs, how IBOs supposedly made money, how IBOs' commissions were

calculated by ACN, how IBOs earned bonuses, what role new IBO recruitment played in IBOs'

compensation, or how the IBO compensation plan worked. Ex. 27 at 60:15-64:3. Instead, Trump

claimed he did research by speaking with people at ACN events who, according to Trump, were

apparently all "happy" and "made money." *Id.* at 64:4-66:25.

### D.    Trump Consistently Communicated the Fraudulent Statements to Prospective IBOs Through ACN's Various Marketing Platforms

Trump's endorsement of ACN and the IBO Opportunity, including the Fraudulent

Statements, was consistently broadcast to all prospective IBOs nationwide through ACN's

marketing materials. ACN's General Marketing and Advertising Policy encouraged IBOs to use

these formal ACN materials to market the IBO Opportunity to prospective IBOs and "strongly

discouraged IBOs from creating or using their own marketing materials" in order to ensure the IBO recruitment message was "accurate" and "consistent across IBOs." Ex. 1. at 86:15-88:6; *see* Ex. 28 at ACN583. As a matter of practice, IBOs complied with these ACN policies and "overwhelmingly did use ACN's marketing materials." Ex. 1. at 88:7-10.

The Fraudulent Statements were conveyed by ACN and its IBOs through the following ACN marketing materials: (1) the Opportunity Discs; (2) in-person speeches at ACN conventions; (3) *Success* and *Success from Home* magazines; (4) episodes of *The Celebrity Apprentice*; and (5) ACN's website (and IBO webpages made available by ACN).

**1.     The Opportunity Discs**

The Fraudulent Statements were published on the Opportunity Discs, which ACN sold to IBOs for use in their IBO recruitment efforts—known as "piquing," Ex. 1. at 93:24-94:6; 123:3-124:8, and featured videos designed to spark prospective IBOs interest in the IBO Opportunity, *id.* at 96:15-97:3; 124:9-14; *see, e.g.*, Ex. 17. All of the Opportunity Discs sold by ACN from 2006 to 2015 contained footage of Trump, filmed at Trump Tower in 2006 and 2008 using similar talking points. Ex. 1 at 218:23-219:8, 235:14-235:21; Ex. 35 at 181:1-183:18. The Opportunity Discs were widely sold and distributed by ACN IBOs to potential IBOs. ██████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

### 2.    In-Person Speeches at ACN Conventions

A core feature of Trump's endorsement deal with ACN was his contractual agreements to appear and speak on stage at a number of live ACN events.[7] Trump appeared at so many ACN events that ACN later highlighted in its marketing materials that Trump had "become a fixture" at ACN events, "setting the record for the most appearances from the ACN stage by any ACN special guest speaker." Ex. 14 at ACN023058.

### 3.    *Success* and *Success from Home* Magazines

*Success* and *Success from Home* were both print magazines available for purchase by the general public, including through a subscription, at "newsstand[s]," and through retailers like Barnes & Noble. Ex. 1. at 97:8-22, 99:17-100:6. ██████████████

████████████████████████████████████████████

████████████████████████████████

Trump and/or ACN were featured in at least four *Success* and *Success from Home* magazine articles. *See* Exs. 16, 30-32. These articles "reinforced similar themes to the Trump Endorsement efforts in other media." Ex. 23 ¶ 137. For example, Trump assured readers in one article that if they pursued an MLM opportunity (like ACN), "the odds will be with you." Ex. 16 at SPH1204.

### 4.    *The Celebrity Apprentice*

ACN was a central fixture of two episodes of Trump's hit TV show, *The Celebrity Apprentice*. The show had a massive audience—8.98 million people watched the show's 2009 season.[8] In a March 2009 episode, the celebrity contestants were challenged to produce a live

---

[7] *See* Ex. 5 (2006 agreement); Ex. 7 (2008 agreement); Ex. 8 (2009 agreement); Ex. 9 (2011 agreement); Ex. 10 (2013 agreement).
[8] *See* Tony Maglio, "'Celebrity Apprentice': Just How 'Yuge' Were Those TV Ratings Anyway?," The Wrap, January 1, 2017, https://www.thewrap.com/celebrity-apprentice-trump-tv-ratings-arnold/.

event for the launch of ACN's Video Phone. Ex. 36. In March 2011, ACN was again the focus when the celebrity contestants were tasked with producing a commercial for an ACN Video Phone. Ex. 37. Trump's use of *The Celebrity Apprentice* to shed a spotlight on ACN—"one of only a few featured brands to appear on more than one episode"—"added to the legitimacy of the ACN brand." Ex. 23 ¶ 135.

### 5.    ACN's Website

During the Endorsement Period, ACN dedicated a special section of its website to Trump, featuring videos of Trump's endorsement of ACN, quotes attributed to Trump, and images of Trump.[9] When ACN eventually phased out the Opportunity Discs, it took the same content and made it available online through its website rather than through a physical disc. Ex. 1. at 119:6-12. IBOs were then able to use the online content to market the IBO Opportunity. *Id.*

## II.    PLAINTIFFS ARE REPRESENTATIVE OF THE CLASSES

This action is brought by three working-class individuals who were persuaded by Trump's Fraudulent Statements to pay ACN to become ACN IBOs and participate in the IBO Opportunity. Plaintiff Catherine McKoy enrolled as an ACN IBO in California in 2014 and pursued the opportunity for approximately two years. McKoy Decl. ¶¶ 1-2. Plaintiff Markus Frazier joined ACN as an IBO in Maryland in 2016 and participated in the IBO Opportunity for one year. Frazier Decl. ¶¶ 1-2. Plaintiff Lynn Chadwick participated in the ACN IBO Opportunity from 2013 to 2014 while living in Pennsylvania. Chadwick Decl. ¶¶ 1-2. Plaintiffs McKoy, Frazier, and Chadwick each relied on Trump's endorsement of ACN and his statements about the ACN IBO Opportunity when they decided to spend $499 to enroll as ACN IBOs. *See*

---

[9] *See* ACN, Inc., "ACN & Donald J. Trump," June 15, 2008,
https://web.archive.org/web/20080615160445/http://www.acninc.com/acn/us/opportunity/trump.jsp;
ACN, Inc., "ACN," June 21, 2015,
https://web.archive.org/web/20150621214440/http://acninc.com/trump.

*id.* ¶ 3; McKoy Decl. ¶ 3; Frazier Decl. ¶ 3. All Plaintiffs lost money with ACN and did not even

recoup their initial $499 sign-up fee. McKoy Decl. ¶ 4; Frazier Decl. ¶ 4; Chadwick Decl. ¶ 4.

## ARGUMENT

### I.   FOUR CLASSES SHOULD BE CERTIFIED UNDER RULE 23(b)(3)

#### A.   The Four Proposed Classes

Plaintiffs seek the certification of four separate classes under Rule 23(b)(3): (1) all

Plaintiffs seek certification of a nationwide class for purposes of asserting common law fraud

and negligent misrepresentation claims (the "Common Law Class"); (2) Plaintiff McKoy seeks

certification of a class for purposes of asserting statutory claims under the California False

Advertising Law ("FAL") and Unfair Competition Law ("UCL") (the "California Class"); (3)

Plaintiff Markus Frazier seeks certification of a class for purposes of asserting statutory claims

under the Maryland Consumer Protection Act ("MCPA") (the "Maryland Class"); and (4)

Plaintiff Lynn Chadwick seeks certification of a class for purposes of asserting statutory claims

under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (the

"Pennsylvania Class"). *See* Pls' Notice of Mot. for Class Cert.

#### B.   Legal Standard for Class Certification

To obtain class certification under Rule 23(b)(3), Plaintiffs must show that each

requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of

representation—is satisfied. *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,

546 F.3d 196, 201-02 (2d Cir. 2008). Plaintiffs must also meet Rule 23(b)(3)'s two requirements:

predominance and superiority. *Id.* at 202. "[A] court's class-certification analysis must be

rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," but

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification

stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013).

12

C.      **The Classes Satisfy Rule 23(a)**

Rule 23(a)'s four requirements are met for each Class.

**1. Joinder is Impracticable.** Each of the four proposed Classes comprises thousands of potential class members and is therefore "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Generally, a class composed of more than 40 members satisfies the numerosity requirement." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 123 (S.D.N.Y. 2012). Courts do not require "evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Plaintiffs also need not show that "joinder of all parties [is] impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Floyd v. City of New York*, 283 F.R.D. 153, 161 (S.D.N.Y. 2012).

Here, each of the four classes is comprised of thousands of potential class members and is therefore sufficiently numerous that joinder of all members is impracticable. ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████   Ex. 13 at Ex. II.A.2; *see* Ex. 2. "Given that there are thousands of potential class members, the numerosity requirement is satisfied." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 437 (S.D.N.Y. 2019) ("*In re Foreign Exchange*"); *see In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (finding numerosity where hundreds of thousands of the defendant's products were sold during the relevant time period, which "suggest[ed] far more than 40 individuals comprise each class").

2. **Commonality.**  Each of the four proposed classes raises "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is "satisfied if plaintiffs demonstrate that the class members have suffered the same injury," such that the resolution of certain issues "will affect all or a significant number of the putative class members." *Johnson v. Nextel Comms. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). The commonality requirement poses a "minimal burden," *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 448 (S.D.N.Y. 2010), *aff'd,* 721 F.3d 77 (2d Cir. 2013), and is "liberally construed" to require "a minimum of one issue common to all class members," *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson*, 780 F.3d at 137.

Where plaintiffs' claims are based on a defendant's false statements, the claims necessarily raise questions "common to all class members" that are "apt to drive the resolution of [the] litigation." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 405 (finding commonality where plaintiffs' New York and California false advertising and related claims required asking "whether the [defendant's] . . . claim is false and/or misleading").[10] Any "variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality." *Ries*, 287 F.R.D. at 537. Even where the defendant's false statements are "worded in several variations" and the named plaintiff was not exposed to every false statement, the plaintiff's claims "are reasonably coextensive with those of absent [class] members" for purposes of Rule 23(a)(2)'s commonality requirement. *Id.* at 538-39.

---

[10] *See Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 398 (E.D.N.Y. 2022) (finding commonality where common questions included whether defendant's representation was false or misleading); *Belfiore v. Procter & Gamble* Co., 311 F.R.D. 29, 62 (E.D.N.Y. 2015) (same); *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 538-39 (N.D. Cal. 2012) (same).

14

Plaintiffs here easily meet their "minimal burden" as to commonality. The same conduct—Trump's Fraudulent Statements—gives rise to each proposed class's claims. Numerous questions of law and fact are common to each of the classes, including, for example: (1) whether Trump's conduct constituted common law fraud or negligent misrepresentation, or violated the respective state statutes; (2) whether the Fraudulent Statements were false and misleading; (3) whether Trump's conduct injured class members; and (4) whether the class members are entitled to an award of damages. In addition, Plaintiffs' damages are a common question of fact—one that can be readily answered by ACN's internal records, which will show the amount each class member paid to become an IBO and maintain their IBO status.

**3. Typicality.**  Fed. R. Civ. P. 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is satisfied where "each class member's claim arises from the same course of events" and "each class member makes similar legal arguments" to prove their claim. *In re Foreign Exchange*, 407 F. Supp. 3d at 437. The typicality requirement is "not highly demanding," because "the claims only need to share the same essential characteristics and need not be identical." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 53 (E.D.N.Y. 2019).[11]

"Here, the lead plaintiffs' and absent class members' claims arise from the same course of events, and each class member will make similar legal arguments to prove defendants' liability." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 406. The claims brought by Plaintiffs and members of each respective proposed class are the same and address the same harm caused by Trump's Fraudulent Statements: all three named Plaintiffs and the members of the national

---

[11] *See Robidoux*, 987 F.2d at 936-37 ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying the individual claims.").

Common Law Class bring common law fraud and negligent misrepresentation claims, and the members of the Maryland, Pennsylvania, and California classes bring the same claims under each state's respective consumer protection statute. Plaintiffs' claims in each share the same nexus of fact and law. Typicality is satisfied.

**4. Adequacy.** Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining adequacy, courts consider "whether (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. AG. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007). Both of these prongs are met here.

Plaintiffs' and the Classes' interests are aligned. An adequate class representative is one who has "an interest in vigorously pursuing the claims of the class" and "no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). "Courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012).

Here, "each of the named Plaintiffs has a baseline familiarity with the complaint, has been in contact with counsel, possesses a general understanding of the basis for this lawsuit and of their roles as a class representative, and has demonstrated and professed a willingness to prosecute this case." *Allegra*, 341 F.R.D. at 400; *see* McKoy Aff. ¶¶ 6-8; Frazier Aff. ¶¶ 6-8; Chadwick Aff. ¶¶ 6-8. Plaintiffs have vigorously litigated their case, withstood various procedural hurdles including an interlocutory appeal, participated in voluminous party and non-

party discovery, responded "to extensive written discovery requests" and sat for "lengthy depositions." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 406. Each named Plaintiff has stated that "he or she understands the requirements of serving as a lead plaintiff." *Id.* at 407; *see* McKoy Aff. ¶ 5; Frazier Aff. ¶ 5; Chadwick Aff. ¶ 5. "Finally, nothing in the record suggests lead plaintiffs' interests are antagonistic to those of other class members." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 407.

Plaintiffs' counsel at Kaplan Hecker & Fink LLP ("KHF") and Emery Celli Brinckerhoff Abady Ward & Maazel LLP ("ECBAWM") are "qualified, experienced and generally able to conduct the litigation," *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992), and should be appointed as class counsel under Rule 23(g). Plaintiffs' counsel has effectively and steadfastly prosecuted this litigation to date, including conducting voluminous fact discovery; taking and defending 29 depositions; litigating various discovery disputes involving parties and non-parties; and retaining multiple expert witnesses.

Looking beyond Plaintiffs' counsel's performance in the present case, KHF has been recognized as a top litigation firm by The American Lawyer, The National Law Journal, The New York Law Journal, Benchmark Litigation, Bloomberg, Chambers, Law Dragon, and other publications, and has recent experience as defense counsel in large class actions, including for multiple major universities.[12] Similarly, courts in the Second Circuit have repeatedly recognized that ECBAWM has extensive experience litigating complex class actions.[13]

---

[12] *See, e.g.*, *Cohen v. Brown Univ.*, No. 21-1032 (1st Cir. 2021); *Brittain v. Trs. of Colum. Univ. in N.Y.*, No. 20 Civ. 9194 (S.D.N.Y. 2020); *In re Colum. Tuition Refund Action*, No. 20 Civ. 3208 (S.D.N.Y. 2020).

[13] *See, e.g., Scott v. Quay*, 338 F.R.D. 178, 189 (E.D.N.Y. 2021) (granting motion for class certification and noting that ECBAWM has "extensive experience litigating . . . class actions in federal court"); *McBean v. City of New York*, 260 F.R.D. 120, 132 n.17 (S.D.N.Y. 2009) (finding that ECBAWM "amply demonstrate[d]" its "ability and determination to represent the class effectively").

**5. Ascertainability.**  In addition to the four Rule 23(a) factors, the Second Circuit has recognized a fifth pre-condition to class certification: ascertainability. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). "To be ascertainable, the class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010). "The standard for ascertainability is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin v. Kangadis Food Inc.,* 297 F.R.D. 561, 567 (S.D.N.Y. 2014).

Here, the Classes are readily ascertainable; they consist of persons who invested in the IBO Opportunity who can be identified using ACN's internal IBO data.



Courts routinely find that classes are sufficiently ascertainable when class members can be readily identified using records such as ACN's. *See, e.g.*, *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 292-93 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015) (class sufficiently ascertainable and "identifiable pursuant to objective criteria" where members could be "readily identified using . . . records maintained by defendants"). [14]

**D.    The Classes Satisfy Rule 23(b)(3)**

In addition to meeting the Rule 23(a) requirements, Plaintiffs satisfy both the "predominance" and "superiority" requirements of Rule 23(b)(3).

---

[14] *Betances v. Fischer*, 304 F.R.D. 416, 428-29 (S.D.N.Y. 2015) (class sufficiently ascertainable where "Defendants maintain[ed] within their computer systems information regarding all individuals" in the putative plaintiff class); *Cazares v. AVA Rest. Corp.*, No. 15 Civ 477, 2017 WL 1229727, at *7 (E.D.N.Y. Mar. 31, 2017) (class sufficiently ascertainable through use of employee payroll spreadsheets).

### 1.      Common Questions of Liability and Damages Predominate

For each of the Classes, "questions of law or fact common to class members predominate over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In this Circuit, "[p]redominance is satisfied if resolution of *some* of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (emphasis added).

When evaluating predominance, courts "must assess (1) the 'elements of the claims and defenses to be litigated'; and (2) 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief.'" *Johnson*, 780 F.3d at 138. "This assessment is more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case." *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 80 (S.D.N.Y. 2018). Ultimately, when "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Common issues predominate here because Plaintiffs can prove the elements of their claims on a class-wide basis using generalized evidence, and those elements indisputably subject to common proof are the significant driving issues of this case. To state a common law fraud

claim, a plaintiff must show: (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damages as a result of such reliance. *Nielson Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 105 (S.D.N.Y. 2015). The elements of Plaintiffs' common law negligent misrepresentation claim include: "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information on the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Ginsburg Dev. Cos., LLC v. Carbone*, 134 A.D.3d 890, 894 (2d Dep't 2015). To bring a claim under the California UCL or FAL, a plaintiff must: "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising." *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 947 (S.D. Cal. 2016). To state an MCPA claim, a plaintiff must allege: "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 432 (D. Md. 2015). Finally, under the UTPCPL, a plaintiff must allege: "(1) plaintiff purchased or leased goods or services primarily for a personal, family, or household purpose; (2) plaintiff suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL." *Doe v. The Trustees of the Univ. of Penn.*, 270 F. Supp. 3d 799, 828 (E.D. Pa. 2017).

Running through these claims as a common element is *the* significant and central issue of this case: the falsity and materiality of the Fraudulent Statements. Plaintiffs will prove this element through common proof. While Defendants may argue that Trump's Fraudulent

Statements to class members were variable, Trump in fact communicated the same, standardized message to the IBOs every time he spoke about ACN—and his uniform statements were mass distributed to the class in hundreds of thousands, if not millions, of identical discs. Plaintiffs can use the same evidence to establish what Trump said and why it was materially false, for the entire class. A second significant element that can easily be proven using common evidence is the class members' injuries. Even the common element of reliance is susceptible to class-wide proof, cementing that core common issues predominate over any individual ones. Given that the driving issues of Plaintiffs' claims are subject to common proof, predominance is satisfied.

### a.       The Fraudulent Statements Were Materially Uniform

Trump's Fraudulent Statements concerning the reasonable probability of financial success` with the IBO Opportunity were sufficiently materially uniform to be susceptible to generalized proof at trial.  The Second Circuit has held that "fraud claims based on uniform misrepresentations made to all members of the class" are "appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof." *Moore*, 306 F.3d at 1253; *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) ("*In re U.S. Foodservice*") (same). "In assessing whether a defendant made materially uniform misrepresentations, no particular form of evidentiary proof is dispositive." *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 139 (S.D.N.Y. 2014).

Here, Trump uniformly misrepresented that the IBO Opportunity was a low-risk endeavor that provided a viable source of income for prospective IBOs. ACN relayed this consistent false message throughout the duration of Trump's ACN endorsement. Hundreds of thousands, if not millions, of prospective IBOs (including each of the Plaintiffs) heard from Trump that the IBO Opportunity was "a great opportunity . . . *without any of the risks* most entrepreneurs have to take." That Fraudulent Statement was recorded on video in 2006 and mass

distributed to IBOs via 500,000 Opportunity Discs in a six-month period. ACN consistently

urged IBOs to rely on the Opportunity Discs when marketing the IBO Opportunity to prospective

IBOs, and "strongly discouraged IBOs from creating or using their own marketing materials" to

ensure the recruitment message was "consistent across IBOs." Ex. 1 at 86:15-88:6.[15]

     The Fraudulent Statements saturated all ACN communications to IBOs in this time

period and reached hundreds of thousands if not millions of IBOs. At trial, Plaintiffs can present

common evidence to the factfinder that Trump made uniform, standardized false representations

regarding the IBO Opportunity to prospective IBOs.

     **b.**    **The Common Law, Maryland, and Pennsylvania Classes Will Demonstrate Class-wide Reliance Through Common Circumstantial Evidence**

     Common circumstantial evidence will prove the class members' reliance on the

Fraudulent Statements for the Common Law, Maryland and Pennsylvania Classes,

notwithstanding the individualized reliance elements of those claims.[16]

     Trump's conduct was so central to the ACN business opportunity during this period, and

so pervasive in all communications to prospective IBOs, that Plaintiffs can use common

evidence to establish reliance. Specifically, Plaintiffs can demonstrate that nearly every

prospective IBO, including each of the named Plaintiffs, heard the Fraudulent Statements

depicting ACN as a high-success, low-risk endeavor that Trump had personally vetted. This

message was particularly potent because Trump, as a celebrity endorser known for his supposed

business acumen, had "credibility as an expert in business," which, "coupled with his fame and

---

[15] As detailed in § I.D, in addition to the Opportunity Discs, the Fraudulent Statements were consistently shared during Trump's live appearances before tens of thousands of attendees at ACN conventions, republished on ACN's website, and reinforced in two episodes of The Celebrity Apprentice, a show with nearly 9 million viewers at the time, in which Trump featured ACN as the special guest brand.
[16]*See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) (common law fraud); *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007) (common law negligent misrepresentation); *Peete*-Bey, 131 F. Supp. 3d at 432 (MCPA); *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 45-46 (2007).

noteworthiness at the time, gave [him] a high perceived fit with the ACN endorsement" and "would have provided reassurance and confidence, making [] prospective IBOs more comfortable with investing in ACN." Ex. 23 ¶¶ 30-31. Accordingly, Trump's Fraudulent Statements about the viability of the IBO Opportunity were "so fundamental that it is reasonable to infer not only that [Trump] intended for [his] misrepresentations to induce plaintiffs' reliance, but that plaintiffs in fact relied on those representations in becoming [ACN's] customers." *Rodriguez*, 300 F.R.D. at 139.

"[F]raud-based claims are not entirely beyond the reach of Rule 23, and where each plaintiff can prove reliance through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue), certification may well be appropriate." *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013). The Supreme Court has likewise instructed that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625. Consistent with this precedent, "many courts in this Circuit . . . have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations . . . about that product." *Rodriguez*, 300 F.R.D. at 139 (quoting *Ge Dandong*, 2013 WL 5658790, at *9).

For example, in *Rodriguez*, the court certified a nationwide common law fraud class where the plaintiffs alleged that they paid to sign up for the defendant's matchmaking service based on the defendant's misrepresentations that its service had already found "multiple matches" for each plaintiff, "regardless of whether or not that was true." *Id.* at 131. The court emphasized that "each of the four proposed class representatives provided evidence that they relied on defendants' misrepresentations and signed up with [the matchmaking service] as a

result." *Id.* at 140. The court held that the matchmaking service's "representation to its prospective customers about multiple matches was so fundamental that it is reasonable to infer not only that defendants intended for their misrepresentations to induce plaintiffs' reliance, but that plaintiffs in fact relied on those representations in becoming [the matchmaking service's] customers." *Id.* at 139.

Similarly, in *Ge Dandong*, the court certified a class of investors who alleged common law fraud and fraudulent inducement claims based on alleged misrepresentations made by the defendant financial institutions in brochures describing certain notes purchased by investors. Because the investors purchased the notes "in hopes that they would prove profitable," and because the defendants' brochures "failed to disclose Defendants' conflict of interest and included an allegedly misleading description of the [note's] Underlying Assets," the court found it "hard to imagine a reasonable investor purchasing [the notes] if the [defendant's brochures] had revealed their true nature." 2013 WL 5658790, at *10. Thus, even though the defendants could "demonstrate that some putative class members had more than one reason for purchasing [the notes]," that did not "contradict the notion that putative class members relied on Defendants' alleged misrepresentations and omissions as well." *Id.* at *11. The court therefore held that "while each plaintiff must prove reliance, he or she may do so—in *this* case—through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)." *Id.*

Here too, Trump's consistent false representations to ACN's prospective IBOs about the low-risk nature of the IBO Opportunity were "so fundamental that it is reasonable to infer . . . that plaintiffs in fact relied on those representations in becoming [IBOs]." *Rodriguez*, 300 F.R.D. at 139. As in *Rodriguez* and *Ge Dandong*, it stands to reason—and Plaintiffs can demonstrate

through common proof—that they would not have invested in the IBO Opportunity had Trump

revealed its true nature: ███████████████████████████████████████████

████████████████████████████.[17]

Internal ACN documents further demonstrate how Trump's Fraudulent Statements

successfully increased ACN's business. ACN's own co-founder wrote in an internal email that

he had never seen IBOs as excited as they were after Trump announced his endorsement of

ACN. Ex. 6. ██████████████████████████████████████



This record reflects the named

Plaintiffs' experiences, who have each "provided evidence that they relied on [Trump's]

misrepresentations and signed up with [ACN] as a result." *Rodriguez*, 300 F.R.D. at 140.

Accordingly, even though individual reliance is an element of the Common Law,

Maryland, and Pennsylvania Classes' claims, "[i]t does not follow, however, that individual

issues predominate as a matter of law." *Ge Dandong*, 2013 WL 5658790, at *9. "There is no

blanket rule in the Second Circuit that a 'fraud class action cannot be certified when individual

---

[17] At trial, Dr. Keller will explain how Trump's celebrity endorsement of the IBO Opportunity was especially powerful (1) because the IBO Opportunity compensation structure was complex, and would therefore benefit from the legitimization provided by a celebrity endorser like Trump, Ex. 23 ¶¶ 68-86; (2) "IBOs saw [Trump] as business savvy, able to identify a money-making opportunity, and whose success the prospective IBOs might take as a model for their own success," *id.* ¶ 101; (3) Trump had high source credibility among entrepreneurial prospective IBOs, because he was "positioned as a uniquely strategic and savvy expert in business," *id.* ¶ 107; and (4) "Trump made numerous strong, positive statements about ACN and the [IBO] Opportunity" and his endorsement of ACN "was featured extensively across multiple media sources," *id.* ¶ 120.

reliance will be an issue.'" *Rodriguez*, 300 F.R.D. at 139. Here, where common evidence will be used to establish reliance, predominance is satisfied.

To be clear, Plaintiffs do not ask the Court to "presume, as a matter of law, that the element of reliance is satisfied for each putative class member." *Ge Dandong*, 2013 WL 5658790, at *11. Instead, "[t]he distinct question now before the Court is whether plaintiffs as a *class* can establish reliance through 'common proof.'" *Rodriguez*, 300 F.R.D. at 140. Consistent with the record developed here, the Court should "conclude[], based on the evidence in the record at this stage of the proceedings, that a reasonable factfinder could conclude beyond a preponderance of the evidence that each individual plaintiff relied on [Trump's] uniform representations," *Ge Dandong*, 2013 WL 5658790, at *11, and, accordingly, find that common issues predominate among the Common Law, Maryland, and Pennsylvania Classes.[18]

          **c.**     **Variations in State Common Laws Do Not Preclude a Finding of Predominance of Common Issues**

Variations in state common laws do not preclude a finding of predominance of common issues. Although the elements of different states' common law fraud and negligent misrepresentation claims may vary to some degree, the Common Law Class Plaintiffs still demonstrate predominance of common questions. "The specter of having to apply different substantive laws does not necessarily warrant refusing to certify a class." *Rodriguez*, 300 F.R.D. at 140; *see Ebin*, 297 F.R.D. at 570. "A claim . . . can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim . . . are substantially similar and any differences fall into a limited number of predictable patterns

---

[18] The California statutory claims do not require a plaintiff to prove individualized reliance on the defendant's misrepresentations. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009). Instead, a "presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material"—i.e., "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* at 327.

which can be readily handled by special interrogatories or special verdict forms." *Rodriguez*, 300 F.R.D. at 141.

"[T]he fundamental elements of fraud are substantially similar from state to state"— "[v]irtually every state requires that there be a misrepresentation made by the defendant, that the defendant had knowledge that it was false, the defendant intended to induce the reliance of the plaintiff, the plaintiff relied on the statement, and the plaintiff was injured as a result." *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 300-01 (D. Conn. 2009) (surveying various states' common law fraud claims). Accordingly, "common legal issues predominate with respect to how states treat fraud claims." *Id.* at 301. Even though states "vary in their required standards of proof for fraud claims" and approach specific elements, such as plaintiffs' reliance, differently, *id.*; *Rodriguez*, 300 F.R.D. at 140, "these differences could be adequately addressed with a verdict form and do not defeat predominance," *Spencer*, 256 F.R.D. at 301.[19]

### 2.    Class Treatment Is a Superior Method to Resolve the Disputes

"[A] class action is superior to other available methods for fairly and efficiently adjudicating the controversy" addressed by each proposed class. Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s superiority requirement may be satisfied when "the costs of bringing individual actions outweigh the expected recovery," and when consolidation "will achieve significant economies of time, effort and expense, and promote uniformity of decision." *In re U.S. FoodService*, 729 F.3d at 130.

"Where, as here, the courts—absent class certification—would have to litigate numerous lawsuits by hundreds or even thousands of individual class members, the efficiencies of a class

---

[19] In the alternative, the national Common Law class "may be divided at a later time into subclasses that correspond to the different [state common law] requirements." *Rodriguez*, 300 F.R.D. at 141 (citing Fed. R. Civ. P. 23(c)(1)(C), (c)(5).

action are self-evident." *Mikhlin v. Oasmia Pharm. AB*, No. 19 Civ. 4349, 2021 WL 1259559, at

*11 (E.D.N.Y. Jan. 6, 2021). In particular, the cost and burden of bringing thousands of

individual suits to recoup individuals' $499 IBO enrollment fees weighs in favor of a superiority

finding. *See Rodriguez*, 300 F.R.D. at 141 (holding that "the relatively modest amount of

monetary damages for each individual plaintiff at issue" supported superiority determination). In

addition, "[s]eparate actions would also be burdensome and inefficient for Defendants and for

the court, and would create a significant possibility of divergent outcomes." *Mikhlin*, 2021 WL

1259559, at *11. "Here, substituting a single class action for numerous trials in a matter

involving substantial common legal issues and factual issues susceptible to generalized proof

will achieve significant economies of time, effort and expense, and promote uniformity of

decision." *In re U.S. Foodservice*, 729 F.3d at 130.

## II.   IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY AN ISSUE CLASS PURSUANT TO RULE 23(c)(4)

If the Court does not certify the Common Law, Maryland, or Pennsylvania Classes under

Rule 23(b)(3), it should advance the litigation by certifying a Rule 23(c)(4) class as to the central

issues of the falsity and materiality of Trump's Fraudulent Statements.

Rule 23(c)(4) provides that "an action may be brought or maintained as a class action

with respect to particular issues." Fed. R. Civ. P. 23(c)(4). For particular issues to be certified

pursuant to Rule 23(c)(4), the requirements of Rule 23(a) and (b) must be satisfied only with

respect to those issues. *See* 5 Moore's Fed. Prac. § 23.86[2]. The Second Circuit "has

consistently endorsed a broad reading of Rule 23(c)(4)" and has advised district courts to "take

full advantage" of the rule. *United States v. City of New York*, No. 07 Civ. 2067, 2011 WL

3174084, at *11 (E.D.N.Y. July 8, 2011). As this Court has recognized, "[t]his rule may be

employed to certify a class on a particular issue even if the action as a whole does not satisfy

Rule 23(b)(3)'s predominance requirement." *In re Foreign Exchange*, 407 F. Supp. 3d at 437. "If common resolution of *even a single issue* would further the efficient administration of justice, then the class should be certified." *Id.* (emphasis added). Accordingly, in *In re Foreign Exchange*, an antitrust conspiracy case, this Court certified the issues of "(1) the existence of a conspiracy to [fix pricing] and (2) the [specific] Defendants' participation in the conspiracy." *Id.* at 440.

Here, it would materially advance the administration of justice for the Court to certify a class under Rule 23(c)(4) as to the issues of falsity and materiality of the Fraudulent Statements. These issues are even more common and impactful than the narrow issues the Court certified in *In re Foreign Exchange*. Here, falsity is an element of each of Plaintiffs' claims.[20] Materiality is an element of common law fraud, see *Nielson Co.*, 112 F. Supp. 3d at 105, and the California FAL/UCL claims, *see Quidel Corp. v. Siemens Med. Solutions USA, Inc.*, No. 16 Civ. 3059, 2019 WL 5320390, at *3 (S.D. Cal. Oct. 21, 2019).

Given the centrality of the element of falsity and materiality to Plaintiffs' claims, they are "threshold issues capable of resolving or significantly narrowing the case against [Trump]." *In re Foreign Exchange*, 407 F. Supp. 3d at 437. If the factfinder concludes that the Fraudulent Statements are not false, "then all of the claims against [Trump] are resolved." *Id.* If the factfinder determines that Trump's Fraudulent Statements are false (and/or material), "then that common issue will have been resolved in an efficient way, paving the way for individual lawsuits." *Id.*

---

[20] *See Nielson Co.*, 112 F. Supp. 3d at 105 (common law fraud requires proof of defendant's "false representation"); *Ginsburg*, 134 A.D.3d at 894 (common law negligent misrepresentation requires proof that the information relayed by defendant "was incorrect"); *Quidel*, 2019 WL 5320390, at *3-*4 (FAL/UCL require proof of a "false statement of fact by the defendant"); *Peete-Bey*, 131 F. Supp. 3d at 432 (MCPA requires proof of "an unfair or deceptive practice or misrepresentation"); *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 418 (E.D. Pa. 2016) (UTPCPL requires proof of "a deceptive act").

Class-wide resolution of falsity and materiality would also satisfy all of the Rule 23(a) requirements. "Given that there are thousands of potential class members, the numerosity requirement is satisfied." *Id.* "The commonality requirement is also met" because the issues of whether the Fraudulent Statements were false and/or material "raise common questions with common answers." *Id.* "Typicality is satisfied for purposes of the two certified issues because each class member makes similar legal arguments to prove" Trump's fraudulent endorsement of the IBO Opportunity. *Id.* The adequacy requirement is also satisfied "because of the class members' common interest in proving" the falsity and materiality of the Fraudulent Statements and because Plaintiffs' counsel are qualified. *Id.* Finally, the Rule 23(b)(3) requirements of predominance and superiority do not apply to the issue class. *Id.* at 438.[21]

## III.   CONCLUSION

For the foregoing reasons, the Court should certify the Common Law, Maryland, Pennsylvania, and California Classes pursuant to Rule 23(b)(3), and certify Plaintiffs' counsel as Class Counsel pursuant to Rule 23(g). In the alternative, if the Court does not certify the Rule 23(b)(3) Classes, it should certify as to the issues of the falsity and materiality of Trump's Fraudulent Statements pursuant to Rule 23(c)(4).

---

[21] "Even if [predominance and superiority] did apply, they are satisfied because the certification of only two common issues necessarily means that common issues predominate" and issue certification would remain "superior to multiple adjudications, which would be costly and inefficient." *In re Foreign Exchange*, 407 F. Supp. 3d at 438.

Dated:  March 10, 2023
        New York, New York


_/s/ John C. Quinn_                              _/s/ Matthew D. Brinckerhoff_
Roberta A. Kaplan                                Matthew D. Brinckerhoff
John C. Quinn                                    Nick Bourland
Christopher Le Coney                             Katherine Rosenfeld
Maximillian L. Feldman

KAPLAN HECKER & FINK LLP                          EMERY CELLI BRINCKERHOFF
350 Fifth Avenue, 63rd Floor                     ABADY WARD & MAAZEL LLP
New York, New York 10118                         600 Fifth Avenue at Rockefeller Center
Telephone: (212) 763-0883                        New York, NY 10020
Facsimile: (212) 564-0883                        Telephone: (212) 763-5000

_Attorneys for Plaintiffs_

31