# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

CATHERINE MCKOY, MARKUS FRAZIER, and
LYNN CHADWICK, individually and on behalf of all
others similarly situated,

     *Plaintiffs*,

  v.

THE TRUMP CORPORATION and
DONALD J. TRUMP, in his personal capacity,

     *Defendants*.

No. 18-cv-09936 (LGS) (SLC)

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................iii

INTRODUCTION............................................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 3

    A.    Trump Endorsed ACN in Exchange for Millions ........................................ 4

    B.    Trump Knowingly Conveyed Fraudulent Messages Regarding ACN ........................ 5

    C.    Trump's Endorsement Generated Tremendous Excitement and Drove IBO
        Recruitment ............................................................................................... 9

    D.    The Plaintiffs Relied on Trump's Fraudulent Message in Deciding to Join ACN .... 11

ARGUMENT ................................................................................................................ 12

    I.    PLAINTIFFS' STATUTORY CLAIMS SHOULD PROCEED TO TRIAL........... 12

        A.    Ms. McKoy Is Entitled to Restitution under California's
               UCL and FAL............................................................................... 12

        B     Ms. Chadwick's and Mr. Frazier's Pennsylvania and
              Maryland Consumer Protection Claims Should Proceed to Trial ................. 14

        C.    The Record Establishes that Plaintiffs Relied on Trump's
              Misrepresentations ...................................................................... 16

        D.    Trump's Lies Were Not Puffery ................................................... 18

    II.    PLAINTIFFS HAVE ADDUCED RECORD EVIDENCE
        ESTABLISHING THEIR COMMON LAW CLAIMS ........................................... 21

    III.    SUMMARY JUDGMENT IS UNWARRANTED
        ON CAUSATION GROUNDS. ...................................................................... 23

CONCLUSION ............................................................................................................ 26

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*7-Eleven, Inc. v. Upadhyaya*,
  926 F. Supp. 2d 614 (E.D. Pa. 2013) ........................................................................... 23

*Bailey v. Rite Aid Corp.*,
  338 F.R.D. 390 (N.D. Cal. 2021) .................................................................................. 12

*Boatel Indus. v. Hester*,
  550 A.2d 389 (Md. Ct. Spec. App. 1988) ..................................................................... 15

*Bridge v. ETrade Sec. LLC*,
  2011 WL 5444266 (N.D. Cal. 2011) ............................................................................. 23

*Bruni v. Oceanview Elecs., Inc.*,
  2012 WL 3021086 & n.4 (E.D. Pa. July 23, 2012) ....................................................... 15

*Burton v. Iyogi, Inc.*,
  2015 WL 4385665 (S.D.N.Y. Mar. 16, 2015) ............................................................... 21

*Carhuapoma v. N.Y.-Presbyterian Healthcare Sys.*,
  2013 WL 1285295 (S.D.N.Y. Mar. 29, 2013) ............................................................... 18

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
  491 F. Supp. 3d 610 (N.D. Cal. 2020) ................................................................... 12, 13

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
  648 Pa. 604 (2018) ....................................................................................................... 19

*De Paoli v. Hendrick Auto. Grp.*,
  2009 WL 2248550 (Cal. Ct. App. July 29, 2009) ......................................................... 19

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018) ........................................................................... 20

*Doyle v. Chrysler Grp.*,
  2014 WL 1910628 (C.D. Cal. Jan. 29, 2014) ............................................................... 14

*Drelles v. Mfrs. Life Ins. Co.*,
  881 A.2d 822 (Pa. Super. Ct. 2005) .............................................................................. 17

*Engalla v. Permanente Med. Grp.*,
  938 P.2d 903 (Cal. 1997) ......................................................................................... 17, 22

*Ferrington v. McAfee, Inc.*,
  2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) ................................................................. 13

*Fort Washington Res., Inc. v. Tannen*,
  858 F. Supp. 455 (E.D. Pa. 1994) ................................................................................. 17

*FTC v. Five-Star Auto Club*,
  97 F. Supp. 2d 502 (S.D.N.Y. 2000) ........................................................... 15

*FTC v. Neora LLC*,
  552 F. Supp. 3d 628 (N.D. Tex. 2021) ........................................................ 15

*FTC v. Noland*,
  2023 WL 3372517 (D. Ariz. May 11, 2023) ............................................... 15

*Giannullo v. City of N.Y.*,
  322 F.3d 139 (2d Cir. 2003) ....................................................................... 24

*Gibbs v. Ernst*,
  647 A.2d 882 (Pa. 1994) .............................................................................. 22

*Green v. Wing Enters.*,
  2015 WL 7351478 (D. Md. Nov. 20, 2015) ................................................ 20

*Height St. Skilled Care, LLC v. Liberty Mut. Ins. Co.*,
  2022 WL 1665220 (E.D. Cal. May 25, 2022) ............................................. 14

*Hoffman v. Stamper*,
  867 A.2d 276 (Md. 2005) ............................................................................ 22

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990) ....................................................................... 20

*In re Anthem Data Breach Litig.*,
  2016 WL 3029783 (N.D. Cal. May 27, 2016) ...................................... 12, 13

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  No. 17 Civ. 1580, 2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021) ............... 21

*In re Genworth Fin. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ......................................................... 21

*In re Hain Celestial Grp. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ....................................................................... 21

*In re Lightfoot*,
  399 B.R. 141 (Bankr. E.D. Pa. 2008) ......................................................... 15

*In re MF Glob. Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................ 19

*In re MyFord Touch Consumer Litig.*,
  46 F. Supp. 3d 936 (N.D. Cal. 2014) ......................................................... 23

*In re Petrobas Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) .................................................. 20, 21

*In re RAIT Fin. Sec. Litig.*,
  2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .................................................................. 20

*In re Refco. Sec. Litig.*,
  503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ................................................................... 22

*In re Tobacco Cases II*,
  240 Cal. App. 4th 779 (2015) .......................................................................................... 12

*In re Tobacco II Cases*,
  207 P.3d 20 (Cal. 2009) .................................................................................................. 17

*Jolley v. Chase Home Fin., LLC*,
  213 Cal. App. 4th 872 (2013) .......................................................................................... 21

*Jordan v. Paul Fin.*,
  285 F.R.D. 435 (N.D. Cal. 2012) .................................................................................... 17

*Layton v. AAMCO Transmissions*,
  717 F. Supp. 368 (D. Md. 1989) ..................................................................................... 15

*Luxul Tech. Inc. v. Nectarlux, LLC*,
  78 F. Supp. 3d 1156 (N.D. Cal. 2015) ............................................................................ 14

*McGraw v. Loyola Ford, Inc.*,
  723 A.2d 502 (Md. Ct. Spec. App. 1999) ....................................................................... 19

*Morales v. Superior Living Prods.*,
  2009 WL 3234434 (E.D. Pa. Sept. 30, 2009) ................................................................. 15

*Mortg. Co. v. Rothwell*,
  900 P.2d 601 (Cal. 1995) ................................................................................................ 17

*Murphy v. Mid E. Oil Co.*,
  2007 WL 527715 (W.D. Pa. Feb. 14, 2007) ................................................................... 15

*Nails v. S & R, Inc.*,
  639 A.2d 660 (Md. Ct. App. 1994) ................................................................................. 17

*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*,
  157 Cal. App. 4th 835 (2007) .......................................................................................... 18

*Ohio Six Ltd. v. Motel 6 Operating L.P.*,
  2012 WL 12886208 (C.D. Cal. Nov. 16, 2012) .............................................................. 18

*People v. Bestline Prods.*,
  61 Cal. App. 3d 879 (1976) ............................................................................................. 15

*Pierce v. Showell*,
  357 F. Supp. 2d 307 (D.D.C. 2005) ................................................................................ 15

*Rhee v. Highland Dev. Corp.*,
    958 A.2d 385 (Md. Ct. Spec. App. 2008) ............................................................ 23

*S. Kane & Son Profit Sharing Tr. v. Marine Midland Bank*,
    1996 WL 200603 (E.D. Pa. Apr. 25, 1996) ........................................................ 15

*Shersher v. Sup. Ct.*,
    154 Cal. App. 4th 1491 (2007) ............................................................................ 13

*Sibeto v. Capella Univ.*,
    2014 WL 3547347 (W.D. Pa. June 13, 2014) .................................................... 16

*Slemmer v. McGlaughlin Spray Foam*,
    955 F. Supp. 2d 452 (E.D. Pa. 2013) .................................................................. 14

*SodexoMAGIC, LLC v. Drexel Univ.*,
    24 F.4th 183 (3d Cir. 2022) ................................................................................ 23

*State ex rel. Turner v. Koscot Interplanetary, Inc.*,
    191 N.W. 2d 624 (Iowa 1971) ............................................................................ 15

*Sullins v.Exxon/Mobil Corp.*,
    2010 WL 338091 (N.D. Cal. Jan. 20, 2010) ................................................ 13, 14

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) ...................................................................... 3, 18, 19

*Toy v. Metro. Life Ins. Co.*,
    928 A.2d 186 (Pa. 2007) ...................................................................................... 18

*Troyk v. Farmers Group, Inc.*,
    171 Cal. App. 4th 1305 (2009) ............................................................................ 12

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) ................................................................................ 19

*United States v. Levy*,
    2013 WL 3832718 (S.D.N.Y. July 15, 2013) .................................................... 19

*Valley Forge Towers v. Ron-Ike Foam*,
    574 A.2d 641 (Pa. Super. Ct. 1990) .................................................................... 15

*Vulcan Metals Co. v. Simmons Mfg. Co.*,
    248 F. 853 (2d Cir. 1918) .................................................................................... 18

*W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*,
    534 F. Supp. 3d 1209 (E.D. Cal. 2021) .............................................................. 21

*Weaver v. Real Est. Funding*,
    2010 WL 1662991 (D. Md. Apr. 21, 2010) ...................................................... 15

*Webster v. Omnitrition Int'l*,
   79 F.3d 776 (9th Cir. 1996) ........................................................................................... 15

*Wishkin v. Potter*,
   476 F.3d 180 (3d Cir. 2007) ........................................................................................... 21

## INTRODUCTION

Donald J. Trump pocketed more than $10 million serving as ACN's celebrity endorser and fraudulently promoting its multi-level marketing scheme as a low-risk way for working Americans to achieve financial success. Why was ACN willing to pay him so much? The record tells us why: in internal emails, ACN executives gushed that Trump's endorsement generated "the biggest response we've ever got," and that his video-recorded pitches were "perfect things we can use with our reps." ACN told participants that the mandatory marketing materials featuring Trump were "your best resource for generating interest from prospects" and "one of the most powerful piquing interest tools"—*i.e.*, recruiting tools—"the direct selling industry has witnessed in ages."

They were right: internal company documents, which ACN fiercely resisted producing, confirm that recruiting ███████████████████████████—███████████████████████ of new recruits per year—and then ██████████████████, when Trump ended the relationship after campaign reporters started asking questions. Trump himself boasted on unaired *Celebrity Apprentice* footage that nobody drew crowds like he did. He was right, too.

In his videos and appearances, Trump repeated the same lines. They were no mere hyperbole; they were outright lies. Trump said that the ACN opportunity was "without any . . . risk"; Defendants' expert conceded at deposition it was "high risk." Trump said that the "absolute truth" was that the ACN videophone would "be present in every home within the next several years"; Defendants' expert conceded it was a flop from the start. Trump said he had done careful diligence; the record shows that no one at the Trump Organization asked a single diligence question, checked a single script for accuracy, or responded to a single red flag. Trump's longtime assistant recalled him asking how much he would get paid and where he had to show up—that's it.

Plaintiffs were among the thousands taken in. All of them testified Trump was "the reason" they joined. Like so many others, they paid their $500 enrollment fee and then some, and lost it all.

In their motion for summary judgment, Defendants do not reckon with or even acknowledge this evidence. In a two-page background section, and a nine-page Rule 56.1 statement, they present a sliver of the record, failing to mention a single Trump employee deposition, or to describe a single email, and cherry-pick from the few pieces of evidence they do address. Perhaps most strikingly, they fail to confront a single statement that Trump actually made, preferring instead to engage only with crib-quoted excerpts of Plaintiffs trying to remember and summarize his statements under cross examination at depositions years after the fact. But we have the receipts—the statements were captured on video and in print. Defendants just ignore them. They imagine, in other words, the record they wish they had, not the record discovery produced.

In view of this distortion of the record, it is unsurprising that the handful of arguments Defendants muster for (mostly partial) summary judgment either misstate the applicable law, ignore contrary evidence, or ask the Court to decide factual disputes properly left to the jury.

*First*, Plaintiffs can recover on their state law statutory claims. California courts have rejected Defendants' narrow view of California's unfair competition and false advertising statutes, holding that privity is not required for restitution from a defendant like Trump who benefited indirectly from payments the Plaintiffs made. As for Pennsylvania and Maryland, Plaintiffs here are precisely the type of unsophisticated consumers, lacking business experience and drawn into a home-based scheme, that those states' consumer protection statutes were designed to protect.

*Second*, notwithstanding Defendants' attempts to cherry pick from the deposition record, Plaintiffs have all testified repeatedly and explicitly that they relied on Trump's representations in joining ACN. The fact that Plaintiffs "became ACN IBOs based on ACN marketing," Mot. at 10,[1] only strengthens Plaintiffs' claims because, by Defendants' own admission, Trump's pitch was "featured" in all of those materials, *id*. at 4.

---

[1] References to "Mot." are to Defendants' Memorandum of Law in Support of Summary Judgment, ECF 592.

*Third*, Trump's false statements are actionable. As an initial matter, the puffery doctrine is a "seller's privilege," *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007), with no application to a promoter like Trump—especially one whose financial entanglements with the company being promoted were hidden. Indeed, Defendants essentially concede that Trump himself did not disclose the multi-million-dollar payments he was receiving, *see* Mot. at 21, ECF 551 at 7 n.4, and the record shows that ACN executives likewise insisted that payments to Trump remain "STRICTLY confidential"—"[i]n particular the amount that was paid"—because disclosure would "diminish[] the effectiveness for us." But even if puffery applied, Trump's statements were straightforward misstatements of fact, plainly capable of influencing people (that's why they were paying him so much), and of being true or false (they were false).

*Fourth*, Defendants' scattershot arguments regarding Plaintiffs' common law claims likewise fail. A defendant's fraudulent intent is almost always ill-suited for resolution on summary judgment, and that is particularly true here, since the record confirms that Trump repeated his false statements again and again, in the face of numerous red flags, and with clear financial motivation to lie. And Defendants cannot credibly argue that Trump did not intend to induce reliance—what else is a paid celebrity spokesperson for? Trump himself demanded on tape that ACN "pay me more money for my goddamn speeches" because of how many people he was bringing in.

*Finally*, the record confirms the causal link between Trump's lies and Plaintiffs' losses. They joined based on his false representations, and like thousands of others, they lost their investment when the truth became clear. Defendants try to wave away this evidence without citation to caselaw or to evidence; they offer, at best, rank speculation that maybe macroeconomic factors or some other cause contributed. Obviously, conjecture will not suffice at this stage. Summary judgment is proper only on the basis of evidence, and the Trumps simply do not have it.

## STATEMENT OF FACTS

### A.  Trump Endorsed ACN in Exchange for Millions

From 2006 to 2015, Donald J. Trump was "featured" in ACN's marketing materials to prospective IBOs. Mot. at 4. Trump promoted ACN on video, on ACN's website, in *Success* and *Success From Home* magazines, and at 14 live events put on by ACN. ¶¶ 5-8.[2] In addition, Trump hosted ACN twice on his network television show *The Celebrity Apprentice*, which yielded more clips that ACN packaged into recruiting materials. ¶ 9.

In 2006 and 2008, Trump filmed key video clips touting ACN and its videophone product, which the company repackaged into a recruiting tool dubbed "Opportunity Discs" that it then sold, by the millions, to IBOs through 2015. ECF 534-1 at 35-36 (ACN corporate testimony). The Opportunity Discs were the central and indispensable recruiting tool for prospective IBOs and ACN's policies prohibited recruiting IBOs using non-company approved recruiting materials. ECF 534-28 at 11 (ACN 2012 Policies & Procedures). As a result, Trump's consistent false statements about ACN reached ███████████████. ¶ 15.

As Defendants acknowledge, in exchange for his "celebrity endorsement" and promotion of ACN, Trump was paid millions. Mot. at 3. Trump and ACN executed five agreements in total, and each time Trump demanded and ACN agreed to a bigger fee. ¶ 1 (collecting agreements). In total ACN agreed to pay $11.85 million under these contracts, though only $8.8 million had been paid out by the time Trump terminated the relationship in mid-2015, ¶ 1, when *Wall Street Journal* reporters started asking tough questions. ¶ 1. ACN paid another $3.65 million to appear twice on *The Celebrity Apprentice*, half of which flowed directly to Trump. ECF 591-8 at 3; ECF 591-7 at 3; ¶ 2 (D.J. Trump testimony).

---

[2] Citations to "¶" refer to paragraphs of Plaintiffs' Affirmative Rule 56.1 Statement, filed contemporaneously herewith. Short-form citations to record evidence are replicated in longer-form therein as well.

### B.  Trump Knowingly Conveyed Fraudulent Messages Regarding ACN

Each of the Trump-ACN contracts made clear that Trump had the right to determine what he would say about ACN and to approve ACN's footage and use of his image and statements. *See, e.g.*, ECF 534-5 at 3 (2006 Agreement); ECF 534-10 at 2-3 (2010 Agreement).[3] Each of them also made clear that ACN would use Trump's message in marketing materials to recruit IBOs. *Id.* Discovery has confirmed that message was fraudulent, and it included four key components.

*First*, Trump falsely claimed that ACN was a low-risk opportunity that presented a realistic opportunity for economic success, claiming, for example—on every version of the Opportunity Disc—that ACN was a "great opportunity . . . without any of the risks most entrepreneurs have to take," *see, e.g.*, ¶ 21; *see also* ECF 532 at 6 (collecting false statements). But Trump's own expert, Dr. Hair, conceded at his deposition that "ACN is not low risk; it's, in fact, high risk." ¶ 22. As a result, he agreed that "it would not be correct to identify it as low risk." *Id.*; *see also id.* "Q. . . in your words, then, the ACN business venture involves a high level of risk of failure? A. Yes."). It is difficult to move for summary judgment when one's own expert admits one's statements were false.

Indeed, as Plaintiffs' expert Dr. Stacie Bosley will explain at trial, ACN did not offer "a reasonable prospect of economic success with low risk" for the simple reason that it did "not provide meaningful opportunities to earn money." ECF 534-13 at 3 (Bosley Rpt.). IBOs' "███████████████████████████████████████████████████ ██████████████████████████." *Id.* (emphasis added). Defendants here do not argue that ACN offered a reasonable prospect of success; rather they admit it did not, conceding that joining ACN was ████████████████████████████████████████████ Mot. at 22.

---

[3] While in-house Trump lawyers insisted that the last of the five agreements remove the word "endorsement"—a key, if belated, acknowledgment that what Trump was doing was legally problematic—the key employees around Trump acknowledged that nothing changed after the word was removed. ¶ 3 (Graff testimony).

*Second*, Trump falsely asserted that ACN's desktop videophone—a bulky plastic device that had to be plugged in (twice) to the wall, *see* App'x, Fig. 1, that required ACN phone service, and that could only make videocalls to other ACN videophones, ECF 534-3 at 4—was "breakthrough technology" "that will literally revolutionize the way we communicate." ¶ 25. Trump likewise claimed, without any basis, that the "absolute truth" was that the videophone would "be present in every home within the next several years." ¶ 26. Defendants' own expert conceded there was no basis for such a claim—particularly in a world where smartphones and Skype were already taking off—and that ACN's videophone was a commercial failure. ¶ 28 (Crandon testimony).

*Third*, Trump represented that he was endorsing ACN "because I think this is a great company" and because of the founders' "integrity," rather than because he was being paid. *See, e.g.*, ¶ 29 (2014 *Success From Home* article). That misdirection was no accident. After the first endorsement agreement was signed, ACN's president warned his fellow executives that the "particulars of the Trump agreement remain STRICTLY confidential," flagging "[i]n particular the amount that was paid." ¶ 30. He explained that "the Trump organization would not appreciate this information to be on the street and I believe that it diminishes the effectiveness for us." *Id.*

*Fourth*, Trump falsely claimed that he had vetted ACN and that his endorsement was based on extensive due diligence. Trump assured potential IBOs that he had directed one of his "very smart people do research on the company" and that this person "came back with reports that were unbelievable," such that Trump had "read great reports on ACN, glowing reports." ¶ 31. He also claimed that he does "a lot of research on companies before we agree to do something like I'm doing for [ACN]. And ACN's a great company." ¶ 35.

In fact, the record makes clear that Trump performed no due diligence before endorsing ACN. Not a single Trump employee could recall any, nor does the extensive documentary record—containing more than 150,000 pages of email, hardcopy files, and other records—reflect any.

Eric Trump admitted as corporate representative of The Trump Corporation that the organization has no records of any diligence. ¶ 36. Trump's longtime assistant Rhona Graff, who was the point-person on the Trump side of the relationship, testified that, in negotiating the agreements, the Trumps never asked for access to diligence information. ¶¶ 38-39. Trump was focused on how much he would get paid and when and where he needed to show up. *Id.*

The ACN consultant who facilitated the relationship likewise was not aware of any diligence materials sent over to the Trumps; even she had never seen financial documents or performance data or anything of the sort. ¶¶ 40-41 (Butcher testimony). ACN's corporate representative was likewise unaware of any nonpublic data sent over. ¶ 42.

Moreover, The Trump Corporation employees responsible for approving ACN marketing materials over the years, under Trump's supervision, testified that they never checked those materials for accuracy or truthfulness (even though the contracts gave them that explicit right); instead they checked only to make sure that quotes attributed to Trump "sounded like him." ¶ 43.

And so, when Trump sat for his deposition, it was unsurprising that he had no idea how ACN worked:  he did not know what an IBO is, how people became IBOs, how IBOs supposedly made money, or how the ACN IBO compensation plan operates. ECF 534-27 at 3-7. When he was then shown a video of himself exclaiming to a roaring ACN crowd about his detailed diligence, Trump was cornered, and simply put, he lied. He claimed that a former employee named George Ross—who, Trump was quick to note, conveniently was both a "lawyer" and "an older guy" who "may not be" around anymore—had done some diligence. *Id.* at 10. Ross himself had no recollection of what Trump was talking about, *see* ¶ 33 (Trump Corp. testimony),[4] and even in concocting the lie,

---

[4] Pursuant to Judge Cave's guidance, the parties worked out a stipulation to permit Plaintiffs to introduce portions of Eric Trump's 30(b)(6) testimony about a conversation he had with Mr. Ross, in order to avoid subjecting Mr. Ross to a non-party deposition. Plaintiffs continue to reserve all rights with respect to such testimony at trial.

Trump had to admit that Ross did not have access to any ACN documents, nor did he put anything about ACN in writing. ECF 534-27 at 11; ECF 591-6 at 9; ECF 552-7 at 9.

Red flags were raised repeatedly throughout the relationship, but the Trumps sped past them unbothered. As early as 2008, Rhona Graff expressed internally that her "main concern" with renewing the ACN relationship was "the reputation of ACN as I have heard mixed reports about them." ¶ 45; *see also id.* (Graff testimony about accusations of ACN being a pyramid scheme). In September 2010, a reporter contacted The Trump Corporation regarding "allegations by the state of Montana that ACN is a 'pyramid promotional scheme.'" ¶ 47. Later that year, NBC balked at allowing ACN to advertise its "home-based business" opportunity on *The Celebrity Apprentice*, citing legal risk, because it did not want the episode to "be a 'recruiting tool'" for "an implied financial benefit that could be disputed or not." ¶ 48. The relationship forged ahead through all of this.

In 2014, a mother named Maryanne Klustner emailed the Trump Organization about a "fraudulent pitch" her son had received from ACN, noting that the company seemed to be a "scam" and a "classic pyramid scheme," and that they were "pitching their business with Donald Trump's endorsement," but she was "guessing Donald Trump isn't a part of it." ¶ 49. Amanda Miller, a marketing executive at the Trump Organization, testified that the email "wouldn't have concerned her" and that she did not "investigate whether it was true that ACN was a scam or a pyramid scheme." *Id.* Graff could not recall "any process any time at the Trump Organization to vet ACN or diligence these sorts of concerns." ¶ 46.[5]

---

[5] Notably, by the time the Trumps cut ties, at least some in the organization knew they had a problem: Hope Hicks, for example, fired off an email asking Rhona Graff to "quietly check in with the folks at ACN to ensure nothing gets released." ¶ 51.

### C. Trump's Endorsement Generated Tremendous Excitement and Drove IBO Recruitment

ACN's seniormost executives understood that Trumps' fraudulent pitch was powerful; its co-founder and senior chairman described Trump's Opportunity Disc video clips as "perfect things that we can use for our reps." ¶ 52. He also said that Trump's endorsement generated "the biggest response that we ever got a [sic] event with a [sic] announcement . . . [t]he reps are more excited than I ever had seen them." ECF 534-6 (Feb. 15, 2006 email from R. Stevanovski). ACN was vocal about this: the company told its own IBOs that the "ACN Opportunity Disc featuring Donald J. Trump is your best resource for generating interest from prospects" and that "ACN's Opportunity Disc featuring none other than Donald J. Trump has proven to be one of the most powerful piquing interest tools the direct selling industry has witnessed in ages." ¶ 54 (internal ACN emails to IBOs).

Trump understood the power he wielded. In unaired *Celebrity Apprentice* footage, he asked ACN co-founder Greg Provenzano, "does anybody draw like Trump, Greg?" And of course, the response was, "Hasn't been so far." Trump joked with Gary Busey and Star Jones that they couldn't "get 22,000 people" like he could. ¶ 59. He even demanded that ACN "pay me more money for my goddamn speeches," since the last time he spoke at an ACN event "22,000 show[ed] up, who else gets that many people, seriously?" *Id.* He was right: no one else could.[6]

Anne Archer Butcher, who managed the Trump relationship for ACN and attended every ACN convention where Trump spoke, testified that the audience reaction to him was consistently

---

[6] At trial, Plaintiffs' marketing expert Dr. Kevin L. Keller will explain that Trump's celebrity endorsement of ACN was an especially powerful recruiting tool. He will describe how ACN was "a complex offering" that would "have been difficult for prospective IBOs to judge," making a "strong, credible celebrity endorsement more effective." ¶ 60 (Keller Rpt.). Trump "carefully developed his brand through the years to be seen as an extremely successful businessman" who "gives invaluable advice," and "IBOs saw [Trump] as business savvy, able to identify a money-making opportunity, and whose success the prospective IBOs might take as a model for their own success." *Id.* Consequently, Trump had high source credibility among IBOs, because he was "positioned as a uniquely strategic and savvy expert in business." *Id.* Trump's credibility as a business leader, coupled with his "strong, virtually unqualified endorsement of the ACN Opportunity," "███████████████████████████████████████████████████████████████████
███████████████" *Id.*

ecstatic and that the crowd size grew dramatically after Trump began promoting the company; he packed major city convention centers with crowds measured in the tens of thousands, with each appearance deemed a "home run" by ACN. ¶ 53 (Butcher testimony).

The excitement around Trump's endorsement translated into ███████████. In the first few years of Trump's tenure as ACN's celebrity endorser, IBO annual recruitment ██████



. ¶ 55. A ███████████ ███████████████████████████████ ███████████████████████████████ ███████████████" ECF 534-34 at 5. An ACN ███████████ ███████████████████████████████ ████. ECF 534-33 at 2.

Reviewing this record, Dr. Kevin Keller, Plaintiffs' marketing expert, concluded that "the Trump Endorsement significantly increased IBO signups during the Trump Endorsement period." ¶ 58 (Keller Rpt.). Even ACN's corporate representative conceded that, when the time came to renew Trump's contract, they were willing to pay more because ACN was finding "that its endorsement agreement relationship with Mr. Trump was successful and positive for ACN." ¶ 61 (ACN corporate testimony). What's more, he agreed that, the first time ACN appeared on *The Celebrity Apprentice*, the company saw "███████████████████████████ ███████████████████" ¶ 57 (*id.*).

By contrast, when Trump cut ties with the company, enrollment figures ██████, from ███████████████████████. ECF 534-2 at 2 (ACN U.S. IBO Enrollment Data). ACN's corporate representative again ███████████████████████████ ███████████████████" ¶ 62 (ACN corporate testimony).

**D.  The Plaintiffs Relied on Trump's Fraudulent Message in Deciding to Join ACN**

Like thousands of others, the Plaintiffs relied on Trump's fraudulent message; his endorsement was "the reason" they joined. ECF 591-2 at 67; *accord* ECF 535 ¶ 3 (McKoy); ECF 536 ¶ 3 (Frazier); ECF 537 ¶ 3 (Chadwick). Cathy McKoy recalled Trump communicating the message that if "you join this business and you do the work, you will see the money," and she testified that she joined "because of him," adding that when "they put up Donald Trump, that's what convinced me to sign into ACN." ECF 591-2 at 69, 73.

Lynn Chadwick testified that she joined ACN after being shown a video at a recruitment event that "expressed Donald Trump's interest in the ACN business model" with a "snippet from The Apprentice show, which showed a very successful business model and low-risk opportunities for us to get involved on the ground level." ¶ 66. Chadwick testified that the "original jump off point for [her] interest in ACN was . . . the video that Donald Trump had implied that this whole process was a low-risk and easy and a no-brainer." *Id.*

Markus Frazier testified it was "Trump that gave me that motivation [to join ACN]." ¶ 69. "If Donald Trump had a company on a national television show, then I was sure he put his stamp of approval to say this is a company that anyone can join and be successful in." *Id.* The videos featuring Trump were the "words of motivation that made me" try to make money through ACN. *Id.* "If Donald Trump, a successful businessman as it is, vouches for a company like [ACN]," Frazier was "pretty sure" that he could use ACN to be "successful" too. *Id.*

But Plaintiffs and the overwhelming majority of other participants lost money and failed. ECF 534-13 (Bosley Rpt.). Only a small ███████████████████████████. *Id.* Thus, as the Trumps' expert conceded, "there is top bin at the top earning a lot more," but "there's a big group of [IBOs] earning very little or maybe zero." ¶ 70. They deserve their day in court.

## ARGUMENT

## I.   PLAINTIFFS' STATUTORY CLAIMS SHOULD PROCEED TO TRIAL

### A.  Ms. McKoy Is Entitled to Restitution under California's UCL and FAL

Defendants do not dispute that Ms. McKoy's claims fall squarely within the "sweeping" ambit of the UCL and FAL. *In re Anthem Data Breach Litig.*, 2016 WL 3029783, at *29 (N.D. Cal. May 27, 2016) (UCL); *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 399 (N.D. Cal. 2021) (FAL). They assert only that McKoy has no remedy because the statutes authorize restitution and not damages. Mot. at 4-8. After Plaintiffs noted in their response to Defendants' pre-motion letter that this "misreading of California law . . . has been squarely 'rejected' by California courts," ECF 574 at 2, Defendants walked their position back. They now concede that "[t]he UCL permits restitution from a defendant whose unfair business practices caused plaintiff to pay money to a third party," Mot. at 5,[7] but continue to insist that restitution is not available on the record here. They are still mistaken.

Numerous federal and state courts have held that California law allows plaintiffs to seek restitution of money that a defendant acquired—whether directly or indirectly—through fraudulent or unlawful conduct. *See, e.g.*, *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 695 (N.D. Cal. 2020) ("the UCL permits restitution as a remedy for indirectly misappropriated funds") (citing *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1340 (2009)); *Anthem Data Breach*, 2016 WL 3029783, at *29 (same). In *In re Anthem*, a putative class of consumers brought suit under the UCL against Anthem, a healthcare insurer and administrator, based on its allegedly false advertising. 2016 WL 3029783, at *31-32. Although many of the plaintiffs had not contracted with Anthem directly, the court held they could recover from Anthem because they had made payments to third parties, including providers not affiliated with Anthem,

---

[7] "[T]he remedy provisions of the UCL and FAL are interpreted in the same fashion and allow for the same type of relief." *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 785 n.2 (2015).

"which were then used to pay" Anthem. *Id.* at *32 (collecting cases); *see also Purdue*, 491 F. Supp. 3d at 695 (permitting recovery from opioid distributors even though they were not recipients of victims' payments, on basis they had indirectly benefited from failure to stem opioid supply).

The same is true here. As detailed above, ACN entered into and renewed endorsement agreements paying Trump more and more each time. Their corporate representative squarely admitted that they renewed Trump's contract and increased his fee for that reason. ¶ 1.[8] Thus, just as with the plaintiffs in *Anthem* and *Purdue*, Trump's "financial success necessarily relie[d] on" the contributions of IBOs like Plaintiffs, even though they did not pay Defendants directly. *Purdue*, 491 F. Supp. 3d at 695. At a minimum, Defendants' contention that "there is no possible basis to conclude that Defendants received any part of Ms. McKoy's payments to ACN," Mot. at 6, is disputed and must be resolved at trial.

Defendants' further effort to limit restitution to "cases in which the defendant sold a good or service to the plaintiff by way of a distributor, store, supplier, agent or licensee" has no basis in the caselaw. *See Ferrington v. McAfee, Inc.*, 2010 WL 3910169, at *8 (N.D. Cal. Oct. 5, 2010) (rejecting argument that restitution is limited to a plaintiff seeking to "recover from a defendant monies they paid to a third party to purchase indirectly the defendant's product"). Neither *Anthem* nor *Shersher* (which Defendants also cite) contain any such limitation. *See also Shersher v. Sup. Ct.*, 154 Cal. App. 4th 1491, 1500 (2007) (merely stating that "the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means"). Defendants' remaining cases are similarly inapposite. *Sullins v. Exxon/Mobil Corp.* concerned ExxonMobil's refusal to remediate contamination on a property it had previously owned.

---

[8] Moreover, ACN tracked ███████████████████████████████ *See* ¶ 12 (████████████████████████████████████████████); ¶ 12 (ACN testimony) (testifying ████████████████████████████████████████).

2010 WL 338091, at *1, 4 (N.D. Cal. Jan. 20, 2010).[9] There was no indication that ExxonMobil had ever received any money from the plaintiffs or that there was any "relationship between [ExxonMobile] and the third parties to whom Plaintiffs made payments to remediate the property." *Id.* at *1, 4. The same is true for *Height St. Skilled Care, LLC v. Liberty Mut. Ins. Co.*, where all agreed that the defendant was never "in receipt of any funds to which [the plaintiff] ha[d] an interest." 2022 WL 1665220, at *6 (E.D. Cal. May 25, 2022).

### B. Ms. Chadwick's and Mr. Frazier's Pennsylvania and Maryland Consumer Protection Claims Should Proceed to Trial

The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") and the Maryland Consumer Protection Act ("CPA") are to be interpreted "very broadly so as to effectuate as fully as possible the legislature's purpose of preventing unfair or deceptive practices." *Slemmer v. McGlaughlin Spray Foam*, 955 F. Supp. 2d 452, 462 (E.D. Pa. 2013) (applying Pennsylvania UTPCPL); *accord Doyle v. Chrysler Grp.*, 2014 WL 1910628, at *11 (C.D. Cal. Jan. 29, 2014) (applying Maryland CPA). And Ms. Chadwick and Mr. Frazier are exactly the kind of vulnerable consumers whom the statutes are meant to protect: At the time they invested in ACN, Ms. Chadwick worked as a custodian at a school district and Mr. Frazier worked at a fast-food restaurant. ECF 552-1 at 8 (Chadwick testimony); ECF 552-2 at 3-4 (Frazier testimony). These were not professional salespeople—indeed, they had no sales experience at all. ECF 552-1 at 8 (Chadwick testimony); ¶ 69 (Frazier testimony). They viewed joining ACN as an investment, enticed by the prospect of "residual income." ECF 552-1 at 7 (Chadwick testimony); ¶ 66 (Chadwick testimony); ¶ 69 (Frazier testimony). Courts in both states have routinely applied both statutes to protect plaintiffs who were tricked into investing in securities, financial vehicles, and

---

[9] To the extent Defendants rely on *Sullins* to suggest that McKoy lacks standing to bring a UCL claim, that argument is precluded by developments in the law that post-date that decision. *See Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1173-74 (N.D. Cal. 2015).

other similar scams. *See, e.g.*, *Bruni v. Oceanview Elecs., Inc.*, 2012 WL 3021086, at *1 & n.4 (E.D.

Pa. July 23, 2012) (UTPCL, investment securities); *Murphy v. Mid E. Oil Co.*, 2007 WL 527715,

at *8 (W.D. Pa. Feb. 14, 2007) (UTPCPL, investment in limited partnerships); *Pierce v. Showell*,

357 F. Supp. 2d 307, 310 (D.D.C. 2005) (CPA, failed investment scheme); *S. Kane & Son Profit*

*Sharing Tr. v. Marine Midland Bank*, 1996 WL 200603, at *3 (E.D. Pa. Apr. 25, 1996) (UTPCPL,

trust's purchase of securities).[10]

    Defendants argue for an improperly narrow, cramped construction of the UTPCPL and CPA

that turns primarily on what the consumer was deceived into purchasing. Mot. at 8-9. But

Pennsylvania law is clear that the relevant question is "[t]he *purpose* of the purchase, and not the

*type of product* purchased." *Valley Forge Towers v. Ron-Ike Foam*, 574 A.2d 641, 647 (Pa. Super.

Ct. 1990). The relevant purposes work against Defendants here. Indeed, the plaintiffs in the cases

cited by Defendants were commercial operators, engaged in larger preexisting businesses, and

making purchases as part of those business operations.[11]

    That is a far cry from Plaintiffs here, who were unsophisticated individuals buying into a

scheme that promised a "home-based" opportunity to earn "passive income." *See* 534-21-5 at 2:32-

2:41 (2013 Opp. Disc); 534-21-4 at 4:22-6:01 (2013 Opp. Disc). Plaintiffs sought to make money, to be

sure, but that is not the key distinction. Indeed, the UTPCPL and CPA "appl[y] to individual

---

[10] In other states, individuals whose claims sought to recover their investment in multi-level marketing companies have been found to be within the scope of protection afforded by similar federal and state consumer protection laws. *See, e.g.*, *FTC v. Noland*, 2023 WL 3372517, at *21–22, *41 n.44, *60 (D. Ariz. May 11, 2023) (FTC Act); *FTC v. Neora LLC*, 552 F. Supp. 3d 628, 631-32, 636-39 (N.D. Tex. 2021) (FTCA); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 506, 526 (S.D.N.Y. 2000) (FTC Act); *People v. Bestline Prods.*, 61 Cal. App. 3d 879, 903, 911–13 (1976) (California FAL); *Webster v. Omnitrition Int'l*, 79 F.3d 776, 782, 788 (9th Cir. 1996) (same); *State ex rel. Turner v. Koscot Interplanetary, Inc.*, 191 N.W.2d 624, 627 (Iowa 1971) (Iowa consumer fraud statute).

[11] *Morales v. Superior Living Prods.*, 2009 WL 3234434, at *13 (E.D. Pa. Sept. 30, 2009), *aff'd*, 398 F. App'x 812 (3d Cir. 2010) (commercial operator running bathroom renovation business and buying bathtubs for resale to consumers); *In re Lightfoot*, 399 B.R. 141, 152 (Bankr. E.D. Pa. 2008) (truck haulers buying trucks); *Boatel Indus. v. Hester*, 550 A.2d 389, 398–99 (Md. Ct. Spec. App. 1988) (plaintiff corporation formed to purchase yacht and then took business tax credit on same); *Weaver v. Real Est. Funding*, 2010 WL 1662991, at *2 (D. Md. Apr. 21, 2010) (loan at issue required plaintiff to use proceeds "solely for the purpose of carrying on or acquiring a business or commercial investment"); *Layton v. AAMCO Transmissions*, 717 F. Supp. 368, 370-71 (D. Md. 1989) (franchisee already owned and operated "existing AAMCO facility").

consumers regardless of the profit motive of the purchaser." *Sibeto v. Capella Univ.*, 2014 WL
3547347, at *4 (W.D. Pa. June 13, 2014). The point is they were ordinary consumers, who bought
into a pitch and spent their money trying to make their lives and their families' lives better, and
they were duped. They have every right to invoke their states' consumer protection laws.[12]

### C. The Record Establishes that Plaintiffs Relied on Trump's Misrepresentations

Defendants next contend that the record contains no evidence of reliance, but they simply
ignore the mountain of evidence that shows exactly that.

As an initial matter, Defendants' threshold argument that "Plaintiffs became ACN IBOs
based on ACN marketing directed at them" is nothing more than a reference to the ACN
Opportunity Discs and other materials that Defendants themselves concede were "marketing
materials that *featured* Mr. Trump." Mot. at 4 (emphasis added). Defendants get nowhere trying to
point the finger at ACN.

In all events, as detailed above, *supra* at 9-10, the record contains ACN internal emails, emails
to IBOs, actual internal recruiting statistics, and even Trump's own boastful statements all
unanimously attesting to the enormous and unique power of Trump's endorsement in driving
recruiting. Plaintiffs were no different:  Each testified clearly that they signed up with ACN because
of Trump's endorsement. *Supra* at 11. To reiterate just a few of the many examples in the record,
Ms. McKoy testified that "they put up Donald Trump, that's what convinced me to sign into ACN,"
¶ 65 (McKoy testimony); Mr. Frazier testified that "the approval stamp of Mr. Donald Trump . . .
was all I needed," ¶ 69 (Frazier testimony); and Ms. Chadwick testified that her decision to join
was influenced by Trump's endorsement, ¶ 66 (Chadwick testimony). This testimony alone is

---

[12] Even beyond the business opportunity, ACN sold IBOs various products for their own personal use, like individual
wireless plans and home energy. ACN even ran promotions that touted IBOs' ability to obtain home consumer products
and services for themselves at a discount as part of ACN's supposed appeal. *See* ¶ 63 (Stevanovski testifying that "a
lot of people join [ACN] for that reason. They look at it as a way to get a free service.").

sufficient to preclude summary judgment. *See Jordan v. Paul Fin.*, 285 F.R.D. 435, 454 -55 (N.D. Cal. 2012) (finding triable issue of material fact based on plaintiffs' deposition testimony evidencing reliance).

Defendants do not grapple with this testimony, and instead try to muddy the waters by pointing to additional factors that may have influenced the Plaintiffs. *See* Mot. at 11-13. But it is not "necessary that a plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct." *Engalla v. Permanente Med. Grp.*, 938 P.2d 903, 918 (Cal. 1997) (cleaned up). Rather, Defendants' misrepresentation need only have been a "substantial" or "material" factor in influencing the Plaintiffs' conduct, a standard that the evidence more than establishes here. *See id.* (denying summary judgment where representations "were not so obviously unimportant as to render them immaterial as a matter of law" (cleaned up)).[13]

Finally, there is no merit to Defendants' contention that Plaintiffs' reliance on Trump's misrepresentations was unreasonable as a matter of law simply because ACN included vague, fine-print disclaimers to the effect that income was not "guaranteed." Mot. at 11. To begin with, the generic boilerplate disclaimers cited by Defendants do not address Trump's specific misrepresentations about the market potential of ACN's products and services, about his supposed research into ACN, or about his failure to disclose that he was being paid to endorse ACN. More fundamentally, whether a plaintiff's reliance was reasonable is a *quintessential* question for the trier of fact. *See All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 608–09 (Cal. 1995) (holding that

---

[13] *See also In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) (noting same standard under UCL); *Fort Washington Res., Inc. v. Tannen*, 858 F. Supp. 455, 461 (E.D. Pa. 1994) (holding that "one deceived need not prove that fraudulent misrepresentation was the sole inducement" under Pennsylvania common law); *Drelles v. Mfrs. Life Ins. Co.*, 881 A.2d 822, 840 (Pa. Super. Ct. 2005) (holding that UTPCPL reflects Pennsylvania common law with respect to reliance); *Nails v. S & R, Inc.*, 639 A.2d 660, 669-70 (Md. Ct. App. 1994) (rejecting argument that but-for causation is the proper test for reliance and enunciating a substantial inducement standard).

reasonableness of reliance is a fact question except in a "rare case"); *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007) ("[J]ustifiable reliance is typically a question of fact for the fact-finder to decide."). And a plaintiff's claim is not barred "unless his conduct, in the light of his own information and intelligence, is preposterous and irrational." *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 865 (2007). On the record here, Plaintiffs' receipt of a couple of ACN documents containing vague disclaimers does not render their reliance on Trump's repeated misrepresentations about the ACN business opportunity "preposterous," *id.* at 8670-68 (rejecting "challenge to reasonable reliance based on the disclaimers"), particularly given the Plaintiffs' lack of sophistication and the fact that they "had no indication that" Trump was "being anything less than forthright," *Ohio Six Ltd. v. Motel 6 Operating L.P.*, 2012 WL 12886208, at *17 (C.D. Cal. Nov. 16, 2012)—not to mention the fact that both Trump and ACN were hiding that he was being paid. *Supra* at 6.[14]

### D.  Trump's Lies Were Not Puffery

Defendants' assertion that Trump's false statements were mere puffery fails for two reasons. *First*, the puffery doctrine does not apply here. Puffery is a "*seller's* privilege," *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (emphasis added) premised on the presumption that "neither party usually believes what the seller says about his own opinions," *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918). Here, Trump made the false statements at issue while presenting himself as independent of the company. *See* Part I.B,

---

[14] Defendants' suggestion that Trump's misrepresentations about the ACN videophone have not been put at issue is just another example of them engaging with the record they wished they had, instead of the record they do. In fact, Mr. Frazier recalled watching clips from ACN's appearance on *The Celebrity Apprentice* that featured its desktop videophone product, ¶ 68, while Ms. Chadwick testified that the videophone was offered by ACN when she joined the company and said it was among the ACN products she received training on, ¶ 67. Ms. Chadwick's testimony suggesting she was not personally "interested" in the product misses the point, given that the idea was to sell the product to others, but in all events, a deposition is not a direct examination, and the absence of testimony on a factual issue does not provide a basis on which to grant summary judgment. *See Carhuapoma v. N.Y.-Presbyterian Healthcare Sys.*, 2013 WL 1285295, at *9 (S.D.N.Y. Mar. 29, 2013) (denying summary judgment where plaintiff "did not testify in his deposition" about relevant factual issue but "neither [did] anything in his deposition affirmatively contradict" his position).

*supra*. On this very motion, Defendants themselves, in trying to avoid restitution, similarly cast him as "a stranger to the transaction" and a "third party." Mot. at 5, 7. The premise underlying the puffery doctrine is thus inapposite:  Potential IBOs had no reason to believe that Trump would "puff" about ACN, particularly since he represented that he was validating ACN because he had diligenced the company and loved it and its founders, not because he was being paid millions. In these circumstances, Trump cannot use puffery to shield himself from accountability for his lies. *See United States v. Levy*, 2013 WL 3832718, at *3 (S.D.N.Y. July 15, 2013) ("no caselaw [] support[s] the application of [puffery] to statements made by third-party promoters and touters").[15]

*Second*, even if Defendants could invoke a puffery defense, it would fail for the additional reason that Trump did not make "exaggeration[s] or overstatement[s] expressed in broad, vague, and commendatory language," *Time Warner*, 497 F.3d at 159, but instead made material, specific misstatements of fact to induce potential IBOs to join ACN. As detailed above, Trump stated on every version of the Opportunity Disc that ACN presented a "great opportunity" to make money "without any of the risks most entrepreneurs have to take." ¶ 21. These sorts of specific statements about financial upside and lack of risk were not puffery. *See, e.g.*, *United States v. Autuori*, 212 F.3d 105, 118–19 (2d Cir. 2000) (jury could find more than puffery where business forecasts falsely described as "good" and "credible," and investment described as "safe"); *In re MF Glob. Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317-18 (S.D.N.Y. 2013) (not puffery where risk described as "minimal" and "limited"). And they were demonstrably false—the Trumps' own expert conceded that "ACN

---

[15] Defendants assert their puffery defense under federal law, Mot. at 15-17, and in all events there is no substantial conflict with any of the applicable state law. *See, e.g.*, *De Paoli v. Hendrick Auto. Grp.*, 2009 WL 2248550, at *4 (Cal. Ct. App. July 29, 2009) ("'Puffery' or 'puffing' is a seller's statement of its subjective opinion about the merits of a product, as opposed to a factual description of a characteristic of the product."); *McGraw v. Loyola Ford, Inc.*, 723 A.2d 502, 512-13 (Md. Ct. Spec. App. 1999) (stating that puffing is "the sort of speech that is offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable [person] would rely" (cleaned up)); *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 626 (2018) ("[T]he law presumes that . . . neither party usually believes what the seller says about his own opinions, and each knows it." (cleaned up)).

is not low risk; it's, in fact, high risk," ¶ 22 (Hair testimony), and so "it would not be correct to identify it as low risk." *Id*. But that is what Trump said, over and over again, to every recruit.

Similarly, Trump's representations that ACN's videophone was "new," "breakthrough technology" "that will literally revolutionize the way we communicate," were provably false. ECF 534-15-3 (2010 Opp. Disc Ver. 4.0-.02) at 00:57-1:02, 7:10-7:13. As Plaintiffs' technology expert will explain at trial, ACN's videophone technology was obsolete from the moment it was introduced, ¶ 27 (Gartenberg Rpt.), and Defendants' expert conceded there was no basis for Trump's claim that the phone would "be present in every home within the next several years." ¶ 27.

Equally untrue were Trump's representations that he did "a lot of research" on ACN, and that he saw "reports" on the company that were "unbelievable." ECF 534-26 at 13:44-13:51; ECF 534-24 at 1:22:12-1:22:15; TTO_007616 at 61-65. The caselaw is clear that outright lies about one's due diligence are not puffery. *See In re RAIT Fin. Sec. Litig.*, 2008 WL 5378164, at *6 (E.D. Pa. Dec. 22, 2008); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 201 (3d Cir. 1990).

Defendants try to dodge all of this, ignoring Trump's actual statements and dealing only with cherry-picked quotes from deposition transcripts in which Plaintiffs tried to recall and summarize Trump's statements years later. But it is the statements themselves—not Plaintiffs' recollection of them—that matters. *See, e.g.*, *Green v. Wing Enters.*, 2015 WL 7351478, at *4 (D. Md. Nov. 20, 2015) (denying summary judgment where plaintiff identified statements "capable of definition," even though she could not "recall the precise wording of the allegedly false statements").

Finally, even if the Trumps could identify some statements in the record that might be construed as vague or opinion-like in nature, the law recognizes that both context and repetition can often entitle a reasonable investor to rely even on a "puffy" statement. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 443 (S.D.N.Y. 2018) (statement that is "puffery when viewed in isolation" may be actionable depending on "context in which it was made"); *In re*

*Petrobas Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statements made "repeatedly"). And, even as to such statements, a speaker cannot evade liability if he presents himself—as Trump plainly did—as having "superior knowledge." *Burton v. Iyogi, Inc.*, 2015 WL 4385665, at *8 (S.D.N.Y. Mar. 16, 2015); *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 892 (2013).

## II.   PLAINTIFFS HAVE ADDUCED RECORD EVIDENCE ESTABLISHING THEIR COMMON LAW CLAIMS

The record is also more than sufficient to support Plaintiffs' common law claims under California, Maryland, and Pennsylvania law. As explained in Part I, *supra*, Trump's statements were actionable misrepresentations, not mere puffery, and Plaintiffs justifiably relied on them. Defendants' remaining scattershot arguments all miss the mark entirely.

Defendants principally attack Plaintiffs' common law claims with an argument that there is insufficient evidence of scienter. As a general rule, at the summary judgment stage, scienter "is an issue for the trier of fact to decide." *W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*, 534 F. Supp. 3d 1209, 1250 (E.D. Cal. 2021) (cleaned up); *accord Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) ("Issues such as intent . . . are rarely suitable for summary judgment."). Indeed, this Court has instructed that "courts should be lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580, 2021 WL 3727095, at *5 (S.D.N.Y. Aug. 23, 2021) (Schofield, J.) (cleaned up).

Here, the record as to Defendants' scienter is anything but tenuous. To start, Trump's misrepresentations were not one-offs. He repeated them again and again in videos, in print, and at live events, over the course of nearly a decade. *See In re Genworth Fin. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) ("The fact that Defendants made repeated misrepresentations over the course of a year also suggests a substantial degree of scienter."). He also had strong incentives to say whatever would drive the most recruiting, regardless of its truth. *See In re Hain Celestial Grp. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021) (court must consider motive to defraud "together

with" other evidence of intent when assessing scienter). Indeed, ACN renewed Trump's contracts on a short-term basis, and continued to pay him more and more over time as he continued to draw in IBOs. *Supra* at 4, 9-10.

Critically, too, the Trumps studiously avoided doing any diligence, and the applicable scienter is satisfied on a showing of reckless disregard for the truth. *Engalla v. Permanente Med. Grp., Inc*., 938 P.2d at 917; *Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005); *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). Even worse, Trump continued to endorse ACN in the face of serious red flags, *see supra* at 8. *See In re Refco. Sec. Litig.*, 503 F. Supp. 2d611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are . . . reasonably available facts, or 'red flags,' that should have put [defendants] on notice that the public statements were false." (cleaned up)). Together, this all constitutes powerful evidence of scienter, more than sufficient to reach a jury.

On the diligence issue, Defendants' retort—that "no Plaintiff recalls President Trump saying anything about any research he engaged in or relied on"—is not the point and also not true. *See, e.g.*, ¶ 65 (McKoy testimony) ("He did the research on this business. He knows that this is a good business. I don't know anything about business. So he knows. I'm going with what he says."). Defendants' argument that Plaintiffs cannot establish scienter because "Trump verified that the ACN videophone worked" also misses the point. Rotary phones work too. That does not mean that they are a "breakthrough technology" "that will literally revolutionize the way we communicate."

Defendants make a half-hearted suggestion that Ms. McKoy's and Mr. Frazier's negligent misrepresentation claims fail because there is no evidence that Trump did not intend to induce reliance—an argument that is impossible to square with his own pestering of an ACN executive to "pay me more money for my goddamn speeches" given how many IBOs he was bringing in.

Next, Defendants chide Ms. Chadwick for not remembering the precise words that Trump used on the Opportunity Disc that she—like everyone else—was shown when she was recruited

into ACN. But the cases cited by Defendants simply hold that fraud must be proven by clear and convincing evidence—a standard that is easily satisfied here, where Trump's fraudulent statements were captured on video and in print. *See 7-Eleven, Inc. v. Upadhyaya*, 926 F. Supp. 2d 614, 627 (E.D. Pa. 2013) (clear and convincing evidence where there was video of fraud).

Finally, Defendants essentially concede again, Mot. at 21; *see also* ECF 551 at 7 n.4, that Trump did not disclose he was being paid, so they muster a few lines of argument that he did not have to. But of course, "[r]egardless of whether one is under a duty to speak or disclose facts, one who does speak must speak the whole truth, and not by partial suppression or concealment make the utterance untruthful and misleading." *Bridge v. ETrade Sec. LLC*, 2011 WL 5444266, at *5 (N.D. Cal. 2011); *accord SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 211-212 (3d Cir. 2022); *Rhee v. Highland Dev. Corp.*, 958 A.2d 385, 396-97 (Md. Ct. Spec. App. 2008).[16]

## III.   SUMMARY JUDGMENT IS UNWARRANTED ON CAUSATION GROUNDS.

Plaintiffs' theory of causation is straightforward and amply supported by the record. Every Plaintiff testified that they relied on Trump in joining ACN, and the record—from ACN's numbers to Trump's own statements—shows that tens of thousands of others did too. His statements about ACN were false, and when that became clear, Plaintiffs cut their losses and got out.

Defendants nonetheless insist that Trump's misrepresentations were not the "legal cause" of Plaintiffs' damages, Mot. at 21, because Plaintiffs' losses "*may have been* due to a variety of reasons" beyond the high-risk nature of ACN's multi-level marketing model, such as "████████ ████████████████████████████████████████████████████████████" Mot. at 22 (emphasis

---

[16] Under California law, Trump also had an affirmative duty to inform potential IBOs that he had done no diligence on ACN and that he was endorsing ACN for money, because he had "superior knowledge" to Plaintiffs. *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958-60 (N.D. Cal. 2014) (holding that "even the presence of information online" does not necessarily remove a duty to disclose "when the defendant had exclusive knowledge of material facts not known to the plaintiff").

added). This evidence-free conjecture is plainly insufficient to support summary judgment. *Giannullo v. City of N.Y.*, 322 F.3d 139, 140-41 (2d Cir. 2003).

Similarly, Defendants' *ipse dixit* that Plaintiffs' efforts were "████████"—apparently, in Defendants' view, because Plaintiffs participated in ACN for *one to two years* without making money—is at odds with the record. McKoy recruited at least five IBOs, sold at least five ACN products or services, and purchased an additional two ACN services for herself. ¶ 65 (McKoy testimony). For all of this, McKoy received just $38 from ACN. ¶ 65 (McKoy testimony). Chadwick paid to attend more than seventeen ACN training events but only ever recruited a single IBO (her son). ¶ 66 (Chadwick testimony). Frazier made a "maximum effort" to sign up his friends and family. ¶ 69 (Frazier testimony). Despite these efforts, Plaintiffs could not overcome the fact that, as Dr. Bosley found, "███████████████████████████████████████████ ███████████████████████████," and that the typical IBO lost between $40 and $53.14 per month, after factoring in sign-up fees. ¶ 24 (Bosley Rpt.). Indeed, Defendants themselves concede the truth with their blasé assertion that "████████████████████████████ ██████████████████████████" Mot. at 22. This does not advance their argument—rather, it underscores how Trump's representations that prospective IBOs had a reasonable prospect of success, which induced Plaintiffs to sign up as IBOs, were false all along.

*    *    *

Defendants' last-ditch attempt to exclude Dr. Bosley's report, tucked into a few paragraphs in Defendants' causation argument, is meritless. In her report, which was well-reasoned and supported by extensive analysis of IBO outcomes, Dr. Bosley explained that ACN did not offer "a reasonable prospect of economic success with low risk" because it did "not provide meaningful opportunities to earn money." ¶ 23. IBOs' "███████████████████████████████████████ ███████████████████████████████████████████████████████████████" *Id.* (emphasis

added). Defendants contend that this opinion "██████████████████████████

████████████████████████████" and that Dr. Bosley "██████████████████

████████████████████. That is simply false.

Dr. Bosley explained in some detail that "██████████████████████████

████████████████████████████████████████████████████████████████████"

but "████████████████████████████████████████████████████████████████

██████████" due to the structure of ACN itself. ¶ 24 (Bosley Rpt.). And Defendants' expert Dr. Hair

reached the same conclusion, conceding that "there's a big group of [IBOs] earning very little or

maybe zero, and there is a bin at the top earning a lot more." *Id.* (Hair testimony); *see also id.* (Hair

testimony) (agreeing that "this steady group . . . [has] been in a very long time").[17]

Defendants' other arguments for exclusion are equally illusory. It is irrelevant that Dr. Bosley

did not analyze "proximate cause" or Plaintiffs' "skills and aptitude." Mot. at 24-25. Dr. Bosley

does not purport to offer expert testimony on these issues, nor are they relevant to her analysis of

ACN. And Defendants' breezy citation to 37 pages of Dr. Hair's report, without further elaboration,

does little to explain why Defendants believe Dr. Bosley should be excluded. Mot. at 25. This is

particularly true given that, in his deposition, Dr. Hair agreed (repeatedly) that he was "not aware

of any error in [Dr. Bosley's] math or misapplication of the compensation plan or anything like

that." ¶ 24 (Hair testimony).[18]

---

[17] Because there is no dispute that a ████████████████████████████████████████████
████████, Defendants' citation to a handful of declarations from hand-picked IBOs does not move
the needle. In any event, because Defendants failed to timely disclose these declarants, none have been subjected to
cross-examination. Plaintiffs have, therefore, requested leave to depose these declarants in a letter filed concurrently
with this brief, pursuant to an earlier Order issued by Judge Cave. ECF 474.

[18] Finally, Defendants do not offer any reasoned basis for why summary judgment should be granted for The Trump
Corporation. Nor could they. The Trump Corporation's employees, acting within the scope of their employment,
dedicated extensive time and resources to supporting the ACN relationship and Trump's misrepresentations in service
of that relationship. ¶ 19. (Trump Corp. testimony). And The Trump Corporation benefited thereby:  its 30(b)(6)
designee Eric Trump testified that "anything my father did in his kind of personal capacity was ultimately, you know,
benefited, you know, [T]he Trump Corporation and probably vice versa." ¶ 20. The Trump Corporation properly
remains a defendant in this case, and Plaintiffs' claims against it should proceed to trial.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment.


Dated:  June 16, 2023
        New York, New York

_____
Roberta A. Kaplan
John C. Quinn
Christopher R. Le Coney
Maximillian L. Feldman

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel: (212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
cleconey@kaplanhecker.com
mfeldman@kaplanhecker.com


Andrew G. Celli, Jr.
Matthew D. Brinckerhoff
O. Andrew F. Wilson
Vasudha Talla
Nick Bourland

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
600 Fifth Avenue at Rockefeller Center
New York, New York 10020
Tel: (212) 763-5000
acelli@ecbawm.com
mbrinckerhoff@ecbawm.com
awilson@ecbawm.com
vtalla@ecbawm.com
nbourland@ecbawm.com


*Attorneys for Plaintiffs*

**APPENDIX**
*Figure 1 – Excerpt from ACN News Magazine (Summer 2009)*



*ACN012091*