UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE TRUMP CORPORATION and DONALD J. TRUMP, in his personal capacity,<br><br>*Defendants*. | No. 18-cv-09936-LGS-SLC |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Local Rule 56.1 of the Civil Rules of this Court and Rule III.C.6 of Your Honor's Individual Rules and Procedures for Civil Cases, Plaintiffs Catherine McKoy, Markus Frazier, and Lynn Chadwick submit the following responses to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, ECF 593.[1]

**Fact No. 1**: ACN, Inc. ("ACN") has operated a multi-level marketing company since 1993 in the US and internationally. Merriman Tr. 15-16, 22, 37-38.

**Response**: Disputed to the extent that the relevant corporate entity is ACN Opportunity, LLC, not "ACN, Inc." *See, e.g.*, ECF 168 at 1 (memorandum of law filed by ACN Opportunity, LLC).

**Fact No. 2**: In order to sell ACN's products and services, individuals contract with ACN, enabling them to access the "ACN Opportunity," meaning they can become IBOs. Defendants did not contract with the IBOs and were not paid by them. Merriman Tr. 22, 38, 41.

**Response**: Disputed. Defendants benefited financially from the recruitment of ACN IBOs and indirectly received payment from those IBOs through the Trump-ACN endorsement agreement. For nearly a decade, Trump served as ACN's marquee celebrity endorser, in

---

[1] Citations to "Ex." refer to the exhibits annexed to the June 16, 2023 Declaration of Christopher R. Le Coney.

exchange for which ACN agreed to pay him $11.85 million. ECF 534-5 (2006 agreement), ECF 534-7 (2008 agreement), ECF 534-8 (2009 agreement), ECF 534-9 (2011 agreement), ECF 534-10 (2013 agreement).

Further stated that pursuant to the endorsement agreements, Trump endorsed ACN and worked to persuade potential IBOs to pay $499 to join ACN, including by appearing in at least 12 ACN Opportunity Discs featuring Trump's endorsement that were sold to IBOs as marketing materials, Keller ¶ 130, Ex. D; speaking at 14 live ACN IBO conventions, *id.* ¶ 14, 131, which IBOs paid hundreds of dollars to attend; allowing himself to be featured in ACN-sponsored articles promoting ACN and direct selling, ECF 534-23 at 19 (Keller Rpt.); and permitting his image, likeness, and statements endorsing ACN to be featured on ACN marketing materials and on the ACN website Ex. 11 (Keller ¶ 129); ECF 534-23 at 17-18 (Keller Rpt.). Trump also promoted ACN in two episodes of his network TV show, *The Celebrity Apprentice*. ECF 534-36 (video footage), ECF 534-37 (video footage).

Further stated that ACN's leadership noted that Trump's endorsement generated "the biggest response that we ever got at a [sic] event with a [sic] announcement . . . [t]he reps are more excited then [sic] I ever had seen them." ECF 534-6 at 2 (Feb. 15, 2006 email from R. Stevanovski). ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

ACN renewed Trump's contracts on a short-term basis, and continued to pay him more and more

over time as he continued to draw in IBOs. Ex. 9 (Graff Tr. 92:13-93:13); ECF 534-5; ECF 534-7; ECF 534-8; ECF 534-9; ECF 534-10.

███████████████████████████████████████████████████

**Response**: Disputed to the extent that this is not a complete summary of the contents of the ACN IBO Agreement that IBOs were required to sign, which references and incorporates ACN's Policies and Procedures as well as ACN's Compensation Plans. ECF 66-26 at 2-3 (IBO Agreement). Further stated that these statements were buried in fine print, on the back of the ACN IBO Agreement, and were contradicted by Trump's representations that described ACN as a low-risk, high-reward opportunity. For example, Trump told potential IBOs: "You have a great opportunity before you with ACN without any of the risks most entrepreneurs have to take." ECF 534-17-3 at 5:08-5:15 (ACN Opportunity Disc, Version 5.3) (Dec. 2011). Trump further claimed: "I know what it takes to be a success, and ACN has a winning business model. And I mean -- winning." ECF 534-15-3 at 5:39 – 5:46 (ACN Opportunity Disc, Version 4.0) (June 2010).

**Fact No. 4**: ACN, not Defendants, charged IBOs a $499 sign-up fee and a monthly amount to maintain their webpages. Merriman Tr. 39-40; Chadwick Tr. 88, 122-123; Frazier Tr. 26; Merriman Tr. 95.

**Response**: Undisputed, subject to the above response to Fact No. 2.

**Fact No. 5**: IBOs could chose [sic] to pay ACN for additional marketing materials, to attend meetings, and to renew their memberships. Merriman Tr. 43, 100-109; McKoy Tr. 188, 292-294; Chadwick Tr. 56, 78-79, 88, 122-123; Frazier Tr. 42-43.

**Response**: Disputed to the extent that, as Dr. Bosley will testify at trial, ACN "encourages, and in some cases, requires IBOs to spend money in pursuit of retail activity and recruitment." Bosley Rpt. ¶ 28. ACN's Policies & Procedures also encouraged IBOs "to purchase ACN products and services themselves." Rpt. Bosley ¶ 29, and prohibited IBOs from using their

own marketing materials; they had to buy all marketing materials from ACN. ECF 582-4 at 11-13 (ACN 2012 Policies & Procedures). Those same Policies & Procedures explicitly state that "ACN supports" IBOs attending ACN training events, which IBOs must pay to attend. *Id.* at 13. "An *ACN Connections* magazine advertised a 'must-have business building package for everyone who's serious about success now…" which would cost IBOs $39.99 per month." Bosley Rpt. ¶ 31. Defense expert Dr. Hair agreed with Dr. Bosley's conclusion that ACN's compensation plans encourage spending money [by IBOs]," and adopted the following observation: "it takes money to make money." Ex. 11 (Hair Tr. 178:9-16).

**Fact No. 6:** Per the IBO agreement, ACN paid the IBOs commissions for qualifying sales made by them and persons they recruited, as well as bonuses. Merriman Tr. 46-47.

**Response**: Undisputed. Further stated that in addition to commissions on qualifying sales, the bonuses ACN paid were "Customer Acquisition Bonuses," referred to as "CABs" for recruiting new IBOs into one's downline. ECF 582-3 at 5 (ACN Mar. 1, 2012 Compensation Plan). ██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

                  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ *see also* ECF 582-4 at 7 ("A Payment Processing Fee will be deducted from each CAB and commission payment to cover processing costs relating to the issuance of the payment and the statement. A payment will not be issued until the total amount (less the Payment Processing Fee) is greater than $10.").

**Fact No. 7**: ACN offered various services that IBOs could sell to customers, including VOIP (through its own network) and energy services. Merriman Tr. 22, 41-42, 62-63, 174.

**Response**: Disputed to the extent that ACN generally did not ████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ This

includes ACN's wireless and energy services which, although sometimes branded as ACN

services, were provided using infrastructure owned and operated by third parties, though ACN

had its own VOIP software network. *See* Merriman Tr. 63:5-12.

**Fact No. 8**: At one time ACN sold a videophone bundled with VOIP. Merriman Tr. 62-64.

**Response**: Undisputed.

**Fact No. 9**: The videophone was a small part of ACN's sales and was marketed only as a way to promote a bundle with its VOIP service, not as a standalone item. Merriman Tr. 69; Stevanovski Tr. 17-19.

**Response**: Undisputed that the ACN videophone never achieved meaningful sales. Crandon Tr. 54:1-16.

Disputed to the extent that, the ACN videophone was frequently promoted as a standalone product without any mention of VOIP service. Trump described ACN as "the largest distributor of video phones anywhere in the world," ECF 534-36 at 7:26 – 7:32, and claimed that "ACN is leading the way in a new technology that will literally revolutionize the way we communicate with the ACN video phone. And trust me it's changing everything," ECF 534-15-3 at 00:55 – 1:07. The ACN videophone was ACN's flagship product and was prominently featured in ACN's marketing materials, including on the cover of Opportunity Discs, *see, e.g.*, ECF 66-3 (ACN Opportunity Disc, U.S. Version 4.0) (June 2010) (disc cover), and was promoted by Trump twice on his nationwide TV show, *The Celebrity Apprentice* without any mention of VOIP. ECF 534-36, ECF 534-37.███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

**Fact No. 10**: ACN stopped promoting the phone in 2012 and quit selling it altogether in 2014. Stevanovski Tr. 54; 56-57; and 59–61.

**Response**: Disputed to the extent that ACN did not stop marketing the ACN videophone in 2012. For example, the ACN videophone was promoted in an ACN Opportunity Disc released in January 2013. ECF 534-21-31 (ACN Opportunity Disc, Version 7.0) (Jan. 2013). In fact, ACN doubled down on videophones in 2012, releasing a new version of the product, the IRIS X. Gartenberg Rpt., Ex. 1.

**Fact No. 11**: ACN made zero margin on the phone, which it marketed only as an enhancement to the VOIP service it offered. Stevanovski Tr. 51.

**Response**: Disputed to the extent that neither Defendants nor ACN have produced any documents to support the claim that ACN made "zero margin" on the ACN videophone, which sold for as much as $410 per unit. Gartenberg Rpt., Ex. 1.

██████████████████████████████████████████████████

██████████████████████████████████████████

Further disputed to the extent that, as described in response to paragraph 9, the ACN videophone was marketed as a standalone product.

**Fact No. 12**: ACN prohibited cold marketing pursuant to the ACN Marketing & Advertising Policy Section III (Brinckerhoff Decl. Exh. 28); Merriman Tr. 88.

**Response**: Undisputed.

**Fact No. 13**: ACN induced IBOs to join based on extensive marketing materials and information about its business, which disclosed the risk that they would not earn money. Shapiro Decl. Exhs. C, O, P & Q.

**Response**: Disputed to the extent that the above does not include a citation to admissible evidence establishing that "ACN induced IBOs to join based on extensive marketing materials

and information about its business" or that ACN's marketing materials "disclosed the risk that [IBOs] would not earn money," which is not consistent with Local Civil Rule 56.1(d). The above general citations to Plaintiff McKoy's deposition and the Plaintiffs' Responses to Requests for Admissions do not establish these disputed facts.

Further disputed to the extent that, as set out in the response to Fact No. 2, IBOs were induced to join ACN through Trump's fraudulent promotion of the company and, to the extent they were influenced by ACN's marketing materials, those materials featured Trump's name and likeness, and statements by Trump promoting ACN.

Further disputed to the extent that, even if some of ACN's marketing materials made some form of disclosure with respect to the risk that IBOs would not earn money—which the above cited exhibits to the Shapiro Declaration do not establish—then still, as set out in response to Fact No. 3, such a disclosure would have been contradicted by Trump's repeated representations describing ACN as a low-risk, high-reward opportunity.

**Fact No. 14**: From 2006 to 2015, ACN engaged President Donald J. Trump as a "celebrity endorser" via a series of agreements under which he agreed to appear in videos and at 14 ACN conferences. Merriman Tr. 185; 192; Brinckerhoff Decl. Exhs. 2, 7, 8, 9, 10, 11.

**Response**: Disputed to the extent that Trump agreed to appear at 21 ACN events, not 14, but ultimately only fulfilled 4 out of the 10 appearances at ACN conventions contemplated by the 2013 endorsement agreement because the agreement was terminated early, in 2015, after Trump announced his run for president and reporters began asking questions. ECF 534-11 at 6 (Mutual Termination of Appearance Agreement); Graff Tr. 385:12-15; *see also* James V. Grimaldi & Mark Maremont, *Donald Trump Made Millions From Multilevel Marketing Firm*, Wall Street J. (Aug. 13, 2015), https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

Further stated that Trump also agreed to provide inspirational notes and magazine articles, and that he featured ACN and the ACN videophone in two episodes of *The Celebrity Apprentice*. ECF 534-10 at 3-4; ECF 534-36; ECF 534-37.

**Fact No. 15**: In 2008 and 2011 ACN contracted with a production company to be featured on the Celebrity Apprentice, a television show hosted by President Trump. Merriman Tr. At 251-52; Exhs. 38 and 51; Shapiro SJ Decl. Exhs. G and H.

**Response:** Undisputed, except to the extent that the above-cited materials establish that the contract concerning ACN's second appearance on *The Celebrity Apprentice* was executed in 2010, not 2011. ECF 591-7 at 2 (2010 Task Agreement).

Further stated that, according to Trump, he received approximately 50% of the fees paid to appear on *The Celebrity Apprentice* through a fee-sharing agreement. Ex. 9 (D.J. Trump Tr. 35:24-36:5).

**Fact No. 16**: ACN created marketing materials that featured President Trump, including video scripts and talking points which ACN drafted and which President Trump did not see a need to revise. Merriman Tr. 202-204, 206, 244; Trump Tr. 140-141, 149-155.

**Response**: Undisputed that ACN created marketing materials featuring Trump. Disputed to the extent that Trump had the contractual right to review and approve ACN's marketing materials that featured him and on many occasions did. *See, e.g.*, ECF 534-10 at 2-5 (the content of speeches and the use of other marketing materials featuring Trump "shall be subject to Mr. Trump's approval in his sole discretion").

Further stated that Anne Archer Butcher, ACN's marketing consultant who managed the Trump-ACN relationship for ACN, testified that "ACN drafted the materials" which were sent to "Mr. Trump or to his office or representatives. They would sometimes send back edits or feedback, which is a process that continued right up through the filming itself, including some extemporaneous speaking." Ex. 7 (Butcher Tr. at 53:15-24). In addition, Trump testified that he added material to scripts he was provided. *See, e.g.*, ECF 591-6 at 13 (D.J. Trump Tr. 155:8-13).

Butcher also testified that "the Trump side did sometimes make revisions or edits" to ACN-sponsored *Success* and *Success from Home* magazine articles featuring Trump. Ex. 7 (Butcher Tr. 79:18-21).

**Fact No. 17**: Plaintiff Markus Frazier is a Maryland resident. SAC ¶ 23.

**Response**: Undisputed.

**Fact No. 18**: Frazier joined ACN to make money not to buy services for himself. Frazier Tr. 26-27.

**Response**: Undisputed that Frazier joined ACN to make money to benefit himself and his household. Disputed to the extent that Frazier also testified that he tried to purchase ACN services for his household, but his mother, with whom he lived, decided against purchasing ACN services. Frazier Tr. 65:5-13.

Further disputed to the extent that Frazier testified he did not recall whether he signed up for the ACN cellphone service data plan. Frazier Tr. 66:3-5.

**Fact No. 19**: Frazier heard about ACN in 2016 from a business acquaintance, who solicited him and gave him a magazine. Frazier then saw the Celebrity Apprentice and another TV program, and he recalls President Trump saying that ACN was a great company. Before joining he watched a webinar that did not include President Trump. Frazier Tr. 11-26.

**Response**: Disputed to the extent that Frazier first heard about ACN from Ray Harris, who was not a "business acquaintance" but a walk-in customer at the fast-food chain where Frazier worked at the time. ECF 552-2 at 3-4 (Frazier Tr. 11:24-12:22).

Further disputed because Trump, not ACN or Harris, was "the reason" why Frazier joined ACN. ECF 536 ¶ 3 (Frazier Decl.) ("I relied on Trump's endorsement of ACN and his statements about the ACN IBO Opportunity when I decided to spend $499 to enroll as an ACN IBO."). While Harris introduced Frazier to ACN, "[i]t was more Donald Trump that gave me [Frazier] that motivation [to join ACN]." Frazier Tr. 104:24-25. "If Donald Trump had a company on a national television show, then [Frazier was] sure he put his stamp of approval to say this is a

company that anyone can join and be successful in." Frazier Tr. 23:14-18. "[T]he YouTube videos of Donald Trump, those were – those were the words of motivation that made [Frazier] at least attempt to make an effort to make money" from ACN. Ex. 10 (Frazier Tr. 74:11-15). "If Donald Trump, a successful businessman as it is, vouches for a company like [ACN]," Frazier was "pretty sure" that he could use the ACN opportunity to be "successful." Ex. 10 (Frazier Tr. 75:3-7).

**Fact No. 20**: Frazier continued to receive motivational pitches from his acquaintance and attended two local ACN conventions that included motivational speeches, at one of which President Trump was not even mentioned. Frazier Tr. 31-40.

**Response**: Disputed to the extent this is not a complete summary of Frazier's testimony. The above occurred *after* Frazier joined ACN in reliance on Trump's endorsement, and Frazier did not subsequently renew his membership in ACN. Frazier Tr. 42:20-43:13. Further stated that prior to joining ACN, Frazier watched a series of clips of Donald Trump endorsing ACN on YouTube, which gave him the motivation to join ACN. ECF 552-2 at 19 (Frazier Tr. 39:17-19); Frazier Tr. 45:11-13, 104:24-25.

**Fact No. 21**: Frazier spoke to friends and family after signing up for ACN hoping they would join ACN or purchase ACN services, but they did not. Frazier Tr. 28-43.

**Response**: Undisputed. Further stated that Frazier, despite working full-time elsewhere, made a "maximum effort" to succeed as an ACN IBO. Frazier Tr. 77:14-16. Consistent with ACN's Policies and Procedures, which limit cold marketing, ECF 582-4 at 11, Frazier focused his efforts on attempting to sell to his friends and family but was unable to make even one successful sale. ECF 552-2 at 10-11 (Frazier Tr. 27:22-31:10); Frazier Tr. 41:10-42:13. Frazier testified that he "[c]ame close" to making one sale, but technical issues "with the [ACN provided] website" prevented him from completing the sale. Frazier Tr. 41:19-42:8.

**Fact No. 22**: Frazier attended two local ACN conferences. Frazier Tr. 28-43.

**Response**: Undisputed.

**Fact No. 23**: He did not sign up new IBOs or sell products. Frazier Tr. 28-43.

**Response**: Undisputed.

**Fact No. 24**: Frazier terminated his relationship with ACN about a year after joining. Frazier Tr. 28-43.

**Response**: Undisputed. Further stated that Frazier terminated his relationship with ACN after his first year because he developed "doubts" about the ACN business opportunity and couldn't afford the renewal fee, and now believes that "ACN is pretty much a scam." Frazier Tr. 42:20-43:25, 106:13-14.

**Fact No. 25**: Plaintiff Lynn Chadwick is a Pennsylvania resident. SAC ¶ 23.

**Response**: Undisputed.

**Fact No. 26**: Chadwick enrolled as an IBO to earn money, not to buy services for herself. Chadwick Tr. 147-149.

**Response**: Undisputed that Chadwick enrolled as an IBO to earn money to benefit herself and her family. Disputed to the extent that Chadwick also testified that she purchased phone and DISH TV services from ACN for herself, consistent with ACN's model plan which encouraged IBOs to themselves purchase ACN services as a first step in becoming an IBO. Chadwick Tr. 43:15-24.

**Fact No. 27**: Chadwick heard about ACN's videophone product when she was signing up as an IBO, but that product did not interest her. Chadwick Tr. 140.

**Response**: Undisputed. Further stated that to the extent that Defendants rely on this fact to suggest that Chadwick did not attempt to sell the videophone, *see* Mot. at 13 n.2, that claim is not supported by the record.

**Fact No. 28**: In 2013 a relative who was an IBO convinced Lynn Chadwick to attend a meeting and join ACN. Chadwick Tr. 21-22.

**Response**: Undisputed that Chadwick's relative Casey Johnston invited Chadwick to a meeting. Disputed to the disputed to the extent that the testimony does not establish that the meeting took place in 2013. ECF 552-1 at 3 (Chadwick Tr. 21:13-17). Further stated that Johnston did not tell Chadwick what the meeting was for, which Chadwick thought was "kind of mysterious." *Id.* (Chadwick Tr. 21:20-21). At the meeting, Chadwick was shown a video of Trump that "expressed Donald Trump's interest in the ACN business model" and that presented a "snippet from The Apprentice show, which showed a very successful business model and low- risk opportunities for us to get involved on the ground level." *Id.* at 5-6 (Chadwick Tr. 23:23- 24:6). At the meeting, Casey Snyder boasted "about his interactions with Donald Trump" and "the promotion of ACN on The Apprentice," which Chadwick found to be "influential." Chadwick Tr. 27:20-24. Further stated that Chadwick testified that Trump's endorsement was the "original jump off point" for her interest in ACN. ECF 552-1 at 13 (Chadwick Tr. 148:19-23). Chadwick explained:

> My original jump off point for my interest in ACN was Don -- the video that Donald Trump had implied that this whole process was a low-risk and easy and a no-brainer, and he's riding the curtail -- you know, he's riding off the coattails of The Apprentice, so I was really thinking, "this could be my lucky chance to get in here and learn something." The ACN material came secondary, because I had to learn what they were offering. When you sign the IBO, the only information and exposure I had was that meeting and Donald Trump and [Trump's] little cardboard character standing in that room[.]

*Id.* at 13-14 (Chadwick Tr. 148:19-149:11).

Further stated that Chadwick was convinced to join ACN by Trump's endorsement and not by her relative. ECF 537 ¶ 3 (Chadwick Decl.) ("Donald Trump's endorsement convinced me to join ACN. I relied on Trump's endorsement of ACN and his statements about the ACN IBO Opportunity when I decided to spend $499 to enroll as an ACN IBO.").

**Fact No. 29**: Hearing success stories from other IBOs influenced Chadwick's decision to become an IBO. *Id.* 84-85.

**Response**: Disputed to the extent that, as set out in the response to Fact No. 28, Trump's endorsement of ACN was the reason Chadwick decided to become an IBO.

**Fact No. 30**: Chadwick initially signed up a few IBOs but did not earn income from them. Id. 38-50.

**Response**: Disputed to the extent that Chadwick recruited her son to join ACN but did not earn income from the recruitment because her son shared the same legal address as Chadwick on his ID, and so he was excluded as a new recruit under ACN's criteria, which Chadwick felt to be unfair because her son in fact resided elsewhere at the time. Ex. 10 (Chadwick Tr. 47:6- 48:17). Chadwick brought a woman named Courtney Matola to a recruitment meeting, but Chadwick could not recall whether the woman joined or not. Ex. 10 (Chadwick Tr. 47:2-5). Chadwick made a recruitment list and contacted people on her list, but she was not able to recruit anyone else. Chadwick Tr. 53:9-54:22.

**Fact No. 31**: She attended over a dozen IBO meetings during the following year. Id. 38-50.

**Response:** Undisputed.

**Fact No. 32**: Chadwick attended four ACN promotional events. Id.

**Response**: Undisputed that Chadwick attended at least four ACN promotional events. Further stated that Chadwick attended four "Revolution Weekend[s]," which were a specific type of ACN event costing $35 to $50 in attendance fees. Chadwick Tr. 60:6-22.

Disputed to the extent that Chadwick was not asked at her deposition, and did not testify to, the total number of "ACN promotional events" she attended, including ACN conventions, or the meetings mentioned above in Fact No. 30.

**Fact No. 33**: Chadwick renewed her ACN membership in April 2014, but subsequently ended her relationship with ACN around December 2014. Id. 77.

**Response**: Disputed to the extent that, although Chadwick informed another IBO of her decision to end her relationship with ACN in December 2014 and ceased actively participating in ACN from that point, she made no attempt to formally sever her relationship with ACN which pursuant to ACN's form agreement continued through April 2015. Chadwick Tr. 77:8-80:7.

**Fact No. 34**: Prior to the official end of her tenure with ACN in December 2014, Chadwick had not participated in ACN for a period of months. Chadwick Tr. 36-42; 54-59; 60- 61; 77-80.

**Response**: Disputed to the extent that there was no "official end" to Chadwick's tenure with ACN in December 2014 because her membership continued until April 2015. Chadwick Tr. 78:22-25, 79:18-80:7.

Further disputed to the extent that Chadwick remained active in ACN in the months prior to December 2014, including by attending a "Revolution Weekend" in November 2014 with her son and signing up for a trip to California for an ACN meeting in December 2014 that she ultimately decided not to attend due to its cost. *Id.* 74:3-76:25.

**Fact No. 35**: Plaintiff Catherine McKoy is a California resident. SAC ¶ 21.

**Response**: Undisputed.

**Fact No. 36**: Ms. McKoy was recruited by former plaintiff Williams and attended a meeting with members of a club she belonged to and then joined ACN. McKoy Tr. 228-229.

**Response**: Undisputed that McKoy's friend Millard Williams invited her to an ACN meeting.

Disputed to the extent that the above does not include a citation to admissible evidence establishing that "Ms. McKoy was recruited by former plaintiff Williams" or that she "attended a meeting with members of a club she belonged," in violation of Local Civil Rule 56.1(d).

Further stated that Williams did not tell McKoy it was a meeting about ACN or otherwise explain ACN's business model. ECF 591-2 at 42-43 (McKoy Tr. 186:22-187:1).

Further stated that it was not Williams, but Trump's endorsement that convinced McKoy to join ACN. ECF 535 at 1 (Mckoy Decl. ¶ 3) ("Donald Trump's statements about ACN were the reason why I became an ACN IBO. I relied on Trump's endorsement of ACN and his statements about the ACN IBO Opportunity when I decided to spend $499 to enroll as an ACN IBO."). Specifically, after Williams's vague statements about the meeting, McKoy inquired for more details, but was told that Williams "can't talk about it," and that McKoy had "to talk with his [Williams's] upline" instead. ECF 591-2 at 43 (McKoy Tr. 187:19-20). At that initial meeting, McKoy watched a video in which Trump promoted ACN. *Id.* at 47 (McKoy Tr. 191:1-3). McKoy recalled that Trump described ACN on the video she was shown as "a good program to get into" and a "good business." *Id.* at 48-49 (McKoy Tr. 192:6, 193:22). McKoy felt there was no way joining ACN was "the wrong thing because Trump is in ACN, and he's giving us good advice." *Id.* at 50 (McKoy Tr. 194:21-22). McKoy explained her initial meeting and her decision to join as follows:

> I wasn't going to join period. I was ready to leave. And then they put up Trump [on video]. And when he talks about the program  and ACN, and I wanted to get into it…He's a rich guy. And if he's into this ACN, there must be something about it. I will join because this guy Donald Trump is the one that encouraged that. He did the research on this business. He knows that this is a good business. I don't know anything about business. So he knows. I'm going with what he says.

*Id.* at 73 (McKoy Tr. 245:4-20).

**Fact No. 37**: She saw a video that included President Trump saying words to the effect that if you do the work you will make money. McKoy Tr. 228-229.

**Response**: Disputed to the extent that McKoy recalled that Trump said words along the lines of "[T]his business is a good business. If you join this business and you do the work, you will see the money. You will make the money." ECF 591-2 at 73 (McKoy Tr. 245:10-12).

Further disputed to the extent that McKoy recognized that she had to "do some kind of work" and was not surprised about that fact. McKoy Tr. 247:16-17.

**Fact No. 38**: She did not know who President Trump was, but she learned he was on the Celebrity Apprentice, which her mother watched but she did not. McKoy Tr. 234; 245; 257-8.

**Response**: Disputed in that Defendants mischaracterize McKoy's testimony. McKoy testified that, at the initial recruitment meeting, she recognized Trump as a "businessman" and "rich guy" that her mother "used to watch . . . all the time." ECF 591-2 at 73 (McKoy Tr. 245:6-20); McKoy Tr. 233:22-234:8. McKoy testified that as soon as she saw the Trump video at that meeting, she "remember[ed] my mom and them talking about this guy. He's a rich guy. And if he's into this ACN, there must be something about it. I will join because this guy Donald Trump is the one that encouraged that." ECF 591-2 at 73 (McKoy Tr. 245:6-20).

**Fact No. 39**: Ms. McCoy attended ACN meetings, signed up five or six IBOs after joining ACN and sold three products. McKoy Tr. 198-201, 221-225, 248.

**Response**: Undisputed that McKoy (incorrectly spelled "McCoy" by Defendants) recruited at least five IBOs. Disputed to the extent that McKoy sold at least five ACN products or services, and purchased an additional two ACN services (internet and phone) for herself. McKoy Tr. 237:21-239:8. For all of this, McKoy received a total compensation of $38. After she received $38, McKoy started "working more by introducing people. I keep telling everybody that I know because that's what they tell me to do, the work. I tell everybody that I know about ACN.

. . . I spread the word.     I go to every meeting that they tell me to show up to. And I go to any convention that they tell me to come to." McKoy Tr. 241:13-24. But despite these efforts and accompanying expenses, McKoy testified that she only ever made $38 through ACN. ECF 591-2 at 71 (McKoy Tr. 236:1-2).

**Fact No. 40**: Ms. McKoy made $38 from ACN before quitting. Id. 236.

**Response**: Undisputed.

**Fact No. 41**: McKoy recalled having heard President Trump's statements about ACN that if you do the work you will make money and that he liked the company. McKoy Tr. 202; 229.

**Response**: Undisputed. Further stated that McKoy recalled hearing Trump state "[d]o the work, and you will make the money" in videos that were shown at her initial recruiting meeting as well as at the Palm Springs convention she attended shortly after joining ACN. ECF 591-2 at 62-63, 67, 73 (McKoy Tr. 206:23-207:5, 229:9-16, 245:9-12).

**Fact No. 42**: The three Plaintiffs do not have any detailed recollection of any allegedly false statements by President Trump including the quoted statements the Second Amended Complaint claims they relied when they decided to join ACN. Compare SAC ¶¶ 21, 22, 24, 26, 107, 113, 115, 116, 118, 138, 150, 154, 170, 192, 212, 213, 226, 254, 271 to Chadwick Tr. 24-25; Frazier Tr. 15-18; and McKoy Tr. 191-194.

**Response**: Disputed. Plaintiffs recalled numerous false statements by Trump. For example, McKoy testified that Trump described "how good the business is," ECF 591-2 at 47 (McKoy Tr. 191:1-3); that he stated "this is a good product" and "business to get into" and that he "would buy it [himself] if they allowed him," *id.* at 48 (McKoy Tr. 192:3-10); described ACN as "a good company," *id.* at 67 (McKoy Tr. 229:9-16); and, told IBOs "[i]f you join this business and you do the work, you will see the money," *id.* at 73 (McKoy 245:10-12). Chadwick recalled that Trump presented "a very successful business model and low-risk opportunities for us to get involved on the ground level," Chadwick Tr. 24:2-6, and Frazier remembered that Trump "vouched for the business," Ex. 10 (Frazier Tr. 74:20-21).

Further disputed to the extent that, as set out in response to Fact Nos. 19, 28, and 36, Plaintiffs testified that they were exposed to ACN marketing materials, including ACN promotional videos featuring Trump. Multiple versions of the ACN Opportunity Discs featuring Donald Trump's promotional footage touting ACN have been produced in discovery that contain many of the statements identified in the Second Amended Complaint. *See, e.g.*, SAC ¶¶ 21, 107,

116, 138, 150, 154, 212, 254, 271. The same is true of other ACN marketing and recruitment materials in the discovery record.

**Fact No. 43**: Some IBOs knew or assumed President Trump was a paid spokesperson. Barringer Decl. ¶ 5; Davis Decl. ¶ 9; Plumb Decl.¶ 9. Howard Tr. 16-22.

**Response**: Disputed to the extent that, due to Defendants' untimely disclosure, *see* ECF 600, Plaintiffs have not had opportunity to depose these IBOs who submitted declarations in connection with Defendants' motion for class certification, and thus have not been able to determine the basis for this purported understanding.[2]

Further stated that Defendants have identified no such disclosure anywhere in the voluminous discovery record.

**Fact No. 44**: Plaintiff Frazier gave no thought to whether President Trump was being paid for his ACN-related activity. Frazier Tr. 51; 90.

**Response**: Disputed to the extent that this mischaracterizes Frazier's testimony. When asked whether he made "any assumptions" regarding "whether Donald Trump was receiving anything in exchange for promoting ACN," Plaintiff Frazier responded: "I had no idea." ECF 552-2 at 21 (Frazier Tr. 51:9-14).

**Fact No. 45**: Plaintiff McKoy thought President Trump was an IBO. McKoy Tr. 192, 328.

**Response**: Disputed to the extent that the above-cited deposition testimony establishes that Plaintiff McKoy believed that Defendant Trump "was a member" of ACN, not that he "was an IBO." ECF 591-2 at 48 (McKoy Tr. 192:23).

**Fact No. 46**: Defendant Donald J. Trump is the former President of the United States and previously was an extremely successful businessman who from 2006 to 2015 was a celebrity spokesperson for ACN. Merriman Tr. 185; 192; Brinckerhoff Decl. Exhs. 2, 7, 8, 9, 10, 11, 12; Trump Tr. 21-22; 61-62; 93.

---

[2] Plaintiffs have, therefore, requested leave to depose these declarants in a letter filed concurrently with this brief, ECF 600, pursuant to an earlier Order issued by Judge Cave, ECF 474.

**Response**: Undisputed that Trump served one term as President of the United States. Undisputed that from 2006 to 2015 Trump was a celebrity spokesperson for ACN.

Disputed to the extent that above-cited deposition testimony and documents establish that Donald Trump portrays himself as a successful businessman and that some subscribe to that view, but do not establish that he actually had a successful track record in business.

**Fact No. 47**: President Trump appeared at 14 ACN conferences (which Plaintiffs did not attend). Merriman Tr. 185; 192; SAC ¶¶ 141; 145-147; Brinckerhoff Decl. Exh. 24.

**Response**: Undisputed that Donald Trump attended and spoke to live audiences at 14 ACN IBO "conventions." Further stated that endorsement footage featuring Trump was played at ACN conventions that he did not personally attend. *See* ECF 591-2 at 62 (McKoy Tr. 206:13-17).

**Fact No. 48**: President Trump recorded various video statements about ACN that ACN used on Opportunity Discs and for other promotional purposes from 2006 to 2015. Brinckerhoff Decl. Exhs. 15, 17, 18, 19, 20, 21, 22, 23, 24 and 26.

**Response**: Undisputed.

**Fact No. 49**: President Trump was interviewed and quoted in various articles that he did not author, edit or publish, in Success and Success from Home magazines, in which references to ACN were made. Brinckerhoff Decl. 16, 30, 31 and 32.

**Response**: Disputed to the extent that the above does not include a citation to admissible evidence establishing that Trump "did not author, edit or publish" the articles, in violation of Local Civil Rule 56.1(d). The above-cited four magazine articles are insufficient to establish these disputed facts.

Further disputed to the extent that, as set out in the response to Fact No. 16, Trump himself as well as The Trump Corporation employees acting at Trump's direction did in fact regularly edit *Success* and *Success from Home* magazine articles featuring Trump, as with other materials, pursuant to their contractual rights. *See* Plaintiffs' Statement of Additional Facts at Fact Nos. 17-20.

**Fact No. 50**: As of 2011 the content of the ACN Opportunity discs included President Trump's statement that ACN has a reputation for success. Brinkerhoff Decl. Exh. 17.

**Response**: Disputed to the extent that the above suggests that the "ACN has a reputation for success" quote did not appear on ACN Opportunity Discs prior to 2011. In fact, the quote appeared on Opportunity Discs as early as 2007, and as late as 2015. ECF 564-1 at 3 (ACN Opportunity Disc, Version 1.0) (Nov. 2007) (disc cover); ECF 534-22 (ACN Opportunity Disc, Version 9.2) (June 2015).

**Fact No. 51**: President Trump is quoted in one Success From Home magazine article in which he does not mention ACN other than praising the founders, and instead merely discusses direct marketing as a business model. Brinckerhoff Decl. Ex. 16.

**Response**: Disputed in that the above incorrectly implies that Trump was only quoted and/or featured in a single article. In fact, Trump was featured in more than a dozen ACN-sponsored magazine articles.

Further disputed to the extent that the above mischaracterizes the cited article, which discusses ACN and Trump's endorsement of ACN at length. The article is titled *Catching the Eye of A Billionaire: Donald Trump knows a thriving business when he sees one. That's why he endorses ACN*. ECF 85-3 (Aug. 2011 *Success from home*) (excerpts). As set out in the response to Fact No. 16, the content of every article published in *SUCCESS* or *Success From Home* magazine featuring Trump was reviewed and was approved by Trump and/or employees working at his direction. The article details "why Trump partnered with ACN," *id.* at 5, and notes that Trump "personally endorse[d]" ACN, *id.* at 4, and that he chose to "personally invite[] ACN to be featured on his hit prime-time reality television show *The Celebrity Apprentice*," *id.* at 6. Further, the article claims that "ACN has been acknowledged within the industry for its revolutionary and robust line of essential services" and its "outstanding compensation plan." *Id.*

**Fact No. 52**: In another article in the same periodical President Trump again praised the founders and did not make any of the statements alleged to be fraudulent in the SAC. *Id.* Exh. 30.

**Response**: Disputed in that the above once again mischaracterizes the cited article, which discusses the reasons why Trump chose to endorse ACN. The article is titled *Thinking Big with Donald Trump and ACN*. ECF 534-30 at 5 (Sept. 2014 *Success From Home*) (excerpts). As set out in the response to Fact No. 16, the content of every article published in *SUCCESS* or *Success From Home* magazine featuring Trump was reviewed and was approved by Trump and/or employees working at his direction. It notes that Trump "is confident about ACN," *id.* at 7, and describes ACN as "one of the fastest-growing companies in the U.S." that is "continually set[ting] new standards for the industry," *id.* at 9. And the article quotes Trump as describing ACN as a "terrific" company that is "build[ing] a strong future of success." *Id.* at 8.

**Fact No. 53**: Still another magazine article presented only President Trump's personal story. *Id.* Exh. 31.

**Response**: Disputed to the extent that this article ran alongside a feature on ACN. ECF 534-31 at 2 (Aug./Sept. 2008 *SUCCESS*) (excerpts).

**Fact No. 54**: A 2010 article included similar content and also addressed the videophone product. *Id.* Ex. 32.

**Response**: Disputed to the extent that the above mischaracterizes the cited article, which discusses Trump's reasons for endorsing ACN and the ACN videophone. The article is titled *Direct Selling in the Age of Donald J. Trump*. ECF 534-32 (Aug. 2010 *Success From Home*) (excerpts). As set out in the response to Fact No. 16, the content of every article published in *SUCCESS* or *Success From Home* magazine featuring Trump was reviewed and was approved by Trump and/or employees working at his direction. The deposition testimony reflects that the article was sent to the Trump side for review and approval and that edits from the Trump side would have been incorporated before it "went back to both ACN and the Trump organization." Butcher Tr. 75:6-14. It notes that "[o]ne of the products Trump has endorsed is the ACN Video

Phone" and it quotes Trump as stating "The ACN Video Phone is revolutionary" and is "changing communications as we know it." ECF 534-32 at 6. The article likewise notes that Trump "did a great deal of research on the company and took a hard look before deciding to endorse ACN." *Id.* Further, the article claims that "ACN has been acknowledged within the industry for a product line that is leading a technological revolution, an outstanding compensation plan and great leadership." *Id.* at 7.

**Fact No. 55**: ACN was featured on the television program the Celebrity Apprentice in 2009 and 2011. Brinckerhoff Decl. Exhs. 36 and 37.

**Response**: Undisputed. Further stated that ACN was the corporate sponsor of each episode, and that its wire-based, desktop videophone product was featured in those episodes of *The Celebrity Apprentice*. ECF 534-36, ECF 534-37.

**Fact No. 56**: President Trump discussed ACN on the two Celebrity Apprentice episodes. *Id.* Exhs. 36 and 37.

**Response:** Undisputed.

**Fact No. 57**: On the first episode, President Trump touted the videophone and ACN. *Id.* Exhs. 36 and 37.

**Response**: Undisputed that President Trump touted the videophone and ACN on the first episode of *The Celebrity Apprentice*. Trump stated during the episode, among other things, that "ACN is the largest distributor of video phones anywhere in the world. They do a half a billion dollars worth of sales a year, very successful, very good guys." ECF 534-36 at 7:26 – 7:38.

**Fact No. 58**: On the second episode he praised ACN and its executives. *Id.* Exhs. 36 and 37.

**Response**: Undisputed that Trump praised ACN and its executives on the second episode of *The Celebrity Apprentice* in which ACN was featured. Trump stated during the episode, among other things, that ACN is "a home-based marketing company for individuals and it's in over 20 countries." ECF 534-37 at 7:55 – 8:03.

**Fact No. 59**: ACN contracted with Reilly Worldwide, Inc. for the appearances on the Celebrity Apprentice and paid thereunder for the appearances. Shapiro SJ Decl. Exhs. G and H.

**Response**: Undisputed that ACN paid Reilly Worldwide, Inc. $1,650,000 to appear on *The Celebrity* Apprentice in 2009 and $2,000,000 to appear on the show in 2011 in order to be featured on *The Celebrity Apprentice*. In total, ACN paid $3,650,000 to appear on the show twice. ECF 591-8 (2008 Task Agreement); ECF 591-7 (2010 Task Agreement).

Further stated that, according to Trump, as the host of *The Celebrity Apprentice* he received approximately 50% of the fees paid to appear on the show through a fee-sharing agreement. Trump Tr. 35:24-36:5.

**Fact No. 60**: President Trump made various statements at ACN conferences. In Charlotte in 2013 he talked about how successful ACN has been. SAC ¶¶ 145-147.

**Response**: Undisputed. Further stated that this statement (and Fact Nos. 61 and 62 below) do not identify all of the ACN conferences at which Trump spoke.

Further stated that Trump mispresented the nature of his relationship with ACN at the 2013 Charlotte convention. On stage, Trump was asked: "Why do you keep coming back? What is it about ACN? Certainly not for any money?" Although Trump was in fact paid to attend that convention, he answered "No." Keller Rpt., Ex. C at 6.

Further stated that Trump, in describing ACN, stated: "You have great people, you have a great product, you have an amazing concept." Keller Rpt., Ex. C at 6.

**Fact No. 61**: In Charlotte in 2010 he talked about ACN's videophone and his affinity for the founders. SAC ¶ 141.

**Response**: Undisputed. Further stated that this statement (and Fact Nos. 60 and 62) do not identify all of the ACN conferences at which Trump spoke.

**Fact No. 62**: In Baltimore in 2006 he congratulated the IBOs in attendance and praised videophones. Brinckerhoff Decl. Exh. 24.

**Response**: Undisputed. Further stated this statement (and Fact Nos. 60 and 61) do not identify all of the ACN conferences at which Trump spoke. Further stated that Trump misrepresented the nature of his diligence into ACN at the 2006 Baltimore convention. As set out in the response to Fact No. 72, Trump did no diligence into ACN. Despite this, at the 2006 Baltimore convention, Trump described how after he met the four founders, he "had one of [his] very smart people do a research on the company which [he] wasn't that familiar with. He came back with reports that were unbelievable. In fact, I said I want a piece of that company." ECF 534-24 at 1:22:06 – 1:22:17.

**Fact No. 63**: A June 2010 Opportunity Disc included unique statements by President Trump about direct selling not contained on other discs and without mentioning ACN. (Brinkerhoff Decl. Ex. 16).

**Response**: Disputed to the extent that the above-cited exhibit is not the June 2010 ACN Opportunity Disc and is instead a copy of excerpts of the August 2011 issue of *Success from Home* magazine.

Further disputed to the extent that, assuming Defendants intended to cite Exhibit 15 to the Brinkerhoff Declaration, and not Exhibit 16, the June 2010 Opportunity Disc in fact includes numerous statements by Trump that mention ACN, including "ACN is leading the way in a new technology that will literally revolutionize the way we communicate with the ACN video phone. ECF 534-15-3 at 00:55 – 1:05. He further stated "[y]ou have a great opportunity before you at ACN without any of the risks most entrepreneurs have to take." Further stated that this statement was included on multiple other versions of the ACN Opportunity Disc, including ECF 534-17-3 at 5:08 – 5:15 (ACN Opportunity Disc, Version 5.3) (Dec. 2011), ECF 534-18-3 at 5:05 – 5:12 (ACN Opportunity Disc, Version 5.5) (May 2012), ECF 534-19-3 at 5:05 – 5:12 (ACN Opportunity Disc, Version 5.6) (June 2012), ECF 534-20-3 at 5:08 – 5:15 (ACN Opportunity

Disc, Version 6.1) (Sept. 2012), ECF 534-21-3 at 5:08 – 5:15 (ACN Opportunity Disc, Version

7.0) (Jan. 2013), ECF 534-22-3 at 5:00 – 5:07 (ACN Opportunity Disc, Version 9.2) (June 2015).

**Fact No. 64**: As of 2015 for the first time President Trump's Opportunity disc statements mentioned the charitable aspect of the ACN Opportunity. Brinckerhoff Decl. Exh. 22.

**Response**: Undisputed.

**Fact No. 65**: Brinckerhoff Decl. Exh. 15 is comprised of three ACN Opportunity discs. The first is 5:48 minutes long; President Trump speaks for 35 seconds; the second is 7:59 long and President Trump speaks for 2:12 minutes; the third is 3:50 minutes long and President Trump speaks for five seconds. The content from ACN including statements by its IBOs is much longer. ECF 534-15.

**Response**: Disputed in that Exhibit 15 is one single ACN Opportunity disc, not three

separate discs. The front cover of the DVD, which is reproduced below, features a large photo of

Trump and is titled: "A look at the ACN Opportunity featuring the personal endorsement of

renowned entrepreneur and multi-billionaire Donald J. Trump." ECF 66-3 at 3.



Elsewhere, the cover includes the following quote from Trump: "ACN has a reputation for success…Success that's synonymous with the Trump name and you can be part of it." *Id.* at 5 (ellipsis in original).



Further disputed to the extent that the contents of the disc are arranged in twenty-five segments, not three.

Further disputed to the extent that the above description misstates the number of segments that feature Trump. For example, the disc includes a 2:13 minute segment of excerpts from a *The Celebrity Apprentice* episode promoting ACN, which features Trump but is not mentioned by Defendants in their summary of the disc's content.

**Fact No. 66**: President Trump was never an owner, investor, employee, executive, board member or investor in ACN. Trump Tr. 21-22; 61-62; 93; Merriman Tr. 185; 192.

**Response**: Undisputed.

**Fact No. 67**: President Trump did not sell any products or services that only ACN sold or marketed. Trump Tr. 21-22; 61-62; 93; Merriman Tr. 21-22; 40-42.

**Response**: Disputed to the extent that, as set out in the response to Fact No. 7, ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████

Further disputed to the extent that, as set out in the response to Fact No. 2, Trump promoted and marketed ACN and the products and services ACN sold, in particular the ACN videophone, for nearly a decade. ECF 534-32.  Further stated that Trump benefited handsomely from the resulting sales through increased fee payments from ACN with each successive endorsement agreement he entered into with the company.

**Fact No. 68**: President Trump did not receive any payments from any products or services sold or marketed by ACN. Trump Tr. 21-22; 61-62; 93; Merriman Tr. 39-41; 185; 192; Brinckerhoff Decl. Exhs. 5, 7, 8, 9, 10.

**Response:** Disputed to the extent that, as set out in response to Fact No. 2, Trump received millions of dollars in payment from ACN in exchange for promoting and marketing ACN and the products and services ACN sold.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

**Fact No. 69**: President Trump did not enter into any contracts with ACN's IBOs and did not receive any payment from those IBOs. Trump Tr. 21-22; 61-62; 93.

**Response:** Disputed to the extent that, as set out in the response to Fact No. 2, Defendants induced IBOs to enroll in the ACN Business Opportunity and indirectly received millions of dollars in payment from IBOs through their endorsement agreements with ACN.

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

**Fact No. 70:** The Trump Corporation never performed any services for, paid to, was paid by or contracted with ACN as the contracts were all with President Trump. Brinckerhoff Decl. Exhs. 5 through 12. Trump Tr. 21-22; 61-62; 93.

**Response:** Disputed to the extent that The Trump Corporation employees played a role in negotiating the endorsement agreements between Trump and ACN. Emails produced by The Trump Corporation during discovery show that The Trump Corporation employees Cathy Glosser and Rhona Graff liaised with ACN on behalf of Trump during the negotiation process, and that at least one of the endorsement agreements was reviewed by The Trump Corporation's legal department. Graff testified in her deposition that it would be "fair to say" she had a role in negotiating the January 2009, January 2011, and February 2013 agreements or in communicating about those agreements on Trump's behalf. Ex. 10 (Graff Tr. 89:19-90:4). The Trump Corporation employees also coordinated Trump's appearances at ACN events. Graff Tr. 154:18-25. And, as set out in response to Fact No. 16, The Trump Corporation employees edited and approved ACN scripts, publications, and other materials on behalf of Trump. All of these employees were acting within the scope of their employment at The Trump Corporation at all times. Ex. 8 (Trump Corp. 30(b)(6) Tr. 39:23-40:25). And the Trump Corporation benefited from Mr. Trump's contractual relationship with ACN. As Eric Trump testified as the Trump

Corporation's 30(b)(6) designee, "anything my father did in this kind of personal capacity was ultimately, you know, benefited, you know, [T]he Trump Corporation and probably vice versa." Ex. 8 (Trump Corp. 30(b)(6) Tr. 39:14-17).

Further disputed in that Trump signed at least one endorsement agreement with ACN in his capacity as "Chairman and President" of The Trump Corporation. ECF 534-5 at 3.

**Fact No. 71**: President Trump tested the videophones marketed by ACN. Trump Tr. 84.

**Response:** Disputed to the extent that the above-cited deposition testimony was that Trump observed "an experiment" by ACN involving the ACN videophone, but does not establish that he "tested" one or more models of the videophone. ECF 552-7 at 4 (D.J. Trump Tr. 81:12-13).

**Fact No. 72**: President Trump performed research about ACN by speaking to ACN IBOs at various times and having his employee George Ross conduct research. Trump Tr. 90-92.

**Response:** Disputed to the extent that Defendants mischaracterize the above-cited deposition testimony, which merely was that Trump claimed he understood that "[p]eople that were involved with it [ACN] liked it," ECF 552-7 at 7 (D.J. Trump Tr. 92:5-6). The testimony does not establish that he "performed research" on the company by "speaking to ACN IBOs."

Further disputed to the extent that the record contradicts Trump's claim that Ross researched ACN on his behalf. When asked, Ross did not recall performing any diligence on ACN for Trump. Ex. 8 (Trump Corp. 30(b)(6) Tr. 56:6). Moreover, when asked about diligence into ACN in their depositions, no other The Trump Corporation employees identified Ross or testified that he performed any diligence, and The Trump Corporation has no record of any such diligence. Ex. 8 (*Id.* 52:14-19). Numerous Trump employees testified there was no diligence or even negotiation for diligence rights and that numerous red flags about ACN were ignored. *See* Plts. Statement of Facts Fact Nos. 31-51.

██████████████████████████████████████████████████
████████████████████████████████

**Response:** ████████████████████████████████████████████

███████████████████████ Disputed to the extent that, due to Defendants' untimely

disclosure, *see* ECF 600, Plaintiffs have not had opportunity to depose Howard and thus have not

been able to cross-examine her on the the assertions made in the declaration.

██████████████████████████████████████████████████
███████████████████████████████

**Response:** ████████████████████████████████████████████

████████████████████████████████████████████████ Further

disputed to the extent that, due to Defendants' untimely disclosure, *see* ECF 600, Plaintiffs have

not had opportunity to depose Richardson and thus have not been able to cross- examine her on the

assertions made in the declaration.

█████████████████████████████████████████████

**Response:** ████████████████████████████████████████████

███████████████████████████████ Further to the extent that, due to Defendants'

untimely disclosure, *see* ECF 600, Plaintiffs have not had opportunity to depose Plumb and thus

have not been able to cross-examine him on the assertions made in the declaration.

██████████████████████████████████████████████████
███████████████████████████

██████████████████████████████████████████████████
███████████████████████████████

**Response:** ████████████████████████████████████████████

████████████████████████████████ Further disputed to the extent that, due to

Defendants' untimely disclosure, *see* ECF 600, Plaintiffs have not had opportunity to depose Davis and thus have not been able to cross-examine her on the assertions made in the declaration.

████████████████████████████████████████████████

**Response:** ████████████████████████████████████ Disputed to the extent that, due to Defendants' untimely disclosure, *see* ECF 600, Plaintiffs have not had opportunity to depose Barringer and thus have not been able to cross-examine him on the assertions made in the declaration.


Dated: June 16, 2023
     New York, New York

  *s/ John C. Quinn*
Roberta A. Kaplan
John C. Quinn
Christopher R. Le Coney
Maximillian L. Feldman
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel: (212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
cleconey@kaplanhecker.com
mfeldman@kaplanhecker.com

Andrew G. Celli, Jr.
Matthew D. Brinckerhoff
O. Andrew F. Wilson
Vasudha Talla
Nick Bourland
EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
600 Fifth Avenue at Rockefeller Center
New York, New York 10020
Tel: (212) 763-5000
acelli@ecbawm.com
mbrinckerhoff@ecbawm.com
awilson@ecbawm.com
vtalla@ecbawm.com

nbourland@ecbawm.com

*Attorneys for Plaintiffs*