**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE TRUMP CORPORATION and DONALD J. TRUMP, in his personal capacity,<br><br>*Defendants*. | No. 1:18-cv-09936-LGS-SLC |
|---|---|

**PLAINTIFFS' STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1(b)**

Pursuant to Local Rule 56.1(b) of the Civil Rules of this Court and Rule III.C.6 of Your Honor's Individual Rules and Procedures for Civil Cases, Plaintiffs Catherine McKoy, Markus Frazier, and Lynn Chadwick submit the following statement of additional material facts as to which there exists a genuine issue to be tried in support of Plaintiffs' opposition to Defendants' motion for summary judgment.

## I. TRUMP ENDORSED ACN IN EXCHANGE FOR MILLIONS

**Fact No. 1**: In total ACN agreed to pay $11.85 million under these contracts, though only $8.8 million had been paid out by the time Trump terminated the relationship in mid-2015 when Wall Street Journal reporters started asking tough questions. Ex. 5 (reflecting payments from ACN to Trump)[1]; ECF 534-5 (2006 agreement), ECF 534-7 (2008 agreement), ECF 534-8 (2009 agreement), ECF 534-9 (2011 agreement), ECF 534-10 (2013 agreement). Each time Trump and ACN renewed their contract, he demanded and ACN agreed to a bigger fee. Trump Tr. 137:15-20; Ex. 9 at 2 (Graff testimony); *see also* Graff Tr. 92:13-93:13; ECF 534-5 at 3; ECF 534-7 at 2; ECF

---

[1] Citations to "Ex." refer to the exhibits annexed to the June 16, 2023 Declaration of Christopher R. Le Coney.

534-8 at 2; ECF 534-9 at 2; ECF 534-10 at 4. ACN's corporate representative testified that ACN agreed to Trump's request for higher fees because the endorsement agreement relationship was proving successful and positive for ACN. ACN 30(b)(6) Tr. 224:16-22.

In total ACN agreed to pay $11.85 million under these contracts, though only $8.8 million had been paid out by the time Trump terminated the relationship. Ex. 5 (reflecting payments from ACN to Trump); ECF 534-5; ECF 534-7; ECF 534-8; ECF 534-9; ECF 534-10.

**Fact No. 2**: ACN paid another $3.65 million to appear twice on *The Celebrity Apprentice*, half of which flowed directly to Trump. ECF 591-7 at 3; ECF 591-8 at 3; Ex. 8 at 2 (D.J. Trump Tr. 35:24); *see also* D.J. Trump Tr. 35:24-36:5.

**Fact No. 3**: Trump lawyers insisted that the last of the five agreements remove the word "endorsement," but Trump's executive secretary acknowledged that nothing about the endorsement relationship changed after the word was removed. *See, e.g.*, Graff Tr. 320:7-18. *Compare* ECF 534-9 (2011 Appearance and Endorsement Agreement) *with* ECF 534-10 (2013 Appearance Agreement).

## II. TRUMP PROMOTED ACN IN PERSON, IN PRINT, AND BY VIDEO

**Fact No. 4**: The Trump-ACN endorsement contracts made clear that ACN would use Trumps' message in marketing materials to recruit IBOs. *See* ECF 534-5 at 3 (endorsement content to be used in "promoting ACN and its vision to prospective or existing ACN sales representatives"); *accord* ECF 534-7 at 2, 4; ECF 534-10 at 2-3 (endorsement content to be use "to promote ACN opportunities to individual, potential sales representatives"); *see also* ECF 534-8 (footage "may be used by ACN for promotion" of live events); ECF 534-9 (footage "may be used by ACN for promotion").

**<u>Fact No. 5</u>**: Trump promoted ACN on video. Ex. 11 at 13 (Keller Rpt. ¶ 130); *see also* Keller Rpt., Ex. D.

**<u>Fact No. 6</u>**: Trump promoted ACN on ACN's website. Keller Rpt. ¶ 136.

**<u>Fact No. 7</u>**: Trump promoted ACN in *Success* and *Success From Home* magazines. *Id.* ¶ 137.

**<u>Fact No. 8</u>**: Trump promoted ACN at 14 live events put on by ACN. *Id.* ¶ 14, 131.

**<u>Fact No. 9</u>**: Trump also promoted ACN in two episodes of his network TV show, *The Celebrity Apprentice*. ECF 534-36 (video footage), ECF 534-37 (video footage).

**<u>Fact No. 10</u>**: ACN repackaged video of Trump's endorsement, including footage from *The Celebrity Apprentice*, into a recruiting tool dubbed "Opportunity Discs" [redacted] ECF 534-1 at 35-36 (ACN 30(b)(6) Tr. 218:23-219:8, 276:19-277:12).

**<u>Fact No. 11</u>**: All of the Opportunity Discs sold by ACN from 2006 to 2015 included Trump endorsement footage, much of which was filmed at Trump Tower in 2006 and 2008 using similar talking points over which Trump had ultimate approval, per the terms of his endorsement agreements with ACN (*see infra* No.16). ECF 534-1 at 35-36, 37 (ACN 30(b)(6) Tr. 218:23-219:8, 235:14-235:21); ECF 534-35 at 3-5 (Butcher Tr. 181:1-183:18).

**<u>Fact No. 12</u>**: ACN internally tracked the extent to which it was [redacted]

**<u>Fact No. 13</u>**: ACN pushed the Opportunity Discs featuring Trump as the central and indispensable recruiting tool for prospective IBOs. Ex. 12 at ACN023082 (ACN IBO Welcome Packet) ("Make sure every guest [potential recruit] leaves with the Opportunity Disc and Success from Home magazine in hand.").

**<u>Fact No. 14</u>**: ACN's approved marketing materials—most importantly, the Opportunity Disc—were an essential recruitment tool for IBOs because ACN's policies prohibited recruiting IBOs using non-company approved recruiting materials. ECF 582-4 (ACN 2012 Policies & Procedures).

**<u>Fact No. 15</u>**: Trump's endorsement of ACN was featured across numerous forms of media, as stated in Facts Nos. 5-10 above, [redacted]

## III. TRUMP HAD CONTROL OVER THE MESSAGE HE CONVEYED REGARDING ACN

**<u>Fact No. 16</u>**: Each of the Trump-ACN contracts made clear that Trump had the sole right to determine what he would say about ACN and to approve ACN's footage and use of his image and statements. ECF 534-10 at 2-3 (the content of speeches and the use of other marketing materials featuring Trump "shall be subject to Mr. Trump's approval in his sole discretion"); *accord* ECF 534-5 at 3; ECF 534-7 at 2, 4-5; ECF 534-8 at 2; ECF 534-9 at 2.

**<u>Fact No. 17</u>**: Per that contractual right, Trump, and his employees acting at his direction, regularly exercised Trump's right to review, make edits, and provide final approval to ACN's marketing materials featuring Trump. *See, e.g.*, Ex. 7 at 10 (Butcher Tr. 79:18-20); *see also* Butcher Tr. 75:6-14; ECF 591-6 (D.J. Trump Tr. 155:8-13). ACN's marketing consultant Anne Archer Butcher described the process for preparing the 2006 and 2008 endorsement video shoots

at Trump Tower as follows: "ACN drafted the materials" which were sent to "Mr. Trump or to his office or representatives. They would sometimes send back edits or feedback, which is a process that continued right up through the filming itself, including some extemporaneous speaking." Ex. 7 at 9 (Butcher Tr. 53:16-21).

**Fact No. 18**: Defendants similarly reviewed, offered edits to, and approved the pieces featuring Trump and his family that appeared in *SUCCESS* and *Success From Home* magazines as part of the ACN-Trump relationship. Butcher testified that "the Trump side did sometimes make revisions or edits" to ACN-sponsored *Success* and *Success From Home* magazine articles featuring Trump. Ex. 7 at 10 (Butcher Tr. 79:18-20). As another example, a May 4, 2012 email produced in discovery from Anne Archer Butcher to Katie Mapel (marketing at ACN) noted that "Mr. T" – *i.e.*, Donald Trump – would need to personally sign off on a magazine article featuring him because "[h]e alone makes those decisions." Ex. 13; Ex. 9 at 4 (Graff Tr. 114:11-21); *see also* Graff Tr. 132:18-133:13.

**Fact No. 19**: The Trump Corporation employees referenced above and others were all acting within the scope of their employment as they dedicated extensive time and resources to supporting the ACN relationship and Trump's promotion of ACN. Ex. 9 (Trump Corp. 30(b)(6) Tr. 39:23-40:25).

**Fact No. 20**: The performance of the endorsement relationship by Trump and his employees benefited Trump personally as well as his company, The Trump Corporation. The Trump Corporation's 30(b)(6) designee Eric Trump testified that "anything my father did in this kind of personal capacity was ultimately, you know, benefited, you know, [T]he Trump Corporation and probably vice versa." Ex. 9 (Trump Corp. 30(b)(6) Tr. 39:14-17).

## IV. TRUMP KNOWINGLY CONVEYED FRAUDULENT MESSAGES REGARDING ACN

### A. Trump Falsely Claimed ACN Was a Low-Risk Opportunity to Achieve Financial Success

**Fact No. 21**: The endorsement footage Trump taped for ACN included a video in which he claimed that ACN was a "great opportunity . . . without any of the risks most entrepreneurs have to take." That clip was among the footage that was consistently included on multiple versions of ACN's Opportunity Disc over the duration of the ACN-Trump endorsement relationship. *See, e.g.*, ECF 534-19-3 at 5:05-5:12; ECF 534-22-3 at 5:00-5:07; *see also* ECF 532 at 6 (collecting false statements).

**Fact No. 22**: The statement Trump made in Fact No. 21 regarding the risk associated with joining ACN was not true, which Defendants' own expert Dr. Joseph Hair conceded. Ex. 11 (Hair Tr. 143:12-14) (agreeing "ACN is not low risk; it's, in fact, high risk."); *id*. (Hair Tr. 148:21-24) (agreeing "it would not be correct to identify it as low risk"); *id.* 141:22-25 ("Q. . . . [I]n your words, then, the ACN business venture involves a high level of risk of failure? A. Yes.").

**Fact No. 23**: ACN did not offer a reasonable prospect of economic success with low risk because it did not provide meaningful opportunities to earn money. Bosley Rpt. ¶ 12 [redacted]

**Fact No. 24**: [redacted]

[redacted] Bosley Rpt., Ex. III.B.12 (noting the typical IBO lost between $40 and $53.14 per month, after factoring in sign-up fees). Dr. Hair conceded that "there's a big group of [IBOs] earning very little or maybe zero, and there is [a] bin at the top earning a lot more." ECF 564-3 at 3-4 (Hair Tr. 139:5-8). He also agreed that "this steady group [has] been in a very long time." *Id.* 78:25-79:6. Dr. Hair also agreed (repeatedly) that he was "not aware of any error in [Dr. Bosley's] math or misapplication of the compensation plan or anything like that." Hair. 71:15-19.

**B. Trump Falsely Claimed ACN's Videophone Was a Commercially Viable Product**

**Fact No. 25**: Trump asserted that ACN's desktop videophone was "breakthrough technology" "that will literally revolutionize the way we communicate." ECF 534-15-3 (Version 4.0-2) at 00:58-1:02, 7:11-7:13; ECF 534-19-3 at 5:13-5:16.

**Fact No. 26**: Trump likewise claimed that the "absolute truth" was that the ACN videophone would "be present in every home within the next several years." ECF 534-15-3 (U.S. Version 4.0-02.) at 1:07 - 1:14.

**Fact No. 27**: These statements were false. Defendants' expert conceded there was no basis for Trump's claim that the ACN videophone would "be present in every home within the next several years." Ex. 11 (Crandon Tr. 157:20-158:11, 159:19-160:8).

The desktop videophone ACN marketed between 2006 and 2014 was a bulky plastic device that had to be plugged in (twice) to the wall, required ACN phone service, and could only make videocalls to other ACN videophones. Gartenberg Rpt. ¶¶ 29, 34. It was not a competitive product and was obsolete at the time Trump made the statements referenced in Facts Nos. 25-27, including because smartphones were widely available consumer devices and Skype had millions of users. *Id.* ¶¶ 19, 22, 25-27.

**Fact No. 28**: Because it was never a competitive product, the ACN videophone made negligible sales and was a commercial failure. Ex. 11 (Crandon Tr. 54:1-16).

### C. Trump Falsely Claimed He Was Endorsing ACN Out of Genuine Admiration for the Company

**Fact No. 29**: Trump represented that he was endorsing ACN "because I think this is a great company" and because of the company's founders' "integrity," rather than because he was being paid. *See, e.g.*, ECF 534-30 at 7.

**Fact No. 30**: This was false. Trump endorsed ACN because he was being paid to do so, and neither he nor ACN properly disclosed that fact. Indeed, after the first endorsement agreement was signed, ACN's president warned his fellow executives that the "particulars of the Trump agreement remain STRICTLY confidential," flagging "[i]n particular the amount that was paid." ECF 466-1. He explained that "the Trump organization would not appreciate this information to be on the street and I believe that it diminishes the effectiveness for us." *Id.* According to Dr. Keller, who will testify at trial that Trump's pretense that he endorsed ACN for "'love' of the company, not because he was being paid . . . would have increased Mr. Trump's perceived trustworthiness, likeability, and credibility," Keller Rpt. ¶ 110, which in turn would "enhance the persuasiveness of Mr. Trump's endorsement," *id.* ¶ 119.

### D. Trump Falsely Claimed He Endorsed ACN After Doing Diligence on the Company

**Fact No. 31**: In endorsing ACN, Trump stated that he had directed one of his "very smart people do research on the company" and that this person "came back with reports that were unbelievable," such that Trump had "read great reports on ACN, and glowing reports," ECF 534-24 at 1:22:06-1:22:15, 1:26:56-1:27:00; Ex. 6 at 618.

**Fact No. 32**: He later testified that he asked his former employee George Ross to research ACN. In his deposition testimony, Trump noted Ross was a "lawyer" and "an older guy" who "may not be" around anymore. ECF 552-7 at 7 (D.J. Trump Tr. 90:13-91:9).

**Fact No. 33**: But Ross has no recollection of doing any diligence concerning ACN. Ex. 9 (Trump Corp. 30(b)(6) Tr. 56:6).

**Fact No. 34**: Ross did not have access to any ACN documents, nor did he put anything about ACN in writing. *See* ECF 552-7 at 7, 9 (D.J. Trump Tr. 91:14-16; 93:14-18, 203:14-21).

**Fact No. 35**: Trump also claimed that he does "a lot of research on companies before we agree to do something like I'm doing for [ACN]. And ACN's a great company." ECF 534-26 at 13:44-13:51.

**Fact No. 36**: The Trump Corporation is not in possession of any records indicating that any diligence of ACN was ever conducted by Trump or his employees. Trump Corp. 30(b)(6) Tr. 78:9-23. The Trump employees who helped manage the ACN relationship could not recall any diligence performed by Trump or by The Trump Corporation, Ex. 9 (Glosser Tr. 56:22-57:15); Ex. (Graff Tr. 119:23-120:5), Ex. 8 (Ivanka Trump Tr. 141:16-142:5); *see also infra* Fact Nos. 37-44.

**Fact No. 37**: Other than four advertisements ACN placed in USA Today and an email from ACN's marketing consultant filled with promotional blurbs, there is no evidence that anyone associated with The Trump Corporation requested or received any additional information about ACN from ACN before Trump entered the first endorsement agreement. *See* Ex. 9 (Graff Tr. 97:23-98:6, 111:25-120:5); Ex. 9 (Glosser Tr. 55:16-57:15); *see also* Glosser Tr. 62:2-18, 68:22-69:24.

**Fact No. 38**: Trump's longtime secretary Rhona Graff was the point-person on the Trump side in the ACN relationship. Graff Tr. 67:9-14.

**Fact No. 39**: In negotiating the agreements, the Trumps never asked for access to diligence information. Ex. 9 (Graff Tr. 97:23-98:6). Trump was focused on how much he would get paid and when and where he needed to show up. Ex. 9 (Graff Tr. 91:4-92:12).

**Fact No. 40**: Anne Archer Butcher was the ACN marketing consultant who facilitated the Trump-ACN relationship. Butcher Tr. 21:11-24, 33:19-23.

**Fact No. 41**: She likewise was not aware of any diligence materials sent over to the Trumps; even she had never seen financial documents or performance data or anything of the sort. Ex. 7 (Butcher Tr. 86:13-87:3).

**Fact No. 42**: David Merriman, ACN's corporate representative, was likewise unaware of any nonpublic data about ACN that was sent to Trump. Ex. 7 (ACN 30(b)(6) 213:2-5, 216:24-217:6).

**Fact No. 43**: During the course of the Trump-ACN endorsement relationship, The Trump Corporation employees who helped manage Trump's review and approval of ACN marketing materials, under his supervision, never checked those materials for accuracy or truthfulness (even though the contracts gave Trump that explicit right); instead, they checked only to make sure that quotes attributed to Trump "sounded like him." Ex. 9 (McIver Tr. 132:18-134:5); *see also* Ex. 9 (McIver Tr. 114:11-21); Ex. 9 (Graff Tr. 166:14-168:19).

**Fact No. 44**: Trump does not know what an IBO is, how people became IBOs, how IBOs supposedly made money, or how the ACN IBO compensation plan operates. D.J. Trump Tr. 60:15-64:3.

**E. Defendants Ignored Red Flags About ACN**

**Fact No. 45**: As early as 2008, Rhona Graff expressed internally that her "main concern" with renewing the ACN relationship was "the reputation of ACN as I have heard mixed reports about them." Ex. 1; Ex. 9 (Graff Tr. 112:2-3); Ex. 9 (Graff Tr. 116:17-24) (reading about accusations of ACN being a pyramid scheme).

**Fact No. 46**: Graff could not recall "any process at any time at the Trump Organization to vet ACN or diligence these sorts of concerns." Ex. 9 (Graff Tr. 120:5); *see also* Ex. 9 (Graff Tr. 140:17-22).

**Fact No. 47**: In September 2010, a reporter contacted The Trump Corporation regarding "allegations by the state of Montana that ACN is a 'pyramid promotional scheme.'" Ex. 2.

**Fact No. 48**: In 2010, NBC balked at allowing ACN to advertise its "home-based business" opportunity on *The Celebrity Apprentice*, citing legal risk, because it did not want the episode to "be a 'recruiting tool'" for "an implied financial benefit that could be disputed or not." Ex. 3 at AAB00002896.

**Fact No. 49**: In 2014, a mother named Maryann Klustner emailed the Trump Organization about a "fraudulent pitch" her son had received from ACN, noting that the company seemed to be a "scam" and a "classic pyramid scheme," and that they were "pitching their business with Donald Trump's endorsement," but she was "guessing Donald Trump isn't part of it." Ex. 1 (March 26, 2014 Email from M. Klustner). Amanda Miller, a senior marketing executive at the Trump Organization, testified that the email "wouldn't have concerned her" and that she did not "investigate whether it was true that ACN was a scam or a pyramid scheme." Ex. 9 (Miller 161:11-163:14). Neither did anyone else.

**Fact No. 50**: Trump ended the ACN relationship in mid-2015 after *Wall Street Journal* reporters started asking questions about his relationship with ACN. ECF 534-11; Graff Tr. 385:12-

15; *see also* James V. Grimaldi & Mark Maremont, *Donald Trump Made Millions From Multilevel Marketing Firm*, Wall Street J. (Aug. 13, 2015), https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

**Fact No. 51**: In March 2016, after reporters started asking questions about Trump's speeches at ACN conventions, Hope Hicks emailed Rhona Graff asking her to "quietly check in with the folks at ACN to ensure nothing gets released." Ex. 4.

### F. Trump's Endorsement Generated Tremendous Excitement and Drove IBO Recruitment

**Fact No. 52**: Trump's endorsement generated tremendous excitement and was influential over IBOs. ACN's co-founder and chairman said that the announcement of Trump's endorsement generated "the biggest response that we ever got at a [sic] event with a [sic] announcement . . . [t]he reps are more excited then [sic] I ever had seen them." ECF 534-6 (Feb. 15, 2006 email from R. Stevanovski).

After the initial taping of Trump's endorsement footage in 2006, the same ACN executive described Trump as having said "perfect things that we can use for our reps." *Id*.

**Fact No. 53**: Trump's impact on IBOs was reflected in the response he generated at ACN conventions. ACN's marketing consultant Anne Archer Butcher testified that the audience reaction to Trump at ACN conventions was consistently ecstatic and that the crowd size grew dramatically after Trump began promoting the company; he packed major city convention centers with crowds measured in the tens of thousands, with each appearance deemed a "home run" by ACN. Ex. 7 (Butcher Tr. 166:16-167:15).

**Fact No. 54**: ACN recognized that Trump's endorsement of ACN was a powerful tool that ACN told IBOs would help them recruit new IBOs.

ACN told IBOs that the "ACN Opportunity Disc featuring Donald J. Trump is your best resource for generating interest from prospects," Ex. 14 (Oct. 31, 2006 IBO Email), that "ACN's Opportunity Disc featuring none other than Donald J. Trump has proven to be one of the most powerful piquing interest tools the direct selling industry has witnessed in ages," Ex. 14 (March 12, 2008 IBO Email).



**<u>Fact No. 55</u>**: Trump's endorsement Keller Rpt. ¶ 143 Fig. 2.

**<u>Fact No. 56</u>**: A confidential ACN memorandum stated that,

**<u>Fact No. 57</u>**: The first time ACN appeared on *The Celebrity Apprentice*,

**<u>Fact No. 58</u>**: An ACN financial analysis determined that *see also* Ex. 11 (Keller Rpt. ¶ 154) ("[T]he Trump Endorsement significantly increased IBO signups during the Trump Endorsement period.").

**<u>Fact No. 59</u>**: Trump recognized that he was highly successful at promoting ACN to IBOs. In unaired *Celebrity Apprentice* footage, Trump asked ACN co-founder Greg Provenzano, "does anybody draw like Trump, Greg?" Provenzano responded "Hasn't been so far." Trump stated to Gary Busey and Star Jones that they couldn't "get 22,000 people" like he could. Ex. 15 at 9:07-9:33. He demanded that ACN "pay me more money for my goddamn speeches," since the last time

he spoke at an ACN event "22,000 show[ed] up, who else gets that many people, seriously?" Ex. 15 at 00:03-00:24.

**Fact No. 60**: Trump's celebrity endorsement of ACN was an especially powerful recruiting tool because ACN was "a complex offering" that would "have been difficult for prospective IBOs to judge," making a "strong, credible celebrity endorsement relatively more effective." Keller Rpt. ¶ 27. Trump "carefully developed his brand through the years to be seen as an extremely successful businessman" who "gives invaluable advice," *id.* ¶ 30, and "prospective IBOs saw [Trump] as business savvy, able to identify a money-making opportunity, and whose success the prospective IBOs might take as a model for their own success," *id.* ¶ 101. Consequently, Trump had high source credibility among IBOs, because he was "positioned as a uniquely strategic and savvy expert in business." *Id.* ¶ 107. Trump's credibility as a business leader, coupled with his "strong, virtually unqualified endorsement" of ACN, *id.* ¶ 32, [redacted]

**Fact No. 61**: ACN was willing to pay more because ACN was finding "that its endorsement agreement relationship with Mr. Trump was successful and positive for ACN." Ex. 7 (ACN 30(b)(6) Tr. 224:16-22).

**Fact No. 62**: [redacted]

**G. The Plaintiffs Relied on Trump's Fraudulent Message in Deciding to Join ACN**

**Fact No. 63**: In its marketing materials, ACN presented itself as a "home-based" opportunity to earn "passive income." *See, e.g.*, ECF 534-21 (ACN Opportunity Disc, Version 5.6) (June 2012) at 34-21-5 at 2:32-2:41; 534-21-4 at 4:22-6:01; Ex. 7 (Stevanovski Tr. 83:4-9) (testifying that "a lot of people join [ACN] for that reason. They look at it as a way to get a free service.").

**Fact No. 64**: Trump's endorsement was "the reason" the Plaintiffs joined ACN. McKoy Tr. 229:17-18; *accord* ECF 535 ¶ 3 (McKoy); ECF 536 ¶ 3 (Frazier); ECF 537 ¶ 3 (Chadwick).

**Fact No. 65**: Trump's endorsement was the reason Cathy McKoy joined ACN. She recalled Trump communicating the message that if "you join this business and you do the work, you will see the money," and she joined ACN "because of him," stating that when "they put up Donald Trump, that's what convinced [her] to sign into ACN." Ex. 10 (McKoy Tr. 234:5-8, 245:4-12); *see also* McKoy Tr. 229:17-18, 256:19. McKoy recalled: "He [Trump] did the research on this business. He knows that this is a good business. I don't know anything about business. So he knows. I'm going with what he says." Ex. 10 (McKoy Tr. 245:13-20). McKoy recruited at least five IBOs, sold at least five ACN products or services, and purchased an additional two ACN services for herself. McKoy Tr. 237:21-239:8. For all of this, McKoy received just $38 from ACN. Ex. 10 (McKoy Tr. 236:19-21).

**Fact No. 66**: Trump's endorsement was the reason Lynn Chadwick joined ACN. At the time she invested in ACN, Chadwick worked as a custodian at a school district. ECF 552-1 at 8 (Chadwick Tr. 31:11-20). She did not have any sales experience. Chadwick Tr. 38:10-15. She viewed joining ACN as an investment, drawn in by the prospect of "residual income." ECF 552-1 at 6-7 (Chadwick Tr. 24:25-25:7); Chadwick Tr. 33:13-34:7.

Chadwick joined ACN after being shown a video at a recruitment event that "expressed Donald Trump's interest in the ACN business model" with a "snippet from The Apprentice show, which showed a very successful business model and low-risk opportunities for us to get involved on the ground level." Ex. 10 (Chadwick Tr. 23:23-24:6). The "original jump off point for [her] interest in ACN was . . . the video that Donald Trump had implied that this whole process was a low-risk and easy and a no-brainer." ECF 552-1 at 13-14 (Chadwick Tr. 148:19-149:4). And

Chadwick testified that her decision to join was influenced by Trump's endorsement. Chadwick Tr. 149:12-15. Chadwick paid to attend more than seventeen ACN training events but only ever recruited a single IBO (her son). Ex. 10 (Chadwick Tr. 47:6-48:17, 49:15-50:6).

**Fact No. 67**: The videophone was offered by ACN when Chadwick joined the company and it was among the ACN products she received training on. Chadwick Tr. 97:14-23; ECF 552-1 at 11 (Chadwick Tr. 140:14-19).

**Fact No. 68**: Frazier watched clips from ACN's appearance on *The Celebrity Apprentice* that featured ACN's desktop videophone product. ECF 552-2 at 8 (Frazier Tr. 16:2-19).

**Fact No. 69**: Trump's endorsement was the reason Frazier joined ACN. At the time he invested in ACN, Frazier worked at a fast-food restaurant. *Id.* at 3-4 (Frazier Tr. 11:22-12:10). He did not have any sales experience. Frazier Tr. 95:7-10. He viewed joining ACN as an investment, enticed by the prospect of "residual income." *Id.* 106:4-16.

Frazier testified that it was "Trump that gave me that motivation [to join ACN]." *Id.* 104:24-25. He testified that: "If Donald Trump had a company on a national television show, then I was sure he put his stamp of approval to say this is a company that anyone can join and be successful in." *Id.* 23:14-18. He further testified that the videos featuring Trump were the "words of motivation that made me" try to make money through ACN, Ex. 10 (Frazier Tr. 74:11-15), stating that "[i]f Donald Trump, a successful businessman as it is, vouches for a company like [ACN]," Frazier was "pretty sure" that he could use ACN to be "successful" too, Ex. 10 (Frazier Tr. 75:3-7). Mr. Frazier further testified that "the approval stamp of Mr. Donald Trump . . . was all I needed." Ex. 10 (Frazier Tr. 75:15-17). Frazier made a "maximum effort" to sign up his friends and family. Frazier Tr. 27:22-31:10, 41:10-42:13.

**Fact No. 70**: Plaintiffs and the overwhelming majority of other participants lost money and failed. Bosley Rpt. ¶ 87. [redacted] Thus,

"there is this bin at the top earning a lot more," but "there's a big group of [IBOs] earning very little or maybe zero." ECF 564-3 at 4 (Hair Tr. 139:5-8).

Dated: June 16, 2023
New York, New York

*/s/ John C. Quinn*

Roberta A. Kaplan
John C. Quinn
Christopher R. Le Coney
Maximillian L. Feldman

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel: (212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
cleconey@kaplanhecker.com
mfeldman@kaplanhecker.com

Andrew G. Celli, Jr.
Matthew D. Brinckerhoff
O. Andrew F. Wilson
Vasudha Talla
Nick Bourland

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
600 Fifth Avenue at Rockefeller Center
New York, New York 10020
Tel: (212) 763-5000
acelli@ecbawm.com
mbrinckerhoff@ecbawm.com
awilson@ecbawm.com
vtalla@ecbawm.com
nbourland@ecbawm.com

*Attorneys for Plaintiffs*