**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP, JR., ERIC TRUMP, and IVANKA TRUMP, <br><br> Defendants. | No. 1:18-cv-09936-LGS-SLC |

**DECLARATION OF MATTHEW D. BRINCKERHOFF IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

MATTHEW D. BRINCKERHOFF, declares under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.       My name is Matthew D. Brinckerhoff. I am a partner in the firm of Emery Celli Brinckerhoff Abady Ward & Maazel LLP, counsel for Plaintiffs Catherine McKoy, Markus Frazier, and Lynn Chadwick ("Plaintiffs"). I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.       Annexed as **Exhibit 1** is a true and accurate copy of excerpts from the transcript of the August 18, 2022 deposition of David Merriman, who testified on behalf of non-party ACN Opportunity, LLC ("ACN") as its designee pursuant to Fed. R. Civ. P. 30(b)(6).

3.       Annexed as **Exhibit 2** is a true and accurate copy of a spreadsheet documenting ACN Independent Business Owner ("IBO") sign-ups from 2012 to 2016.

4.       Annexed as **Exhibit 3** is a true and accurate copy of excerpts of the November 18, 2022 Expert Report of Michael Gartenberg.

5.      Annexed as **Exhibit 4** [reserved].

6.      Annexed as **Exhibit 5** is a true and accurate copy of a February 6, 2006 Trump Organization memorandum from Cathy Glosser enclosing the February 6, 2006 Endorsement Agreement between Donald Trump and ACN.

7.      Annexed as **Exhibit 6** is a true and accurate copy of a February 15, 2006 email from Robert Stevanovski at ACN.

8.      Annexed as **Exhibit 7** is a true and accurate copy of the February 2008 Endorsement Agreement between Donald Trump and ACN.

9.      Annexed as **Exhibit 8** is a true and accurate copy of the January 28, 2009 Appearance and Endorsement Agreement between Donald Trump and ACN.

10.     Annexed as **Exhibit 9** is a true and accurate copy of the January 14, 2011 Appearance and Endorsement Agreement between Donald Trump and ACN.

11.     Annexed as **Exhibit 10** is a true and accurate copy of the February 13, 2013 Appearance Agreement between Donald Trump and ACN.

12.     Annexed as **Exhibit 11** is a true and accurate copy of an October 30, 2015 email from Rhona Graff at The Trump Organization attaching the Mutual Termination of Appearance Agreement executed by Donald Trump and ACN on June 20, 2015.

13.     Annexed as **Exhibit 12** is a true and accurate copy of a November 17, 2008 email from Sheila Marcello at ACN attaching an ACN document titled, "24 HOUR GAME PLAN."

14.     Annexed as **Exhibit 13** is a true and accurate copy of excerpts of the November 18, 2022 Expert Report of Stacie Bosley.

15.     Annexed as **Exhibit 14** is a true and accurate copy of a December 11, 2012 email from Sheila Marcello at ACN and accompanying attachments, including ACN documents titled: "Road Map to LEXUS," "IBO Getting Started Process," and "Presenting the Opportunuity."

16.     Annexed as **Exhibit 15** is a true and accurate copy of ACN Opportunity Disc, Version 4.0, June 2010.

17.     Annexed as **Exhibit 16** is a true and accurate copy of excerpts of the August 2011 issue of *Success from Home* magazine.

18.     Annexed as **Exhibit 17** is a true and accurate copy of ACN Opportunity Disc Version 5.3, December 2011.

19.     Annexed as **Exhibit 18** is a true and accurate copy of ACN Opportunity Disc Version 5.5, May 2012.

20.     Annexed as **Exhibit 19** is a true and accurate copy of ACN Opportunity Disc Version 5.6, June 2012.

21.     Annexed as **Exhibit 20** is a true and accurate copy of ACN Opportunity Disc Version 6.1, September 2012.

22.     Annexed as **Exhibit 21** is a true and accurate copy of ACN Opportunity Disc Version 7.0, January 2013.

23.     Annexed as **Exhibit 22** is a true and accurate copy of ACN Opportunity Disc Version 9.2, June 2015.

24.     Annexed as **Exhibit 23** is a true and accurate copy of excerpts of the November 18, 2022 Expert Report of Kevin Lane Keller.

25.     Annexed as **Exhibit 24** is a true and accurate copy of an ACN promotional video featuring Donald Trump.

26.     Annexed as **Exhibit 25** is [reserved].

27.     Annexed as **Exhibit 26** is a true and accurate copy of an ACN promotional video featuring Donald Trump.

28.     Annexed as **Exhibit 27** is a true and accurate copy of excerpts from the transcript of the October 11, 2022 deposition of Donald J. Trump.

29.     Annexed as **Exhibit 28** is a true and accurate copy of ACN's 2012 Policies and Procedures.

30.     Annexed as **Exhibit 29** is a true and accurate copy of an October 25, 2006 email from Robert Stevanovski at ACN.

31.     Annexed as **Exhibit 30** is a true and accurate copy of excerpts of the September 2014 issue of *Success from Home* magazine.

32.     Annexed as **Exhibit 31** is a true and accurate copy of excerpts of the August/September 2008 issue of *Success* magazine.

33.     Annexed as **Exhibit 32** is a true and accurate copy of excerpts of the August 2010 issue of *Success from Home* magazine.

34.     Annexed as **Exhibit 33** is a true and accurate copy of an internal ACN financial analysis titled "ACN Consolidated Summary."

35.     Annexed as **Exhibit 34** is a true and accurate copy of a March 26, 2010 letter from Brian L. Davis of McColl Partners to ACN Chairman Robert Stevanovski enclosing a document titled "Confidential Information Memorandum," and excerpts of the same memorandum.

36.     Annexed as **Exhibit 35** is a true and accurate copy of excerpts from the transcript of the August 23, 2022 deposition of Anne Archer Butcher.

37.     Annexed as **Exhibit 36** is a true and accurate copy of the March 2009 episode of *The Celebrity Apprentice* featuring ACN.

38.     Annexed as **Exhibit 37** is a true and accurate copy of the March 2011 episode of *The Celebrity Apprentice* featuring ACN

39.     Documents produced by non-party ACN in this case include lengthy spreadsheets listing thousands of ACN Independent Business Owners ("IBOs) at particular points in time and their ACN earnings, if any. One such spreadsheet is over 700 pages long and lists 65,535 IBOs and "raw data" detailing their earnings, if any. Given the length of the spreadsheet, it is not attached as an exhibit here. Plaintiffs can supplement the record and provide a copy of the complete spreadsheet containing the raw IBO enrollment data to the Court, if needed.

Dated: March 10, 2023

MATTHEW D. BRINCKERHOFF

# EXHIBIT 1

```
 1                    David Merriman

 2           UNITED STATES DISTRICT COURT

 3       FOR THE SOUTHERN DISTRICT OF NEW YORK

 4     CATHERINE MCKOY, MILLARD

 5     WILLIAMS, MARKUS FRAZIER, and

 6     LYNN CHADWICK individually and

 7     on behalf of all others

 8     similarly situated,           Index No.
                                     1:18-cv-09936-LGS
 9                 Plaintiff

10     Vs.

11     THE TRUMP CORPORATION, DONALD J.

12     TRUMP, in his personal capacity,

13     DONALD TRUMP JR., ERIC TRUMP,

14     and IVANKA TRUMP,

15                 Defendants.

16

17             Videotape Deposition of
                    David Merriman
18             Thursday August 18, 2022
                    At 9:48 a.m.
19

20

21
       Reported by LeShaunda Cass-Byrd, CSR, RPR
22

23

24

25     JOB NO. 215262
```

```
 1                    David Merriman
 2   3.
 3            I just want to ask you a couple of
 4   questions about some key terms in this agreement.
 5            First, on the first page about maybe
 6   two-thirds of the way down the page, you can see a box
 7   under the heading "Acceptance and Payment."  And that
 8   indicates that the initial fee a person must pay ACN
 9   in order to sign this agreement and become an IBO is
10   $499; is that right?
11        A.    Yes.
12        Q.    To your understanding, from the period 2012
13   to 2016, was that the standard IBO enrollment fee?
14        A.    Yes.
15        Q.    If you turn to the second page, and
16   apologies, the font gets a little small, but if you
17   kind of squint at page 3, I think this reflects some
18   testimony you gave earlier, beginning on the third
19   line there's a sentence that says, "I acknowledge that
20   my IBO relationship is with ACN Opportunity, LLC, and
21   not with any ACN provider."
22            Do you see that?
23        A.    Yes.
24        Q.    And is that your understanding that
25   throughout that period, again, let's say 2012 to 2016,
```

1              David Merriman

2  purchase themselves or market and sell as they pursue

3  the business opportunity?

4        A.     Yes.

5        Q.     Paragraph 2, just above that, references a

6  compensation plan, and refers to commissions, bonuses,

7  or other compensation earned through the ACN

8  compensation plan.

9               Do you see that?

10       A.     Yes.

11       Q.     And we will come back to this, too.  But at

12  a high level, is that -- are those, basically, the

13  ways in ACN and IBO can earn payments from ACN?

14       A.     Yes.  Commission or bonuses, and there are

15  other types of compensation as well.

16       Q.     Great.  Okay.  We'll go through commissions

17  and bonuses and the others in just a minute.

18               If you look down at paragraph 7, this

19  speaks to the term of the agreement and the

20  possibility of extension.

21               Do you see that?

22       A.     Yes.

23       Q.     Around the 4th or 5th line there, refers to

24  payment of an annual renewal fee in order to extend.

25  So the agreement -- let me back up.  The agreement is

```
 1                    David Merriman
 2   for an initial term of one year, right?
 3        A.      Correct.
 4        Q.      And it can be extended with payment of
 5   a renewal fee?
 6        A.      And agreeing to the terms and the
 7   conditions as of the renewal date.
 8        Q.      Okay.  And it specifically here doesn't
 9   give an amount for the renewal fee.  It says payment
10   of ACN's annual renewal fee sort of according to the
11   terms and conditions, right?
12        A.      Yes.
13        Q.      If you go back to the first page, the third
14   box down says "U.S. Terms and Conditions," right, and
15   begins a series of numbered paragraphs stating terms
16   and conditions, right?
17        A.      Yes.
18        Q.      And, in fact, at the bottom of that section
19   on the first page it says, "Please see page 2 for
20   additional terms and conditions," right?
21        A.      Yes.
22        Q.      So these that we are looking at here, these
23   numbered paragraphs, these are the terms and
24   conditions; is that right?
25        A.      That is correct.
```

```
 1                    David Merriman
 2      A.      Yes.  Different plans, yes.
 3      Q.      Okay.  And if you flip -- flip to the next
 4  page, kind of in the middle of the page, you can see,
 5  again, the AT&T U-verse DSL, right?
 6      A.      Uh-huh.  Yes.
 7      Q.      But slightly different services.  Here,
 8  it's TV only, or different versions of a TV and
 9  internet plan; is that right?
10      A.      That's right.
11      Q.      So that's what you're describing, right,
12  some services are classified as preferred, and others
13  are classified nonpreferred?
14      A.      That is correct.
15      Q.      Okay.  Let's -- let's go back to that first
16  page ending in Bates number 018, and stay with the
17  qualification process for a minute.
18              ACN IBOs can be customers themselves,
19  right, they can just enroll in certain services?
20      A.      They can, yes.
21      Q.      And they can enroll family members or
22  people in their household?
23      A.      Sure.  Yes.
24      Q.      And so one way to earn customer points is
25  no just enroll in services oneself, or for members of
```

1                    David Merriman

2    one's household?

3        A.      Yes.

4        Q.      But as we see here, in order to qualify as

5    a qualified team trainer, and ultimately to reach

6    other levels as well, some of the points must be

7    coming from outside of the household, right?

8        A.      That's correct.

9        Q.      Okay.  Above the levels of TT and QTT,

10   there are six more levels, right?

11       A.      Yes.

12       Q.      And they're -- they're referred to as

13   earned positions?

14       A.      Correct.

15       Q.      And to qualify for any of those, an IBO

16   must recruit new team trainers, right?

17       A.      They -- they have to have customers in

18   order to qualify.  Each of those people, so...

19   Recruiting somebody won't get you qualified.

20       Q.      Understanding that there may be customer

21   requirements, too, in order to reach, let's say, the

22   next -- the first earned position, executive team

23   trainer, you must -- and we can see this in the

24   diagram -- you must also, in addition to accumulating

25   customer points, recruit team trainers who then

1                         David Merriman

2        Q.      Yes.

3        A.      Yes.  Yes.

4        Q.      Okay.  All right.  Let's go back to page 2.

5    I want to ask some more detailed questions about a

6    couple of the services.

7                Let me ask you, first, a general question:

8    Were these services offered by ACN itself or by

9    separate companies that ACN contracted with?

10       A.      I'm not sure what you mean "offered by."

11       Q.      Well, let's take -- I mean, Verizon

12   Wireless is listed here, right?  Someone can enroll in

13   a Verizon Wireless plan as -- through an ACN IBO?

14       A.      Right.

15       Q.      And so ACN has a contract in place then

16   with Verizon where if somebody comes into Verizon

17   through this channel, ACN gets some benefit, pursuant

18   to its contract with Verizon, right?

19       A.      That is correct.  Yes.

20       Q.      And is that basic structure true for all of

21   these services, or was there variation in how that

22   structure worked?

23       A.      Well, that was similar, except for the ones

24   you see where there's ACN services.  So Flash

25   Wireless, for example -- and the S means Sprint, and

1                          David Merriman

2    the V means Verizon.

3              In that case, ACN was, they were signing up

4    through Flash Wireless services, so...

5              And going back to 2013, I'm not exactly --

6    I don't exactly remember the sign off process, but

7    I'll use today, for example, and I think it was the

8    same, which is the IBOs can go through what we call

9    their store front, their personal website.  They can

10   direct a customer then to choose the service, that

11   customer then gets redirected to a page that shows the

12   different plans that are available, and then the

13   customer can enroll in that way.  The IBO gets credit

14   for that enrollment based on -- based on all of that.

15   They can either do that -- because going through their

16   website, or they can put the IBO's ID number in there.

17   That's how the IBO gets credit for that service.

18       Q.     But Flash Wireless is a -- I mean, ACN

19   itself doesn't put up the antennas or own the

20   satellites and actually provide the infrastructure for

21   that wireless service, right?

22       A.     Correct.  Correct.  So that's why you

23   got -- the S was Sprint, so those are customers around

24   the Sprint network, but the service is being provided.

25   No different than you see with companies like Cricket

1                       David Merriman

2    and TracFone, and the one offered through Wal-Mart

3    services.  Those types of services.  Yeah.

4        Q.    Okay.  And what was the nature of ACN's

5    relationship with Flash Wireless?  Was that a

6    contractual relationship, or a more formal

7    affiliation?

8        A.    Oh, Flash Wireless was a subsidiary of ACN.

9        Q.    Okay.

10       A.    Okay.  And that company contracted with

11   Verizon.

12       Q.    Got it.

13             So ACN owned Flash Wireless?

14       A.    Correct.

15       Q.    Got it.

16             Just starting at the top there's a

17   reference to digital phone service.

18       A.    Yes.

19       Q.    And it -- the first -- the first line there

20   says "residential digital phone service."  You know,

21   again, did -- did -- ACN itself didn't provide the

22   technical infrastructure to support that digital phone

23   service, right?

24       A.    Well, actually, we did.  So we had our own

25   VoIP network.

```
1                    David Merriman

2   there was, sort of, a blast e-mail account that ACN

3   use to communicate with IBO, sometimes posting

4   advisories or additional requirements, right?

5       A.     Yes.

6       Q.     Is that also a way that the documents might

7   get incorporated into the overall agreement between an

8   IBO and ACN Opportunity, LLC?

9       A.     Yeah, if a change was made to the policies

10  or we felt like something needed to be kind of

11  reinforced, we would send out what's called ACN action

12  document to all active IBOs.

13      Q.     By e-mail?

14      A.     By e-mail, yes.

15      Q.     Okay.  So let's focus on this marketing and

16  advertising policy for a minute.  Let me ask you to

17  turn to the first page of it, the first page after the

18  cover which bears the Bates number ACN 000583.  The

19  first section there is called "General Marketing and

20  Advertising Policy."

21             Do you see that?

22      A.     Yes.

23      Q.     And it just want to read the first

24  paragraph, and then I'm going to ask you a couple of

25  questions about it.  That paragraph says, "ACN has
```

1                    David Merriman

2    developed a SUCCESS system, based on solid experience

3    and knowledge.  As such, we have created marketing

4    materials, business tools, and activities to fully

5    support this model.  No other marketing materials or

6    activities are necessary to become successful as ACN

7    independent representative.

8              Therefore, ACN strongly discourages our

9    independent representatives from creating and/or

10   distributing any marketing materials.  Marketing

11   materials for the purpose of this policy is not

12   limited to printed material, but also includes website

13   and online content, appearances and media

14   representation."

15             Do you see that?

16   A.        Yes.

17   Q.        Understanding, again, that there may be

18   changes to verbiage overtime, is the substance of that

19   policy, was that consistent from 2012 to 2016?

20   A.        I believe it was.

21   Q.        And, you know, to make sure I understand

22   it, ACN created it's own marketing materials that it

23   encouraged IBOs to use and strongly discouraged IBOs

24   from creating or using their own marketing materials,

25   right?

1                    David Merriman

2        A.      That is correct.  You need to make sure

3    that they are accurate and legal disclaimers, and that

4    sort of things.

5        Q.      Right.  And consistent across IBOs?

6        A.      Correct.  Correct.

7        Q.      And as a practical matter, is it your

8    understanding that as a matter of practice, IBOs

9    overwhelmingly did use ACN's marketing materials?

10       A.      I believe it did, yes.

11       Q.      If you look at Section 3, the heading

12   refers to Cold Marketing.  And it -- the paragraph,

13   and I will read apportion of the paragraph, says, "ACN

14   is a network marketing company that is focussed solely

15   on relationship or, quote, unquote, warm marketing

16   techniques.  ACN strictly prohibits independent

17   representatives from engaging in any, quote, unquote,

18   cold marketing techniques for purposes of customer

19   acquisition at any time.

20            Code marketing is defined as any

21   promotional activity that is geared toward random

22   individuals who have no personal business, social or

23   acquaintance relationship with the promoter."

24            Do you see that?

25       A.      Yes.

1                    David Merriman

2      Q.      And then insofar as they were successful at

3   those meetings and or in follow-up, you know,

4   gatherings like we've talked about, in recruiting

5   people as IBOs, those IBOs then, among themselves,

6   might also have training sessions or other sorts of

7   meetings, and at those as well, ACN created materials

8   were -- were what was used, as opposed to IBO created

9   materials?

10     A.      Correct.  Yeah.  Now, some of those could

11  be just reused, right, so they use them in one meeting

12  and use them the next.  Some of it was online, so they

13  could just bring up -- you know, they could bring up a

14  website on their TV screen and that sort of thing.

15  That's usually what they did.

16     Q.      Okay.  And there was also something, a

17  physical item called the Opportunity Disc, right?

18     A.      Yes.

19     Q.      And that was a significant source of these

20  materials, or instance of these promotional materials

21  created by ACN?

22     A.      It was one of the materials that IBOs could

23  use.  Yes.

24     Q.      And it was -- it was a CD, or a disk of

25  some kind, maybe a DVD, but a disk that IBOs could use

1              David Merriman

2   at these private business receptions or other similar

3   events, right?

4        A.     They could.  Yes.

5        Q.     And it was sold by ACN to IBOs, right?

6        A.     That is correct.  Yeah.

7        Q.     And there were -- were there other -- were

8   there print materials, as well, brochures, fliers?

9        A.     There were some.  I mean, some of them they

10  got when they first signed up, and then there is other

11  information that they can either download and print

12  themselves, or they could purchase it.  But, you know,

13  most of it -- most of it was online, especially in

14  this time frame.

15             Early -- in the early days, it was more

16  printed and videos and that sort of thing.  As, you

17  know, you get into the more recent times, it was --

18  everything was pretty much online for people to be

19  able to download or -- to either print, or just show

20  on -- to show to other people.

21       Q.     And that -- all of that material -- well,

22  let me just tease apart two different kinds of online

23  content.

24             IBOs, once enrolled, had access to ACN

25  websites, right, where they could pull down, or

1                         David Merriman

2       A.      Well, that was more content that just

3    talked about what was going on in the ACN.  So there

4    was maybe articles about a new plan that maybe one of

5    the company -- carriers was offering.  We may have --

6    and there was a lot of recognition, so we would have

7    recognition for people that earned certain levels and

8    that sort of thing.  That was in the news magazine.

9       Q.      Got it.

10      A.      And, you know, if we were talking about

11   international expansion, that may have been referenced

12   in the news magazine, as well, in terms of which

13   country we are going to launch and what services we

14   offered in -- in those countries.

15      Q.      Is it fair to say then that that magazine

16   primarily was for keeping current IBOs informed and

17   maybe excited and -- and growing their business, but

18   it was directed at the current IBOs for those purpose?

19      A.      That's correct.  Yeah.

20      Q.      As opposed to promotional materials

21   available to IBOs for their use in attracting new IBOs

22   or new customers?

23      A.      Correct.  Yes.

24      Q.      The materials in that later category would

25   include the opportunity disc, and maybe some of these

1                     David Merriman

2   other print or video materials created by ACN?

3        A.      Correct.

4        Q.      Okay.  I want to touch on SUCCESS magazine

5   and Success from Home magazine.

6                Are you familiar with those publications?

7        A.      Yes, I am.

8        Q.      Can you just generally describe for us what

9   they are and how they relate to ACN?

10       A.      Well, SUCCESS magazine has been around for

11  decades, and that is more of personal development

12  magazine.  It doesn't have anything to do with direct

13  selling, network marketing.  It's more just general

14  business and entre -- more entrepreneurship, I guess I

15  would say, or that personal development side of

16  business.  Completely separate magazine.

17               And then there is also -- there is also

18  Success from Home, which was geared more towards the

19  direct selling business, but also adds some personal

20  development in that as well.  Both of those were

21  available at newsstand, such as Barnes & Noble, those

22  sort of places.

23       Q.      All right.  I want to talk more in detail,

24  but let me mark the next document.

25               (Plaintiff Exhibit 10 was marked for

```
 1                     David Merriman

 2    in this e-mail she writes that -- kind of look at the

 3    second line, maybe half way over, she refers to

 4    Success from Home magazine as, quote, more inhouse

 5    than news stand use, as this is a promotional arm of

 6    SUCCESS magazine that the network marketing companies

 7    use to highlight their companies if invited by SUCCESS

 8    magazine.

 9              Do you see that?

10       A.     I see what is written here, yes.

11       Q.     Is that a fair description, in your view,

12    of what Success from Home magazine was?

13       A.     I don't know how many of the magazines, for

14    example, were distributed through news stands versus

15    what were distributed, you know, through the companies

16    themselves.  So I can't really comment on that.

17       Q.     So let me break that down a little bit.

18              The Success from Home magazine, as you

19    said, was distributed both through news stands, like

20    Barnes & Noble, but also by network marketing

21    companies who were featured in it, right?

22       A.     And I believe there were also other people

23    in the industry that would just get a subscription to

24    it.  So they -- yeah, they definitely -- because I got

25    a subscription to it, so I would get a copy of that
```

```
 1                    David Merriman

 2   month's Success from Home.  Every month it would

 3   come --

 4       Q.      Got it.

 5       A.      -- regardless as to which company was

 6   featured.

 7       Q.      So three channels of distribution, as you

 8   understand it then, news stand, subscription, and kind

 9   of bulk purchase and resell by network marketing

10   companies themselves?

11       A.      That's what I'm aware of.  Yes.

12       Q.      Okay.  Does ACN itself have -- or did it

13   ever have a -- any kind of ownership interest in the

14   SUCCESS entities?

15       A.      No.  Not to my knowledge.

16       Q.      So insofar as ACN had a relationship with

17   SUCCESS, it was a just contractual relationship for

18   bulk purchase and resell of these magazines?

19       A.      They were a vendor of ours for the

20   magazines and some other things, too.

21       Q.      Okay.  There is an entity called SUCCESS

22   Partners.  Do you understand that to be the kind of

23   umbrella entity behind the various SUCCESS

24   publications and other things that you've referenced?

25       A.      Yes.  And it -- it originally was Video
```

1                     David Merriman

2    Video Plus was sort of a brand that R&L Publishing was

3    using, right?

4         A.     Correct.  Yes.

5         Q.     Okay.  So this is contract then between ACN

6    and the publisher of Success from Home magazine at

7    this time in March of 2011?

8         A.     Yes.

9         Q.     And if you turn to page 2, there is a

10   numbered list and the publisher agrees to produce a

11   132-page magazine with various features and profiles

12   and photo shoots all featuring or highlighting ACN,

13   right?

14        A.     Yes.  It says that.  Yes.

15        Q.     And in exchange, if you go back to page 1,

16   ACN agree to purchase 200,000 copies of that magazine,

17   and potentially more, at a price of 300 per copy,

18   right?  Or $3, excuse me, per copy.

19        A.     Correct.

20        Q.     And again, I mean, this is just an example.

21   That was the basic framework, as you understood it,

22   for any ACN feature and Success from Home magazine,

23   right?  This is the basic way that that exchange

24   worked?

25        A.     At a very high level, yes.

1                    David Merriman

2      Q.      Okay.  And the -- you can put that to the

3  side.

4      A.      Okay.

5      Q.      The business model that is -- that ACN

6  turns around and sells smaller bundles of Success from

7  Home magazine to its IBOs, right?

8      A.      Correct.

9      Q.      And actually, apologies, I told you you

10  could put that to the side, one more thing.

11              On page 2, in the third paragraph, that is

12  actually memorialized in this agreement, right?  It

13  says, "The company may sell magazines in bundles of 10

14  or more.  Single copies of the magazine may not be

15  sold," right?

16      A.      I am sorry.  Where are you seeing that?

17      Q.      It's sort of the third paragraph, about

18  halfway down to page 2.

19      A.      Yes.  I see it.

20      Q.      Okay.  And that was consistent with ACN's

21  actual practice, right?  It sold Success from Home

22  magazine in bundles to its IBOs, right?

23      A.      Yes.

24      Q.      And why is that?  Was that -- was the idea

25  that the IBOs would use that -- copies of the magazine

1                    David Merriman

2    to kind of pique interest of perspective IBOs or

3    customers?

4         A.    Well, they could.  But I believe the reason

5    for the 10 -- packs of 10 is so that the -- so we

6    didn't have any conflict with Barnes & Noble -- Barnes

7    & Noble, Borders, Books-A-Million, so there is certain

8    rules in the publishing trade in terms of, you know,

9    certain agreements that they have.  So that was --

10   must be why there is a requirement to have a bundle of

11   ten or more.

12        Q.    Got it.

13              The magazines were kind of designed though

14   so that IBOs could use to -- to pique interest, right,

15   and they were encouraged to do that?

16        A.    Yes.  They were -- no requirement, but some

17   people did.  Some people used it.

18        Q.    Okay.

19              (Plaintiff Exhibit 12 was marked for

20         identification.)

21   BY MR. QUINN:

22        Q.    So now we have handed you a copy of what we

23   marked as Exhibit 12.  This is an e-mail and

24   attachment produced to us by ACN with the Bates number

25   ACN004835, and this is an e-mail about an auto

1                    David Merriman

2              And we will come to that in a minute.

3              That structure was the same, right, that

4    was a tool available for purchase from ACN by IBOs?

5        A.     Yes.

6        Q.     And at some point, ACN kind of fazed out

7    the physical opportunity disc, but took that same

8    ACN-created consistent content and just made it

9    available online rather than through hey physical CD

10   or DVD?

11       A.     Correct.  Again, it was a matter of giving

12   IBO a tool to be able to use.

13       Q.     Okay.  And still that was a tool that

14   contained set of promotional materials and a tools for

15   which IBO was paying ACN?

16       A.     Which --

17       Q.     In other words, the ACN, once the

18   opportunity disc content moved to an online medium,

19   IBO still had to pay ACN to access it?

20       A.     No.  Most of that was available to them.

21   Just by being in IBO, they can log in.  Difference is,

22   that way we could post it on there, there was no cost

23   to ACN, so therefore, you know, they could access it,

24   you know, just by going by logging in as an IBO.  It

25   wasn't on the public side.  It was on what we call the

1                        David Merriman

2       A.      Sure.

3       Q.      That was -- that was designed or the

4    purpose of that was for the IBO's own development,

5    right?

6       A.      Yes.

7       Q.      For their personal use?

8       A.      Success On Demand was marketed to many,

9    many different people, not just indirect -- so it

10   would have been something similar to SUCCESS magazine,

11   which wasn't a direct selling publication, but more of

12   a general business personal development.

13      Q.      Got it.  So then if we look at number 2,

14   that is where we get to piquing tools.

15              Do you see that, P-I-Q-U-I-N-G, piquing?

16      A.      Yes.

17      Q.      It's a term I've used a couple of times

18   today.  I don't know if you've noticed?

19      A.      Okay.

20      Q.      That's a term that we've seen is in a

21   number of ACN documents.  Can you just tell us what

22   ACN means in that term?

23      A.      Well, that's -- it's a tool for an IBO to

24   use to talk to somebody else about potentially being

25   an IBO.  So it's -- the reason why I call it a piquing

```
 1                     David Merriman

 2  tool is, it sometimes people that just get involved in

 3  a business like this, and if they want to talk to

 4  people, they need something to help them, right?  What

 5  is that -- what's the kind of icebreaker, right?  What

 6  do I say?  What should I do?  So these are tools that

 7  they could use to walk people through what the

 8  businesses is all about.

 9      Q.     Got it.  And the tools referenced here,

10  specifically, are the Success from Home magazine and

11  opportunity discs?

12      A.     Yes.  And called piquing, because it's

13  really to pique their interest to see if they are

14  interested at all.

15      Q.     Got it.  And as we have seen, I mean,

16  dating back to 2006, those are the same two tools that

17  ACN is making available to IBOs for this purpose,

18  right, Success from Home magazines and opportunity

19  disc?

20      A.     Yes.  Again, I don't remember when they

21  started an ended.

22      Q.     Okay.  But they started it at least as

23  early as 2006 and continued at least to mid-2014,

24  correct?

25      A.     Right.
```

```
 1                    David Merriman

 2      Q.      And then at some point, the opportunity

 3  disc portion was moved online, but the substantial

 4  content of it was basically the same, just presented

 5  through a non-physical medium?

 6      A.      Correct.

 7      Q.      Okay.  If you turn one more page to the

 8  page that ends in 917, there is a reference to a

 9  Cleveland International Training Event.

10              Do you see that?

11      A.      Yes.

12      Q.      And these training events, these were held

13  regularly by ACN, right, throughout the period we have

14  been discussing?

15      A.      Yes.

16      Q.      And IBO is paid to attend those as well,

17  right?

18      A.      Yes.

19      Q.      We can look at a document on this, but can

20  you give us an estimate of what the cost is for an IBO

21  to attend an international training even like this?

22      A.      It was for a full weekend, like mid -- or

23  like Friday afternoon through Sunday afternoon.  And

24  it was about -- depending on, you know,

25  preregistration pricing and at-the-door pricing, it
```

```
 1                    David Merriman

 2    was generally around $129 to $189.

 3         Q.      Okay.  Yeah, we've seen one from 2013 that

 4    referenced a preregistration price of 160 dollars and,

 5    you know, a day-of price of 190 dollars.

 6                 That sound about representative to you?

 7         A.      That could be, yes.

 8         Q.      Okay.  Were these events open only to

 9    current IBOs or perspective IBOs invited to attend?

10    What was the attendance?

11         A.      They were primarily, like the vast, vast

12    majority, probably 90 percent, if not higher for IBOs

13    because they were training events.  Now, if somebody

14    was from the area, like originally from Cleveland, if

15    I was an IBO -- or if I was an IBO and I knew

16    something in Cleveland, I would want them to stop by

17    and check it out.  You know, they could attend as

18    well.

19         Q.      Okay.  There was no prohibition or barrier

20    on that?

21         A.      No, because we offered guests to register.

22    They could register a guest if they wanted to.

23         Q.      I see.  So an IBO can bring a guest?

24         A.      Now, sometimes a guest maybe their spouse,

25    you know, maybe their business partner, you know, that
```

1                       David Merriman

2    BY MR. QUINN:

3        Q.      I guess just while we are pulling up the

4    Excel spreadsheet, Mr. Merriman, we've handed you as

5    Exhibit 16, an e-mail bearing the Bates number

6    ACN013646, which is an e-mail chain from February of

7    2010, also referring to and attaching a monthly top

8    300 earners report, right?

9        A.      That is what it says, yes.

10       Q.      And is that consistent with your memory and

11   knowledge from your preparation for today's deposition

12   that, you know, at least up through 2010, ACN was

13   still creating these top 300 earner reports every

14   month?

15       A.      Yes.

16       Q.      All right.  So now we've put up on the

17   screen the attachment, which we'll mark as 16A, and

18   we'll -- this one is even larger, but we'll hand some

19   copies out in the room.  Catherine is going to walk

20   around with this one.

21               But let me ask you -- all right.  Just

22   looking through this, again, Mr. Merriman, this is the

23   same format that we have seen, right?  A series of

24   tabs, top earners ranked by total compensation,

25   country codes, IBOs name and ID, right?  This is the

```
 1                     David Merriman
 2   same format as the document that we looked at last?
 3        A.    Yeah.   The same format as the previous one.
 4        Q.    Okay.   And again, let's go to the reps by
 5   earnings tab.
 6              Here, again, we see the same sort of
 7   summary information providing total numbers of IBOs in
 8   a series of earning bands, right?
 9        A.    Yes.
10        Q.    And here the numbers are significantly
11   higher, this is January 2010.  I'll, again, represent
12   to you we just did the athematic and the total number
13   of IBOs here is 65,535.
14              Do you see that?
15        A.    Yes.
16        Q.    And let's look at the -- the tab that says
17   "Top earner, raw data, January 2010."
18              Here we can actually see -- and this is why
19   it's so large -- a massive printout of all 65,000 --
20   it's 65,535 rows of data, right?  Just scrolling
21   through the screen.
22        A.    Okay.
23        Q.    You can scroll down to the bottom.
24        A.    Okay.
25        Q.    Okay.  Do you see here there are a
```

1               David Merriman

2    that bottom band in November 2011, down to just 4,900

3    in December of 2011 in the 25 to 100 band, right?

4         A.     That is what it says, yes.

5         Q.     Does this -- focusing on the time period

6    before the change then, before December of 2011, does

7    this seem to you, consistent with the tabs we looked

8    at in the 2010 spreadsheet indicating that that

9    band -- the lowest band, zero to 100, does include

10   IBOs making zero dollars?

11        A.     I don't think it did in the past.  I don't

12   think that -- that 60,000 was -- was complete.  And

13   this 300,000 may have included inactive IBOs.  I don't

14   know.  I don't know for sure either way.

15        Q.     Well, let me breakdown a few piece of that.

16               When you say "inactive IBO," what do you

17   mean by that?

18        A.     People that are no longer -- their IBOs are

19   no longer active today.

20        Q.     Does that mean the termination of their IBO

21   agreement has passed, they have not renewed, and they

22   are no longer are an IBO?

23        A.     That's what an inactive IBO would be, yes.

24   They are terminated for the cancelled, they are

25   terminated.  He's terminated for compliance reasons.

```
1                   David Merriman

2   on his role as director of marketing?

3       A.      That is correct.

4       Q.      Okay.  All right.  Let's look at the first

5   contract.

6       A.      Okay.

7               (Plaintiff Exhibit 21 was marked for

8        identification.)

9   BY MR. QUINN:

10      Q.      Okay.  So Exhibit 21 that we've handed you

11  is a document produced to us by The Trump

12  Organization, with the Bates numbers TTO000616.  As

13  you can see, it's an internal Trump Organization

14  memorandum, but the memorandum contains, on the second

15  page, a one-page endorsement agreement between Donald

16  Trump and ACN, Inc., right?

17      A.      Yes.

18      Q.      And that's an executed agreement, right,

19  signed by both Donald Trump and Robert Stevanovski?

20      A.      That's what it says, correct.

21      Q.      Okay.  As ACN's corporate representative,

22  can you testify that this was -- this is an

23  endorsed -- I mean, this is an actual contract, it was

24  executed and is binding on these parties?

25      A.      Yes.  This was an executed contract.
```

1                    David Merriman

2       Q.      Okay.   You can see that the title of the

3  contract is entitled, "Endorsement Agreement," right?

4       A.      That is what it says.   Yeah.

5       Q.      And per paragraph 1, "ACN agrees to pay" --

6  maybe four lines down -- "agrees to pay Mr. Trump

7  $1 million to record a video," right?   To record video

8  content.

9       A.      Yes.

10      Q.      And in paragraph 5, "ACN also agrees to pay

11  Mr. Trump a million dollars to speak at a total of

12  three ACN live events, right?

13      A.      That is correct.

14      Q.      You can see in the third line there's a

15  reference to ACN's international events, right?

16      A.      Yes.

17      Q.      And as you said a moment ago, we looked at

18  some documents about those kinds of events earlier,

19  and I just want to clarify, an international event

20  doesn't mean it actually took place outside the

21  United States, right?   Many of them took place

22  domestically in the U.S.?

23      A.      Yes.   They -- these probably all occurred

24  in the U.S.

25      Q.      Although, you --

1                    David Merriman

2      A.      But they were inviting -- they were open to

3  all IBOs if they chose to -- to come.

4      Q.      Got it.

5              And that was the name we saw in like the

6  Detroit flier, for example, or some of the other

7  documents, right, international event?

8      A.      Yes.

9      Q.      Okay.  In paragraph 6, you can see that

10  Mr. Trump grants ACN a royalty free license to use the

11  video, as well as recordings of the speeches, but

12  solely for purposes of promoting ACN to current or

13  perspective IBOs; is that right?

14     A.      Yes.  That is what it says.

15     Q.      And ACN did, in fact, use that content in

16  the opportunity disc and another ACN created

17  promotional materials we've talked about this morning?

18     A.      Yes.

19     Q.      Okay.  You can put that to the side for a

20  moment.  I would ask you, this is one of those I will

21  ask you to keep handy, because we may look back at it.

22     A.      Okay.

23             (Plaintiff Exhibit 22 was marked for

24        identification.)

25             MR. QUINN:  Give us just a moment.

```
 1                     David Merriman
 2      A.      I'm not aware of anything to the contrary.
 3  BY MR. QUINN:
 4      Q.      Okay.  So trying to put these pieces
 5  together, then, looking at Exhibits 25 and 26, and
 6  even 24, again, it's indicating that in the same
 7  series of a few days in February of 2006, Mr. Trump
 8  films the video content in his office in New York with
 9  some of the ACN founders present.  And there's also,
10  at the same time, an event in Fort Worth, Texas, at
11  which the Trump endorsement is announced but Mr. Trump
12  doesn't appear personally.
13              Is that your best understanding?
14      A.      Yes.  Mr. Trump did not appear at the Fort
15  Worth convention.  And I see the other documentation,
16  they are all about the same.  Like you said, based on
17  the e-mails, it's approximately the same time.
18      Q.      Right.  Okay.  And so in the first line of
19  Exhibit 25, when Mr. Stevanovski says "It went great.
20  He said some perfect things that we can use for our
21  reps."
22              Do you see that?
23      A.      Yes.
24      Q.      He would appear there to be referring to
25  the video filming, right?
```

1                  David Merriman

2       A.      Well, not all of them, but some of them

3   would.  And I don't believe there ever would have been

4   a magazine that did not feature ACN that included the

5   Trumps.

6       Q.      I see.  If the Trumps were in, it was

7   because of ACN?

8       A.      Correct.  Correct.

9       Q.      But perhaps there were features about ACN

10  that didn't reference the Trumps in that period?

11      A.      That is possible, yes.

12      Q.      Okay.  Are you aware of any that didn't?

13      A.      I'm not, but --

14              (Reporter Clarification.)

15      A.      I did not go through them.  I did not

16  review all of those as -- either.

17      Q.      Did you review any Success from Home

18  features from that time period?

19      A.      Yes.

20      Q.      And the ones that you reviewed all featured

21  Mr. Trump?

22      A.      Yes.

23      Q.      Is that true of the opportunity discs as

24  well, all the versions of the opportunity disc from

25  2006, up until it was rolled into the website, which I

1                David Merriman

2  think we established was after mid-2014, all of those

3  also featured Mr. Trump?

4       A.    All of the versions that I reviewed from

5  the first one that included Mr. Trump until, I

6  believe, the last one or 2015, whatever time frame

7  that was, included -- featured President Trump as

8  well.

9       Q.    And in the context of Success from Home,

10  you know, was there sort of a similar process, as with

11  the live events where ACN would draft and create --

12  create the material and then send it to The Trump

13  Organization for collaboration, review and approval?

14      A.    I don't recall whether that was done by ACN

15  to The Trump Organization or if Success from Home and

16  their writers reached out directly to The Trump

17  Organization.

18      Q.    Okay.  Well, let's look through a few

19  documents about this.

20           (Plaintiff Exhibit 28 was marked for

21      identification.)

22  BY MR. QUINN:

23      Q.    Okay.  So this is an e-mail exchange from

24  October 2006 between Allan Van Buhler at ACN and Rhona

25  Graff at The Trump Organization, right?

1               David Merriman

2      A.     I think it was.

3      Q.     Okay.  And were recordings of Mr. Trump's

4  live appearances that are also woven into the

5  opportunity disc or other promotional materials?

6      A.      I don't remember if there were or if there

7  weren't, so I just don't remember, you know, to what

8  degree we used those and if they were allowed to be

9  used.

10     Q.     Okay.

11            (Reporter clarification.)

12     A.     Allowed to be used.  To the extent we were

13  allowed to use them.

14     Q.     All right.  So just putting those two

15  things together then, so perhaps some of these shorter

16  clips might have been woven into the opportunity disc,

17  and likewise, for clips of event appearance?  But the,

18  kind of, heart of the Trump portions of the

19  opportunity disc was from the 2006 filming?

20     A.     Based on the information we reviewed, that

21  makes sense to me.

22     Q.     Okay.  And that was true from 2006 through

23  2015, or at least up until whatever time in 2014 or

24  2015 the opportunity disc was no longer used?

25     A.     Yes.  I don't recall exactly, you know,

1                    David Merriman

2    agreement.

3                    (Plaintiff Exhibit 32 was marked for

4    identification.)

5    BY MR. QUINN:

6        Q.    Okay.  Exhibit 32 is a document produced by

7    The Trump Organization with a Bates TTO-000597, and

8    again, this appears to be a hard copy file with some

9    writing on it, but the document itself is a final

10   executed agreement dated January 28th, 2009; is that

11   right?

12       A.    Yes.

13       Q.    And you can see in that first paragraph, it

14   references the prior agreements dated February 6th,

15   2006 and February 8th, 2008, right?

16       A.    Yes.

17       Q.    Those are the ones that we looked at

18   earlier today?

19       A.    Yes.

20       Q.    All right.  And you can see, you know, here

21   again, in the first paragraph, there's discussion of

22   appearances at live events, right, this time four

23   distinct ACN events?

24       A.    Yes.

25       Q.    This time they are actually called national

1                        David Merriman

2   events, right, so even clearer, these are taking place

3   in the U.S.?

4        A.    I believe all of them did, yes.

5        Q.    Okay.  And again, this contract doesn't

6   speak to any separate filming or video content other

7   than the live appearances, right?

8        A.    It does not.

9        Q.    It does in paragraph 1, though, say ACN can

10  record the live appearances?

11       A.    That's correct.

12       Q.    With certain limitations on how those can

13  be used, right?

14       A.    Yes.

15       Q.    This also doesn't include any reference

16  still to Success from Home magazine, right?

17       A.    That is correct.

18       Q.    And yet, members of -- Mr. Trump

19  and members of his family or organization did continue

20  to appear in Success from Home magazine features that

21  featured ACN, right?

22       A.    I'm not sure about this time period, but

23  it's possible.

24       Q.    Okay.  Well, let's put that to the side

25  then, and mark the next document.

1          David Merriman

2    that SUCCESS, paren, (and he is the publisher), close

3    paren, are an unfair, unbalanced and biased

4    publication and, dash, all they want to probe him

5    about are his successes, his victories and all he does

6    to achieve.  They have no interest in controversy or,

7    quote, 'the other side of the story,' close quote.

8    Darren said he wants Mr. Trump to feel like he is

9    sitting down with a friend who wants to make him and

10   ACN look good, not an adversary.  Darren has a very

11   close relationship with ACN as well, so there would be

12   no surprises," right?

13        A.     That's what it says, yes.

14        Q.     Do you have any reason or basis to dispute

15   that characterization of Darren Hardy and Success that

16   Ms. Marcello wrote?

17        A.     No, I don't.  I don't -- I don't have any

18   opinion either way on this paragraph.

19        Q.     Okay.  You can put that to the side.

20             (Plaintiff Exhibit 36 was marked for

21        identification.)

22   BY MR. QUINN:

23        Q.     All right.  Let's look at the next

24   agreement.

25             All right.  Exhibit 36 is a document

1                  David Merriman

2    produced to us by The Trump Organization, with the

3    Bates TTO-000615, and this is a January 14th, 2011,

4    appearance and endorsement agreement, right?

5         A.      Yes.

6         Q.      And this, too, is a final binding agreement

7    executed by both Mr. Stevanovski and Donald Trump,

8    right?

9         A.      Yes.

10        Q.      And you can see, again, in the first

11   paragraph, there is -- there are terms about

12   appearance at 4 ACN Events, right?

13        A.      Yes.

14        Q.      But otherwise, there is no -- no term or

15   discussion about some separate video filming, nor is

16   there any reference to Success from Home, right?

17        A.      Correct.

18        Q.      Okay.  So let's shift gears a little bit.

19   I want to talk about the ACN appearances on the

20   Celebrity Apprentice.

21               As I think we mentioned this morning, ACN

22   was featured on two episodes of the Celebrity

23   Apprentice, right?

24        A.      Yes.

25        Q.      They aired in March of 2009 and March of

1                    David Merriman

2   cofounders who participated and appeared, and then the

3   producers had ultimate editorial control over, you

4   know, scripts and content as well as the final

5   editing?

6        A.    Yes.

7        Q.    And did ACN, similar to the first episode,

8   make efforts to promote the episode with its IBOs and

9   make reference to the appearance in various

10  ACN-created promotional materials?

11       A.    Yes.

12       Q.    All right.  Following the 2011 episode,

13  Mr. Trump and ACN continued working together under the

14  2011 endorsement agreement we looked at earlier?

15       A.    Yes.

16       Q.    And then in 2013, in early 2013, they

17  entered into another agreement to -- as you read --

18  clarified, not extends, but continue their contractual

19  relationship?

20       A.    Correct.

21       Q.    Let's take a look at that.

22             (Plaintiff Exhibit 52 was marked for

23  identification.).

24  BY MR. QUINN:

25       Q.    This agreement was actually produced to us

1                    David Merriman

2    as an attachment to an e-mail rather than as either a

3    standalone or part of a memo.  But if you turn to the

4    Bates number page with the Bates number TTO 000478 in

5    Exhibit 52.  You can see at that page, there begins a

6    longer formed document which is referred to in the

7    first line as an "Appearance Agreement."

8              Do you see that?

9    A.       Yes.

10   Q.       And it says, "The appearance agreement is

11   entered into, as of February 13th, 2013"?

12   A.       Yes.

13   Q.       And if you flip to the Bates -- the page

14   with the Bates number ending in 486, you can see that

15   it's a final executed agreement signed by both Robert

16   Stevanovski and Donald Trump, right?

17   A.       Yes.

18   Q.       Now, as we put it out a moment ago, this

19   one's entitled appearance agreement rather than

20   endorsement agreement or appearance and endorsement

21   agreement.  Do you know why that is?

22   A.       No, I think this is primarily focussed on

23   his appearing at ACN events.

24   Q.       Well, that was true also of the January '09

25   agreement and the 2011 agreement, right, in the sense

1                      David Merriman

2      that they were just for event appearances and not the

3      kinds of video filming that we saw in earlier

4      agreements, right?

5          A.      Yes.  So I -- yes.  There is an agreement,

6      right?  The title wasn't as important to us as the

7      content.

8          Q.      Let me try to ask it this way.  Are you

9      aware of discussion with The Trump Organization,

10     specifically focussed on no longer using the term

11     endorsement to describe the nature of that

12     relationship?

13         A.      I am not, no.

14         Q.      And what we've seen now, which by this

15     point ACN had used the word "endorsed," you know,

16     endorsed by Donald Trump in any number of promotional

17     materials and, you know, including magazines and discs

18     and that sort of thing, right?

19         A.      Yes.

20         Q.      Okay.  Now, in paragraph 1, you can see the

21     agreement is also much longer, right?  Most of the

22     others have been a page or page and a half.  This is

23     quite a few pages.

24         A.      Yes.

25         Q.      And in paragraph 1, there is also, you

```
 1                    David Merriman

 2   know, again, explicit language -- let me just find

 3   that.  Yes, starting about four lines down where there

 4   are -- there is a discussion of the events that

 5   Mr. Trump has agreed to appear at.  And it says, "Each

 6   event should promote ACN's network business to ACN's

 7   sales force and shall promote nothing else."

 8            Do you see that?

 9   A.       Where are you looking?

10   Q.       Starting about four lines down in paragraph

11   1 on the first page.

12   A.       Oh, okay.

13   Q.       So that text appears there, right?  "Each

14   event shall promote ACN's network marketing business

15   to ACN's sales force and shall promote nothing else,"

16   right?

17   A.       Yes.

18   Q.       It also comits to 10 events, right, as

19   opposed to in some of the others we saw three or four,

20   right?

21   A.       Yes.

22   Q.       And then again, in paragraph 3, you know,

23   just at a high level, it, again, acknowledges that ACN

24   is going to record these events, and that it may make

25   use of some of that footage for certain purposes?
```

1                        David Merriman

2        A.      Yes.

3        Q.      And goes on to say, as we've also seen in

4   some of the prior agreements, that Mr. Trump will make

5   himself available to film short little video clips for

6   use at events or for what's called pick up here,

7   right?

8        A.      Yes.

9        Q.      And that's different than the 2006 video

10  filming, that was a much longer form of filming that

11  was then used in the opportunity disc, right?

12       A.      I'm not sure that -- I don't see those.  I

13  don't see any limitation in terms of -- it says, "No

14  such taping shall take more than one hour."  I might

15  be missing it, but I don't see anything that says how

16  long each video could be.

17       Q.      Like on the fourth line on the second page,

18  there is a reference that shall not exceed 10 minutes?

19       A.      10 minutes, right.

20       Q.      Okay.  So these are those shorter clips,

21  not the bigger --

22       A.      The shorter clips we are looking at would

23  have been more like 30 second clips, so, you know, 10

24  minutes is obviously much longer than that.

25       Q.      Uh-huh (affirmative).

1                    David Merriman

2           MR. QUINN:  Do we need to go off the

3      record?

4           THE VIDEOGRAPHER:  No.

5 BY MR. QUINN:

6      Q.    I want to confirm we are still recording

7 the Zoom, correct?  Okay.

8           Well, in all events, at this time, ACN

9 still had the video recordings from the 2006

10 agreement, the 2008, the other agreements, right?

11     A.    Yes.

12     Q.    Okay.  And there is also a new component

13 here that we see for the first time in this agreement

14 in paragraph 4, which refers to, among other things, a

15 weekly inspirational note, as well as, finally now in

16 black and white, appearances in SUCCESS magazine or

17 Success from Home, right?

18     A.    Yes.

19     Q.    And again, just so the record is clear,

20 this is the first time that a reference to a success

21 publication has been included in -- in an agreement

22 between Mr. Trump and ACN, right?

23     A.    Yes.

24     Q.    But Mr. Trump and his adult children and

25 members of the organization had been featured in

# EXHIBIT 2

**US IBO Data**

| 2012 | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New IBOs | 6,568 | 6,984 | 7,988 | 6,455 | 5,872 | 6,790 | 6,206 | 5,375 | 3,929 | 6,832 | 4,987 | 4,910 |
| Renewals | 2,651 | 2,682 | 2,931 | 2,180 | 1,926 | 1,806 | 2,104 | 1,928 | 1,907 | 2,006 | 1,600 | 1,661 |
| Drops | 6,141 | 5,371 | 8,254 | 4,999 | 4,162 | 3,672 | 5,690 | 5,904 | 6,218 | 5,982 | 6,382 | 6,371 |
| Ending Count | 96,427 | 97,613 | 95,734 | 97,456 | 97,710 | 99,118 | 96,516 | 95,471 | 93,711 | 96,850 | 94,605 | 94,539 |

| 2013 | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New IBOs | 6,696 | 6,450 | 7,945 | 6,328 | 5,966 | 5,459 | 6,920 | 6,323 | 6,547 | 6,598 | 5,297 | 4,961 |
| Renewals | 2,548 | 2,425 | 2,729 | 2,149 | 2,020 | 2,320 | 2,329 | 2,014 | 1,889 | 2,064 | 1,560 | 1,733 |
| Drops | 6,365 | 6,796 | 8,374 | 6,627 | 5,849 | 6,320 | 6,345 | 5,503 | 4,414 | 6,778 | 5,306 | 4,876 |
| Ending Count | 94,870 | 94,524 | 94,095 | 93,796 | 93,913 | 93,052 | 93,627 | 94,447 | 96,580 | 96,400 | 96,391 | 96,476 |

| 2014 | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New IBOs | 6,958 | 6,467 | 8,019 | 6,259 | 5,706 | 4,737 | 5,328 | 4,640 | 5,432 | 4,923 | 3,293 | 3,916 |
| Renewals | 2,429 | 2,378 | 2,609 | 2,179 | 1,813 | 1,883 | 2,085 | 1,848 | 1,979 | 1,939 | 1,595 | 1,825 |
| Drops | 7,010 | 6,499 | 8,215 | 6,548 | 6,201 | 5,667 | 7,310 | 6,551 | 6,619 | 6,594 | 5,694 | 5,158 |
| Ending Count | 96,424 | 96,392 | 96,196 | 95,907 | 95,412 | 94,482 | 92,500 | 90,589 | 89,402 | 87,731 | 85,330 | 84,088 |

| 2015 | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New IBOs | 4,013 | 4,358 | 4,962 | 4,281 | 3,074 | 3,243 | 4,581 | 3,708 | 2,885 | 2,869 | 2,041 | 2,363 |
| Renewals | 2,456 | 2,371 | 2,577 | 2,086 | 1,696 | 1,872 | 2,016 | 1,863 | 1,851 | 1,983 | 1,376 | 1,517 |
| Drops | 6,867 | 6,387 | 8,078 | 6,341 | 5,599 | 5,143 | 5,372 | 4,781 | 5,819 | 5,037 | 3,739 | 4,429 |
| Ending Count | 90,058 | 88,029 | 84,913 | 82,853 | 80,328 | 78,428 | 77,637 | 76,564 | 73,630 | 71,462 | 69,764 | 67,698 |

| 2016 | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New IBOs | 2,250 | 2,877 | 3,126 | 1,836 | 1,764 | 1,518 | 2,229 | 2,211 | 2,414 | 1,820 | 1,224 | 1,938 |
| Renewals | 2,010 | 2,141 | 2,183 | 1,614 | 1,421 | 1,464 | 1,729 | 1,485 | 1,486 | 1,389 | 1,127 | 1,235 |
| Drops | 4,522 | 4,536 | 5,589 | 4,965 | 3,447 | 3,762 | 4,893 | 4,053 | 3,691 | 3,453 | 2,492 | 2,884 |
| Ending Count | 67,259 | 65,600 | 63,137 | 60,008 | 58,325 | 56,081 | 53,417 | 51,575 | 50,298 | 48,665 | 47,397 | 46,451 |

ACN000685
CONFIDENTIAL

# EXHIBIT 3

*McKoy, et al., v. The Trump Corporation, et al.,* Case No. 1:18-cv-09936 (S.D.N.Y)
Expert Report of Michael Gartenberg
November 18, 2022
Confidential – Subject to Protective Order

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE MCKOY, MARKUS FRAZIER, and LYNN CHADWICK, individually and on behalf of all others similarly situated<br><br>*Plaintiffs,*<br><br>v.<br><br>THE TRUMP CORPORATION, DONALD J. TRUMP, in his personal capacity, DONALD TRUMP JR., ERIC TRUMP, and IVANKA TRUMP,<br><br>*Defendants.* | No. 1:18-cv-09936-LGS |

<u>**EXPERT REPORT OF MICHAEL GARTENBERG**</u>

**November 18, 2022**

9.      The research methods that I used to conduct my assignment required the compilation, evaluation, and analysis of facts and data available to me, including publicly available market data from U.S. government sources and industry participants, articles from public media, and product reviews on the Internet.  This is the type of information that I have regularly relied on to provide research analysis to clients throughout my career as a personal technology analyst.  I also reviewed and analyzed documents produced and deposition testimony provided during discovery in this case.  The research methods that I used to conduct my assignment are reliable, valid, and of the type used by leading IT research and advisory firms in practice.

## III.    Summary of Opinions

10.     Applying the methods I describe above, in my expert opinion, ACN's videophone was not a commercially viable personal technology product at any point during the period it was offered from 2006 through 2015.  Based on my review of consumer technology product market trends, there was never a market for a desktop-based videophone such as ACN's at any point from 2006 through 2015 because such desktop videophones were continually eclipsed and outperformed by other products throughout the period, as outlined below:

- In 2006, when ACN launched its videophone, there was virtually no market for desktop videophones, notwithstanding the efforts of multiple competitors.  By the time the first ACN videophone was introduced in 2006, desktop videophones were already available to U.S. consumers but had failed to achieve any meaningful traction in the market, which illustrates both that desktop videophones were not a new idea and that consumers did not want them. In contrast, Skype launched video calling via desktop computer software in 2006 and already had 6 million registered users in the U.S. that year.  As a new entrant in this market environment, ACN's videophone was dead on arrival because consumers already had easy access to broadband and had widely adopted personal computers that would allow them to take advantage of Skype and other peer web-based video calling options that only proliferated and improved from 2006 onward.

- Indeed, after 2006, the market environment only became less welcoming to desktop videophones like ACN's as the adoption of personal computers, broadband speeds, and the quality and adoption of alternative computer-based video calling options, such as Skype and Google Talk, further increased. In the late 2000s and early 2010s, laptops with built-in webcams and Wi-Fi connectivity increasingly eclipsed desktop computers, further easing consumers' ability to make high-quality video calls on their laptops from the convenience of wherever they were sitting, rendering a wire-tethered desktop product like ACN's videophone even less competitive than it already was.

- Later in the 2000s, smartphones began to take the consumer technology sector by storm, and cellular broadband networks became more commonplace in the U.S. market over a period stretching into the early-and mid-2010s. These trends further reinforced the non-existent commercial prospects of a product like the ACN videophone, given that, by no later than 2011, the technology was in place for consumers to place Skype or FaceTime video calls from their smartphones using Wi-Fi as they walked around their house, or even down the street using cellular data networks by 2012.

11.    Moreover, even if there had been a market for desktop videophones from 2006 through 2015 (which there was not), ACN's videophone was unappealing to U.S. consumers due to several design flaws inherent in the product itself. Specifically, ACN's videophone: (a) could only be used to place video calls to other ACN videophones, which dramatically limited its consumer appeal; (b) was awkward to use and needed to be plugged into both an ethernet modem and a power source, which meant it could not be used for impromptu, high-quality video calls from anywhere in one's home or office; (c) was technologically inferior and difficult to use; and (d) was not remotely cost competitive relative to other competing video calling services at the time such as Skype, nor did it offer anything approaching the same scope of functionality and level of convenience that similarly priced smartphones offered later on.

12.    As to the second question I consider in this report, I conclude that ACN's videophone generated minimal industry and consumer interest and failed to achieve any market success from 2006 through 2015, which is unsurprising, and indeed expected given the market

# EXHIBIT 4

## [RESERVED]

# EXHIBIT 5

The Trump Organization

# Memo

| | |
|---|---|
| To: | Allen Weisselberg, Michelle Lokey & Stella Lane |
| From: | Cathy Glosser |
| CC: | Melissa Nicchitta |
| Date: | February 6, 2006 |
| Re: | ACN, Inc. |

Good Day,

Attached is a copy/original of the newly executed speaker's agreement between Donald J. Trump and ACN Incorporated.

Thank you,

Cathy

1

Confidential Treatment Pursuant to Protective Order

## Endorsement AGREEMENT

This agreement is entered into this day of February 6, 2006 between ACN, Inc. of Farmington Hills, Michigan hereinafter referred to as ACN, and Donald J. Trump of New York, New York hereinafter referred to as Mr. Trump. The parties agree that Mr. Trump will endorse ACN as a celebrity and will commit to speaking engagements at ACN International Events on the following terms:

1. Mr. Trump will provide celebrity endorsement services; specifically, Mr. Trump will appear on-camera to be taped to produce ten to fifteen minutes finished video content of Mr. Trump (the "Production Content"); provided such taping can be done in the offices of The Trump Corporation shall take no more than two (2) hours of Mr. Trump's time. ACN agrees to pay Mr. Trump $1,000,000 USD for this service. Payment will be made as follow: $250,000 will be paid on signing of this agreement. $500,000 will be paid on February 14th (the day of the video shoot) and $250,000 will be paid no later then a week after both parties have approved the footage.

2. Concepts to be incorporated into Mr. Trump's endorsement could include, but would not be limited to: edification of ACN—the company and their vision; importance of teamwork; entrepreneurial message; value of having a personal vision; how one must seize an opportunity and make the most of it; taking advantage of timing in the marketplace; and a greeting from Mr. Trump to the ACN sales representatives. Content will be outlined and agreed upon by both parties before and during filming to allow both spontaneity on the part of Mr. Trump and consistency with the corporate strategy of ACN.

3. The content determination will be completed as promptly as possible after execution of this agreement, such that the filming of Mr. Trump will be completed in New York City in his offices within 45 days of the execution of this agreement, at a mutually convenient time.

4. The Production Content to be used by ACN will be agreed upon to the satisfaction of both parties during the scripting and filming process.

5. Mr. Trump also agrees to attend and speak live before an ACN audience on three occasions in the next 24 months, scheduling of which will be determined by coordinating the dates of ACN's International Events and the availability of Mr. Trump. Each talk will be approximately one hour. ACN will pay Mr. Trump $1,000,000 USD total for these speaking engagements, payable in one-third increments, immediately prior to each engagement. Mr. Trump agrees that ACN and Mr. Trump will mutually agree on speech content. ACN tapes its International Events and Mr. Trump agrees that the footage of him giving a talk may be taped and a minimal portion not to exceed 120 seconds may be used by ACN to promote future talks by Mr. Trump only as part of ACN's license to the Production Content; provided such footage approved by Mr. Trump in his sole discretion

6. Mr. Trump hereby grants to ACN the right to use the video for internal purposes only until the date of the last speech or, in any event, no less than 12 months or later than 24 months from the date of execution of this agreement, a royalty free license to the Production Content for use by ACN for CD/DVD use only to solely promote ACN to sales representatives. ACN's permitted use would include, but not be limited to, use in activities promoting ACN and its vision to ACN sales representatives, or use in sales, training and motivational aids prepared for ACN's sales representatives. ACN's permitted use would not include movie theatre, television, television advertising, or any mass distribution not targeted specifically to prospective or existing ACN sales representatives, for internal purposes only.

7. Mr. Trump agrees to permit the use of mutually approved still images of Mr. Trump, and a written quote from Mr. Trump and short video clip from the video production of Mr. Trump for publication on the ACN website only for use until the conclusion of Mr. Trump's last speaking engagement for ACN as provided for in this agreement.

8. This agreement is the entire agreement between the parties and may be amended or altered only in writing, signed by both parties. This agreement is governed by the laws of the State of New York.

ACN, Inc.:

By: _____

**Robert Stevanovski**
Chairman & Co-founder, ACN

_____

**Donald J. Trump**
Chairman and President

Page 1 of 1

**Confidential Treatment Pursuant to Protective Order**

# EXHIBIT 6

| | |
|---|---|
| **From:** | Robert Stevanovski <rstevano@acninc.com> |
| **Sent:** | Wednesday, February 15, 2006 11:39 AM |
| **To:** | Tony Cassara |
| **Subject:** | RE: Trump |

It went great, he said some perfect things that we can use for our reps.

We got the biggest response that we ever got at a event with a announcement. The reps are more excited then I ever had seen them.

---

**From:** Anthony Cassara [mailto:acassara@cassaramgi.com]
**Sent:** Wednesday, February 15, 2006 7:59 AM
**To:** Robert Stevanovski
**Subject:** Trump

Roberto...how did things go with Donald?

Anthony J. Cassara
Cassara Management Group, Inc.
2440 Ridgeway Avenue, Suite 120
Rochester, NY 14626
585-720-1730 (office)
585-720-1790 (fax)
585-721-9151 (cell)
acassara@cassaramgi.com

1

**CONFIDENTIAL**

**ACN004304**

# EXHIBIT 7

## ENDORSEMENT AGREEMENT

This agreement (this "**Endorsement Agreement**") is entered into this _____ day of February, 2008 between ACN, Inc. of Farmington Hills, Michigan (hereinafter referred to as "**ACN**"), and Donald J. Trump of New York, New York (hereinafter referred to as "**Mr. Trump**"). The parties agree that Mr. Trump will endorse ACN and will commit to promoting ACN on the following terms:

1. Mr. Trump will provide celebrity endorsement services; specifically, Mr. Trump will appear on-camera to be taped to produce finished video content of Mr. Trump (the "Production Content"); provided such taping can and shall be done in the offices of The Trump Organization located at 725 Fifth Avenue, New York, NY, ("**Mr. Trump's Office**") and shall take no more than three (3) hours of Mr. Trump's time. Additionally, Mr. Trump agrees to film three (3) "Video Pick-Ups" (as defined below) during the term of this agreement; provided the shooting of each Video Pick-Up can and shall be done in Mr. Trump's Office and shall take no more than one (1) hour of Mr. Trump's time. "**Video Pick-Ups**" shall mean video segments that revise Production Content that had previously been filmed, either to update the Production Content in connection with current events concerning ACN's business, or to reflect particular events at which the Production Content will be shown. In return for the rights granted to ACN under this Endorsement Agreement, ACN agrees to pay Mr. Trump $2,250,000 USD (the "**Fee**"), which shall be paid as follows: $875,000 will be paid on signing of this agreement, $750,000 will be paid on the day of the first video shoot, $325,000 will be paid on the day of the second shoot, and $300,000 shall be paid on the day of the third shoot. Notwithstanding the foregoing, the entire Fee shall have been paid on or before June 1, 2009, regardless of the timing of any video shoots.

2. Concepts to be incorporated into Mr. Trump's endorsement could include, but would not be limited to: edification of ACN—the company, their products and their vision; importance of teamwork; entrepreneurial message; value of having a personal vision; how one must seize an opportunity and make the most of it; taking advantage of time in the marketplace; and greetings from Mr. Trump to the ACN sales representatives. Content will be outlined and agreed upon by both parties before and during filming to allow both spontaneity on the part of Mr. Trump and consistency with the corporate strategy of ACN. Notwithstanding anything in this Endorsement Agreement to the contrary, Mr. Trump shall have approval rights over any and all uses of his voice, likeness, image name and all Production Content before any are used, in his sole discretion.

3. The content determination will be completed as promptly as possible after execution of this agreement, such that the filming of Mr. Trump will be completed in Mr. Trump's Office within 120 days of the execution of this agreement, at a mutually convenient time but in all events subject to Mr. Trump's schedule.

4. Mr. Trump hereby grants to ACN the right during the Term (as defined below) to use Production Content that was approved by Mr. Trump in activities promoting ACN and its vision to prospective or existing ACN sales representatives, or use in sales, training and motivational aids prepared for ACN's sales representatives, including DVDs and CD ROMs. ACN's permitted use shall not include movie theatre, television, or television advertising, and shall not include any mass distribution not targeted specifically to prospective or existing ACN sales representatives.

5. Mr. Trump agrees to permit during the Term, but all subject to his prior approval in his sole discretion, the use of still images of Mr. Trump, written quotes from Mr. Trump and short video clips from the video production of Mr. Trump for publication on the ACN website during the Term.

6. The "**Term**" shall commence on the date hereof and shall expire on December 31, 2010 (the "**Expiration Date**"). All rights granted hereunder to ACN shall expire on the Expiration Date. Without limitation, ACN shall destroy or return to Mr. Trump all video footage including all copies shot under this Endorsement Agreement and any CDs and DVDs still in ACN's possession. On or before the Expiration Date, ACN shall remove all content used on its website under this Endorsement Agreement. Notwithstanding anything herein to the contrary, the provisions of paragraphs 7 and 8 shall survive the expiration of the Term.

7. Notwithstanding anything to the contrary contained herein, ACN understands and agrees that it shall not use Mr. Trump's name, image, likeness or voice in any manner that would hold up to ridicule any of Mr. Trump or his family members or businesses that he or they own or control, directly or indirectly, or the affiliates of such businesses (collectively the "**Trump Parties**"), or damage the name, image or reputation of any of the Trump Parties.

8. ACN hereby agrees to indemnify, defend, and hold free and harmless the Trump Parties from and against any and all liabilities, claims, losses, causes of action (including without limitation under contract or tort) and reasonable out-of-pocket expenses, including, without limitation, interest, penalties, reasonable attorneys' fees and expenses and third party fees, and all amounts paid in the investigation, defense, and/or settlement of any claims, suits, proceedings, judgments, losses, damages, costs, liabilities and the like (individually and collectively, "**Claims**"), which may be suffered, incurred or paid by any of the Trump Parties

**Confidential Treatment Pursuant to Protective Order**

arising, in whole or in part, directly or indirectly, from ACN's negligence or willful misconduct or actions in connection with or breach of this Endorsement Agreement.

9. This agreement is the entire agreement between the parties and may be amended or altered only in writing, signed by both parties. Notwithstanding anything herein to the contrary, (i) ACN acknowledges that, in addition to the Fee, it shall pay to Mr. Trump the amount of $333,333.33 to satisfy ACN's obligations under a previous agreement between ACN and Mr. Trump, dated February 6, 2006 (the "2006 Agreement"); and (ii) Mr. Trump acknowledges and agrees that he shall give one live speech as provided in the 2006 Agreement, to satisfy his obligation to do so thereunder.

ACN, Inc.
By _____
Robert Stevanovski
Chairman and Co-founder, ACN

_____
Donald J. Trump

TTO_000592

# EXHIBIT 8

## Appearance and Endorsement Agreement

This agreement (this "**Agreement**") is entered into this 28th day of January, 2009 between ACN, Inc. of Concord, North Carolina (hereinafter referred to as "**ACN**"), and Donald J. Trump of New York, New York (hereinafter referred to as "**Mr. Trump**") and is entered into in conjunction with the agreements entered into between Mr. Trump and ACN dated as of February 6, 2006 and February 2008 (the "**Prior ACN Agreements**"). Mr. Trump and ACN may be referred to herein collectively as the "**Parties**". The Parties agree that in accordance with this Agreement, Mr. Trump will commit to speaking engagements at ACN National Events on the following terms:

1.  Mr. Trump will appear live and speak on stage before an ACN audience at four distinct ACN National Events (with Mr. Trump, in his sole discretion, having the right to substitute an ACN International Event for any of the four National Events) on or before December 31, 2010 (the "**Trump Obligations**"). The dates of the Trump Obligations will be determined by coordinating the dates of ACN's International Events and the availability of Mr. Trump; the December 31, 2010 date may be extended by mutual agreement of ACN and Mr. Trump to accommodate this scheduling (with such extension being subject to Mr. Trump's sole discretion). The Parties agree that the first of the Trump Obligations will be held in Charlotte, NC on Sunday, June 28th, 2009. Each Trump Obligation will be approximately one hour. ACN will pay Mr. Trump $375,000 in US dollars for each of the Trump Obligations and shall transfer the full amount to Mr. Trump within 10 days prior to the scheduled date of the corresponding Trump Obligation. Mr. Trump and ACN will mutually agree on speech content. The fee for the Trump Obligations is $1,500,000 in US dollars, to be paid in accordance with the terms of this Agreement. Mr. Trump acknowledges and agrees that ACN may video record these appearances, and that the footage, in an amount not to exceed 5 minutes ("**Appearance Footage**"), may be used by ACN for promotion of the Trump Obligations through December 31, 2010 (unless otherwise extended in the sole discretion of Mr. Trump); provided however, such footage and its use must be approved by Mr. Trump, in his sole discretion. Mr. Trump gives ACN the right through the expiration of the Term (as defined herein) to use the Appearance Footage for the sole purpose of, and as limited by, fulfillment of this Agreement.

2.  This Agreement is the entire agreement between the Parties with respect to the Trump Obligations, and may be amended or altered only in writing, signed by the Parties. This Agreement does not supersede or modify in any way the Prior ACN Agreements, and is intended by the Parties to be in addition to and in conjunction with the Prior ACN Agreements. This Agreement is governed by the laws of the State of New York.

3.  The term of this Agreement shall commence on the date hereof and shall expire on December 31, 2010 (the "**Term**"); provided however, that to the extent that ACN and Mr. Trump agree to extend the Term to accommodate the scheduling of appearances as described in Section 1 of this Agreement (with such extension being subject to Mr. Trump's sole discretion), the Term shall automatically extend to the date of the final appearance hereof.

4.  Notwithstanding anything to the contrary contained herein, ACN understands and agrees that it shall not use Mr. Trump's name, image, likeness or voice in any manner that would hold up to ridicule Mr. Trump or any of his family member s or businesses that he or they own or control, directly or indirectly, or the affiliates of such businesses (collectively the "**Trump Parties**"), or damage the name image or reputation of any of the Trump Parties.

5.  ACN hereby agrees to indemnify, defend, and hold free and harmless the Trump Parties from and against any and all liabilities, claims, losses, causes of action (including without limitation under contract or tort) and reasonable out-of-pocket expenses, including, without limitation interest penalties, reasonable attorneys' fees and expenses and third party fees, and all amounts paid in the investigation, defense and/or settlement of any claims, suit proceedings, judgments, losses, damages, costs liabilities and the like (individually and collectively, "**Claims**"), which may be suffered, incurred or paid by any of the Trump Parties arising in whole or in part, directly or indirectly, from ACN's negligence or willful misconduct or action in connection with or breach of this Agreement.

ACN, Inc.

By: _____

Robert Stevanovski
Chairman & Co-Founder

Donald J. Trump

Page 1 of 1

**Confidential Treatment Pursuant to Protective Order**

# EXHIBIT 9

Appearance and Endorsement Agreement, 2011-2013

This Appearance and Endorsement Agreement (this "**Agreement**") is entered into this JANUARY 14, 2011 between ACN, Inc. of Concord North Carolina (hereinafter referred to as "**ACN**"), and Donald J. Trump of New York, New York (hereinafter referred to as "**Mr. Trump**"). The parties agree that Mr. Trump will commit to speaking engagements at ACN International Events on the following terms:

    **1.**    Mr. Trump will appear live and speak on stage before an ACN audience at <u>four distinct ACN Events on or before April 1, 2013</u> and Mr. Trump, in his sole discretion, shall have the right to fulfill this obligations hereunder by speaking at either ACN events held in the United States or internationally. The dates of the appearances will be determined by coordinating the dates of ACN's Events and the availability of Mr. Trump; the term of this Agreement (the "**Term**") will begin March 31, 2011, after Mr. Trump's appearance in Barcelona, Spain, for ACN, and will continue until April 1, 2013. It may be extended by mutual agreement of ACN and Mr. Trump to accommodate his scheduling. Each speaking event will be approximately one and one-half (1.5) hours, inclusive of the speech, question and answer session and organized meet and greet. ACN will pay Mr. Trump $400,000 for each of the events, plus the cost of two first-class roundtrip tickets for International events, and the full amount for each event to be transferred to Mr. Trump within ten (10) days prior to a corresponding appearance. Mr. Trump and ACN will mutually agree on speech content and format. The fee for the four appearances is $1,600,000. Mr. Trump acknowledges and agrees that ACN may video record these appearances for the internal promotion of ACN and Mr. Trump's ACN relationship, and that the footage, in an amount not to exceed ten (10) minutes ("**Appearance Footage**") without written agreement, may be used by ACN for promotion; provided however, such footage and the manner of its use must be approved by Mr. Trump, in his sole discretion. Mr. Trump will also appear one time on-camera to be taped to produce ten (10) minutes finished video content as pick-ups and greetings for the Appearance Footage, provided taping can be done at Mr. Trump's office in Trump Tower and shall take no more than one (1) hour. Mr. Trump gives ACN the right during the Term to use the Appearance Footage for the sole purpose of, and as limited by, fulfillment of this Agreement.

    **2.**    This Agreement is the entire agreement between the parties with respect to the appearances described above, and may be amended or altered only in writing, signed by both parties. This Agreement does not supersede or modify in any way the Endorsement and Speaking Agreement executed by the parties January 2009, and is intended by the parties to be in addition to that agreement. This Agreement is governed by the laws of the State of New York.

    **3.**    As stated above, the Term of this Agreement shall commence on March 31, 2011 and shall expire on March 31, 2013; provided however, that to the extent that ACN and Mr. Trump agree to extend the end date to accommodate the scheduling of appearances as described in Section 1 of this Agreement, the Term shall automatically extend to the date of the final appearance scheduled in accordance with this Agreement.

    **4.**    Notwithstanding anything to the contrary contained herein, ACN understands and agrees it shall not use Mr. Trump's name, image, likeness or voice in any manner that would hold up to ridicule Mr. Trump or any of his family members or businesses that he or they own or control, directly or indirectly, or the affiliates of such businesses (collectively the "**Trump Parties**"), or damage the name image or reputation of any of the Trump Parties.

    **5.**    ACN hereby agrees to indemnify, defend, and hold free and harmless the Trump Parties from and against any and all liabilities, claims, losses, causes of action (including without limitation under contract or tort) and reasonable out-of-pocket expenses, including, without limitation interest penalties, reasonable attorneys' fees and expenses and third party fees, and all amounts paid in the investigation, defense and/or settlement of any claims, suit proceedings, judgments, losses, damages, costs liabilities and the like (individually and collectively, "**Claims**"), which may be suffered, incurred or paid by any of the Trump Parties arising in whole or in part, directly or indirectly, from ACN's negligence or willful misconduct or action in connection with or breach of this Agreement.

**ACN, Inc.**

By _____
**Robert Stevanovski**
Chairman & Co-founder, ACN, Inc.

_____
**Donald J. Trump**
Chairman and President

Page 1 of 1

**Confidential Treatment Pursuant to Protective Order**

# EXHIBIT 10

This Appearance Agreement (this "**Agreement**") is entered into as of February 13, 2013 between ACN, Inc., a corporation organized under the laws of the state of Michigan with an address at 1000 Progress Place, Concord, NC 28025 (hereinafter referred to as "**ACN**"), and Donald J. Trump, an individual with an address at 725 Fifth Avenue, New York, New York 10022 (hereinafter referred to as "**Mr. Trump**", and sometimes hereinafter referred to collectively with ACN as the "**Parties**" and individually each of them a "**Party**"). The Parties agree that Mr. Trump shall provide the services described below, for the compensation described below, on the following terms:

     **1.**     Events; Promotional Services. ACN shall at its sole cost during the Term (as defined below) organize and stage ten (10) distinct events (as further described herein, each an "Event"), no less than one (1) Event per any calendar year and no less than three (3) Events in any consecutive two (2) calendar years. Each Event shall promote ACN's network marketing business to ACN's sales force (each an "**Event**"), and shall promote nothing else (and be attended solely by ACN's executives and employees, and ACN's independent business owners ("IBOs") or by invitation of ACN only), and such promotion of ACN shall be the central feature of each Event. No less than eight (8) of the ten (10) Events hereunder shall occur in the lower forty-eight (48) states of the United States. The specific dates and locations of the Events will be mutually determined by the Parties, and ACN shall coordinate such dates with the availability of Mr. Trump. The term of this Agreement (the "**Term**") will begin March 31, 2013, and will continue until April 1, 2018. The Term may be extended for no more than six (6) months by mutual agreement of ACN and Mr. Trump in the sole discretion of each of them, either to accommodate Mr. Trump's schedule, or in the event that the tenth (10th) such Event shall not have been staged during the Term.

     **2.**     Personal Appearance and Live Speech at Events. Mr. Trump agrees to appear, subject to the provisions of the Exclusivity Restrictions (as defined below), live and speak on stage before an audience consisting of ACN's employees and IBOs at such Events. Mr. Trump and ACN will mutually agree on the speech topic, format (i.e., monologue or interview) and basic talking points; provided that the specific content of the speeches shall be subject to Mr. Trump's sole discretion. The services to be provided by Mr. Trump at each Event shall be approximately two (2) consecutive hours (but in no event more than three (3) consecutive hours, unless mutually agreed upon by the Parties in their sole discretion) commencing from his arrival at the venue of the applicable Event, inclusive of all services. Such services shall include the above described interview or speech and may include one or more of the following: a question and answer session, video interview (of no more than ten (10) minutes in length) consisting of greetings for new ACN top leaders, and an organized meet and greet with photographs, each and all of the foregoing as shall mutually be agreed upon by the Parties; and, no more than once per calendar year, such activities at an Event may include a lunch with the ACN executives at such Event.

     **3.**     Recorded Footage; Photographs. Mr. Trump acknowledges and agrees that ACN may video record Mr. Trump's live presentation at each Event (the "**Appearance Footage**"), subject to the Video Conditions (as defined below). In addition, if requested, Mr. Trump will also be available no more than two (2) times per calendar year to make an on-camera, taped recording of a promotional greeting and subsequent video pick-up for the promotion of his Event appearances, provided that such taping shall be done at Mr. Trump's office in Trump Tower, New York, NY (subject in each case to ACN's entering into a location agreement with the owner of such premises on such owner's form, which shall include obligations on the part of ACN at ACN's sole cost to provide insurance covering such activities on such premises), or such other location as shall be mutually agreed upon, and no such taping shall take more than one (1) consecutive hour, and such footage shall be subject to the Video Conditions (the "**Video**

Recording Sessions"). The "**Video Conditions**" shall mean that applicable recorded footage of Mr. Trump (i) may only be used internally to motivate ACN's IBOs during the Term and by individual IBOs during the Term to promote ACN opportunities to individual, potential sales representatives, (ii) shall not exceed ten (10) minutes, and (iii) shall be solely in DVD format and/or on the ACN corporate website, www.acninc.com (the "**ACN Website**") or any website issued by ACN for IBOs (the "**ACN-issued Websites**") (provided that such DVD shall be distributed solely to ACN's personnel and IBOs, or to such governmental agency or regulatory body as may be required by law, and that the ACN Website and ACN-issued Websites shall be solely internal websites inaccessible to the general public and not available to search engines queries (the "**Internal Website Requirements**") such that the video footage appearing on the ACN Website and/or ACN-issued Websites shall only be accessible by ACN's personnel and ACN's IBOs). Mr. Trump acknowledges and agrees that ACN may also photograph Mr. Trump at the ACN Events and Video Recording Sessions, and use such photographs for promotional purposes as part of the promotional activities expressly contemplated by this Agreement, subject to the requisite approvals; as an example of the foregoing, the photographs may appear along with (1) videos used in accordance with this Agreement and (2) the Magazine Article (as defined below) in accordance with Section 4 below. In addition, photographs (but no video footage) of Mr. Trump may appear on the home page of the ACN Website indicating that Mr. Trump appeared at or is scheduled to appear at applicable Events, and for similar reasons that shall be subject to Mr. Trump's approval in his sole discretion. As shall be requested by Mr. Trump from time to time, ACN shall provide Mr. Trump with copies of photographs of Mr. Trump selected by Mr. Trump that shall have been taken by or on behalf of ACN pursuant to this Agreement.

    4.    Inspirational Note; Magazine Article; Replacement Projects. Mr. Trump also agrees to collaborate with ACN, as set forth below in this paragraph, on an inspirational weekly note of encouragement by Mr. Trump to ACN's representatives (each an "**Inspirational Note**") to appear on the ACN Website until the expiration or termination of this Agreement. Material for such purposes will be prepared by ACN, and presented by ACN to Mr. Trump for his approval in advance each quarter; such approval shall be in Mr. Trump's sole discretion. ACN may cause an article (similar to the article featuring Mr. Trump that prior to the date hereof appeared in SUCCESS Magazine) indicating Mr. Trump's services provided to ACN hereunder (a "**Magazine Article**"), to appear in SUCCESS Magazine (but not elsewhere except on the ACN Website as described below), no more than once or twice per calendar year, but which in any event shall not appear therein unless approved by Mr. Trump in his sole discretion in each instance and subject to the provisions of Section 6 below; Mr. Trump shall use commercially reasonable efforts to respond to requests for approval of a proposed Magazine Article within fourteen (14) business days of such request (subject to extension of one (1) day for each day during which Mr. Trump shall be traveling during such review period). Notwithstanding the foregoing, ACN shall also have the right during the Term to cause a Magazine Article to appear on the ACN Website, provided that (i) the Internal Website Requirements are met such that the Magazine Article appearing on the ACN Website shall only be accessible by ACN's personnel and ACN's IBOs and (ii) ACN obtains the prior written, signed permission for same from all parties holding the rights to the Magazine Article for such purposes. ACN may request similar replacement projects (i.e., similar to the magazine articles or inspirational notes described in this paragraph) that Mr. Trump shall have the right to approve in his sole discretion, provided that in the event of such approval details shall be negotiated in advance, and an amendment of this Agreement may be required if so determined by Mr. Trump. ACN may also request approval for quotes from Mr. Trump regarding his appearance at an Event or similar topics ("**Quotes**") for use on the ACN Website, subject to the Internal Website Requirements, provided that the topic, content and each specific use of any Quote shall be subject to approval at Mr. Trump's sole discretion and the other provisions of Section 6 below. ACN may make a single announcement on ACN's (i) corporate Twitter account and (ii) corporate Facebook page, respectively, regarding

**Confidential Treatment Pursuant to Protective Order**

Mr. Trump's upcoming appearance for each respective Event, subject to the prior approval of Mr. Trump, at his sole discretion, as to the content of each such announcement.

**5.** <u>Fee</u>. The fee for the services of Mr. Trump hereunder shall be FOUR MILLION FIVE HUNDRED THOUSAND UNITED STATES DOLLARS US$4,500,000 (the "**Fee**"), payable (in accordance with wire instructions to be provided by Mr. Trump which payment method may be changed from time to time by Mr. Trump in his sole discretion), as follows. For each Event at which Mr. Trump shall provide services pursuant to this Agreement, ACN will pay Mr. Trump an installment portion of the Fee equal to $450,000.00 (each an "**Event Installment**") (plus, for each Event outside of North America, the cost of two (2) first-class roundtrip airfare tickets (the "**Airfare Payment**")). The full amount of such Event Installment in respect of an Event shall be paid to Mr. Trump no later than ten (10) days prior to the scheduled commencement of the corresponding Event; and each applicable Airfare Payment shall be made within ten (10) days of request for such Airfare Payment. The obligation to pay the Fee hereunder and each Installment thereof shall be unconditional, regardless of whether or not ACN shall elect to receive the services hereunder in connection with the applicable Event (or otherwise), and regardless of whether or not ACN shall actually organize and/or stage any one or more of the Events contemplated hereunder. Without limiting the foregoing, in the event that in any calendar year no Event shall have been staged by ACN at which Mr. Trump shall have provided services hereunder (unless due to the fault of Mr. Trump in violation of his obligations under this Agreement), in such event ACN shall pay an Event Installment to Mr. Trump by no later than January 10 of the immediately following calendar year. In addition, within ten (10) days of the expiration of the Term, ACN shall pay Mr. Trump a sum equal to the difference between (i) $4,500,000.00 and (ii) the aggregate of all Event Installments (excluding any Airfare Payment) previously paid to Mr. Trump, which obligation shall survive expiration or termination of this Agreement.

**6.** <u>Trump Property; No Disparagement; Approval; Upon Expiration or Termination of this Agreement, Etc</u>. For avoidance of any doubt and except as otherwise expressly provided under this Agreement, ACN may not distribute (or encourage or permit any person or party to sell or distribute) anything containing Mr. Trump's name, image, likeness and/or voice (collectively "**Trump Property**"), including without limitation footage or photographs of Mr. Trump, any Inspirational Note or any Quote, or anything containing any of the foregoing. Notwithstanding anything to the contrary in this Agreement, any footage and/or photograph of Mr. Trump or other Trump Property, and the manner of their respective use in each instance, shall be subject to approval by Mr. Trump, in his sole discretion. Without limiting the foregoing, it is expressly understood that any of ACN's promotional material that references Mr. Trump or otherwise indicates his services contemplated under this Agreement shall be subject to Mr. Trump's approval in his sole discretion with respect to such reference and/or indication. Notwithstanding any use of Trump Property by ACN, including without limitation any reference to or inclusion of the name, likeness, image or voice of Mr. Trump in any material hereunder and/or any photograph or footage or any other use of Trump Property pursuant to this Agreement, Mr. Trump shall retain all right, title and interest to the Trump Property (including without limitation his name and the trademark "Trump"), and any goodwill generated by any such use. Except for the permission to use Trump Property expressly granted by the provisions of this Agreement during the Term, no rights of any kind in or to any of the Trump Property, including without limitation any goodwill symbolized or generated by the Trump Property or any such use, shall ever vest in ACN. Immediately upon the expiration or termination of this Agreement, ACN shall cease all distribution and use of video footage and photographs of Mr. Trump hereunder, the Inspirational Notes and Quotes, and otherwise any use of Trump Property, including without limitation on the ACN Website and any DVD, and, upon request, shall return or destroy all copies of any such footage and photographs of Mr. Trump and other Trump Property, and certify compliance therewith executed by an officer of ACN, which obligation shall survive any

termination or expiration of this Agreement. Notwithstanding anything to the contrary contained herein, ACN understands and agrees it shall not use any Trump Property, in any manner, (a) except as expressly provided under this Agreement, or (b) that expresses or implies a commercial tie-in, or (c) that would hold up to ridicule Mr. Trump or any of his family members or businesses that he or they own or control, directly or indirectly, or the affiliates of any such businesses (collectively the "**Trump Parties**"), or damage the name image or reputation of any of the Trump Parties.

7. <u>Indemnification</u>. ACN hereby agrees to indemnify, defend, and hold harmless the Trump Parties from and against any and all liabilities, claims, losses, causes of action (including without limitation under contract or tort) and reasonable out-of-pocket expenses, including, without limitation interest penalties, reasonable attorneys' fees and expenses and third party fees, and all amounts paid in investigation, defense/settlement of any claims, suit proceedings, judgments, losses, damages, costs liabilities and the like (individually and collectively) which may be incurred or paid by any of the Trump Parties arising in whole or in part, directly or indirectly, from ACN's (including any of its principals', owners', employees', officers', agents' and/or representatives') negligence or willful misconduct or action or omission in connection with or breach of this Agreement. ACN's indemnification obligations herein specifically exclude any claim to the extent caused by any act or omission of an IBO; however, ACN agrees to fully cooperate, at ACN's sole cost, with Mr. Trump in (a) any legal action taken against an IBO as a result of any act or omission of an IBO and (b) any efforts to remediate damage caused by any act or omission of an IBO.

8. <u>Insurance</u>. ACN shall at all times throughout the Term, at its sole cost, obtain and maintain insurance policies in accordance with the requirements shown on Exhibit A attached hereto. ACN shall simultaneously with the execution of this Agreement, and additionally again at least 30 (but no more than 60) days prior to each Event, deliver (to Rhona Graff, by email to rgaff@trumporg.com, or such other representative and/or email address as shall be designated by Mr. Trump from time to time, on behalf of Mr. Trump) an insurance certificate evidencing that ACN is in compliance with the foregoing insurance requirements, including without limitation that the parties indicated on Exhibit A as additional insured parties are additional insured parties under such policies. Between September 1, 2015 and September 30, 2015, the Parties hereby agree to revisit the insurance coverage to be obtained by ACN for the duration of the Term. In addition to the coverage set forth in Exhibit A, the parties shall discuss other coverage, including without limitation, Media Liability Insurance and Network Liability including Privacy Coverage (the "Additional Coverage"). If the Parties agree that ACN shall obtain Additional Coverage, then, in accordance with Section 15 herein, such agreement shall be codified through an amendment to the Agreement covering any applicable revisions to Exhibit A.

9. <u>Security</u>. ACN shall implement, at its expense, such security procedures and hire such security personnel as shall be reasonably required by Mr. Trump to safeguard and protect Mr. Trump from personal injury while at the Event. A security plan must be developed by ACN and approved by Mr. Trump in his sole discretion at least ten (10) days prior to the Event Date. All security procedures and personnel should be subject to Mr. Trump's or his representative's written approval.

10. <u>Exclusivity</u>. During the Term, Mr. Trump shall not provide "**Promotional Services**" (as defined below) directly to any party (except for ACN) having a party's Network/Multi-level Marketing Business. "**Network/Multi-level Marketing Business**" shall mean (a) the business of Amway, NUSkin, Shaklee, Avon, Herbalife or 5Linx (collectively, "**Prominent Network/Multi-level Marketing Companies**"), or (b) any business similar to the Prominent Network/Multi-level Marketing Companies, operated by a member of the Direct Selling Association, the sales of which business are solely (and are generally identified by the general public as being conducted solely) to individual retail customers on the basis of multi-

**Confidential Treatment Pursuant to Protective Order**

level, network direct marketing, by which such business's sales force are each an independent contractor compensated not only for sales directly generated by such salesperson, but also, on a "multi-tiered" compensation basis, for the "downline" sales generated either by (x) another salesperson directly recruited by the first such salesperson, or (y) another salesperson deemed to have been indirectly recruited by the first such salesperson due to direct recruitment performed by another salesperson who is directly or indirectly "downline" from the first such salesperson. The terms **"multi-tiered"** and **"downline"** shall have the meanings generally used as of the date hereof for such terms by the Direct Selling Association's members. For avoidance of any doubt, none of the following shall be deemed a Network/Multi-level Marketing Business: The business of sales in physical or "brick and mortar" retail stores or other sales outlets, wholesale sales or sales to retail outlets (unless, in the case of any such retail or wholesale sales in physical brick and mortar outlets in the continent of Asia, such sales are conducted in brick and mortar venues, by a business that would otherwise qualify as a Network/Multi-level Marketing Business, solely to comply with government regulations requiring Network Marketing Businesses to conduct retail and/or wholesale sales (as the case may be) in physical, brick and mortar outlets therein). Without limiting the generality of the foregoing, and solely for the avoidance of any doubt and without limitation, (x) nothing in this Agreement shall prohibit Mr. Trump from (i) appearing in (or otherwise being associated with, benefitting economically from or entering or into agreements in respect of) the news, information and/or entertainment portion of any film, TV show, live event and/or other program regardless of any underwriting sponsorships or commercial tie-ins, including without limitation the television program "The Apprentice" or any promotional campaign in respect thereof, notwithstanding that any of the foregoing (including without limitation its promotional campaign) advertises, promotes and/or markets various goods, products and/or services that may include a Networking Marketing Business; and Mr. Trump shall expressly be permitted to appear on any of the foregoing (including without limitation The Apprentice) and its promotional campaign as an observer, advisor, judge, assessor or in any other capacity and including without limitation projects featuring or otherwise connected with competitive tasks or other segments, whether or not any such program, segment, campaign or advertisement constitutes, directly or indirectly, an advertisement, promotion, or marketing of one or more Network/Multi-level Marketing Businesses, and (y) nothing in this Agreement shall prohibit any hotel, golf property or other property or business owned directly or indirectly by Mr. Trump or associated with the name Trump (each a **"Trump Location"**), to engage in business dealings with any Network/Multi-level Marketing Business or any Network/Multi-level Marketing Business Party (as defined below), including without limitation for any party, event, conference or outing concerning a Network/Multi-level Marketing Business (or that is organized by a Network/Multi-level Marketing Business or by any Network/Multi-level Marketing Business Party), that may take place at the premises of a Trump Location (and such parties, events, conferences and outings shall expressly be permitted to take place thereat); nor shall anything in this Agreement prohibit Mr. Trump (or any entity that owns or controls any such business or property even if owned or controlled by Mr. Trump) from entering into any agreement for any of same. **"Promotional Services"** shall mean (i) motivational speeches, which are similar to Mr. Trump's speeches under this Agreement, conveyed at personal appearances to live audiences of Network/Multi-level Marketing Business salespeople (other than ACN's IBOs), or (ii) paid personal endorsements of a Network/Multi-level Marketing Business (other than ACN) expressed before a live audience of the salespeople of such Network/Militia-level Marketing Business or (iii) paid personal endorsements of a Network/Multi-level Marketing Business (other than ACN) that Mr. Trump causes to be circulated by social media or to appear on the Internet, which are similar to the services provided by Mr. Trump under this Agreement and are to motivate the sales force of such Network/Multi-level Marketing Business. **"Network/Multi-level Marketing Business Party"** shall mean any company or other party or group that owns, controls, operates or is otherwise involved in a Network/Multi-level Marketing Business. The provisions of this Section 10 shall collectively be referred to as the **"Exclusivity Restrictions"**.

**Confidential Treatment Pursuant to Protective Order**

**11.** Brokers. ACN acknowledges that ACN has engaged Dolphin Media Group, and/or Anne Archer (collectively "**Archer**") as a broker to facilitate the relationship and transactions that are the subject matter of this Agreement. Each Party (the "**Indemnifying Party**") represents and warrants to the other Party that, except for ACN's foregoing engagement of Archer, the Indemnifying Party has not dealt with any broker with respect to the subject matter of this Agreement, and such Indemnifying Party agrees to indemnify and hold the other Party harmless from and against any claim for any brokerage or other commission or finder's fee or other compensation (collectively any of the foregoing a "**Broker Fee**") made by any person or entity claiming to have acted on the behalf of such Indemnifying Party in connection therewith, including without limitation for all costs and expenses in connection with same (including without limitation attorney fees). Without limiting the generality of the foregoing, ACN agrees that ACN is solely responsible for any Broker Fee payable to Archer, if any, and shall indemnify Mr. Trump for any claim for any Broker Fee by Archer, including without limitation for all costs and expenses in connection with any such claim (including without limitation attorney fees). The obligations set forth in this paragraph shall survive the expiration or earlier termination of this Agreement.

**12.** Notices. (a) Each notice required or permitted to be given hereunder or in connection with the subject matter hereof, (expressly excluding, however, Ordinary Course Communications (as defined below), must be given in writing and delivered (i) personally or (ii) by a nationally recognized courier, or (iii) sent by prepaid certified mail, return receipt requested; or (iv) transmitted via email to the Party (provided that another copy is within two (2) business days sent as provided in subsection (ii) or (iii) of this Section 12(a)), as follows:

**If to ACN :**

| | |
|---|---|
| Address: | ACN, Inc. |
| | 1000 Progress Place |
| | Concord, NC 28025 |
| Attention: | Robert Stevanovski, Chairman and Co-Founder |
| | |
| Email. | robert@acninc.com |

with a copy simultaneously sent to:

| | |
|---|---|
| Address: | Dolphin Media Group |
| | 111 Spartina Court, Mooresville, NC 28117 |
| Attention: | Anne Archer, Vice President |
| Email: | Dolphinent@aol.com |

**If to Mr. Trump:**

| | |
|---|---|
| Address: | The Trump Organization LLC, 725 Fifth Avenue, New York, NY, 10022 |
| Attention: | Donald J. Trump, President |
| Email: | rgraff@trumporg.com |

with a copy simultaneously sent to:

| | |
|---|---|
| Address: | The Trump Organization LLC, 725 Fifth Avenue, New York, NY, 10022 |
| | 25th floor |
| Attention: | Jason Greenblatt, EVP & General Counsel |
| Email: | jgreenblatt@trumporg.com |

**Confidential Treatment Pursuant to Protective Order**

or to any other address, email address or person that a Party designates in the manner above-provided. Any notice shall be deemed to have been given when actually received, if received before 5:00 p.m. on a business day, but will be deemed to have been given on the next business day if received after 5:00 p.m. on a business day.

(b) Ordinary Course Communications may be delivered by email. "**Ordinary Course Communications**" shall mean communications between the Parties conveyed in the ordinary course of carrying on the relationship hereunder, including without limitation communications requesting or granting consent or approval pursuant to this Agreement. Archer shall be deemed a representative of ACN for purposes of Ordinary Course Communications, until such time, if any, as ACN shall in accordance with Section 12(a) hereof notify Mr. Trump that Archer is no longer a representative of ACN for such purposes.

13. <u>Default</u>. Either party may terminate this Agreement, in writing delivered to the other party, in the event that the other party hereto shall have materially breached a provision of this Agreement and such breach is not cured within ten (10) business days of written notice of such breach. Without limiting the generality of the foregoing, in addition to events of default by ACN in respect of the other provisions of this Agreement, and without waiving any right or remedy available to Trump, Trump shall have the additional right to terminate this Agreement in the event that ACN does any of the following:

> (a)  fails to timely make any payment due to Mr. Trump hereunder when the same is due and shall fail to cure such failure after ten (10) business days (but in all events prior to commencement of the applicable Event in respect of which an Installment for payment is due); or

> (b)  breaches any of the provisions of this Agreement prohibiting ACN from directly or indirectly assigning, transferring, sublicensing or otherwise encumbering this Agreement, or

> (c)  files a petition in bankruptcy or is adjudicated as bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or if ACN discontinues its business, or if a receiver is appointed for ACN or for ACN's business and such receiver is not discharged within the earlier to occur of (i) thirty (30) days thereafter or (ii) ten (10) days preceding an Event; or

> (d)  fails to obtain or maintain insurance as required by the provisions of this Agreement after the earlier of (i) five (5) business days notice to ACN, or (ii) five (5) business days preceding the commencement of any Event.

In the event that ACN terminates this Agreement in accordance with this paragraph for Mr. Trump's breach, ACN shall pay Mr. Trump that portion of the Fee for Events for which Mr. Trump shall have provided services hereunder, to the extent not previously paid, which obligation shall survive such termination. In the event that Mr. Trump terminates this Agreement in accordance with this paragraph for ACN's breach, the full unpaid portion of the Fee shall be payable by ACN, no later than ten (10) business days following the effective date of such termination, which obligation shall survive such termination.

14. <u>Entire Agreement; Existing Agreement</u>. This Agreement represents the entire agreement between the Parties with respect to the appearances and other services and activities

**Confidential Treatment Pursuant to Protective Order**

described above for the Term of this Agreement, and supersedes all previous agreements, whether written or oral, between the Parties concerning same. Notwithstanding the foregoing, (i) the Parties acknowledge that they have entered into an agreement dated January 14, 2011 (the "**Existing Agreement**") pursuant to which the parties agreed that Mr. Trump shall provide certain services described therein during the term of such Existing Agreement, for the fee described therein, all on the terms thereof, and (ii) the Parties agree that this Agreement is not intended to amend, modify or supersede the Existing Agreement, and that all of the terms of the Existing Agreement shall remain in full force and effect in respect of the services to be provided thereunder.

**15.** <u>Amendment</u>. This Agreement may be amended or altered only in writing, signed by both parties.

**16.** <u>Governing Law; Venue</u>. This Agreement is governed by the laws of the State of New York (without giving effect to New York's principles of conflicts of laws.) The State or Federal courts located in the City of New York in New York State shall have exclusive jurisdiction over any suit, action or proceeding arising out of or relating to this Agreement, provided that injunctive relief may be sought in any court located anywhere having jurisdiction.

**17.** <u>Representation of Authority, Etc</u>. ACN represents that it is a corporation organized under the laws of the State of Michigan and that it is fully authorized (including without limitation that it has obtained all corporation and similar authority necessary) to enter into and satisfy its obligations under this Agreement. The individual executing this Agreement on behalf of ACN, by so doing represents and warrants that he is fully authorized to so sign on behalf of ACN.

**18.** <u>Assignment</u>. Neither Party shall have the right to assign any rights or obligations under this Agreement to any other person or party, without the prior written consent of the other Party, which may be given or withheld in such other Party's sole discretion. A change of control of ACN shall be deemed an assignment by ACN of this Agreement. A "change of control of ACN" shall include without limitation a change in the ownership of a majority of the direct or indirect ownership or voting interests in ACN, or a change in the ability to control or direct the day to day or other operations of ACN.

**19.** <u>Independent Contractors</u>. In giving effect to this Agreement, no Party is or can or shall be deemed to be an agent or employee of another Party for any purpose. The relationship between the Parties will be and is that of, independent contractors. Nothing in this Agreement constitutes a partnership or a joint venture between the Parties, and neither Party has the right to enter into contracts or pledge the credit of or incur expenses or liabilities on behalf of the other Party.

**20.** <u>Drafting for Convenience; Sophisticated Parties</u>. To the extent this Agreement may have been drafted by either of the Parties or a representative thereof, the Parties agree that such drafting was as a convenience to the Parties only and shall not, by reason of such action, be construed against such Party. Each party acknowledges and agrees that it has had full opportunity to review this Agreement and has had access to counsel of its choice to the extent necessary to interpret its legal effect; and the Parties acknowledge and agree that (i) each Party is a sophisticated party with significant experience in the matters contemplated by this Agreement and (ii) each Party has had the opportunity to consult with and be advised by counsel in all applicable jurisdictions and has had the opportunity to make whatever investigation or inquiry each may have deemed necessary or desirable in connection with the subject matter of this Agreement prior to its execution. Each Party waives any claims that may be available at law or in equity to the effect that they did not have the opportunity to so consult with counsel.

**Confidential Treatment Pursuant to Protective Order**